IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DONALD MICHAEL OUTLAW, **Plaintiff,** v. CITY OF PHILADELPHIA, et al., **Defendants.** | Civil Action No. 21-1290 |

## PROPOSED ORDER

Upon consideration of Defendants' Motion for Sanctions Against Plaintiff Donald Michael Outlaw, and any response or reply thereto, it is **HEREBY ORDERED** that the Motion is **GRANTED**. It is **FURTHER ORDERED** that Defendants are entitled to a sanction that an adverse inference be granted in their favor and against Plaintiff as to the documents that were the subject of Defendants' Motion.

BY THE COURT:

_____

**CHAD F. KENNEY, J.**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DONALD MICHAEL OUTLAW,** : | |
| Plaintiff, : | |
| : | Civil Action |
| v. : | No. 21-1290 |
| : | |
| **CITY OF PHILADELPHIA, et al.,** : | |
| Defendants. : | |

## DEFENDANTS' MOTION FOR SANCTIONS AGAINST PLAINTIFF DONALD MICHAEL OUTLAW

Defendants the City of Philadelphia, Howard Peterman, and Jeffrey Piree (collectively, "Defendants") hereby file this Motion for Sanctions Against Plaintiff Donald Michael Outlaw based on his spoliation of evidence. In support of this Motion, Defendants incorporate the attached Memorandum of Law. Defendants respectfully request that the Court grant Defendants' Motion and impose the requested sanction of an adverse inference based on the destruction of documents.

Date: August 15, 2022

Respectfully submitted,

*/s/ Danielle B. Rosenthal*
Danielle B. Rosenthal
Deputy City Solicitor
PA Bar No. 329676
City of Philadelphia Law Department
1515 Arch Street, 14th Floor
Philadelphia, PA 19102
(215) 683-5448
danielle.rosenthal@phila.gov

*/s/ Katelyn Mays*
Katelyn Mays
Assistant City Solicitor
Pa. Attorney ID No. 324246
City of Philadelphia Law Department

=

1515 Arch Street, 14th Floor
Philadelphia, PA 19102
(215) 683-5434
katelyn.mays@phila.gov

=

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DONALD MICHAEL OUTLAW, : | |
|               Plaintiff, : | |
| : | Civil Action |
| v. : | No. 21-1290 |
| : | |
| CITY OF PHILADELPHIA, et al., : | |
|               Defendants. : | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SANCTIONS AGAINST PLAINTIFF DONALD MICHAEL OUTLAW**

Defendants the City of Philadelphia, Howard Peterman, and Jeffrey Piree (collectively, "Defendants"), respectfully submit this memorandum of law in support of their Motion for Sanctions Against Plaintiff Donald Michael Outlaw based on the spoliation of evidence.

**FACTUAL BACKGROUND**

**A.     Timeline Related to Outlaw's Planning of a Civil Lawsuit.**

As early as 2017, Mr. Outlaw planned to file a lawsuit should he prevail in his efforts to have his conviction overturned. Mr. Outlaw discussed these plans repeatedly and unmistakably during recorded jail conversations. A mere handful of the plethora of calls are illustrated below:

| Exhibit | Date | Start | Relevant Substance |
|---|---|---|---|
| D | 5/31/18 | 20:02:42 | Outlaw tells his sister, Shanita Starr, that he's "about to be a millionaire, explaining "to cut a long story short," if he prevails in obtaining post-conviction relief, he's "going to sue the breaks off of them" and that he will "get [her] the BMW and a new house." |
| E | 6/21/18 | 13:58:05 | Outlaw notes that he plans to "sue the shit out of them for wrongfully convicting me." |
| F | 6/28/18 | 09:00:40 | Outlaw tells his sister that one of his lawyers is trying to get him a deal," but he would "rather his innocence prevail so he can sue and be rich." |
| G | 7/9/18 | 09:00:47 | In speaking about his criminal case and a potential deal, Outlaw says to an unidentified female that he "doesn't know |

1

| | | | |
|---|---|---|---|
| | | | if [he] should tap out just so he can go home, or wait and then be able to sue." |
| H | 9/6/18 | 10:14:29 | Outlaw tells his sister that "[w]hen I was at trial I was offered 12 and a half to 25 but I didn't take it and I got life... Now I don't see me losing the case and that's if I want to fight. My lawyer said they might just dismiss this shit because they got court with full of evidence and I can sue them for that." |

B.   **The Initiation of this Lawsuit and Defendants' Discovery Requests**

On January 29, 2019, the Philadelphia Court of Common Pleas granted Mr. Outlaw's petition for post-conviction relief, overturning his murder conviction. Compl. ¶ 30, ECF No. 1. On August 1, 2019, Mr. Outlaw was released from prison. *Id.* ¶ 31. Then, on December 29, 2020, the Philadelphia Court of Common Pleas granted the District Attorney's Motion for *Nolle Prosequi* Pursuant to Pa. R. Crim. P. 585(a), dated December 15, 2020. *Id.* ¶¶ 32–32. Very soon thereafter, on March 17, 2021, Mr. Outlaw filed the instant civil suit in the U.S. District Court for the Eastern District of Pennsylvania.

On February 16, 2022, Defendants served their First Set of Requests for Production Directed Towards Plaintiff Donald Michael Outlaw ("First Set of RFPs"). *See* ECF No. 77-2. Among the documents requested were the following basic documents plainly relevant to the claims and defenses in the case:

- RFP No. 3: All documents (other than those available to download and view on a public docket or those that have been already produced in this action) that have been filed with or otherwise submitted to any court, whether formally or informally, in connection with the case of *Commonwealth v. Outlaw*.

- RFP No. 22: All documents that reflect or refer to any communications between any of your criminal defense attorneys, on the one hand, and Monique Soloman-Outlaw [sic], on the other, relating to the case of *Commonwealth v. Outlaw*.

*See id.*

2

In addition, nine additional of Defendants' requests (RFPs 39–41, 44–49) sought documents reflecting or referring to communications between Plaintiff or anyone acting on his behalf, on the one hand, and Charles Paladino, Ruth Mills, Katima Jackson, Eric Lee, Derrick Alston, Wesley Harmon, Chris Holder, Lamar Rodgers, Jamal Kelly, and immediate family members of Jamal Kelly, on the other. *See id.* And nine more requests (RFPs 23–25, 28–33) sought documents concerning payments of money or goods made to/from Mr. Outlaw or anyone acting on his behalf and these same individuals.[1] *See id.* In a chart filed with the Court on June 6, 2022, as to the status of his production, Mr. Outlaw certified that he had conducted a diligent search for each of these categories of documents and produced all responsive documents. *See* ECF No. 89.

Although at times in his own production, Mr. Outlaw included documents prepared, authored, or sent to third parties by his wife – indicating a large blurring of boundaries between the two – on April 26, 2022, Defendants also separately served a subpoena for documents on Mr. Outlaw's wife, Ms. Monique Solomon-Outlaw. (**Exhibit A**). As Ms. Solomon-Outlaw testified during her deposition, she has significant legal training and experience, having been employed as a paralegal since August of 2012 and having undertaken a yearlong course to obtain a paralegal certification. Solomon-Outlaw Dep. Tr. at 49:14-49:21, 52:9-52:17 (**Exhibit B**).

Defendants' subpoena requested that Ms. Monique Solomon-Outlaw produce *inter alia* the following categories of documents:

- All communications to or from you, on the one hand, and any of the following individuals, on the other: (a) Charles Paladino; (b) Lamar Rodgers; (c) Eric Lee; (d) Yusef Brown; (e) Wesley Harmon; (f) Derrick Allston; (g) Christopher Holder; (h)

---

[1] With the exception of Ruth Mills (Mr. Paladino's deceased mother) and Jamal Kelly (the decedent), each of these witnesses either testified on Mr. Outlaw's behalf during his post-conviction proceedings or purportedly submitted affidavits attesting to Mr. Outlaw's innocence or to police misconduct.

  Lemuel Barr/Bar; (i) Marie Rodgers; (j) Nicole Clark; (k) Yashon Williams; (1) Jibrail Jones; (m) Saniyaah Williams; (n) Keith Rodgers; (o) Kevin Rodgers; (p) Brenda Rodgers; and ( q) Katima Jackson.

- All communications to or from you and Mr. Outlaw's criminal defense attorneys (including his trial level, appellate, and post-conviction attorneys) about the case of *Commonwealth of Pennsylvania v. Donald Outlaw*, Docket No. CP-51-CR-1101321-2003.

- All documents reflecting any form of payment or goods, either directly or indirectly, between you, on the one hand, and any of the following individuals, on the other hand: (a) Charles Paladino; (b) Lamar Rodgers; (c) Eric Lee; (d) Yusef Brown; (e) Wesley Harmon; (f) Derrick Allston; (g) Christopher Holder; (h) Lemuel Barr/Bar; (i) Marie Rodgers; (j) Nicole Clark; (k) Yashon Williams; (1) Jibrail Jones; (m) Saniyaah Williams; (n) Keith Rodgers; (o) Kevin Rodgers; (p) Brenda Rodgers; and (q) Katima Jackson. Please note that this request is intended to also include any pseudonyms used by these individuals, so long as you understand those pseudonyms to be synonymous with the names referenced.

- All communications reflecting your efforts to obtain legal records on behalf of Mr. Outlaw from his former or current criminal defense attorneys for use in the instant civil suit or in the underlying case of *Commonwealth of Pennsylvania v. Donald Outlaw*.

- All records obtained from Mr. Outlaw's criminal defense attorneys who currently represent him or formerly represented him in the case of *Commonwealth of Pennsylvania v. Outlaw*.

- All of Mr. Outlaw's legal records that you currently have in your possession, provided that the records pertain to the case of *Commonwealth of Pennsylvania v. Outlaw*.

Subpoena at 5–6 (**Exhibit A**). Neither Ms. Monique Solomon-Outlaw nor her husband objected to any portion of the subpoena that was served.

C. **The Destruction and Failure to Preserve Relevant Evidence.**

  At the close of the fact discovery period in this case, after having engaged in motions practice and countless meet-and-confers and served a significant number of third-party subpoenas to track down documents, Defendants have come to learn that Mr. Outlaw and his wife are responsible for destroying and/or failing to take reasonable steps to preserve a multitude of significant documents that speak directly to the claims and defenses in this case. The most

significant categories of these documents include the entire collection of hard-copy paperwork and legal documents obtained by Mr. Outlaw and his wife in Mr. Outlaw's over 15-year-effort to obtain post-conviction relief and an unquantifiable number of letters, emails, and text messages to/from Mr. and Mrs. Outlaw and key witnesses in the case, including those reflecting and/or discussing payments of money.

Late last month, Defense counsel deposed Ms. Solomon-Outlaw. During the deposition, Defendants learned for the first time why their efforts to obtain responsive documents over the last several months had largely been in vain – Ms. Solomon-Outlaw set boxes of documents pertaining to Mr. Outlaw's criminal case on fire, destroying them, after the Philadelphia Court of Common Pleas granted the District Attorney's Motion for *Nolle Prosequi* Pursuant to Pa. R. Crim. P. 585(a), dated December 15, 2020.

When questioned about searching for relevant paperwork, Ms. Solomon-Outlaw testified:

| | |
|---|---|
| Q. | When was the last time you had paperwork in your house pertaining to the case? |
| A. | When his case was I want to say dismissed, if that was the -- it was dismissed. |
| Q. | When it was nolle prossed? |
| A. | Yes. |
| Q. | And how much paperwork did you have? |
| A. | I mean, it wasn't like, I can't give you a page number, but it was definitely a lot of documents. |
| | . . . . |
| Q. | And what did you do with those when the case was nolle prossed? |
| A. | I don't want to say like we had a celebration and got rid of everything, but it's kind of like when his case was dismissed it was a celebration and |

> I didn't need those documents anymore, so it was something that I was glad to get rid of.
>
> Q.   So how did you dispose of them?
>
> A.   I don't want to say that, like, I burned them or anything like that but --
>
> Q.   Well, it's not a matter of what you don't or do want to say. Just I'm asking for what the truth is. Did you burn them?
>
> A.   Yes, I did.

Solomon-Outlaw Dep. Tr. at 98:22–99:10, 99:19–100:14 (**Exhibit B**). When asked when she destroyed the documents, Ms. Solomon-Outlaw testified that, although she does not recall the date that she burned the documents, she did so "shortly after his case was dismissed." *Id.* at 101:11–101:14.

During the deposition, counsel for Defendants also asked Ms. Solomon-Outlaw about a significant quantity of written correspondence that is believed to have been once in existence based on the productions of the Pennsylvania Department of Corrections and tape-recorded jail conversations. When asked about the possession of written correspondence, Ms. Solomon-Outlaw testified:

> Q.   I believe if I understood your testimony correctly, you seemed to say that you have exchanged mail with [Mr. Paladino]."
>
> A.   I don't, like, have any letters to give you other than what I've already produced.
>
> Q.   Okay. So did you search for any hard copy letters or are you confident that they are no longer in your possession?
>
> A.   I'm confident that they're no longer in my possession.
>
> Q.   Okay. So at one point you did possess such letters?
>
> A.   Yes, I did have mail.
>
> Q.   And what happened to those letters?

| | |
|---|---|
| A. | I got rid of them. Like, I don't keep mail. Like, once I read it, I'm done with it. I didn't have a reason to keep it. |
| Q. | Okay. So you threw it away? |
| A. | Correct. |

*Id*. at 79:10–80:07. As a result of Ms. Solomon-Outlaw's destruction of evidence, Defendants are without – and have no way of recovering – this significant evidence. For instance, although the Pennsylvania Department of Corrections had scanned copies of letters that Ms. Solomon-Outlaw had written to Mr. Paladino and sent to him in prison dating back to 2018, which is how Defendants first learned lats month of the written communications' existence in the first instance, they do not have any scanned mail prior to that date, and they neither logged nor scanned any of Mr. Paladino's outgoing correspondence. Defendants also lack original copies of correspondence and affidavits despite significant concerns as to alteration and falsification.

**LEGAL STANDARD**

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Paramount Pictures Corp. v. Davis*, 234 F.R.D. 102, 110 (E.D. Pa. 2005). Rule 37(e) provides that spoliation occurs where "that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). "Spoliation occurs where: the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and, the duty to preserve the evidence was reasonably foreseeable to the party." *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012).

If a court finds that spoliation occurred, it must then determine what sanction to impose. Sanctions for the spoliation are governed by Rule 37(e) of the Federal Rules of Civil Procedure. *Bistrian v. Levi*, 448 F. Supp. 3d 454, 467 (E.D. Pa. 2020). "If a party 'acted with intent to deprive another party of the information's use in the litigation,' the district court may draw an adverse inference or even impose case-dispositive sanctions." *Id.* (quoting Fed. R. Civ. P. 37(e)(2)). In the absence of bad faith, however, "a court may impose a range of lesser sanctions if the loss of the information prejudiced another party." *Id.* (citing Fed. R. Civ. P. 37(e)(1)). In addition, the Third Circuit has set out three factors that a court must consider in contemplating Rule 37(e) spoliation sanctions:

> (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party, and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.

*GN Netcom, Inc. v. Plantronics, Inc.*, 930 F.3d 76 (3d Cir. 2019); *see also Bistrian*, 448 F. Supp. 3d at 466 (noting that the GN Netcom factors are still applicable to motions governed by a 2015 amendment to Rule 37(e)).

## ARGUMENT

**A.    Mr. Outlaw Satisfies Each of the Four Prongs of the Spoliation Inquiry.**

### 1.    The Duty To Preserve Evidence Was Reasonably Foreseeable.

"The duty to preserve arises no later than when a lawsuit is filed but may be triggered earlier than the filing of the complaint depending on the particular circumstances." *Bistrian*, 448 F. Supp. 3d at 468. "When a party argues that spoliation occurred before the complaint was filed, the court must conduct a fact-sensitive inquiry to determine at what point the spoliating party reasonably should have anticipated the litigation." *See id.*

As indicated above, here Mr. Outlaw anticipated filing civil litigation as early as at least 2018, prior to his conviction being overturned. There are numerous examples of Mr. Outlaw discussing on tape-recorded jail calls his plan to sue the City should he prevail in obtaining post-conviction relief. Accordingly, litigation was foreseeable – and Mr. Outlaw had a duty to preserve relevant evidence – at least by 2018.

Even were the Court to set aside this factual record, Mr. Outlaw's preservation obligation still would have been undisputedly triggered by the decision of the Court of Common Pleas to grant Mr. Outlaw post-conviction relief. For instance, in a similar alleged wrongful conviction case where the plaintiff Debra Jean Milke destroyed documents after release, the court held that, even "[a]dopting a very generous and favorable view to Milke," Milke's duty to preserve documents was triggered at the latest when the U.S. Court of Appeals for the Ninth Circuit overturned the conviction in Milke's case. *Milke v. City of Phoenix*, 497 F. Supp. 3d 442, 464 (D. Ariz. 2020), *aff'd*, No. 20-17210, 2022 WL 259937 (9th Cir. Jan. 27, 2022). "As of the date of the Ninth Circuit's decision," the court noted, "a reasonable person would have known litigation was likely," thus triggering the preservation obligation. *Id.*

So too here. Even adopting a very generous and favorable view towards Mr. Outlaw, his preservation obligation would have been triggered no later than on January 29, 2019, which is the date that the Philadelphia Court of Common Pleas granted Mr. Outlaw's petition for post-conviction relief, overturning his conviction.

### 2. The Spoliated Evidence Was in Plaintiff's Control.

The second prong of the spoliation inquiry looks at whether the missing evidence was in the non-movant's control. *Bull*, 665 F.3d at 73. In conducting this inquiry, "courts have extended the affirmative duty to preserve evidence to instances when that evidence is not directly within

9

the party's custody or control so long as the party has access to or indirect control over such evidence." *World Courier v. Barone*, No. C 06-3072 TEH, 2007 WL 1119196, at *1 (N.D. Cal. Apr. 16, 2007). Here, prior to their destruction, all of the spoliated evidence was not only in the control – but actual possession – of Mr. Outlaw and his wife, who were cohabitating at the time of the document destruction.

      Further, that Mr. Outlaw's wife testified that she was the one who destroyed certain documents is of no consequence to the analysis and that the documents were in Mr. Outlaw's control prior to the documents' destruction. Courts have routinely found this element of the analysis to the met, even where documents are destroyed by a spouse rather than a party to the litigation. *See, e.g.*, *World Courier v. Barone*, No. C 06-3072 TEH, 2007 WL 1119196, at *1 (N.D. Cal. Apr. 16, 2007) ("[W]hile Jay Barone destroyed the hard drive, Defendant Doneen Barone was in regular contact with her husband about this matter during the relevant time period and the hard drive was kept at the Barone residence. Indeed, it is difficult to imagine a scenario in which a husband would secretly create a copy of, and subsequently destroy, a hard drive relating to his spouse's pending legal matters and professional career without any knowledge, support or involvement of his wife. As such, Defendant Barone at least had access to or maintained indirect control over the hard drive, and therefore she had an affirmative duty to preserve it.").

      In addition, even beyond the practical reality that documents maintained within Mr. Outlaw's *own* residence pertaining to his *own* criminal case were within Mr. Outlaw's control, it is evident from the factual record in this matter that in managing Mr. Outlaw's legal documents and affairs, Ms. Solomon-Outlaw was acting in the capacity of Mr. Outlaw's agent. *Dykes v. BNSF Ry. Co.*, No. C17-1549-JCC, 2019 WL 1128521, at *6 (W.D. Wash. Mar. 12, 2019) ("It is

10

not uncommon for courts to hold principals liable for spoliation committed by their agents."); *State Farm Fire & Cas. Co. v. Steffen*, No. CV 09-4965, 2013 WL 12308502, at *4 n.8 (E.D. Pa. Mar. 14, 2013) ("It appears that a spoliation inquiry is not limited solely to an analysis of the party's actions but also to its agents and those acting at the party's behest.").

Here, Mr. Outlaw testified under oath during his deposition that he has formally given his wife "power of attorney," and that she is legally empowered to "make decisions on [his] behalf."[2] Outlaw Dep. Tr. at 45:7–45:12, 45:21–45:23, 46:6–46:11 (**Exhibit C**). According to Mr. Outlaw, such formal arrangement has been in effect since prior to Mr. Outlaw's release from incarceration. *Id.* at 46:6-46:11. Indeed, at numerous points during Mr. Outlaw's deposition, he repeatedly disclaimed any responsibility for managing his own legal affairs and documents, putting the onus on his wife. *See, e.g.*, *id.* at 30:1–30:22 (testifying that he relied on his wife to search for and produce documents responsive to requests for production of documents served on him in this litigation); *id.* at 40:5–41:14 (same); *id.* at 36:3–36:11 (testifying that he would have to ask his wife for his own phone number and could not provide it on his own); *id.* at 30:20–30:23 (testifying that he could not attest to his own email or email addresses because his wife handles all of that). Mr. Outlaw cannot have it both ways – invoking his wife's handling of his affairs when it suits him and disclaiming reliance on her when it does not.

3. **The Evidence Has Been Actually Suppressed or Withheld.**

The third prong of the spoliation inquiry is whether the evidence has been actually suppressed or withheld. *Bull*, 665 F.3d at 73. Here, there is little need to examine this prong where Defendants' wife has conceded that she threw away and set fire to evidence. Further,

---

[2] Indeed, according to Mr. Outlaw's admittedly incredulous testimony, he relies on his wife to such an extent that she files tax returns on his behalf without consulting him and even signs such documents his behalf using his name. *Id.*

11

while Ms. Solomon-Outlaw may claim that copies of all documents were provided to Mr. Outlaw's PCRA counsel, Mr. Ed Foster, this assertion is belied by the fact that Defendants subpoenaed Mr. Foster and examined his files, yet large quantities of originals and copies of documents remain unaccounted for.

### 4. The Spoliated Evidence Was Relevant to the Claims and Defenses.

The final prong of the spoliation inquiry is whether the destroyed evidence was relevant to the plaintiff's claims. *Bull*, 665 F.3d at 73. Here, the spoliated evidence includes all of the underlying papers and filings in Mr. Outlaw's criminal case and original copies of affidavits and letters, including those on which Mr. Outlaw relied in obtaining the reversal and/or *nolle prose* of his conviction; an unknown quantity of communications with key witnesses.

The answer as to relevancy is therefore undoubtedly, yes. *See United States v. Abel*, 469 U.S. 45, 52 (1984) (witness bias is almost always relevant and provable by extrinsic evidence, in contrast to less favored forms of impeachment); *Aetna Inc. v. Mednax, Inc.*, No. 18-CV-02217-WB, 2019 WL 6250850, at *6 (E.D. Pa. Nov. 22, 2019) ("Witness credibility, and payments or other consideration offered to witnesses, are 'relevant.'"); *Milke*, 497 F. Supp. 3d at 469 ("Over the years, Milke has repeatedly recounted the crucial events in written statements. Defendants were entitled to all of those statements as they would be critical for establishing whether Milke's version of events has varied over time." (footnote omitted)). Accordingly, the third prong required for a spoliation finding is also met.

### B. The Court Should Impose Strong Sanctions Against Mr. Outlaw.

Because Mr. Outlaw has spoliated evidence, the Court can—and should—impose sanctions against him. Spoliation sanctions serve multiple functions: they "serve a remedial function by leveling the playing field or restoring the prejudiced party to the position it would

have been without spoliation," "a punitive function[] by punishing the spoliator for its actions," and "'a deterrent function'" by sending a message to litigants that certain conduct will not be tolerated and will be dealt with appropriately by the Court. *E.E.O.C. v. Smokin' Joe's Tobacco Shop, Inc.*, No. CIV.A. 06-01758, 2007 WL 1258132, at *13 (E.D. Pa. Apr. 27, 2007) (quoting *MOSAID Techs. Inc. v. Samsung Elecs. Co.*, 348 F. Supp. 2d 332, 335 (D.N.J. 2004)). "Appropriate sanctions for spoliation include dismissal of claims, suppression of evidence, an adverse inference, fines, and attorneys' fees and costs." *Patel v. Havana Bar, Rest. & Catering*, No. CIV.A. 10-1383, 2011 WL 6029983, at *5 (E.D. Pa. Dec. 5, 2011)

"To determine which spoliation sanction is appropriate, courts in this Circuit consider: (1) the spoliator's degree of fault and personal responsibility; (2) the prejudice suffered by the opposing party; and (3) the availability of a lesser sanction that will avoid substantial unfairness to the opposing party and, if necessary, deter future spoliation." *Pa. Tr. Co. v. Dorel Juv. Grp., Inc.*, No. CIV.A. 07-4029, 2011 WL 2789336, at *5 (E.D. Pa. July 18, 2011). Here, the Court should determine that Mr. Outlaw bears all responsibility for the spoliated evidence, that Defendants have and will continue to suffer substantial prejudice, and only aggressive sanctions will sufficiently serve the remedial, punitive, and deterrent functions of such sanctions.

1. **Degree of Fault and Personal Responsibility.**

In assessing the spoliator's degree of fault and personal responsibility, courts distinguish between the intentional destruction of evidence and instances where "the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for." *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 334 (3d Cir. 1995). Unlike where documents have been accidentally destroyed, the intentional spoliation or

13

destruction of evidence gives rise to "a presumption" of "fraud and a desire to suppress the truth." *Id.* (quoting 29 Am. Jur. 2d Evidence § 177).

It is a matter of common sense that the intentional decision to *set fire* to documents is a far cry from instances where a document "has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for." *Brewer*, 72 F.3d at 334; *see also Nicholson v. Bd. of Trustees for the Ct. State Univ. Sys.*, No. 3:08CV1250 WWE, 2011 WL 4072685, at *6 (D. Conn. Sept. 12, 2011) ("Such *egregious conduct* warranting a terminating sanction may include intentional destruction of evidence such as *burning or shredding documents*, wiping out a computer hard drive or willful noncompliance with discovery obligations." (emphases added)).

Finally, Mr. Outlaw's bad faith and personal responsibility is further underscored by his recorded telephone conversations, in which he indicated his intent to destroy documents *by fire*, which is precisely the means by which they were disposed. During one tape-recorded prison conversation between Mr. Outlaw and his wife on June 28, 2019 at 20:56:56, for instance, Ms. Solomon-Outlaw asked Mr. Outlaw "what [he] will do with [his] law work" upon release from prison. In response, Mr. Outlaw stated in no uncertain terms that he will "take that box of law shit and *set it on fire*." (*See* **Exhibit I**). Then, during a March 7, 2019 phone call with his sister at 09:48:31, Mr. Outlaw again stated that he is "*going to burn* . . . all [his] legal shit," this time noting that "*keeping certain stuff*" has been "beneficial to [him]." (*See* **Exhibit J**).

### 2. Prejudice to Defendants.

Mr. Outlaw's spoliation has inflicted substantial prejudice on Defendants. A party is prejudiced by spoliation if the spoliation adversely affects the party's ability to effectively investigate and litigate its claims. *See Int'l Fin. Co., LLC v. Jabali-Jeter*, No. 18-CV-2120, 2019

WL 2268961, at *16 (E.D. Pa. May 28, 2019) (defendant's spoliation "prejudiced IFC because it prevented IFC from finding and proving the extent of IFC's information Defendant took and used for herself"); see also Brown, 2017 WL 2536419, at *5 ("Of course, when a party is denied any opportunity to examine evidence, [prejudice] would automatically be satisfied." (alteration in original) (citation omitted)). The prejudice to Defendants is plain where Plaintiff has destroyed boxes of documents collected over more than a decade in support of his legal case. The destruction of correspondence with witnesses and original affidavits and letters is particularly detrimental where, as here, particularly where witness intimidation, witness credibility, and potential falsification of documents are at issue.

### 3. Availability of Lesser Sanctions.

In cases such as this one, where destruction of documents is so pervasive, and intentional, courts have not hesitated to impose the case dispositive sanction of dismissal. *See, e.g.*, *Milke*, 497 F. Supp. 3d at 479 (imposing sanction of dismissal for destruction of boxes of documents in wrongful conviction case after the plaintiff's release from prison). Indeed, such sanction would be appropriate here. That said, at this juncture in the case, Defendants ask merely for the sanction of an adverse inference. Such sanction is appropriate where, as here, the evidence may not be recreated by other means, and thus lesser sanctions will not serve to level the playing field between the parties. *See, e.g.*, *N.V.E., Inc. v. Palmeroni*, No. CIV.A. 06-5455 ES, 2011 WL 4407428, at *6 (D.N.J. Sept. 21, 2011) ("An adverse inference, or the spoliation inference, is regarded as a 'far lesser sanction,' and is intended to level the playing field between the parties.").

## CONCLUSION

For the reasons set forth above, the Court should grant Defendants' Motion for Sanctions Against Plaintiff Donald Michael Outlaw.

Date: August 15, 2022                                   Respectfully submitted,

*/s/ Danielle B. Rosenthal*
Danielle B. Rosenthal
Deputy City Solicitor
PA Bar No. 329676
City of Philadelphia Law Department
1515 Arch Street, 14th Floor
Philadelphia, PA 19102
(215) 683-5448
danielle.rosenthal@phila.gov

*/s/ Katelyn Mays*
Katelyn Mays
Assistant City Solicitor
Pa. Attorney ID No. 324246
City of Philadelphia Law Department
1515 Arch Street, 14th Floor
Philadelphia, PA 19102
(215) 683-5434
katelyn.mays@phila.gov