# EXHIBIT A

(Solomon Subpoena)

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Pennsylvania

| | |
|---|---|
| Donald Michael Outlaw | ) |
| *Plaintiff* | ) |
| v. | )   Civil Action No.  21-1290 |
| City of Philadelphia, et al. | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                                Monique Solomon-Outlaw
            c/o VSCP Law, 2001 Market St., Suite 3700, Philadelphia PA 19103

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: Documents attached on Schedule A

| Place: City of Philadelphia Law Departent<br>1515 Arch St., 14th Floor<br>Philadelphia, PA 19102 | Date and Time:<br><br>May 17, 2022 at 10:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    4/26/2022

|    *CLERK OF COURT* | OR | |
|---|---|---|
| | | /s/ Danielle B. Rosenthal |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*    Defendants City of Philadelphia, Howard Peterman, Jeffrey Piree                          , who issues or requests this subpoena, are:

Danielle Rosenthal, 1515 Arch St., 14th Floor, Philadelphia PA 19102; danielle.rosenthal@phila.gov; 215-683-5448

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## Exhibit A

Instructions

1. You are required in responding to these requests to obtain and produce all responsive documents in your possession, custody, or control.

2. Where specific documents are requested, such a request shall be interpreted to include any other documents that contain information relevant or responsive to the request other than exact duplicate documents.

3. Each request represents a continuing and ongoing request for production. If additional responsive documents are created or received after service of your responses to these requests, you must promptly produce such documents without another or further request and revise and serve updated discovery responses consistent with the Federal Rules of Civil Procedure.

4. Any request propounded in the disjunctive shall also be read as propounded in the conjunctive and vice versa. Any request propounded in the singular shall also be read as propounded in the plural and vice versa. Any request propounded in the present tense shall also be read as propounded in the past tense and vice versa.

5. The terms "and" and "or" shall be construed either conjunctively or disjunctively as necessary to bring within the scope of a request all responses that might otherwise fall outside the scope of that request.

6. The word "each" shall be understood to include and encompass "every" and vice versa. The words "all" and "any" shall be understood to mean "any and all."

7. If a request calls for the production of a document (or part of a document) as to which you claim any privilege, separately set forth in a privilege log each and every fact on which your claim of privilege is based with sufficient specificity to permit the Court to make a determination as to whether your claim of privilege is valid, including, but not limited to: (a) a description of the information or communications; (b) the date and time of the information or communications; (c) the author or authors of the information or communications; (c) the basis upon which the privilege is claimed; and (d) the identity of each person to whom the information or contents of the communication have been disclosed, whether orally, electronically, or in writing.

8. No request shall be left unanswered. If the answer to a request or subparagraph of a request is "none" or "unknown," the word "none" or "unknown" must be written in the answer. If the request is inapplicable, "n/a" must be written as the response.

9. All photographs, video, and audio recordings responsive to a request shall be produced in the format in which they were originally created.

10. All documents that are physically attached to each other when located for production shall be left so attached. Documents that are segregated or separated from other documents, whether by inclusion of binders, files, subfiles, or by use of dividers, tabs, clips, or any other method, shall be left so segregated or separated.

11. If a document contains color markings and it is necessary to see those markings in their original color to understand the meaning or content of the document, the document shall be produced in its original colors.

12. Unless otherwise specified, the time period applicable to these requests is September 4, 1995, to the present.

<u>Definitions</u>

1. "*Commonwealth v. Outlaw*" means the case filed in the Philadelphia Court of Common Pleas entitled *Commonwealth of Pennsylvania v. Donald Outlaw*, Docket No. CP-51-CR-1101321-2003 and includes all appellate and state and federal post-conviction proceedings stemming therefrom.

2. "Communication(s)" means the transmission of information or data in any form, including, without limitation, written, oral, or electronic transmissions, **such as emails, text messages, or voicemails.**

3. "Criminal defense attorney(s)" means any attorney retained to represent Mr. Outlaw in the case of *Commonwealth v. Outlaw*.

4. "Document(s)" includes all materials listed Federal Rule of Civil Procedure 34(a) (including, but not limited to, written, typewritten, printed, recorded, taped, graphic, magnetic, photographed, filmed, and computer-based materials). If a document has been prepared in several copies, or additional copies have been made that are not identical (or no longer identical due to subsequent notation or modification of any kind whatever, including, but not limited to, notations on the backs of pages thereof) each non-identical copy is a separate document to be produced.

<u>Requests</u>

1. All communications to or from you, on the one hand, and any of the following individuals, on the other: (a) Charles Paladino; (b) Lamar Rodgers; (c) Eric Lee; (d) Yusef Brown; (e) Wesley Harmon; (f) Derrick Allston; (g) Christopher Holder; (h) Lemuel Barr/Bar; (i) Marie Rodgers; (j) Nicole Clark; (k) Yashon Williams; (l) Jibrail Jones; (m) Saniyaah Williams; (n) Keith Rodgers; (o) Kevin Rodgers; (p) Brenda Rodgers; and (q) Katima Jackson. Please note that this request is intended to also include any pseudonyms used by these individuals, so long as you understand those pseudonyms to be synonymous with the names referenced.

2

2. All communications to or from you and Mr. Outlaw's criminal defense attorneys (including his trial level, appellate, and post-conviction attorneys) about the case of *Commonwealth of Pennsylvania v. Donald Outlaw*, Docket No. CP-51-CR-1101321-2003.

3. All documents reflecting any form of payment or goods, either directly or indirectly, between you, on the one hand, and any of the following individuals, on the other hand: (a) Charles Paladino; (b) Lamar Rodgers; (c) Eric Lee; (d) Yusef Brown; (e) Wesley Harmon; (f) Derrick Allston; (g) Christopher Holder; (h) Lemuel Barr/Bar; (i) Marie Rodgers; (j) Nicole Clark; (k) Yashon Williams; (l) Jibrail Jones; (m) Saniyaah Williams; (n) Keith Rodgers; (o) Kevin Rodgers; (p) Brenda Rodgers; and (q) Katima Jackson. Please note that this request is intended to also include any pseudonyms used by these individuals, so long as you understand those pseudonyms to be synonymous with the names referenced.

4. All communications reflecting your efforts to obtain legal records on behalf of Mr. Outlaw from his former or current criminal defense attorneys for use in the instant civil suit or in the underlying case of *Commonwealth of Pennsylvania v. Donald Outlaw*.

5. All records obtained from Mr. Outlaw's criminal defense attorneys who currently represent him or formerly represented him in the case of *Commonwealth of Pennsylvania v. Outlaw*.

6. Documents sufficient to reflect the joint income received by you and Mr. Outlaw during the tenure of your marriage.

7. Documents sufficient to show all income received by either you or Mr. Outlaw through Outlaw Tender Touch Home Care, LLC.

8. All of Mr. Outlaw's medical or mental health records that you currently have in your possession.

9. All of Mr. Outlaw's legal records that you currently have in your possession, provided that the records pertain to the case of *Commonwealth of Pennsylvania v. Outlaw*.

# EXHIBIT B

(Monique Solomon-Outlaw Deposition Transcript)

UNITED STATES DISTRICT COURT
FOR THE
EASTERN DISTRICT OF PENNSYLVANIA


DONALD MICHAEL OUTLAW,  :
                        :  Civil Action No. 21-1290
          Plaintiff,    :
                        :
       v.               :
                        :
CITY OF PHILADELPHIA,   :
et al.,                 :
                        :
          Defendants.   :


                  -  -  -

          Friday, July 22, 2022

                  -  -  -


          Videotaped Deposition of MONIQUE SOLOMON

OUTLAW, taken pursuant to Notice, commencing

at 10:14 a.m., 1515 Arch Street, 14th Floor,

Philadelphia, Pennsylvania 19102, before Taneha

Carroll, Court Reporter - Notary Public, there

being present.

Monique Solomon
7/22/2022

```
 1    A P P E A R A N C E S:

 2

 3    VSCP LAW

 4    BY:         JOSHUA VAN NAARDEN, ESQUIRE
                  Two Commerce Square
 5                2001 Market Street, Suite 3700
                  Philadelphia, Pennsylvania 19103
 6                (215)960-0000
                  jvannaarden@vscplaw.com
 7

 8                Representing the Plaintiff

 9

10    CITY OF PHILADELPHIA - LAW DEPARTMENT

11    BY:         DANIELLE ROSENTHAL, ESQUIRE
                  KATELYN MAYS, ESQUIRE
12                One Parkway
                  1515 Arch Street, 14th Floor
13                Philadelphia, Pennsylvania 19102
                  (215)683-5400
14                danielle.rosenthal@phila.gov
                  katelyn.mays@phila.gov
15

16                Representing the Defendants

17

18    ALSO PRESENT:
19
          Bill Haze, Videographer
20

21

22

23

24
```

Monique Solomon
7/22/2022

```
 1                  I N D E X

 2
    WITNESS                        PAGE
 3
    MONIQUE SOLOMON OUTLAW
 4
    (Witness Sworn.)                5
 5

 6  EXAMINATION:

 7    By:  Ms. Rosenthal            7

 8    By:  Ms. Mays                 301

 9

10                  -   -   -

11
                 E X H I B I T S
12
    NUMBER           DESCRIPTION        PAGE
13
    Exhibit 1     7/19/22 Subpoena      65
14
    Exhibit 2     4/26/22 Subpoena      71
15
    Exhibit 3     OUTLAWDA02022000752   121
16
    Exhibit 4     OUTLAWDA02022002691   142
17
    Exhibit 5     OUTLAWDA02022002693   150
18
    Exhibit 6     OUTLAWDA02022002692   157
19
    Exhibit 7     OUTLAWDA02022002514   170
20
    Exhibit 8     PLAINTIFF00316        175
21
    Exhibit 9     OUTLAWDA02022002508   179
22
    Exhibit 10    OUTLAWDA02022002399   185
23
    Exhibit 11    CITY016932            188
24
```

Strehlow and Associates/LEXITAS
215-504-4622

Monique Solomon
7/22/2022

1           E X H I B I T S(Continued)

2

    NUMBER              DESCRIPTION           PAGE
3
    Exhibit 12      Outgoing Messages      199
4
    Exhibit 13      CITY018846             206
5
    Exhibit 14      Incoming Messages      215
6
    Exhibit 15      Incoming Messages      224
7
    Exhibit 16      Outgoing Messages      227
8
    Exhibit 17      Outgoing Messages      230
9
    Exhibit 18      Incoming Messages      241
10
    Exhibit 19      Incoming Messages      252
11
    Exhibit 20      OUTLAWDA02022008468    255
12
    Exhibit 21      PLAINTIFF27322         271
13
    Exhibit 22      CITY022091             282
14
    Exhibit 23      CITY022088             285
15
    Exhibit 24      CITY022079             288
16
    Exhibit 25      CITY022082             289
17
    Exhibit 26      CITY022070             291
18
    Exhibit 27      CITY022073             293
19
    Exhibit 28      CITY022061             294
20
    Exhibit 29      CITY022058             294
21
    Exhibit 30      CITY022064             295
22
    Exhibit 31      CITY022067             297
23
    Exhibit 32      CITY014413             306
24      (EXHIBITS RETAINED)

Monique Solomon
7/22/2022

```
1              P R O C E E D I N G S
2                    -   -   -
3              THE VIDEOGRAPHER:  We're
4      now on the video record.  This is
5      the video deposition of Monique
6      Solomon Outlaw taken in the matter
7      of Donald Outlaw v. the City of
8      Philadelphia, Civil Action No.
9      21-1290.  This deposition is being
10     held at 1515 Arch Street, 14th
11     Floor, Philadelphia, Pa on July
12     22, 2022 at 10:14 a.m.
13             I am Bill Haze, the
14     videographer.  The court reporter
15     is Taneha Carroll and we're from
16     the firm of Strehlow & Associates.
17     Counsel will now introduce
18     themselves.
19             MR. VAN NAARDEN:  Joshua
20     Van Naarden on behalf of Donald
21     Outlaw.  I'm also representing
22     Monique Solomon Outlaw for
23     purposes of the deposition.
24             MS. ROSENTHAL:  Danielle
```

1          Rosenthal representing Defendants

2          the City of Philadelphia, Howard

3          Peterman and Jeffrey Piree.

4                    MS. MAYS:  And Katelyn

5          Mays on behalf of the City,

6          Detectives Piree and Peterman.

7                    THE VIDEOGRAPHER:  The

8          court reporter will now swear in

9          the witness.

10                    -   -   -

11                    MONIQUE SOLOMON

12          OUTLAW, having been duly sworn,

13          was examined and testified as

14          follows:

15                    -   -   -

16                    COURT REPORTER:  Usual

17          stipulations?

18                    MS. ROSENTHAL:  Usual

19          stipulations.

20                    MR. VAN NAARDEN:  She's

21          going to retain the right to read

22          and sign.  But other than that,

23          normal stipulations will apply.

24                    -   -   -

Monique Solomon
7/22/2022

```
 1                       EXAMINATION

 2                       -  -  -

 3  BY MS. ROSENTHAL:

 4  Q.       So thank you so much for coming to

 5  be deposed today.  I introduced myself, but

 6  I'm Danielle Rosenthal and I represent the

 7  City and the two detectives who are

 8  defendants in this case, and I will be

 9  conducting your deposition today and I have

10  my co-counsel here --

11                  MS. MAYS:  Good morning.

12                  THE WITNESS:  Good

13        morning.  Nice to meet you.

14  BY MS. ROSENTHAL:

15  Q.       -- Katelyn Mays.  So I just want

16  to go over some ground rules at the

17  beginning of the deposition just to make

18  sure that we understand one another.

19            First of all, do you understand

20  that we're testifying under -- that you are

21  testifying under oath today and you're

22  legally obligated to tell the truth under

23  the penalty of perjury?

24  A.       I do.
```

1   Q.        You also must provide verbal

2   responses to my questions.  The court

3   reporter can't take down gestures or

4   uh-huh, so yes or no or other words would

5   help it go smoother and give us a cleaner

6   record.  Do you understand that?

7   A.        Yes.

8   Q.        And if you don't understand or

9   hear a question, please let me know and I'm

10  happy to repeat it or rephrase it and ask

11  the court reporter to read it back.  If you

12  answer a question, I will assume that you

13  both heard the question and understood the

14  question.  Do you understand that?

15  A.        Yes.

16  Q.        And I'm going to be asking you

17  today about certain events that occurred

18  quite a while ago.  If you have an actual

19  present recollection of the matter called

20  for by my questions even if that

21  recollection is faint, please give us that

22  recollection.

23          But this isn't supposed to be a

24  memory contest or designed to trip you up.

Monique - Solomon
7/22/2022

```
1    So if you don't recall, simply say that

2    since we don't want you to rely on

3    speculation or guess in your answers.  Do

4    you understand that?

5    A.        Yes.

6    Q.        And also, if you don't know the

7    answer to a question, that also is a

8    perfectly acceptable response.  Do you

9    understand that?

10   A.        Yes.

11   Q.        If you want at any point to craft

12   an answer to the current question or to a

13   previous question if something jogs your

14   memory or you realize that you misspoke,

15   you can do so and let me know.  Do you

16   understand that?

17   A.        Yes.

18   Q.        So another thing that will make

19   the deposition go smoother is that we try

20   not to talk over one another.  I'll do my

21   best to let you finish answering a question

22   before I begin asking one, and I'd ask you

23   to do the same because the court reporter

24   has trouble when we're talking over one
```

1  another.  Do you understand that?

2  A.        Yes.

3  Q.        And if you want to take a break at

4  any point, please let me know and we will.

5  If there's a question pending, then I need

6  an answer to the question before we take a

7  break.  But otherwise, you're free to take

8  a break at any point, and that we'll

9  probably also take short breaks and break

10 for lunch.  Do you understand that?

11 A.        Yes.

12 Q.        And if you need to consult with

13 your attorney at any time, please also let

14 me know and you have the right to do that.

15 Do you understand that?

16 A.        Yes.

17 Q.        Do you have any questions for me

18 about the deposition?

19 A.        No.

20 Q.        Okay.  So I understand you have

21 some legal background so I'm sure you're

22 familiar with these introductory questions.

23 The one question we ask everyone is whether

24 you took any prescription medications or

Monique Solomon
7/22/2022

1   substances in the last 24 hours that could

2   impair your memory, your ability to

3   understand the questions or your ability to

4   testify fully and truthfully?

5   A.        No.

6   Q.        Is there any other reason today

7   that you may not be able to recall events

8   or testify fully and truthfully today?

9   A.        No.

10  Q.        Are you testifying with counsel

11  today or are you represented by counsel

12  today?

13  A.        Yes, I am.

14  Q.        Can you identify him for the

15  record?

16  A.        Josh Van Naarden.

17  Q.        And what's your understanding of

18  the scope of your representation?

19                  MR. VAN NAARDEN:

20          Objection.

21                  MS. ROSENTHAL:  You can

22          answer, if you know.

23                  MR. VAN NAARDEN:  If you

24          understand it.

Monique Solomon
7/22/2022

```
 1                      THE WITNESS:  He's my

 2           attorney.

 3    BY MS. ROSENTHAL:

 4    Q.        Do you understand whether he

 5    represents you for purposes other than

 6    defending this deposition?

 7                      MR. VAN NAARDEN:

 8           Objection.

 9                      THE WITNESS:  I don't get

10           the question.

11                      MS. ROSENTHAL:  Okay.

12           Let me move on.  Let me move on.

13           I may come back to that or not.

14    BY MS. ROSENTHAL:

15    Q.        Are you paying any legal fees for

16    your deposition today?

17                      MR. VAN NAARDEN:

18           Objection.  Don't answer that

19           question.

20                      MS. ROSENTHAL:  On what

21           grounds?

22                      MR. VAN NAARDEN:

23           Privileged.

24                      MS. ROSENTHAL:  Payment
```

```
1                of legal fees is not privileged.

2                But if we have a dispute about

3                that, we can just leave that for

4                the record.

5    BY MS. ROSENTHAL:

6    Q.        Have you been deposed before?

7    A.        No.

8    Q.        Have you testified in court

9    before?

10   A.        Yes.

11   Q.        When or let me start with how many

12   times?

13   A.        Once.

14   Q.        And was that in Mr. Outlaw's PCRA

15   hearing?

16   A.        Yes.

17   Q.        Have you testified in court in

18   connection with any other proceeding?

19   A.        No.

20   Q.        Any other legal proceeding like an

21   arbitration have you testified?

22   A.        No.

23   Q.        Have you ever been a party in a

24   criminal or civil case?
```

1    A.        A civil case, yes.

2    Q.        And when or what was the nature of

3    that case?

4    A.        A motor vehicle accident.

5    Q.        And were you a plaintiff or a

6    defendant?

7    A.        Defendant.

8    Q.        And was that in state court?

9    A.        Yes.

10   Q.        Do you know which county?

11   A.        Philadelphia.

12   Q.        Do you know around what time

13   period it was?

14   A.        Maybe 2016.  I'm not 100 percent

15   sure.

16   Q.        Some time in the last 10 years?

17   A.        Yes.

18   Q.        And do you remember any of the

19   other parties in that case?

20   A.        My son was a defendant.

21   Q.        Sorry?

22   A.        My son was a defendant.

23   Q.        Okay.  And what was his name or is

24   his name?

```
1   A.        DeAndre Solomon.

2   Q.        Do you know who brought the case?

3   A.        The plaintiff, the person involved

4   in the accident.

5   Q.        I'm just trying to -- I'm just

6   trying to get an idea if you remember his

7   or her name in case we wanted to look it

8   up?

9   A.        I don't remember the person's

10  name.

11  Q.        Okay.  And what was the outcome of

12  that case?

13  A.        I don't think it went to

14  arbitration.  I believe it settled before

15  arbitration.  I'm not 100 percent sure.

16  Q.        And you have never been a party in

17  this criminal case?

18  A.        No.

19  Q.        Have you ever been arrested

20  before?

21  A.        No.

22                  MR. VAN NAARDEN:

23            Objection.  You can answer.

24  BY MS. ROSENTHAL:
```

Monique Solomon
7/22/2022

1   Q.        And in the state court case, I

2   assume that you didn't -- based on your

3   previous testimony, you didn't testify and

4   you weren't deposed in that case?

5   A.        No.

6   Q.        Did you do any sort of preparation

7   in advance of your deposition today --

8   yeah, sorry, strike that.  Did you do any

9   preparation in advance of your deposition

10  today?

11  A.        Yes.

12  Q.        Please describe that preparation

13  without revealing anything that

14  Mr. Van Naarden or his co-counsel told you

15  during conversations?

16  A.        I just reviewed the subpoena.

17  Q.        And when you say the subpoena, are

18  you referring to the subpoena for the

19  deposition?

20  A.        No, the subpoena for the documents

21  I had to produce.

22  Q.        Okay.  So I just want to be clear

23  because the subpoena for the deposition

24  today also had a request for documents.

Monique Solomon
7/22/2022

```
 1              Are you referring to the subpoena
 2   that was served several months ago that was
 3   just a request for documents?
 4   A.        I'm not sure.
 5   Q.        Okay.  And did you review the
 6   documents that have been produced in
 7   response to the subpoena?
 8   A.        No.
 9   Q.        So you only reviewed the subpoena
10   itself?
11   A.        Yes.
12   Q.        I'm not asking what your
13   communications with Mr. Van Naarden or his
14   co-counsel were, but did you meet with him
15   in preparation?  Did you meet with him or
16   anyone else in his office in preparation
17   for the deposition today?
18                    MR. VAN NAARDEN:
19            Objection.  I'll let you answer
20            that question.
21                    THE WITNESS:  I met with
22            him this morning to come over
23            here.
24   BY MS. ROSENTHAL:
```

Monique Solomon
7/22/2022

```
1    Q.        Okay.  Did you meet with him to go

2    over -- to prepare for the deposition

3    though?

4    A.        Yes.

5    Q.        And was that this morning?

6    A.        Yes.

7                    MR. VAN NAARDEN:

8         Objection.

9                    MS. ROSENTHAL:  Can she

10        answer?

11                   MR. VAN NAARDEN:  She

12        did.

13                   MS. ROSENTHAL:  Okay.

14   BY MS. ROSENTHAL:

15   Q.        So today is the only time that you

16   met with him to prepare for the deposition?

17                   MR. VAN NAARDEN:

18        Objection.  You can answer that

19        question.

20                   THE WITNESS:  No.

21   BY MS. ROSENTHAL:

22   Q.        Okay.  So if you met with

23   attorneys in preparation for the deposition

24   today, how many times did you meet with
```

```
 1   them?

 2                    MR. VAN NAARDEN:

 3           Objection.  You can answer that

 4           question.

 5                    THE WITNESS:  Two times

 6           maybe.

 7   BY MS. ROSENTHAL:

 8   Q.      And this morning was one of them?

 9   A.      Yes.

10   Q.      When was the other time?

11                    MR. VAN NAARDEN:

12           Objection.

13                    MS. ROSENTHAL:  On what

14           basis?

15                    MR. VAN NAARDEN:  It's

16           privileged.  Getting into the

17           intricacies of when we met, how

18           long we met, you're not entitled

19           to know that information.

20                    MS. ROSENTHAL:  Are you

21           instructing her to not to answer?

22           I will disagree that it's

23           privileged.

24                    MR. VAN NAARDEN:  Any
```

1              further questions regarding the

2              timing associated or the time

3              spent in preparation meeting with

4              counsel, she's not going to answer

5              any more questions.

6                        MS. ROSENTHAL:  Okay.

7              I'm going to -- I would disagree

8              with that, but let me move on and

9              we can maybe discuss that later

10             off the record.

11   BY MS. ROSENTHAL:

12   Q.        Did you review any documents --

13   without revealing any documents that were

14   shown to you by Mr. Van Naarden, I'm asking

15   any documents that were shown, did you

16   review any documents in preparation for --

17   A.        No.

18   Q.        When you -- and I'm asking this

19   because I'm unsure if this is within the

20   scope of what Mr. Van Naarden directed you

21   not to answer, but I'm sure he will direct

22   you not to answer if he feels it's

23   appropriate.

24             On the date that you met with

1   counsel to prepare for the deposition, was

2   anyone else other than attor -- other than

3   attorneys present?

4                     MR. VAN NAARDEN:

5           Objection.

6   BY MS. ROSENTHAL:

7   Q.      At the meeting?

8                     MR. VAN NAARDEN:

9           Objection.  Don't answer that.

10                     MS. ROSENTHAL:  That's

11          directly relevant to whether -- I

12          mean, it's not privileged to the

13          extent who was at a meeting with

14          attorneys.  To the extent there

15          were third parties there, that

16          would destroy the privilege.

17                     MR. VAN NAARDEN:  You're

18          not entitled to know if my

19          paralegals were there, if my law

20          clerks were there or if my other

21          clients were there who had

22          interests that were aligned with

23          hers.

24                     MS. ROSENTHAL:  Okay.

Monique Solomon
7/22/2022

```
 1              Let me strike that question and
 2              re-ask it.  And Mr. Van Naarden
 3              may object if he feels it's still
 4              objectionable.
 5    BY MS. ROSENTHAL:
 6    Q.        When I said were any other lawyers
 7    there, I was referring to anyone affiliated
 8    with his firm, paralegals, any staff,
 9    investigators.  I'm not including clients
10    who are aligned with your interests.
11              Was anyone else present for that
12    conversation?
13                    MR. VAN NAARDEN:
14              Objection.  And again, my
15              objection is that there is not --
16              I don't understand the question.
17                    MS. ROSENTHAL:  Okay.
18              Sorry.
19    BY MS. ROSENTHAL:
20    Q.        Other than -- other than any
21    office staff employed by Mr. Van Naarden or
22    any investigators or contractors working on
23    his behalf, were any other individuals
24    present during your meetings in preparation
```

1    for your deposition today?

2                    MR. VAN NAARDEN:  I

3            object and I'm going to instruct

4            her not to answer.  There are -- I

5            represent two individuals in this

6            case whose interests are aligned.

7            You're not entitled to know if

8            they're both present in our

9            attorney-client meetings.

10                   MS. ROSENTHAL:  Okay.  I

11           understand your objection.  And I

12           would like to -- I believe I

13           disagree with it, but I want to

14           think on it for a moment.  And so,

15           we will return.

16   BY MS. ROSENTHAL:

17   Q.      Did you speak to anyone other than

18   counsel who are representing you in

19   preparation for today's deposition about

20   the deposition today other than in the

21   presence of counsel?

22                   MR. VAN NAARDEN:

23           Objection.  Again, Danielle, I'm

24           not going to be difficult.  But

1          you said in your question any

2          other individuals representing

3          her so --

4                    MS. ROSENTHAL:  Sorry --

5                    MR. VAN NAARDEN:  I'm

6          not --

7                    MS. ROSENTHAL:  Strike

8          that.  I may have misspoke.

9    BY MS. ROSENTHAL:

10   Q.      Other than the attorneys who are

11   representing you for purposes of this

12   deposition, did you speak to any other

13   individuals about your deposition today,

14   and I'm excluding from the question any

15   meetings where attorneys were present?

16   A.      No.

17   Q.      So you did not speak to Mr. Outlaw

18   outside of the presence of attorneys about

19   the deposition today?

20   A.      Well, like, he's my husband and he

21   knows I'm here because he's my husband, but

22   that's about it.

23   Q.      Did you talk to him about the

24   deposition other than the fact that you

Monique Solomon
7/22/2022

```
1   were going to be deposed and you were

2   scheduled to be deposed today?

3   A.        No.

4   Q.        Did you have any meetings with

5   anyone else in preparation with today's

6   deposition who are unaffiliated with

7   Mr. Van Naarden's office?

8   A.        No.

9   Q.        Have you spoken to any of

10  Mr. Outlaw's lawyers or investigators in

11  the civil matter about the case other than

12  in connection with the subpoena for

13  documents directed towards you or in

14  preparation for the deposition?

15                    MR. VAN NAARDEN:

16           Objection of the form.

17  BY MS. ROSENTHAL:

18  Q.        You can answer.

19  A.        Can you repeat the question?

20                    MS. ROSENTHAL:  Sure.

21           Can the court reporter repeat it?

22                    COURT REPORTER:  Sure.

23           I'm sorry.  My scroll is not

24           working.  Let me just fix it real
```

Monique Solomon
7/22/2022

```
1              quick.

2                        MS. ROSENTHAL:  That's

3              okay.  Let me just rephrase.

4    BY MS. ROSENTHAL:

5    Q.        My question is whether you've

6    spoken to any of Mr. Outlaw's lawyers or

7    investigators about this civil case other

8    than about your compliance with the

9    subpoena that was directed with you,

10   towards you or for preparation for today's

11   deposition?

12                        MR. VAN NAARDEN:

13              Objection.  Assuming that excludes

14              me and my office?

15                        MS. ROSENTHAL:  No, I'm

16              asking whether you had any

17              communications with them other

18              than -- excluding communications

19              that are within the scope of his

20              representation of you in complying

21              with the subpoena or in preparing

22              for the deposition?

23                        THE WITNESS:  I don't

24              understand the question, like what
```

```
 1              you're asking.
 2                      MS. ROSENTHAL:   Okay.
 3              Let me come back to that.
 4   BY MS. ROSENTHAL:
 5   Q.       Did you make any notes in
 6   preparing for the deposition?
 7   A.       No.
 8   Q.       Did you read any transcripts prior
 9   to the deposition in this matter?
10   A.       No.
11   Q.       Did anyone speak to you about what
12   was said during the prior depositions in
13   this matter?
14   A.       No.
15   Q.       Did you bring any documents with
16   you today?
17   A.       No.
18   Q.       Are you familiar with the
19   complaint and the allegations in this case?
20   A.       Yes, I'm familiar.
21   Q.       Have you read the complaint in
22   full?
23   A.       No.
24   Q.       Have you seen the complaint at
```

Monique Solomon
7/22/2022

```
1   all?
2   A.        Yes, I've seen it.
3   Q.        So what would you say your -- so
4   how would you describe your review of it?
5                       MR. VAN NAARDEN:
6            Objection.  You can answer.
7                       THE WITNESS:  Just that
8            it was long.
9   BY MS. ROSENTHAL:
10  Q.        I'm asking more whether, you know,
11  you skimmed.  You said you didn't read the
12  whole thing.  So I'm trying to get an idea
13  of how much you read and however you would
14  describe in your own words?
15  A.        Not enough for me to remember
16  exactly what was in it.
17  Q.        When was that, that you read it?
18  A.        I don't recall the date.
19  Q.        Was it one or multiple times?
20  A.        I don't remember how many times.
21  Q.        Have you looked at the complaint
22  in the past month?
23  A.        No.
24  Q.        Did you review the complaint prior
```

```
1    to its filing?

2    A.        Yes.

3    Q.        Did you review drafts of the

4    complaint that were nonfinal?

5                     COURT REPORTER:  I'm

6              sorry.  Did you say nonfiling?

7    BY MS. ROSENTHAL:

8    Q.        Oh, sorry.  Did you review drafts

9    of the complaint that were not final?

10                    MR. VAN NAARDEN:  I'm

11             going to object to that question

12             to the extent it asks for

13             privileged, a work product

14             information between clients, so

15             she's not going to answer those

16             questions.

17                    MS. ROSENTHAL:  Okay.  I

18             would disagree -- put on the

19             record I would disagree she wasn't

20             a client and so her -- you had no

21             attorney-client relationship at

22             that point in her reading the

23             complaint as far as attorney-

24             client privilege.  But I will
```

1              contemplate how and if to take

2              that up with the judge. You're

3              instructing her not to answer it

4              though?

5                        MR. VAN NAARDEN:  You

6              never established when our

7              attorney-client relationship was

8              engaged.

9    BY MS. ROSENTHAL:

10   Q.        Sorry.  Do you -- has Mr. Out --

11   what is your -- I asked this question

12   before, but I'm going to ask one more time,

13   maybe phrase it a little differently.

14              Do you -- well, are you -- first

15   of all, am I correct that you're employed

16   as a paralegal?

17   A.        Yes.

18   Q.        Given your background as a

19   paralegal, do you have any understanding of

20   the phrase scope of representation?

21   A.        No, that's not a term that we use.

22   Q.        Do you understand that a lawyer

23   could represent an individual for certain

24   purposes, but not others in a case?

Monique Solomon
7/22/2022

1    A.        Yes.

2    Q.        Is it your understanding that

3    Mr. Van Naarden is representing you only

4    for purposes of complying with the

5    documents, subpoena and defending your

6    deposition today?

7    A.        I'm not sure.  I just know he

8    represents me so...

9    Q.        Okay.  So you don't know what the

10   scope of your representation is?  You don't

11   know what purposes he represents you for in

12   this case?

13   A.        No, just that he's my attorney.

14   Q.        Do you have a retention agreement

15   with him?

16                     MR. VAN NAARDEN:

17            Objection.  Don't answer that.

18                     MS. ROSENTHAL:  That's

19            not privileged.  I would disagree

20            with that.

21   BY MS. ROSENTHAL:

22   Q.        When did -- what is your

23   understanding when Mr. Van Naarden came to

24   begin representing you?

 1   A.        When he started representing my

 2   husband.

 3   Q.        And when was that?

 4   A.        I don't remember the exact date.

 5   Q.        What's your understanding of what

 6   this case is about?

 7                    MR. VAN NAARDEN:

 8            Objection.  You can answer.

 9                    MS. ROSENTHAL:  What's

10            the basis of your objection?

11                    MR. VAN NAARDEN:  It

12            doesn't have a reasonable basis to

13            lead to admissible evidence.  Her

14            understanding of what the

15            complaint is about has nothing to

16            do with any of the elements that

17            we're pursuing or any of the

18            defense.

19                    She's not a party and

20            therefore asking a nonlawyer about

21            what the legal ramifications are

22            about a complaint is

23            inappropriate, but I'll let her

24            answer the question.

Monique Solomon
7/22/2022

```
1                  MS. ROSENTHAL:  Okay.

2         Great.

3   BY MS. ROSENTHAL:

4   Q.        What is your understanding of what

5   this case is about?

6                       MR. VAN NAARDEN:

7              Objection.

8                       THE WITNESS:  My

9              understanding is that my husband

10             Donald wants the City and the

11             detectives to be held accountable

12             for their actions where they --

13             where they failed to do the right

14             thing.

15  BY MS. ROSENTHAL:

16  Q.        Do you know what the claims are in

17  this case?

18  A.        Him being in prison for a crime he

19  did not commit.

20  Q.        Do you know what the specific

21  legal violations are that are alleged?

22                       MR. VAN NAARDEN:  Again,

23             objection.  But you can answer.

24                       THE WITNESS:  I believe
```

Monique Solomon
7/22/2022

```
 1              his civil rights.
 2  BY MS. ROSENTHAL:
 3  Q.        In what respect?
 4  A.        Well, the fact that he was
 5  incarcerated for 16 years, the fact of the
 6  damages that he suffered while being
 7  incarcerated, his trauma that he's
 8  experienced while being incarcerated.
 9  Q.        Do you know what the allegations
10  are specifically against Detective
11  Peterman?
12  A.        I believe that he withheld
13  evidence.
14  Q.        Anything else?
15  A.        I'm not sure.
16  Q.        What about Detective Piree?
17  A.        I believe him withholding
18  evidence.  I'm not 100 percent sure.
19  Q.        Have you discussed the complaint
20  with Mr. Outlaw?
21  A.        Yes.
22  Q.        And how many occasions would you
23  say you can approximate if you're not sure?
24  A.        I'm not really sure how many
```

Monique Solomon
7/22/2022

```
 1    times.  And when we did speak about the
 2    complaint, it was just, like, I guess like
 3    husband-and-wife conversations where, you
 4    know, just, you know, his case being
 5    vacated and, you know, just I guess, like,
 6    the shock of him finally having his life
 7    back and wanting to hold these detectives
 8    or the City of Philadelphia accountable
 9    for, like, ruining his life.
10    Q.       Do you know what the allegations
11    specifically are as they pertain to the
12    City of Philadelphia?
13    A.       No, not really.
14    Q.       Have you talked to anyone else
15    besides Mr. Outlaw about the complaint or
16    this lawsuit?
17                    MR. VAN NAARDEN:
18             Objection to the extent asking for
19             privileged information and
20             discussions with counsel.
21                    MS. ROSENTHAL:  I
22             would -- you know, let's come back
23             to that.  There's a lot of
24             privileged issues and it makes
```

Monique Solomon
7/22/2022

```
 1              sense to return to them after

 2              consideration.

 3    BY MS. ROSENTHAL:

 4    Q.        What's your understanding for

 5    relief Mr. Outlaw's seeking in this action?

 6    A.        I don't really know how to answer

 7    that question because it's like how can

 8    anybody put a value on his life.  Like, he

 9    missed out on so much.  He was away for 16

10    years.  He can't get that time back, um --

11    Q.        So when you -- sorry.  Are you

12    finished?  I don't want to cut you off.

13    A.        He can't get that time back, and

14    more than anything he just wants, you know,

15    the people that were supposed to do the

16    right thing to be held accountable so that,

17    you know, this doesn't happen to somebody

18    else.

19    Q.        So when you said that you don't

20    know how you can put a value on life,

21    correct me if I'm wrong, but did you mean

22    by that, that were you referring to money

23    damages?

24    A.        Just his life.  Like, when you say
```

1    what type of relief is he expecting in

2    filing this lawsuit, it's like, well, he

3    missed 16 years of his life, so how can you

4    get some type of relief of missing 16 years

5    of your life because you can't get that

6    time back, you can't get that experience

7    back and how do you rebuild and repair

8    after you missed so much time.

9    Q.       Well, do you understand that

10   Mr. Outlaw is seeking specific forms of

11   relief in this action?  I guess my question

12   is a little different.

13        My question is to what is your

14   understanding, if you have one, of what

15   relief Mr. Outlaw is specifically seeking

16   in this lawsuit?

17                    MR. VAN NAARDEN:  Asked

18            and answered.  Objection.  You can

19            answer again.

20                    THE WITNESS:  Well, it's

21            a civil complaint so obviously

22            he's looking for some type of

23            financial compensation.

24   BY MS. ROSENTHAL:

Monique Solomon
7/22/2022

1   Q.        Okay.  That was my question.  So

2   it's your understanding he's seeking

3   damages?  Do you have -- yes?

4   A.        Yes.

5   Q.        Okay.  And do you have an

6   understanding of how much money he's

7   seeking?

8   A.        No.

9   Q.        Have you discussed it with him?

10  A.        No.  From my understanding, I

11  believe it's like the jury's job to put a

12  value on it.

13  Q.        Has he made any remarks to you

14  about how much money he would expect to

15  receive either specifically or generally?

16  For example, hundreds of thousands of

17  dollars, millions of dollars, have you had

18  any discussions like that?

19  A.        No.  More than anything, like, he

20  just wants his life back and to pick up the

21  pieces where his life was taken.

22  Q.        If Mr. Outlaw does obtain money as

23  part of the settlement or judgment in this

24  case, is it your understanding that the

1    money would be marital property?

2                    MR. VAN NAARDEN:

3           Objection.

4                    MS. ROSENTHAL:  You can

5           answer.

6                    MR. VAN NAARDEN:  No, I'm

7           thinking about it.  I'll let her

8           answer the question.

9                    MS. ROSENTHAL:  Do you

10          still have an objection or --

11                   MR. VAN NAARDEN:  I still

12          have an objection, yes.

13                   MS. ROSENTHAL:  Okay.

14                   MR. VAN NAARDEN:  What

15          individuals do with settlements or

16          verdict money is not an

17          appropriate fodder for

18          investigation, but I'll let her

19          answer this question.

20                   MS. ROSENTHAL:  Can you

21          read back the question?

22                   MR. VAN NAARDEN:  It also

23          asks for -- I'm sorry.  It also

24          asks for a legal analysis of

Monique Solomon
7/22/2022

```
 1              marital laws for which she has no
 2              experience.
 3                      MS. ROSENTHAL:  Well, I'm
 4              asking for just to clarify your
 5              understanding if you have one.
 6                      COURT REPORTER:  I'm
 7              sorry.  Can you repeat that --
 8                      MS. ROSENTHAL:  Sure.
 9              Let me just repeat the question.
10   BY MS. ROSENTHAL:
11   Q.      So if you do have an
12   understanding, if Mr. Outlaw obtains money
13   as part of the settlement or judgment in
14   this case, is it your understanding that
15   the money would be marital property,
16   meaning it would be shared?
17                      MR. VAN NAARDEN:
18              Objection.  You can answer.
19                      THE WITNESS:  My
20              understanding of our marriage is
21              that what's mine is his and what's
22              his is mine, so we share
23              everything.
24   BY MS. ROSENTHAL:
```

1   Q.      So would it be fair to say that if

2   Mr. Outlaw obtained money as part of the

3   settlement or judgment, you would have a

4   financial benefit to that?

5                       MR. VAN NAARDEN:

6           Objection.  You can answer.

7                       THE WITNESS:  Again, we

8           are married and we share

9           everything so --

10  BY MS. ROSENTHAL:

11  Q.      I'm just looking for a yes or no.

12  Would it be financially beneficial for

13  Mr. Outlaw to obtain mon -- strike that.

14          Would it be financially beneficial

15  to you personally for Mr. Outlaw to obtain

16  money as a part of the settlement or

17  judgment in this case?

18                      MR. VAN NAARDEN:

19          Objection.  Asked and answered.

20          And not reasonably calculated to

21          lead to discoverable evidence.

22          I'll let you answer it again

23          however you so choose.

24                      THE WITNESS:  Can you

```
 1              repeat the question?
 2                   COURT REPORTER:  I'm
 3              sorry.  I'm trying to -- my
 4              computer is about to die --
 5                   MS. ROSENTHAL:  Do you
 6              remember the --
 7                   COURT REPORTER:  Excuse
 8              me.  This is not working at all.
 9                   MS. ROSENTHAL:  Can we go
10              off the record.
11                   THE VIDEOGRAPHER:  We're
12              now going off record.  The time is
13              10:50 a.m.
14                   (Brief recess.)
15                   THE VIDEOGRAPHER:  We're
16              now back on record.  The time is
17              now 10:57 a.m.
18         BY MS. ROSENTHAL:
19         Q.      What is your home address?
20         A.      241 Cambridge Road, Clifton
21         Heights, Pennsylvania.
22         Q.      Oh, and sorry.  I should have done
23         this at the very beginning.  Can you state
24         your full name for the record?
```

Monique Solomon
7/22/2022

```
1    A.        Monique Solomon Outlaw.

2    Q.        Okay.  Your legal name is Solomon

3    Outlaw?

4    A.        Yes.

5    Q.        I saw Solomon in some places and

6    just wanted to be sure.  How long have you

7    lived at this address?

8    A.        Since June of 2016.

9    Q.        Have you lived there continuously

10   in that time period?

11   A.        Yes.

12   Q.        Do you own it or rent?

13   A.        Own.

14   Q.        And you purchased the property in

15   June 2016?

16   A.        Yes.

17   Q.        Okay.  And is it owned exclusively

18   by you or are there any other co-owners?

19   A.        Just myself.

20   Q.        So Mr. Outlaw is not on the deed

21   or mortgages?

22   A.        No.

23   Q.        Who do you live with currently?

24   A.        Me and Donald.
```

Monique Solomon
7/22/2022

```
 1   Q.        Okay.  No other family members
 2   live with you?
 3   A.        No.
 4   Q.        Okay.  Did -- was there a time in
 5   the past where your son had lived with you?
 6   A.        Yes.
 7   Q.        And is that DeAndra?
 8   A.        DeAndre.
 9   Q.        When did he move out?
10   A.        Maybe two years ago.
11   Q.        And do you own any other
12   properties besides 241 Cambridge Road?
13   A.        No.
14   Q.        Has Mr. Outlaw lived at that
15   address from the time he was released from
16   his incarceration to the present?
17   A.        No.
18   Q.        What time periods did he live
19   elsewhere?
20   A.        When he was on house arrest.
21   Q.        And was that immediately after he
22   was released?
23   A.        Yes.
24   Q.        And where was he living then?
```

Monique Solomon
7/22/2022

```
1   A.        His sister's house.

2   Q.        What sister?

3   A.        Shanita Star.

4   Q.        Okay.  And where is that?  Sorry.

5   Where is her address?

6   A.        1914 74th Avenue.

7   Q.        In Philadelphia?

8   A.        Yes.

9   Q.        And did he live there continuously

10  while on house arrest?

11  A.        No.  We later went to another

12  house --

13  Q.        When -- sorry.  Go ahead.

14  A.        I'm not sure of the exact address,

15  but I think it's 4862 North 15th Street.

16  Q.        And why is it that he was living

17  with his sister while on house arrest?  Is

18  there a reason why he could not live with

19  you?

20  A.        He had to stay in Philadelphia and

21  I don't live in Philadelphia.

22  Q.        Okay.  And when you said that we

23  went to a different address, were you

24  referring to you and him?
```

Monique Solomon
7/22/2022

```
 1   A.        Yes.

 2   Q.        Okay.  So what -- I just want to

 3   make sure I understand your testimony.  I

 4   thought you had testified earlier that

 5   you --

 6   A.        Well, I actively do live at my

 7   house.  But when he got off of house

 8   arrest, I did stay nights at his sister's

 9   house.

10   Q.        Okay.  So his sister moved to

11   North 15th Street?

12   A.        No.

13   Q.        Okay.

14   A.        His sister lives at 1914 74th

15   Avenue.

16   Q.        So you stayed nights there?

17   A.        I would stay nights there.  And

18   then he went to 15th Street which I also

19   was at 15th Street with him too in addition

20   to being at my house.

21   Q.        Okay.  So were you living part-

22   time at 15th Street?

23   A.        Yes.

24   Q.        But your legal residence was still
```

```
1    241 Cambridge?

2    A.        Yes.

3    Q.        Okay.  And do you know what time

4    period he moved to North 15th Street?

5    A.        I want to say maybe November until

6    he got off of house arrest.

7    Q.        Okay.  And was anyone else living

8    there besides him?

9    A.        No.

10   Q.        And was that a property that was

11   leased or owned?

12   A.        It was leased.

13   Q.        Okay.  Was it leased in his name

14   or your name or both of your names?

15   A.        No.  Well, it wasn't really

16   leased.  All the utilities were in my name

17   and I paid the utilities.

18   Q.        When you say it wasn't really

19   leased, what do you mean by that?

20   A.        Like, we didn't have like an

21   official signed lease.

22   Q.        Was it someone who was letting you

23   stay there?

24   A.        Yeah, it was a friend letting us
```

Monique - Solomon
7/22/2022

1   stay there.

2   Q.      Okay.  Who was the friend?

3   A.      I don't know the friend.

4   Q.      Okay.  And then did he stay there

5   continuously through the end of his house

6   arrest?

7   A.      Yes.

8   Q.      And then moved to 241 Cambridge

9   Road?

10  A.      Yes.

11  Q.      And have you both lived there ever

12  since?

13  A.      Yes.

14  Q.      And where did you live before 241

15  Cambridge?

16  A.      3708 Schuylkill Falls Lane.

17  Q.      And how long did you live there

18  for?

19  A.      I think I moved there in 2006, but

20  I'm not 100 percent sure when I moved

21  there.

22  Q.      So you lived there for about 10

23  years?

24  A.      Maybe.

Monique Solomon
7/22/2022

1    Q.        Okay.  And who did you live with

2    there, if anyone?

3    A.        Me and my son.

4    Q.        Did you own or rent that property?

5    A.        Rent.

6    Q.        Are you presently employed?

7    A.        Yes.

8    Q.        And who's your employer or

9    employers?

10   A.        I work for the Law Office of

11   Robert Katz.

12   Q.        Any other employers?

13   A.        No.

14   Q.        How long have you worked at the

15   Law Office of Robert Katz?

16   A.        August of 2012, I believe.

17   Q.        What is your position there?

18   A.        Paralegal.

19   Q.        Have you been a paralegal since

20   August of 2012?

21   A.        Yes.

22   Q.        Were you employed as a paralegal

23   elsewhere prior to there?

24   A.        No, I was a legal secretary prior

```
 1   to that.

 2   Q.       With the same office?

 3   A.       No, a different office.

 4   Q.       Okay.  And the Law Office of

 5   Robert Katz, what type of law do they

 6   practice?

 7   A.       Like motor vehicle acci -- well,

 8   civil litigation like motor vehicle

 9   accidents and slip-and-falls.

10   Q.       Just exclusively motor vehicle

11   accidents, slip-and-falls?

12   A.       Yes.

13   Q.       Okay.  And what are your

14   responsibilities as a paralegal?

15   A.       I set up insurance claims, help

16   with property damage, draft minors

17   petitions, draft complaints.

18   Q.       When you say help with --

19   A.       Get --

20   Q.       Sorry.  Go ahead.

21   A.       Get medical records.

22   Q.       When you say help with property

23   damage --

24   A.       Oh, like helping the client get
```

Monique Solomon
7/22/2022

```
1    their vehicle repaired.

2    Q.      Anything else?  Any other

3    responsibilities that come to mind?

4    A.      Whatever he sees fit for me to do

5    pretty much.

6    Q.      Are you the only paralegal?

7    A.      Yes.

8    Q.      And how many attorneys are there?

9    A.      Right now there's just one.

10   Q.      Is that Robert Katz?

11   A.      Yes.

12   Q.      So that's who you report to?

13   A.      Yes.

14   Q.      Okay.  Do you have any

15   responsibility preparing for depositions?

16   A.      No.

17   Q.      Do you sit in depositions as part

18   of your work responsibility?

19   A.      No.

20   Q.      Okay.  What about responding to

21   subpoenas?

22   A.      No.

23   Q.      Gathering documents in response to

24   requests for production?
```

```
1    A.        Not really.  The attorney -- well,

2    the attorney we had before, it was just

3    Robert Katz, because we had another

4    attorney.  He would mainly do discovery.

5    Q.        Sorry.  You said prior -- well,

6    that's probably fine.  Have you had any

7    other employers since 2012?

8    A.        No, not that I can think of.

9    Q.        Okay.  What type of training, if

10   any, do you have as a paralegal?

11   A.        I have a paralegal certificate.

12   Q.        What's entailed in getting a

13   paralegal certificate?

14   A.        I took classes.

15   Q.        Okay.  So like is it yearlong, how

16   long?

17   A.        I believe it was a year program.

18   Q.        Okay.  And do you have any college

19   or post-high school education?

20   A.        Yes.  I attended Rosemont College.

21   Q.        Sorry?

22   A.        Rosemont College.

23   Q.        What year did you graduate?

24   A.        Um --
```

Monique Solomon
7/22/2022

```
1   Q.        It's okay.  You can give me an
2   estimate.
3   A.        That is a very good question.
4   Q.        Approximately?
5   A.        Maybe -- maybe May of 2017, '18 or
6   '19.  Maybe it was '18 or '19 -- or, no,
7   it -- no, maybe it was '18 or '19.
8   Q.        Okay.  And what degree did you
9   obtain?
10  A.        Bachelor's in Business
11  Communication.
12  Q.        So were you -- you were attending
13  that program while working full-time?
14  A.        Yes.
15  Q.        It was a four-year program or --
16  A.        It was, but I turned it into a
17  10-year program obviously.
18  Q.        Okay.  Any other training or
19  education past college?
20  A.        Like --
21  Q.        Just higher education or you
22  mentioned the paralegal certificate.
23  Anything like that?  Did you attend
24  graduate school?
```

1    A.        No.

2    Q.        Do you have any other

3    certifications?

4    A.        I do have a certification in

5    something to do with my home care, but not

6    really sure exactly what it's called.

7    Q.        Okay.  I should have asked when I

8    was talking about employers.  Are there any

9    businesses that you don't have an

10   employee/employer relationship with, but

11   you're affiliated with, like you have an

12   ownership interest or you work as an

13   independent contractor?

14   A.        Yes.

15   Q.        What are those?

16   A.        I own a home health care business.

17   Q.        What's that called?

18   A.        It is called Outlaw Tender Touch

19   Home Care, where our touch is family.

20   Q.        Are you the only business owner?

21   A.        Yes.

22   Q.        Okay.  And you said you have some

23   certification or something to do with that,

24   but you're not sure what?

Monique Solomon
7/22/2022

```
1    A.        Yes.

2    Q.        Explain what you mean.

3    A.        I think it's just like a -- I had

4    took this online seminar for a home health

5    aide maybe like two years ago.  I don't

6    even know if it's still active honestly.

7    Q.        Is your business still active?

8    A.        Yes.

9    Q.        Do you have a nursing degree?

10   A.        No.

11   Q.        So you may be a home health

12   care -- certified home health care aide but

13   you're not sure?

14   A.        Excuse me?

15   Q.        Sure.  Are you saying that you may

16   have taken a home health care aide class,

17   but you're not sure exactly?

18   A.        No, I did.  I am -- I do have a

19   certificate to be a home health care aide.

20   Q.        Okay.  But you're not sure if it's

21   still active?

22   A.        I don't know if it's still active,

23   but I don't care for any clients or

24   anything like that.
```

Monique - Solomon
7/22/2022

```
 1   Q.         Does your business have any

 2   participation in the Medicaid or Medicare

 3   program?

 4   A.         We are currently waiting for

 5   Medicare approval.

 6   Q.         What about Medicaid?

 7   A.         Medicaid.

 8   Q.         Have you received any money from

 9   either?

10   A.         No.

11   Q.         Have you served any clients

12   through this business?

13   A.         No.

14   Q.         Do you have any employees?

15   A.         No.  It's still up and coming.

16   Q.         Have you generated any income at

17   all?

18   A.         No.

19   Q.         When did you say you started this

20   business?

21   A.         I want to say maybe January of

22   2020 is when I got the LLC, I believe.  I'm

23   not 100 percent sure.

24   Q.         How much money would you say
```

Monique Solomon
7/22/2022

1   you've invested in this business total?

2   A.        I don't know the exact dollar

3   amount.

4   Q.        What's your best guess?  You can

5   give me a range.

6   A.        Maybe a little over $1,000.  I'm

7   not 100 percent sure.

8   Q.        Okay.  So it cost $1,000 about, if

9   you go through all the -- to go through the

10  whole process of registering the business,

11  anything else you have to do, getting

12  Medicare and Medicaid approval?

13  A.        I wouldn't say it cost that much.

14  It could be more.  I don't have an exact

15  dollar amount.

16  Q.        But you would say it's less than

17  $10,000?

18  A.        Oh, yes.

19  Q.        So what makes you -- well, has

20  this business filed a tax return at all in

21  any year?

22  A.        No, we haven't generated any

23  income.

24  Q.        What makes you keep a business

1    open for two years that hasn't generated

2    any income?

3    A.        Well, because I'm still building

4    it and me just personally when I do open, I

5    want it to be put together right and I've

6    literally taken my time with picking a

7    logo, developing our mission statement

8    because this is, like, my baby and I want

9    it to be perfect so I don't want to just,

10   you know, half do something so that's why

11   we're not open because it's not good enough

12   right now.

13   Q.        Do you have a website?

14   A.        No, I'm still working on that.

15   Q.        Do you advertise as being open?

16   A.        No.

17   Q.        And when did you fill out that --

18   sorry.  You said you were working.  Let me

19   make sure I heard you right.  You're

20   working on Medicare and Medicaid approval?

21   A.        Yes, we're waiting for, like, I

22   submitted the application and I'm waiting

23   for it to be approved.

24   Q.        Okay.  When did you submit the

1   applications?

2   A.        April of this year.

3   Q.        Have you ever worked as a home

4   health aide?

5   A.        No.

6   Q.        Has your husband Mr. Outlaw that

7   you know of?

8   A.        I'm not sure -- oh, no, he does

9   have a home health aide certificate.

10  Q.        Has he ever been employed as one?

11  A.        I'm not sure.

12  Q.        When did he get the home health

13  aide certificate?

14  A.        When he was incarcerated.

15  Q.        Does he have any affiliation with

16  Outlaw Tender Touch?

17  A.        Not like on paperwork, but we do

18  brainstorm ideas.  Like, he helped with the

19  logo and (inaudible).

20  Q.        Any other businesses?

21  A.        We also own a demolition company.

22  Q.        When you say we, do you mean you

23  and your husband?

24  A.        Yes.

```
 1   Q.        What's the name of that company?

 2   A.        Outlaw Demolition & Restoration.

 3   Q.        And so, are you -- you and

 4   Mr. Outlaw are co-owners?

 5   A.        Yes.  I believe my son is on that

 6   company too.

 7   Q.        When you say on it, he --

 8   A.        Like, he's on the LLC.

 9   Q.        Okay.  And how long has that been

10   open for?

11   A.        I believe in 2020.  I'm not sure

12   of the exact date.

13   Q.        Have you generated any income

14   through that?

15   A.        Not really.  I don't really handle

16   the demolition.  I'm not really involved in

17   that part.

18   Q.        Who handles the finances?

19   A.        Well, I'm just having a hard time

20   answering that question because it's, like,

21   I don't want to say, like, I don't think

22   any money has generated from the Outlaw

23   Demolition, but I'm not 100 percent sure.

24   Q.        Who would know the answer to that?
```

```
 1    A.         Donald.

 2    Q.         Has the demolition company filed a

 3    tax return, a federal or state tax return

 4    to your knowledge since it's been open?

 5    A.         I'm not 100 percent sure.

 6    Q.         Have you seen one?

 7    A.         No.

 8    Q.         Are you aware if any income has

 9    been received through the company has been

10    income that you've accounted for on your

11    own tax return?

12    A.         I'm not sure.

13    Q.         Do you prepare your tax returns or

14    you have someone else prepare them?

15    A.         I not only prepare my tax returns.

16    Q.         Do you have an accountant?

17    A.         Excuse me?

18    Q.         An accountant?

19    A.         No, I'm not, which is why I don't

20    do it anymore.

21    Q.         Oh, you don't -- when was the last

22    time you filed a tax return?

23    A.         2021.

24    Q.         Okay.  So --
```

Monique Solomon
7/22/2022

```
1   A.        Did you -- you asked me am I an
2   accountant or do I have one?
3   Q.        Sorry.  You said that you don't
4   prepare your tax returns so I was asking if
5   someone else prepared them.
6   A.        No, you said --
7   Q.        I'm not saying you were an
8   accountant.  I'm saying does an accountant
9   prepare your tax returns?
10  A.        No.  You asked me if I prepared my
11  taxes and I said I did.  And --
12  Q.        Okay.
13  A.        -- you said are you an accountant.
14  So --
15  Q.        Sorry.  That was just a total
16  miscommunication.
17  A.        Oh.
18  Q.        So I was asking -- well, let's
19  just back up.  Has any income from the
20  demolition company been accounted for on
21  your tax returns or do you not know?
22  A.        No.
23  Q.        You don't know or it hasn't been?
24  A.        Both, no.
```

```
1    Q.        Sorry.  Do you --
2                      MS. ROSENTHAL:  Can you
3            read back the question?
4                      (The last question was
5            read back.)
6                      THE WITNESS:  And I said
7            no.
8    BY MS. ROSENTHAL:
9    Q.        Okay.  So let's break up the
10   question.  Has any money from the
11   demolition company been accounted for in
12   your tax returns?
13   A.        No.
14   Q.        Okay.  So just to clarify, you do
15   know that no money has been accounted for?
16   A.        No.
17   Q.        I just -- there's a difference
18   between you not knowing and you knowing
19   that it hasn't been accounted for on your
20   tax return, so I'm unclear how you don't
21   know and --
22   A.        Well --
23   Q.        But maybe you can elaborate.
24   A.        Well, no, as far as we haven't
```

```
1    filed business taxes yet.

2    Q.       Okay.  So what I was asking is

3    have you personally received any income

4    that you've accounted for on your tax

5    return?

6    A.       From the demolition company --

7    Q.       Yes.

8    A.       -- no.

9    Q.       Okay.  So if income has been

10   received through that, it has gone -- you

11   haven't received any of it?

12   A.       Any of?

13   Q.       The income if there has been

14   any -- let's just move on.

15            Are you familiar with the

16   Pennsylvania Bar Association's ethical

17   guidelines for nonlawyers?

18   A.       No.

19   Q.       Okay.  Are you familiar with the

20   concept of spoliation?

21   A.       No.

22   Q.       I want to mark as Exhibit 1 -- oh,

23   wait, back up.  Before I get there, is it

24   correct that you're currently married to
```

1    Mr. Outlaw?

2    A.      Yes.

3    Q.      And have you ever been married to

4    anyone else?

5    A.      No.

6    Q.      Do you have any children?

7    A.      Yes.

8    Q.      Names and ages?

9    A.      DeAndre Solomon, 24.

10   Q.      And he's your only child?

11   A.      Yes.

12   Q.      And is Mr. Outlaw his father --

13   sorry, his biological father?

14   A.      No.

15   Q.      Who is his biological father?

16   A.      Justin Clark.

17   Q.      Okay.  Now, I'm going to turn to a

18   document that I'm going to mark as, if I

19   can find it -- okay.  I'm going to mark as

20   Exhibit 1, if the court reporter could mark

21   it.

22                    (Exhibit marked Exhibit 1

23         for identification.)

24   BY MS. ROSENTHAL:

Monique Solomon
7/22/2022

```
1   Q.        Do you recognize this document?

2   A.        Yes.

3   Q.        Okay.  Can you describe the

4   document just for the record, a brief

5   description?

6   A.        A subpoena with an exhibit.

7   Q.        Okay.  Do you recognize this as

8   the subpoena for you to testify today in

9   this case with an exhibit listing items

10  requesting that items -- sorry, strike

11  that.

12            Do you recognize this as a

13  subpoena for you to testify today and also

14  to produce items that are listed in Exhibit

15  A?

16  A.        Yes.

17  Q.        I want you to turn to the last

18  page which is Exhibit A to the subpoena.

19  There are three items listed here.  I want

20  to go through each of them briefly.  Any

21  and all communications between yourself and

22  any of Donald Outlaw's attorneys

23  representing him in the case of

24  Commonwealth of Pennsylvania v. Donald
```

Monique Solomon
7/22/2022

1   Outlaw, and then there's the Docket No.

2          Did you understand that this

3   subpoena was asking you to search for and

4   produce any documents that fall into that

5   category?

6   A.       Yes.

7   Q.       And did you undertake a search for

8   such documents?

9   A.       Yes.

10  Q.       And did you locate any documents

11  other than those that have already been

12  produced?

13  A.       Can you repeat the question?

14  Q.       Sure.  Other than the doc -- and

15  maybe I'm presuming in the question that

16  you know which documents have been

17  produced.  So did you locate any

18  communications other than documents that

19  you have already turned over to

20  Mr. Van Naarden or anyone else in his

21  office responsive to the subpoena?

22  A.       So you're asking me if I have

23  anything else that in addition to what I

24  already gave you?

```
1   Q.        Yes.  I'm asking whether you --

2   this is a second subpoena that was

3   different from the first subpoena that you

4   received.  So I had asked if you had

5   searched for these and you said yeah.  So

6   I'm asking whether you located any others

7   than documents that you had turned over?

8   A.        No.

9   Q.        Okay.  But you did undertake a

10  separate search?

11  A.        Yes.

12  Q.        Okay.  No. 2, any and all

13  communications between yourself and any

14  other individual including private

15  investigators about the case of

16  Commonwealth of Pennsylvania v. Donald

17  Outlaw or the present matter?

18            I understand that your counsel is

19  asserting a privilege objection to that and

20  we would ask for a privilege log.  But

21  putting that aside, did you undertake --

22                      MR. VAN NAARDEN:  Only

23            substant -- I'm not lodging an

24            objection to any communications
```

Monique Solomon
7/22/2022

1        with private investigators related

2        to Don's criminal case.

3                MS. ROSENTHAL:  I

4        believe --

5                MR. VAN NAARDEN:  She

6        wasn't his -- she wasn't a client

7        of the criminal defense attorney's

8        Commonwealth --

9                MS. ROSENTHAL:  Yeah, I

10        believe Julia sent an email last

11        night saying I think it was

12        directed toward the present

13        matter.

14                MR. VAN NAARDEN:  It's

15        about the present matter.

16                MS. ROSENTHAL:  Yeah.

17                MR. VAN NAARDEN:  Yeah.

18        But about the criminal matter, no,

19        you have all of that stuff.

20                MS. ROSENTHAL:  Right.

21        So I would ask for a privilege log

22        as far as anything related to the

23        present matter.

24    BY MS. ROSENTHAL:

1   Q.       But putting that aside, did you

2   undertake a -- did you understand what this

3   No. 2 was requesting?

4   A.       Yes.

5   Q.       And did you undertake a search for

6   documents?

7   A.       Yes.

8   Q.       And did you turn over all

9   documents that were responsive to the

10  counsel who's representing you in the

11  deposition today?

12  A.       Yes.

13  Q.       And then third, any and all

14  communications about any subject matter

15  between yourself and Derrick Alston, Eric

16  Lee, Charles Paladino, Chris Holder, Wesley

17  Harmon, Lemuel Barr, Anthony Brisbon,

18  Katima Jackson, Antoinette Alexander, Lamar

19  Braheem Rogers and/or Yashon Williams.  Do

20  you understand what that document request

21  search was requesting?

22  A.       Yes.

23  Q.       And did you undertake a search for

24  all communications responsive?

Monique Solomon
7/22/2022

1   A.        Yes.

2   Q.        And did you find any additional

3   responsive documents?

4   A.        No, I don't believe so.

5   Q.        I want to now show you a document

6   that I'm going to mark as Exhibit 2.

7                        MR. VAN NAARDEN:  Just if

8            we have a second so the record is

9            clear, the one that -- Exhibit 1

10           is the subpoena that was served on

11           July 19th, three days ago.

12                       MS. MAYS:  Yes.

13                       (Exhibit marked Exhibit 2

14           for identification.)

15   BY MS. ROSENTHAL:

16   Q.        Sorry.  Oh, you can put this

17   aside.  Have you seen this document before?

18   A.        Yes.

19   Q.        And can you describe it for the

20   record?  And it will be helpful if you

21   specifically list the date just for the

22   record so it's specific.

23   A.        The subpoena is dated May 17,

24   2022.

Monique Solomon
7/22/2022

1   Q.       Um --

2   A.       4/26/22.

3   Q.       Okay.  It's a subpoena for --

4   would you agree it's a subpoena requesting

5   the production of documents that is six

6   pages in total long, including an addendum?

7   I'm just describing it for the record.

8   Would you agree with that?

9   A.       Yes.

10  Q.       And is this the subpoena that you

11  said that you reviewed in preparation for

12  your deposition today?

13  A.       Yes.

14  Q.       When you received this subpoena,

15  can you describe what search you undertook

16  for documents responsive to it?  And if

17  it's helpful, you can go item-by-item, but

18  you can also describe generally.  Why don't

19  we go one-by-one.  I'm going to turn to the

20  first request.

21          So on Page 2 of Exhibit A, do you

22  see where it starts all communications to

23  and from you, on the one hand in any of the

24  following individuals on other, Charles

```
1   Paladino, Lamar Rogers, Eric Lee, Yusef

2   Brown, Wesley Harmon, Derrick Alston,

3   Christopher Holder, Lemuel Barr, Maria

4   Rogers, Nicole Clark, Yashon Williams,

5   Jabril Jones, Sania Williams, Keith Rogers,

6   Kevin Rogers, Brendra Rogers and Katima

7   Jackson.  Please note that this request is

8   intended to also include any pseudonyms

9   used by these individuals so long as you

10  understand the pseudonyms used synonymous

11  with the names referenced.

12          Do you remember reading that

13  request?

14  A.      Yes.

15  Q.      And do you understand what it was

16  asking for?

17  A.      Yes.

18  Q.      Can you tell me what search you

19  undertook for documents responsive to it?

20  A.      I did a search on my computer with

21  my email to see what came up when I put

22  these names in.

23  Q.      And what email account was that?

24  A.      Moniques3708@aol.com.
```

Monique Solomon
7/22/2022

```
1   Q.        Is that the only email account
2   that you have access to?
3   A.        Yes.
4   Q.        When you said that you did a
5   search, put the names in, do you mean that
6   you entered each individual's name into
7   your AOL account and reviewed all the
8   emails that popped up?
9   A.        Yes.
10  Q.        Do you know any of these
11  individuals by any nicknames or other names
12  that they go by?
13  A.        Paladino.
14  Q.        What other name?
15  A.        Pop.
16  Q.        What about Wesley Harmon?
17  A.        He goes by Sa.
18  Q.        Okay.  I'm not going to go through
19  each one of these, but did you, for
20  example, type in Sa or Pop to your AOL
21  account to see whether any emails arose?
22  A.        Yes.
23  Q.        Okay.  So what else -- so tell me
24  what other names then you searched for.
```

Monique Solomon
7/22/2022

```
1    A.        Lamar Rogers.
2    Q.        Sorry.  I understand that you put
3    each of the individual's names.  I'm
4    saying -- you said you searched for the
5    word Pop?
6    A.        Yes.
7    Q.        And Sa?
8    A.        Yes.
9    Q.        Okay.  So what other names did you
10   search for?
11   A.        Derrick Alston -- well, you know,
12   Shank.
13   Q.        Okay.
14   A.        That was it because these other
15   people, a lot of these names, like, I don't
16   know.
17   Q.        Okay.
18   A.        So when they were put in my email,
19   nothing came up.
20   Q.        Which names are you not familiar
21   with?
22   A.        Marie Rogers, Nicole Clark, Yashon
23   Williams, Sania Williams, Keith Rogers,
24   Kevin Rogers, Brenda Rogers.
```

Monique Solomon
7/22/2022

```
1   Q.      Do you know any of these

2   individuals' email addresses?

3   A.      No.

4   Q.      So would it be fair to say that

5   you didn't do any searches for any specific

6   email addresses pertaining to these

7   individuals?

8   A.      Yes.

9                   MR. VAN NAARDEN:  Can

10          I -- just to clarify, you had sent

11          us a list that had search terms.

12                  MS. ROSENTHAL:  Mm-hmm.

13                  MR. VAN NAARDEN:  I don't

14          know if you want to explore that

15          because she was shown these other

16          search terms to look for.  This is

17          your opportunity to ask her so she

18          was shown that list, yeah.

19                  MS. ROSENTHAL:  Thanks

20          for that.  Thanks for that

21          suggestion.

22   BY MS. ROSENTHAL:

23   Q.      Did you search for -- did you

24   search anywhere else besides your AOL email
```

Monique Solomon
7/22/2022

```
 1   account?  For example, on your computer
 2   would there be any documents on your
 3   computer -- let me rephrase that.
 4          Would there be any communications
 5   other than in your email account?
 6   A.      No.
 7   Q.      What about on phones?  Have you
 8   texted with any of these individuals?
 9   A.      No.
10   Q.      So looking at these names, there's
11   not a single individual you've sent a text
12   message to or received a text message to
13   that you can remember?
14   A.      No.
15   Q.      What about could there be any
16   letters that would be saved other than
17   email?
18   A.      Not that I'm aware of.
19   Q.      Hard copy letters?
20   A.      No.
21   Q.      Well, is it correct that you had
22   attached -- or sorry.  Are you aware that
23   attached to certain filings in Mr. Outlaw's
24   criminal proceedings, and I say that
```

1   including appellate and Post Conviction

2   Relief Act proceedings there were certain

3   communications with some of these

4   individuals that were attached to those

5   proceedings?

6   A.        Can you repeat that?

7   Q.        Yeah, why don't actually we skip

8   that and we can return to it and we can

9   take a look at it specifically.

10  A.        Excuse me.  Can I get a tissue?

11  Q.        Sure.  Let's go off the record.

12                     THE VIDEOGRAPHER:  We're

13             now going off record.  The time

14             now is 11:41 a.m.

15                     (Brief recess.)

16                     THE VIDEOGRAPHER:  We're

17             now back on record.  The time is

18             11:42 a.m.

19  BY MS. ROSENTHAL:

20  Q.        I'm going to move on from 1, but

21  let me ask you one final question on that.

22  Do you recall receiving any mail, any snail

23  mail from or sending any snail mail to

24  Charles Paladino, for example?

Monique Solomon
7/22/2022

```
1    A.        Yes.

2    Q.        So when you said -- I'm just

3    trying to understand your statement that

4    there wouldn't be any communications

5    outside of your email.  Is it -- whatever

6    did you undertake to search for any of

7    those communications, for example?

8    A.        Well, you're asking me if I have

9    mail from Paladino, right?

10   Q.        I believe if I understood your

11   testimony correctly, you seemed to say that

12   you have exchanged mail with him.

13   A.        I don't, like, have any letters to

14   give you other than what I've already

15   produced.

16   Q.        Okay.  So did you search for any

17   hard copy letters or are you confident that

18   they are no longer in your possession?

19   A.        I'm confident that they're no

20   longer in my possession.

21   Q.        Okay.  So at one point you did

22   possess such letters?

23   A.        Yes, I did have mail.

24   Q.        And what happened to those
```

1  letters?

2  A.          I got rid of them.  Like, I don't

3  keep mail.  Like, once I read it, I'm done

4  with it.  I didn't have a reason to keep

5  it.

6  Q.          Okay.  So you threw it away?

7  A.          Correct.

8  Q.          When is the most recent time that

9  you can recall having thrown away mail to

10  or from Charles Paladino?

11  A.          I don't recall a date if I haven't

12  heard from him in a while, so I don't

13  remember the last time.

14  Q.          So would it be your practice to

15  throw that away immediately or would you

16  keep it for some period of time or it would

17  depend?

18  A.          Honestly, it just depends, like,

19  where I'm at opening my mail, what I'm

20  doing.  Like, normally when I get mail, I

21  go through it, read it and get rid of it.

22  Q.          Did you throw any mail away since

23  the onset of this case?

24  A.          No.

```
 1                   MR. VAN NAARDEN:

 2             Objection.  You just asked her if

 3             she threw away any mail since she

 4             started the case.

 5                   MS. ROSENTHAL:  Yeah,

 6             sorry.  I will rephrase.

 7   BY MS. ROSENTHAL:

 8   Q.       Did you throw away any mail to or

 9   from any of these individuals since this

10   case was filed?

11   A.       No.

12   Q.       Did you delete any emails

13   involving these individuals to and from

14   this case was filed -- since this case was

15   filed?

16   A.       No.

17   Q.       Have you received any instruction

18   about your obligation to preserve documents

19   that could be relevant evidence -- or

20   sorry, strike that.

21             Have you received any instruction

22   from Mr. Van Naarden or his office about

23   your obligation to retain documents

24   potentially relevant to this case?
```

Monique Solomon
7/22/2022

```
1                    MR. VAN NAARDEN:

2            Objection.  That's going to be

3            privileged.

4                    MS. ROSENTHAL:  I would

5            disagree on that, but let's just

6            preserve it.  I think with all

7            these privileged objections we'll

8            just reserve time in the

9            deposition and we can take up it

10           with the judge and then recall it,

11           if needed.

12                   MR. VAN NAARDEN:  Okay.

13                   MS. ROSENTHAL:  So you're

14           directing her not to answer that?

15                   MR. VAN NAARDEN:  Yes.

16           She's not going to answer

17           questions about discussions she

18           had with her attorney.

19                   MS. ROSENTHAL:  Okay.  I

20           would disagree that a notification

21           about obligation to preserve

22           documents would be privileged, but

23           we can agree to disagree.

24      BY MS. ROSENTHAL:
```

Monique Solomon
7/22/2022

```
1   Q.        Do you understand -- sitting here

2   today regardless of where that

3   understanding came from, do you understand

4   that you have an obligation as a witness in

5   this case not to destroy any documents that

6   could be potentially relevant?

7   A.        Yes.

8   Q.        Would you consider communications

9   to or from any of the key witnesses in this

10  case -- or let me strike that.

11            Would you consider communications

12  to or from any witnesses who have

13  participated at all in the underlying

14  criminal case to be potentially relevant to

15  this action?

16  A.        Yes.

17  Q.        The email account that you

18  mentioned, the AOL email account, does

19  anyone else have access to that account?

20  A.        No.

21  Q.        Okay.  I want to move on to No. 2

22  that's listed, all communications to or

23  from you and Mr. Outlaw's criminal defense

24  attorneys, including his trial, appellate
```

Monique Solomon
7/22/2022

1  and post conviction attorneys about the

2  case of Commonwealth of Pennsylvania v.

3  Donald Outlaw, and then there's a Docket

4  No. listed.  Did you understand that

5  document request?

6  A.        Yes.

7  Q.        And what efforts did you undertake

8  to search for documents responsive to that

9  request?

10  A.        I did a search of his attorneys'

11  names.

12  Q.        How did you come up with a list of

13  attorneys?

14  A.        I know all of his attorneys'

15  names, so I put them in.

16  Q.        Off the top of your head or you

17  have a list somewhere?

18  A.        Off the top of my head.

19  Q.        Okay.  He's had many attorneys

20  over the years.  That's something that I

21  would be interested in having a list of

22  them, so could you go through what

23  attorneys?

24  A.        Well, the attorneys that I've had

```
 1  communication with this.  Like, I know he
 2  has had a lot of attorneys but --
 3  Q.      Okay.  You said that -- whichever
 4  you know of?
 5  A.      Brian Zieger, Mark I think his
 6  last name is Henricks or something like
 7  that.
 8                  COURT REPORTER:  I'm
 9          sorry.  Can you repeat that?
10                  THE WITNESS:  Mark
11          Henricks I believe his last name
12          is.  Dennis Turner, Edward Foster.
13          He had attorneys from Cozen
14          O'Connor for his juvenile issues,
15          and then he had an attorney from
16          the Innocence Project.
17  BY MS. ROSENTHAL:
18  Q.      Do you know the name of the
19  attorneys?
20  A.      Nilam, I can't say her last name.
21  Q.      Any other attorneys that you're
22  aware of or that you searched for
23  communications for?
24  A.      I believe those are it.  The way I
```

1    did the search in addition to, like, his

2    attorneys' names I just put his Case No.

3    and whatever popped up, I would forward

4    that.

5    Q.        Did you search for any particular

6    attorneys at Cozen O'Connor?

7    A.        No, I pretty much put in Cozen

8    O'Connor because that's in the email would

9    have came up with an attorney from them.

10   Q.        Do you have these individuals

11   email addresses?

12   A.        In my email.

13   Q.        Did you search for their email

14   addresses or their names only?

15   A.        Cozen O'Connor is how I did the

16   search.

17   Q.        Sorry.  I understand for that one,

18   Cozen O'Connor.  For the others, did you

19   search for their email addresses or just

20   their names?

21   A.        For Ed Foster, I did his name and

22   his email address.

23   Q.        What about Brian Zieger?

24   A.        Brian Zieger, I just did his name.

Monique Solomon
7/22/2022

```
 1   Q.        Mark Henricks?

 2   A.        The same.

 3   Q.        Dennis Turner?

 4   A.        The same.

 5   Q.        You said Ed Foster.  You did his

 6   name and his email?

 7   A.        Mm-hmm.

 8   Q.        What about Innocence Project?

 9   A.        I did Nilam's name.

10   Q.        I understand that this request

11   pertained to attorneys, but do you have

12   knowledge of any investigators that worked

13   on Mr. Outlaw's case, criminal case

14   including his trial, appellate and post

15   conviction proceedings?

16   A.        I know the Innocence Project maybe

17   they had an investigator.  I'm not 100

18   percent sure.

19   Q.        You don't know the names?

20   A.        No.

21   Q.        Any other investigators' names?

22   A.        Not that I can think of.

23   Q.        Any other attorneys besides the

24   ones that you mentioned that you searched
```

Monique Solomon
7/22/2022

```
1   for?

2   A.        Not that I can think of offhand.

3   Q.        Did you retain all emails to and

4   from these individuals or do you have

5   knowledge of having deleted any?

6   A.        I believe everything that's in my

7   email is everything that I have.

8   Q.        Did you look in your sent email

9   box as well?

10  A.        The way my search -- the way that

11  I did my search it included incoming and

12  outgoing.

13  Q.        Did you have any correspondence

14  other than an email with these individuals?

15  A.        No.

16  Q.        You didn't exchange any hard copy

17  correspondence with them?

18  A.        Oh, I'm not really sure.  I

19  believe pretty much communicated via email.

20  Q.        You have no recollection of having

21  ever exchanged hard copy correspondence?

22  A.        Well, I mean I gave these

23  attorneys, like, Don's hard copies of his

24  file, like, the copies that I had, if
```

Monique Solomon
7/22/2022

1   that's what you mean.

2   Q.        Well, any -- I mean, obviously if

3   you sent something, you would no longer

4   have it.  What was it, your practice to

5   make a photocopy of something you sent out?

6   A.        What through, like, if I gave the

7   attorney his file?

8   Q.        (Nodding affirmatively).

9   A.        No, I would just give him the file

10  because I know...

11  Q.        What about communications you

12  received through them, the hard copy,

13  sorry, from them?

14  A.        Normally, anything that the

15  attorney would give me, he would email it.

16  I don't really recall him giving me a hard

17  copy of anything.

18  Q.        Would you ever type anything up on

19  your computer to send via email?

20                      MR. VAN NAARDEN:

21          Objection.

22  BY MS. ROSENTHAL:

23  Q.        Do you understand my question?

24  A.        You asked me if I --

Monique Solomon
7/22/2022

1   Q.        Would there be any documents

2   potentially on your computer, like a letter

3   that you typed up to send via email that

4   would be separately in existence?

5   A.        You're asking me if I typed up a

6   letter and sent the letter by email?

7   Q.        I'm asking would there be

8   communications that would be saved on your

9   computer?  For example, if someone wrote a

10  letter even if you sent it by email and not

11  by snail mail that might separately exist

12  on your computer?

13  A.        No, not that I'm aware of.

14  Q.        Okay.  While Mr. Outlaw's criminal

15  case was ongoing, was it your practice to

16  save these -- to save letters and

17  communications with any of these

18  individuals that you recognize under 1 or

19  with attorneys?

20  A.        What do you mean, like, saved

21  communication?

22  Q.        Well, I think you testified that

23  at least recently when you read something,

24  a letter, you would throw it away.  So

Monique Solomon
7/22/2022

```
 1   during the course of the criminal

 2   proceedings, was it your practice to save

 3   those documents and communications?

 4   A.        Communications, what from these

 5   people?

 6   Q.        Yeah, with attorneys, with those

 7   people?

 8   A.        Well, again if one of the -- if

 9   the attorneys emailed me, then it would

10   still be in my email.

11   Q.        Okay.  I want to move on to 3.

12   All documents reflecting any form of

13   payments or goods either directly or

14   indirectly between you and any of the

15   following individuals on the other hand,

16   Charles Paladino, Lamar Rogers, Eric Lee,

17   Yusef Brown, Wesley Harmon, Lemuel Barr,

18   Maria Rogers, Nicole Clark, Yashon

19   Williams, Jabril Jones, Sania Williams,

20   Keith Rogers, Kevin Rogers, Brenda Rogers

21   and Katima Jackson.  Please note this

22   request is to also include any pseudonyms

23   used by these individuals as long you

24   understand those pseudonyms to be
```

Monique Solomon
7/22/2022

1    synonymous with the names referenced.

2              Did you understand what that was

3    asking for?

4    A.        Yes.

5    Q.        And what search did you undertake

6    for documents?

7    A.        I searched my email for these

8    names.

9    Q.        Well, are there any other sources

10   of documents or information that could

11   potentially be responsive to this request?

12   A.        No, I don't think so.

13   Q.        For example, did you undertake a

14   search to see if you had any checks that

15   you had received from them or that you

16   sent?

17   A.        I don't write checks, so no.

18   Q.        What are the forms of payment that

19   you make to people?

20   A.        For the attorney I would --

21   Q.        Not for an attorney.  For the

22   individuals listed here if you were going

23   to give them payment of goods or payment or

24   goods, how would you do that if you don't

Monique Solomon
7/22/2022

```
1   write checks?
2   A.       Well, I didn't --
3   Q.       This isn't meant to be a trick
4   question.  Would you give them cash?  Do
5   you --
6   A.       Well, I wouldn't give these people
7   anything.  A lot of these people on this
8   list I don't even know.
9   Q.       Well, I'm asking I guess what
10  forms of payment do you normally use
11  because we would ask that you conduct a
12  search to be sure that you don't -- that
13  there were no -- that there was no payment?
14  A.       Well, for inmate I would do my
15  email because money sent to an inmate is
16  through JPay, so I did put in these names
17  and Christopher Holder did come up that I
18  sent him money.
19  Q.       What about on your credit card
20  statements would it reflect any JPay
21  payments if there were any?
22  A.       I believe so.
23  Q.       Did you look at your credit card
24  statements?
```

Monique Solomon
7/22/2022

```
1    A.       The question is, like, because
2    when you send a payment through JPay, you
3    get a confirmation email.  So if I sent
4    somebody a JPay, I would have a log of it
5    on my email, so it really wouldn't be a
6    need for me to check my statement.
7    Q.       Well, are you trying to say for
8    these, and tell me if I'm getting this
9    wrong, but I'm gathering are you saying
10   that you are so confident that there were
11   no payments that were made to any of these
12   individuals that you didn't feel the need
13   to conduct a search beyond your email?
14                   MR. VAN NAARDEN:
15           Objection.
16                   You can answer.  I'm
17           objecting to the form of her
18           question.  I don't think that was
19           your testimony, so go ahead.
20   BY MS. ROSENTHAL:
21   Q.       Yeah.  I'm not sure that you're
22   testifying to that.  I'm just trying to
23   clarify what --
24   A.       I mean, I can say that I'm pretty
```

1    confident that if --

2    Q.       Okay.  Let me just ask:  So you

3    didn't check credit card statements, for

4    example, to see if there are any payments

5    to these individuals, yes or no?

6    A.       Um, I did review my statements,

7    but it's like -- excuse me -- these names

8    weren't in my statement and they wouldn't

9    be in my statement.

10   Q.       So you checked your credit card

11   statements to see if there were any

12   payments made to these individuals?

13   A.       Well, I checked my bank statement

14   that would be with my JPay account.

15   Q.       Okay.  You don't use a credit card

16   with your JPay?

17   A.       No.

18   Q.       Do you use any like app service to

19   transfer money like Venmo or Cash App?

20   A.       I don't have Venmo or Cash App.

21   Q.       Do you have any recollection of

22   paying any of these individuals any form of

23   payment or goods?

24   A.       No, other than Holder which came

Monique Solomon
7/22/2022

1   up in my email and I did produce that

2   document to you.

3   Q.        Do you have any recollection of

4   making any additional payments and beyond

5   JPay records that you've produced?

6   A.        No, not that I'm aware of.

7   Q.        Going for all communications

8   reflecting your efforts to obtain legal

9   records on behalf of Mr. Outlaw from his

10  former or current defense attorney for use

11  in instance civil suit or the underlying

12  case of Commonwealth of Pennsylvania v.

13  Donald Outlaw, what, if any, search did you

14  undertake for documents?

15  A.        Well, isn't No. 2 and No. 5 like

16  the same thing?

17  Q.        We're on 4.

18  A.        Oh.

19  Q.        But during the deposition, it's my

20  job to ask questions and for you to answer

21  it.  If you think they're the same thing,

22  then you can give the same answer.

23  A.        So wait.  All right.  No. 4 is

24  asking if I sent you any documents -- if I

Monique Solomon
7/22/2022

1    produced any documents from his previous

2    attorneys?

3    Q.        No.  If you made any efforts to

4    obtain legal records from them?

5    A.        Like, what I had in my possession

6    or if I reached out to these people and

7    asked them --

8    Q.        Yes, communications where you're

9    reaching out not necessarily to the

10   attorneys, I don't know, other staff to

11   obtain records.  For example, if you made

12   any attempts to obtain records from Norris

13   Gelman communications related to those,

14   what did you do to search for them?

15   A.        I guess I'm not really

16   understanding the question.

17   Q.        Did you not understand what 4 was

18   asking for?

19   A.        It's asking me did I -- to produce

20   records that I have from his attorneys,

21   right?

22   Q.        I think maybe you didn't

23   understand that --

24   A.        From his former attorneys.

Monique Solomon
7/22/2022

1  Q.        So what it's asking for is efforts

2  to obtain record legal records, for

3  example, going to an attorney or the staff

4  and asking for a copy of the file.  Yeah,

5  do you recall testifying in the PCRA

6  hearing about efforts that you made to

7  obtain files?

8  A.        Oh, okay.  See, that's better.

9  I'm glad you said that because I'm

10  thinking -- all right.  Yes, I did reach

11  out to attorneys trying to get a copy of

12  the file.

13  Q.        So I'm asking what search, if any,

14  did you make to look for those records that

15  reflect your effort to obtain legal

16  records?

17  A.        I did a search in my email.  I

18  also went through like, well, any paperwork

19  that I had in my house which I don't have

20  any paperwork pertaining to his case in my

21  house.

22  Q.        When was the last time you had

23  paperwork in your house pertaining to the

24  case?

Monique Solomon
7/22/2022

```
1   A.        When his case was I want to say
2   dismissed, if that was the -- it was
3   dismissed.
4   Q.        When it was nolle prossed?
5   A.        Yes.
6   Q.        And how much paperwork did you
7   have?
8   A.        I mean, it wasn't, like, I can't
9   give you a page number, but it was
10  definitely a lot of documents.
11  Q.        Can you give me an estimate of
12  banker's boxes?
13  A.        Banker's boxes?
14  Q.        Oh, sorry.  You know the standard
15  cardboard boxes?
16  A.        Okay.  Maybe it was enough to fit
17  in a box like that, but not really
18  completely fill the box up.
19  Q.        And what did you do with those
20  when the case was nolle prossed?
21  A.        I don't want to say like we had a
22  celebration and got rid of everything, but
23  it's kind of like when his case was
24  dismissed it was a celebration and I didn't
```

Monique Solomon
7/22/2022

1   need those documents anymore, so it was

2   something that I was glad to get rid of.

3   Q.        So how did you dispose of them?

4   A.        I don't want to say that, like, I

5   burned them or anything like that but --

6   Q.        Well, it's not a matter of what

7   you don't or do want to say.  Just I'm

8   asking for what the truth is.  Did you burn

9   them?

10  A.        Yes, I did dispose of the

11  documents.

12  Q.        Did you burn the documents?  That

13  just calls for a yes or no answer.

14  A.        Yes, I did.

15  Q.        Why are you hesitating saying that

16  you burned the documents?

17  A.        Because it's, like, for me it was

18  a celebration.  But, you know, for somebody

19  looking in, it's just, like, you know, why

20  would you go that far.  And it's, like,

21  disposing of those documents was like a

22  celebration for me and my family, because,

23  like, holding on to these documents was

24  like a burden and it's, like, that burden

1    was lifted.

2    Q.        Did you have -- did Mr. Outlaw

3    burn any documents?

4    A.        No.

5    Q.        Did you have knowledge of the

6    point if the documents were burned that

7    Mr. Outlaw was intending to bring or first

8    of all, had he brought this lawsuit at the

9    time?

10   A.        No, not that I'm aware of.

11   Q.        What was the date?

12   A.        I don't remember the exact date,

13   but it was shortly after his case was

14   dismissed.

15   Q.        Did you think that there was

16   anything wrong about burning the documents

17   from an ethical perspective?

18   A.        No, that was his criminal case and

19   the case was dismissed so there was no need

20   for the documents and they were just

21   copies.

22   Q.        There's a copy of everything in

23   your possession someone else had?

24   A.        No, these are documents that all

Monique Solomon
7/22/2022

1    of his attorneys have.

2    Q.        Were there any originals that you

3    burned?

4    A.        No, I always had copies.

5    Q.        I'm asking if there were originals

6    of any of the documents that were burned?

7    A.        Originals to what?

8    Q.        For example, if a letter was

9    handwritten, an affidavit was handsigned?

10   A.        No.

11   Q.        Who was in possession of all the

12   copies?

13   A.        His attorneys, I would think.

14   Q.        Why would you think that?  Did you

15   give it to them?

16   A.        Well, because the originals would

17   be for the attorneys to have.  I wouldn't

18   have an original.

19   Q.        So everything that you had, you

20   turned over to an attorney?

21   A.        Yes.

22   Q.        And at the point that you burned

23   the documents, did you have knowledge that

24   Mr. Outlaw was intending to bring a civil

1  suit against the City and its former

2  employees related to his criminal case?

3  A.       At that time I'm not sure.  But

4  again, getting -- disposing of the

5  documents was because his case was

6  dismissed and I no longer had a need for

7  the documents, and the documents were my

8  file.

9  Q.       Okay.  I would move to strike the

10  portion of the nonresponsive answer.  My

11  question was only whether you had knowledge

12  that he was intending to bring a civil suit

13  at the time.  And what's your answer to

14  that, yes or no?

15                  MR. VAN NAARDEN:

16          Objection.  Asked and answered.

17                  MS. ROSENTHAL:  All

18          right.  You're right.  It was

19          asked and answered.  Moving on.

20  BY MS. ROSENTHAL:

21  Q.       But you knew those -- sorry, I'll

22  move on.  And what's the reason that you

23  kept them up until the case was dismissed?

24  Is it because you thought that they would

Monique Solomon
7/22/2022

1   be relevant evidence?

2   A.        Relevant evidence to, like, what?

3   It's just like I had a file that I gave to

4   his attorneys and there were maybe, like,

5   his transcripts and stuff like that that I

6   didn't need anymore.

7   Q.        Why did you feel you needed them

8   up until the case was dismissed?

9   A.        Because that was his file and his

10  case was still ongoing.

11  Q.        Okay.  And in your role as a

12  paralegal, you're not familiar with any

13  obligations related to retaining documents

14  when you're aware of impending litigation

15  or current litigation?

16                      MR. VAN NAARDEN:

17          Objection.  Asked and answered.

18          You can answer again.

19                      MS. ROSENTHAL:  She said

20          she was not familiar with the

21          concept of spoliation, so I'm now

22          asking whether --

23  BY MS. ROSENTHAL:

24  Q.        Putting aside the word spoliation,

1    are you aware of any obligation to retain

2    documents when you are on notice of

3    litigation that is impending?

4    A.        Well, I'm not an attorney so I

5    don't have to keep the file.

6    Q.        Okay.  So you don't have any

7    understanding about witnesses having to

8    keep documents?

9    A.        No.

10   Q.        Okay.  I want to switch to go to

11   No. 6, documents efficient to request the

12   joint income received by you and Mr. Outlaw

13   during the tenure of your marriage.

14            Did you and Mr. Outlaw have any

15   joint income at any point?

16   A.        Joint income, like, can you give

17   me an example?

18   Q.        Do you not understand the

19   question?  Do you not understand joint

20   income?

21   A.        Well, again marriage, his money is

22   my money and my money is his money.  So,

23   like, when you say joint income, are you

24   saying, like, money that we made together

1   or just money in general, because again in

2   the marriage his money is my money and my

3   money is his money?

4   Q.        Okay.  So when you read No. 6,

5   that's how you interpreted it, joint

6   income?  Did you understand what that

7   number referred to?

8   A.        Correct.

9   Q.        What efforts did you make to

10  search for any documents responsive to this

11  request?

12  A.        Bank statements.  But again, joint

13  income is like your -- the way I'm reading

14  into it is money that we made together,

15  which technically we haven't made any money

16  together other than he has his job and I

17  have my job.

18  Q.        So let me back up.  Did you

19  provide to your attorneys for production

20  any documents responsive to No. 6?

21  A.        I mean other than, like, our bank

22  statements, we wouldn't have any joint

23  income.

24  Q.        Did you provide your bank

Monique Solomon
7/22/2022

```
1   statements to your attorneys?

2   A.        Yes.

3   Q.        When was that?

4   A.        I don't remember the exact date.

5   Q.        More than two weeks ago?

6   A.        No, I don't recall.

7   Q.        Do you recall if it was more than

8   a month ago?

9   A.        No, I don't remember.

10  Q.        Do you recall whether it was less

11  than a week ago?

12  A.        I'm not sure of the exact date.

13  Q.        Could it have been yesterday?

14  A.        No, it wasn't yesterday.

15  Q.        And have you maintained one or

16  more joint bank accounts at any point with

17  Mr. Outlaw?

18  A.        We have one joint bank account.

19  Q.        And what bank is that with?

20  A.        Wells Fargo.

21  Q.        When was that opened?

22  A.        November of 2019 maybe.

23  Q.        Prior to that date, you did not

24  have any joint bank account with
```

1   Mr. Outlaw?

2   A.        No.

3   Q.        Do you have any separate bank

4   account?

5   A.        Myself?

6   Q.        (Nodding affirmatively).

7   A.        Yes.

8   Q.        Okay.  So when you say that

9   everything is yours is his, can you

10  explain -- do you differentiate between the

11  joint bank account versus the individual

12  bank account?

13  A.        What do you mean?

14  Q.        What goes into the joint bank

15  account versus the individual?

16  A.        The joint bank account is mainly

17  the house bills, like the mortgage,

18  utilities.

19  Q.        Well, I think you're describing

20  what you would pay out of the bank account.

21  What goes into the bank account?

22  A.        Oh, well, the money for the bills,

23  for the house, like.

24  Q.        Is it a checking or savings or

Monique Solomon
7/22/2022

```
1    both?

2    A.       It's a checking.

3    Q.       Do you deposit your salary into

4    that account?

5    A.       I do.

6    Q.       Into the joint bank account?

7    A.       Yes.

8    Q.       Did Mr. Outlaw have any individual

9    bank accounts?

10   A.       Yes, I believe he does.

11   Q.       And so, what type categories of

12   money do you keep separate?

13   A.       What do you mean?

14   Q.       Do you have any general rules

15   about why you would deposit something into

16   your joint versus your separate bank

17   account?

18   A.       We don't really have a general

19   rule about it.

20   Q.       How much money approximately is in

21   your Wells Fargo joint bank account right

22   now?

23   A.       I'm not sure of the exact dollar

24   amount.
```

Monique Solomon
7/22/2022

```
1    Q.       That's okay.  You can provide the

2    best estimate.

3    A.       Maybe over 1,000.  I'm not 100

4    percent sure.

5    Q.       $1000?

6    A.       Maybe.

7    Q.       And you deposit your entire salary

8    into there?

9    A.       Mm-hmm.

10   Q.       Do you have any joint credit cards

11   with Mr. Outlaw?

12   A.       Yes, we do.

13   Q.       And what are those?

14   A.       A Capital One, Lowes.

15   Q.       Mm-hmm.

16   A.       And I believe that's it.

17   Q.       When were those credit cards

18   opened?

19   A.       2016.

20   Q.       And do you have individual credit

21   cards?

22   A.       Yes.

23   Q.       Both you and Mr. Outlaw?

24   A.       Yes.
```

1  Q.        Have you ever filed a joint tax

2  return with Mr. Outlaw?

3  A.        Our taxes are actually -- no, but

4  our taxes are currently in the process of

5  being amended because I filed my taxes

6  incorrectly.

7  Q.        Why would his taxes be amended if

8  you filed yours incorrectly?

9  A.        No, because I filed my taxes as

10 single not knowing because I made a

11 mistake, so our taxes are in the process of

12 being amended to be filed jointly.

13 Q.        Did he file his taxes as single?

14 A.        Yes.

15 Q.        You did not understand at the time

16 that that was inaccurate?

17 A.        Honestly, I want to say that it

18 was my fault because I'm so used to filing

19 single that I didn't even think to do

20 married until after I realized that we

21 should have done it jointly, which is why

22 we're in the process of having it

23 professionally done because I'm no tax

24 expert, so I'm going to leave the taxes to

Monique Solomon
7/22/2022

1    the experts.

2    Q.        What years are being amended?

3    A.        '20 and '21.

4    Q.        When was it brought to your

5    attention that it was done incorrectly?

6    A.        I don't remember the exact date.

7    Q.        How was it brought to your

8    attention?

9                     MR. VAN NAARDEN:  I'll

10             put an objection on the record to

11             the extent that it calls for

12             privileged communications with

13             counsel.  But if it doesn't, you

14             can answer.

15                     THE WITNESS:  You said if

16             it does not?

17                     MR. VAN NAARDEN:  If the

18             answer to that question would

19             divulge discussions that you had

20             with me, then you can't talk about

21             it.

22                     THE WITNESS:  Okay.

23                     MR. VAN NAARDEN:  But if

24             you identified that issue

Monique Solomon
7/22/2022

```
1              independently from anything that
2              I've had discussions with you
3              about, then you should tell them
4              or you learned about it on your
5              own.
6                       THE WITNESS:  I really
7              don't know how to answer that
8              question only because I know that
9              when I was getting the documents
10             together --
11                      MS. ROSENTHAL:  Mm-hmm.
12                      THE WITNESS:  -- that I
13             realized that, you know, we did
14             both file single and that we are
15             married and that the taxes should
16             be amended and that we should have
17             filed jointly.  So when I realized
18             that I dropped the ball with the
19             taxes is when I got someone to
20             professionally do our taxes to
21             file an amendment.
22    BY MS. ROSENTHAL:
23    Q.      And who is that?
24    A.      Jacob Cohen.
```

Monique Solomon
7/22/2022

```
1    Q.        An accountant?

2    A.        Yes.

3    Q.        Does Mr. Van Naarden's law firm

4    represent you for purposes other than with

5    respect to this case, for example, in

6    providing tax advice?

7    A.        No.

8    Q.        Do you have any understanding of

9    when the amendments -- well, strike that.

10   Are those both state and federal tax

11   returns that are being amended?

12   A.        I believe so.

13   Q.        And have you notified the state

14   and federal government or do you have any

15   knowledge as to whether your accountant

16   has?

17   A.        I'm not sure.

18   Q.        And do you have any knowledge of

19   when you believe the amendments will be

20   complete?

21   A.        I'm not sure.

22   Q.        Do you know whether you will be

23   filing them married -- separately as

24   married or jointly as married?
```

1    A.        I believe jointly as married, but

2    I'm not 100 percent sure.

3    Q.        Have you filed federal and state

4    tax returns every year in the last 10

5    years?

6    A.        Yes.

7    Q.        Do you see any -- did you also

8    indicate that you were single on the tax

9    returns prior to 2020 when you were

10   married?

11   A.        Yes.

12   Q.        Those aren't being amended, are

13   they?

14   A.        Well, Donald was incarcerated.

15   Q.        So it's your understanding that --

16   sorry.  Let me just ask the question again

17   to get a yes or no answer.

18          Is -- are -- have you taken any

19   steps to amend the tax returns prior to

20   2020 to indicate that you were married at

21   the time?

22                    MR. VAN NAARDEN:

23          Objection.  You can answer.

24                    MS. ROSENTHAL:  On what

Monique Solomon
7/22/2022

```
1              grounds?
2                    MR. VAN NAARDEN:  You
3         can't direct the witness to answer
4         yes or no.  The answer is going to
5         be what it's going to be.  This is
6         your witness.  You don't get to
7         cross-examine her.
8                    MS. ROSENTHAL:  You can
9         go ahead and elaborate --
10                   MR. VAN NAARDEN:
11        Exactly.
12                   MS. ROSENTHAL:  -- if you
13        need to, but I don't believe your
14        prior answer was responsive.
15   BY MS. ROSENTHAL:
16   Q.       But anyway, my question is just
17   whether you had taken any steps to amend
18   the tax returns prior to 2020 to indicate
19   that you were married during the period
20   when you were?
21   A.       No, again because Donald was
22   incarcerated.
23   Q.       So you considered yourself single
24   for purposes of taxes?
```

```
1    A.       Yes.

2    Q.       How much income did you earn last

3    year roughly?

4                     MR. VAN NAARDEN:

5              Objection.  You can answer.

6                     MS. ROSENTHAL:  Well,

7              given that we haven't seen the

8              joint tax returns.

9                     THE WITNESS:  I'm not

10             sure exactly, but I don't want to

11             guess.  But I believe it was in

12             maybe the 66 range.  I'm not 100

13             percent sure.

14   BY MS. ROSENTHAL:

15   Q.       Did you have any sources of income

16   other than your employment?

17   A.       No.

18   Q.       Do you own any stocks or bonds

19   with Mr. Outlaw?

20   A.       No.

21   Q.       Any other significant marital

22   property of value?

23   A.       No.

24   Q.       Any knowledge of Mr. Outlaw having
```

Monique Solomon
7/22/2022

```
 1    received or applied for unemployment

 2    benefits?

 3    A.        Yes.

 4    Q.        What's that?

 5    A.        I believe he was getting the PUA.

 6    Q.        PUA?

 7    A.        During the pandemic.

 8    Q.        Are you referring to the PPE loan?

 9    A.        No, the --

10    Q.        Sorry.  I'm just not familiar with

11    PUA?

12    A.        It was, like, some type of

13    unemployment benefit that people got during

14    Corona.

15    Q.        Oh, the increased -- regular

16    unemployment, but it was an increased

17    amount?

18    A.        No.

19    Q.        No?

20                    MS. MAYS:  Pandemic

21            unemploy --

22                    MR. VAN NAARDEN:  Yeah,

23            the --

24    BY MS. ROSENTHAL:
```

1  Q.        Okay.  Pandemic unemployment

2  assistance, yes?

3  A.        Yes.

4  Q.        Do you know about how much?

5  A.        No, I don't.

6  Q.        Was that deposited into your joint

7  bank account?

8  A.        No.

9  Q.        Have you taken out any joint loans

10  with Mr. Outlaw?

11  A.        No.

12  Q.        Have either of you or he cosigned

13  on a loan that others have?

14  A.        No, not that -- no, I don't think

15  so.

16  Q.        Okay.  We're going to switch gears

17  a bit.  When did you first meet Mr. Outlaw?

18  A.        We actually grew up together, but

19  we reconnected in I want to say like 2008.

20  Q.        When you say you grew up together,

21  can you elaborate on that a little more?

22  A.        We're from the same neighborhood

23  and we also went to the same elementary

24  school.

Monique Solomon
7/22/2022

```
1   Q.        Were you in the same year?

2   A.        No.

3   Q.        Did you know him at the time of

4   the Jamal Kelly murder?

5   A.        Again, we grew up together so it's

6   like I would see him in passing.

7   Q.        How would you describe your

8   relationship with him?

9   A.        During that time, probably like a

10  hi and bye type of relationship.

11  Q.        Sorry.  I missed that.

12  A.        I said during that time, like, in

13  the early 2000s, which I would say more

14  like a hi and bye relationship.  Like, if I

15  saw him, I would say hi.

16  Q.        Did you at any point prior to his

17  conviction have a romantic relationship

18  with him?

19  A.        No.

20  Q.        I want to show you a document that

21  I'm going to mark as Exhibit 3.  It's a

22  four-page document that's Bates marked

23  OUTLAWDA02022000752 through

24  OUTLAWDA02022000755.
```

1              MS. ROSENTHAL:  You can

2         mark it as Exhibit 3.

3              (Exhibit marked Exhibit 3

4         for identification.)

5    BY MS. ROSENTHAL:

6    Q.        Have you seen this document

7    before?

8    A.        No.

9    Q.        Would you agree that it appears to

10   be a letter dated November 8, 2018 where

11   written by Cozen O'Connor to Samuel

12   Ritterman about the Commonwealth v. Robert

13   Outlaw case --

14   A.        Yes.

15   Q.        -- attempting to discuss for the

16   record?

17   A.        Yes.

18   Q.        I just want to ask you about one

19   specific part of it.  If you could turn to

20   the second page, the page that's marked

21   OUTLAWDA02022000753.

22              Do you see that there's a heading

23   midway down the page as Ms. Solomon

24   Outlaw -- or sorry, Ms. Monique Solomon and

Monique Solomon
7/22/2022

1    Robert's wife?

2    A.        Yes.

3    Q.        Do you see the first sentence

4    reads under that, Robert has been in a

5    relationship with Ms. Monique Solomon prior

6    to his conviction and throughout his

7    incarceration?  Do you see that?

8    A.        Yes.

9    Q.        Would you say that that statement

10   is incorrect?

11   A.        Yes.

12   Q.        Did you at any point tell Cozen

13   O'Connor that you had been in a

14   relationship with Mr. Outlaw prior to his

15   conviction?

16   A.        No, I explained to him that we

17   grew up together.

18   Q.        Okay.  You can put that one aside.

19   At the time of Jamal Kelly's murder in

20   September of 2000, where were you living at

21   the time?

22   A.        With my mom, my mother.

23   Q.        I'm just trying to get an idea

24   where in the neighborhood?

Monique Solomon
7/22/2022

```
1    A.        Germantown.

2    Q.        How close to -- can you give me a

3    more specific, like how close to Mr. Outlaw

4    did you live?  Can me give me an address,

5    if you know one?

6    A.        I don't know an address.

7    Q.        You don't know an address, okay.

8    And what's your mother's name?

9    A.        Natalie.

10   Q.        And the last name is Solomon?

11   A.        Yes.

12   Q.        Okay.  And what's her -- what's

13   her current address?

14   A.        947 East Chelten Avenue.

15   Q.        East Chelten Avenue.

16   Philadelphia?

17   A.        Yes.

18   Q.        Have you ever lived at that

19   address?

20   A.        Yes.

21   Q.        During what time period?

22   A.        From birth until I moved into my

23   3708 apartment, which I believe was in '06.

24   I'm not 100 percent sure when I moved.
```

Monique Solomon
7/22/2022

1  Q.      Okay.  So you were living at that

2  address at the time of the Jamal Kelly

3  murder in 2000?  I just want to make sure.

4  A.      Yes.

5  Q.      Okay.  So when you said you

6  couldn't give an exact address, I just want

7  to make sure --

8  A.      When did I say I couldn't --

9  Q.      I may have misunderstood.  That's

10  why I just wanted to make sure the record

11  was clear --

12              MS. MAYS:  I think she

13       meant Mr. Outlaw's address.

14              MS. ROSENTHAL:  Oh,

15       Mr. Outlaw's address.

16              THE WITNESS:  Oh --

17  BY MS. ROSENTHAL:

18  Q.      Okay.  I was asking where you were

19  living --

20  A.      Oh, I thought you were referring

21  to him.

22  Q.      And did you know any of his family

23  members?

24  A.      Yes.

Monique Solomon
7/22/2022

1   Q.        And who did you know?

2   A.        His sister Shanita Star.

3   Q.        Mm-hmm.  How did you know her?

4   A.        She was in a relationship with my

5   cousin.

6   Q.        Who's your cousin?

7   A.        Jonathan Jones.

8   Q.        Are they still in a relationship?

9   A.        No.

10  Q.        Is that your first cousin?

11  A.        Yes.

12  Q.        Okay.  Do they have any children

13  together?

14  A.        No.

15  Q.        Okay.  Were they ever married?

16  A.        No.

17  Q.        Okay.  And any other connections

18  to his family?

19  A.        Again, like we grew up together

20  so, like, I do know a lot of his family

21  from the neighborhood.  His sister Annette

22  Outlaw.

23  Q.        And what was your relationship

24  with her?

Monique Solomon
7/22/2022

```
 1   A.        We grew up together so we were
 2   friends.
 3   Q.        Okay.  Would you say that you were
 4   closest to Annette, Shanita or Donald or
 5   they were all hi and bye?
 6   A.        I was pretty much closer to the
 7   sisters.
 8   Q.        Okay.  Were you aware of the Jamal
 9   Kelly shooting when it took place?
10   A.        No.
11   Q.        So were you -- did you hang out in
12   the neighborhood with other people who were
13   involved in that, like did you know Charles
14   Paladino at the time?
15   A.        No.
16   Q.        Lamar Rogers?
17   A.        No.
18   Q.        Okay.  So I take it you didn't,
19   like, live in that immediate couple of
20   block radius from where it took place?
21   A.        No.
22   Q.        Okay.  So you said you lost touch
23   with Mr. Outlaw at some point?
24   A.        Yeah.  Again, like I know him from
```

Monique Solomon
7/22/2022

1    the neighborhood and it's like if I would

2    see him out, hi or if I would see him at a

3    family event or something like that, hi.

4    But I wouldn't, like, actively see him out.

5    Like, we didn't run in the same circles.

6    Q.        Were you aware when he was charged

7    with the Jamal Kelly murder?

8    A.        No.

9    Q.        Were you aware when he was

10   convicted?

11   A.        No.

12   Q.        So did you say you had lost

13   contact with him or --

14   A.        I mean, is hi and bye really

15   contact, because it's like, you know, I

16   would see him out.  It's not like I had his

17   phone number.

18   Q.        Right.  It wasn't a distinct,

19   like, difference?

20   A.        Yeah.

21   Q.        Once he was incarcerated, did you

22   have contact with him?

23   A.        We started communicating in 2008.

24   Q.        Okay.  So what precipitated that?

Monique Solomon
7/22/2022

```
 1   A.        One night I was at his sister's
 2   house and he called, and he and his sister
 3   were talking and she was telling him how I
 4   work at a law office and maybe I could help
 5   him, and we started communicating through
 6   that.  I think I might have wrote him a
 7   letter and he responded to my letter.
 8   Q.        And was the sister Annette or
 9   Shanita?
10   A.        Annette.
11   Q.        When you began assisting with his
12   case, was that almost immediately from when
13   you began communicating with him?
14   A.        No, it wasn't really immediately.
15   Like, we exchanged some letters back and
16   forth.  And then, like, once I learned more
17   about his case or once he, like, told me
18   about his case and how he didn't do it and
19   how he was fighting to overturn his
20   sentence.
21   Q.        And were you helping him through
22   your law firm or was it something
23   independently that you were doing?  Did you
24   understand that question?
```

Monique Solomon
7/22/2022

1   A.        Independently.

2   Q.        So your law firm had nothing to do

3   with it?

4   A.        No.

5   Q.        And you said you're still

6   currently married to Mr. Outlaw?

7   A.        Yes.

8   Q.        And living together?

9   A.        Yes.

10  Q.        Does Mr. Outlaw have any

11  additional wives to your knowledge?

12  A.        Well, I'm trying to see how to

13  answer this because, you know, in the

14  Commonwealth of Pennsylvania you can only

15  be married to one person.  And I'm his

16  legal wife, so that's my answer.

17  Q.        Well, what about nonlegal?

18  A.        Well, nonlegal would be --

19  Q.        Religious or spiritual marriage?

20  Am I correct -- well, let me strike that.

21  Let me back up.

22            Am I correct that you had like a

23  religious ceremony where you were married

24  to Mr. Outlaw in advance to becoming

Monique Solomon
7/22/2022

1   legally married?

2   A.       Yeah.

3   Q.       So talking about the former type

4   of marriage, does Mr. Outlaw have any

5   additional wives beyond you even if they're

6   not legal wives?

7                    MR. VAN NAARDEN:  I'll

8          object, but you can answer.

9                    MS. ROSENTHAL:  On what

10         ground?

11                   MR. VAN NAARDEN:  What's

12         the relevance?  There's no

13         consortium claim here.

14   BY MS. ROSENTHAL:

15   Q.       You can answer.

16   A.       Yes.

17   Q.       One or more?

18                   MR. VAN NAARDEN:

19         Objection.  I'll just keep

20         objecting so it's on the record.

21                   THE WITNESS:  I mean, I

22         don't personally know.

23   BY MS. ROSENTHAL:

24   Q.       You don't know who the person is?

Monique Solomon
7/22/2022

```
 1   A.        I don't know how -- I don't, like,
 2   have a relationship with his wife to know
 3   who she is.
 4   Q.        You don't know her name?
 5   A.        I do know her name.
 6   Q.        What's her name?
 7   A.        Well, they're not married anymore.
 8   Q.        Oh, they had a divorce?
 9   A.        Yes.
10   Q.        Okay.  So first of all, let's
11   begin with what's her name?
12   A.        Zykia.
13   Q.        Sorry?
14   A.        Zykia.
15   Q.        Can you spell that?
16   A.        Z-y-k-i-a.
17   Q.        And last name?
18   A.        I'm not sure of her last name.
19   Q.        Does she have any addition -- does
20   she go by any other name?
21   A.        I'm not sure what she goes by.
22   Q.        And when did they become married?
23   A.        I'm not sure of an exact date.
24   Q.        Approximately?
```

Monique Solomon
7/22/2022

```
1    A.        I'm not sure of an approximate

2    date.

3    Q.        How did you learn of the marriage?

4    A.        Donald told me.

5    Q.        And when did they become divorced?

6    A.        I'm not sure of an exact date.

7    Q.        When did you learn they became

8    divorced?

9    A.        I don't remember an exact date.

10   Q.        Would you say that you actively

11   practiced polygamy?

12                   MR. VAN NAARDEN:

13             Objection.  Don't answer that

14             question.

15                   MS. ROSENTHAL:  On what

16             basis are you instructing --

17                   MR. VAN NAARDEN:  It's

18             harassing.  It's inappropriate.

19             It's -- what else -- also not

20             relevant at all.

21                   MS. ROSENTHAL:  All

22             right.  I'll let that stand,

23             although I do believe there is a

24             consortium claim.
```

Monique Solomon
7/22/2022

```
1                    MR. VAN NAARDEN:   Under
2           the laws -- the federal laws that
3           dictate this case, you can't have
4           a consortium claim.   It doesn't
5           exist.   But if you want to add one
6           on voluntarily, I'm happy to add a
7           consortium claim onto the case to
8           increase its value.   But there is
9           no consortium claim in 1983
10          actions.
11   BY MS. ROSENTHAL:
12   Q.       When you began assisting with
13   Donald Outlaw's criminal case, when was
14   that?
15   A.       I believe some time in 2009.
16   Q.       And you were not doing that under
17   the supervision of an attorney, I assume?
18   A.       No.
19   Q.       At that point were you receiving
20   or at any point have you received payment
21   for your services?
22   A.       No.
23   Q.       These were -- were these services
24   that you were performing as part of your
```

1    employment at your law firm you would

2    ordinarily bill for?

3    A.        No.

4    Q.        They were not paralegal services?

5    A.        No.

6    Q.        Why were you willing to perform

7    them for free?

8    A.        Because I believed in Donald's

9    innocence and I wanted to help him and he

10   needed help.

11   Q.        What tasks did you do for him,

12   just general categories of tasks?

13   A.        Well, I posted flyers throughout

14   our neighborhood asking for help basically

15   for anyone to come forward with any

16   information that they remembered that

17   night, from that night.

18   Q.        Anything else other than post

19   flyers?

20   A.        I requested his files from other

21   attorneys.

22   Q.        Did you ever file any documents

23   directly for him?

24   A.        Yes.

Monique Solomon
7/22/2022

1    Q.        Do you recall specific documents?

2    A.        I don't.

3    Q.        Was he represented by an attorney

4    at the time?

5    A.        I believe he was not.

6    Q.        Okay.  Did you prepare documents

7    that others filed, that he filed pro se?

8    A.        Yes.

9    Q.        Did you prepare documents that

10   attorneys filed?

11   A.        No, I don't believe so.

12   Q.        Did you assist any witnesses with

13   writing statements?

14   A.        No.

15   Q.        Did you obtain any statements from

16   witnesses or -- let me strike that and

17   first ask, did you interview any witnesses?

18   A.        I don't know if I would refer to

19   it as interview, but I've spoken to several

20   of a couple of the witnesses in this

21   case -- I meant in Donald's case where they

22   provided infor -- gave me information.

23   Q.        And who are they?

24   A.        Christopher Holder, Charles

1    Paladino and I believe that's it.  I'm not

2    sure.

3    Q.       Okay.  If you remember any others,

4    then let me know.  With witnesses you spoke

5    to, did you facilitate obtaining statements

6    from them?  I understand you said you

7    didn't write the statements themselves.

8    A.       When you say facilitate

9    statements, like when I spoke to these

10   individuals, I, you know, would ask them if

11   they were willing to come forward and share

12   their story with his attorney or would they

13   be willing to help in his case moving

14   forward.

15   Q.       Did you assist with getting any

16   statements notarized?

17   A.       No.

18   Q.       Did you visit any witnesses who

19   were incarcerated?

20   A.       Yes.

21   Q.       And who were those?

22   A.       I went to see Charles Paladino.

23   Q.       When was that?

24   A.       I don't remember the exact date.

Monique Solomon
7/22/2022

1    Q.        Can you give me an approximate

2    date?

3    A.        I really don't know.

4    Q.        Would 2015 ring a bell?

5    A.        I'm not sure if it was 2015.

6    Q.        Did anyone accompany you on the

7    visit?

8    A.        My son.

9    Q.        How long did you meet with him

10   for?

11   A.        Maybe an hour, if that.  I'm not

12   really sure the exact time frame.

13   Q.        Why did you go visit him?

14   A.        I just wanted to hear from Charles

15   Paladino, like, how he got wrapped up into

16   this, you know, how, what part he played in

17   this.  And I can honestly say that, you

18   know, I was angry at Charles Paladino and I

19   couldn't understand how he could give these

20   statements saying that Donald did this and

21   then later come to court and say that he

22   didn't do this and then later say he lied

23   and, you know, it's not true, you know.

24            I wanted to understand how he got

1   wrapped up into this and why did he do it.

2   And in having this conversation with

3   Paladino, I came to realize that he was

4   just as much a victim to the system as Don

5   was because here this person is weak,

6   addicted to drugs, a criminal background

7   and these detectives, you know, preyed on

8   that.  They preyed on him being weak.  They

9   preyed on his addiction, and these

10  detectives were supposed to be here to

11  protect and serve and they didn't protect

12  him.

13  Q.      Did anyone ask you to go see him

14  or encourage you to go see him?

15  A.      No.

16  Q.      Did you speak to Donald Outlaw

17  about seeing him beforehand?

18  A.      No.

19  Q.      He never asked you -- he never

20  indicated that was something he wanted you

21  to do?

22  A.      No.

23  Q.      And what did you talk about --

24  what did you talk about when you saw

1   Charles Paladino?

2   A.        I just asked him to tell me the

3   truth, tell me, like, how all of this

4   started, how he got involved in this and

5   why would he say that Donald did this if he

6   didn't.

7   Q.        Did you find him credible?

8   A.        After hearing Charles's story and

9   he telling me what he went through, I did

10  believe him.  And at the same time, like, I

11  want to say I felt pity for him because

12  here he was this person saying that these

13  detectives beat him and made him say these

14  things or -- and here he was this person

15  where he said these things that weren't

16  true because he felt like he had no other

17  choice but to do what these detectives

18  wanted him to do where he felt like he

19  didn't have a voice.

20  Q.        Were you aware when you met with

21  him how frequently he had been receiving

22  visitors at the time?

23  A.        No.

24  Q.        You didn't know that you were the

Monique Solomon
7/22/2022

1  first visitor that he had seen in many

2  years?

3              MR. VAN NAARDEN:

4       Objection.

5              THE WITNESS:  No.

6  BY MS. ROSENTHAL:

7  Q.     Well, would it surprise you to

8  learn that you were the first visitor that

9  had seen him in years?

10             MR. VAN NAARDEN:

11      Objection.

12             THE WITNESS:  No, it

13      wouldn't surprise me.

14  BY MS. ROSENTHAL:

15  Q.     Why wouldn't it surprise you?

16  A.     From my understanding, he doesn't

17  really have family.

18  Q.     Is that one of the reasons why you

19  took -- you had pity for him?

20  A.     No.  My pity came from him telling

21  me his story, him accepting responsibility

22  and the fact that, you know, he did lie and

23  say that -- say these things that were

24  untrue.

Monique Solomon
7/22/2022

```
 1                    MS. ROSENTHAL:  We've
 2          been going on for quite a while
 3          now.  Would it be okay if we took
 4          a short break for lunch to get
 5          something to eat because we still
 6          have quite a while left?
 7                    MR. VAN NAARDEN:  It's up
 8          to you.
 9                    THE WITNESS:  Okay.
10                    MS. ROSENTHAL:  So let's
11          return at 1:30.  Would that be
12          okay?
13                    THE WITNESS:  What time
14          is it now?
15                    MS. ROSENTHAL:  It's
16          1:00.  I assume from your reaction
17          you prefer a shorter break rather
18          than a longer one?
19                    THE WITNESS:  Yes.
20                    MS. ROSENTHAL:  Okay.  We
21          won't go an hour.
22                    MR. VAN NAARDEN:  Is
23          Reading Terminal right here?  Is
24          that where you guys go?
```

Monique Solomon
7/22/2022

```
 1                      MR. MAYS:  It's 11th and

 2          Market.

 3                      MR. VAN NAARDEN:  That's

 4          too far in this heat.

 5                      THE VIDEOGRAPHER:  We're

 6          now going off record.  The time

 7          now is 12:57 p.m.

 8                      (Lunch recess.)

 9                      THE VIDEOGRAPHER:  We're

10          now back on record.  The time is

11          1:38 p.m.

12   BY MS. ROSENTHAL:

13   Q.       I'm going to show you another

14   document that I'm going to mark as Exhibit,

15   what are we up to, 4?

16                      COURT REPORTER:  Yes.

17                      (Exhibit marked Exhibit 4

18          for identification.)

19   BY MS. ROSENTHAL:

20   Q.       So I've marked as Exhibit 4 a

21   one-page document with the Bates No.

22   OUTLAWDA02022002691.  Do you recognize this

23   document?

24   A.       Yes.
```

Monique Solomon
7/22/2022

```
1    Q.        And can you describe what it is
2    briefly for the record?
3    A.        I'm just reading through it.
4    Q.        Yeah, take your time.
5    A.        I believe this is a post I posted
6    on Don's Facebook page when I had created
7    him a social media, like, years ago.
8    Q.        Is this a document that you
9    authored?
10   A.        No, not in its entirety.  Some of
11   this language is, like, from Donald.
12   Q.        So you authored part of it and
13   Donald authored the other part; is that
14   correct?
15   A.        I would say majority of it was
16   authored by Donald more so my part.
17   Q.        Did anyone else participate in
18   authoring it other than you and Donald?
19   A.        I don't believe so, no.
20   Q.        Were you the one who typed up the
21   document?
22   A.        Yes -- well, it was a post on
23   Facebook.
24   Q.        Are you the one who typed this
```

Monique Solomon
7/22/2022

1   document into a computer word processor?

2   A.        Yeah, like I typed in the post on

3   Facebook.

4   Q.        So you're saying this is an actual

5   post from Facebook?

6   A.        Well, the content is the post.

7   This is more like a copy and pasted and

8   print.

9   Q.        Okay.  But you're the one who

10  typed in these words into the computer?

11  A.        Yes.

12  Q.        And when you say much of it was

13  authored by Donald, did he communicate the

14  portion he authored or how did he

15  communicate it to you, by phone, by mail?

16  A.        I think by mail or email.  I'm not

17  100 percent sure.  I had started a Facebook

18  page for him in addition to handing out the

19  flyers, and I just asked for some content

20  to post on the Facebook page.

21  Q.        Do you know what time period this

22  was written?

23  A.        I don't.  I'm sorry.

24  Q.        Can you provide any estimate at

Monique Solomon
7/22/2022

```
1    all?
2    A.       Well, just based off the last line
3    where I'm saying he's at SCI Dallas.  So
4    when he was at Dallas, I'm not 100 percent
5    sure when he was transferred to Dallas.
6    Q.       You don't have any independent
7    recollection or you're unable to provide
8    any?
9    A.       Yeah, no.
10   Q.       Was this flyer printed out and
11   posted anywhere or was it only posted on
12   Facebook?
13   A.       Just Facebook.
14   Q.       Do you still have this document in
15   your possession?
16   A.       No, I do not.
17   Q.       What computer did you type this
18   on, if you remember?
19   A.       I'm not sure.
20   Q.       Would you still have access to the
21   computer that you typed this on or do you
22   still have access to the computer that you
23   may have typed this on?
24   A.       No.
```

1    Q.        What -- well, let me strike that.

2    During the 2000 -- or sorry, strike that.

3             During the 2010 to 2015 time

4    period, did you own a computer?

5    A.        Yes.

6    Q.        And do you recall what type of

7    computer you owned?  Was it one or more

8    than one?

9    A.        Maybe a desktop and a laptop.

10   Q.        What happened to those?

11   A.        Desktop crashed.  Laptop my niece

12   broke.

13   Q.        Was this document ever transferred

14   to a back-up drive or to any other

15   computer?

16   A.        No.

17   Q.        Around what date did you create

18   the Facebook account or what was it, a

19   group?  What did you create on Facebook?

20   A.        A page for Donald.

21   Q.        Okay.  And when did you create

22   that?

23   A.        I don't remember the exact date.

24   Q.        Can you just provide your best

1    estimate?

2    A.        I don't know honestly.  It was

3    years ago.

4    Q.        And what happened to that page?

5    Do you still have access to it?

6    A.        No.

7    Q.        When was the last time you had

8    access to it?

9    A.        I haven't had access to it in

10   years.  When my laptop got messed up, I

11   lost access to it.

12   Q.        You lost access to your Facebook

13   account?

14   A.        Yeah, because my passwords and

15   stuff were saved on my laptop and I didn't

16   have them written down.

17   Q.        Do you have a Facebook account

18   currently?

19   A.        No, I do not.

20   Q.        Have you had a Facebook account

21   since that time?

22   A.        No.

23   Q.        What was your Facebook username at

24   the time?

```
1   A.        Monique Solomon.

2   Q.        What was the name of the group

3   that you created?

4   A.        Oh, no.  My personal Facebook

5   didn't have any of this up on it.  The

6   Facebook that I created for Donald was just

7   solely Donald Outlaw Facebook.

8   Q.        Oh, it was like a profile for him?

9   A.        Yeah.

10  Q.        Was the name Donald Outlaw?

11  A.        It was something like Seeking

12  Justice for Donald Outlaw or something like

13  that.

14  Q.        Was it ever deleted?

15  A.        I'm not sure if, like, Facebook

16  deleted it due to it not being active.

17  Q.        Who else posted on that -- did

18  anyone else have access to the account

19  other than you?

20  A.        No.

21  Q.        Who else posted on the account?

22  A.        Nobody.

23  Q.        Did you receive any re -- well,

24  I'm just -- well, first of all, do you see
```

Monique Solomon
7/22/2022

1  at the bottom it says also log onto

2  Facebook.com?

3  A.        Right.

4  Q.        I'm just a little bit confused.

5  If this was posted on Facebook -- you're

6  sure it was posted on Facebook, it said

7  also to log onto Facebook.com on the

8  Facebook posting?

9  A.        Yes.

10  Q.        Okay.  So this wasn't printed out

11  and hung anywhere?

12  A.        No.

13  Q.        Did you get any leads through

14  Facebook?

15  A.        Not really, no.

16  Q.        And you believe that the account

17  was Seeking Justice for Donald Outlaw?

18  A.        Yes.

19  Q.        Would you have any record of the

20  name of the account anywhere that could

21  refresh your recollection?

22  A.        No.

23  Q.        Did you lose access to it?  Is it

24  that you lost access to it or at some point

Monique Solomon
7/22/2022

```
1   you actively deleted it?

2   A.        No.  When my laptop was broken, I

3   lost access to anything that was on that

4   laptop.

5   Q.        You said you lost access to the

6   password to the account?

7   A.        Yes, to the account period.

8   Q.        Okay.  But you never took steps to

9   delete it.  You just were unable to log

10  into it again?

11  A.        I mean, it could be deleted.  I

12  don't know the current status to the

13  Facebook page.

14  Q.        But you never took steps to delete

15  it?

16  A.        No.

17  Q.        Okay.  I want to show you another

18  document that I'm going to mark as

19  Exhibit -- what are we up to?

20                     MR. VAN NAARDEN:  5.

21                     MS. ROSENTHAL:  5.

22                     (Exhibit marked Exhibit 5

23            for identification.)

24  BY MS. ROSENTHAL:
```

1   Q.        Do you recognize -- oh, sorry.

2   Just for the record, this is a one-page

3   document Bates marked OUTLAWDA02022002693.

4   Do you recognize this document?

5   A.        Yes.

6   Q.        Can you describe it for the record

7   briefly?

8   A.        It's one of the flyers that I was

9   posting in our neighborhood.

10  Q.        Did you author it?

11  A.        Yes.

12  Q.        Do you have this document in your

13  possession, custody or control?

14  A.        I believe it's in the emails that

15  I produced because it would have been one

16  of the attachments to a document I sent one

17  of his attorneys.

18  Q.        Was this saved on a computer when

19  it was sent as an attachment?

20  A.        No, the document would be in my

21  email.

22  Q.        When you sent it in your email,

23  did you attach it?  Was it a file that was

24  saved in your computer that you attached to

Monique Solomon
7/22/2022

1   the email?

2   A.        Yes.

3   Q.        What was the date of this

4   document?

5   A.        I don't know the exact date of

6   this document.

7   Q.        Can you give me an approximate?

8   A.        I can't.  I don't know because

9   this is one of many flyers.

10  Q.        Do you have an original document

11  unattached from the email in your

12  possession?

13  A.        No, I don't.

14  Q.        Do you know what computer you

15  drafted this on?

16  A.        My desktop.

17  Q.        The one that crashed?

18  A.        Yes.

19  Q.        Do you know what year it crashed?

20  A.        I don't.

21  Q.        Do you still have the crashed hard

22  drive?

23  A.        I don't have anything of it.

24  Q.        Did you delete this document prior

1    to it being crashed?

2    A.        No.

3    Q.        Where did you get the photo on the

4    page?

5    A.        Based off the way it's cut, I

6    think it's actually me and Don and I just

7    cut myself out of it.

8    Q.        Now, at this time he was known as

9    Robert Outlaw.  Is that -- well, I

10   shouldn't say at this time.

11             Well, would it be fair to say this

12   was likely posted in the 2010 to 2015 time

13   period?

14   A.        Yes.

15   Q.        At that time, was he known as

16   Robert Outlaw primarily?

17   A.        Well, from my knowledge I don't

18   think he was ever known to anybody in our

19   neighborhood as Robert.  His court case is

20   under Robert Outlaw.  Like, no one from the

21   neighborhood would refer to him as Robert

22   that I'm aware of.

23   Q.        Do you know how he got that alias?

24   A.        No.

1    Q.       Okay.  And you're listed as one of

2    the individuals to contact if you have

3    information regarding the shooting death.

4    There's a phone number listed next to your

5    name, 267-506-4966?

6    A.       Yes.

7    Q.       Was that a phone number that --

8    well, is that a phone number that you still

9    have?

10   A.       No.

11   Q.       Was it a cell phone or a landline?

12   A.       A cell phone.

13   Q.       What was the time period you had

14   that phone number?

15   A.       I do not know.

16   Q.       What are your current phone

17   numbers?

18   A.       I just have one phone number.

19   Q.       What's that?

20   A.       267-624-6304.

21   Q.       Is that a cell phone?

22   A.       Yes.

23   Q.       What's the carrier?

24   A.       AT&T.

1    Q.        How long have you had that number?

2    A.        I believe a couple of years.  I'm

3    not exactly sure how many years.

4    Q.        Have you had any other phone

5    numbers in the last couple of years?

6    A.        Several.

7    Q.        What phone numbers, do you know?

8    A.        I do not.

9    Q.        What's the reason for having

10   several phone numbers?

11   A.        No really real valid reason other

12   than I wanted to change my number, so I

13   did.

14   Q.        Why did you want to change your

15   number?

16   A.        I can only -- whatever I was going

17   through in my life I wanted change and it

18   started with the changing of my number.

19   Q.        Did you frequently have multiple

20   phone numbers at one time?

21   A.        I have changed my number a couple

22   of times before.

23   Q.        My question is a little different.

24   It's whether you -- whether you frequently

Monique Solomon
7/22/2022

```
1    had multiple phone numbers at the same

2    time?

3    A.       Oh, no, I always had one number.

4    And if I changed the number, it would

5    replace the number that I had.

6    Q.       Okay.  That makes sense.  So this

7    was the one number that you had at the

8    time?

9    A.       Yes.

10   Q.       And did anyone help you author

11   this document?

12   A.       No.

13   Q.       And you said that you posted it

14   around?

15   A.       Yes.

16   Q.       Were you the one who printed it?

17   A.       Yes.

18   Q.       Do you remember approximately how

19   many copies?

20   A.       Over 100.

21   Q.       Do you know -- well, am I correct

22   that Katima Jackson ultimately saw a flyer

23   that led to contacting you?

24   A.       Yes.
```

Monique Solomon
7/22/2022

```
1   Q.        Do you know if it was this flyer

2   or a different flyer?

3   A.        I'm not sure exactly what flyer

4   she saw.

5   Q.        Whose idea was it to post flyers?

6   A.        It was my idea.

7   Q.        I'm going to show you another

8   document that's marked -- I'm going to mark

9   as Exhibit 6.  It's a one-page document

10  with Bates marked OUTLAWDA02022002692.

11                  (Exhibit marked Exhibit 6

12          for identification.)

13  BY MS. ROSENTHAL:

14  Q.        Do you recognize this document?

15  A.        Yes.

16  Q.        Can you describe it for the

17  record?

18  A.        This was the very first flyer that

19  I did.

20  Q.        Okay.  Do you remember around what

21  time period that was?

22  A.        I don't remember the time period.

23  Q.        Can you give me even like a rough

24  three-year estimate?
```

Monique Solomon
7/22/2022

```
1   A.        I don't know.

2   Q.        Do you remember how long after you

3   said you started assisting Mr. Outlaw in --

4   A.        '09, so maybe this flyer is from

5   '09.

6   Q.        Okay.  And I understand that is

7   just an estimate.  Did you author this

8   flyer?

9   A.        Yes.

10  Q.        And did you draft it on the same

11  desktop as the last flyer?

12  A.        I'm not sure.

13  Q.        Do you still have a copy of this

14  original document irrespective of any

15  emails?

16  A.        No.

17  Q.        Do you see that there's

18  handwriting Donald Outlaw aka Don Don?

19  A.        Yes.

20  Q.        Is that your handwriting?

21  A.        No.

22  Q.        Do you know whose handwriting it

23  is?

24  A.        I believe it's his sister's
```

1    handwriting.  I'm not really sure.

2    Q.        Which sister?

3    A.        Annette Outlaw.

4    Q.        And is there a reason why only

5    Annette's phone number is listed on this

6    one?

7    A.        At the time I really didn't want

8    my phone number out there because it was,

9    like, my own line.  And I was nervous about

10   having my phone number out there.

11   Q.        Did you post -- do you remember

12   how many copies that you -- were you the

13   one -- sorry, strike that.  Were you the

14   one who printed copies of these?

15   A.        Yes.

16   Q.        Do you remember how many copies

17   were printed and posted?

18   A.        Maybe a little over 100.  I'm not

19   exactly sure.

20   Q.        Were they posted in the same area

21   as the prior flyers?

22   A.        Yeah, this was the very first

23   flyer that we did and his name is written

24   on here like this because I forgot to put

Monique Solomon
7/22/2022

1    the name in the flyer so that's one of the

2    notes that she made and why we ended up

3    eventually coming up with a new flyer with

4    a picture and his name because it really

5    wasn't saying much on this flyer.

6    Q.       Were different versions of the

7    flyer posted at the same time or were you

8    just --

9    A.       No, one version at one time and

10   then when I recreated another flyer, then

11   that other flyer would no longer be active

12   and then a new one.

13   Q.       Okay.  So would it be fair to say

14   that Katima Jackson saw the last iteration

15   of the flyer?  Did you post any additional

16   flyers after she contacted you?

17   A.       I don't believe so.

18   Q.       You don't believe that you posted

19   additional ones, yes?

20   A.       Yes.

21   Q.       All right.  I haven't gone through

22   all the flyers, but we may come back to

23   that but I'm going to move on in the time

24   being.

Monique Solomon
7/22/2022

```
1              We've talked a bit about the name
2    Charles Paladino.  When did you first
3    become familiar with that name?
4    A.        Early on into my contact with
5    Donald and him telling me about his case
6    and just learning about his case.
7    Q.        Is Mr. Paladino someone you've had
8    direct contact with?
9    A.        Direct contact as in?
10   Q.        Directly communicated with him.
11   A.        We have communicated via letter.
12   Q.        Have you -- you mentioned that you
13   had also met with him in person?
14   A.        Yes.
15   Q.        That was on one occasion?
16   A.        Yes.
17   Q.        Have you talked to him on the
18   phone at all?
19   A.        No.
20   Q.        What about over the GTL Department
21   of Corrections messaging system?  Do you
22   know what I'm referring to?
23   A.        Yes, I don't believe so.
24   Q.        Is the answer no or you don't
```

Monique Solomon
7/22/2022

1   recall?

2   A.        I don't recall.  I don't think

3   I've spoken to him via that.

4   Q.        And how many letters would you say

5   that you've sent to Mr. Paladino in total

6   approximately?

7   A.        I'm not sure how many approximate

8   letters that I've sent to him.  I know we

9   have corresponded.

10  Q.        Can you give me a rough estimate?

11  A.        I don't want to give you wrong

12  information, so I don't know how many

13  letters I've sent him.

14  Q.        Would it be over 100?  Could it be

15  over 100?

16  A.        I can't imagine that it would be

17  but...

18  Q.        What about between 50 and 100?

19  Would that be reasonable or that would be

20  surprising?

21  A.        That would be surprising, but

22  again I'm not sure and I don't want to --

23  Q.        It's possible.  Would you say that

24  it -- do you have any idea if it's more

Monique Solomon
7/22/2022

```
1   than 20?

2   A.       No, I'm not saying that it is or

3   it is not.  I don't remember.  I don't know

4   how many letters.

5   Q.       When's the last time that you

6   received an email -- or sorry, a letter

7   from him or sent one to him?

8   A.       I don't remember the last date.

9   Q.       Was he incarcerated?

10  A.       He was incarcerated.

11  Q.       Is there any document that you're

12  aware of that would refresh your

13  recollection?

14  A.       Maybe if I saw a letter.

15  Q.       Any documents in your possession?

16  A.       No, I don't have anything other

17  than what I produced already.

18  Q.       Do you remember anything about the

19  last time you heard from him or you wrote

20  to him?

21  A.       I don't remember our last contact.

22  Q.       Do you remember if you had written

23  to him or if he had written to you?

24  A.       I don't remember.
```

Monique Solomon
7/22/2022

1  Q.        Okay.  But you've had no contact

2  with him since he was -- well, I should be

3  more specific since I believe he's been out

4  of jail a couple of times.

5            Well, what about this, can you

6  tell me whether it was during the pandemic

7  or not that you had contact with him?

8  A.        Oh, no.

9  Q.        Before the pandemic?

10 A.        When he was at SCI Benner.

11 Q.        Okay.  It's just I believe he's

12 been in jail since.  When was the first

13 time you had contact with him?

14 A.        When he was at SCI Benner.

15 Q.        Okay.  Can you provide a little

16 more detail about what you remember about

17 that?

18 A.        Just that I wrote him a letter

19 asking him how was he involved, like.

20 Q.        Did you speak to anyone about the

21 fact that you were going to write him a

22 letter beforehand?

23 A.        No.

24 Q.        How did you get his contact

1  information?

2  A.        I looked him up.

3  Q.        Using what?

4  A.        Inmate locator.

5  Q.        And nobody asked you to contact

6  him?

7  A.        No.

8  Q.        Do you have a copy of that letter?

9  A.        I believe it's in with the stuff

10  with his attorneys.

11  Q.        So that was a letter that you

12  retained that you wrote him?

13  A.        Yes, I believe so.

14  Q.        Okay.  I'm just trying to

15  understand the distinction between this

16  letter which you retained and you had, I

17  believe and tell me if I'm wrong, but I

18  believe you testified your normal practice

19  would be just to throw away letters as you

20  receive them or sent them out.  Why did you

21  retain this one?

22  A.        I kept that letter based upon what

23  he said in the letter, which I don't

24  remember.  I just know there is a letter, a

Monique Solomon
7/22/2022

```
1   part of his file.

2   Q.        I'm sorry.  I don't understand --

3   A.        A part of Donald's file.

4   Q.        Yeah, I'm not sure I understand

5   your answer.  What was it that made you

6   retain a copy of that letter when other

7   letters you've thrown away?

8   A.        Well, because that was, like, the

9   first letter that I ever received from him.

10  Q.        Is it because that you thought it

11  would be evidence potentially in his case,

12  Mr. Outlaw's case?

13  A.        Yes.

14  Q.        And is that letter -- you said you

15  provided a copy of the letter to his

16  attorneys, Mr. Outlaw's attorneys?

17  A.        Mm-hmm.

18  Q.        Which attorneys?

19  A.        I believe Ed Foster.

20  Q.        An original copy of the letter or

21  a copy?

22  A.        I'm not sure if it was an original

23  or a copy.  I'm not sure.

24  Q.        Would you have had -- would you
```

Monique Solomon
7/22/2022

1   have saved a hard copy or would it have

2   just been on your computer or you don't

3   know?

4   A.        I don't know.

5   Q.        But that letter was one of the

6   letters that you burned after the case was

7   nolle prossed?

8   A.        No, I wouldn't say that.  I burned

9   his file.  So if the letter was in that

10  file, then possibly.  I can't say every

11  docum -- what was in the box with his

12  stuff.

13  Q.        Do you still have access to the

14  computer that you typed the letter on?

15  A.        No.

16  Q.        Did you share the letter with

17  anyone else besides Mr. Foster?

18  A.        No, I don't believe so.

19  Q.        Did Mr. Paladino respond to your

20  letter?

21  A.        Yes.

22  Q.        Well, let me back up.  What do you

23  recall about what you wrote in that letter?

24  A.        I just asked him how he got

Monique Solomon
7/22/2022

```
1   wrapped up into this.

2   Q.      Did you ask him to write an

3   affidavit?

4   A.      No, I don't believe so.

5   Q.      Did Mr. Paladino respond to your

6   letter?

7   A.      Yes, I believe he did.

8   Q.      Do you still have an original

9   version of it?

10  A.      No, I do not.

11  Q.      What did you do with it?

12  A.      I believe I gave it to his

13  attorney.

14  Q.      Do you have a specific

15  recollection of giving it to his attorney?

16  I'll represent to you that we have not

17  received an original copy from an attorney?

18  A.      I don't know if it was an original

19  or a copy.  I know that the letter was

20  produced to his attorney, so it could have

21  been a copy.  It could have been an

22  original.  I'm not sure.

23  Q.      When's the time do you remember

24  seeing an original version of the letter?
```

```
1   A.        I don't remember.
2   Q.        Is it possible it was in the
3   bonfire?
4                    MR. VAN NEERDAN:
5        Objection.
6   BY MS. ROSENTHAL:
7   Q.        You can answer.
8   A.        Again, Donald's file that was
9   burned, it was his file.  I can't name
10  every single document that was in the file.
11  It was his file.
12  Q.        So it's possible that it was there
13  if we don't -- if we can't find it anywhere
14  else?
15  A.        No.  Again, I don't -- it was his
16  file that was destroyed because his case
17  was closed.
18  Q.        Do you know whether that letter
19  was in the file?
20  A.        I don't know if it was or if it
21  was not.
22  Q.        I want to show you a document that
23  I'm going to mark as Exhibit -- what are we
24  up to?
```

```
 1              COURT REPORTER:  7.
 2              (Exhibit marked Exhibit 7
 3       for identification.)
 4  BY MS. ROSENTHAL:
 5  Q.      Just for the record, this is a
 6  four-page document Bates marked
 7  OUTLAWDA02022002514 to OUTLAWDA02022002517.
 8  We're going to mark it as Exhibit 7.
 9          Do you recog -- I will give you a
10  second to take a look at it.  Let me know
11  when you're ready to discuss it.  You'll
12  have a chance as well when I ask questions,
13  but take as much time as you need.  Do you
14  recognize this document?
15  A.      I do, yes.
16  Q.      And just for the record, can you
17  briefly describe it?
18  A.      It's Paladino basically writing me
19  telling me how he got wrapped up into Don's
20  case.
21  Q.      Okay.  So is it correct that it's
22  a letter from Mr. Paladino to you dated
23  January 2nd and then the date is unclear at
24  the top?
```

Monique Solomon
7/22/2022

1    A.        Yes.

2    Q.        Do you know what date it was?

3    A.        I don't.

4    Q.        To the best of your knowledge, is

5    this a true and accurate and complete

6    version of the letter that you received

7    from Mr. Paladino?

8    A.        Yes, I believe so.

9    Q.        Do you see how the first page has

10   a distortion?

11   A.        Yes.

12   Q.        It looks like something may have

13   been written across, but I don't know.  Do

14   you know what that is?

15   A.        I do not.

16   Q.        Do you know if the original copy

17   of the letter had that?

18   A.        I do not.

19   Q.        I want you to turn to the second

20   page OUTLAWDA02022002515.  Do you see that

21   same marking?

22   A.        Yes.

23   Q.        Do you have any recollection of

24   what that may have looked like on the

Monique Solomon
7/22/2022

1  original?

2  A.        No, I don't know what that is.

3  Q.        At any point, did you attempt to

4  alter this letter to reduce those -- well,

5  let me strike that.  Do you remember

6  whether when you received it from

7  Mr. Paladino it had that marking or you

8  don't recall any marking on the page?

9  A.        I don't recall.

10  Q.        Did you at any point attempt to

11  alter this letter to make it more legible

12  to reduce those markings that you can

13  recall?

14  A.        Absolutely not.

15  Q.        I want you to turn to the last

16  page OUTLAWDA02022002517.  This isn't the

17  best copy.  I believe we have a different

18  copy where the words are a little more

19  legible, but I believe it says at the

20  bottom although the document speaks for

21  itself, P.S. I didn't -- P.S. I don't have

22  a copy of the attached letter to make a

23  copy and send to Don and/or his attorney

24  for the court record.  I recognize some

1    letters are cut off.

2            Do you recall seeing that on the

3    letter that he sent?

4    A.       Yes, I never altered the letter so

5    this would be on there.

6    Q.       Okay.  That's not my question.  My

7    question is whether you recall when you

8    were reading this letter did you remember

9    reading that?  I understand you received

10   this a long time ago so you may not

11   remember.

12   A.       I don't remember.  But if this was

13   the letter sent, then this is the letter

14   that -- I wouldn't have made any changes to

15   the letter.

16   Q.       Do you know -- reading that, does

17   it jog your memory at all when he said the

18   copy of the attached letter, what he's

19   referring to?

20   A.       No, I figured he's talking about

21   this letter that he wrote, not like he

22   attached another letter in addition to this

23   letter.

24   Q.       That's how you -- to me it's

Monique Solomon
7/22/2022

```
 1   ambiguous so I'm just asking how you took

 2   it.  You believe he was referring to this

 3   letter, but you don't recall whether -- do

 4   you recall specifically whether anything

 5   additional was in the envelope?

 6   A.        No.

 7   Q.        You don't recall?

 8   A.        I don't recall.

 9   Q.        Okay.  Did you make a copy of this

10   letter and send it to Don or his attorney

11   for the court record?

12   A.        Yes, I believe I did send it to

13   his attorney.

14   Q.        And do you know who the attorney

15   was at the time?

16   A.        I believe it was Ed Foster.

17   Q.        Would you have sent that via

18   email?

19   A.        Yes.

20   Q.        Did you send Ed Foster documents

21   via regular mail at all?

22   A.        I don't know.  It's not impossible

23   that I would have sent him something in the

24   mail, but I'm not 100 percent sure.
```

Monique Solomon
7/22/2022

1    Q.       So would you have scanned it in

2    then and sent it to him over email?

3    A.       If I emailed it to him, yes, that

4    would have been how I sent it to him.

5    Q.       Would you have any record other

6    than the emails to and from Ed Foster where

7    you could -- that would help refresh your

8    recollection of how it was sent or in what

9    form or no?

10   A.       Can you repeat that?

11   Q.       Yeah.  Do you have any records or

12   documents that would help confirm one way

13   or another who it was sent to and what date

14   and whether it was by regular mail and --

15   A.       Well, other than the email, yeah.

16   Q.       Other than the email to Ed Foster?

17   A.       Right.

18   Q.       Okay.  I want to show you another

19   document.  I'm going to mark it as -- what

20   are we up to -- 8.  Exhibit 8 is a one-page

21   document.  It's a one-page document Bates

22   marked PLAINTIFF00316.

23                    (Exhibit marked Exhibit 8

24         for identification.)

Monique Solomon
7/22/2022

```
1   BY MS. ROSENTHAL:

2   Q.       Do you recognize this document?

3   A.       Yes.

4   Q.       Can you describe what it is?

5   A.       It's the same document you gave me

6   in Exhibit 7.

7   Q.       Okay.  I just want you to take a

8   look at Exhibit 7.  The first page marked

9   OUTLAWDA02022002514, do you notice any

10  discrepancies between the documents?  This

11  isn't a trick question.  Just does

12  anything --

13  A.       No, I see the difference.  And the

14  difference, I don't know why it's

15  different.  I mean like, you know, the

16  paper --

17  Q.       Well, just because we have a

18  stenographer can you describe what the

19  difference is?

20  A.       Exhibit 7 looks like really, like,

21  balled up or destroyed or altered whereas

22  though Exhibit 8 is a clean copy.

23  Q.       So would you agree that that

24  marking on the first page of Exhibit 7
```

Monique Solomon
7/22/2022

1    seems to be missing on Exhibit 8?  Would

2    you agree this 2015 is filled in -- well,

3    sorry.  Let me --

4    A.        Well, I mean it looks whoever

5    copied this was a poor copy.

6    Q.        So you believe that -- well, do

7    you have any recollection one way or

8    another about which was the original?

9    A.        I mean, it looks like this clean

10   copy would be a better copy as opposed to

11   this copy, so no.

12   Q.        I'm not asking you to assume.  I'm

13   just asking if you have a recollection of

14   which is the original?

15   A.        No.  I mean, it looks like this

16   Exhibit 8 is a clean copy, so I would have

17   to think that this is the original because

18   it's the cleaner copy whereas though if 7

19   was an original, it wouldn't be an original

20   because we have 8 right here.

21   Q.        But you don't recall one way or

22   another, for example, like you saw this

23   blemish on one?

24   A.        No, I do not recall.

Monique Solomon
7/22/2022

1  Q.        Okay.  And do you see on

2  PLAINTIFF003168, do you see how the 15 in

3  2015 looks a little lighter than the rest

4  of the date?

5  A.        Yes.

6  Q.        Also, do you see -- well, do you

7  see the last third there's a word day, the

8  following day a detective also appears to

9  be in a lighter font?

10 A.        Where is that at?

11 Q.        (Indicating).

12 A.        Yes.

13 Q.        Do you recall whether -- well, do

14 you recall what type of ink the original

15 was written in?

16 A.        I do not.

17 Q.        Do you recall there being

18 different colors of ink that were used?

19 A.        No, I do not.

20 Q.        At any point, is it your -- is it

21 your testimony that if 8 was altered from

22 Version 7 you have no idea how that

23 happened and you had nothing to do with it?

24 A.        No, absolutely not.

Monique Solomon
7/22/2022

1    Q.        Would you consider it to be

2    improper to be altering documents?

3    A.        Yes.

4    Q.        And that's why you would have

5    nothing to do with it?

6    A.        Yes.

7    Q.        Have you ever seen -- I know at

8    the beginning you said that you did

9    recognize this document.  But now that you

10   see the differences, do you recall seeing

11   this version Exhibit 8?  Do you recall

12   seeing this version of this page?

13   A.        I recall seeing the letter as to

14   which version, this destroyed version

15   versus the cleaned copy.  I mean, I

16   remember seeing the letter and the content.

17   Q.        Okay.  And again, you have no idea

18   who would have the original if it wasn't

19   for Ed Foster?

20   A.        Correct.

21   Q.        I'm going to show you a document

22   that I'm going to mark as 9.

23                 (Exhibit marked Exhibit 9

24          for identification.)

Monique Solomon
7/22/2022

```
 1   BY MS. ROSENTHAL:

 2   Q.        Just for the record, it's a

 3   one-page document labeled Bates marked

 4   OUTLAWDA02022002508.  Do you recognize this

 5   document?

 6   A.        Yes, it's an envelope from

 7   Paladino.

 8   Q.        And is this the envelope that you

 9   recall -- do you recall whether -- do you

10   know whether this is the envelope that the

11   letter we looked at, at Exhibit 7 arrived

12   in?

13   A.        I'm not sure.

14                  MR. VAN NEERDAN:  Real

15              quick because I don't have the

16              Bates No.

17                  MS. ROSENTHAL:  Oh, I

18              didn't give you a copy of the

19              Bates No.?

20                  MR. VAN NEERDAN:  No, no,

21              it's okay.  Was this -- is this

22              letter the production that came in

23              yesterday?

24                  MS. ROSENTHAL:  No, I
```

Monique Solomon
7/22/2022

```
 1              think you have a Bates No.

 2                     MR. VAN NEERDAN:  No, I

 3          know I have a Bates No.  But I --

 4                     MS. ROSENTHAL:  OUTLAWDA0

 5          is everything produced by the DA.

 6                     MR. VAN NEERDAN:  Got it.

 7          Yeah.  That's what I thought.

 8          Okay.  Thank you.

 9  BY MS. ROSENTHAL:

10  Q.      Sorry, I got off track.  Is it

11  your practice to normally copy envelopes of

12  letters that you receive?

13  A.      No, I wouldn't say that it's

14  something I would do often.

15  Q.      What made you copy this one?

16                     MR. VAN NEERDAN:

17          Objection.

18  BY MS. ROSENTHAL:

19  Q.      Sorry.  Did you copy this one?

20  A.      I believe I did.  I don't really

21  remember.

22  Q.      Would it surprise you if this was

23  sent to Mr. Outlaw and included in a court

24  filing?
```

1    A.         What do you mean?

2    Q.         Would it surprise you if this

3    was -- a copy of this envelope was included

4    in a filing that Mr. Outlaw submitted in

5    connection with his Post Conviction Relief

6    Act proceedings?

7    A.         Well, no, because I know this

8    letter was of a court filing so...

9    Q.         So would it be fair to say that

10   you most likely copied it and sent --

11   A.         Yeah, I just don't remember.  I

12   know I provided this stuff.  So if it's

13   here, yes, I did copy it.  But from 2015

14   you're asking me do I personally remember

15   copying this letter today from 2015.

16   Q.         Yeah, thank you for that

17   clarification.  Is this a true and accurate

18   copy of the envelope as you remember it?

19   A.         Yes, I would have not made any

20   changes to an envelope.

21   Q.         And is that where you were living

22   at the time, 3708 Schuylkill Falls Lane?

23   A.         Yes.

24   Q.         Do you know what happened to the

Monique Solomon
7/22/2022

```
1   original of this envelope?

2   A.       I don't know.

3   Q.       If you sent it to Mr. Outlaw, do

4   you know if you would have sent -- I don't

5   understand you don't have a specific

6   recollection?

7   A.       I don't know that I would have

8   sent him an original envelope, so I'm not

9   sure.

10  Q.       What would be the normal practice

11  where you were going to send him mail

12  pertaining to his legal case?  Is that

13  something that you would send in hard copy

14  mail or you would send in the GTL messaging

15  system?

16  A.       Well, if I'm sending him a

17  document, it would be a hard mail.  But if

18  I'm, like, sending him something that's

19  from me, then it would be hard mail or GTL

20  if it was something that I could just type.

21  Q.       Do you know whether you saved this

22  envelope for any period of time or you

23  immediately threw it away upon receipt and

24  scanning it?
```

Monique Solomon
7/22/2022

1  A.        I don't remember.

2  Q.        Did you usually keep documents

3  that were relevant to Mr. Outlaw's case?

4  A.        Yes.  Well, I had a copy of his

5  file, and this was a part of his file so I

6  did have a copy of his file.

7  Q.        When you say this is a copy of his

8  file, what do you mean by that?

9  A.        Well, because this was something

10 that was filed in court because you just

11 said that this document was attached to a

12 court proceeding.

13 Q.        Okay.  What about documents that

14 were pertinent to his case that were not

15 attached to a court proceeding, did you

16 keep those in the file?

17 A.        Well, any documents that I had

18 were pertaining to his file which is his

19 court case so...

20 Q.        Okay.  So it would have been

21 unusual for you to dispose of a document

22 pertaining to his court case during

23 proceedings?

24 A.        Well, a legal document?  What kind

1  of document are you referring to?

2  Q.      A document like this.  Let's say

3  it wasn't filed in court.  If you received

4  a letter from Charles Paladino that's

5  talking about his criminal case in an

6  envelope, is that something you would

7  usually save as part of the file?

8  A.      Yeah, because I feel like this

9  file is a part of it because he's

10 explaining Don's case.

11 Q.      I want to show you another

12 document I'll mark as Exhibit -- what are

13 we up to?

14              COURT REPORTER:  10.

15              (Exhibit marked Exhibit

16      10 for identification.)

17 BY MS. ROSENTHAL:

18 Q.      This is a two-page front and back

19 document Bates marked OUTLAWDA02022002399.

20 Do you recognize this document?

21 A.      Yes, I do.

22 Q.      Can you describe it briefly for

23 the record?  Just the name of the affidavit

24 and the date is fine.

Monique Solomon
7/22/2022

```
 1   A.        This is an affidavit from Charles
 2   Paladino dated January 27th of 2015?
 3   Q.        At what point did you receive this
 4   affidavit or did you receive this
 5   affidavit?
 6   A.        I believe I did receive a copy of
 7   this affidavit.  As to when I received it,
 8   I'm not sure of the exact date.
 9   Q.        If Mr. Paladino had testified that
10   this was an affidavit that you drafted and
11   gave to him to sign, would that be false?
12                    MR. VAN NEERDAN:
13        Objection.
14   BY MS. ROSENTHAL:
15   Q.        Go ahead.
16   A.        Yes, that would be false.
17   Q.        You played no part in drafting
18   this affidavit?
19   A.        I did not.
20   Q.        Given your experience with your
21   husband and others who are incarcerated,
22   are you aware of inmates having access to
23   nontypewriter or word processing?
24   A.        No.
```

1  Q.       So would it be unusual that

2  someone who was incarcerated would have

3  typed up this document in this font?

4  A.       Well, inmates do have access to

5  typewriters and word processors.

6  Q.       Sorry.  Typewriters and word

7  processors?

8  A.       Yeah, I believe so.  Because I

9  believe just -- I believe Donald had a

10  typewriter and then later as time went on,

11  they gave them something else like a word

12  processor type of thing.

13  Q.       In 2015, do you know if they had

14  access to word processors?

15  A.       I don't know, no.

16  Q.       Do you -- what do you remember

17  about receiving this affidavit?  Did you

18  have any communications with Mr. Paladino

19  prior to receiving it about an affidavit?

20  A.       I don't remember.

21  Q.       I want to show you a document that

22  I'm going to mark as Exhibit --

23            COURT REPORTER:  I think

24       it's 11.

1    BY MS. ROSENTHAL:

2    Q.        Okay, 11.  Actually, strike that.

3    Did you speak to Mr. Paladino about the

4    content of that affidavit prior to it being

5    drafted?

6    A.        I don't believe so.

7    Q.        Had you visited Mr. Paladino prior

8    to January 27, 2015?

9    A.        I did visit Paladino.  I don't

10   know the exact date I went to see him.

11   Q.        Okay.  Let me show you -- I'm

12   going to show you a document that I'm

13   marking as Exhibit 11.  It's a one-page

14   document Bates marked CITY016932.

15                    (Exhibit marked Exhibit

16        11 for identification.)

17   BY MS. ROSENTHAL:

18   Q.        Have you seen this document

19   before?

20   A.        No, I'm not sure what this is.

21   Q.        Yeah.  I'll represent to you that

22   this is a printout that we received from

23   the Department of Corrections.  It shows

24   Mr. Paladino's visit history between 2017

Monique Solomon
7/22/2022

```
1   and 2019.  Do you see the first two entries

2   show --

3   A.        Yes.

4   Q.        Do you see the first entry is

5   dated 12/31/2017 and has your name Monique

6   Outlaw next to it and then underneath that,

7   there's another entry of the same date that

8   has your son's name?

9                    MR. VAN NEERDAN:

10             Objection.  You can answer.

11                    THE WITNESS:  Yes.

12                    MS. ROSENTHAL:  Sorry.

13             What's the basis of the objection?

14                    MR. VAN NEERDAN:  These

15             are the documents that were

16             produced to us last night,

17             correct?

18                    MS. ROSENTHAL:  No.

19                    MR. VAN NEERDAN:  I

20             believe they are.  They were in

21             the Bates range of stuff that we

22             got from the Department of

23             Corrections last night.

24                    MS. ROSENTHAL:  I'll tell
```

Monique Solomon
7/22/2022

1          you this was not produced last

2          night.

3                    MR. VAN NEERDAN:  Okay.

4          All right then.

5                    MS. ROSENTHAL:  Sorry.

6          Can you repeat back my question?

7                    (The last question was

8          read back.)

9                    THE WITNESS:  Yes.

10    BY MS. ROSENTHAL:

11    Q.        Does that refresh your

12    recollection about your visit with

13    Mr. Paladino and the date that it occurred?

14    A.        Yes, it does.

15    Q.        Looking at this, do you believe

16    that you visited him on 12/31/2017?

17    A.        Yes.

18    Q.        And you only visited him one time;

19    is that correct?

20    A.        Yes.

21    Q.        Okay.  So turning back to Exhibit

22    10, you had not visited him before the date

23    of this affidavit January 27, 2015?

24    A.        No, I visited him on December 31st

Monique Solomon
7/22/2022

```
1   of 2017.
2   Q.        So you wouldn't have talked to him
3   about it in person; is that correct?
4   A.        No.
5   Q.        And you did not talk to him on the
6   phone?
7   A.        No.
8   Q.        Do you recall any written
9   correspondence where the contents of the
10  affidavit were discussed?
11  A.        We have correspondence in writing.
12  As far as what was said in the letter, I
13  don't remember.  Well, he sent me this
14  affidavit, right, there's a letter.
15  Q.        I don't believe they're the same
16  date.  I'm trying to understand how you
17  received this later if you don't have
18  any --
19  A.        Right.
20  Q.        -- of it.  So as far as you
21  remember, you didn't ask him for an
22  affidavit or tell him what to say in it.
23  He just sent this to you out of the blue?
24  A.        No -- well, that affidavit is
```

1  dated in 2015 and I saw him in 2017.

2  Q.       Sorry.  For context, I think we

3  were talking about -- well, maybe it would

4  help to show you a document that I don't

5  have a copy of, so we'll have to wait until

6  a break and move on.

7           After you received this affidavit,

8  do you remember if you sent a letter back

9  to him?

10  A.       I don't remember.

11  Q.       At any point, have you or anyone

12  you know deposited any money on

13  Mr. Paladino's prison inmate account?

14  A.       No.

15  Q.       Okay.  I'm going to jump around a

16  little bit so you don't get too bored.

17           I want to ask you about the DOC

18  GTL messaging system.  You said that you're

19  familiar with that?

20  A.       Yes.

21  Q.       Okay.  What is it?  Can you

22  briefly describe it for us?

23  A.       I believe it's a system used to

24  send emails back and forth.  Well, isn't it

Monique Solomon
7/22/2022

1    called ConnectNetwork?

2    Q.      You could be right.  Is it a text

3    message or an email system?

4    A.      I think it's email.

5    Q.      Do you have to request to contact

6    an inmate or they can request contact to

7    you?

8    A.      I don't think you have to request

9    contact.  I think if you put in their

10   inmate number, their name pops up and you

11   can write them.  I don't know if -- I think

12   you do have to reach out to them before

13   they can write you.

14   Q.      Does it cost to send a message?

15   A.      Yes, because you have to buy

16   stamps or -- yeah.

17   Q.      Is there any rule that you're

18   aware of that inmates can't send messages

19   to other inmates directly?

20   A.      I'm not sure.

21   Q.      Are you able to send attachments

22   through this system?

23   A.      I don't think so.

24   Q.      How long after a message is sent

1   or received do you have access to it

2   through the system?

3   A.        I'm not sure.

4   Q.        Well, in your experience using the

5   system if you've sent a message if you log

6   back in, is that message saved in your

7   account?

8   A.        So you're asking if I send a

9   message and I send the message and the next

10  day I go back in, if I'll still be able to

11  see that message?

12  Q.        Yeah, like Gmail.

13  A.        Yes.

14  Q.        And does it save for a certain

15  period of time until you delete it?

16  A.        No, I believe it does save for a

17  certain amount of time.  I'm not sure how

18  much time.

19  Q.        But until it is -- until that time

20  elapses which you're not sure how long it

21  is, you'd have to actively delete them.  Is

22  there an option for that?

23  A.        I'm not sure if there is or is

24  not.

```
1    Q.        Have you used the messaging system
2    to send or receive messages from any
3    individuals who are incarcerated?
4    A.        I do have a ConnectNetwork
5    account.
6    Q.        And have you used that account to
7    send or receive messages?
8    A.        Not recently, but my son does have
9    access to my ConnectNetwork and he has a
10   couple of contacts on there that he use to
11   send messaging and money back and forth to
12   his friends.
13   Q.        You can use that system to send
14   money?
15   A.        I believe so.
16   Q.        Sorry.  Your son has his own
17   account or he uses yours?
18   A.        No, he uses my account.  I haven't
19   really used ConnectNetwork since Don has
20   been home, maybe a couple times after, but
21   no.
22   Q.        Okay.  My question is just not --
23   I'm not asking about the very recent past.
24   I'm just asking in general have you used
```

Monique Solomon
7/22/2022

1   the system to send and receive messages?

2   A.      Yes.

3   Q.      Starting approximately when?

4   A.      Whenever it started up.

5   Q.      Okay.  Who do you remember --

6   well, can you give me the names of anyone

7   you remember communicating with using that

8   system?

9   A.      Donald.

10  Q.      Anyone else?

11  A.      I know I have a couple of names on

12  there, but I mean, my cousin --

13  Q.      I'm just asking who you remember

14  having sent or received a message from?

15  A.      Like a couple of family members.

16  Q.      Okay.  Who are they?

17  A.      Lydell Heyward, my cousin.

18  Q.      Sorry.  Say the name again.

19  A.      Lydell Heyward and a family friend

20  Timothy Baker.

21  Q.      Anyone else?

22  A.      I know I've sent messages, but I

23  can't remember, like, every single person

24  that I've sent a message to on there.

Monique Solomon
7/22/2022

```
1    Q.        Do you have to register for an

2    account?

3    A.        Yes, like you sign up.

4    Q.        Okay.  So can you describe the

5    process of what you have to do to sign up,

6    what information you have to enter?

7    A.        First, last name and your credit

8    card information I believe.

9    Q.        You said your son has access to

10   your account?

11   A.        Mm-hmm.

12   Q.        Does he also have his own account?

13   A.        I don't believe he has his own

14   account.  He uses my account.

15   Q.        When did you share your password

16   with him?  How long has he had access to

17   your account?

18   A.        I'm not sure of the exact date,

19   but he's had access to it for a while.

20   Q.        Can you give me -- did he have

21   access when your husband was incarcerated?

22   A.        I don't think so.  I don't

23   remember.

24   Q.        Has anyone else had access to your
```

1    password?

2    A.        No.

3    Q.        If an inmate had access to your

4    password, would they be able to just log in

5    into the account and use it?

6    A.        No, I don't believe so.

7    Q.        Has your husband ever had access

8    to your account?

9    A.        I don't think so, but it wouldn't

10   be impossible, like, if he wanted to send a

11   message.  Like, I wouldn't say no.

12   Q.        Well, does he have your password?

13   A.        No.  But again, if he wanted to

14   send an email and he said, let me send an

15   email, like, I would open up my phone and

16   let him use it.

17   Q.        Is that a hypothetical or has it

18   happened?

19   A.        No, I'm just saying, like, I don't

20   want to say yes and I don't want to say no.

21   I'm saying it's not impossible for him to

22   have sent a message since him being home.

23   Q.        Are you aware of any instances

24   where he's asked to use your account?

Monique Solomon
7/22/2022

```
1   A.       No.

2   Q.       Have you ever opened more than one

3   account?

4   A.       No, not that I can recall.

5   Q.       Have you ever used anyone else's

6   account to send a message?

7   A.       No.

8   Q.       If a message is deleted, are you

9   able to see it?  Is there a deleted box?

10  A.       I don't believe so.

11  Q.       And then how do you get

12  notifications?  I'm asking because I really

13  don't understand the system so --

14  A.       I believe it comes to your email

15  or if you have the app, like it notifies

16  you via the app, like you have an message.

17  Q.       I'm going to show you a document

18  that I'm going to mark as --

19                  COURT REPORTER:  12.

20                  (Exhibit marked Exhibit

21       12 for identification.)

22  BY MS. ROSENTHAL:

23  Q.       This document does not have --

24  this is produced in native form so it
```

1  doesn't have a Bates No. on it, but I'm

2  happy to at a break look up the Bates No.

3  of the big packet.  It's just an excerpt

4  from that document.  It's a one-page

5  excerpt from GTL messages produced by the

6  DOC of Wesley Harmon's account.

7           So I'm going to represent to you

8  this is a page of outgoing G -- of outgoing

9  messages.  I was going to say GTL, but you

10  may be correct, it's titled something

11  differently, produced by the Department of

12  Corrections, Wesley Harmon's account.  I

13  want to turn your attention to the second

14  entry.

15           Do you agree that it appears to be

16  a message sent by Wesley Harmon to your

17  account dated 10/29/2016?

18                     MR. VAN NEERDAN:

19           Objection.

20                     THE WITNESS:  Yes.

21  BY MS. ROSENTHAL:

22  Q.       Do you recall this message?

23  A.       I don't remember this message, but

24  I do see that it was sent to me so...

Monique Solomon
7/22/2022

1   Q.        First, before I get into it, who

2   is Wesley Harmon?  Is he someone you know?

3   A.        Yes.

4   Q.        When did you come to meet him?

5   A.        I know Mr. Harmon through Donald

6   being incarcerated, and he's also -- him

7   and Donald are friends.

8   Q.        Has he had a romantic relationship

9   with any of Mr. Outlaw's family members?

10  A.        Yes.

11  Q.        And who's that?

12  A.        His sister.

13  Q.        Were they married?

14  A.        No.

15  Q.        Do they have any children

16  together?

17  A.        They share a child.

18  Q.        And when -- has it been a constant

19  relationship or is a relationship that --

20  is it a relationship with a start-end date?

21  Well, first of all, are they still in a

22  relationship?

23  A.        No.

24  Q.        Do you know when they first began

1    a relationship with one another?

2    A.         No.

3    Q.         Okay.  Have they been off and on

4    or constant?

5    A.         I don't know about their

6    relationship.

7    Q.         How old is their son?

8    A.         Daughter.

9    Q.         Daughter?

10   A.         I know she's grown.  She's over

11   21.

12   Q.         What's her name again?

13   A.         Ishira Star.

14   Q.         That's the only child they have

15   together?

16   A.         Yes.

17   Q.         Is Mr. Harmon married, if you

18   know?

19   A.         I believe he's married.

20   Q.         Who is he married to, do you know?

21   A.         I'm not sure.

22   Q.         Is this message addressed to you

23   as you read it?

24   A.         Well, in the letter he's saying

1    Bro so...

2    Q.      It starts with you -- you see it

3    starts with Asa.  Is that a name or a

4    greeting?

5    A.      It's the Islamic greeting.

6    Q.      Okay.  And do you see it says in

7    the subject Don?

8    A.      Yes.

9    Q.      Do you believe reading this or can

10   you tell if this is addressed to -- this

11   message is addressed to Don or you have no

12   idea?

13   A.      I mean, he has his name in the

14   subject line and he does refer to him as

15   Bro so...

16   Q.      Is it common practice for inmates

17   in your experience to send messages to

18   someone to pass them on to someone else?

19   A.      In my experience, it does happen.

20   Q.      So if you received this message --

21   if you received a message like this, how

22   would you pass it on?

23   A.      I would tell Don that.

24   Q.      On the phone or in person?

Monique Solomon
7/22/2022

```
1   A.         Either or.

2   Q.         Okay.  I want to ask you, and you

3   may not know, but do you see in the first

4   line there's reference to Ali.  I may be

5   pronouncing that wrong.  It says, What's

6   going on Bro.  I know Alli -- Ali.  Do you

7   know who that's referring to?

8   A.         No.

9   Q.         Okay.  Do you know what that

10  expression in the second line is, they took

11  a dime off?

12  A.         It means 10 so...

13  Q.         Oh, like 10 years off?

14  A.         (Nodding affirmatively).

15  Q.         Then I want to ask you a couple of

16  lines down do you see it says, I talked to

17  Maul or maybe Mal.  Do you know who that's

18  referring to?

19  A.         No.

20  Q.         Do you know any individuals who go

21  by that name?

22  A.         No, I don't think so.

23  Q.         What about Rashee or -- I really

24  apologize if I'm mispronouncing --
```

Monique Solomon
7/22/2022

```
 1   A.        It's Rashee.

 2   Q.        Rashee?

 3   A.        Rashee is Wesley's brother.

 4   Q.        Okay.  What is his full name?

 5   A.        I don't know.

 6   Q.        Okay.  You don't know the last

 7   name?

 8   A.        No.

 9   Q.        And then at the last line it says,

10   Tell -- you said you don't know who the

11   A-l-i is referring to?

12   A.        Mm-hmm.

13   Q.        And what about Little G?

14   A.        No, I'm not sure.

15   Q.        You don't know anyone by that

16   name?

17   A.        No.

18   Q.        Do you know whether this was a

19   message that you received or that your son

20   received?

21   A.        This would have been a message

22   that I received just based off of the 2016

23   date.

24   Q.        So I don't believe Wesley Harmon
```

Monique Solomon
7/22/2022

```
1   is one of the individuals that you

2   mentioned as having communicated with over

3   the platform.  Is he someone that you

4   communicated with?

5   A.        Through this GTL?

6   Q.        Mm-hmm.

7   A.        Yes.

8   Q.        More frequently than just this one

9   time?

10  A.        I wouldn't say that we had

11  frequent communication, but it's not

12  uncommon for him to send me a message.

13  Q.        Okay.  I want to show you another

14  document.  I'm going to mark it as

15  Exhibit --

16                  COURT REPORTER:  13.

17                  (Exhibit marked Exhibit

18        13 for identification.)

19  BY MS. ROSENTHAL:

20  Q.        -- 13.  This is also an excerpt

21  from a larger document, although I believe

22  I put the Bates No. that it came from at

23  the bottom CITY018846.  This is -- I'll let

24  you know since you don't have the full
```

Monique Solomon
7/22/2022

1  document, this is a sheet of incoming

2  messages that Darrell Wyatt received using

3  the messaging system.

4         I want to turn your attention to

5  the first time -- well, first of all, do

6  you know someone named Darrell Wyatt?

7  A.       Yes.

8  Q.       Who is that?

9  A.       He's a friend of Donald's.

10  Q.       Do you know if they have any

11  relation or any relatives in common or --

12  A.       No, I don't believe so.

13  Q.       Okay.  So do you know how they met

14  or what --

15  A.       I believe they grew up together.

16  Q.       Okay.  Do you know if he's close

17  to any other of Donald's friends?

18  A.       Like?

19  Q.       Do they have friends in common?

20  A.       Yeah.  I mean, Wyatt's from the

21  neighborhood so they have a lot of friends

22  in common.

23  Q.       Does he have any relation that you

24  know of to Mr. Harmon?

1    A.        I know they're friends.

2    Q.        Okay.  I want to draw your

3    attention to the first entry that's marked

4    12 -- or the date is 12/16/2018.  Do you

5    see that this looks like an incoming

6    message from you to Darrell Wyatt on that

7    date?

8    A.        So this is a message I sent to

9    him?

10   Q.        Well, this is just the sheet that

11   shows incoming messages.  And I can just

12   show you I only have the document.  It

13   lists the inmate and then the individual

14   who I believe sent the message in the

15   second column, so that's what it appears to

16   be.

17            Do you have any recollection of

18   this message?

19   A.        No, other than that it was sent to

20   me.

21   Q.        Well, I believe it would have been

22   sent by your account.

23   A.        Oh, I sent this to somebody -- I

24   meant to Wyatt?

Monique Solomon
7/22/2022

```
1   Q.        Well, I'm just saying the document
2   appears -- that's what appears --
3   A.        Oh, okay.
4   Q.        Do you have any recollection of
5   this message?
6   A.        Yes.
7   Q.        Okay.  So you specifically recall
8   sending this message?
9   A.        I mean, I know it's from my
10  account, so yes.
11  Q.        Do you have like -- are you
12  assuming that you sent it or do you
13  specifically remember this content, it
14  rings a bell?
15  A.        I mean, what's in it, yeah, rings
16  a bell.
17  Q.        Rings a bell.  Okay.  Is this a
18  message that you wrote on someone's behalf?
19  A.        It would be a little bit of both.
20  Like, this is probably me sending Wyatt a
21  message just updating him on, like, what's
22  going on from Don.
23  Q.        Okay.  So in a couple of lines
24  down it says, I be talking with Sy.  Would
```

Monique Solomon
7/22/2022

1    I be referring to you or to Don?

2    A.        Don.

3    Q.        Okay.  So is this a message that's

4    from Don -- well, my question is confusing.

5              Is this a message that's written

6    from you to him or are you passing along a

7    message that Donald wrote, does that make

8    any sense?

9    A.        I'm passing a message.

10   Q.        Okay.  And is that something that

11   you did frequently for your husband?

12   A.        Well, people would, like, I might

13   reach out to one of his friends just to let

14   them know, like, what's going on or if Don

15   says reach out to Wyatt and tell him what's

16   going on, then I would message him.

17   Q.        And is that again because inmates

18   weren't allowed to message each other

19   directly?

20   A.        Yes.

21   Q.        Okay.  So I just want to ask you

22   about some names in this again to see if

23   you know who they are.

24             Do you see three lines down

Monique Solomon
7/22/2022

1   there's a reference to Chris?

2   A.       Yes.

3   Q.       Who's that?

4   A.       I believe it was Chris Holder

5   because I believe Holder and Wyatt were

6   incarcerated at the same jail.

7   Q.       Okay.  It says, I told Chris to

8   get your info for me.  Do you know what

9   that's referencing?

10  A.       I guess I believe his contact

11  information.

12  Q.       Oh, okay.  And then skipping down

13  a few lines, do you see where it says, I be

14  talking to Sy on the regular, well, hit and

15  miss?

16  A.       Yes.

17  Q.       Who is Sy referring to?

18  A.       Wesley Harmon.

19  Q.       Did he also go by Sa?

20  A.       Yes.

21  Q.       Did he go by Sa as long as you

22  knew him?

23  A.       Yes.

24  Q.       So he is called both Sy and Sa?

Monique Solomon
7/22/2022

```
 1   A.        Well, Sa is his Islamic name, so
 2   majority of people will call him by his
 3   Islamic name as opposed to his real name,
 4   so yes.
 5   Q.        Sorry.  You have to pardon my
 6   ignorance.  I thought his real name was
 7   Wesley Harmon?
 8   A.        It is.
 9   Q.        Okay.  So what's Sy?
10   A.        His attribute for Sa or Saheem.
11   Q.        Oh, okay.
12   A.        When you're a Muslim, you have an
13   attribute and your attribute is your
14   Islamic name.
15   Q.        Okay.  So Donald Outlaw would have
16   known him as Sa since growing up?
17   A.        Yes.
18   Q.        They knew each other well before
19   he was convicted?
20   A.        Yes.
21   Q.        Then there's the next line down
22   says, That creepy ass nigga stalked Tanny.
23   Who's Tanny?
24   A.        Tanny is Wyatt's sister.
```

Monique Solomon
7/22/2022

```
1    Q.        Is Darrell Wyatt's sister?

2    A.        Yes.

3    Q.        What's her full name?

4    A.        I don't know her full name.

5    Q.        Do you know her by any other name?

6    A.        I know her by Tanny, but I don't

7    think that's her full name.

8    Q.        And then there's reference to JR?

9    A.        JR is Tanny's baby father.

10   Q.        Okay.  Who's that?

11   A.        It's like a big ol' soap opera.

12   Q.        So I understand baby's father, but

13   what's his name?

14   A.        JR.  I don't know, like, his real

15   name.

16   Q.        Okay.  Tanny's baby father, but we

17   don't have any idea of any other

18   identifying characteristics.  Is he known

19   by anything else?

20   A.        As long as I've known him, he's

21   been known by JR.

22   Q.        What about Jamil Rogers?

23   A.        No.

24   Q.        I'm just trying to think of a JR.
```

1    All right.  I think that's all I had.

2            Who's Charlie Williams?  You see

3    his name or her name a bunch of times.

4    A.      She's Wyatt's -- she has a child

5    by Wyatt.

6    Q.      Okay.  Does Donald have any

7    children?

8    A.      He does.

9    Q.      What are their names and ages?

10   A.      Well, my son DeAndre, 24, and then

11   he has a son Donald, Jr.

12   Q.      Did he adopt your son?

13   A.      No.

14   Q.      Okay.  And sorry, who's the second

15   son?

16   A.      Donald, Jr.

17   Q.      And how old is Donald, Jr.?

18   A.      I think maybe like four months,

19   three months.

20   Q.      Is it Donald, Jr. Outlaw?

21   A.      Yes.

22   Q.      Who is the mother?

23   A.      Zykia.

24   Q.      Does he live with Mr. Outlaw or --

Monique Solomon
7/22/2022

```
1    A.        No.

2    Q.        With his mother.  Okay.  And those

3    are the only two children that he has?

4    A.        (Nodding affirmatively).

5    Q.        Okay.  I'm going to show you

6    another document that I'm going to mark as

7    Exhibit --

8                    COURT REPORTER:  14.

9                    (Exhibit marked Exhibit

10           14 marked for identification.)

11   BY MS. ROSENTHAL:

12   Q.        -- 14.  It's a two-page, it's

13   front and back.  It's an excerpt of Wesley

14   Harmon that the DOC produced.

15           So just to orient you, it looks

16   like these are one page of incoming

17   messages to Wesley Harmon and other pages,

18   a mix of incoming and outgoing messages the

19   Department of Corrections produced us.  I

20   want you to turn to the page that has the

21   two boxes.

22           If you could look at the second

23   box, do you see that there's an entry July

24   29, 2016.  It's an incoming message.  It
```

Monique Solomon
7/22/2022

1  appears to be from you to Wesley Harmon?

2  A.        Yes.

3  Q.        Do you remember that

4  correspondence at all?

5  A.        Yes, vaguely.

6  Q.        Okay.  Is this a message that you

7  were sending or you were sending on behalf

8  of someone else?  Were you conveying a

9  message from someone else?

10  A.        I would have been conveying a

11  message.

12  Q.        And who would that message be

13  from?

14  A.        I just want to read through it.

15  Q.        Oh, go ahead.

16  A.        Yes, this would have been from

17  Don.

18  Q.        And you remember this message

19  vaguely you said?

20  A.        Yeah.

21  Q.        And so, is this normal practice

22  when he was asking you to convey a message

23  to tell you to send it in his account to

24  you to send it over or he would tell you on

1   the phone or in person or he didn't really

2   have a normal practice?

3   A.        He didn't really have a normal

4   practice.

5   Q.        Okay.  So I just want to ask you

6   again about names.  The second line,

7   there's again reference to Rash.  Did we

8   already go over?

9   A.        We did.

10  Q.        Who did you say that was?   I

11  apologize.

12  A.        Harmon's brother.

13  Q.        Harmon's brother.  And did you say

14  you had more information about his name or

15  no?

16  A.        No.

17  Q.        Okay.  And then there's another

18  reference to Mal.  And you said that you

19  didn't know who that was in the prior

20  message.  Does looking at this refresh your

21  recollection anymore?

22  A.        Not really.  I don't really know

23  Mal personally.  I know that, you know, Don

24  and Harmon have a friend named Mal, but I

Monique Solomon
7/22/2022

1   don't know him or I've never seen him.

2   Q.       Okay.  But you know that -- not to

3   say necessarily to know him, but there is

4   someone named Mal who Harmon and Don

5   have --

6   A.       Yes.

7   Q.       Is that the only individual that

8   they have -- that their mutual friends with

9   that name?

10  A.       I don't --

11  Q.       You don't know?

12  A.       Yeah.

13  Q.       Okay.  So the person that you

14  know, can you give me more identifying

15  details about who that person would be?

16  A.       I don't know this Mal person at

17  all.

18  Q.       Okay.  Do you know at all what

19  Donald's talking about when he says, Well,

20  I actually talked to Mal and he was talking

21  cash money?

22  A.       He just means that when he spoke

23  to this person, the person was, like, just

24  bragging about, like, how he gets a whole

Monique Solomon
7/22/2022

```
 1   bunch of money and if Don ever needed
 2   anything, then he had him, which he didn't
 3   because in the letter it said every time it
 4   was time to meet up --
 5   Q.       Okay.  You see the next line says,
 6   He was like he got me.  And if there's
 7   anything, he's the man to see.  But every
 8   time he's supposed to link up with my wife,
 9   it's a song and dance?
10   A.       Right.
11   Q.       So did that person ever try to
12   link up with you?
13   A.       No.
14   Q.       And was the cash money in exchange
15   for anything or --
16   A.       No.
17   Q.       Okay.  Who's Jay who's referenced
18   on the next line?
19   A.       I believe he's referring to JR,
20   but I'm not 100 percent sure.
21   Q.       Is JR sometimes referred to as
22   Jay?
23   A.       Not really, but that's the only
24   Jay that I would know of, but I'm not sure.
```

1  Q.        And then do you know what he's

2  referring to when he says, It looked extra

3  fishy, Bro.  I didn't see the paperwork,

4  but fuck that, F word.  Do you know at all

5  what he's referring to there?

6  A.        I'm not sure.

7  Q.        You have no idea at all?

8  A.        No.

9  Q.        So when he would tell you to send

10 these letters, he would just dictate them,

11 but you might not have any idea of what

12 he's saying?

13 A.        No.  Sometimes he might email me

14 or he might -- well, he might tell me

15 but...

16 Q.        Was it frequent that you had no

17 idea what he was talking about when you

18 were conveying the message?

19 A.        Sometimes, but honestly I don't

20 really get wrapped up into the street

21 language and stuff so...

22 Q.        Okay.  A few lines down it says,

23 Thanks for reaching out to folks for me

24 too.  Do you know what he's referring to

Monique Solomon
7/22/2022

1   there?

2   A.        No.

3   Q.        Did Mr. Harmon reach out to anyone

4   to assist Mr. Outlaw with his case, his

5   criminal case?

6   A.        No, not that I'm aware of.

7   Q.        You're not aware of him

8   facilitating any transportation of

9   witnesses?

10  A.        No.

11  Q.        Or approaching witnesses and

12  asking them to write affidavits?

13  A.        No.

14  Q.        Sitting here today, are you

15  absolutely sure of that?

16  A.        I don't believe so.

17  Q.        Do you see it says, I need you to

18  put a (inaudible) of recommendation

19  together for my resentencing as well?

20  A.        Yeah, a letter of recommendation.

21  Q.        Did Mr. Harmon do that?

22  A.        I don't believe he did --

23  Q.        Do you know why?

24  A.        -- but I'm not sure.

Monique Solomon
7/22/2022

1  Q.      You were the one -- were you the

2  one who was responsible for compiling those

3  letters?

4  A.      Yes.

5  Q.      Do you remember if you had any

6  conversation with Mr. Harmon about whether

7  he would do that?

8  A.      I don't remember.

9  Q.      Okay.  I want you to turn to the

10 back of the page.  Do you see that there's

11 an entry 7/29/16 incoming?  It looks like a

12 message from your account to Mr. Harmon

13 again.

14         Take a look at that and let me

15 know if you remember it at all.

16 A.      So this is a message I sent to him

17 or he sent this to me?

18 Q.      Well, it says incoming.  So

19 usually that would mean -- outgoing means

20 when the inmate sends it out.  Incoming

21 means that the inmate receives it.

22         So as far as I can just tell you

23 what this paper says.  I believe it says

24 that it was a message he received.

Monique Solomon
7/22/2022

```
1   A.       And you're asking me what this is?

2   Q.       No, I'm just asking if you

3   remember this message?

4   A.       Vaguely.  It just looks like I'm

5   explaining how to do a letter of

6   recommendation -- I meant like a character

7   letter, not like a letter of

8   recommendation.

9   Q.       You mean a letter for court?

10  A.       Yeah.

11  Q.       And was that in reference to Don's

12  case that you wrote that?

13  A.       I'm not sure if it was in

14  reference to Don's case or if it was in

15  reference to Harmon's case.

16  Q.       Did you assist Mr. Harmon with his

17  case at all?

18  A.       No, but I'm not sure if he asked

19  about a character letter or if I sent this

20  to him so that he could write one for Don.

21  Q.       Okay.  You can put that one aside.

22                  MS. ROSENTHAL:  I'd like

23           to take a five-minute break so I

24           can try to narrow down what I
```

Monique Solomon
7/22/2022

```
 1              asked you about so I don't
 2              unnecessarily --
 3                      THE VIDEOGRAPHER:  We're
 4              now going off record.  The time
 5              now is 3:24 p.m.
 6                      (Brief recess.)
 7                      THE VIDEOGRAPHER:  We're
 8              now back on record.  The time is
 9              3:42 p.m.
10   BY MS. ROSENTHAL:
11   Q.        Okay.  When we went off the
12   record, we were reviewing messages the DOC
13   produced.  I want to show you a few more.
14   I'm going to mark this one as Exhibit 15.
15   It's one page.  It's a one-page excerpt
16   from Robert Outlaws's account.
17                      (Exhibit marked Exhibit
18              15 for identification.)
19   BY MS. ROSENTHAL:
20   Q.        Okay.  I'm going to go through
21   this one real, real quick.  As I said, this
22   is a one-page excerpt from the messages
23   that were produced from Robert Outlaw's
24   account, the incoming messages from the
```

Monique Solomon
7/22/2022

1    Department of Corrections.

2         I want to call your attention to

3    three lines from the bottom.  You see

4    there's an entry Monique Solomon that's

5    dated September 19, 2016?

6    A.      What was the date?

7    Q.      It's three lines from the bottom,

8    September 19, 2016.  And my question is

9    very limited.  I'm just going to ask you if

10   you know who the individual's being

11   referred to as being Bust two lines from

12   the bottom?

13   A.      One of his friends that he was

14   going to add to his visiting list.

15   Q.      So do you know any identifying

16   information about that person?

17   A.      It's Christopher Jones at the

18   bottom.

19   Q.      Are you aware of anyone else that

20   you or Mr. Outlaw knows by the name of

21   Bust?

22   A.      No.

23   Q.      And then who is Christopher Jones?

24   A.      Bust is a friend of Don's.

1   Q.        Is he a friend of yours as well

2   or --

3   A.        I know of Bust through Donald and

4   him being incarcerated.

5   Q.        Did they meet when they were

6   incarcerated?

7   A.        No, Bust is from the neighborhood.

8   Q.        And did they grow up together?

9   A.        Bust is a lot older than Don, but

10  they -- he knows him from the neighborhood.

11  I'm not really sure.

12  Q.        Do you see the next message down

13  it says, He said add him so he can come

14  holler at you about a couple of things and

15  then lists his name and address.

16            Do you have any knowledge about

17  what it is that he wanted to talk to Donald

18  Outlaw about?

19  A.        No.

20  Q.        Is Christopher Jones in any way

21  implicated or involved in Mr. Outlaw's

22  criminal case at all?

23  A.        No.

24  Q.        Okay.  That's it for that one.  I

Monique Solomon
7/22/2022

1    want to show you another.  I'm going to go

2    through these real quick.  Another I'm

3    marking as 16.  It's a two-page excerpt

4    from Robert Outlaw's messages or outgoing

5    messages that it appears he sent.

6                    (Exhibit marked Exhibit

7         16 for identification.)

8    BY MS. ROSENTHAL:

9    Q.      So again, I'm just going to ask

10   you really direct questions about this.  I

11   want you to take a look at the -- are we on

12   the same page, the one that has guess who,

13   good news at the bottom?

14   A.      Yes.

15   Q.      Do you see a message that appears

16   to be sent to you from Mr. Outlaw on

17   December 9, 2017 at the very bottom?

18   A.      Yes, with a phone number?

19   Q.      Yes.  And I believe it

20   continues -- no, maybe that's a separate

21   email.  No, I believe it's a separate

22   email.

23           Just focusing on this one, do you

24   recall this message?

Monique Solomon
7/22/2022

```
1    A.       No, not really but...

2    Q.       Do you know whose phone number

3    that refers to?

4    A.       I don't.

5    Q.       Okay.  Looking on the opposite

6    page, do you see that there's an entry at

7    the very top dated December 9, 2017 that

8    appears to be sent from Mr. Outlaw to your

9    account?

10   A.       Yes.

11   Q.       Do you recall that message?

12   A.       Yes, this is a phone number.

13   Q.       Do you recall receiving this

14   message?

15   A.       I don't recall receiving the

16   message, but this is my name right here

17   so...

18   Q.       Do you know who Bounty refers to?

19   A.       Bounty is someone that he was

20   incarcerated with.

21   Q.       So is it your understanding that

22   Mr. Outlaw was -- do you know if he was

23   incarcerated with Mr. Outlaw at the time

24   this message was sent?
```

Monique Solomon
7/22/2022

```
1   A.        I'm not sure.
2                   MR. VAN NEERDAN:  I'm
3         sorry.  Where are you?
4                   THE WITNESS:  It's on the
5         back right here.
6                   MR. VAN NEERDAN:  Okay.
7         Thank you.
8   BY MS. ROSENTHAL:
9   Q.        Well, would it make sense that he
10  was providing a number?
11  A.        I don't know if what he's saying
12  this is Bounty's number or it could be
13  somebody like Bounty's folks.
14  Q.        Do you have any idea why he's
15  providing either of these numbers to you?
16  A.        No.
17  Q.        Do you remember doing anything
18  with these numbers?
19  A.        No.
20  Q.        Do you know any other identifying
21  information for Bounty?
22  A.        No.
23  Q.        Do you know if he has anything to
24  do with Mr. Outlaw's criminal case?
```

Monique Solomon
7/22/2022

```
1   A.        No, he does not.

2   Q.        Do you have any idea why with

3   respect to this number December 9, 2017

4   message, he would be sending the number

5   with good news?

6   A.        I don't think the good news was

7   for this email.  It looks like the good

8   news goes with this Saleema person.

9   Q.        Okay.  Well, either way it doesn't

10  ring a bell at all?

11  A.        No.

12  Q.        Were there particular numbers for

13  witnesses in the criminal case that he was

14  looking for that he did not have?

15  A.        I don't believe so.

16  Q.        Okay.  You can put that one aside.

17  I'm going to mark this one as Exhibit 17.

18  It's a one-page excerpt of a native

19  document that was produced.  It's a page of

20  outgoing messages from Robert Outlaw's

21  account.

22                  (Exhibit marked Exhibit

23        17 for identification.)

24  BY MS. ROSENTHAL:
```

Monique Solomon
7/22/2022

```
1   Q.        I want to call your attention to
2   the bottom message.  Do you see a message
3   at the very -- oh, sorry.  Do you not have
4   it yet?
5            Do you see a message at the very
6   bottom that appears to be sent from Robert
7   Outlaw to you dated January 9, 2018?
8   A.        Yes.
9   Q.        Take a second to look it over.
10  And then my question is whether you recall
11  receiving this message?
12  A.        Yes.
13  Q.        You recall receiving this message?
14  A.        Yes.
15  Q.        And is this a message that you
16  understood Mr. Outlaw was sending for you
17  to pass on to Ed Foster?
18  A.        Yes.
19  Q.        Do you see a couple lines down it
20  says, Paladino can confirm her presence and
21  I would like to subpoena him for my
22  upcoming evidentiary hearing?
23  A.        Yes.
24  Q.        And does her refer to Katima
```

1    Jackson?

2    A.       Yes, I believe so.

3    Q.       Do you have any knowledge as to

4    what led Mr. Outlaw to believe or at least

5    state that he believed as of January 2018

6    that Mr. Paladino could confirm

7    Ms. Jackson's presence?

8    A.       What was the question again?  I'm

9    sorry.  I was --

10                     MS. ROSENTHAL:  Can

11          you --

12                     THE WITNESS:  -- reading

13          through.

14                     (The last question was

15          read back.)

16                     THE WITNESS:  Not that I

17          can recall.

18   BY MS. ROSENTHAL:

19   Q.       Did you ever have any

20   conversations with Mr. Paladino about

21   Katima Jackson at any point in time?

22   A.       I believe that when I went to

23   visit him that we did -- we spoke on, like,

24   what happened that night and if he saw some

Monique Solomon
7/22/2022

```
1   other people there.
2   Q.        Was the name Katima Jackson
3   specifically mentioned?
4   A.        He did mention a woman, but I
5   don't remember if he specifically said her
6   name.  I'm not 100 percent sure.
7   Q.        What did he say about the woman?
8   A.        Just that there was a female out
9   there that night.
10  Q.        So could he have been referring to
11  Shelby Green?
12  A.        I'm not sure.
13  Q.        Did you ever -- do you recall any
14  conversation where you directly discussed
15  Katima Jackson using her name with
16  Mr. Paladino?
17  A.        No, not that I can recall.
18  Q.        Would you have said anything to
19  lead Mr. Outlaw to believe that
20  Mr. Paladino could confirm her presence as
21  of January 9, 2018?
22  A.        I don't remember.  I know that me
23  and Donald, we did have a conversation and
24  I told him, you know, what Paladino said.
```

Monique Solomon
7/22/2022

1   And again, I'm not 100 percent sure like if

2   he said her name or did not say her name.

3   I don't remember.

4   Q.        When you say he, are you referring

5   to Mr. Outlaw?

6   A.        No, Paladino.

7   Q.        Okay.  So tell me what do you

8   specifically recall -- I understand that

9   there's some things that may be murky.  But

10  what do you specifically recall discussing

11  with Mr. Paladino about Katima Jackson?

12  Let's start with, did you specifically ask

13  whether he knows someone named Katima

14  Jackson?

15  A.        No, I did not ask her -- if he

16  knew her.  I don't recall having that

17  conversation with him.

18  Q.        Do you recall -- so you recall

19  that he said he saw a woman out there and

20  he may have mentioned a person's name.  Is

21  there anything else -- is that accurate?

22  A.        Sorry.  I'm just trying to think

23  back to, like, that conversation.  Like, I

24  don't want to speak and then --

Monique Solomon
7/22/2022

1  Q.        It's okay if you don't remember.

2  A.        I don't remember, like.

3  Q.        Okay.  That's fine.  Do you

4  remember having any conversation with

5  Mr. Outlaw saying that Mr. Paladino could

6  confirm her presence?  And again, I don't

7  want you to struggle to remember --

8  A.        I'm saying, it's not impossible,

9  but, like, I don't recall this specific

10 conversation from 2018.

11 Q.        That's totally fine.

12 A.        I really just don't remember.

13 Like, I'm not trying to be difficult.

14 Q.        No, that's totally fine.  I don't

15 want you to say you remember because you're

16 trying and you don't remember.

17 A.        It's like when this case was

18 dismissed, like, I was mentally allowed to,

19 like, forget stuff and not have to be

20 perfect and keep notes and do this and do

21 that.  So it's, like, when you mentioned

22 the bonfire, it wasn't a bonfire.  Like,

23 when I think of a bonfire, I think of this

24 big ol' fire surrounded by people having a

1   good time.  And although it was a

2   celebration, it wasn't a bonfire.  It was

3   not a bonfire, but I didn't burn any

4   originals or burn, like, unimportant

5   documents.  Like, anything that was in the

6   file was a copy.  I don't -- just the whole

7   bonfire thing, I just wanted to --

8   Q.      I'm not sure it's relevant what

9   type of fire it was rather than them going

10  in the fire.

11          I just want to be clear though

12  that the record is clear.  I believe you

13  testified earlier that you were not sure if

14  originals were included in the file.  And

15  so --

16  A.      Well, in the file, Don's file that

17  I kept, like, my personal file of his

18  stuff, like any originals would have been

19  provided to counsel.  So I can't imagine

20  that it would have been originals in that

21  file.  It would have been copies, not

22  originals because his attorneys would have

23  had the originals.

24  Q.      Well, I can just represent to you

```
1    that it does not appear that Mr. Foster has

2    that, so I'm just trying to figure out

3    where it is.  And so, again are you sure

4    that you provided the originals to the

5    attorney or is it possible that the

6    originals were in -- especially if you

7    scanned them in and emailed them to an

8    attorney that that wouldn't be the

9    original?

10   A.        Whatever I received and provided

11   to the attorney would have been the

12   documents that I provided to the attorney,

13   which would have been an original and

14   possibly would have been a copy as well,

15   because I mean it's being filed with the

16   court so...

17   Q.        When you email it to Mr. Foster --

18   A.        Yeah, but I'm saying, like, in

19   addition to emailing him, I sent him mail

20   too because we discussed that earlier where

21   you asked me if I provided hard copies or

22   if I emailed as well, and I said I did

23   both.

24   Q.        Okay.  Is there --
```

Monique Solomon
7/22/2022

1   A.        I'm sorry.  I just had a flashback

2   from the bonfire --

3   Q.        That's fine.  I want you to

4   correct if you think that your testimony is

5   incorrect.

6             Is there any way -- do you have

7   any -- well, let's get back to the

8   documents.  Can you turn back to this

9   exhibit please at the bottom where it says

10  Lamar Rogers and Jabril Jones signed

11  affidavits confirming her presence?

12  A.        Yes.

13  Q.        Are you aware of whether Jabril

14  Jones had ever signed an affidavit at all

15  in this case?

16  A.        Not that I'm aware, but I'm not

17  sure.

18  Q.        Do you know where Mr. Outlaw would

19  have gotten that from?

20  A.        I'm not sure.

21  Q.        Did he obtain any affidavits on

22  his own?

23  A.        I'm not sure.

24  Q.        Did anyone else assist with

Monique Solomon
7/22/2022

1    obtaining affidavits other than you?

2    A.        I'm not sure.  Again, I came in,

3    you know, later, so I'm not really sure

4    what happened before me.

5    Q.        Have you ever seen affidavits from

6    Jabril Jones confirming her presence?

7    A.        Not that I can recall.  But again,

8    I haven't seen Donald's file in its

9    entirety.

10   Q.        What about Lamar Rogers?  Do you

11   know if he had signed an affidavit at this

12   point confirming her presence?

13   A.        I believe I do recall an affidavit

14   from Rogers.

15   Q.        Before 2018?

16   A.        Oh, I don't know of an exact date.

17   Q.        What's your understanding of a

18   relationship between Ms. Katima Jackson and

19   Mr. Outlaw?  Have they had any

20   communication prior to -- that you're aware

21   of prior to 2016 when she went to the jail?

22   A.        No, not that I'm aware of.

23   Q.        Would it surprise you if there was

24   documentation showing that he placed her on

1   his visitor's list as his niece in 2010?

2   A.      Oh, no.

3   Q.      It wouldn't surprise you?

4   A.      No, I didn't have any knowledge of

5   that.

6   Q.      So my question is whether that

7   would surprise you?

8   A.      Oh, yes, that would surprise me.

9   Q.      Would it surprise you -- do you

10  have any understanding of whether they

11  engaged in any romantic relationship at any

12  point?

13  A.      No, I don't believe so.

14  Q.      Are you aware whether Ms. Katima

15  Jackson was visiting Mr. Outlaw in prison?

16  A.      I know that she did go up to the

17  jail.

18  Q.      You're talking about in 2013?

19  A.      I'm not sure of the exact date,

20  but I know that she did visit.

21  Q.      On a regular basis?

22  A.      I wouldn't say regular, but I know

23  that she was there before.

24  Q.      Did they develop a friendship to

1  your knowledge?

2  A.        I'm not sure.  I mean, I know they

3  were in contact.  I don't know like, you

4  know, how much they were in contact and

5  what they were in communication, talking

6  about.

7  Q.        Did they have any mutual friends

8  that you're aware of?

9  A.        Well, they're from the same

10  neighborhood so I believe they may have

11  people in common.  I'm not 100 percent

12  sure.

13  Q.        I'm going to show you a document

14  I'm going to mark as Exhibit -- what are we

15  on?

16                  COURT REPORTER:  18.

17                  (Exhibit marked Exhibit

18          18 for identification.)

19  BY MS. ROSENTHAL:

20  Q.        -- 18.  It's a several-page

21  printout of incoming messages received to

22  Robert Outlaw.  I want to turn your

23  attention to the last page, the back.

24                  Do you see the last entry marked

Monique Solomon
7/22/2022

1  March 17, 2016 that appears to be from

2  Katima Jackson Peterson to Robert Outlaw?

3  A.      Yes.

4  Q.      And do you understand Katima

5  Jackson to have gone by Katima Jackson

6  Peterson?

7  A.      No.

8  Q.      Okay.  Understanding that you just

9  know her by Katima Jackson, assuming I

10  will -- assuming that it's the same person,

11  does it surprise you that message at the

12  bottom, I love you, babe, hugs and kisses.

13  Is that the type of relationship that you

14  thought that they had?

15  A.      I wouldn't say that -- I mean,

16  it's surprising in a sense that I didn't

17  know.  But, no, it doesn't surprise me.

18  Q.      What's not surpri -- you said that

19  you didn't know that they had any --

20  A.      I mean, I didn't know that she

21  said this.  But as far as does it surprise

22  me personally, no, it don't surprise me at

23  all because I mean -- let me just -- it

24  doesn't surprise me at all because, I mean,

Monique Solomon
7/22/2022

1  Donald is a lovable guy and I know she came

2  to see him and they were in communication

3  or contact.  But, no, it doesn't surprise

4  me.

5  Q.        Okay.  Can you turn to the page

6  before, the second to last page.  Take a

7  look at the message that's March 21, 2016.

8  A.        The first one at the top?

9  Q.        Yeah, take a look at it.

10  A.        And what, this is her or --

11  Q.        I believe this is an incoming

12  message from her.  Is this surprising to

13  you given what your understanding of their

14  relationship?

15  A.        It is a little surprising.  But

16  again, like, Don had a life sentence so,

17  you know, him sending messages or receiving

18  messages like this, like, it doesn't

19  surprise me in the sense that I know that I

20  wasn't the only person that he was

21  communicating with.  Like, this man was in

22  jail for life for a crime that he didn't

23  commit.

24            So, you know, if he found time and

1   comfort to communicate with somebody else

2   through the email, it doesn't surprise me.

3   It doesn't make me feel any type of way.

4   Like, because I know that Don loves me.  I

5   know that this man was fighting for his

6   life.  And, you know, if this took away

7   from it for any point, for any time where,

8   you know, he wasn't stressed out or

9   anything like that, then...

10  Q.        Would you agree that reading this

11  indicates more than a platonic friendship?

12  It indicates at least romantic feelings?

13                    MR. VAN NEERDAN:

14             Objection.  You can answer.  Calls

15             for speculation.

16                    THE WITNESS:  I mean, it

17             appears that throughout them

18             communicating that she may have

19             begun to develop some feelings for

20             him, which is not uncommon.  Like,

21             when you communicate with

22             somebody, you may develop

23             feelings.

24  BY MS. ROSENTHAL:

Monique Solomon
7/22/2022

1   Q.      Just talking about your own

2   opinion, nobody else's, do you think that

3   these communications and as you said, it

4   appears that she developed feelings for

5   him, do you think that that cast any doubt

6   on her credibility in this case?

7                   MR. VAN NEERDAN:

8           Objection.

9                   MS. ROSENTHAL:  I'm

10          asking only for your opinion.

11                  MR. VAN NEERDAN:  She

12          doesn't determine credibility.

13          The jury does.  It's an

14          inappropriate question.

15                  MS. ROSENTHAL:  Are you

16          instructing her not to answer?

17                  MR. VAN NEERDAN:  I'll

18          let her answer the question, but

19          it's inappropriate.

20                  MS. ROSENTHAL:  I'm only

21          asking for her personal opinion.

22                  THE WITNESS:  No, I don't

23          believe so because...

24   BY MS. ROSENTHAL:

1    Q.        At any point, do you think that --
2    at any point, did you -- at any point, do
3    you -- sorry, strike that.
4             Are you aware of any instance
5    where it was disclosed to the DA that they
6    had a friendship or anything more than a
7    friendship during the course of the PCRA
8    proceedings?
9    A.        No, I don't believe so and they
10   didn't.
11   Q.        Do you think that -- okay.  I want
12   you to turn to the page before.  Sorry,
13   it's the page that says -- it starts with
14   June 3, 2018.  Sorry, I'll help you.  It's
15   like the third to last page.  There's an
16   entry from Monique -- from you to Robert
17   that do you see where it says Shank said to
18   call him, I had to open another account so
19   I can link to my phone.  Hopefully this one
20   will work?
21   A.        Yes.
22   Q.        Do you recall this message?
23   A.        Yes.
24   Q.        Who is Shank referred to here?

Monique Solomon
7/22/2022

1  A.        I don't know his first name --

2  well, I mean, I don't know his last name,

3  but his first name is Neil, and he's a

4  younger guy that was locked up with Don and

5  they became friends so they stayed in

6  contact.

7  Q.        Did he grow up in the same

8  neighborhood as well?

9  A.        He's a lot younger than Don.  I'm

10  not sure if he grew up in the neighborhood

11  or how they know each other.

12  Q.        Does Don know any other Shanks

13  besides -- well, yeah, sorry, strike that.

14  Does Don know any other Shanks?

15  A.        Well, what, like, in addition to

16  Derrick Alston or in addition to --

17  Q.        Well --

18  A.        -- this person?

19  Q.        Sorry.  Let me re-ask the

20  question.  I didn't want to presume Derrick

21  Alston.  So you can include him in your

22  response.  But my question is does he know

23  any other Shanks besides this person you

24  referred to?

Monique Solomon
7/22/2022

1   A.        I'm not sure.

2   Q.        You mentioned Derrick Alston?

3   A.        Oh, in addition --

4   Q.        Anybody else besides the two?

5   A.        Yeah, I'm not sure if there are

6   any other Shanks floating around.

7   Q.        Floating around, okay.  On the

8   first page of the packet, do you see -- I

9   want to direct your attention to a message

10  sent from you to Robert Outlaw on April 6,

11  2016.  Do you recognize this message?

12  A.        You said the first message?

13  Q.        Mm-hmm.

14  A.        Yes.

15  Q.        I just want to ask you a couple

16  of -- sorry.  Is this the message that you

17  wrote or anyone else wrote using your

18  account?

19  A.        No, me.

20  Q.        Okay.  Do you see a couple of

21  lines down from the bottom it says, Sy sent

22  me a letter?

23  A.        Yes.

24  Q.        Is Sy referring to Wesley Harmon?

1    A.        Yes.

2    Q.        Do you recall that letter?

3    A.        Not really, unless it was one of

4    the letters that we went over from him that

5    was in this pile over here.

6    Q.        I don't know.

7    A.        Because I know we just went over

8    some stuff from him.

9    Q.        Did Sy ever send you a hard-copy

10   letter?

11   A.        I mean, he has written me a

12   hard-copy letter but...

13   Q.        He has, okay.  You can recall a

14   specific instance?

15   A.        Not really specific.  I can say

16   that I've received mail from him before.

17   But as to what, when, I don't really

18   remember.

19   Q.        And he's someone as a witness in

20   the underlying criminal case?

21   A.        A wit --

22   Q.        Can you -- has he played any role

23   writing affidavits?

24   A.        I believe he may have written an

Monique Solomon
7/22/2022

1  affidavit, but that was, like, before I

2  came in, if I'm not mistaken.

3  Q.        When you received letters from him

4  given his role in the underlying case, did

5  you turn those over to anyone?

6  A.        No.

7  Q.        Did you save them?

8  A.        No.

9  Q.        Have you saved any letters from

10  him that you still have?

11  A.        No.

12  Q.        Because he talking -- he wasn't

13  talking about too much.  Then he was

14  waiting to go down and something about his

15  case and something about a lawyer, 1,000 to

16  fight his case.  Do you know what he was

17  referring to there?

18  A.        I believe he was referring to his

19  case that he was fighting, his criminal

20  case.

21  Q.        Was he asking for the $1,000 --

22  was he asking for assistance with the

23  $1,000?

24  A.        No, I don't think so.

Monique Solomon
7/22/2022

1    Q.        Has he ever asked for money

2    before?

3    A.        No, I don't believe so.

4    Q.        Have you ever sent him money

5    before?

6    A.        I don't believe so.  I'm not 100

7    percent sure.  I don't think so.

8    Q.        Okay.  I want you to look at the

9    bottom email on the page from 4/4/2016, an

10   email that you sent to Robert Outlaw.

11            Do you see the second -- the third

12   sentence says, Don't worry about the fed

13   stuff?

14   A.        Yes.

15   Q.        What you were you referring to

16   there?

17   A.        I believe this is from somebody

18   like a jailhouse lawyer that was, like,

19   also helping him with some stuff and he

20   sent this information.

21   Q.        What does fed stuff refer to?

22   A.        I think it was pertaining to his

23   juvenile stuff, like him getting sentenced

24   as a juvenile.  He was supposed to file

Monique Solomon
7/22/2022

1   some type of document.

2   Q.      Okay.  It's in connection with the

3   same case?

4   A.      Yes.

5   Q.      Okay.  Let's put that one aside.

6   Sorry for -- I'm even boring myself.

7   Number -- let me mark this as 19.  It's a

8   one-page printout of incoming messages of

9   Robert Outlaw.

10                  (Exhibit marked Exhibit

11          19 for identification.)

12   BY MS. ROSENTHAL:

13   Q.      I just want to ask you about -- do

14   you see there's reference to a per --

15   sorry.  Do you see first of all the first

16   message August 9, 2016.  Is that a message

17   that you sent to Mr. Outlaw?

18          My question is very limited.  I

19   just -- in reference to you, do you see

20   there's reference to someone named Dom?

21   A.      Yes.

22   Q.      Who's that?

23   A.      He has a friend named Dom that he

24   grew up with.

Monique Solomon
7/22/2022

```
1   Q.        Is that someone named Donald

2   Carter?

3   A.        Yes, I believe so.

4   Q.        And is Donald Carter married to

5   anyone?

6   A.        He does have a wife.  I'm not sure

7   of his wife, though.  I meant he does have

8   a wife.

9   Q.        You don't know what -- you don't

10  have any relationship or friendship with

11  his wife?

12  A.        I'm not sure of, like, who his

13  wife is.

14  Q.        Okay.  At some point, was he

15  married to someone named I think she may go

16  by Parra Carter?

17  A.        Yes.

18  Q.        They are no longer married?

19  A.        I'm not sure what their

20  relationship status are.  I know he had

21  more than one wife.  I'm just not sure.

22  Q.        How does Mr. Outlaw know Donald

23  Carter?

24  A.        I believe they grew up together.
```

Monique Solomon
7/22/2022

```
1   Q.        What's your relationship with

2   either of them?

3   A.        I know them through Donald.

4   Q.        Would you say that your good

5   friends or acquaintances?  How would you

6   describe your relationship?

7   A.        We're pretty good, like.

8   Q.        Pretty good, can you elaborate a

9   little?

10  A.        Like, I know her through Donald

11  and his relationship with Dom, so they're

12  friends so we're friends.

13  Q.        And then looking at the next email

14  on the page from August 4, 2016, do you

15  recognize that email?  It looks like it's

16  an email you sent to Robert Outlaw?  Do you

17  recognize this email?

18  A.        I recognize that I sent it because

19  it's from me, but -- or no, it's from

20  Donald or is it from me?

21  Q.        It appears to be from you.

22  A.        Okay.  I don't remember what this

23  is.

24  Q.        Do you have any idea what is meant
```

Monique Solomon
7/22/2022

1    by she just recanted in the first line?

2    A.        No, I'm not sure what I was

3    talking about.

4    Q.        Okay.  All right.  Oh, and then in

5    the last part of that do you see it says --

6    do you know what is meant by, yeah, I heard

7    the son fell bold under his old head but

8    his old head just flipped and turned fed?

9    A.        I don't know what that means.

10   Q.        What about when do you need these

11   letters by?

12   A.        I believe these are the character

13   letters, but I'm not 100 percent sure.

14   Q.        Okay.  I can't take those anymore.

15   All right.  So let's turn to something

16   else.  I want to show you a document that

17   I'm going to mark as Exhibit 20.  It's a

18   document that's Bates marked

19   OUTLAWDA02022008468 through

20   OUTLAWDA02022008483.

21                    (Exhibit marked Exhibit

22        20 for identification.)

23   BY MS. ROSENTHAL:

24   Q.        I'll represent to you that this is

Monique Solomon
7/22/2022

```
1    a transcript of your testimony November of

2    2018 in Mr. Outlaw's PCRA hearing.  I just

3    want to ask you about a few lines in here.

4            You know what, actually I'm going

5    to pass on that one.  Let's withdraw 20 so

6    we can go quicker.  Don't worry about that

7    one.  So take off the sticker.

8    A.       What, this one?

9    Q.       Yeah, I'm not going to ask you

10   about it.  I want to go a little faster.

11           Oh, do you still have access to

12   your DOC account?

13   A.       My son uses it.  I don't access

14   it.

15   Q.       But you're able to access it if

16   you want to?

17   A.       I would have to get the

18   information from my son.  Like, I don't

19   know if the passwords and stuff are the

20   same.

21   Q.       Okay.  But it's your account,

22   right?

23   A.       Yes.

24   Q.       Have you undertaken any -- you
```

Monique Solomon
7/22/2022

1  said the documents are saved in there for a

2  while.  Have you undertaken any search to

3  see whether there are any messages that

4  were responsive to the subpoena that are

5  included within that account?

6  A.      Well, I don't have access to the

7  ConnectNetwork account, so you're asking

8  me --

9  Q.      It's your account, so do you have

10 ability to obtain access?

11 A.      I would have to get information

12 from my son because again, I don't use it

13 so I don't have access to it.

14 Q.      He changed the password?

15 A.      I'm not sure if he did or did not.

16 I don't have access to it.

17 Q.      So you don't know if you have

18 access to it because you don't know whether

19 your password works?

20 A.      Well, I don't use the account.  My

21 son uses it.  So again, I don't have access

22 to it.

23 Q.      Do you have the ability to change

24 the password?

Monique Solomon
7/22/2022

A.      Well, I don't know the login

information to access it.  I would have to

get it from my son because I don't use it

or have access to it.

                    MS. ROSENTHAL:  Okay.

          Well, we're just going to renew

          our request that she searches for

          that.  Otherwise, we'll serve a

          subpoena on her son, but I believe

          it's within her possession,

          custody and control, especially if

          she doesn't know whether the

          password has been changed.

                    MR. VAN NEERDAN:  You

          have all of the DOC documents that

          you subpoenaed directly from the

          DOC.

                    MS. ROSENTHAL:  We can

          talk about this later.  I just

          want to put on the record that we

          would renew our requests.  Those

          are separate.  The fact that

          something is produced by a

          different custodian does not make

Monique Solomon
7/22/2022

```
1                   it a duplicative document that you

2                   don't have to produce.  And it is

3                   not entirely overlapping, the two

4                   sets of materials.

5                         For example, it asks for

6                   communications indirectly and I'm

7                   not -- it's not -- I'm not sure

8                   that there's -- well, regardless

9                   we renew our request for that.

10                  And if you can confirm that she

11                  doesn't have access to it, we'll

12                  serve a subpoena on her son.

13   BY MS. ROSENTHAL:

14   Q.      But I understand you haven't

15   accessed it, but you don't know if the

16   password would work or --

17   A.      Well, because I don't use it.

18   Q.      You don't use it, but -- well,

19   it's -- this is a discussion that I'll have

20   with your counsel about it, but we renew

21   our requests for that.

22              I'm going to show you a document

23   that I'm going to mark as Exhibit --

24                  COURT REPORTER:  20.
```

Monique Solomon
7/22/2022

```
1   BY MS. ROSENTHAL:

2   Q.         -- 20.  When was the last -- well,

3   I'll wait.  It's a one-page document Bates

4   marked CITY022044.  I believe it's a list

5   of individuals who have communicated or I'm

6   not sure if it's only active -- a list of

7   individuals who have communicated at some

8   point with Mr. Outlaw using the messaging

9   system.

10             Do you recognize this document?

11                  MR. VAN NEERDAN:

12             Objection to the representation.

13                  MS. ROSENTHAL:  Objection

14             to the representation?

15                  MR. VAN NEERDAN:  Yes.

16             You just made a very long

17             representation of what you believe

18             this document to be.  These are I

19             believe part of the documents that

20             were produced last night.  We have

21             no idea what this stuff is.

22                  MS. ROSENTHAL:  Okay.

23             Your objection is noted that the

24             documents were produced last
```

```
 1              night.
 2                        MR. VAN NEERDAN:  It's
 3              not just about last night.  It's
 4              about foundation.
 5    BY MS. ROSENTHAL:
 6    Q.        Okay.  Do you have any idea what
 7    this document is?
 8    A.        No, other than the list of names.
 9    Q.        Do you have any reason -- if I
10    told you that this was a list of
11    individuals registered to communicate with
12    Mr. Outlaw through messaging system, would
13    you have any reason to doubt that that was
14    the case?
15                        MR. VAN NEERDAN:
16              Objection.
17    BY MS. ROSENTHAL:
18    Q.        I'm not representing that that is
19    the case.  I'm asking if I told you that,
20    would you have reason to doubt it?
21                        MR. VAN NEERDAN:  She
22              already told you she doesn't know
23              what the document is.  You can
24              tell her it's a can of soup.
```

```
1              She's not going to be able to tell

2              you what it is.

3                       MS. ROSENTHAL:  Okay.

4              I'm going to ask my question again

5              and you may object.

6  BY MS. ROSENTHAL:

7  Q.      If I told you that this was a list

8  of individuals registered to communicate

9  with Mr. Outlaw through the DOC messaging

10 platform, would you have any reason to

11 dispute that that was the case?

12                      MR. VAN NEERDAN:

13             Objection.

14                      THE WITNESS:  Well, I

15             don't know because it's addresses

16             on here.  So for the address would

17             be for the email?

18 BY MS. ROSENTHAL:

19 Q.      Well, my question is whether you

20 have any reason to believe that this isn't

21 a list of individuals who've communicated

22 with him?

23                      MR. VAN NEERDAN:

24             Objection.
```

Monique Solomon
7/22/2022

```
 1                    THE WITNESS:  I'm not
 2           sure what this is a list of.
 3  BY MS. ROSENTHAL:
 4  Q.       Okay.  I want to -- looking at the
 5  first line, do you see that there's an
 6  email address moniques3708@aol.com, Monique
 7  Solomon, username MoniqueS3708?
 8  A.       Yes.
 9  Q.       And is that your email address?
10  A.       Yes.
11  Q.       Do you know whether that's the
12  username that you have used in the past to
13  correspond with individuals using the DOC
14  messaging system?
15  A.       Yes.
16  Q.       It is?
17  A.       Yes.
18  Q.       And it says that the last login
19  was June 17, 2022.  Do you believe that
20  that was your son who last logged in then?
21  A.       Yes, I believe so.  I haven't used
22  this.
23  Q.       When was the last time you've
24  logged in?
```

Monique Solomon
7/22/2022

```
1    A.        Maybe in 2019 when Don came home.

2    Q.        I want you to look a few lines

3    down.  Do you see your name is listed again

4    seven lines down under first and last name?

5    Do you see where I'm referring?

6    A.        Yes.

7    Q.        Did you ever create an account

8    using the email address that's listed next

9    to your name there?

10   A.        What is it an account for?

11   Q.        Did you ever register to use the

12   DOC system, the messaging system, using

13   that email address?

14   A.        No, I don't believe so.

15   Q.        Do you recognize that email

16   address?

17   A.        I do.

18   Q.        Is it your email address?

19   A.        Yes, it's an old email address.

20   Q.        Do you still have access to that

21   email?

22   A.        I haven't tried to access it.

23   Q.        Is it possible that if you're able

24   to access it, is it possible that there
```

Monique Solomon
7/22/2022

1   could be emails that are responsive to the

2   subpoena that was served on you in that

3   account?

4   A.      No, this was an email address that

5   I used for social media.

6   Q.      Well, wasn't it the case that you

7   used Facebook?

8   A.      Well, no, not like a Facebook,

9   like an Instagram, like, for me.

10  Q.      Did you use Instagram at all to

11  advocate for Mr. Outlaw's case?

12  A.      No.

13  Q.      You're sure of that?

14  A.      Well, not me personally.  Like, he

15  has been posted on Instagram, like, when

16  we've had fish fries and stuff like that

17  where other people posted pictures and

18  stuff of him.

19  Q.      Is it possible any of that could

20  be in that account?

21  A.      No, not from me.  Like, other

22  people posted on Instagram.  I never posted

23  off of my personal page.

24  Q.      Do you have any other email

Monique Solomon
7/22/2022

1    addresses that you have currently or had in

2    the past besides these two?

3    A.        I've had email addresses for,

4    like, school that I don't have access to or

5    don't remember.  I have email addresses

6    that I've been locked out of because I

7    wasn't able to remember my password and had

8    to create a new one.

9    Q.        Any that you don't know whether

10   you have access or do have access?

11   A.        Not that I can recall.

12   Q.        Okay.  I would -- and if your

13   counsel disagrees, we can take it up later,

14   but I would request that you just try to

15   access that account and search.  And it may

16   be that there's nothing, but to do due

17   diligence to search if there's nothing in

18   that account.

19           Do you know -- so you have no

20   recollection of creating a second account?

21   A.        A second ConnectNetwork account?

22   Q.        (Nodding affirmatively).

23   A.        No.

24   Q.        Does anyone else have access to

1    that?

2    A.        No.

3    Q.        Okay.  Does anyone else have

4    access to your AOL account?

5    A.        No.

6    Q.        Okay.  Do you know why -- does

7    that username ring a bell Munira3708?

8    A.        No.  I mean my attribute is Munira

9    but, like, this specific username is not a

10   username that I'm familiar with.

11   Q.        What do you mean your attribute is

12   Munira?

13   A.        My Islamic name is Munira.

14   Q.        Okay.  Do you go by any other

15   names?

16   A.        Nicki.

17   Q.        Do you see a couple of lines down

18   there's an entry for someone named Michael

19   Solomon?

20   A.        Yes.

21   Q.        Do you know who that is?

22   A.        That's my twin brother.

23   Q.        Do you know if -- is he in contact

24   with Donald Outlaw?

Monique Solomon
7/22/2022

```
 1   A.        He was.

 2   Q.        Okay.  Is he currently alive?

 3   A.        No.

 4   Q.        Do you have any other siblings?

 5   A.        Yes.

 6   Q.        What are their names?

 7   A.        Well, Kevin Solomon is deceased.

 8   Terrance Solomon is deceased, and I have a

 9   little sister named Natalie Solomon.

10   Q.        Oh, did you say your mom was also

11   named Natalie Solomon?

12   A.        Yes.

13   Q.        Okay.  And do you recognize that

14   email address to it, nsolomon98@gmail -- or

15   is it 00@gmail.com?

16   A.        Yes.

17   Q.        Whose email address is that?

18   A.        Natalie's, my sister's.

19   Q.        And is that her address, 425 West

20   Chelten Avenue?

21   A.        It's an old address.

22   Q.        Okay.  That's where your mom still

23   lives?

24   A.        Oh, no, that's an old address for
```

Monique Solomon
7/22/2022

```
1   my sister.  My mom lives at 947.

2   Q.        Oh, 947 West Chelten?

3   A.        East Chelten.

4   Q.        East Chelten, okay.  And you do

5   see above your -- sorry to jump around --

6   above the second name where you're listed,

7   do you see that there is an individual with

8   your son's name right above?

9   A.        Yes.

10  Q.        And then do you recognize the

11  email address?

12  A.        Yes, it's an old email address for

13  him.

14  Q.        Okay.  And then the 425 West

15  Chelten Avenue, is that a current or a

16  former --

17  A.        No, that's an old address.

18  Q.        Okay.  So do you have any reason

19  to dispute that he has had at least at one

20  point his own account on --

21  A.        I'm not sure if he did or didn't

22  have his own ConnectNetwork account.

23  Q.        Are there any names on this list

24  that you don't recognize who they are?
```

1    A.         So these names are people from

2    ConnectNetwork?

3    Q.         Well, Mr. Van Naarden has objected

4    to me representing what this document is.

5    My understanding is that this is a list of

6    individuals who have registered and

7    communicated with Mr. Outlaw.

8    A.         So what was --

9    Q.         I don't know what time period.

10   Oh, I'm just asking this list of names.  Do

11   you know all of these people or is there

12   anyone you don't know?

13   A.         It's people I don't know on here.

14   Q.         Who don't you know?

15   A.         Nicosia, Alexis, Nefertia,

16   Syrelle, Ali, Jalil, Andrew, Kendra,

17   Shanique.

18   Q.         Okay.  So quite a few.  Do you

19   know who Jalil Sie is?

20   A.         No.

21   Q.         Okay.  What about Victoria

22   Workman?

23   A.         No.

24   Q.         And then next to -- I think we

Monique Solomon
7/22/2022

1  discussed her before.  I'm sorry.  I'm not

2  sure how to pronounce her name.  How would

3  you say that?  The one that goes by Parra

4  Carter, how would you say her name?

5  A.       I would say Aparra --

6  Q.       And does she also go by Wafiya

7  Carter?

8  A.       Yes, I believe she does.

9  Q.       Okay.  And then the bottom name

10  Nicosia Capers, you've never heard that

11  name before?

12  A.       I've heard that name, but I don't

13  know her personally.

14  Q.       Okay.  I'm going to show you,

15  rushing along because we're running out of

16  time -- I'm going to a document that I'm

17  going to mark as Exhibit --

18                  COURT REPORTER:  21.

19                  (Exhibit marked Exhibit

20       21 for identification.)

21  BY MS. ROSENTHAL:

22  Q.       -- 21.  It's a document Bates

23  marked PLAINTIFF27322 through 27335.  Do

24  you recognize this document?

1   A.        Yes.

2   Q.        Am I correct that it appears to be

3   an email that you sent to Ed Foster that

4   where you're attaching a letter from Pop to

5   Jabril Jones, from Pop to Robert's mom,

6   from Shelby Green to Robert?

7   A.        Yes.

8   Q.        Turning to the first letter, am I

9   correct that the letter from Pop to Jabril

10  Jones that you state is from Pop to Jabril

11  Jones covers Bates range PLAINTIFF27325 to

12  27327?

13  A.        Yes.

14  Q.        Were you ever in possession of an

15  original of this letter?

16  A.        No.

17  Q.        How did you originally receive it?

18  A.        I believe this was a part of Don's

19  file, if I'm not mistaken.  I'm not sure.

20  Q.        When you say part of Don's file,

21  what do you mean by that?

22  A.        Like this was in his, like, in his

23  file, like, in his possession and he sent

24  it to me maybe.

Monique Solomon
7/22/2022

1    Q.        Did he have documents in jail?

2    Did he have a collection of documents

3    related to his legal proceeding?

4    A.        Yes, he had his own file.

5    Q.        And did he also destroy them upon

6    the case being nolle prossed?

7    A.        He was never able to get his files

8    because when his case got vacated he was in

9    CFCF and all his stuff was upstate and he

10   never ended up going back upstate.

11   Q.        He had nothing with him at CFCF?

12   A.        I believe he did have something,

13   but it wasn't, like, all of his property.

14   Q.        Did he have any legal papers at

15   all?

16   A.        I'm not sure exactly what he had.

17   Q.        Prior to that, did he ever discuss

18   with you an intention to destroy them upon

19   his case being nolle prossed?

20   A.        Not that I can recall.

21   Q.        So you believe you may have

22   received this from Donald Outlaw?

23   A.        I believe so.  I mean, this is not

24   dated so I'm not sure when.

Monique Solomon
7/22/2022

```
1   Q.        Did you receive this directly from

2   Jabril?

3   A.        I'm not sure.  I don't think so.

4   Q.        Do you have any idea what the date

5   is?

6   A.        No, it's -- this stuff isn't

7   dated.

8   Q.        Okay.  Did you ever talk to Jabril

9   Jones about this letter?

10  A.        No, not that I can recall.

11  Q.        Did you ever talk to Charles

12  Paladino about it?

13  A.        No, not that I can recall.

14  Q.        When did you receive it?

15  A.        I don't know exactly when I got

16  this letter.  I can only assume that it was

17  about the time I sent this email.

18  Q.        And you don't recall whether he

19  sent you a photocopy or if he sent you an

20  original of it?

21  A.        It was not an original.  It was a

22  copy.

23  Q.        And you don't know whether

24  Mr. Outlaw had an original himself?
```

Monique Solomon
7/22/2022

```
1   A.       I'm not sure.

2   Q.       Okay.

3   A.       Him moving from jail to jail, he

4   lost a lot of his stuff.

5   Q.       He didn't come home with any legal

6   papers?

7   A.       I'm not sure what he came home

8   with.  I don't think he did.

9   Q.       Okay.  Moving onto -- am I correct

10  that the letter to Pop to Robert's mom

11  covers PLAINTIFF27328 to 27333?

12  A.       Yes.

13  Q.       How did you come in possession of

14  this letter?

15  A.       I believe it was a part of

16  Donald's file.  I'm not 100 percent sure.

17  Q.       Would he have sent it to you over,

18  like, in snail mail?  Would he have any

19  other way of sending it --

20  A.       Well, yeah, that would be the only

21  way.

22  Q.       And when he sent something to you,

23  did he usually accompany it with a letter?

24  A.       Not all the time.
```

1   Q.        Could he have?

2   A.        Maybe.  I'm not really sure.

3   Q.        Would those have been kept in the

4   file that you had if you had received

5   letters from him?

6   A.        Maybe.  I'm not 100 percent sure.

7   Q.        Okay.  Do you know how Mr. Outlaw

8   came into possession of this letter?

9   A.        I'm not sure.  Again, I'm not sure

10  if they came from him or not.  Like, I

11  just -- like, I know this email is from me

12  because it's right here in front of my

13  face, but I just don't remember this stuff.

14  Q.        Okay.  I just want to turn to the

15  last from Shelby Green to Robert.  Is that

16  PLAINTIFF27334 to PLAINTIFF27335?

17  A.        Yes.

18  Q.        And do you recall when you

19  received this letter?

20  A.        I don't remember when I received

21  this letter.  But I mean, I do remember

22  this letter.

23  Q.        Do you again believe that you

24  received a copy from Donald Outlaw?

Monique Solomon
7/22/2022

1   A.        Yes.

2   Q.        Do you remember whether you

3   received all three of these at the same

4   time?

5   A.        I'm not sure.

6   Q.        Do you know why -- did he instruct

7   you to send these to a lawyer?

8   A.        I don't remember, like, how or why

9   I sent this.

10  Q.        Okay.  That's all for that.  I'm

11  going to show you a series of documents.  I

12  just want to confirm that you authored

13  them.

14              MS. ROSENTHAL:  These

15          were the documents produced last

16          night, so would you just like to

17          put a standing objection on the

18          record?

19              MR. VAN NEERDAN:  Well, I

20          just -- first of all, we've asked

21          a couple of times for the City to

22          identify where those documents

23          came from and we haven't gotten an

24          answer.

Monique Solomon
7/22/2022

```
 1                   MS. ROSENTHAL:  I'm
 2          sorry.  I think I got that email
 3          last night --
 4                   MR. VAN NAARDEN:  And we
 5          got the documents yesterday.
 6                   MS. ROSENTHAL:  I know.
 7          I think I asked you a couple of
 8          questions that I haven't gotten an
 9          answer to.  I'm happy to --
10                   MR. VAN NAARDEN:  I need
11          to know on the record where they
12          came from.  We corresponded with
13          the Department of Corrections last
14          night.  They independently
15          produced what they produced to
16          you.  Those letters weren't in
17          them.
18                   MS. ROSENTHAL:  Okay.
19          I'll tell you that these letters
20          that I'm going to show her are
21          from the Department of
22          Corrections.  I'm happy to discuss
23          separately -- it has not been my
24          understanding that you have
```

Monique Solomon
7/22/2022

```
1            either -- we have been happy from
2            the beginning to identify which
3            documents correspond to which
4            document requests and you have not
5            been doing that.  I'm happy to do
6            that if you would like to -- if we
7            would both like to do that.
8                    MR. VAN NEERDAN:  Well,
9            that's not true.  We have
10           identified when we produce things,
11           we tell you where they come from.
12           In fact, when we get files from
13           attorneys, we send them over to
14           you and say where they've come
15           from.
16                    MS. ROSENTHAL:  Which are
17           responsive to which document
18           requests?
19                    MR. VAN NEERDAN:  I'm not
20           even talking about that.  We can
21           argue about it another time.  I
22           just want to know where the
23           letters came from.
24                    MS. ROSENTHAL:  The
```

Monique Solomon
7/22/2022

1          letters came from --

2                    MR. VAN NAARDEN:  You got

3          them from the Department of

4          Corrections?

5                    MS. ROSENTHAL:

6          Department of Corrections.

7                    MR. VAN NAARDEN:  Okay.

8          I mean, we got last night from

9          Chase a data dump of all the

10          documents.  Those weren't in them.

11                    MS. ROSENTHAL:  Can we go

12          off the record then if we're going

13          to spend time on this.

14                    THE VIDEOGRAPHER:  We're

15          now going off record.  The time is

16          5:01 p.m.

17                    (Discussion held off the

18          record.)

19                    THE VIDEOGRAPHER:  We're

20          now back on record.  The time is

21          5:03 p.m.

22    BY MS. ROSENTHAL:

23    Q.     Okay.  I'm going to show you some

24    documents that we had received from the

Monique Solomon
7/22/2022

```
 1  Department of Corrections that appear to be
 2  letters that were sent to either Mr. Outlaw
 3  or Mr. Paladino, and they appear to
 4  potentially have been written from you, and
 5  I just want to confirm whether or not that
 6  is the case.
 7          So I'm going to mark as --
 8                  MS. ROSENTHAL:  Sorry.
 9          How do we have this organized?
10          Can you go off the record for one
11          second?
12                  THE VIDEOGRAPHER:  We're
13          now going off record.  The time is
14          5:04 p.m.
15                  (Brief recess.)
16                  THE VIDEOGRAPHER:  We're
17          now back on record.  The time is
18          5:06 p.m.
19  BY MS. ROSENTHAL:
20  Q.      I'm going to mark as Exhibit 22,
21  and these were produced in color but we're
22  having issues with our color printer so
23  they will be black and white.  For the
24  record, this is a document Bates marked
```

Monique Solomon
7/22/2022

```
1   CITY022091 to CITY022094.  It's a document

2   that was produced from the Department of

3   Corrections.

4                     MR. VAN NAARDEN:  She

5          doesn't have the exhibit.

6                     THE VIDEOGRAPHER:  She

7          can't do this at the same time

8          you're talking.

9                     MS. ROSENTHAL:  Oh, I

10         apologize.

11                    THE VIDEOGRAPHER:  So

12         that's why --

13                    MS. ROSENTHAL:  I

14         apologize.

15                    (Exhibit marked Exhibit

16         22 for identification.)

17  BY MS. ROSENTHAL:

18  Q.      I'm not going to ask you -- there

19  may be one or two that I have a question

20  on, but I mainly would just like you to --

21  do you recognize this document?

22  A.      Yes.

23  Q.      Can you describe it for the

24  record?
```

Monique Solomon
7/22/2022

```
1    A.        It's a letter that I wrote to

2    Paladino.

3    Q.        Okay.  And is it a true and

4    complete version of the letter that you

5    sent?

6    A.        Yes.

7    Q.        And when you sent him letters, did

8    he typically send you a letter back?

9    A.        Yes.

10   Q.        And what did you do with those

11   letters?

12   A.        The letter that he sent me?

13   Q.        (Nodding affirmatively).

14   A.        I no longer have the letters.  I

15   didn't keep them.

16   Q.        Did you share them with anyone?

17   A.        No.

18   Q.        Did you disclose that you were

19   corresponding with Paladino to anyone?

20   A.        Other than his attorney, Donald's

21   attorney, like, when I sent him a letter

22   that I received from him.

23   Q.        Did you talk to anyone about the

24   fact that you had engaged in additional
```

1    correspondence?

2    A.        Oh, no.

3    Q.        So Mr. Outlaw's attorney was only

4    aware of the letters that you had sent?

5    A.        Yes, correct.

6    Q.        And did Mr. Outlaw know that you

7    were corresponding with Mr. Paladino on a

8    regular basis?

9    A.        No.

10   Q.        I just want to ask you about one

11   question, one quick question about this

12   letter.  On the page CITY022093, there's

13   reference -- am I correct that there's

14   reference to you helping him set up a

15   dating profile online?

16   A.        Yes.

17   Q.        Is that something that you did?

18   A.        Yes.

19   Q.        Do you have access to that

20   account?

21   A.        No.

22   Q.        Okay.  And did you do that because

23   you understood that he was looking for a

24   romantic partner?

Monique Solomon
7/22/2022

```
 1   A.        Yes.

 2   Q.        Would it be fair to say you

 3   developed a friendship with Mr. Paladino?

 4   A.        I wouldn't necessarily call it a

 5   friendship, but I honestly -- I don't want

 6   to say, like, took pity on him.  But again,

 7   like I said in the beginning when I

 8   initially contacted Paladino, I was angry

 9   and I wanted answers.  And after hearing

10   his story, it made me understand that, you

11   know, he was a victim just as well as Don.

12   Maybe not a victim that was affected as

13   much as Donald was, but he was a victim of

14   the system as well.

15   Q.        Okay.  I want to mark as Exhibit

16   23 another document.

17                      (Exhibit marked Exhibit

18        23 for identification.)

19   BY MS. ROSENTHAL:

20   Q.        Just for the record, this is a

21   three-page document Bates marked CITY022088

22   to CITY022090.  Do you recognize this

23   letter?

24   A.        Yes.
```

Monique Solomon
7/22/2022

1    Q.        Is that your handwriting on the

2    first page and the third page?

3    A.        Yes.

4    Q.        Is this a true and correct and

5    complete copy of the letter that you sent

6    Mr. Paladino?

7    A.        Yes.

8    Q.        Okay.  I'm going to mark this as

9    Exhibit 24.

10                      (Exhibit marked Exhibit

11            24 for identification.)

12   BY MS. ROSENTHAL:

13   Q.        This is a document that's Bates

14   marked CITY022079 to CITY022081.  Do you

15   recognize this document?

16   A.        Yes.

17   Q.        Can you describe it briefly for

18   the record?

19   A.        This is a letter that I wrote to

20   Paladino.

21   Q.        Is it a true and accurate and

22   complete copy of the letter?

23                      MS. ROSENTHAL:  Sorry.

24            Did I give you a different

Monique Solomon
7/22/2022

```
1          version?

2                    MR. VAN NEERDAN:  Yeah, I

3          don't have the same one that she's

4          looking at.

5                    THE WITNESS:  This is one

6          that was already 22.

7                    MR. VAN NEERDAN:  I don't

8          know if you meant this one.

9                    THE WITNESS:  This was

10         22.

11                   MS. ROSENTHAL:  It's this

12         one.  Is this the one you have?

13                   MR. VAN NEERDAN:  That's

14         the one I have.  That's not the

15         one she's looking at.

16                   MS. ROSENTHAL:  Let me

17         strike -- can we strike the

18         conversation about this exhibit.

19         I gave her the wrong document.

20         I'm remarking as Exhibit 27.

21                   MR. VAN NEERDAN:  24.

22                   MS. ROSENTHAL:  24.  I'm

23         remarking as Exhibit 24.  If you

24         could just strike everything about
```

Monique Solomon
7/22/2022

```
 1              the incorrect document.
 2                   (Exhibit marked Exhibit
 3         24 for identification.)
 4  BY MS. ROSENTHAL:
 5  Q.        This is a three-page document
 6  Bates marked CITY022079 to CITY022081.  Do
 7  you recognize this document?
 8  A.        Yes.
 9  Q.        Is this another letter that you
10  sent Mr. Paladino?
11  A.        Yes.
12  Q.        It appears that this letter is
13  typewritten as were the others that or not
14  all of them, but some of them that were
15  wrote.  Did you type this on your computer?
16  A.        A laptop, yes.
17  Q.        Is that a laptop you still have
18  possession of?
19  A.        No.
20  Q.        What happened to the laptop?
21  A.        It was the laptop that my niece
22  broke.
23  Q.        Do you still have it even if it's
24  not functional?
```

Monique Solomon
7/22/2022

```
1   A.        No, I don't.

2   Q.        Do you have copies of these

3   letters saved anywhere else?

4   A.        No.

5   Q.        Is this a full and complete copy

6   of the letter that you sent?  I apologize

7   if I'm asking again.

8   A.        Yes.

9   Q.        Okay.  Let me show you another

10  document.  I'll mark it as Exhibit 25.

11                  (Exhibit marked Exhibit

12            25 for identification.)

13  BY MS. ROSENTHAL:

14  Q.        This is a document Bates marked

15  CITY022082 to CITY022084.  Do you recognize

16  this document?  Is it missing a page?

17  A.        No, I don't believe so.  You're

18  asking me?

19  Q.        It just doesn't have a heading

20  like the others, but do you believe it to

21  be complete?

22  A.        Yes.

23  Q.        Do you recognize this document?

24  A.        Yes.
```

Monique Solomon
7/22/2022

```
1   Q.        Can you describe it briefly for
2   the record?
3   A.        It's a letter I sent to Paladino.
4   Q.        And is it a true and complete copy
5   of the letter that you sent?
6   A.        Yes.
7   Q.        You note that at the bottom
8   somebody named Shannon or Sharon emailed me
9   under your profile talking about how she
10  got a message from about you being in love
11  with someone named Nic and she wanted to
12  know who I am and why would you say that.
13  Do you remember that?
14  A.        Vaguely, yes.
15  Q.        So were you able to access emails
16  that Mr. Paladino received through the
17  dating site that you set up?  Is that what
18  this -- strike that.
19            What is this -- is this referring
20  to that dating profile that you set up?
21  A.        I believe it is, but I don't know
22  how this person got in contact with me.
23  Q.        Were you logging into
24  Mr. Paladino's profile?
```

1  A.       No.

2  Q.       Do you know who Nic is that was

3  being referred to?

4  A.       I don't.

5  Q.       Did Mr. Paladino respond to the

6  letter clarifying?

7  A.       No, I don't believe so.

8  Q.       Okay.  Next marking as Exhibit --

9                COURT REPORTER:  I think

10            26.

11                (Exhibit marked Exhibit

12            26 for identification.)

13 BY MS. ROSENTHAL:

14 Q.       -- 26.  This is a document Bates

15 marked CITY022070 to CITY022072.  Do you

16 recognize this document?

17 A.       Yes.

18 Q.       What is it?

19 A.       It's a letter I sent to Paladino.

20 Q.       And is this a full and complete

21 copy of the letter that was sent?

22 A.       Yes.

23 Q.       And when was that laptop broken

24 that you said you drafted the other letter

```
1   on?
2                   MR. VAN NAARDEN:  Asked
3           and answered.
4                   MS. ROSENTHAL:  I
5           apologize.  I don't have a
6           transcript in front of me.
7                   THE WITNESS:  I don't
8           remember the exact date.
9   BY MS. ROSENTHAL:
10  Q.      Okay.  Were all the letters that
11  you sent were all on that laptop other than
12  the handwritten ones?
13  A.      Well, I wouldn't say every letter
14  was written on the laptop.  I'm not sure.
15  Q.      When did you get your current
16  computer?
17  A.      I don't have a current computer.
18  Q.      You don't have a desktop or a
19  laptop?
20  A.      No.
21  Q.      Did you use your work laptop for
22  any personalized letters like this?
23  A.      No.
24  Q.      I'm going to mark as Exhibit 28 --
```

Monique Solomon
7/22/2022

```
 1                COURT REPORTER:  27.
 2                (Exhibit marked Exhibit
 3        27 for identification.)
 4   BY MS. ROSENTHAL:
 5   Q.        -- 27.  A document Bates marked
 6   CITY022073 to CITY022078.  Do you recognize
 7   this document?
 8                MS. MAYS:  Can you repeat
 9        the Bates No.?
10   BY MS. ROSENTHAL:
11   Q.        CITY022073 to CITY022078.  Do you
12   recognize this document?
13   A.        Yes.
14   Q.        And can you describe it for the
15   record?
16   A.        It's a letter I sent to Paladino.
17   Q.        Okay.  Dated October 15, 2018?
18   A.        Yes.
19   Q.        And is it a true and complete copy
20   of the letter that was sent?
21   A.        Yes.
22   Q.        We're going to mark another one as
23   Exhibit 28.
24                (Exhibit marked Exhibit
```

```
1              28 for identification.)
2    BY MS. ROSENTHAL:
3    Q.      Did I say the Bates No.?
4                   MS. MAYS:  You can say
5          it --
6    BY MS. ROSENTHAL:
7    Q.      Bates CITY022061 to CITY022063.
8    Is this another letter that you wrote to
9    Mr. Paladino dated -- sorry, undated?
10   A.      Yes.
11   Q.      Is it a full copy of the letter?
12   A.      Yes.
13   Q.      You say in the third paragraph
14   that you set up a profile on
15   writeaninmate.com.  Is that the same
16   profile that you set up related to the
17   dating or is that different?
18   A.      Yes.
19   Q.      Okay.  Sorry, it is the same?
20   A.      Yes.
21   Q.      Okay.  And we're marking as
22   Exhibit 29 a document Bates No. CITY022058
23   to CITY022060.
24                   (Exhibit marked Exhibit
```

Monique Solomon
7/22/2022

```
 1              29 for identification.)
 2   BY MS. ROSENTHAL:
 3   Q.        Is this the copy of an undated
 4   letter that you sent to Mr. Paladino?
 5   A.        Yes.
 6   Q.        And is it a true and correct copy
 7   of the letter?
 8   A.        Yes.
 9   Q.        I will mark this as Exhibit 30.
10                   (Exhibit marked
11              Exhibit 30 for identification.)
12   BY MS. ROSENTHAL:
13   Q.        This is a document marked
14   CITY022064 to CITY022066.  Do you recognize
15   this document?
16   A.        Yes.
17   Q.        Is it a letter that you sent to
18   Mr. Paladino?
19   A.        Yes.
20   Q.        I want to ask you about what you
21   wrote on the third page marked CITY022066.
22   Do you see the first line says, I got your
23   letter and I initially wrote like seven
24   angry letters but you basically wrote me
```

Monique Solomon
7/22/2022

```
1    and called me a liar, and that did not sit

2    right with me.  Do you remember what --

3                         MR. VAN NEERDAN:

4              Objection.  I think you read it

5              wrong.

6                         MS. ROSENTHAL:  Okay.

7              I'll read it again.

8    BY MS. ROSENTHAL:

9    Q.        Do you see the first line reads, I

10   got your letter and I initially wrote you

11   like seven very angry letters, but you

12   basically wrote me and called me a liar and

13   that did not sit right with him?

14   A.        Right, it should have been me.

15                         MR. VAN NEERDAN:  That's

16             how she initially read it.  That's

17             why I objected.

18   BY MS. ROSENTHAL:

19   Q.        So you meant did not sit right

20   with me?

21   A.        Right.

22   Q.        Okay.  Do you remember what led up

23   to --

24   A.        It was some letter that he wrote
```

Monique Solomon
7/22/2022

1    me basically saying that I wasn't Don's

2    wife, that some other girl named Nic was

3    his wife and that I lied.

4    Q.        Okay.  Do you know who that person

5    is that he was referring to?

6    A.        No.  I believe it's the Nicosia

7    person, but I'm not 100 percent sure.

8    Q.        Okay.  What was his response to

9    this letter?

10   A.        I believe he responded and maybe

11   apologized.  I'm not 100 percent sure, but

12   I think or -- I don't remember.

13   Q.        Okay.  I'm going to show you

14   another --

15                    (Exhibit marked Exhibit

16        31 for identification.)

17   BY MS. ROSENTHAL:

18   Q.        This is a document Bates marked

19   CITY022067 to CITY022069.  Do you recognize

20   this document?

21   A.        Yes.

22   Q.        This is another letter that you

23   sent to Mr. Paladino?

24   A.        Yes.

Monique Solomon
7/22/2022

1    Q.        Do you see the second paragraph it

2    says, I got an email from the

3    writeaninmate.com -- strike that.  Are you

4    still receiving emails from Mr. Paladino's

5    writeaninmate.com?

6    A.        No.

7    Q.        Would that email still be in

8    your -- would any of these emails related

9    to that account you set up still be in your

10   inbox?

11   A.        No.

12   Q.        You would have deleted them?

13   Well, let me ask it differently:  Do you

14   know if they're still in your inbox?

15   A.        No, I don't.

16   Q.        Okay.  I would ask that you check

17   to see if they're in there.

18                      MS. MAYS:  That's the

19            last one.

20   BY MS. ROSENTHAL:

21   Q.        That's the last one.  I won't show

22   them to you, but were there a number of

23   letters that you wrote to Mr. Outlaw under

24   the name Munira Outlaw?

Monique Solomon
7/22/2022

```
1    A.          Yes.

2    Q.          Is there a reason why you sent

3    them under the name Munira Outlaw?

4    A.          Because Munira's my attribute.

5    Q.          Is that the name that Mr. Outlaw

6    usually calls you by?

7    A.          It's one of the names.

8    Q.          Okay.  I hesitate to go through

9    all these letters, but do you remember --

10   is it your recollection that in any of

11   these letters you mentioned that you were

12   considering buying a tablet for

13   Mr. Paladino?

14   A.          No, I don't believe so.

15   Q.          You don't believe so.  All right.

16   I'll find it.  You know what, let me strike

17   my follow-up question on that.

18              Let me just ask:  Did you at any

19   point buy a tablet for Mr. Paladino?

20   A.          No.

21   Q.          Did you ever buy him anything?

22   A.          No.

23   Q.          Did he ever ask for money from

24   you?
```

```
1   A.        No, not that I can recall.

2   Q.        Either -- did you ever get the

3   sense that he was asking for money from you

4   even if he didn't use those direct words?

5   A.        I believe in one of his letters he

6   did mention something about money, but I

7   never sent him any money.

8                   MS. ROSENTHAL:  Okay.

9              I'm going to take one final

10             five-minute break and then maybe

11             ask like one question.  And, yeah,

12             let's go off the record and then

13             be done.  I'm going to reserve --

14             well, however much is left.  I

15             think it will be about an hour in

16             the event that --

17                  THE VIDEOGRAPHER:  You're

18             ready --

19                  MS. ROSENTHAL:  Yeah, go

20             off.

21                  THE COURT:  We're now

22             going off record.  The time now is

23             5:28 p.m.

24                  (Brief recess.)
```

Monique Solomon
7/22/2022

```
 1                    THE VIDEOGRAPHER:  We're
 2            now back on the record.  The time
 3            now is 6:04 p.m.
 4                    -  -  -
 5                    EXAMINATION
 6                    -  -  -
 7   BY MS. MAYS:
 8   Q.       Okay.  I just have a couple more
 9   questions after we spoke to your counsel.
10            So when did you first retain
11   Mr. Van Naarden, if you can remember?
12   A.       In the beginning when Donald
13   retained him.  We retained him together.
14   Q.       Okay.  So at the same time?
15   A.       Yes.
16   Q.       Is there a fee agreement that you
17   know of that you signed?
18   A.       No.
19   Q.       Okay.  So you're not paying
20   Mr. Van Naarden any fees yourself?
21   A.       No.
22   Q.       Did you ever enter into any type
23   of joint defense agreement with Mr. Outlaw?
24   A.       No.  It's my understanding that
```

Monique Solomon
7/22/2022

```
 1   he's just representing me for anything that
 2   comes up.
 3   Q.       Okay --
 4                    MR. VAN NAARDEN:  Real
 5           quick, I don't know if she knows
 6           what a joint defense agreement is
 7           so it's hard to --
 8   BY MS. MAYS:
 9   Q.       Did you ever sign any type of
10   contract with your husband when you
11   retained Mr. Van Naarden?
12   A.       I don't believe so, no.
13   Q.       So your understanding is that
14   Mr. Van Naarden represents you for this
15   whole civil litigation?
16   A.       Yes, and if I needed an attorney
17   for anything.
18   Q.       You could contact Mr. Van Naarden?
19   A.       Yes.
20   Q.       And we went through this a little
21   bit before, but how many times did you meet
22   with Mr. Van Naarden?  How many times have
23   you met with Mr. Van Naarden in person?
24   A.       We met yesterday for a couple
```

Monique Solomon
7/22/2022

```
 1   hours.

 2   Q.      Okay.  And before that?

 3   A.      I believe I met with him in the

 4   beginning, like, when we retained him.

 5   Q.      Okay.  When you first met with

 6   him, was anyone else at that meeting

 7   besides people from Mr. Van Naarden's firm?

 8   A.      Well, Donald.

 9   Q.      Okay.  And when you met with him

10   yesterday, was anyone else there besides

11   people from Mr. Van Naarden's firm?

12   A.      No.

13   Q.      Have you spoken on the phone with

14   Mr. Van Naarden to prepare for this

15   deposition?

16   A.      No, we met yesterday for a couple

17   hours.

18   Q.      Okay.  And then let me change

19   track a little bit here.

20           Did you ever discuss with your

21   husband Mr. Outlaw not taking a lesser plea

22   when he was offered that?

23   A.      We did have a conversation about

24   it.
```

Monique Solomon
7/22/2022

```
1   Q.        Okay.  And obviously, Mr. Outlaw
2   did not take a lesser offense, right?
3   A.        Correct.
4   Q.        And did you discuss why he chose
5   not to do that?
6   A.        Well, because he was innocent and
7   he wanted to take it all the way.
8                      MR. VAN NAARDEN:  Are
9            you -- just because I don't want
10           to get into issues, you're talking
11           about later on, like during the
12           post conviction release stuff?
13                     MS. MAYS:  Yes.
14                     THE WITNESS:  Oh, okay.
15           Because that's what I was
16           saying --
17                     MR. VAN NAARDEN:  Not as
18           opposed to --
19                     MS. MAYS:  Yeah, not like
20           a guilty plea in the beginning.
21                     MR. VAN NAARDEN:  That's
22           what I thought you meant.
23   BY MS. MAYS:
24   Q.        Did he ever mention to you not
```

Monique Solomon
7/22/2022

1   wanting to take a lesser plea because he

2   wanted to file this civil lawsuit?

3   A.        No, his main thing was he wanted

4   justice for himself.  He didn't do it and

5   he wanted to be vindicated.  He wanted to

6   clear his name.

7   Q.        Okay.  When did you first discuss

8   with Mr. Outlaw or with anyone filing this

9   civil lawsuit?

10   A.        I believe it was after his case

11   was dismissed.

12   Q.        Do you know how soon after?

13   A.        I'm not sure.

14   Q.        Was it one month after?

15   A.        I believe it was more than a

16   month.

17   Q.        Okay.  But you can't say how many

18   months?

19   A.        I don't remember the exact date

20   where he decided that that's what he wanted

21   to do.

22   Q.        Okay.  I'm just going to show -- I

23   forget what Exhibit No. we're on.

24                    COURT REPORTER:  I

Monique Solomon
7/22/2022

```
1              think --

2                      THE WITNESS:  32.

3                      COURT REPORTER:  So we're

4              starting with 32?

5                      MR. VAN NAARDEN:  She's

6              right.

7                      (Exhibit marked Exhibit

8              32 for identification.)

9      BY MS. MAYS:

10     Q.       Okay.  So I'm showing you what has

11     been Bates stamped CITY014413 through

12     CITY014424.  Do you see on the fifth line

13     there the date of 8/26/2019 it says

14     personal gift Solomon Monique?

15     A.       Yes.

16     Q.       And do you see at the top of this

17     document it says, Offender name Holder,

18     Christopher?

19     A.       Yes.

20     Q.       Is that you who gave that personal

21     gift of $100 to Christopher Holder?

22     A.       Yes.

23     Q.       And why did you give him that

24     money?
```

Monique Solomon
7/22/2022

```
1   A.       Well, him and Donald are friends
2   and I believe Christopher called and said
3   that he needed money for either food or
4   honestly, it could have been a month of
5   Ramadan.  And during the month of Ramadan,
6   we're supposed to give charity.  So he
7   could have -- you know, we could have sent
8   that money for the sake of the month of
9   Ramadan where we give charity to the less
10  fortunate.
11  Q.       Okay.  Is that something you did
12  with other inmates as well or just
13  Mr. Holder?
14  A.       No, just specifically, like,
15  Donald's friends.
16  Q.       Okay.  And do you know anyone
17  named Rob that you would cc on emails that
18  you had sent?
19  A.       Rob?
20  Q.       (Nodding affirmatively).
21  A.       I don't believe so unless it was
22  another attorney.  I can't think of a Rob.
23  Q.       Okay.  I'm going to play a call
24  that I don't know that it's been Bates
```

Monique Solomon
7/22/2022

1   stamped necessarily.  These are from the

2   DOC.  And the date is April 15, 2019, time

3   of 14:04:48.  I'm going to play a portion

4   of it starting at the 4:01 mark.

5            Audio playing:

6                 "Speaker 1:  At 8:30 today

7            because I'm on vacation" --

8            Do you recognize that voice?

9   A.       I believe that's me.

10  Q.       Okay.  Starting again at 4 minutes

11  and 6 seconds.

12                "Speaker 1:  And he gave me

13           something to file like Friday

14           before he left in the afternoon

15           and it didn't get accepted by the

16           court and Rob had to be there

17           Monday morning so he was, like,

18           texting my phone on Saturday all

19           worried and stressed, like, you

20           know, come in early because we

21           need to make sure this is done

22           whatever, whatever, because he

23           hate doing last-minute stuff.

24                Speaker 2:  Who don't?

Monique Solomon
7/22/2022

1          Speaker 1:  Yeah, so I had
2      called the lady at the court and
3      she was like, she only accept them
4      in morning time or whatever, this
5      is Friday afternoon.  So she,
6      like, on the tip like she'll do it
7      on Monday.  So I mean, I came in
8      and he had messed up on it and she
9      rejected it and I had to correct
10     it and then refile it, but I mean
11     it ended up working out because he
12     thought he had to be in court at
13     9:15, but it was really 10:45.
14         Speaker 2:  I know.  I hate
15     working like that.  I don't like
16     that type of shit.
17         Speaker 1:  And Tim sent me an
18     email wanting me to do all this
19     stuff that he should have did
20     before he left.  So I pretty much
21     was working on that all freaking
22     morning until now because he got a
23     motion against him.
24         Speaker 2:  Yeah, (inaudible).

```
 1                    Speaker 1:  Yo, it's so windy
 2          outside like --
 3                    Speaker 2:  I think like
 4          that's your thing, though.  You're
 5          like a last-minute type of gal.
 6                    Speaker 1:  No, I'm not.  In
 7          my personal life absolutely, but
 8          in my work life like because if we
 9          miss the statutes, like that's my
10          job.  I always like to get shit
11          in.  But it's, like, with Tim with
12          my (inaudible), I've been busting
13          my butt for these three complaints
14          that I gave him (inaudible).
15                    Speaker 2:  You need to start
16          telling on him.
17                    Speaker 1:  No, I have.  And I
18          cc'd Rob and emailed him so he
19          knows.  And Rob is like stay on
20          Tim, stay on Tim."
21          Pausing it at 6 minutes and 38
22    seconds.  Did you hear the name Rob in that
23    then?
24    A.       Yeah, that's my boss.
```

Monique Solomon
7/22/2022

```
1   Q.      Okay.

2   A.      It wouldn't be pertaining to

3   anything to Donald.  Like, that whole

4   situation was work-related.

5   Q.      Okay.  Got it.

6                   THE VIDEOGRAPHER:  Just

7           to let you know, I --

8                   MS. MAYS:  You can't hear

9           that one?

10                  THE VIDEOGRAPHER:  No,

11          it's like -- I can hear it, but I

12          can't distinguish what it is.

13                  MS. MAYS:  Okay.

14  BY MS. MAYS:

15  Q.      I think just one more question.

16  Do you ever keep in contact with Katima

17  Jackson now?

18  A.      No.

19  Q.      When was the last time you talked

20  to her?

21  A.      At the hearing.

22  Q.      At the PCRA hearing?

23  A.      Yeah.

24                  MS. MAYS:  Okay.  I think
```

Monique Solomon
7/22/2022

```
 1          I have nothing further.
 2                    MR. VAN NEERDAN:  I have
 3          nothing.
 4                    THE VIDEOGRAPHER:  That's
 5          it.  Okay.  This concludes the
 6          deposition of Monique Solomon
 7          Outlaw.  We're going off record at
 8          6:15 p.m.
 9                    (Videotaped Deposition
10          concluded at 6:15 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

1                   C E R T I F I C A T I O N

2

3              I, hereby certify that the

       proceedings and evidence noted are contained
4
       fully and accurately in the stenographic notes
5
       taken by me in the foregoing matter, and that
6
       this is a correct transcript of the same.
7

8

9

10

11            _____

              TANEHA CARROLL
12            Court Reporter - Notary Public

13

14

15

16

17

18            (The foregoing certification of

19       this transcript does not apply to any

20       reproduction of the same by any means,

21       unless under the direct control and/or

22       supervision of the certifying reporter.)

23

24

**WORD INDEX**

**< $ >**
**$1,000**  57:6, 8
250:21, 23
**$10,000**  57:17
**$100**  306:21
**$1000**  110:5

**< 0 >**
**00@gmail.com**
268:15
**06**  123:23
**09**  158:4, 5

**< 1 >**
**1**  3:10  64:22
65:20, 22  71:9
78:20  90:18
308:6, 12
309:1, 17
310:1, 6, 17
**1,000**  110:3
250:15
**1:00**  141:16
**1:30**  141:11
**1:38**  142:11
**10**  3:10  14:16
48:22  115:4
185:14, 16
190:22  204:12,
13
**10/29/2016**
200:17
**10:14**  1:1  5:12
**10:45**  309:13
**10:50**  42:13
**10:57**  42:17
**100**  14:14
15:15  34:18
48:20  56:23
57:7  60:23
61:5  87:17
110:3  115:2
117:12  123:24
144:17  145:4
156:20  159:18
162:14, 15, 18
174:24  219:20
233:6  234:1
241:11  251:6
255:13  275:16
276:6  297:7,
11
**10-year**  53:17
**11**  3:10
187:24  188:2,

**13, 16**
**11:41**  78:14
**11:42**  78:18
**11th**  142:1
**12**  4:1  199:19,
21  208:4
**12/16/2018**
208:4
**12/31/2017**
189:5  190:16
**12:57**  142:7
**121**  3:10
**13**  4:1  206:16,
18, 20
**14**  4:1  215:8,
10, 12
**14:04:48**  308:3
**142**  3:10
**14th**  1:1  2:12
5:10
**15**  4:1  178:2
224:14, 18
293:17  308:2
**150**  3:10
**1515**  1:1  2:12
5:10
**157**  3:10
**15th**  45:15
46:11, 18, 19,
22  47:4
**16**  4:1  34:5
36:9  37:3, 4
227:3, 7
**17**  4:1  71:23
230:17, 23
242:1  263:19
**170**  3:10
**175**  3:10
**179**  3:10
**18**  4:1  53:5, 6,
7  241:16, 18,
20
**185**  3:10
**188**  3:10
**19**  4:1  53:6, 7
225:5, 8  252:7,
11
**19102**  1:1
2:13
**19103**  2:5
**1914**  45:6
46:14
**1983**  133:9
**199**  4:1
**19th**  71:11

**< 2 >**
**2**  3:10  68:12
70:3  71:6, 13

**72:21  83:21**
96:15  308:24
309:14, 24
310:3, 15
**20**  4:1  112:3
163:1  255:17,
22  256:5
259:24  260:2
**2000**  122:20
124:3  146:2
**2000s**  120:13
**2001**  2:5
**2006**  48:19
**2008**  119:19
127:23
**2009**  133:15
**2010**  146:3
153:12  240:1
**2012**  49:16, 20
52:7
**2013**  240:18
**2015**  137:4, 5
146:3  153:12
177:2  178:3
182:13, 15
186:2  187:13
188:8  190:23
192:1
**2016**  14:14
43:8, 15
110:19  205:22
215:24  225:5,
8  239:21
242:1  243:7
248:11  252:16
254:14
**2017**  53:5
188:24  191:1
192:1  227:17
228:7  230:3
**2018**  121:10
231:7  232:5
233:21  235:10
239:15  246:14
256:2  293:17
**2019**  107:22
189:1  264:1
308:2
**2020**  56:22
60:11  115:9,
20  116:18
**2021**  61:23
**2022**  1:1  5:12
71:24  263:19
**206**  4:1
**21**  4:1  112:3
202:11  243:7
271:18, 20, 22

**21-1290**  1:1
5:9
**215**  4:1
**215)683-5400**
2:13
**215)960-0000**
2:6
**22**  1:1  4:1
5:12  281:20
282:16  287:6,
10
**224**  4:1
**227**  4:1
**23**  4:1  285:16,
18
**230**  4:1
**24**  4:1  11:1
65:9  214:10
286:9, 11
287:21, 22, 23
288:3
**241**  4:1  42:20
44:12  47:1
48:8, 14
**25**  4:1  289:10,
12
**252**  4:1
**255**  4:1
**26**  4:1  291:10,
12, 14
**267-506-4966**
154:5
**267-624-6304**
154:20
**27**  4:1  188:8
190:23  287:20
293:1, 3, 5
**271**  4:1
**27327**  272:12
**27333**  275:11
**27335**  271:23
**27th**  186:2
**28**  4:1  292:24
293:23  294:1
**282**  4:1
**285**  4:1
**288**  4:1
**289**  4:1
**29**  4:1  215:24
294:22  295:1
**291**  4:1
**293**  4:1
**294**  4:1
**295**  4:1
**297**  4:1
**2nd**  170:23

**< 3 >**

**3**  3:10  91:11
120:21  121:2,
3  246:14
**3:24**  224:5
**3:42**  224:9
**30**  4:1  295:9,
11
**301**  3:8
**306**  4:1
**31**  4:1  297:16
**31st**  190:24
**32**  4:1  306:2,
4, 8
**3700**  2:5
**3708**  48:16
123:23  182:22
**38**  310:21

**< 4 >**
**4**  3:10  96:17,
23  97:17
142:15, 17, 20
254:14  308:10
**4/26/22**  3:10
72:2
**4/4/2016**  251:9
**4:01**  308:4
**425**  268:19
269:14
**4862**  45:15

**< 5 >**
**5**  3:1, 10
96:15  150:20,
21, 22
**5:01**  280:16
**5:03**  280:21
**5:04**  281:14
**5:06**  281:18
**5:28**  300:23
**50**  162:18

**< 6 >**
**6**  3:10  105:11
106:4, 20
157:9, 11
248:10  308:11
310:21
**6:04**  301:3
**6:15**  312:8, 10
**65**  3:10
**66**  117:12

**< 7 >**
**7**  3:7, 10
170:1, 2, 8
176:6, 8, 20, 24
177:18  178:22

**180:11**
**7/19/22**  3:10
**7/29/16**  222:11
**71**  3:10
**74th**  45:6
46:14

**< 8 >**
**8**  3:10  121:10
175:20, 23
176:22  177:1,
16, 20  178:21
179:11
**8/26/2019**
306:13
**8:30**  308:6

**< 9 >**
**9**  3:10  179:22,
23  227:17
228:7  230:3
231:7  233:21
252:16
**9:15**  309:13
**947**  123:14
269:1, 2

**< A >**
**a.m**  1:1  5:12
42:13, 17
78:14, 18
**ability**  11:2, 3
257:10, 23
**able**  11:7
193:21  194:10
198:4  199:9
256:15  262:1
264:23  266:7
273:7  290:15
**Absolutely**
172:14  178:24
221:15  310:7
**accept**  309:3
**acceptable**  9:8
**accepted**
308:15
**accepting**
140:21
**access**  74:2
83:19  145:20,
22  147:5, 8, 9,
11, 12  148:18
149:23, 24
150:3, 5
167:13  186:22
187:4, 14
194:1  195:9
197:9, 16, 19,
21, 24  198:3, 7

256:*11, 13, 15*
257:*6, 10, 13,*
*16, 18, 21*
258:2, *4*
259:*11* 264:*20,*
*22, 24* 266:*4,*
*10, 15, 24*
267:*4* 284:*19*
290:*15*
**accessed**
259:*15*
**acci** 50:*7*
**accident** 14:*4*
15:*4*
**accidents** 50:*9,*
*11*
**accompany**
137:*6* 275:*23*
**account** 73:*23*
74:*1, 7, 21*
77:*1, 5* 83:*17,*
*18, 19* 95:*14*
107:*18, 24*
108:*4, 11, 12,*
*15, 16, 20, 21*
109:*4, 6, 17, 21*
119:*7* 146:*18*
147:*13, 17, 20*
148:*18, 21*
149:*16, 20*
150:*6, 7*
192:*13* 194:*7*
195:*5, 6, 17, 18*
197:*2, 10, 12,*
*14, 17* 198:*5, 8,*
*24* 199:*3, 6*
200:*6, 12, 17*
208:*22* 209:*10*
216:*23* 222:*12*
224:*16, 24*
228:*9* 230:*21*
246:*18* 248:*18*
256:*12, 21*
257:*5, 7, 9, 20*
264:*7, 10*
265:*3, 20*
266:*15, 18, 20,*
*21* 267:*4*
269:*20, 22*
284:*20* 298:*9*
**accountable**
33:*11* 35:*8*
36:*16*
**accountant**
61:*16, 18* 62:*2,*
*8, 13* 114:*1, 15*
**accounted**
61:*10* 62:*20*

63:*11, 15, 19*
64:*4*
**accounts**
107:*16* 109:*9*
**accurate**
171:*5* 182:*17*
234:*21* 286:*21*
**accurately**
313:*1*
**acquaintances**
254:*5*
**Act** 78:2
182:*6*
**Action** 1:*1*
5:*8* 36:*5*
37:*11* 83:*15*
**actions** 33:*12*
133:*10*
**active** 55:*6, 7,*
*21, 22* 148:*16*
160:*11* 260:*6*
**actively** 46:*6*
127:*4* 132:*10*
150:*1* 194:*21*
**actual** 8:*18*
144:*4*
**add** 133:*5, 6*
225:*14* 226:*13*
**addendum**
72:*6*
**addicted** 138:*6*
**addiction**
138:*9*
**addition** 46:*19*
67:*23* 86:*1*
131:*19* 144:*18*
173:*22* 237:*19*
247:*15, 16*
248:*3*
**additional**
71:*2* 96:*4*
129:*11* 130:*5*
160:*15, 19*
174:*5* 283:*24*
**address** 42:*19*
43:*7* 44:*15*
45:*5, 14, 23*
86:*22* 123:*4, 6,*
*7, 13, 19* 124:*2,*
*6, 13, 15*
226:*15* 262:*16*
263:*6, 9* 264:*8,*
*13, 16, 18, 19*
265:*4* 268:*14,*
*17, 19, 21, 24*
269:*11, 12, 17*
**addressed**
202:*22* 203:*10,*
*11*

**addresses** 76:*2,*
*6* 86:*11, 14, 19*
262:*15* 266:*1,*
*3, 5*
**admissible**
32:*13*
**adopt** 214:*12*
**advance** 16:*7,*
*9* 129:*24*
**advertise** 58:*15*
**advice** 114:*6*
**advocate**
265:*11*
**affidavit** 102:*9*
168:*3* 185:*23*
186:*1, 4, 5, 7,*
*10, 18* 187:*17,*
*19* 188:*4*
190:*23* 191:*10,*
*14, 22, 24*
192:*7* 238:*14*
239:*11, 13*
250:*1*
**affidavits**
221:*12* 238:*11,*
*21* 239:*1, 5*
249:*23*
**affiliated** 22:*7*
54:*11*
**affiliation**
59:*15*
**affirmatively**
89:*8* 108:*6*
204:*14* 215:*4*
266:*22* 283:*13*
307:*20*
**afternoon**
308:*14* 309:*5*
**ages** 65:*8*
214:*9*
**ago** 8:*18* 17:*2*
44:*10* 55:*5*
71:*11* 107:*5, 8,*
*11* 143:*7*
147:*3* 173:*10*
**agree** 72:*4, 8*
82:*23* 121:*9*
176:*23* 177:*2*
200:*15* 244:*10*
**agreement**
31:*14* 301:*16,*
*23* 302:*6*
**ahead** 45:*13*
50:*20* 94:*19*
116:*9* 186:*15*
216:*15*
**aide** 55:*5, 12,*
*16, 19* 59:*4, 9,*

*13*
**aka** 158:*18*
**al** 1:*1*
**Alexander**
70:*18*
**Alexis** 270:*15*
**Ali** 204:*4, 6*
270:*16*
**A-l-i** 205:*11*
**alias** 153:*23*
**aligned** 21:*22*
22:*10* 23:*6*
**alive** 268:*2*
**allegations**
27:*19* 34:*9*
35:*10*
**alleged** 33:*21*
**Alli** 204:*6*
**allowed**
210:*18* 235:*18*
**Alston** 70:*15*
73:*2* 75:*11*
247:*16, 21*
248:*2*
**alter** 172:*4, 11*
**altered** 173:*4*
176:*21* 178:*21*
**altering** 179:*2*
**ambiguous**
174:*1*
**amend** 115:*19*
116:*17*
**amended**
111:*5, 7, 12*
112:*2* 113:*16*
114:*11* 115:*12*
**amendment**
113:*21*
**amendments**
114:*9, 19*
**amount** 57:*3,*
*15* 109:*24*
118:*17* 194:*17*
**analysis** 39:*24*
**and/or** 70:*19*
172:*23* 313:*21*
**Andrew**
270:*16*
**angry** 137:*18*
285:*8* 295:*24*
296:*11*
**Annette**
125:*21* 126:*4*
128:*8, 10*
159:*3*
**Annette's**
159:*5*
**answer** 8:*12*
9:*7, 12* 10:*6*

11:*22* 12:*18*
15:*23* 17:*19*
18:*10, 18* 19:*3,*
*21* 20:*4, 21, 22*
21:*9* 23:*4*
25:*18* 28:*6*
29:*15* 30:*3*
31:*17* 32:*8, 24*
33:*23* 36:*6*
37:*19* 39:*5, 8,*
*19* 40:*18* 41:*6,*
*22* 60:*24*
82:*14, 16*
94:*16* 96:*20,*
*22* 100:*13*
103:*10, 13*
104:*18* 112:*14,*
*18* 113:*7*
115:*17, 23*
116:*3, 4, 14*
117:*5* 129:*13,*
*16* 130:*8, 15*
132:*13* 161:*24*
166:*5* 169:*7*
189:*10* 244:*14*
245:*16, 18*
277:*24* 278:*9*
**answered**
37:*18* 41:*19*
103:*16, 19*
104:*17* 292:*3*
**answering**
9:*21* 60:*20*
**answers** 9:*3*
285:*9*
**Anthony** 70:*17*
**Antoinette**
70:*18*
**anybody** 36:*8*
153:*18* 248:*4*
**anymore**
61:*20* 100:*1*
104:*6* 131:*7*
217:*21* 255:*14*
**anyway** 116:*16*
**AOL** 72:*7, 20*
76:*24* 83:*18*
267:*4*
**Aparra** 271:*5*
**apartment**
123:*23*
**apologize**
204:*24* 217:*11*
282:*10, 14*
289:*6* 292:*5*
**apologized**
297:*11*
**app** 95:*18, 19,*
*20* 199:*15, 16*

**appear** 237:*1*
281:*1, 3*
**appears** 121:*9*
178:*8* 200:*15*
208:*15* 209:*2*
216:*1* 227:*5,*
*15* 228:*8*
231:*6* 242:*1*
244:*17* 245:*4*
254:*21* 272:*2*
288:*12*
**appellate** 78:*1*
83:*24* 87:*14*
**application**
58:*22*
**applications**
59:*1*
**applied** 118:*1*
**apply** 6:*23*
313:*19*
**approaching**
221:*11*
**appropriate**
20:*23* 39:*17*
**approval** 56:*5*
57:*12* 58:*20*
**approved**
58:*23*
**approximate**
34:*2* 132:*1*
137:*1* 152:*7*
162:*7*
**Approximately**
53:*4* 109:*20*
131:*24* 156:*18*
162:*6* 196:*3*
**April** 59:*2*
248:*10* 308:*2*
**arbitration**
13:*21* 15:*14,*
*15*
**Arch** 1:*1*
2:*12* 5:*10*
**area** 159:*20*
**argue** 279:*21*
**arose** 74:*21*
**arrest** 44:*20*
45:*10, 17* 46:*8*
47:*6* 48:*6*
**arrested** 15:*19*
**arrived** 180:*11*
**Asa** 203:*3*
**aside** 68:*21*
70:*1* 71:*17*
104:*24* 122:*18*
223:*21* 230:*16*
252:*5*
**asked** 30:*11*
37:*17* 41:*19*

54:7  62:1, 10
68:4  81:2
89:24  97:7
103:16, 19
104:17  138:19
139:2  144:19
165:5  167:24
198:24  223:18
224:1  237:21
251:1  277:20
278:7  292:2
asking  8:16
9:22  17:12
20:14, 18
26:16  27:1
28:10  32:20
35:18  40:4
62:4, 18  64:2
67:3, 22  68:1,
6  73:16  79:8
90:5, 7  92:3
93:9  96:24
97:18, 19  98:1,
4, 13  100:8
102:5  104:22
124:18  134:14
164:19  174:1
177:12, 13
182:14  194:8
195:23, 24
196:13  199:12
216:22  221:12
223:1, 2
245:10, 21
250:21, 22
257:7  261:19
270:10  289:7,
18  300:3
asks  29:12
39:23, 24
259:5
ass  212:22
asserting  68:19
assist  135:12
136:15  221:4
223:16  238:24
assistance
119:2  250:22
assisting
128:11  133:12
158:3
associated  20:2
Associates  5:16
Association's
64:16
assume  8:12
16:2  133:17
141:16  177:12
274:16

Assuming
26:13  209:12
242:9, 10
AT&T  154:24
attach  151:23
attached
77:22, 23  78:4
151:24  172:22
173:18, 22
184:11, 15
attaching
272:4
attachment
151:19
attachments
151:16  193:21
attempt  172:3,
10
attempting
121:15
attempts  97:12
attend  53:23
attended  52:20
attending
53:12
attention
112:5, 8
200:13  207:4
208:3  225:2
231:1  241:23
248:9
attor  21:2
attorney  10:13
12:2  29:23
31:13  52:1, 2,
4  82:18  85:15
86:9  89:7, 15
92:20, 21
96:10  98:3
102:20  105:4
133:17  135:3
136:12  168:13,
15, 17, 20
172:23  174:10,
13, 14  237:5, 8,
11, 12  283:20,
21  284:3
302:16  307:22
attorney-client
23:9  29:21
30:7
attorneys
18:23  21:3, 14
24:10, 15, 18
51:8  66:22
83:24  84:1, 10,
13, 14, 19, 23,
24  85:2, 13, 19,
21  86:2, 6

87:11, 23
88:23  90:19
91:6, 9  97:2,
10, 20, 24
98:11  102:1,
13, 17  104:4
106:19  107:1
134:21  135:10
151:17  165:10
166:16, 18
236:22  279:13
attorney's  69:7
attribute
212:10, 13
267:8, 11
299:4
Audio  308:5
August  49:16,
20  252:16
254:14
author  151:10
156:10  158:7
authored
143:9, 12, 13,
16  144:13, 14
277:12
authoring
143:18
Avenue  45:6
46:15  123:14,
15  268:20
269:15
aware  61:8
77:18, 22
85:22  90:13
96:6  101:10
104:14  105:1
126:8  127:6, 9
139:20  153:22
163:12  186:22
193:18  198:23
221:6, 7
225:19  238:13,
16  239:20, 22
240:14  241:8
246:4  284:4

< B >
babe  242:12
baby  58:8
213:9, 16
baby's  213:12
Bachelor's
53:10
back  8:11
12:13  27:3
35:7, 22  36:10,
13  37:6, 7
38:20  39:21

42:16  62:19
63:3, 5  64:23
78:17  106:18
128:15  129:21
142:10  160:22
167:22  185:18
190:6, 8, 21
192:8, 24
194:6, 10
195:11  215:13
222:10  224:8
229:5  232:15
234:23  238:7,
8  241:23
273:10  280:20
281:17  283:8
301:2
background
10:21  30:18
138:6
back-up
146:14
Baker  196:20
ball  113:18
balled  176:21
bank  95:13
106:12, 21, 24
107:16, 18, 19,
24  108:3, 11,
12, 14, 16, 20,
21  109:6, 9, 16,
21  119:7
banker's
99:12, 13
Bar  64:16
Barr  70:17
73:3  91:17
based  16:2
145:2  153:5
165:22  205:22
basically
134:14  170:18
295:24  296:12
297:1
basis  19:14
32:10, 12
132:16  189:13
240:21  284:8
Bates  120:22
142:21  151:3
157:10  170:6
175:21  180:3,
16, 19  181:1, 3
185:19  188:14
189:21  200:1,
2  206:22
255:18  260:3
271:22  272:11
281:24  285:21

286:13  288:6
289:14  291:14
293:5, 9  294:3,
7, 22  297:18
306:11  307:24
beat  139:13
becoming
129:24
began  128:11,
13  133:12
201:24
beginning
7:17  42:23
179:8  279:2
285:7  301:12
303:4  304:20
begun  244:19
behalf  5:20
6:5  22:23
96:9  209:18
216:7
believe  15:14
23:12  33:24
34:12, 17
38:11  49:16
52:17  56:22
60:5, 11  69:4,
10  71:4  79:10
85:11, 24  88:6,
19  93:22
109:10  110:16
114:12, 19
115:1  116:13
117:11  118:5
123:23  132:23
133:15  135:5,
11  136:1
139:10  143:5,
19  149:16
151:14  155:2
158:24  160:17,
18  161:23
164:3, 11
165:9, 13, 17,
18  166:19
167:18  168:4,
7, 12  171:8
172:17, 19
174:2, 12, 16
177:6  181:20
186:6  187:8, 9
188:6  189:20
190:15  191:15
192:23  194:16
195:15  197:8,
13  198:6
199:10, 14
202:19  203:9
205:24  206:21

207:12, 15
208:14, 21
211:4, 5, 10
219:19  221:16,
22  222:23
227:19, 21
230:15  232:2,
4, 22  233:19
236:12  239:13
240:13  241:10
243:11  245:23
246:9  249:24
250:18  251:3,
6, 17  253:3, 24
255:12  258:9
260:4, 17, 19
262:20  263:19,
21  264:14
271:8  272:18
273:12, 21, 23
275:15  276:23
289:17, 20
290:21  291:7
297:6, 10
299:14, 15
300:5  302:12
303:3  305:10,
15  307:2, 21
308:9
believed  134:8
232:5
bell  137:4
209:14, 16, 17
230:10  267:7
beneficial
41:12, 14
benefit  41:4
118:13
benefits  118:2
Benner  164:10,
14
best  9:21
57:4  110:2
146:24  171:4
172:17
better  98:8
177:10
beyond  94:13
96:4  130:5
big  200:3
213:11  235:24
Bill  2:16  5:13
134:2
bills  108:17, 22
biological
65:13, 15
birth  123:22
bit  119:17
149:4  161:1

192:*16* 209:*19*
302:*21* 303:*19*
**black** 281:*23*
**blemish** 177:*23*
**block** 126:*20*
**blue** 191:*23*
**bold** 255:*7*
**bonds** 117:*18*
**bonfire** 169:*3*
235:*22, 23*
236:*2, 3, 7*
238:*2*
**bored** 192:*16*
**boring** 252:*6*
**boss** 310:*24*
**bottom** 149:*1*
172:*20* 206:*23*
225:*3, 7, 12, 18*
227:*13, 17*
231:*2, 6* 238:*9*
242:*12* 248:*21*
251:*9* 271:*9*
290:*7*
**Bounty** 228:*18,*
*19* 229:*21*
**Bounty's**
229:*12, 13*
**box** 88:*9*
99:*17, 18*
167:*11* 199:*9*
215:*23*
**boxes** 99:*12,*
*13, 15* 215:*21*
**bragging**
218:*24*
**Braheem** 70:*19*
**brainstorm**
59:*18*
**break** 10:*3, 7,*
*8, 9* 63:*9*
141:*4, 17*
192:*6* 200:*2*
223:*23* 300:*10*
**breaks** 10:*9*
**Brenda** 75:*24*
91:*20*
**Brendra** 73:*6*
**Brian** 85:*5*
86:*23, 24*
**Brief** 42:*14*
66:*4* 78:*15*
224:*6* 281:*15*
300:*24*
**briefly** 66:*20*
143:*2* 151:*7*
170:*17* 185:*22*
192:*22* 286:*17*
290:*1*

**bring** 27:*15*
101:*7* 102:*24*
103:*12*
**Brisbon** 70:*17*
**Bro** 203:*1, 15*
204:*6* 220:*3*
**broke** 146:*12*
288:*22*
**broken** 150:*2*
291:*23*
**brother** 205:*3*
217:*12, 13*
267:*22*
**brought** 15:*2*
101:*8* 112:*4, 7*
**Brown** 73:*2*
91:*17*
**building** 58:*3*
**bunch** 214:*3*
219:*1*
**burden** 100:*24*
**burn** 100:*8, 12*
101:*3* 236:*3, 4*
**burned** 100:*5,*
*16* 101:*6*
102:*3, 6, 22*
167:*6, 8* 169:*9*
**burning**
101:*16*
**Business**
53:*10* 54:*16,*
*20* 55:*7* 56:*1,*
*12, 20* 57:*1, 10,*
*20, 24* 64:*1*
**businesses**
54:*9* 59:*20*
**Bust** 225:*11,*
*21, 24* 226:*3, 7,*
*9*
**busting** 310:*12*
**butt** 310:*13*
**buy** 193:*15*
299:*19, 21*
**buying** 299:*12*
**bye** 120:*10, 14*
126:*5* 127:*14*

< C >
**calculated**
41:*20*
**call** 212:*2*
225:*2* 231:*1*
246:*18* 285:*4*
307:*23*
**called** 8:*19*
54:*6, 17, 18*
128:*2* 193:*1*
211:*24* 296:*1,*

*12* 307:*2*
309:*2*
**calls** 100:*13*
112:*11* 244:*14*
299:*6*
**Cambridge**
42:*20* 44:*12*
47:*1* 48:*8, 15*
**Capers** 271:*10*
**Capital** 110:*14*
**card** 93:*19, 23*
95:*3, 10, 15*
197:*8*
**cardboard**
99:*15*
**cards** 110:*10,*
*17, 21*
**care** 54:*5, 16,*
*19* 55:*12, 16,*
*19, 23*
**carrier** 154:*23*
**Carroll** 1:*1*
5:*15* 313:*11*
**Carter** 253:*2,*
*4, 16, 23* 271:*4,*
*7*
**case** 7:*8*
13:*14* 14:*1, 3,*
*19* 15:*2, 7, 12,*
*17* 16:*1, 4*
23:*6* 25:*11*
26:*7* 27:*19*
30:*24* 31:*12*
32:*6* 33:*5, 17*
35:*4* 38:*24*
40:*14* 41:*17*
66:*9, 23* 68:*15*
69:*2* 80:*23*
81:*4, 10, 14, 24*
83:*5, 10, 14*
84:*2* 86:*2*
87:*13* 90:*15*
96:*12* 98:*20,*
*24* 99:*1, 20, 23*
101:*13, 18, 19*
103:*2, 5, 23*
104:*8, 10*
114:*5* 121:*13*
128:*12, 17, 18*
133:*3, 7, 13*
135:*21* 136:*13*
161:*5, 15,*
*6* 166:*11, 12*
167:*6* 169:*16*
170:*20* 183:*12*
184:*3, 14, 19,*
*22* 185:*5, 10*
221:*4, 5*
223:*12, 14, 15,*

*17* 226:*22*
229:*24* 230:*13*
235:*17* 238:*15*
245:*6* 249:*20*
250:*4, 15, 16,*
*19, 20* 252:*3*
261:*14, 19*
262:*11* 265:*6,*
*11* 273:*6, 8, 19*
281:*6* 305:*10*
**cash** 93:*4*
95:*19, 20*
218:*21* 219:*14*
**cast** 245:*5*
**categories**
109:*11* 134:*12*
**category** 67:*5*
**cc** 307:*17*
**cc'd** 310:*18*
**celebration**
99:*22, 24*
100:*18, 22*
236:*2*
**cell** 154:*11, 12,*
*21*
**ceremony**
129:*23*
**certain** 8:*17*
30:*23* 77:*23*
78:*2* 194:*14,*
*17*
**certificate**
52:*11, 13*
53:*22* 55:*19*
59:*9, 13*
**certification**
54:*4, 23*
313:*18*
**certifications**
54:*3*
**certified** 55:*12*
**certify** 313:*1*
**certifying**
313:*22*
**CFCF** 273:*9,*
*11*
**chance** 170:*12*
**change** 155:*12,*
*14, 17* 257:*23*
303:*18*
**changed**
155:*21* 156:*4*
257:*14* 258:*13*
**changes**
173:*14* 182:*20*
**changing**
155:*18*

**character**
223:*6, 19*
255:*12*
**characteristics**
213:*18*
**charged** 127:*6*
**charity** 307:*6,*
*9*
**Charles** 70:*16*
72:*24* 78:*24*
80:*10* 91:*16*
126:*13* 135:*24*
136:*22* 137:*14,*
*18* 139:*1*
161:*2* 185:*4*
186:*1* 274:*11*
**Charles's**
139:*8*
**Charlie** 214:*2*
**Chase** 280:*9*
**check** 94:*6*
95:*3* 298:*16*
**checked** 95:*10,*
*13*
**checking**
108:*24* 109:*2*
**checks** 92:*14,*
*17* 93:*1*
**Chelten**
123:*14, 15*
268:*20* 269:*2,*
*3, 4, 15*
**child** 65:*10*
201:*17* 202:*14*
214:*4*
**children** 65:*6*
125:*12* 201:*15*
214:*7* 215:*3*
**choice** 139:*17*
**choose** 41:*23*
**chose** 304:*4*
**Chris** 70:*16*
211:*1, 4, 7*
**Christopher**
73:*3* 93:*17*
135:*24* 225:*17,*
*23* 226:*20*
306:*18, 21*
307:*2*
**circles** 127:*5*
**CITY** 1:*1*
2:*10* 5:*9* 6:*2,*
*5* 7:*7* 33:*10*
35:*8, 12* 103:*1*
277:*21*
**CITY014413**
4:*1* 306:*11*
**CITY014424**
306:*12*

**CITY016932**
3:*10* 188:*14*
**CITY018846**
4:*1* 206:*23*
**CITY022044**
260:*4*
**CITY022058**
4:*1* 294:*22*
**CITY022060**
294:*23*
**CITY022061**
4:*1* 294:*7*
**CITY022063**
294:*7*
**CITY022064**
4:*1* 295:*14*
**CITY022066**
295:*14, 21*
**CITY022067**
4:*1* 297:*19*
**CITY022069**
297:*19*
**CITY022070**
4:*1* 291:*15*
**CITY022072**
291:*15*
**CITY022073**
4:*1* 293:*6, 11*
**CITY022078**
293:*6, 11*
**CITY022079**
4:*1* 286:*14*
288:*6*
**CITY022081**
286:*14* 288:*6*
**CITY022082**
4:*1* 289:*15*
**CITY022084**
289:*15*
**CITY022088**
4:*1* 285:*21*
**CITY022090**
285:*22*
**CITY022091**
4:*1* 282:*1*
**CITY022093**
284:*12*
**CITY022094**
282:*1*
**Civil** 1:*1* 5:*8*
13:*24* 14:*1*
25:*11* 26:*7*
34:*1* 37:*21*
50:*8* 96:*11*
102:*24* 103:*12*
302:*15* 305:*2,*
*9*

**claim** 130:*13*
132:*24* 133:*4,
7, 9*
**claims** 33:*16*
50:*15*
**clarification**
182:*17*
**clarify** 40:*4*
63:*14* 76:*10*
94:*23*
**clarifying**
291:*6*
**Clark** 65:*16*
73:*4* 75:*22*
91:*18*
**class** 55:*16*
**classes** 52:*14*
**clean** 176:*22*
177:*9, 16*
**cleaned** 179:*15*
**cleaner** 8:*5*
177:*18*
**clear** 16:*22*
71:*9* 124:*11*
236:*11, 12*
305:*6*
**clerks** 21:*20*
**client** 29:*20,
24* 50:*24* 69:*6*
**clients** 21:*21*
22:*9* 29:*14*
55:*23* 56:*11*
**Clifton** 42:*20*
**close** 123:*2, 3*
207:*16*
**closed** 169:*17*
**closer** 126:*6*
**closest** 126:*4*
**co-counsel**
7:*10* 16:*14*
17:*14*
**Cohen** 113:*24*
**collection**
273:*2*
**college** 52:*18,
20, 22* 53:*19*
**color** 281:*21,
22*
**colors** 178:*18*
**column** 208:*15*
**come** 12:*13*
17:*22* 27:*3*
35:*22* 51:*3*
84:*12* 93:*17*
134:*15* 136:*11*
137:*21* 160:*22*
201:*4* 226:*13*
275:*5, 13*

279:*11, 14*
308:*20*
**comes** 199:*14*
302:*2*
**comfort** 244:*1*
**coming** 7:*4*
56:*15* 160:*3*
**commencing**
1:*1*
**Commerce** 2:*4*
**commit** 33:*19*
243:*23*
**common**
203:*16* 207:*11,
19, 22* 241:*11*

**Commonwealth**
66:*24* 68:*16*
69:*8* 84:*2*
96:*12* 121:*12*
129:*14*
**communicate**
144:*13, 15*
244:*1, 21*
261:*11* 262:*8*
**communicated**
88:*19* 161:*10,
11* 206:*2, 4*
260:*5, 7*
262:*21* 270:*7*
**communicating**
127:*23* 128:*5,
13* 196:*7*
243:*21* 244:*18*

**Communication**
53:*11* 85:*1*
90:*21* 206:*11*
239:*20* 241:*5*
243:*2*
**communication
s** 17:*13* 26:*17,
18* 66:*21*
67:*18* 68:*13,
24* 70:*14, 24*
72:*22* 77:*4*
78:*3* 79:*4, 7*
83:*8, 11, 22*
85:*23* 89:*11*
90:*8, 17* 91:*3,
4* 96:*7* 97:*8,
13* 112:*12*
187:*18* 245:*3*
259:*6*
**company**
59:*21* 60:*1, 6*
61:*2, 9* 62:*20*
63:*11* 64:*6*

**compensation**
37:*23*
**compiling**
222:*2*
**complaint**
27:*19, 21, 24*
28:*21, 24* 29:*4,
9, 23* 32:*15, 22*
34:*19* 35:*2, 15*
37:*21*
**complaints**
50:*17* 310:*13*
**complete**
114:*20* 171:*5*
283:*4* 286:*5,
22* 289:*5, 21*
290:*4* 291:*20*
293:*19*
**completely**
99:*18*
**compliance**
26:*8*
**complying**
26:*20* 31:*4*
**computer** 42:*4*
73:*20* 77:*1, 3*
89:*19* 90:*2, 9,
12* 144:*1, 10*
145:*17, 21, 22*
146:*4, 7, 15*
151:*18, 24*
152:*14* 167:*2,
14* 288:*15*
292:*16, 17*
**concept** 64:*20*
104:*21*
**concluded**
312:*10*
**concludes**
312:*5*
**conduct** 93:*11*
94:*13*
**conducting** 7:*9*
**confident**
79:*17, 19*
94:*10* 95:*1*
**confirm**
175:*12* 231:*20*
232:*6* 233:*20*
235:*6* 259:*10*
277:*12* 281:*5*
**confirmation**
94:*3*
**confirming**
238:*11* 239:*6,
12*
**confused** 149:*4*
**confusing**
210:*4*

**connection**
13:*18* 25:*12*
182:*5* 252:*2*
**connections**
125:*17*
**ConnectNetwor
k** 193:*1* 195:*4,
9, 19* 257:*7*
266:*21* 269:*22*
270:*2*
**consider** 83:*8,
11* 179:*1*
**consideration**
36:*2*
**considered**
116:*23*
**considering**
299:*12*
**consortium**
130:*13* 132:*24*
133:*4, 7, 9*
**constant**
201:*18* 202:*4*
**consult** 10:*12*
**contact** 127:*13,
15, 22* 154:*2*
161:*4, 8, 9*
163:*21* 164:*1,
7, 13, 24* 165:*5*
193:*5, 6, 9*
211:*10* 241:*3,
4* 243:*3* 247:*6*
267:*23* 290:*22*
302:*18* 311:*16*
**contacted**
160:*16* 285:*8*
**contacting**
156:*23*
**contacts**
195:*10*
**contained**
313:*1*
**contemplate**
30:*1*
**content** 144:*6,
19* 179:*16*
188:*4* 209:*13*
**contents** 191:*9*
**contest** 8:*24*
**context** 192:*2*
**continues**
227:*20*
**continuously**
43:*9* 45:*9*
48:*5*
**contract**
302:*10*
**contractor**
54:*13*

**contractors**
22:*22*
**control** 151:*13*
258:*11* 313:*21*
**conversation**
22:*12* 138:*2*
222:*6* 233:*14,
23* 234:*17, 23*
235:*4, 10*
287:*18* 303:*23*
**conversations**
16:*15* 35:*3*
232:*20*
**convey** 216:*22*
**conveying**
216:*8, 10*
220:*18*
**convicted**
127:*10* 212:*19*
**Conviction**
78:*1* 84:*1*
87:*15* 120:*17*
122:*6, 15*
182:*5* 304:*12*
**co-owners**
43:*18* 60:*4*
**copied** 177:*5*
182:*10*
**copies** 88:*23,
24* 101:*21*
102:*4, 12*
156:*19* 159:*12,
14, 16* 236:*21*
237:*21* 289:*2*
**copy** 77:*19*
79:*17* 88:*16,
21* 89:*12, 17*
98:*4, 11*
101:*22* 144:*7*
158:*13* 165:*8*
166:*6, 15, 20,
21, 23* 167:*1*
168:*17, 19, 21*
171:*16* 172:*17,
18, 22, 23*
173:*18* 174:*9*
176:*22* 177:*5,
10, 11, 16, 18*
179:*15* 180:*18*
181:*11, 15, 19*
182:*3, 13, 18*
183:*13* 184:*4,
6, 7* 186:*6*
192:*5* 236:*6*
237:*14* 274:*22*
276:*24* 286:*5,
22* 289:*5*
290:*4* 291:*21*

293:*19* 294:*11*
295:*3, 6*
**copying** 182:*15*
**Corona** 118:*14*
**correct** 30:*15*
36:*21* 64:*24*
77:*21* 80:*7*
106:*8* 129:*20,
22* 143:*14*
156:*21* 170:*21*
179:*20* 189:*17*
190:*19* 191:*3*
200:*10* 238:*4*
272:*2, 9* 275:*9*
284:*5, 13*
286:*4* 295:*6*
304:*3* 309:*9*
313:*7*
**Corrections**
161:*21* 188:*23*
189:*23* 200:*12*
215:*19* 225:*1*
278:*13, 22*
280:*4, 6* 281:*1*
282:*3*
**correctly** 79:*11*
**correspond**
263:*13* 279:*3*
**corresponded**
162:*9* 278:*12*
**correspondence**
88:*13, 17, 21*
191:*9, 11*
216:*4* 284:*1*
**corresponding**
283:*19* 284:*7*
**cosigned**
119:*12*
**cost** 57:*8, 13*
193:*14*
**Counsel** 5:*17*
11:*10, 11* 20:*4*
21:*1* 23:*18, 21*
35:*20* 68:*18*
70:*10* 112:*13*
236:*19* 259:*20*
266:*13* 301:*9*
**county** 14:*10*
**couple** 126:*19*
135:*20* 155:*2,
5, 21* 164:*4*
195:*10, 20*
196:*11, 15*
204:*15* 209:*23*
226:*14* 231:*19*
248:*15, 20*
267:*17* 277:*21*

278:7 301:8
302:24 303:16
course 91:1
246:7
COURT 1:1
5:14 6:8, 16
8:2, 11 9:23
13:8, 17 14:8
16:1 25:21, 22
29:5 40:6
42:2, 7 65:20
85:8 137:21
142:16 153:19
170:1 172:24
174:11 181:23
182:8 184:10,
12, 15, 19, 22
185:3, 14
187:23 199:19
206:16 215:8
223:9 237:16
241:16 259:24
271:18 291:9
293:1 300:21
305:24 306:3
308:16 309:2,
12 313:12
cousin 125:5,
6, 10 196:12,
17
covers 272:11
275:11
Cozen 85:13
86:6, 7, 15, 18
121:11 122:12
craft 9:11
crashed
146:11 152:17,
19, 21 153:1
create 146:17,
19, 21 264:7
266:8
created 143:6
148:3, 6
creating
266:20
credibility
245:6, 12
credible 139:7
credit 93:19,
23 95:3, 10, 15
110:10, 17, 20
197:7
creepy 212:22
crime 33:18
243:22
criminal 13:24
15:17 69:2, 7,
18 77:24

83:14, 23
87:13 90:14
91:1 101:18
103:2 133:13
138:6 185:5
221:5 226:22
229:24 230:13
249:20 250:19
cross-examine
116:7
current 9:12
96:10 104:15
123:13 150:12
154:16 269:15
292:15, 17
currently
43:23 56:4
64:24 111:4
129:6 147:18
266:1 268:2
custodian
258:24
custody
151:13 258:11
cut 36:12
153:5, 7 173:1

< D >
DA 181:5
246:5
Dallas 145:3,
4, 5
damage 50:16,
23
damages 34:6
36:23 38:3
dance 219:9
DANIELLE
2:11 5:24 7:6
23:23
danielle.rosenth
al@phila.gov
2:14
Darrell 207:2,
6 208:6 213:1
data 280:9
date 20:24
28:18 32:4
60:12 71:21
80:11 101:11,
12 107:4, 12,
23 112:6
131:23 132:2,
6, 9 136:24
137:2 146:17,
23 152:3, 5
163:8 170:23
171:2 175:13
178:4 185:24

186:8 188:10
189:7 190:13,
22 191:16
197:18 201:20
205:23 208:4,
7 225:6
239:16 240:19
274:4 292:8
305:19 306:13
308:2
dated 71:23
121:10 170:22
186:2 189:5
192:1 200:17
225:5 228:7
231:7 273:24
274:7 293:17
294:9
dating 284:15
290:17, 20
294:17
Daughter
202:8, 9
day 178:7, 8
194:10
days 71:11
DeAndra 44:7
DeAndre 15:1
44:8 65:9
214:10
death 154:3
deceased
268:7, 8
December
190:24 227:17
228:7 230:3
decided 305:20
deed 43:20
defendant
14:6, 7, 20, 22
Defendants
1:1 2:16 6:1
7:8
defending
12:6 31:5
defense 32:18
69:7 83:23
96:10 301:23
302:6
definitely
99:10
degree 53:8
55:9
delete 81:12
150:9, 14
152:24 194:15,
21
deleted 88:5
148:14, 16

150:1, 11
199:8, 9
298:12
demolition
59:21 60:2, 16,
23 61:2 62:20
63:11 64:6
Dennis 85:12
87:3
DEPARTMEN
T 2:10
161:20 188:23
189:22 200:11
215:19 225:1
278:13, 21
280:3, 6 281:1
282:2
depend 80:17
depends 80:18
deposed 7:5
13:6 16:4
25:1, 2
deposit 109:3,
15 110:7
deposited
119:6 192:12
Deposition 1:1
5:5, 9, 23 7:9,
17 9:19 10:18
12:6, 16 16:7,
9, 19, 23 17:17
18:2, 16, 23
21:1 23:1, 19,
20 24:12, 13,
19, 24 25:6, 14
26:11, 22 27:6,
9 31:6 70:11
72:12 82:9
96:19 303:15
312:6, 9
depositions
27:12 51:15,
17
Derrick 70:15
73:2 75:11
247:16, 20
248:2
describe 16:12
28:4, 14 66:3
71:19 72:15,
18 120:7
143:1 151:6
157:16 170:17
176:4, 18
185:22 192:22
197:4 254:6
282:23 286:17
290:1 293:14

describing
72:7 108:19
DESCRIPTIO
N 3:10 4:1
66:5
designed 8:24
desktop 146:9,
11 152:16
158:11 292:18
destroy 21:16
83:5 273:5, 18
destroyed
169:16 176:21
179:14
detail 164:16
details 218:15
Detective
34:10, 16
178:8
Detectives 6:6
7:7 33:11
35:7 138:7, 10
139:13, 17
determine
245:12
develop
240:24 244:19,
22
developed
245:4 285:3
developing
58:7
dictate 133:3
220:10
die 42:4
difference
63:17 127:19
176:13, 14, 19
differences
179:10
different
37:12 45:23
50:3 68:3
155:23 157:2
160:6 172:17
176:15 178:18
258:24 286:24
294:17
differentiate
108:10
differently
30:13 200:11
298:13
difficult 23:24
235:13
diligence
266:17
dime 204:11

direct 20:21
116:3 161:8, 9
227:10 248:9
300:4 313:21
directed 20:20
25:13 26:9
69:12
directing 82:14
directly 21:11
91:13 134:23
161:10 193:19
210:19 233:14
258:16 274:1
disagree 19:22
20:7 23:13
29:18, 19
31:19 82:5, 20,
23
disagrees
266:13
disclose 283:18
disclosed 246:5
discoverable
41:21
discovery 52:4
discrepancies
176:10
discuss 20:9
121:15 170:11
273:17 278:22
303:20 304:4
305:7
discussed
34:19 38:9
191:10 233:14
237:20 271:1
discussing
234:10
discussion
259:19 280:17
discussions
35:20 38:18
82:17 112:19
113:2
dismissed 99:2,
3, 24 101:14,
19 103:6, 23
104:8 235:18
305:11
dispose 100:3,
10 184:21
disposing
100:21 103:4
dispute 13:2
262:11 269:19
distinct 127:18
distinction
165:15

distinguish 311:*12*
distortion 171:*10*
DISTRICT 1:*1*
divorce 131:8
divorced 132:5, *8*
divulge 112:*19*
doc 67:*14* 192:*17* 200:6 215:*14* 224:*12* 256:*12* 258:*15, 17* 262:9 263:*13* 264:*12* 308:2
Docket 67:*1* 84:*3*
docum 167:*11*
document 65:*18* 66:*1, 4* 70:20 71:5, *17* 84:5 96:2 120:*20, 22* 121:6 142:*14, 21, 23* 143:8, 21 144:*1* 145:*14* 146:*13* 150:*18* 151:*3, 4, 12, 16, 20* 152:*4, 6, 10, 24* 156:*11* 157:8, 9, 14 158:*14* 163:*11* 169:*10, 22* 170:6, *14* 172:20 175:*19, 21* 176:2, 5 179:9, *21* 180:*3, 5* 183:*17* 184:*11, 21, 24* 185:*1, 2, 12, 19, 20* 187:*3, 21* 188:*12, 14, 18* 192:*4* 199:*17, 23* 200:*4* 206:*14, 21* 207:*1* 208:*12* 209:*1* 215:6 230:*19* 241:*13* 252:*1* 255:*16, 18* 259:*1, 22* 260:*3, 10, 18* 261:*7, 23* 270:*4* 271:*16, 22, 24* 279:*4, 17* 281:24 282:*1, 21* 285:*16, 21*

286:*13, 15* 287:*19* 288:*1, 5, 7* 289:*10, 14, 16, 23* 291:*14, 16* 293:5, 7, *12* 294:22 295:*13, 15* 297:*18, 20* 306:*17*
documentation 239:*24*
documents 16:*20, 24* 17:*3, 6* 20:*12, 13, 15, 16* 25:*13* 27:*15* 31:5 51:*23* 67:*4, 8, 10, 16, 18* 68:7 70:6, 9 71:*3* 72:5, *16* 73:*19* 77:2 81:*18, 23* 82:*22* 83:5 84:8 90:*1* 91:*3, 12* 92:6, *10* 96:*14, 24* 97:*1* 99:*10* 100:*1, 11, 12, 16, 21, 23* 101:*3, 6, 16, 20, 24* 102:6, *23* 103:5, 7 104:*13* 105:*2, 8, 11* 106:*10, 20* 113:9 134:22 135:*1, 6, 9* 163:*15* 174:20 175:*12* 176:*10* 179:2 184:*2, 13, 17* 189:*15* 236:5 237:*12* 238:8 257:*1* 258:*15* 260:*19, 24* 273:*1, 2* 277:*11, 15, 22* 278:5 279:*3* 280:*10, 24* doing 80:*20* 128:*23* 133:*16* 229:*17* 279:5 308:*23*
dollar 57:2, *15* 109:*23*
dollars 38:*17*
Dom 252:*20, 23* 254:*11*
Don 138:*4* 153:6 158:*18* 172:*23* 174:*10* 195:*19* 203:7,

11, 23 209:22 210:*1, 2, 4, 14* 216:*17* 217:*23* 218:*4* 219:*1* 223:*20* 226:9 243:*16* 244:*4* 247:*4, 9, 12, 14* 264:*1* 285:*11*
DONALD 1:*1* 5:7, *20* 33:*10* 43:*24* 61:*1* 66:*22, 24* 68:*16* 84:*3* 96:*13* 115:*14* 116:*21* 126:*4* 132:*4* 133:*13* 137:*20* 138:*16* 139:5 143:*11, 13, 16, 18* 144:*13* 146:*20* 148:*6, 7, 10, 12* 149:*17* 158:*18* 161:5 187:9 196:9 201:5, 7 210:7 212:*15* 214:6, *11, 16, 17, 20* 226:*3, 17* 233:*23* 243:*1* 253:*1, 4, 22* 254:*3, 10, 20* 267:*24* 273:22 276:24 285:*13* 301:*12* 303:8 307:*1* 311:*3*
Donald's 134:8 135:*21* 166:*3* 169:8 207:9, *17* 218:*19* 239:8 275:*16* 283:*20* 307:*15*
Don's 69:2 88:*23* 143:6 170:*19* 185:*10* 223:*11, 14* 225:*24* 236:*16* 272:*18, 20* 297:*1*
doubt 245:5 261:*13, 20*
draft 50:*16, 17* 158:*10*
drafted 152:*15* 186:*10* 188:5 291:*24*
drafting 186:*17*

drafts 29:*3, 8*
draw 208:*2*
drive 146:*14* 152:*22*
dropped 113:*18*
drugs 138:6
due 148:*16* 266:*16*
duly 6:*12*
dump 280:9
duplicative 259:*1*

< E >
earlier 46:*4* 236:*13* 237:*20*
early 120:*13* 161:*4* 308:*20*
earn 117:2
East 123:*14, 15* 269:*3, 4*
EASTERN 1:*1*
eat 141:*5*
Ed 86:*21* 87:5 166:*19* 174:*16, 20* 175:6, *16* 179:*19* 231:*17* 272:*3*
education 52:*19* 53:*19, 21*
Edward 85:*12*
efficient 105:*11*
effort 98:*15*
efforts 84:7 96:*8* 97:*3* 98:*1, 6* 106:*9* either 38:*15* 56:9 91:*13* 119:*12* 204:*1* 229:*15* 230:9 254:2 279:*1* 281:2 300:2 307:*3*
elaborate 63:*23* 116:9 119:*21* 254:8
elapses 194:*20*
elementary 119:*23*
elements 32:*16*
else's 199:5 245:2
email 69:*10* 73:*21, 23* 74:*1* 75:*18* 76:2, 6,

24 77:5, *17* 79:5 83:*17, 18* 86:8, *11, 12, 13, 19, 22* 87:6 88:7, 8, *14, 19* 89:*15, 19* 90:*3, 6, 10* 91:*10* 92:7 93:*15* 94:*3, 5, 13* 96:*1* 98:*17* 144:*16* 151:*21, 22* 152:*1, 11* 163:6 174:*18* 175:2, *15, 16* 193:*3, 4* 198:*14, 15* 199:*14* 220:*13* 227:*21, 22* 230:7 237:*17* 244:2 251:*9, 10* 254:*13, 15, 16, 17* 262:*17* 263:6, 9 264:*8, 13, 15, 18, 19, 21* 265:4, *24* 266:*3, 5* 268:*14, 17* 269:*11, 12* 272:*3* 274:*17* 276:*11* 278:2 298:2, *7* 309:*18*
emailed 91:9 175:*3* 237:*7, 22* 290:8 310:*18*
emailing 237:*19*
emails 74:*8, 21* 81:*12* 88:*3* 151:*14* 158:*15* 175:6 192:*24* 265:*1* 290:*15* 298:*4, 8* 307:*17*
employed 22:*21* 30:*15* 49:6, *22* 59:*10*
employee/emplo yer 54:*10*
employees 56:*14* 103:2
employer 49:8
employers 49:9, *12* 52:7 54:8
employment 117:*16* 134:*1*

encourage 138:*14*
ended 160:2 273:*10* 309:*11*
engaged 30:8 240:*11* 283:*24*
entailed 52:*12*
enter 197:6 301:*22*
entered 74:6
entire 110:7
entirely 259:*3*
entirety 143:*10* 239:*9*
entitled 19:*18* 21:*18* 23:7
entries 189:*1*
entry 189:*4, 7* 200:*14* 208:*3* 215:*23* 222:*11* 225:*4* 228:6 241:*24* 246:*16* 267:*18*
envelope 174:5 180:6, *8, 10* 182:*3, 18, 20* 183:*1, 8, 22* 185:6
envelopes 181:*11*
Eric 70:*15* 73:*1* 91:*16*
especially 237:6 258:*11*
ESQUIRE 2:*4, 11*
established 30:6
estimate 53:2 99:*11* 110:2 144:*24* 147:*1* 157:*24* 158:7 162:*10*
et 1:*1*
ethical 64:*16* 101:*17*
event 127:*3* 300:*16*
events 8:*17* 11:7
eventually 160:*3*
evidence 32:*13* 34:*13, 18* 41:*21* 81:*19* 104:*1, 2* 166:*11* 313:*1*
evidentiary 231:*22*

exact 32:4
45:14 57:2, 14
60:12 101:12
107:4, 12
109:23 112:6
124:6 131:23
132:6, 9
136:24 137:12
146:23 152:5
186:8 188:10
197:18 239:16
240:19 292:8
305:19
exactly 28:16
54:6 55:17
116:11 117:10
155:3 157:3
159:19 273:16
274:15
EXAMINATIO
N 3:6 7:1
301:5
examined 6:13
example 38:16
74:20 77:1
78:24 79:7
90:9 92:13
95:4 97:11
98:3 102:8
105:17 114:5
177:22 259:5
excerpt 200:3,
5 206:20
215:13 224:15,
22 227:3
230:18
exchange
88:16 219:14
exchanged
79:12 88:21
128:15
excludes 26:13
excluding
24:14 26:18
exclusively
43:17 50:10
Excuse 42:7
55:14 61:17
78:10 95:7
Exhibit 3:10
4:1 64:22
65:20, 22 66:6,
9, 14, 18 71:6,
9, 13 72:21
120:21 121:2,
3 142:14, 17,
20 150:19, 22
157:9, 11
169:23 170:2,

8 175:20, 23
176:6, 8, 20, 22,
24 177:1, 16
179:11, 23
180:11 185:12,
15 187:22
188:13, 15
190:21 199:20
206:15, 17
215:7, 9
224:14, 17
227:6 230:17,
22 238:9
241:14, 17
252:10 255:17,
21 259:23
271:17, 19
281:20 282:5,
15 285:15, 17
286:9, 10
287:18, 20, 23
288:2 289:10,
11 291:8, 11
292:24 293:2,
23, 24 294:22,
24 295:9, 10,
11 297:15
305:23 306:7
EXHIBITS
4:24
exist 90:11
133:5
existence 90:4
expect 38:14
expecting 37:1
experience
37:6 40:2
186:20 194:4
203:17, 19
experienced
34:8
expert 111:24
experts 112:1
Explain 55:2
108:10
explained
122:16
explaining
185:10 223:5
explore 76:14
expression
204:10
extent 21:13,
14 29:12
35:18 112:11
extra 220:2

< F >
face 276:13

Facebook
143:6, 23
144:3, 5, 17, 20
145:12, 13
146:18, 19
147:12, 17, 20,
23 148:4, 6, 7,
15 149:5, 6, 8,
14 150:13
265:7, 8
Facebook.com
149:2, 7
facilitate
136:5, 8
facilitating
221:8
fact 24:24
34:4, 5 140:22
164:21 258:22
279:12 283:24
failed 33:13
faint 8:21
fair 41:1 76:4
153:11 160:13
182:9 285:2
fall 67:4
Falls 48:16
182:22
false 186:11,
16
familiar 10:22
27:18, 20
64:15, 19
75:20 104:12,
20 118:10
161:3 192:19
267:10
family 44:1
54:19 100:22
124:22 125:18,
20 127:3
140:17 196:15,
19 201:9
far 29:23
63:24 69:22
100:20 142:4
191:12, 20
222:22 242:21
Fargo 107:20
109:21
faster 256:10
father 65:12,
13, 15 213:9,
12, 16
fault 111:18
fed 251:12, 21
255:8

federal 61:3
114:10, 14
115:3 133:2
fee 301:16
feel 94:12
104:7 185:8
244:3
feelings
244:12, 19, 23
245:4
feels 20:22
22:3
fees 12:15
13:1 301:20
fell 255:7
felt 139:11, 16,
18
female 233:8
fifth 306:12
fight 250:16
fighting
128:19 244:5
250:19
figure 237:2
figured 173:20
file 88:24
89:7, 9 98:4,
12 103:8
104:3, 9 105:5
111:13 113:14,
21 134:22
151:23 166:1,
3 167:9, 10
169:8, 9, 10, 11,
16, 19 184:5, 6,
8, 16, 18 185:7,
9 236:6, 14, 16,
17, 21 239:8
251:24 272:19,
20, 23 273:4
275:16 276:4
305:2 308:13
filed 57:20
61:2, 22 64:1
81:10, 14, 15
111:1, 5, 8, 9,
12 113:17
115:3 135:7,
10 184:10
185:3 237:15
files 98:7
134:20 273:7
279:12
filing 29:1
37:2 111:18
114:23 181:24
182:4, 8 305:8
filings 77:23

fill 58:17
99:18
filled 177:2
final 29:9
78:21 300:9
finally 35:6
finances 60:18
financial
37:23 41:4
financially
41:12, 14
find 65:19
71:2 139:7
169:13 299:16
fine 52:6
185:24 235:3,
11, 14 238:3
finish 9:21
finished 36:12
fire 235:24
236:9, 10
firm 5:16
22:8 114:3
128:22 129:2
134:1 303:7,
11
First 7:19
30:14 68:3
72:20 101:7
119:17 122:3
125:10 131:10
135:17 140:1,
8 148:24
157:18 159:22
161:2 164:12
166:9 171:9
176:8, 24
189:1, 4 197:7
201:1, 21, 24
204:3 207:5
208:3 243:8
247:1, 3 248:8,
12 252:15
255:1 263:5
264:4 272:8
277:20 286:2
295:22 296:9
301:10 303:5
305:7
fish 265:16
fishy 220:3
fit 51:4 99:16
five-minute
223:23 300:10
fix 25:24
flashback
238:1
flipped 255:8

floating 248:6,
7
Floor 1:1
2:12 5:11
flyer 145:10
156:22 157:1,
2, 3, 18 158:4,
8, 11 159:23
160:1, 3, 5, 7,
10, 11, 15
flyers 134:13,
19 144:19
151:8 152:9
157:5 159:21
160:16, 22
focusing
227:23
fodder 39:17
folks 220:23
229:13
following
72:24 91:15
178:8
follows 6:14
follow-up
299:17
font 178:9
187:3
food 307:3
foregoing
313:1, 18
forget 235:19
305:23
forgot 159:24
form 25:16
91:12 94:17
95:22 175:9
199:24
former 96:10
97:24 103:1
130:3 269:16
forms 37:10
92:18 93:10
forth 128:16
192:24 195:11
fortunate
307:10
forward 86:3
134:15 136:11,
14
Foster 85:12
86:21 87:5
166:19 167:17
174:16, 20
175:6, 16
179:19 231:17
237:1, 17
272:3
found 243:24

foundation
261:*4*
four  214:*18*
four-page
120:*22*  170:*6*
four-year
53:*15*
frame  137:*12*
freaking
309:*21*
free  10:*7*
134:*7*
frequent
206:*11*  220:*16*
frequently
139:*21*  155:*19*,
*24*  206:*8*
210:*11*
**Friday**  1:*1*
308:*13*  309:*5*
friend  47:*24*
48:*2, 3*  196:*19*
207:*9*  217:*24*
225:*24*  226:*1*
252:*23*
friends  126:*2*
195:*12*  201:*7*
207:*17, 19, 21*
208:*1*  210:*13*
218:*8*  225:*13*
241:*7*  247:*5*
254:*5, 12*
307:*1, 15*
friendship
240:*24*  244:*11*
246:*6, 7*
253:*10*  285:*3,*
*5*
fries  265:*16*
front  185:*18*
215:*13*  276:*12*
292:*6*
fuck  220:*4*
full  27:*22*
42:*24*  205:*4*
206:*24*  213:*3,*
*4, 7*  289:*5*
291:*20*  294:*11*
full-time  53:*13*
fully  11:*4, 8*
313:*1*
functional
288:*24*
further  20:*1*
312:*1*

**< G >**
gal  310:*5*

Gathering
51:*23*  94:*9*
gears  119:*16*
Gelman  97:*13*
general  106:*1*
109:*14, 18*
134:*12*  195:*24*
generally
38:*15*  72:*18*
generated
56:*16*  57:*22*
58:*1*  60:*13, 22*
Germantown
123:*1*
gestures  8:*3*
Getting  19:*16*
52:*12*  57:*11*
94:*8*  103:*4*
113:*9*  118:*5*
136:*15*  251:*23*
gift  306:*14, 21*
girl  297:*2*
give  8:*5, 21*
53:*1*  57:*5*
79:*14*  89:*9, 15*
92:*23*  93:*4, 6*
96:*22*  99:*9, 11*
102:*15*  105:*16*
123:*2, 4*  124:*6*
137:*1, 19*
152:*7*  157:*23*
162:*10, 11*
170:*9*  180:*18*
196:*6*  197:*20*
218:*14*  286:*24*
306:*23*  307:*6,*
*9*
**Given**  30:*18*
117:*7*  186:*20*
243:*13*  250:*4*
giving  89:*16*
168:*15*
glad  98:*9*
100:*2*
Gmail  194:*12*
go  7:*16*  8:*5*
9:*19*  18:*1*
42:*9*  45:*13*
50:*20*  57:*9*
66:*20*  72:*17,*
*19*  74:*12, 18*
78:*11*  80:*21*
84:*22*  94:*19*
100:*20*  105:*10*
116:*9*  131:*20*
137:*13*  138:*13,*
*14*  141:*21, 24*
186:*15*  194:*10*
204:*20*  211:*19,*

*21*  216:*15*
217:*8*  224:*20*
227:*1*  240:*16*
250:*14*  253:*15*
256:*6, 10*
267:*14*  271:*6*
280:*11*  281:*10*
299:*8*  300:*12,*
*19*
goes  74:*17*
108:*14, 21*
131:*21*  230:*8*
271:*3*
going  6:*21*
8:*16*  20:*4, 7*
23:*3, 24*  25:*1*
29:*11, 15*
30:*12*  42:*12*
65:*17, 18, 19*
71:*6*  72:*19*
74:*18*  78:*13,*
*20*  82:*2, 16*
92:*22*  96:*7*
98:*3*  111:*24*
116:*4, 5*
119:*16*  120:*21*
141:*2*  142:*6,*
*13, 14*  150:*18*
155:*16*  157:*7,*
*8*  160:*23*
164:*21*  169:*23*
170:*8*  175:*19*
179:*21, 22*
183:*11*  187:*22*
188:*12*  192:*15*
199:*17, 18*
200:*7, 9*  204:*6*
206:*14*  209:*22*
210:*14, 16*
215:*5, 6*  224:*4,*
*14, 20*  225:*9,*
*14*  227:*1, 9*
230:*17*  236:*9*
241:*13, 14*
255:*17*  256:*4,*
*9*  258:*6*
259:*22, 23*
262:*1, 4*
271:*14, 16, 17*
273:*10*  277:*11*
278:*20*  280:*12,*
*15, 23*  281:*7,*
*13, 20*  282:*18*
286:*8*  292:*24*
293:*22*  297:*13*
300:*9, 13, 22*
305:*22*  307:*23*
308:*3*  312:*7*

**Good**  7:*11, 12*
53:*3*  58:*11*
227:*13*  230:*5,*
*6, 7*  236:*1*
254:*4, 7, 8*
goods  91:*13*
92:*23, 24*
95:*23*
gotten  238:*19*
277:*23*  278:*8*
government
114:*14*
graduate
52:*23*  53:*24*
**Great**  33:*2*
**Green**  223:*11*
272:*6*  276:*15*
greeting  203:*4,*
*5*
grew  119:*18,*
*20*  120:*5*
122:*17*  125:*19*
126:*1*  207:*15*
247:*10*  252:*24*
253:*24*
ground  7:*16*
130:*10*
grounds  12:*21*
116:*1*
group  146:*19*
148:*2*
grow  226:*8*
247:*7*
growing
212:*16*
grown  202:*10*
**GTL**  161:*20*
183:*14, 19*
192:*18*  200:*5,*
*9*  206:*5*
guess  9:*3*
35:*2, 5*  37:*11*
57:*4*  93:*9*
97:*15*  117:*11*
211:*10*  227:*12*
guidelines
64:*17*
guilty  304:*20*
guy  243:*1*
247:*4*
guys  141:*24*

**< H >**
half  58:*10*
hand  72:*23*
91:*15*
handing
144:*18*

handle  60:*15*
handles  60:*18*
handsigned
102:*9*
handwriting
158:*18, 20, 22*
159:*1*  286:*1*
handwritten
102:*9*  292:*12*
hang  126:*11*
happen  36:*17*
203:*19*
happened
79:*24*  146:*10*
147:*4*  178:*23*
182:*24*  198:*18*
232:*24*  239:*4*
288:*20*
happy  8:*10*
133:*6*  200:*2*
278:*9, 22*
279:*1, 5*
harassing
132:*18*
hard  60:*19*
77:*19*  79:*17*
88:*16, 21, 23*
89:*12, 16*
152:*21*  167:*1*
183:*13, 17, 19*
237:*21*  302:*7*
hard-copy
249:*9, 12*
**Harmon**  70:*17*
73:*2*  74:*16*
91:*17*  200:*16*
201:*2, 5*
202:*17*  205:*24*
207:*24*  211:*18*
212:*7*  215:*14,*
*17*  216:*1*
217:*24*  218:*4*
221:*3, 21*
222:*6, 12*
223:*16*  248:*24*
**Harmon's**
200:*6, 12*
217:*12, 13*
223:*15*
hate  308:*23*
309:*14*
**Haze**  2:*16*
5:*13*
head  84:*16, 18*
255:*7, 8*
heading
121:*22*  289:*19*

health  54:*16*
55:*4, 11, 12, 16,*
*19*  59:*4, 9, 12*
hear  8:*9*
137:*14*  310:*22*
311:*8, 11*
heard  8:*13*
58:*19*  80:*12*
163:*19*  255:*6*
271:*10, 12*
hearing  13:*15*
98:*6*  139:*8*
231:*22*  256:*2*
285:*9*  311:*21,*
*22*
heat  142:*4*
**Heights**  42:*21*
held  5:*10*
33:*11*  36:*16*
280:*17*
help  8:*5*
50:*15, 18, 22*
128:*4*  134:*9,*
*10, 14*  136:*13*
156:*10*  175:*7,*
*12*  192:*4*
246:*14*
helped  59:*18*
helpful  71:*20*
72:*17*
helping  50:*24*
128:*21*  251:*19*
284:*14*
**Henricks**  85:*6,*
*11*  87:*1*
hesitate  299:*8*
hesitating
100:*15*
**Heyward**
196:*17, 19*
hi  120:*10, 14,*
*15*  126:*5*
127:*2, 3, 14*
higher  53:*21*
history  188:*24*
hit  211:*14*
hold  35:*7*
**Holder**  70:*16*
73:*3*  93:*17*
95:*24*  135:*24*
211:*4, 5*
306:*17, 21*
307:*13*
holding  100:*23*
holler  226:*14*
home  42:*19*
54:*5, 16, 19*
55:*4, 11, 12, 16,*
*19*  59:*3, 9, 12*

195:*20*  198:*22*
264:*1*  275:*5, 7*
**honestly**  55:*6*
80:*18*  111:*17*
137:*17*  147:*2*
220:*19*  285:*5*
307:*4*
**Hopefully**
246:*19*
**hour**  137:*11*
141:*21*  300:*15*
**hours**  11:*1*
303:*1, 17*
**house**  44:*20*
45:*1, 10, 12, 17*
46:*7, 9, 20*
47:*6*  48:*5*
98:*19, 21, 23*
108:*17, 23*
128:*2*
**Howard**  6:*2*
**hugs**  242:*12*
**hundreds**
38:*16*
**hung**  149:*11*
**husband**
24:*20, 21*  32:*2*
33:*9*  59:*6, 23*
186:*21*  197:*21*
198:*7*  210:*11*
302:*10*  303:*21*
**husband-and-**
**wife**  35:*3*
**hypothetical**
198:*17*

**< I >**
**idea**  15:*6*
28:*12*  122:*23*
157:*5, 6*
162:*24*  178:*22*
179:*17*  203:*12*
213:*17*  220:*7,*
*11, 17*  229:*14*
230:*2*  254:*24*
260:*21*  261:*6*
274:*4*
**ideas**  59:*18*
**identification**
65:*23*  71:*14*
121:*4*  142:*18*
150:*23*  157:*12*
170:*3*  175:*24*
179:*24*  185:*16*
188:*16*  199:*21*
206:*18*  215:*10*
224:*18*  227:*7*
230:*23*  241:*18*
252:*11*  255:*22*

271:*20*  282:*16*
285:*18*  286:*11*
288:*3*  289:*12*
291:*12*  293:*3*
294:*1*  295:*1,*
*11*  297:*16*
306:*8*
**identified**
112:*24*  279:*10*
**identify**  11:*14*
277:*22*  279:*2*
**identifying**
213:*18*  218:*14*
225:*15*  229:*20*
**ignorance**
212:*6*
**imagine**
162:*16*  236:*19*
**immediate**
126:*19*
**immediately**
44:*21*  80:*15*
128:*12, 14*
183:*23*
**impair**  11:*2*
**impending**
104:*14*  105:*3*
**implicated**
226:*21*
**impossible**
174:*22*  198:*10,*
*21*  235:*8*
**improper**
179:*2*
**inaccurate**
111:*16*
**inappropriate**
32:*23*  132:*18*
245:*14, 19*
**inaudible**
59:*19*  221:*18*
309:*24*  310:*12,*
*14*
**inbox**  298:*10,*
*14*
**incarcerated**
34:*5, 7, 8*
59:*14*  115:*14*
116:*22*  127:*21*
136:*19*  163:*9,*
*10*  186:*21*
187:*2*  195:*3*
197:*21*  201:*6*
211:*6*  226:*4, 6*
228:*20, 23*
**incarceration**
44:*16*  122:*7*
**include**  73:*8*
91:*22*  247:*21*

**included**
88:*11*  181:*23*
182:*3*  236:*14*
257:*5*
**including**  22:*9*
68:*14*  72:*6*
78:*1*  83:*24*
87:*14*
**income**  56:*16*
57:*23*  58:*2*
60:*13*  61:*8, 10*
62:*19*  64:*3, 9,*
*13*  105:*12, 15,*
*16, 20, 23*
106:*6, 13, 23*
117:*2, 15*
**Incoming**  4:*1*
88:*11*  207:*1*
208:*5, 11*
215:*16, 18, 24*
222:*11, 18, 20*
224:*24*  241:*21*
243:*11*  252:*8*
**incorrect**
122:*10*  238:*5*
288:*1*
**incorrectly**
111:*6, 8*  112:*5*
**increase**  133:*8*
**increased**
118:*15, 16*
**independent**
54:*13*  145:*6*
**independently**
113:*1*  128:*23*
129:*1*  278:*14*
**indicate**  115:*8,*
*20*  116:*18*
**indicated**
138:*20*
**indicates**
244:*11, 12*
**Indicating**
178:*11*
**indirectly**
91:*14*  259:*6*
**individual**
30:*23*  68:*14*
77:*11*  108:*11,*
*15*  109:*8*
110:*20*  208:*13*
218:*7*  269:*7*
**individuals**
22:*23*  23:*5*
24:*2, 13*  39:*15*
72:*24*  73:*9*
74:*11*  76:*2, 7*
77:*8*  78:*4*
81:*9, 13*  86:*10*

88:*4, 14*  90:*18*
91:*15, 23*
92:*22*  94:*12*
95:*5, 12, 22*
136:*10*  154:*2*
195:*3*  204:*20*
206:*1*  260:*5, 7*
261:*11*  262:*8,*
*21*  263:*13*
270:*6*
**individual's**
74:*6*  75:*3*
225:*10*
**info**  211:*8*
**infor**  135:*22*
**information**
19:*19*  29:*14*
35:*19*  92:*10*
134:*16*  135:*22*
154:*3*  162:*12*
165:*1*  197:*6, 8*
211:*11*  217:*14*
225:*16*  229:*21*
251:*20*  256:*18*
257:*11*  258:*2*
**initially**  285:*8*
295:*23*  296:*10,*
*16*
**ink**  178:*14, 18*
**inmate**  93:*14,*
*15*  165:*4*
192:*13*  193:*6,*
*10*  198:*3*
208:*13*  222:*20,*
*21*
**inmates**
186:*22*  187:*4*
193:*18, 19*
203:*16*  210:*17*
307:*12*
**Innocence**
85:*16*  87:*8, 16*
134:*9*
**innocent**  304:*6*
**Instagram**
265:*9, 10, 15,*
*22*
**instance**  96:*11*
246:*4*  249:*14*
**instances**
198:*23*
**instruct**  23:*3*
277:*6*
**instructing**
19:*21*  30:*3*
132:*16*  245:*16*
**instruction**
81:*17, 21*

**insurance**
50:*15*
**intended**  73:*8*
**intending**
101:*7*  102:*24*
103:*12*
**intention**
273:*18*
**interest**  54:*12*
**interested**
84:*21*
**interests**  21:*22*
22:*10*  23:*6*
**interpreted**
106:*5*
**interview**
135:*17, 19*
**intricacies**
19:*17*
**introduce**  5:*17*
**introduced**  7:*5*
**introductory**
10:*22*
**invested**  57:*1*
**investigation**
39:*18*
**investigator**
87:*17*
**investigators**
22:*9, 22*  25:*10*
26:*7*  68:*15*
69:*1*  87:*12, 21*
**involved**  15:*3*
60:*16*  126:*13*
139:*4*  164:*19*
226:*21*
**involving**
81:*13*
**irrespective**
158:*14*
**Ishira**  202:*13*
**Islamic**  203:*5*
212:*1, 3, 14*
267:*13*
**issue**  112:*24*
**issues**  35:*24*
85:*14*  281:*22*
304:*10*
**item-by-item**
72:*17*
**items**  66:*9, 10,*
*14, 19*
**iteration**
160:*14*
**its**  29:*1*  103:*1*
133:*8*  143:*10*
239:*8*

**< J >**

**Jabril**  73:*5*
91:*19*  238:*10,*
*13*  239:*6*
272:*5, 9, 10*
274:*2, 8*
**Jackson**  70:*18*
73:*7*  91:*21*
156:*22*  160:*14*
232:*1, 21*
233:*2, 15*
234:*11, 14*
239:*18*  240:*15*
242:*2, 5, 9*
311:*17*
**Jackson's**
232:*7*
**Jacob**  113:*24*
**jail**  164:*4, 12*
211:*6*  239:*21*
240:*17*  243:*22*
273:*1*  275:*3*
**jailhouse**
251:*18*
**Jalil**  270:*16, 19*
**Jamal**  120:*4*
122:*19*  124:*2*
126:*8*  127:*7*
**Jamil**  213:*22*
**January**  56:*21*
170:*23*  186:*2*
188:*8*  190:*23*
231:*7*  232:*5*
233:*21*
**Jay**  219:*17, 22,*
*24*
**Jeffrey**  6:*3*
**job**  38:*11*
96:*20*  106:*16,*
*17*  310:*10*
**jog**  173:*17*
**jogs**  9:*13*
**joint**  105:*12,*
*15, 16, 19, 23*
106:*5, 12, 22*
107:*16, 18, 24*
108:*11, 14, 16*
109:*6, 16, 21*
110:*10*  111:*1*
117:*8*  119:*6, 9*
301:*23*  302:*6*
**jointly**  111:*12,*
*21*  113:*17*
114:*24*  115:*1*
**Jonathan**
125:*7*
**Jones**  73:*5*
91:*19*  125:*7*
225:*17, 23*
226:*20*  238:*10,*

*14* 239:6
272:*5, 10, 11*
274:*9*
**Josh** 11:*16*
**JOSHUA** 2:*4*
*5:19*
**JPay** 93:*16, 20*
94:2, *4* 95:*14,
16* 96:*5*
**JR** 213:*8, 9,
14, 21, 24*
214:*11, 16, 17,
20* 219:*19, 21*
**judge** 30:2
82:*10*
**judgment**
38:23 40:*13*
41:*3, 17*
**Julia** 69:*10*
**July** 1:*1* 5:*11*
71:*11* 215:23
**jump** 192:*15*
269:*5*
**June** 43:*8, 15*
246:*14* 263:*19*
**jury** 245:*13*
**jury's** 38:*11*
**Justice** 148:*12*
149:*17* 305:*4*
**Justin** 65:*16*
**juvenile** 85:*14*
251:*23, 24*
**jvannaarden@v
scplaw.com**
2:*6*

**< K >**
**KATELYN**
2:*11* 6:*4* 7:*15*
**katelyn.mays@
phila.gov** 2:*14*
**Katima** 70:*18*
73:*6* 91:*21*
156:22 160:*14*
231:*24* 232:*21*
233:*2, 15*
234:*11, 13*
239:*18* 240:*14*
242:*2, 4, 5, 9*
311:*10*
**Katz** 49:*11, 15*
50:*5* 51:*10*
52:*3*
**keep** 57:*24*
80:*3, 4, 16*
105:*5, 8*
109:*12* 130:*19*
184:2, *16*

235:20 283:*15*
311:*16*
**Keith** 73:*5*
75:*23* 91:*20*
**Kelly** 120:*4*
124:2 126:*9*
127:*7*
**Kelly's** 122:*19*
**Kendra** 270:*16*
**kept** 103:*23*
165:22 236:*17*
276:*3*
**Kevin** 73:*6*
75:*24* 91:*20*
268:*7*
**key** 83:*9*
**kind** 99:*23*
184:*24*
**kisses** 242:*12*
**knew** 103:*21*
211:22 212:*18*
234:*16*
**know** 8:*9* 9:*6,
15* 10:*4, 14*
11:22 14:*10,
12* 15:2 19:*19*
21:*18* 23:*7*
28:*10* 31:*7, 9,
11* 33:*16, 20*
34:*9* 35:*4, 5,
10, 22* 36:*6, 14,
17, 20* 47:*3*
48:*3* 55:*6, 22*
57:*2* 58:*10*
59:*7* 60:*24*
62:*21, 23*
63:*15, 21*
67:*16* 74:*10*
75:*11, 16* 76:*1,
14* 84:*14* 85:*1,
4, 18* 87:*16, 19*
89:*10* 93:*8*
97:*10* 99:*14*
100:*18, 19*
113:*7, 8, 13*
114:22 119:*4*
120:*3* 123:*5, 6,
7* 124:22
125:*1, 3, 20*
126:*13, 24*
127:*15* 129:*13*
130:22, *24*
131:*1, 2, 4, 5*
135:*18* 136:*4,
10* 137:*3, 16,
18, 23* 138:*7*
139:*24* 140:22
144:*21* 147:*2*
150:*12* 152:*5,*

8, *14, 19*
153:*23* 154:*15*
155:*7* 156:*21*
157:*1* 158:*1,
22* 161:22
162:*8, 12*
163:*3* 165:*24*
167:*3, 4*
168:*18, 19*
169:*18, 20*
170:*10* 171:*2,
13, 14, 16*
172:*2* 173:*16*
174:*14, 22*
176:*14, 15*
179:*7* 180:*10*
181:*3* 182:*7,
12, 24* 183:*2, 4,
7, 21* 187:*13,
15* 188:*10*
192:*12* 193:*11*
196:*11, 22*
201:*2, 5, 24*
202:*5, 10, 18,
20* 204:*3, 6, 7,
9, 17, 20* 205:*5,
6, 10, 15, 18*
206:*24* 207:*6,
10, 13, 16, 24*
208:*1* 209:*9*
210:*14, 23*
211:*8* 213:*4, 5,
6, 14* 217:*19,
22, 23* 218:*1, 2,
3, 11, 14, 16, 18*
219:*24* 220:*1,
4, 24* 221:*23*
222:*15* 225:*10,
15* 226:*3*
228:*2, 18, 22*
229:*11, 20, 23*
233:22, *24*
238:*18* 239:*3,
11, 16* 240:*16,
20, 22* 241:*2, 3,
4* 242:*9, 17, 19,
20* 243:*1, 17,
19, 24* 244:*4, 5,
6, 8* 247:*1, 2,
11, 12, 14, 22*
249:*6, 7*
250:*16* 253:*9,
20, 22* 254:*3,
10* 255:*6, 9*
256:*4, 19*
257:*17, 18*
258:*1, 12*
259:*15* 261:22
262:*15* 263:*11*

266:*9, 19*
267:*6, 21, 23*
270:*9, 11, 12,
13, 14, 19*
271:*13* 274:*15,
23* 276:*7, 11*
277:*6* 278:*6,
11* 279:22
284:*6* 285:*11*
287:*8* 290:*12,
21* 291:*2*
297:*4* 298:*14*
299:*16* 301:*17*
302:*5* 305:*12*
307:*7, 16, 24*
308:*20* 309:*14*
311:*7*
**knowing**
63:*18* 111:*10*
**knowledge**
61:*4* 87:*12*
88:*5* 101:*5*
102:*23* 103:*11*
114:*15, 18*
117:*24* 129:*11*
153:*17* 171:*4*
226:*16* 232:*3*
240:*4* 241:*1*
**known** 153:*8,
15, 18* 212:*16*
213:*18, 20, 21*
**knows** 24:*21*
225:*20* 226:*10*
234:*13* 302:*5*
310:*19*

**< L >**
**labeled** 180:*3*
**lady** 309:*2*
**Lamar** 70:*18*
73:*1* 75:*1*
91:*16* 126:*16*
238:*10* 239:*10*
**landline**
154:*11*
**Lane** 48:*16*
182:22
**language**
143:*11* 220:*21*
**laptop** 146:*9,
11* 147:*10, 15*
150:*2, 4*
288:*16, 17, 20,
21* 291:*23*
292:*11, 14, 19,
21*
**larger** 206:*21*
**last-minute**
308:*23* 310:*5*

**LAW** 2:*3, 10*
21:*19* 49:*10,
15* 50:*4, 5*
114:*3* 128:*4,
22* 129:2
134:*1*
**laws** 40:*1*
133:*2*
**lawsuit** 35:*16*
37:*2, 16* 101:*8*
305:*2, 9*
**lawyer** 30:*22*
250:*15* 251:*18*
277:*7*
**lawyers** 22:*6*
25:*10* 26:*6*
**lead** 32:*13*
41:*21* 233:*19*
**leads** 149:*13*
**learn** 132:*3, 7*
140:*8*
**learned** 113:*4*
128:*16*
**learning** 161:*6*
**lease** 47:*21*
**leased** 47:*11,
12, 13, 16, 19*
**leave** 13:*3*
111:*24*
**led** 156:*23*
232:*4* 296:22
**Lee** 70:*16*
73:*1* 91:*16*
**left** 141:*6*
300:*14* 308:*14*
309:*20*
**legal** 10:*21*
12:*15* 13:*1, 20*
32:*21* 33:*21*
39:*24* 43:*2*
46:*24* 49:*24*
96:*8* 97:*4*
98:*2, 15*
129:*16* 130:*6*
183:*12* 184:*24*
273:*3, 14*
275:*5*
**legally** 7:*22*
130:*1*
**legible** 172:*11,
19*
**Lemuel** 70:*17*
73:*3* 91:*17*
**lesser** 303:*21*
304:2 305:*1*
**letter** 90:*2, 6,
10, 24* 102:*8*
121:*10* 128:*7*
161:*11* 163:*6,*

*14* 164:*18, 22*
165:*8, 11, 16,
22, 23, 24*
166:*6, 9, 14, 15,
20* 167:*5, 9, 14,
16, 20, 23*
168:*6, 19, 24*
169:*18* 170:22
171:*6, 17*
172:*4, 11, 22*
173:*3, 4, 8, 13,
15, 18, 21, 22,
23* 174:*3, 10*
179:*13, 16*
180:*11, 22*
182:*8, 15*
185:*4* 191:*12,
14* 192:*8*
202:*24* 219:*3*
221:*20* 223:*5,
7, 9, 19* 248:22
249:*2, 10, 12*
272:*4, 8, 9, 15*
274:*9, 16*
275:*10, 14, 23*
276:*8, 19, 21,
22* 283:*1, 4, 8,
12, 21* 284:*12*
285:*23* 286:*5,
19, 22* 288:*9,
12* 289:*6*
290:*3, 5* 291:*6,
19, 21, 24*
292:*13* 293:*16,
20* 294:*8, 11*
295:*4, 7, 17, 23*
296:*10, 24*
297:*9, 22*
**letters** 77:*16,
19* 79:*13, 17,
22* 80:*1* 90:*16*
128:*15* 162:*4,
8, 13* 163:*4*
165:*19* 166:*7*
167:*6* 173:*1*
181:*12* 220:*10*
222:*3* 249:*4*
250:*3, 9*
255:*11, 13*
276:*5* 278:*16,
19* 279:*23*
280:*1* 281:*2*
283:*7, 11, 14*
284:*4* 289:*3*
292:*10, 22*
295:*24* 296:*11*
298:*23* 299:*9,
11* 300:*5*

**letting** 47:22, 24
**liar** 296:1, 12
**lie** 140:22
**lied** 137:22 297:3
**life** 35:6, 9 36:8, 20, 24 37:3, 5 38:20, 21 155:17 243:16, 22 244:6 310:7, 8
**lifted** 101:1
**lighter** 178:3, 9
**limited** 225:9 252:18
**line** 145:2 159:9 203:14 204:4, 10 205:9 212:21 217:6 219:5, 18 255:1 263:5 295:22 296:9 306:12
**lines** 204:16 209:23 210:24 211:13 220:22 225:3, 7, 11 231:19 248:21 256:3 264:2, 4 267:17
**link** 219:8, 12 246:19
**list** 71:21 76:11, 18 84:12, 17, 21 93:8 225:14 240:1 260:4, 6 261:8, 10 262:7, 21 263:2 269:23 270:5, 10
**listed** 66:14, 19 83:22 84:4 92:22 154:1, 4 159:5 264:3, 8 269:6
**listing** 66:9
**lists** 208:13 226:15
**literally** 58:6
**litigation** 50:8 104:14, 15 105:3 302:15
**little** 30:13 37:12 57:6 119:21 149:4 155:23 159:18 164:15 172:18

**178:3** 192:16 205:13 209:19 243:15 254:9 256:10 268:9 302:20 303:19
**live** 43:23 44:2, 18 45:9, 18, 21 46:6 48:14, 17 49:1 123:4 126:19 214:24
**lived** 43:7, 9 44:5, 14 48:11, 22 123:18
**lives** 46:14 268:23 269:1
**living** 44:24 45:16 46:21 47:7 122:20 124:1, 19 129:8 182:21
**LLC** 56:22 60:8
**loan** 118:8 119:13
**loans** 119:9
**locate** 67:10, 17
**located** 68:6
**locator** 165:4 266:6
**lodging** 68:23
**log** 68:20 69:21 94:4 149:1, 7 150:9 194:5 198:4
**logged** 263:20, 24
**logging** 290:23
**login** 258:1 263:18
**logo** 58:7 59:19
**long** 19:18 28:8 43:6 48:17 49:14 52:16 60:9 72:6 73:9 91:23 137:9 155:1 158:2 173:10 193:24 194:20 197:16 211:21 213:20 260:16
**longer** 79:18, 20 89:3 103:6 141:18 160:11 253:18 283:14

**look** 15:7 76:16 78:9 88:8 93:23 98:14 170:10 176:8 200:2 215:22 222:14 227:11 231:9 243:7, 9 251:8 264:2
**looked** 28:21 165:2 171:24 180:11 220:2
**looking** 37:22 41:11 77:10 100:19 190:15 217:20 228:5 230:14 254:13 263:4 284:23 287:4, 15
**looks** 171:12 176:20 177:4, 9, 15 178:3 208:5 215:15 222:11 223:4 230:7 254:15
**lose** 149:23
**lost** 126:22 127:12 147:11, 12 149:24 150:3, 5 275:4
**lot** 35:23 75:15 85:2 93:7 99:10 125:20 207:21 226:9 247:9 275:4
**lovable** 243:1
**love** 242:12 290:10
**loves** 244:4
**Lowes** 110:14
**lunch** 10:10 141:4 142:8
**Lydell** 196:17, 19

**< M >**
**mail** 78:22, 23 79:9, 12, 23 80:3, 9, 19, 20, 22 81:3, 8 90:11 144:15, 16 174:21, 24 175:14 183:11, 14, 17, 19 237:19 249:16 275:18
**main** 305:3

**288:2, 6**
**289:11, 14**
**291:11, 15**
**293:2, 5, 24**
**294:24 295:10, 13, 21 297:15, 18 306:7**
**Market** 2:5 142:2
**marking** 171:21 172:7, 8 176:24 188:13 227:3 291:8 294:21
**markings** 172:12
**marriage** 40:20 105:13, 21 106:2 129:19 130:4 132:3
**married** 41:8 64:24 65:3 111:20 113:15 114:23, 24 115:1, 10, 20 116:19 125:15 129:6, 15, 23 130:1 131:7, 22 201:13 202:17, 19, 20 253:4, 15, 18
**materials** 259:4
**matter** 5:6 8:19 25:11 27:9, 13 68:17 69:13, 15, 18, 23 70:14 100:6 313:1
**Maul** 204:17
**MAYS** 2:11 3:8 6:4, 5 7:11, 15 71:12 118:20 124:12 142:1 293:8 294:4 298:18 301:7 302:8 304:13, 19, 23 306:9 311:8, 13, 14, 24
**mean** 21:12 36:21 47:19 55:2 59:22 74:5 88:22 89:1, 2 90:20 94:24 99:8 106:21 108:13 109:13 127:14

**maintained** 107:15
**majority** 143:15 212:2
**making** 96:4
**Mal** 204:17 217:18, 23, 24 218:4, 16, 20
**man** 219:7 243:21 244:5
**March** 242:1 243:7
**Maria** 73:3 91:18
**Marie** 75:22
**marital** 39:1 40:1, 15 117:21
**mark** 64:22 65:18, 19, 20 71:6 85:5, 10 87:1 120:21 121:2 142:14 150:18 157:8 169:23 170:8 175:19 179:22 182:12 187:22 199:18 206:14 215:6 224:14 230:17 241:14 252:7 255:17 259:23 271:17 281:7, 20 285:15 286:8 289:10 292:24 293:22 295:9 308:4
**marked** 65:22 71:13 120:22 121:3, 20 142:17, 20 150:22 151:3 157:8, 10, 11 170:2, 6 175:22, 23 176:8 179:23 180:3 185:15, 19 188:14, 15 199:20 206:17 208:3 215:9, 10 224:17 227:6 230:22 241:17, 24 252:10 255:18, 21 260:4 271:19, 23 281:24 282:15 285:17, 21 286:10, 14

**130:21 150:11**
**176:15 177:4, 9, 15 179:15 182:1 184:8 196:12 203:13 207:20 209:9, 15 222:19 223:9 237:15 241:2 242:15, 20, 23, 24 244:16 247:2 249:11 267:8, 11 272:21 273:23 276:21 280:8 309:7, 10**
**meaning** 40:16
**means** 204:12 218:22 222:19, 21 255:9 313:20
**meant** 93:3 124:13 135:21 208:24 223:6 253:7 254:24 255:6 287:8 296:19 304:22
**media** 143:7 265:5
**Medicaid** 56:2, 6, 7 57:12 58:20
**medical** 50:21
**Medicare** 56:2, 5 57:12 58:20
**medications** 10:24
**meet** 7:13 17:14, 15 18:1, 24 119:17 137:9 201:4 219:4 226:5 302:21
**meeting** 20:3 21:7, 13 303:6
**meetings** 22:24 23:9 24:15 25:4
**members** 44:1 124:23 196:15 201:9
**memory** 8:24 9:14 11:2 173:17
**mentally** 235:18
**mention** 233:4 300:6 304:24

mentioned
53:22  83:18
87:24  161:12
206:2  233:3
234:20  235:21
248:2  299:11
message  77:12
193:3, 14, 24
194:5, 6, 9, 11
196:14, 24
198:11, 22
199:6, 8, 16
200:16, 22, 23
202:22  203:11,
20, 21  205:19,
21  206:12
208:6, 8, 14, 18
209:5, 8, 18, 21
210:3, 5, 7, 9,
16, 18  215:24
216:6, 9, 11, 12,
18, 22  217:20
220:18  222:12,
16, 24  223:3
226:12  227:15,
24  228:11, 14,
16, 24  230:4
231:2, 5, 11, 13,
15  242:11
243:7, 12
246:22  248:9,
11, 12, 16
252:16  290:10
Messages  4:1
193:18  195:2,
7  196:1, 22
200:5, 9
203:17  207:2
208:11  215:17,
18  224:12, 22,
24  227:4, 5
230:20  241:21
243:17, 18
252:8  257:3
messaging
161:21  183:14
192:18  195:1,
11  207:3
260:8  261:12
262:9  263:14
264:12
messed  147:10
309:8
met  17:21
18:16, 22
19:17, 18
20:24  139:20
161:13  207:13

302:23, 24
303:3, 5, 9, 16
MICHAEL
1:1  267:18
midway  121:23
millions  38:17
mind  51:3
mine  40:21, 22
minors  50:16
minutes
308:10  310:21
miscommunicat
ion  62:16
mispronouncin
g  204:24
missed  36:9
37:3, 8  120:11
missing  37:4
177:1  289:16
mission  58:7
misspoke  9:14
24:8
mistake  111:11
mistaken
250:2  272:19
misunderstood
124:9
mix  215:18
Mm-hmm
76:12  87:7
110:9, 15
113:11  125:3
166:17  197:11
205:12  206:6
248:13
mom  122:22
268:10, 22
269:1  272:5
275:10
moment  23:14
mon  41:13
Monday
308:17  309:7
money  36:22
38:6, 14, 22
39:1, 16  40:12,
15  41:2, 16
56:8, 24  60:22
63:10, 15
93:15, 18
95:19  105:21,
22, 24  106:1, 2,
3, 14, 15
108:22  109:12,
20  192:12
195:11, 14
218:21  219:1,
14  251:1, 4
299:23  300:3,

6, 7  306:24
307:3, 8
MONIQUE
1:1  3:1  5:5,
22  6:11  43:1
121:24  122:5
148:1  189:5
225:4  246:16
263:6  306:14
312:6
MoniqueS3708
263:7
Moniques3708
@aol.com
73:24  263:6
month  28:22
107:8  305:14,
16  307:4, 5, 8
months  17:2
214:18, 19
305:18
morning  7:11,
13  17:22  18:5
19:8  308:17
309:4, 22
mortgage
108:17
mortgages
43:21
mother  122:22
214:22  215:2
mother's  123:8
motion  309:23
motor  14:4
50:7, 8, 10
move  12:12
20:8  44:9
64:14  78:20
83:21  91:11
103:9, 22
160:23  192:6
moved  46:10
47:4  48:8, 19,
20  123:22, 24
Moving
103:19  136:13
275:3, 9
multiple  28:19
155:19  156:1
Munira  267:8,
12, 13  298:24
299:3
Munira3708
267:7
Munira's
299:4
murder  120:4
122:19  124:3

127:7
murky  234:9
Muslim  212:12
mutual  218:8
241:7

< N >
NAARDEN
2:4  5:19, 20
12:6  11:16, 19,
23  12:7, 17, 22
15:22  16:14
17:13, 18  18:7,
11, 17  19:2, 11,
15, 24  20:14,
20  21:4, 8, 17
22:2, 13, 21
23:2, 22  24:5
25:15  26:12
28:5  29:10
30:5  31:3, 16,
23  32:7, 11
33:6, 22  35:17
37:17  39:2, 6,
11, 14, 22
40:17  41:5, 18
67:20  68:22
69:5, 14, 17
71:7  76:9, 13
81:1, 22  82:1,
12, 15  89:20
94:14  103:15
104:16  112:9,
17, 23  115:22
116:2, 10
117:4  118:22
130:7, 11, 18
132:12, 17
133:1  140:3,
10  141:7, 22
142:3  150:20
270:3  278:4,
10  280:2, 7
282:4  292:2
301:11, 20
302:4, 11, 14,
18, 22, 23
303:14  304:8,
17, 21  306:5
Naarden's
25:7  114:3
303:7, 11
name  14:23,
24  15:7, 10
42:24  43:2
47:13, 14, 16
60:1  74:6, 14
85:6, 11, 18, 20
86:21, 24  87:6,

9  123:8, 10
131:4, 5, 6, 11,
17, 18, 20
148:2, 10
149:20  154:5
159:23  160:1,
4  161:1, 3
169:9  185:23
189:5, 8
193:10  196:18
197:7  202:12
203:3, 13
204:21  205:4,
7, 16  212:1, 3,
6, 14  213:3, 4,
5, 7, 13, 15
214:3  217:14
218:9  225:20
226:15  228:16
233:2, 6, 15
234:2, 20
247:1, 2, 3
264:3, 4, 9
267:13  269:6,
8  271:2, 4, 9,
11, 12  298:24
299:3, 5  305:6
306:17  310:22
named  207:6
217:24  218:4
234:13  252:20,
23  253:1, 15
267:18  268:9,
11  290:8, 11
297:2  307:17
names  47:14
65:8  73:11, 22
74:5, 11, 24
75:3, 9, 15, 20
77:10  84:11,
15  86:2, 14, 20
87:19, 21  92:1,
8  93:16  95:7
196:6, 11
210:22  214:9
217:6  261:8
267:15  268:6
269:23  270:1,
10  299:7
narrow  223:24
Natalie  123:9
268:9, 11
Natalie's
268:18
native  199:24
230:18
nature  14:2

necessarily
97:9  218:3
285:4  308:1
need  10:5, 12
94:6, 12  100:1
101:19  103:6
104:6  116:13
170:13  221:17
255:10  278:10
308:21  310:15
needed  82:11
104:7  134:10
219:1  302:16
307:3
NEERDAN
169:4  180:14,
20  181:2, 6, 16
186:12  189:9,
14, 19  190:3
200:18  229:2,
6  244:13
245:7, 11, 17
258:14  260:11,
15  261:2, 15,
21  262:12, 23
277:19  279:8,
19  287:2, 7, 13,
21  296:3, 15
312:2
Nefertia
270:15
neighborhood
119:22  122:24
125:21  126:12
127:1  134:14
151:9  153:19,
21  207:21
226:7, 10
241:10  247:8,
10
Neil  247:3
nervous  159:9
never  15:16
30:6  138:19
150:8, 14
173:4  218:1
265:22  271:10
273:7, 10
300:7
new  160:3, 12
266:8
news  227:13
230:5, 6, 8
Nic  290:11
291:2  297:2
Nice  7:13
Nicki  267:16
nicknames
74:11

Nicole 73:4
75:22 91:18
Nicosia 270:15
271:10 297:6
niece 146:11
240:1 288:21
nigga 212:22
night 69:11
128:1 134:17
189:16, 23
190:2 232:24
233:9 260:20
261:1, 3
277:16 278:3,
14 280:8
nights 46:8, 16,
17
Nilam 85:20
Nilam's 87:9
Nodding 89:8
108:6 204:14
215:4 266:22
283:13 307:20
nolle 99:4, 20
167:7 273:6,
19
nonfiling 29:6
nonfinal 29:4
nonlawyer
32:20
nonlawyers
64:17
nonlegal
129:17, 18
nonresponsive
103:10
nontypewriter
186:23
normal 6:23
165:18 183:10
216:21 217:2,
3
normally
80:20 89:14
93:10 181:11
Norris 97:12
North 45:15
46:11 47:4
notarized
136:16
Notary 1:1
313:12
note 73:7
91:21 290:7
noted 260:23
313:1
notes 27:5
160:2 235:20
313:1

Notice 1:1
105:2 176:9
notification
82:20
notifications
199:12
notified 114:13
notifies 199:15
November
47:5 107:22
121:10 256:1
nsolomon98@g
mail 268:14
NUMBER
3:10 4:1 99:9
106:7 127:17
154:4, 7, 8, 14,
18 155:1, 12,
15, 18, 21
156:3, 4, 5, 7
159:5, 8, 10
193:10 227:18
228:2, 12
229:10, 12
230:3, 4 252:7
298:22
numbers
154:17 155:5,
7, 10, 20 156:1
229:15, 18
230:12
nursing 55:9

< O >
oath 7:21
object 22:3
23:3 29:11
130:8 262:5
objected 270:3
296:17
objecting
94:17 130:20
Objection
11:20 12:8, 18
15:23 17:19
18:8, 18 19:3,
12 21:5, 9
22:14, 15
23:11, 23
25:16 26:13
28:6 31:17
32:8, 10 33:7,
23 35:18
37:18 39:3, 10,
12 40:18 41:6,
19 68:19, 24
81:2 82:2
89:21 94:15
103:16 104:17

112:10 115:23
117:5 130:19
132:13 140:4,
11 169:5
181:17 186:13
189:10, 13
200:19 244:14
245:8 260:12,
13, 23 261:16
262:13, 24
277:17 296:4
objectionable
22:4
objections 82:7
obligated 7:22
obligation
81:18, 23
82:21 83:4
105:1
obligations
104:13
obtain 38:22
41:13, 15 53:9
96:8 97:4, 11,
12 98:2, 7, 15
135:15 238:21
257:10
obtained 41:2
obtaining
136:5 239:1
obtains 40:12
obviously
37:21 53:17
89:2 304:1
occasion
161:15
occasions
34:22
occurred 8:17
190:13
O'Connor
85:14 86:6, 8,
15, 18 121:11
122:13
October
293:17
Offender
306:17
offense 304:2
offered 303:22
offhand 88:2
office 17:16
22:21 25:7
26:14 49:10,
15 50:2, 3, 4
67:21 81:22
128:4
official 47:21

Oh 29:8
42:22 50:24
57:18 59:8
61:21 62:17
64:22 71:16
88:18 96:18
98:8 99:14
108:22 118:15
124:14, 16, 20
131:8 148:4, 8
151:1 156:3
164:8 180:17
204:13 208:23
209:3 211:12
212:11 216:15
231:3 239:16
240:2, 8 248:3
255:4 256:11
268:10, 24
269:2 270:10
282:9 284:2
304:14
Okay 10:20
12:11 14:23
15:11 16:22
17:5 18:1, 13,
22 20:6 21:24
22:17 23:10
26:3 27:2
29:17 31:9
33:1 38:1, 5
39:13 43:2, 17
44:1, 4 45:4,
22 46:2, 10, 13,
21 47:3, 7, 13
48:2, 4 49:1
50:4, 13 51:14,
20 52:9, 15, 18
53:1, 8, 18
54:7, 22 55:20
57:8 58:24
60:9 61:24
62:12 63:9, 14
64:2, 9, 19
65:17, 19 66:3,
7 68:9, 12
72:3 74:18, 23
75:9, 13, 17
79:16, 21 80:6
82:12, 19
83:21 84:19
85:3 90:14
91:11 95:2, 15
98:8 99:16
103:9 104:11
105:6, 10
106:4 108:8
110:1 112:22
119:1, 16

122:18 123:7,
12 124:1, 5, 18
125:12, 15, 17
126:3, 8, 18, 22
127:24 131:10
135:6 136:3
141:3, 9, 12, 20
144:9 146:21
149:10 150:8,
17 154:1
156:6 157:20
158:6 160:13
164:1, 11, 15
165:14 170:21
173:6 174:9
175:18 176:7
178:1 179:17
180:21 181:8
184:13, 20
188:2, 11
190:3, 21
192:15, 21
195:22 196:5,
16 197:4
202:3 203:6
204:2, 9 205:4,
6 206:13
207:13, 16
208:2 209:3, 7,
17, 23 210:3,
10, 21 211:7,
12 212:9, 11,
15 213:10, 16
214:6, 14
215:2, 5 216:6
217:5, 17
218:2, 13, 18
219:5, 17
220:22 222:9
223:21 224:11,
20 226:24
228:5 229:6
230:9, 16
234:7 235:1, 3
237:24 242:8
243:5 246:11
248:7, 20
249:13 251:8
252:2, 5
253:14 254:22
255:4, 14
256:21 258:5
260:22 261:6
262:3 263:4
266:12 267:3,
6, 14 268:2, 13,
22 269:4, 14,
18 270:18, 21
271:9, 14

274:8 275:2, 9
276:7, 14
277:10 278:18
280:7, 23
283:3 284:22
285:15 286:8
289:9 291:8
292:10 293:17
294:19, 21
296:6, 22
297:4, 8, 13
298:16 299:8
300:8 301:8,
14, 19 302:3
303:2, 5, 9, 18
304:1, 14
305:7, 17, 22
306:10 307:11,
16, 23 308:10
311:1, 5, 13, 24
312:5
ol 213:11
235:24
old 202:7
214:17 255:7,
8 264:19
268:21, 24
269:12, 17
older 226:9
Once 13:13
80:3 127:21
128:16, 17
one-by-one
72:19
one-page
142:21 151:2
157:9 175:20,
21 180:3
188:13 200:4
224:15, 22
230:18 252:8
260:3
ones 87:24
160:19 292:12
ongoing 90:15
104:10
online 55:4
284:15
onset 80:23
open 58:1, 4,
11, 15 60:10
61:4 198:15
246:18
opened 107:21
110:18 199:2
opening 80:19
opera 213:11
opinion 245:2,
10, 21

**opportunity** 76:17
**opposed** 177:10 212:3 304:18
**opposite** 228:5
**option** 194:22
**ordinarily** 134:2
**organized** 281:9
**orient** 215:15
**original** 102:18 152:10 158:14 166:20, 22 168:8, 17, 18, 22, 24 171:16 172:1 177:8, 14, 17, 19 178:14 179:18 183:1, 8 237:9, 13 272:15 274:20, 21, 24
**originally** 272:17
**originals** 102:2, 5, 7, 16 236:4, 14, 18, 20, 22, 23 237:4, 6
**outcome** 15:11
**Outgoing** 4:1 88:12 200:8 215:18 222:19 227:4 230:20
**OUTLAW** 1:1 3:1 5:6, 7, 21, 22 6:12 24:17 34:20 35:15 37:10, 15 38:22 40:12 41:2, 13, 15 43:1, 3, 20 44:14 54:18 59:6, 16 60:2, 4, 22 65:1, 12 67:1 68:17 84:3 96:9, 13 101:2, 7 102:24 105:12, 14 107:17 108:1 109:8 110:11, 23 111:2 117:19, 24 119:10, 17 121:13, 24 122:14 123:3 125:22 126:23 129:6, 10, 24 130:4 138:16 148:7, 10, 12 149:17 153:9, 16, 20 158:3, 18 159:3 181:23 182:4 183:3 189:6 212:15 214:20, 24 221:4 225:20 226:18 227:16 228:8, 22, 23 231:7, 16 232:4 233:19 234:5 235:5 238:18 239:19 240:15 241:22 242:2 248:10 251:10 252:9, 17 253:22 254:16 260:8 261:12 262:9 267:24 270:7 273:22 274:24 276:7, 24 281:2 284:6 298:23, 24 299:3, 5 301:23 303:21 304:1 305:8 312:7
**OUTLAWDA0** 181:4
**OUTLAWDA0 2022000752** 3:10 120:23
**OUTLAWDA0 2022000753** 121:21
**OUTLAWDA0 2022000755** 120:24
**OUTLAWDA0 2022002399** 3:10 185:19
**OUTLAWDA0 2022002508** 3:10 180:4
**OUTLAWDA0 2022002514** 3:10 170:7 176:9
**OUTLAWDA0 2022002515** 171:20
**OUTLAWDA0 2022002517** 170:7 172:16
**OUTLAWDA0 2022002691** 3:10 142:22
**OUTLAWDA0 2022002692** 3:10 157:10
**OUTLAWDA0 2022002693** 3:10 151:3
**OUTLAWDA0 2022008468** 4:1 255:19
**OUTLAWDA0 2022008483** 255:20
**Outlaw's** 13:14 25:10 26:6 36:5 66:22 77:23 83:23 87:13 90:14 124:13, 15 133:13 166:12, 16 184:3 201:9 224:23 226:21 227:4 229:24 230:20 256:2 265:11 284:3
**Outlaws's** 224:16
**outside** 24:18 79:5 310:2
**overlapping** 259:3
**overturn** 128:19
**owned** 43:17 47:11 146:7
**owner** 54:20
**ownership** 54:12

**< P >**
**p.m** 142:7, 11 224:5, 9 280:16, 21 281:14, 18 300:23 301:3 312:8, 10
**P.S** 172:21
**Pa** 5:11
**packet** 200:3 248:8
**PAGE** 3:1, 10 4:1 66:18 72:21 99:9 121:20, 23 143:6 144:18, 20 146:20 147:4 150:13 153:4 171:9, 20 172:8, 16 176:8, 24 179:12 200:8 215:16, 20 222:10 224:15 227:12 228:6 230:19 241:23 243:5, 6 246:12, 13, 15 248:8 251:9 254:14 265:23 284:12 286:2 289:16 295:21
**pages** 72:6 215:17
**paid** 47:17
**Paladino** 70:16 73:1 74:13 78:24 79:9 80:10 91:16 126:14 136:1, 22 137:15, 18 138:3 139:1 161:2, 7 162:5 167:19 168:5 170:18, 22 171:7 172:7 180:7 185:4 186:2, 9 187:18 188:3, 7, 9 190:13 231:20 232:6, 20 233:16, 20, 24 234:6, 11 235:5 274:12 281:3 283:2, 19 284:7 285:3, 8 286:6, 20 288:10 290:3, 16 291:5, 19 293:16 294:9 295:4, 18 297:23 299:13, 19
**Paladino's** 188:24 192:13 290:24 298:4
**pandemic** 118:7, 20 119:1 164:6, 9
**paper** 176:16 222:23
**papers** 273:14 275:6
**paperwork** 59:17 98:18, 20, 23 99:6 220:3
**paragraph** 294:13 298:1
**paralegal** 30:16, 19 49:18, 19, 22 50:14 51:6 52:10, 11, 13 53:22 104:12 134:4
**paralegals** 21:19 22:8
**pardon** 212:5
**Parkway** 2:12
**Parra** 253:16 271:3
**part** 38:23 40:13 41:2, 16 46:21 51:17 60:17 121:19 133:24 137:16 143:12, 13, 16 166:1, 3 184:5 185:7, 9 186:17 255:5 260:19 272:18, 20 275:15
**participate** 143:17
**participated** 83:13
**participation** 56:2
**particular** 86:5 230:12
**parties** 14:19 21:15
**partner** 284:24
**party** 13:23 15:16 32:19
**pass** 203:18, 22 231:17 256:5
**passing** 120:6 210:6, 9
**password** 150:6 197:15 198:1, 4, 12 257:14, 19, 24 258:13 259:16 266:7
**passwords** 147:14 256:19
**pasted** 144:7
**Pausing** 310:21
**pay** 108:20
**paying** 12:15 95:22 301:19
**Payment** 12:24 92:18, 23 93:10, 13 94:2 95:23 133:20
**payments** 91:13 93:21 94:11 95:4, 12 96:4
**PCRA** 13:14 98:5 246:7 256:2 311:22
**penalty** 7:23
**pending** 10:5
**PENNSYLVANIA** 1:1 2:5, 13 42:21 64:16 66:24 68:16 84:2 96:12 129:14
**people** 36:15 75:15 91:5, 7 92:19 93:6, 7 97:6 118:13 126:12 210:12 212:2 233:1 235:24 241:11 265:17, 22 270:1, 11, 13 303:7, 11
**percent** 14:14 15:15 34:18 48:20 56:23 57:7 60:23 61:5 87:18 110:4 115:2 117:13 123:24 144:17 145:4 174:24 219:20 233:6 234:1 241:11 251:7 255:13 275:16 276:6 297:7, 11
**perfect** 58:9 235:20
**perfectly** 9:8
**perform** 134:6
**performing** 133:24
**period** 14:13 43:10 47:4 80:16 116:19 123:21 144:21 146:4 150:7 153:13 154:13 157:21, 22

183:22  194:15
270:9
**periods**  44:18
**perjury**  7:23
**person**  15:3
129:15  130:24
138:5  139:12,
14  161:13
191:3  196:23
203:24  217:1
218:13, 15, 16,
23  219:11
225:16  230:8
242:10  243:20
247:18, 23
290:22  297:4,
7  302:23
**personal**
148:4  236:17
245:21  265:23
306:14, 20
310:7
**personalized**
292:22
**personally**
41:15  58:4
64:3  130:22
182:14  217:23
242:22  265:14
271:13
**person's**  15:9
234:20
**perspective**
101:17
**pertain**  35:11
**pertained**
87:11
**pertaining**
76:6  98:20, 23
183:12  184:18,
22  251:22
311:2
**pertinent**
184:14
**Peterman**  6:3,
6  34:11
**Peterson**
242:2, 6
**petitions**  50:17
**PHILADELPH
IA**  1:1  2:5, 10,
13  5:8, 11  6:2
14:11  35:8, 12
45:7, 20, 21
123:16
**phone**  127:17
144:15  154:4,
7, 8, 11, 12, 14,
16, 18, 21

155:4, 7, 10, 20
156:1  159:5, 8,
10  161:18
191:6  198:15
203:24  217:1
227:18  228:2,
12  246:19
303:13  308:18
**phones**  77:7
**photo**  153:3
**photocopy**
89:5  274:19
**phrase**  30:13,
20
**pick**  38:20
**picking**  58:6
**picture**  160:4
**pictures**
265:17
**pieces**  38:21
**pile**  249:5
**Piree**  6:3, 6
34:16
**pity**  139:11
140:19, 20
285:6
**place**  126:9, 20
**placed**  239:24
**places**  43:5
**Plaintiff**  1:1
2:8  14:5  15:3
**PLAINTIFF003
16**  3:10
175:22
**PLAINTIFF003
168**  178:2
**PLAINTIFF273
22**  4:1  271:23
**PLAINTIFF273
25**  272:11
**PLAINTIFF273
28**  275:11
**PLAINTIFF273
34**  276:16
**PLAINTIFF273
35**  276:16
**platform**
206:3  262:10
**platonic**
244:11
**play**  307:23
308:3
**played**  137:16
186:17  249:22
**playing**  308:5
**plea**  303:21
304:20  305:1
**please**  8:9, 21
10:4, 13  16:12

73:7  91:21
238:9
**point**  9:11
10:4, 8  29:22
79:21  101:6
102:22  105:15
107:16  120:16
122:12  126:23
133:19, 20
149:24  172:3,
10  178:20
186:3  192:11
232:21  239:12
240:12  244:7
246:1, 2
253:14  260:8
269:20  299:19
**polygamy**
132:11
**poor**  177:5
**Pop**  74:15, 20
75:5  272:4, 5,
9, 10  275:10
**popped**  74:8
86:3
**pops**  193:10
**portion**
103:10  144:14
308:3
**position**  49:17
**possess**  79:22
**possession**
79:18, 20  97:5
101:23  102:11
145:15  151:13
152:12  163:15
258:10  272:14,
23  275:13
276:8  288:18
**possible**
162:23  169:2,
12  237:5
264:23, 24
265:19
**possibly**
167:10  237:14
**Post**  78:1
84:1  87:14
134:18  143:5,
22  144:2, 5, 6,
20  157:5
159:11  160:15
182:5  304:12
**posted**  134:13
143:5  145:11
148:17, 21
149:5, 6
153:12  156:13
159:17, 20

160:7, 18
265:15, 17, 22
**post-high**
52:19
**posting**  149:8
151:9
**potentially**
81:24  83:6, 14
90:2  92:11
166:11  281:4
**PPE**  118:8
**practice**  50:6
80:14  89:4
90:15  91:2
165:18  181:11
183:10  203:16
216:21  217:2,
4
**practiced**
132:11
**precipitated**
127:24
**prefer**  141:17
**preparation**
16:6, 9, 12
17:15, 16
18:23  20:3, 16
22:24  23:19
25:5, 14  26:10
72:11
**prepare**  18:2,
16  21:1  61:13,
14, 15  62:4, 9
135:6, 9
303:14
**prepared**  62:5,
10
**preparing**
26:21  27:6
51:15
**prescription**
10:24
**presence**
23:21  24:18
231:20  232:7
233:20  235:6
238:11  239:6,
12
**present**  1:1
2:16  8:19
21:3  22:11, 24
23:8  24:15
44:16  68:17
69:12, 15, 23
**presently**  49:6
**preserve**
81:18  82:6, 21
**presume**
247:20

**presuming**
67:15
**pretty**  51:5
86:7  88:19
94:24  126:6
254:7, 8
309:20
**previous**  9:13
16:3  97:1
**preyed**  138:7,
8, 9
**primarily**
153:16
**print**  144:8
**printed**
145:10  149:10
156:16  159:14,
17
**printer**  281:22
**printout**
188:22  241:21
252:8
**prior**  27:8, 12
28:24  49:23,
24  52:5
107:23  115:9,
19  116:14, 18
120:16  122:5,
14  152:24
159:21  187:19
188:4, 7
217:19  239:20,
21  273:17
**prison**  33:18
192:13  240:15
**private**  68:14
69:1
**privilege**
21:16  29:24
68:19, 20
69:21
**Privileged**
12:23  13:1
19:16, 23
21:12  29:13
31:19  35:19,
24  82:3, 7, 22
112:12
**pro**  135:7
**probably**  10:9
52:6  120:9
209:20
**proceeding**
13:18, 20
184:12, 15
273:3
**proceedings**
77:24  78:2, 5
87:15  91:2

182:6  184:23
246:8  313:1
**process**  57:10
111:4, 11, 22
197:5
**processing**
186:23
**processor**
144:1  187:12
**processors**
187:5, 7, 14
**produce**  16:21
66:14  67:4
96:1  97:19
259:2  279:10
**produced**  17:6
67:12, 17
79:15  96:5
97:1  151:15
163:17  168:20
181:5  189:16
190:1  199:24
200:5, 11
215:14, 19
224:13, 23
230:19  258:23
260:20, 24
277:15  278:15
281:21  282:2
**product**  29:13
**production**
51:24  72:5
106:19  180:22
**professionally**
111:23  113:20
**profile**  148:8
284:15  290:9,
20, 24  294:14,
16
**program**
52:17  53:13,
15, 17  56:3
**Project**  85:16
87:8, 16
**pronounce**
271:2
**pronouncing**
204:5
**properties**
44:12
**property**  39:1
40:15  43:14
47:10  49:4
50:16, 22
117:22  273:13
**prossed**  99:4,
20  167:7
273:6, 19
**protect**  138:11

provide 8:*1*
106:*19*, 24
110:*1* 144:24
145:7 146:*24*
164:*15*
provided
135:22 166:*15*
182:*12* 236:*19*
237:*4*, *10*, *12*,
*21*
providing
114:6 229:*10*,
*15*
pseudonyms
73:8, *10* 91:22,
*24*
PUA 118:*5*, 6,
*11*
Public 1:*1*
313:*12*
purchased
43:*14*
purposes 5:*23*
12:*5* 24:*11*
30:24 31:*4*, *11*
114:*4* 116:24
pursuant 1:*1*
pursuing 32:*17*
put 29:*18*
36:8, *20* 38:*11*
58:*5* 71:*16*
73:*21* 74:*5*
75:*2*, *18* 84:*15*
86:*2*, 7 93:*16*
112:*10* 122:*18*
159:*24* 193:9
206:22 221:*18*
223:*21* 230:*16*
252:*5* 258:*20*
277:*17*
putting 68:*21*
70:*1* 104:*24*

< Q >
question 8:*9*,
*12*, *13*, *14* 9:*7*,
*12*, *13*, *21* 10:*5*,
*6*, *23* 12:*10*, *19*
17:*20* 18:*19*
19:*4* 22:*1*, *16*
24:*1*, *14* 25:*19*
26:*5*, *24* 29:*11*
30:*11* 32:*24*
36:*7* 37:*11*, *13*
38:*1* 39:*8*, *19*,
*21* 40:*9* 42:*1*
53:*3* 60:*20*
63:*3*, *4*, *10*
67:*13*, *15*

78:*21* 89:*23*
93:*4* 94:*1*, *18*
97:*16* 103:*11*
105:*19* 112:*18*
113:*8* 115:*16*
116:*16* 128:*24*
132:*14* 155:*23*
173:*6*, *7*
176:*11* 190:*6*,
*7* 195:*22*
210:*4* 225:*8*
231:*10* 232:*8*,
*14* 240:*6*
245:*14*, *18*
247:*20*, *22*
252:*18* 262:*4*,
*19* 282:*19*
284:*11* 299:*17*
300:*11* 311:*15*
questions 8:*2*,
*20* 10:*17*, *22*
11:*3* 20:*1*, *5*
29:*16* 82:*17*
96:*20* 170:*12*
227:*10* 278:*8*
301:*9*
quick 26:*1*
180:*15* 224:*21*
227:*2* 284:*11*
302:*5*
quicker 256:*6*
quite 8:*18*
141:*2*, *6*
270:*18*

< R >
radius 126:*20*
Ramadan
307:*5*, *9*
ramifications
32:*21*
range 57:*5*
117:*12* 189:*21*
272:*11*
Rash 217:*7*
Rashee 204:*23*
205:*1*, *2*, *3*
reach 98:*10*
193:*12* 210:*13*,
*15* 221:*3*
reached 97:*6*
reaching 97:*9*
220:*23*
reaction
141:*6*
read 6:*21*
8:*11* 27:*8*, *21*
28:*11*, *13*, *17*
39:*21* 63:*3*, *5*

80:*3*, *21* 90:*23*
106:*4* 190:*8*
202:*23* 216:*14*
232:*15* 296:*4*,
*7*, *16*
reading 29:22
73:*12* 106:*13*
141:*23* 143:*3*
173:*8*, *9*, *16*
203:*9* 232:*12*
244:*10*
reads 122:*4*
296:*9*
ready 170:*11*
300:*18*
real 25:*24*
155:*11* 180:*14*
212:*3*, *6*
213:*14* 224:*21*
227:*2* 302:*4*
realize 9:*14*
138:*3*
realized
111:*20* 113:*13*,
*17*
really 34:*24*
35:*13* 36:*6*
47:*15*, *18* 52:*1*
54:*6* 60:*15*, *16*
88:*18* 89:*16*
94:*5* 97:*15*
99:*17* 109:*18*
113:*6* 127:*14*
128:*14* 137:*3*,
*12* 140:*17*
149:*15* 155:*11*
159:*1*, 7 160:*4*
176:*20* 181:*20*
195:*19* 199:*12*
204:*23* 217:*1*,
*3*, *22* 219:*23*
220:*20* 226:*11*
227:*10* 228:*1*
235:*12* 239:*3*
249:*3*, *15*, *17*
276:*2* 309:*13*
re-ask 22:*2*
247:*19*
reason 11:*6*
45:*18* 80:*4*
103:*22* 155:*9*,
*11* 159:*4*
261:*9*, *13*, *20*
262:*10*, *20*
269:*18* 299:*2*
reasonable
32:*12* 162:*19*
reasonably

41:*20*
reasons 140:*18*
rebuild 37:*7*
recall 9:*1*
11:*7* 28:*18*
78:*22* 80:*9*, *11*
82:*10* 89:*16*
98:*5* 107:*6*, *7*,
*10* 135:*1*
146:*6* 162:*1*, *2*
167:*23* 172:*8*,
*9*, *13* 173:*2*, *7*
174:*3*, *4*, *7*, *8*
177:*21*, *24*
178:*13*, *14*, *17*
179:*10*, *11*, *13*
180:*9* 191:*8*
199:*4* 200:*22*
209:*7* 227:*24*
228:*11*, *13*, *15*
231:*10*, *13*
232:*17* 233:*13*,
*17* 234:*8*, *10*,
*16*, *18* 235:*9*
239:*7*, *13*
246:*22* 249:*2*,
*13* 266:*11*
273:*20* 274:*10*,
*13*, *18* 276:*18*
300:*1*
recanted 255:*1*
receipt 183:*23*
receive 38:*15*
148:*23* 165:*20*
181:*12* 186:*3*,
*4*, *6* 195:*2*, *7*
196:*1* 272:*17*
274:*1*, *14*
received 56:*8*
61:*9* 64:*3*, *10*,
*11* 68:*4* 72:*14*
77:*12* 81:*17*,
*21* 89:*12*
92:*15* 105:*12*
118:*1* 133:*20*
163:*6* 166:*9*
168:*17* 171:*6*
172:*6* 173:*9*
185:*3* 186:*7*
188:*22* 191:*17*
192:*7* 194:*1*
196:*14* 203:*20*,
*21* 205:*19*, *20*,
*22* 207:*2*
222:*24* 237:*10*
241:*21* 249:*16*
250:*3* 273:*22*
276:*4*, *19*, *20*,
*24* 277:*3*

280:24 283:22
290:*16*
receives 222:*21*
receiving
78:22 133:*19*
139:*21* 187:*17*,
*19* 228:*13*, *15*
231:*11*, *13*
243:*17* 298:*4*
recess 42:*14*
78:*15* 142:*8*
224:*6* 281:*15*
300:*24*
recog 170:*9*
recognize 66:*1*,
*7*, *12* 90:*18*
142:*22* 151:*1*,
*4* 157:*14*
170:*14* 172:*24*
176:*2* 179:*9*
180:*4* 185:*20*
248:*11* 254:*15*,
*17*, *18* 260:*10*
264:*15* 268:*13*
269:*10*, *24*
271:*24* 282:*21*
285:*22* 286:*15*
288:*7* 289:*15*,
*23* 291:*16*
293:*6*, *12*
295:*14* 297:*19*
308:*8*
recollection
8:*19*, *21*, *22*
88:*20* 95:*21*
96:*3* 145:*7*
149:*21* 163:*13*
168:*15* 171:*23*
175:*8* 177:*7*,
*13* 183:*6*
190:*12* 208:*17*
209:*4* 217:*21*
266:*20* 299:*10*
recommendatio
n 221:*18*, *20*
223:*6*, 8
reconnected
119:*19*
record 5:*4*
8:*6* 11:*15*
13:*4* 20:*10*
29:*19* 42:*10*,
*12*, *16*, *24* 66:*4*
71:*8*, *20*, *22*
72:*7* 78:*11*, *13*,
*17* 98:*2*
112:*10* 121:*16*
124:*10* 130:*20*
142:*6*, *10*

143:2 149:*19*
151:*2*, *6*
157:*17* 170:*5*,
*16* 172:24
174:*11* 175:*5*
180:*2* 185:*23*
224:*4*, *8*, *12*
236:*12* 258:*20*
277:*18* 278:*11*
280:*12*, *15*, *18*,
*20* 281:*10*, *13*,
*17*, *24* 282:24
285:*20* 286:*18*
290:*2* 293:*15*
300:*12*, *22*
301:*2* 312:*7*
records 50:*21*
96:*5*, 9 97:*4*,
*11*, *12*, *20* 98:*2*,
*14*, *16* 175:*11*
recreated
160:*10*
reduce 172:*4*,
*12*
refer 135:*18*
153:*21* 203:*14*
231:*24* 251:*21*
reference
204:*4* 211:*1*
213:*8* 217:*7*,
*18* 223:*11*, *14*,
*15* 252:*14*, *19*,
*20* 284:*13*, *14*
referenced
73:*11* 92:*1*
219:*17*
referencing
211:*9*
referred 106:*7*
219:*21* 225:*11*
246:*24* 247:*24*
291:*3*
referring
16:*18* 17:*1*
22:*7* 36:*22*
45:*24* 118:*8*
124:*20* 161:*22*
173:*19* 174:*2*
185:*1* 204:*7*,
*18* 205:*11*
210:*1* 211:*17*
219:*19* 220:*2*,
*5*, *24* 233:*10*
234:*4* 248:*24*
250:*17*, *18*
251:*15* 264:*5*
290:*19* 297:*5*
refers 228:*3*,

*18*
**refile** 309:*10*
**reflect** 93:*20*
98:*15*
**reflecting**
91:*12* 96:*8*
**refresh** 149:*21*
163:*12* 175:*7*
190:*11* 217:*20*
**regarding**
20:*1* 154:*3*
**regardless**
83:*2* 259:*8*
**register** 197:*1*
264:*11*
**registered**
261:*11* 262:*8*
270:*6*
**registering**
57:*10*
**regular**
118:*15* 174:*21*
175:*14* 211:*14*
240:*21, 22*
284:*8*
**rejected** 309:*9*
**related** 69:*1,*
*22* 97:*12*
103:*2* 104:*13*
273:*3* 294:*16*
298:*8*
**relation**
207:*11, 23*
**relationship**
29:*21* 30:*7*
54:*10* 120:*8,*
*10, 14, 17*
122:*5, 14*
125:*4, 8, 23*
131:*2* 201:*8,*
*19, 20, 22*
202:*1, 6*
239:*18* 240:*11*
242:*13* 243:*14*
253:*10, 20*
254:*1, 6, 11*
**relatives**
207:*11*
**release** 304:*12*
**released** 44:*15,*
*22*
**relevance**
130:*12*
**relevant** 21:*11*
81:*19, 24* 83:*6,*
*14* 104:*1, 2*
132:*20* 184:*3*
236:*8*

**relief** 36:*5*
37:*1, 4, 11, 15*
78:*2* 182:*5*
**Religious**
129:*19, 23*
**rely** 9:*2*
**remarking**
287:*20, 23*
**remarks** 38:*13*
**remember**
14:*18* 15:*6, 9*
28:*15, 20* 32:*4*
42:*6* 73:*12*
77:*13* 80:*13*
101:*12* 107:*4,*
*9* 112:*6* 132:*9*
136:*3, 24*
145:*18* 146:*23*
156:*18* 157:*20,*
*22* 158:*2*
159:*11, 16*
163:*3, 8, 18, 21,*
*22, 24* 164:*16*
165:*24* 168:*23*
169:*1* 172:*5*
173:*8, 11, 12*
179:*16* 181:*21*
182:*11, 14, 18*
184:*1* 187:*16,*
*20* 191:*13, 21*
192:*8, 10*
196:*5, 7, 13, 23*
197:*23* 200:*23*
209:*13* 216:*3,*
*18* 222:*5, 8, 15*
223:*3* 229:*17*
233:*5, 22*
234:*3* 235:*1, 2,*
*4, 7, 12, 15, 16*
249:*18* 254:*22*
266:*5, 7*
276:*13, 20, 21*
277:*2, 8*
290:*13* 292:*8*
296:*2, 22*
297:*12* 299:*9*
301:*11* 305:*19*
**remembered**
134:*16*
**renew** 258:*6,*
*21* 259:*9, 20*
**rent** 43:*12*
49:*4, 5*
**repair** 37:*7*
**repaired** 51:*1*
**repeat** 8:*10*
25:*19, 21* 40:*7,*
*9* 42:*1* 67:*13*
78:*6* 85:*9*

175:*10* 190:*6*
293:*8*
**rephrase** 8:*10*
26:*3* 77:*3*
81:*6*
**replace** 156:*5*
**report** 51:*12*
**Reporter** 1:*1*
5:*14* 6:*8, 16*
8:*3, 11* 9:*23*
25:*21, 22* 29:*5*
40:*6* 42:*2, 7*
65:*20* 85:*8*
142:*16* 170:*1*
185:*14* 187:*23*
199:*19* 206:*16*
215:*8* 241:*16*
259:*24* 271:*18*
291:*9* 293:*1*
305:*24* 306:*3*
313:*12, 22*
**represent** 7:*6*
23:*5* 30:*23*
114:*4* 168:*16*
188:*21* 200:*7*
236:*24* 255:*24*
**representation**
11:*18* 26:*20*
30:*20* 31:*10*
260:*12, 14, 17*
**represented**
11:*11* 135:*3*
**Representing**
2:*8, 16* 5:*21*
6:*1* 23:*18*
24:*2, 11* 31:*3,*
*24* 32:*1* 66:*23*
70:*10* 261:*18*
270:*4* 302:*1*
**represents**
12:*5* 31:*8, 11*
302:*14*
**reproduction**
313:*20*
**request** 16:*24*
17:*3* 70:*20*
72:*20* 73:*7, 13*
84:*5, 9* 87:*10*
91:*22* 92:*11*
105:*11* 106:*11*
193:*5, 6, 8*
258:*7* 259:*9*
266:*14*
**requested**
134:*20*
**requesting**
66:*10* 70:*3, 21*
72:*4*

**requests** 51:*24*
258:*21* 259:*21*
279:*4, 18*
**resentencing**
221:*19*
**reserve** 82:*8*
300:*13*
**residence**
46:*24*
**respect** 34:*3*
114:*5* 230:*3*
**respond**
167:*19* 168:*5*
291:*5*
**responded**
128:*7* 297:*10*
**responding**
51:*20*
**response** 9:*8*
17:*7* 51:*23*
247:*22* 297:*8*
**responses** 8:*2*
**responsibilities**
50:*14* 51:*3*
**responsibility**
51:*15, 18*
140:*21*
**responsible**
222:*2*
**responsive**
67:*21* 70:*9, 24*
71:*3* 72:*16*
73:*19* 84:*8*
92:*11* 106:*10,*
*20* 116:*14*
257:*4* 265:*1*
279:*17*
**rest** 178:*3*
**Restoration**
60:*2*
**retain** 6:*21*
81:*23* 88:*3*
105:*1* 165:*21*
166:*6* 301:*10*
**RETAINED**
4:*24* 165:*12,*
*16* 301:*13*
302:*11* 303:*4*
**retaining**
104:*13*
**retention** 31:*14*
**return** 23:*15*
36:*1* 57:*20*
61:*3, 11, 22*
63:*20* 64:*5*
78:*8* 111:*2*
141:*11*
**returns** 61:*13,*
*15* 62:*4, 9, 21*

63:*12* 114:*11*
115:*4, 9, 19*
116:*18* 117:*8*
**revealing**
16:*13* 20:*13*
**review** 17:*5*
20:*12, 16* 28:*4,*
*24* 29:*3, 8*
95:*6*
**reviewed**
16:*16* 17:*9*
72:*11* 74:*7*
**reviewing**
224:*12*
**rid** 80:*2, 21*
99:*22* 100:*2*
**right** 6:*21*
10:*14* 33:*13*
36:*16* 51:*9*
58:*5, 12, 19*
69:*20* 79:*9*
96:*23* 97:*21*
98:*10* 103:*18*
109:*21* 127:*18*
132:*22* 141:*23*
149:*3* 160:*21*
175:*17* 177:*20*
190:*4* 191:*14,*
*19* 193:*2*
214:*1* 219:*10*
228:*16* 229:*5*
255:*4, 15*
256:*22* 269:*8*
276:*12* 296:*2,*
*13, 14, 19, 21*
299:*15* 304:*2*
306:*6*
**rights** 34:*1*
**ring** 137:*4*
230:*10* 267:*7*
**rings** 209:*14,*
*15, 17*
**Ritterman**
121:*12*
**Road** 42:*20*
44:*12* 48:*9*
**Rob** 307:*17,*
*19, 22* 308:*16*
310:*18, 19, 22*
**Robert** 49:*11,*
*15* 50:*5* 51:*10*
52:*3* 121:*12*
122:*4* 153:*9,*
*16, 19, 20, 21*
224:*16, 23*
227:*4* 230:*20*
231:*6* 241:*22*
242:*2* 246:*16*
248:*10* 251:*10*

252:*9* 254:*16*
272:*6* 276:*15*
**Robert's**
122:*1* 272:*5*
275:*10*
**Rogers** 70:*19*
73:*1, 4, 5, 6*
75:*1, 22, 23, 24*
91:*16, 18, 20*
126:*16* 213:*22*
238:*10* 239:*10,*
*14*
**role** 104:*11*
249:*22* 250:*4*
**romantic**
120:*17* 201:*8*
240:*11* 244:*12*
284:*24*
**Rosemont**
52:*20, 22*
**ROSENTHAL**
2:*11* 3:*7* 5:*24*
6:*1, 18* 7:*3, 6,*
*14* 11:*21* 12:*3,*
*11, 14, 20, 24*
13:*5* 15:*24*
17:*24* 18:*9, 13,*
*14, 21* 19:*7, 13,*
*20* 20:*6, 11*
21:*6, 10, 24*
22:*5, 17, 19*
23:*10, 16* 24:*4,*
*7, 9* 25:*17, 20*
26:*2, 4, 15*
27:*2, 4* 28:*9*
29:*7, 17* 30:*9*
31:*18, 21* 32:*9*
33:*1, 3, 15*
34:*2* 35:*21*
36:*3* 37:*24*
39:*4, 9, 13, 20*
40:*3, 8, 10, 24*
41:*10* 42:*5, 9,*
*18* 63:*2, 8*
65:*24* 69:*3, 9,*
*16, 20, 24*
71:*15* 76:*12,*
*19, 22* 78:*19*
81:*5, 7* 82:*4,*
*13, 19, 24*
85:*17* 89:*22*
94:*20* 103:*17,*
*20* 104:*19, 23*
113:*11, 22*
115:*24* 116:*8,*
*12, 15* 117:*6,*
*14* 118:*24*
121:*1, 5*
124:*14, 17*

130:*9, 14, 23*
132:*15, 21*
133:*11*  140:*6, 14*  141:*1, 10, 15, 20*  142:*12, 19*  150:*21, 24*
157:*13*  169:*6*
170:*4*  176:*1*
180:*1, 17, 24*
181:*4, 9, 18*
185:*17*  186:*14*
188:*1, 17*
189:*12, 18, 24*
190:*5, 10*
199:*22*  200:*21*
206:*19*  215:*11*
223:*22*  224:*10, 19*  227:*8*
229:*8*  230:*24*
232:*10, 18*
241:*19*  244:*24*
245:*9, 15, 20, 24*  252:*12*
255:*23*  258:*5, 18*  259:*13*
260:*1, 13, 22*
261:*5, 17*
262:*3, 6, 18*
263:*3*  271:*21*
277:*14*  278:*1, 6, 18*  279:*16, 24*  280:*5, 11, 22*  281:*8, 19*
282:*9, 13, 17*
285:*19*  286:*12, 23*  287:*11, 16, 22*  288:*4*
289:*13*  291:*13*
292:*4, 9*  293:*4, 10*  294:*2, 6*
295:*2, 12*
296:*6, 8, 18*
297:*17*  298:*20*
300:*8, 19*
**rough**  157:*23*
162:*10*
**roughly**  117:*3*
**ruining**  35:*9*
**rule**  109:*19*
193:*17*
**rules**  7:*16*
109:*14*
**run**  127:*5*
**running**
271:*15*
**rushing**  271:*15*

**< S >**

**S(Continued**
4:*1*
**Sa**  74:*17, 20*
75:*7*  211:*19, 21, 24*  212:*1, 10, 16*
**Saheem**  212:*10*
**sake**  307:*8*
**salary**  109:*3*
110:*7*
**Saleema**  230:*8*
**Samuel**  121:*11*
**Sania**  73:*5*
75:*23*  91:*19*
**Saturday**
308:*18*
**save**  90:*16*
91:*2*  185:*7*
194:*14, 16*
250:*7*
**saved**  77:*16*
90:*8, 20*
147:*15*  151:*18, 24*  167:*1*
183:*21*  194:*6*
250:*9*  257:*1*
289:*3*
**savings**  108:*24*
**saw**  43:*5*
120:*15*  138:*24*
156:*22*  157:*4*
160:*14*  163:*14*
177:*22*  192:*1*
232:*24*  234:*19*
**saying**  55:*15*
62:*7, 8*  69:*11*
75:*4*  94:*9*
100:*15*  105:*24*
137:*20*  139:*12*
144:*4*  145:*3*
160:*5*  163:*2*
198:*19, 21*
202:*24*  209:*1*
220:*12*  229:*11*
235:*5, 8*
237:*18*  297:*1*
304:*16*
**says**  149:*1*
172:*19*  203:*6*
204:*5, 16*
205:*9*  209:*24*
210:*15*  211:*7, 13*  212:*22*
218:*19*  219:*5*
220:*2, 22*
221:*17*  222:*18, 23*  226:*13*
231:*20*  238:*9*
246:*13, 17*

248:*21*  251:*12*
255:*5*  263:*18*
295:*22*  298:*2*
306:*13, 17*
**scanned**  175:*1*
237:*7*
**scanning**
183:*24*
**scheduled**  25:*2*
**school**  52:*19*
53:*24*  119:*24*
266:*4*
**Schuylkill**
48:*16*  182:*22*
**SCI**  145:*3*
164:*10, 14*
**scope**  11:*18*
20:*20*  26:*19*
30:*20*  31:*10*
**scroll**  25:*23*
**se**  135:*7*
**search**  67:*3, 7*
68:*10*  70:*5, 21, 23*  72:*15*
73:*18, 20*  74:*5*
75:*10*  76:*11, 16, 23, 24*  79:*6, 16*  84:*8, 10*
86:*1, 5, 13, 16, 19*  88:*10, 11*
92:*5, 14*  93:*12*
94:*13*  96:*13*
97:*14*  98:*13, 17*  106:*10*
257:*2*  266:*15, 17*
**searched**  68:*5*
74:*24*  75:*4*
85:*22*  87:*24*
92:*7*
**searches**  76:*5*
258:*7*
**second**  68:*2*
71:*8*  121:*20*
170:*10*  171:*19*
200:*13*  204:*10*
208:*15*  214:*14*
215:*22*  217:*6*
231:*9*  243:*6*
251:*11*  266:*20, 21*  269:*6*
281:*11*  298:*1*
**seconds**
308:*11*  310:*22*
**secretary**
49:*24*
**see**  72:*22*
73:*21*  74:*21*
92:*14*  95:*4, 11*

98:*8*  115:*7*
120:*6*  121:*22*
122:*3, 7*  127:*2, 4, 16*  129:*12*
136:*22*  138:*13, 14*  148:*24*
158:*17*  171:*9, 20*  176:*13*
178:*1, 2, 6, 7*
179:*10*  188:*10*
189:*1, 4*
194:*11*  199:*9*
200:*24*  203:*2, 6*  204:*3, 16*
208:*5*  210:*22, 24*  211:*13*
214:*2*  215:*23*
219:*5, 7*  220:*3*
221:*17*  222:*10*
225:*3*  226:*12*
227:*15*  228:*6*
231:*2, 5, 19*
241:*24*  243:*2*
246:*17*  248:*8, 20*  251:*11*
252:*14, 15, 19*
255:*5*  257:*3*
263:*5*  264:*3, 5*
267:*17*  269:*5, 7*  295:*22*
296:*9*  298:*1, 17*  306:*12, 16*
**seeing**  138:*17*
168:*24*  173:*2*
179:*10, 12, 13, 16*
**seeking**  36:*5*
37:*10, 15*  38:*2, 7*  148:*11*
149:*17*
**seen**  27:*24*
28:*2*  61:*6*
71:*17*  117:*7*
121:*6*  140:*1, 9*
179:*7*  188:*18*
221:*17*  239:*5, 8*
**sees**  51:*4*
**seminar**  55:*4*
**send**  89:*19*
90:*3*  94:*2*
172:*23*  174:*10, 12, 20*  183:*11, 13, 14*  192:*24*
193:*14, 18, 21*
194:*8, 9*  195:*2, 7, 11, 13*  196:*1*
198:*10, 14*
199:*6*  203:*17*
206:*12*  216:*23,

24*  220:*9*
249:*9*  277:*7*
279:*13*  283:*8*
**sending**  78:*23*
183:*16, 18*
209:*8, 20*
216:*7*  230:*4*
231:*16*  243:*17*
275:*19*
**sends**  222:*20*
**sense**  36:*1*
156:*6*  210:*8*
229:*9*  242:*16*
243:*19*  300:*3*
**sent**  69:*10*
76:*10*  77:*11*
88:*8*  89:*3, 5*
90:*6, 10*  92:*16*
93:*15, 18*  94:*3*
96:*24*  151:*16, 19, 22*  162:*5, 8, 13*  163:*7*
165:*20*  173:*3, 13*  174:*17, 23*
175:*2, 4, 8, 13*
181:*23*  182:*10*
183:*3, 4, 8*
191:*13, 23*
192:*8*  193:*24*
194:*5*  196:*14, 22, 24*  198:*22*
200:*16, 24*
208:*8, 14, 19, 22, 23*  209:*12*
222:*16, 17*
223:*19*  227:*5, 16*  228:*8, 24*
231:*6*  237:*19*
248:*10, 21*
251:*4, 10, 20*
252:*17*  254:*16, 18*  272:*3, 23*
274:*17, 19*
275:*17, 22*
277:*9*  281:*2*
283:*5, 7, 12, 21*
284:*4*  286:*5*
288:*10*  289:*6*
290:*3, 5*
291:*19, 21*
292:*11*  293:*16, 20*  295:*4, 17*
297:*23*  299:*2*
300:*7*  307:*7, 18*  309:*17*
**sentence**  122:*3*
128:*20*  243:*16*
251:*12*

**sentenced**
251:*23*
**separate**  68:*10*
108:*3*  109:*12, 16*  227:*20, 21*
258:*22*
**separately**
90:*4, 11*
114:*23*  278:*23*
**September**
122:*20*  225:*5, 8*
**series**  277:*11*
**serve**  138:*11*
258:*8*  259:*12*
**served**  17:*2*
56:*11*  71:*10*
265:*2*
**service**  95:*18*
**services**
133:*21, 23*
134:*4*
**set**  50:*15*
284:*14*  290:*17, 20*  294:*14, 16*
298:*9*
**sets**  259:*4*
**settled**  15:*14*
**settlement**
38:*23*  40:*13*
41:*3, 16*
**settlements**
39:*15*
**seven**  264:*4*
295:*23*  296:*11*
**several-page**
241:*20*
**Shanique**
270:*17*
**Shanita**  45:*3*
125:*2*  126:*4*
128:*9*
**Shank**  75:*12*
246:*17, 24*
**Shanks**  247:*12, 14, 23*  248:*6*
**Shannon**  290:*8*
**share**  40:*22*
41:*8*  136:*11*
167:*16*  197:*15*
201:*17*  283:*16*
**shared**  40:*16*
**Sharon**  290:*8*
**sheet**  207:*1*
208:*10*
**Shelby**  233:*11*
272:*6*  276:*15*
**she'll**  309:*6*

Monique Solomon
7/22/2022

**shit** 309:*16*
310:*10*
**shock** 35:*6*
**shooting** 126:*9*
154:*3*
**short** 10:*9*
141:*4*
**shorter** 141:*17*
**shortly** 101:*13*
**show** 71:*5*
120:*20* 142:*13*
150:*17* 157:*7*
169:*22* 175:*18*
179:*21* 185:*11*
187:*21* 188:*11*,
*12* 189:*2*
192:*4* 199:*17*
206:*13* 208:*12*
215:*5* 224:*13*
227:*1* 241:*13*
255:*16* 259:*22*
271:*14* 277:*11*
278:*20* 280:*23*
289:*9* 297:*13*
298:*21* 305:*22*
**showing**
239:*24* 306:*10*
**shown** 20:*14*,
*15* 76:*15*, *18*
**shows** 188:*23*
208:*11*
**siblings** 268:*4*
**Sie** 270:*19*
**sign** 6:*22*
186:*11* 197:*3*,
*5* 302:*9*
**signed** 47:*21*
238:*10*, *14*
239:*11* 301:*17*
**significant**
117:*21*
**simply** 9:*1*
**single** 77:*11*
111:*10*, *13*, *19*
113:*14* 115:*8*
116:*23* 169:*10*
196:*23*
**sister** 45:*2*, *17*
46:*10*, *14*
125:*2*, *21*
128:*2*, *8* 159:*2*
201:*12* 212:*24*
213:*1* 268:*9*
269:*1*
**sisters** 126:*7*
**sister's** 45:*1*
46:*8* 128:*1*
158:*24* 268:*18*

**sit** 51:*17*
296:*1*, *13*, *19*
**site** 290:*17*
**sitting** 83:*1*
221:*14*
**situation** 311:*4*
**six** 72:*5*
**skimmed** 28:*11*
**skip** 78:*7*
**skipping**
211:*12*
**slip-and-falls**
50:*9*, *11*
**smoother** 8:*5*
9:*19*
**snail** 78:*22*, *23*
90:*11* 275:*18*
**soap** 213:*11*
**social** 143:*7*
265:*5*
**solely** 148:*7*
**SOLOMON**
1:*1* 3:*1* 5:*6*,
*22* 6:*11* 15:*1*
43:*1*, *2*, *5* 65:*9*
121:*23*, *24*
122:*5* 123:*10*
148:*1* 225:*4*
263:*7* 267:*19*
268:*7*, *8*, *9*, *11*
306:*14* 312:*6*
**somebody**
36:*17* 94:*4*
100:*18* 208:*23*
229:*13* 244:*1*,
*22* 251:*17*
290:*8*
**someone's**
209:*18*
**son** 14:*20*, *22*
44:*5* 49:*3*
60:*5* 137:*8*
195:*8*, *16*
197:*9* 202:*7*
205:*19* 214:*10*,
*11*, *12*, *15*
255:*7* 256:*13*,
*18* 257:*12*, *21*
258:*3*, *9*
259:*12* 263:*20*
**song** 219:*9*
**son's** 189:*8*
269:*8*
**soon** 305:*12*
**Sorry** 14:*21*
16:*8* 22:*18*
24:*4* 25:*23*
29:*6*, *8* 30:*10*
36:*11* 39:*23*

40:*7* 42:*3*, *22*
45:*4*, *13* 50:*20*
52:*5*, *21* 58:*18*
62:*3*, *15* 63:*1*
65:*13* 66:*10*
71:*16* 75:*2*
77:*22* 81:*6*, *20*
85:*9* 86:*17*
89:*13* 99:*14*
103:*21* 115:*16*
118:*10* 120:*11*
121:*24* 131:*13*
144:*23* 146:*2*
151:*1* 159:*13*
163:*6* 166:*2*
177:*3* 181:*10*,
*19* 187:*6*
189:*12* 190:*5*
192:*2* 195:*16*
196:*18* 212:*5*
214:*14* 229:*3*
231:*3* 232:*9*
234:*22* 238:*1*
246:*3*, *12*, *14*
247:*13*, *19*
248:*16* 252:*6*,
*15* 269:*5*
271:*1* 278:*2*
281:*8* 286:*23*
294:*9*, *19*
**sort** 16:*6*
**soup** 261:*24*
**sources** 92:*9*
117:*15*
**speak** 23:*17*
24:*12*, *17*
27:*11* 35:*1*
138:*16* 164:*20*
188:*3* 234:*24*
**Speaker** 308:*6*,
*12*, *24* 309:*1*,
*14*, *17*, *24*
310:*1*, *3*, *6*, *15*,
*17*
**speaks** 172:*20*
**specific** 33:*20*
37:*10* 71:*22*
76:*5* 121:*19*
123:*3* 135:*1*
164:*3* 168:*14*
183:*5* 235:*9*
249:*14*, *15*
267:*9*
**specifically**
34:*10* 35:*11*
37:*15* 38:*15*
71:*21* 78:*9*
174:*4* 209:*7*,
*13* 233:*3*, *5*

234:*8*, *10*, *12*
307:*14*
**speculation**
9:*3* 244:*15*
**spell** 131:*15*
**spend** 280:*13*
**spent** 20:*3*
**spiritual**
129:*19*
**spoke** 136:*4*, *9*
218:*22* 232:*23*
301:*9*
**spoken** 25:*9*
26:*6* 135:*19*
162:*3* 303:*13*
**spoliation**
64:*20* 104:*21*,
*24*
**Square** 2:*4*
**staff** 22:*8*, *21*
97:*10* 98:*3*
**stalked** 212:*22*
**stamped**
306:*11* 308:*1*
**stamps** 193:*16*
**stand** 132:*22*
**standard** 99:*14*
**standing**
277:*17*
**Star** 45:*3*
125:*2* 202:*13*
**start** 13:*11*
234:*12* 310:*15*
**started** 32:*1*
56:*19* 81:*4*
127:*23* 128:*5*
139:*4* 144:*17*
155:*18* 158:*3*
196:*4*
**start-end**
201:*20*
**Starting** 196:*3*
306:*4* 308:*4*,
*10*
**starts** 72:*22*
203:*2*, *3*
246:*13*
**state** 14:*8*
16:*1* 42:*23*
61:*3* 114:*10*,
*13* 115:*3*
232:*5* 272:*10*
**statement**
58:*7* 79:*3*
94:*6* 95:*8*, *9*,
*13* 122:*9*
**statements**
93:*20*, *24* 95:*3*,
*6*, *11* 106:*12*,

**22** 107:*1*
135:*13*, *15*
136:*5*, *7*, *9*, *16*
137:*20*
**STATES** 1:*1*
**status** 150:*12*
253:*20*
**statutes** 310:*9*
**stay** 45:*20*
46:*8*, *17* 47:*23*
48:*1*, *4* 310:*19*,
*20*
**stayed** 46:*16*
247:*5*
**stenographer**
176:*18*
**stenographic**
313:*1*
**steps** 115:*19*
116:*17* 150:*8*,
*14*
**sticker** 256:*7*
**stipulations**
6:*17*, *19*, *23*
**stocks** 117:*18*
**story** 136:*12*
139:*8* 140:*21*
285:*10*
**Street** 1:*1* 2:*5*,
*12* 5:*10* 45:*15*
46:*11*, *18*, *19*,
*22* 47:*4*
220:*20*
**Strehlow** 5:*16*
**stressed** 244:*8*
308:*19*
**strike** 16:*8*
22:*1* 24:*7*
41:*13* 66:*10*
81:*20* 83:*10*
103:*9* 114:*9*
129:*20* 135:*16*
146:*1*, *2*
159:*13* 172:*5*
188:*2* 246:*3*
247:*13* 287:*17*,
*24* 290:*18*
298:*3* 299:*16*
**struggle** 235:*7*
**stuff** 69:*19*
104:*5* 147:*15*
165:*9* 167:*12*
182:*12* 189:*21*
220:*21* 235:*19*
236:*18* 249:*8*
251:*13*, *19*, *21*,
*23* 256:*19*
260:*21* 265:*16*,
*18* 273:*9*

274:*6* 275:*4*
276:*13* 304:*12*
308:*23* 309:*19*
**subject** 70:*14*
203:*7*, *14*
**submit** 58:*24*
**submitted**
58:*22* 182:*4*
**Subpoena**
3:*10* 16:*16*, *17*,
*18*, *20*, *23* 17:*1*,
*7*, *9* 25:*12*
26:*9*, *21* 31:*5*
66:*6*, *8*, *13*, *18*
67:*3*, *21* 68:*2*,
*3* 71:*10*, *23*
72:*3*, *4*, *10*, *14*
231:*21* 257:*4*
258:*9* 259:*12*
265:*2*
**subpoenaed**
258:*16*
**subpoenas**
51:*21*
**substances**
11:*1*
**substant** 68:*23*
**suffered** 34:*6*
**suggestion**
76:*21*
**suit** 96:*11*
103:*1*, *12*
**Suite** 2:*5*
**supervision**
133:*17* 313:*22*
**supposed** 8:*23*
36:*15* 138:*10*
219:*8* 251:*24*
307:*6*
**sure** 7:*18*
10:*21* 14:*15*
15:*15* 17:*4*
20:*21* 25:*20*,
*22* 31:*7* 34:*15*,
*18*, *23*, *24* 40:*8*
43:*6* 45:*14*
46:*3* 48:*20*
54:*6*, *24* 55:*13*,
*15*, *17*, *20*
56:*23* 57:*7*
58:*19* 59:*8*, *11*
60:*11*, *23* 61:*5*,
*12* 67:*14*
78:*11* 87:*18*
88:*18* 93:*12*
94:*21* 103:*3*
107:*12* 109:*23*
110:*4* 114:*17*,
*21* 115:*2*

117:*10, 13*
123:*24* 124:*3,
7, 10* 131:*18,
21, 23* 132:*1, 6*
136:*2* 137:*5,
12* 144:*17*
145:*5, 19*
148:*15* 149:*6*
155:*3* 157:*3*
158:*12* 159:*1,
19* 162:*7, 22*
166:*4, 22, 23*
168:*22* 174:*24*
180:*13* 183:*9*
186:*8* 188:*20*
193:*20* 194:*3,
17, 20, 23*
197:*18* 202:*21*
205:*14* 219:*20,
24* 220:*6*
221:*15, 24*
223:*13, 18*
226:*11* 229:*1*
233:*6, 12*
234:*1* 236:*8,
13* 237:*3*
238:*17, 20, 23*
239:*2, 3*
240:*19* 241:*2,
12* 247:*10*
248:*1, 5* 251:*7*
253:*6, 12, 19,
21* 255:*2, 13*
257:*15* 259:*7*
260:*6* 263:*2*
265:*13* 269:*21*
271:*2* 272:*19*
273:*16, 24*
274:*3* 275:*1, 7,
16* 276:*2, 6, 9*
277:*5* 292:*14*
297:*7, 11*
305:*13* 308:*21*
**surpri** 242:*18*
**surprise** 140:*7,
13, 15* 181:*22*
182:*2* 239:*23*
240:*3, 7, 8, 9*
242:*11, 17, 21,
22, 24* 243:*3,
19* 244:*2*
**surprising**
162:*20, 21*
242:*16* 243:*12,
15*
**surrounded**
235:*24*
**swear** 6:*8*

**switch** 105:*10*
119:*16*
**Sworn** 3:*1*
6:*12*
**Sy** 209:*24*
211:*14, 17, 24*
212:*9* 248:*21,
24* 249:*9*
**synonymous**
73:*10* 92:*1*
**Syrelle** 270:*16*
**system** 138:*4*
161:*21* 183:*15*
192:*18, 23*
193:*3, 22*
194:*2, 5* 195:*1,
13* 196:*1, 8*
199:*13* 207:*3*
260:*9* 261:*12*
263:*14* 264:*12*
285:*14*

**< T >**
**tablet** 299:*12,
19*
**take** 8:*3* 10:*3,
6, 7, 9* 30:*1*
78:*9* 82:*9*
126:*18* 143:*4*
170:*10, 13*
176:*7* 222:*14*
223:*23* 227:*11*
231:*9* 243:*6, 9*
255:*14* 256:*7*
266:*13* 300:*9*
304:*2, 7* 305:*1*
**taken** 1:*1* 5:*6*
38:*21* 55:*16*
58:*6* 115:*18*
116:*17* 119:*9*
313:*1*
**talk** 9:*20*
24:*23* 112:*20*
138:*23, 24*
191:*5* 226:*17*
258:*19* 274:*8,
11* 283:*23*
**talked** 35:*14*
161:*1, 17*
191:*2* 204:*16*
218:*20* 311:*19*
**talking** 9:*24*
54:*8* 128:*3*
130:*3* 173:*20*
185:*5* 192:*3*
209:*24* 211:*14*
218:*19, 20*
220:*17* 240:*18*
241:*5* 245:*1*

250:*12, 13*
255:*3* 279:*20*
282:*8* 290:*9*
304:*10*
**Taneha** 1:*1*
5:*15* 313:*11*
**Tanny** 212:*22,
23, 24* 213:*6*
**Tanny's** 213:*9,
16*
**tasks** 134:*11,
12*
**tax** 57:*20*
61:*3, 11, 13, 15,
22* 62:*4, 9, 21*
63:*12, 20* 64:*4*
111:*1, 23*
114:*6, 10*
115:*4, 8, 19*
116:*18* 117:*8*
**taxes** 62:*11*
64:*1* 111:*3, 4,
5, 7, 9, 11, 13,
24* 113:*15, 19,
20* 116:*24*
**technically**
106:*15*
**tell** 7:*22*
73:*18* 74:*23*
94:*8* 113:*3*
122:*12* 139:*2,
3* 164:*6*
165:*17* 189:*24*
191:*22* 203:*10,
23* 205:*10*
210:*15* 216:*23,
24* 220:*9, 14*
222:*22* 234:*7*
261:*24* 262:*1*
278:*19* 279:*11*
**telling** 128:*3*
139:*9* 140:*20*
161:*5* 170:*19*
310:*16*
**Tender** 54:*18*
59:*16*
**tenure** 105:*13*
**term** 30:*21*
**Terminal**
141:*23*
**terms** 76:*11,
16*
**Terrance**
268:*8*
**testified** 6:*13*
13:*8, 17, 21*
46:*4* 90:*22*
165:*18* 186:*9*
236:*13*

**testify** 11:*4, 8*
16:*3* 66:*8, 13*
**testifying** 7:*20,
21* 11:*10*
94:*22* 98:*5*
**testimony**
16:*3* 46:*3*
79:*11* 94:*19*
178:*21* 238:*4*
256:*1*
**text** 77:*11, 12*
193:*2*
**texted** 77:*8*
**texting** 308:*18*
**thank** 7:*4*
181:*8* 182:*16*
229:*7*
**Thanks** 76:*19,
20* 220:*23*
**thing** 9:*18*
28:*12* 33:*14*
36:*16* 96:*16,
21* 187:*12*
236:*7* 305:*3*
310:*4*
**things** 139:*14,
15* 140:*23*
226:*14* 234:*9*
279:*10*
**think** 15:*13*
23:*14* 45:*15*
48:*19* 52:*8*
55:*3* 60:*21*
69:*11* 82:*6*
85:*5* 87:*22*
88:*2* 90:*22*
92:*12* 94:*18*
96:*21* 97:*22*
101:*15* 102:*13,
14* 108:*19*
111:*19* 119:*14*
124:*12* 128:*6*
144:*16* 153:*6,
18* 162:*2*
177:*17* 181:*1*
187:*23* 192:*2*
193:*4, 8, 9, 11,
23* 197:*22*
198:*9* 204:*22*
213:*7, 24*
214:*1, 18*
230:*6* 234:*22*
235:*23* 238:*4*
245:*2, 5* 246:*1,
11* 250:*24*
251:*7, 22*
253:*15* 270:*24*
274:*3* 275:*8*
278:*2, 7* 291:*9*

296:*4* 297:*12*
300:*15* 306:*1*
307:*22* 310:*3*
311:*15, 24*
**thinking** 39:*7*
98:*10*
**third** 21:*15*
70:*13* 178:*7*
246:*15* 251:*11*
286:*2* 294:*13*
295:*21*
**thought** 46:*4*
103:*24* 124:*20*
166:*10* 181:*7*
212:*6* 242:*14*
304:*22* 309:*12*
**thousands**
38:*16*
**three** 66:*19*
71:*11* 210:*24*
214:*19* 225:*3,
7* 277:*3*
310:*13*
**three-page**
285:*21* 288:*5*
**three-year**
157:*24*
**threw** 80:*6*
81:*3* 183:*23*
**throw** 80:*15,
22* 81:*8* 90:*24*
165:*19*
**thrown** 80:*9*
166:*7*
**Tim** 309:*17*
310:*11, 20*
**time** 10:*13*
14:*12, 16*
18:*15* 19:*10*
20:*2* 30:*12*
36:*10, 13* 37:*6,
8* 42:*12, 16*
43:*10* 44:*4, 15,
18* 46:*22* 47:*3*
58:*6* 60:*19*
61:*22* 78:*13,
17* 80:*8, 13, 16*
82:*8* 98:*22*
101:*9* 103:*3,
13* 111:*15*
115:*21* 120:*3,
9, 12* 122:*19,
21* 123:*21*
124:*2* 126:*14*
133:*15* 135:*4*
137:*12* 139:*10,
22* 141:*13*
142:*6, 10*
143:*4* 144:*21*

146:*3* 147:*7,
21, 24* 153:*8,
10, 12, 15*
154:*13* 155:*20*
156:*2, 8*
157:*21, 22*
159:*7* 160:*7, 9,
23* 163:*5, 19*
164:*13* 168:*23*
170:*13* 173:*10*
174:*15* 182:*22*
183:*22* 187:*10*
190:*18* 194:*15,
17, 18, 19*
206:*9* 207:*5*
219:*3, 4, 8*
224:*4, 8*
228:*23* 232:*21*
236:*1* 243:*24*
244:*7* 263:*23*
270:*9* 271:*16*
274:*17* 275:*24*
277:*4* 279:*21*
280:*13, 15, 20*
281:*13, 17*
282:*7* 300:*22*
301:*2, 14*
308:*2* 309:*4*
311:*19*
**times** 13:*12*
18:*24* 19:*5*
28:*19, 20* 35:*1*
155:*22* 164:*4*
195:*20* 214:*3*
277:*21* 302:*21,
22*
**timing** 20:*2*
**Timothy**
196:*20*
**tip** 309:*6*
**tissue** 78:*10*
**titled** 200:*10*
**today** 7:*5, 9,
21* 8:*17* 11:*6,
8, 11, 12* 12:*16*
16:*7, 10, 24*
17:*17* 18:*15,
24* 23:*1, 20*
24:*13, 19* 25:*2*
27:*16* 31:*6*
66:*8, 13* 70:*11*
72:*12* 83:*2*
182:*15* 221:*14*
308:*6*
**today's** 23:*19*
25:*5* 26:*10*
**told** 16:*14*
128:*17* 132:*4*
211:*7* 233:*24*

261:*10, 19, 22*
262:*7*
**top**  84:*16, 18*
170:*24*  228:*7*
243:*8*  306:*16*
**total**  57:*1*
62:*15*  72:*6*
162:*5*
**totally**  235:*11,*
*14*
**Touch**  54:*18,*
*19*  59:*16*
126:*22*
**track**  181:*10*
303:*19*
**training**  52:*9*
53:*18*
**transcript**
256:*1*  292:*6*
313:*1, 19*
**transcripts**
27:*8*  104:*5*
**transfer**  95:*19*
**transferred**
145:*5*  146:*13*
**transportation**
221:*8*
**trauma**  34:*7*
**trial**  83:*24*
87:*14*
**trick**  93:*3*
176:*11*
**tried**  264:*22*
**trip**  8:*24*
**trouble**  9:*24*
**true**  137:*23*
139:*16*  171:*5*
182:*17*  279:*9*
283:*3*  286:*4,*
*21*  290:*4*
293:*19*  295:*6*
**truth**  7:*22*
100:*8*  139:*3*
**truthfully**
11:*4, 8*
**try**  9:*19*
219:*11*  223:*24*
266:*14*
**trying**  15:*5, 6*
28:*12*  42:*3*
79:*3*  94:*7, 22*
98:*11*  122:*23*
129:*12*  165:*14*
191:*16*  213:*24*
234:*22*  235:*13,*
*16*  237:*2*
**turn**  65:*17*
66:*17*  70:*8*
72:*19*  121:*19*

171:*19*  172:*15*
200:*13*  207:*4*
215:*20*  222:*9*
238:*8*  241:*22*
243:*5*  246:*12*
250:*5*  255:*15*
276:*14*
**turned**  53:*16*
67:*19*  68:*7*
102:*20*  255:*8*
**Turner**  85:*12*
87:*3*
**turning**
190:*21*  272:*8*
**twin**  267:*22*
**Two**  2:*4*  7:*7*
19:*5*  23:*5*
44:*10*  55:*5*
58:*1*  107:*5*
189:*1*  215:*3,*
*21*  225:*11*
248:*4*  259:*3*
266:*2*  282:*19*
**two-page**
185:*18*  215:*12*
227:*3*
**type**  37:*1, 4,*
*22*  50:*5*  52:*9*
74:*20*  89:*18*
109:*11*  118:*12*
120:*10*  130:*3*
145:*17*  146:*6*
178:*14*  183:*20*
187:*12*  236:*9*
242:*13*  244:*3*
252:*1*  288:*15*
301:*22*  302:*9*
309:*16*  310:*5*
**typed**  90:*3, 5*
143:*20, 24*
144:*2, 10*
145:*21, 23*
167:*14*  187:*3*
**typewriter**
187:*10*
**typewriters**
187:*5, 6*
**typewritten**
288:*13*
**typically**  283:*8*

**< U >**
**uh-huh**  8:*4*
**ultimately**
156:*22*
**um**  36:*10*
52:*24*  72:*1*
95:*6*

**unable**  145:*7*
150:*9*
**unaffiliated**
25:*6*
**unattached**
152:*11*
**unclear**  63:*20*
170:*23*
**uncommon**
206:*12*  244:*20*
**undated**  294:*9*
295:*3*
**underlying**
83:*13*  96:*11*
249:*20*  250:*4*
**underneath**
189:*6*
**understand**
7:*18, 19*  8:*6, 8,*
*14*  9:*4, 9, 16*
10:*1, 10, 15, 20*
11:*3, 24*  12:*4*
22:*16*  23:*11*
26:*24*  30:*22*
37:*9*  46:*3*
67:*2*  68:*18*
70:*2, 20*  73:*10,*
*15*  75:*2*  79:*3*
83:*1, 3*  84:*4*
86:*17*  87:*10*
89:*23*  91:*24*
92:*2*  97:*17, 23*
105:*18, 19*
106:*6*  111:*15*
128:*24*  136:*6*
137:*19, 24*
158:*6*  165:*15*
166:*2, 4*  173:*9*
183:*5*  191:*16*
199:*13*  213:*12*
234:*8*  242:*4*
259:*14*  285:*10*
**understanding**
11:*17*  30:*19*
31:*2, 23*  32:*5,*
*14*  33:*4, 9*
36:*4*  37:*14*
38:*2, 6, 10, 24*
40:*5, 12, 14, 20*
83:*3*  97:*16*
105:*7*  114:*8*
115:*15*  140:*16*
228:*21*  239:*17*
240:*10*  242:*8*
243:*13*  270:*5*
278:*24*  301:*24*
302:*13*

**understood**
8:*13*  79:*10*
231:*16*  284:*23*
**undertake**
67:*7*  68:*9, 21*
70:*2, 5, 23*
79:*6*  84:*7*
92:*5, 13*  96:*14*
**undertaken**
256:*24*  257:*2*
**undertook**
72:*15*  73:*19*
**unemploy**
118:*21*
**unemployment**
118:*1, 13, 16*
119:*1*
**unimportant**
236:*4*
**UNITED**  1:*1*
**unnecessarily**
224:*2*
**unsure**  20:*19*
**untrue**  140:*24*
**unusual**
184:*21*  187:*1*
**upcoming**
231:*22*
**updating**
209:*21*
**upstate**  273:*9,*
*10*
**use**  30:*21*
93:*10*  95:*15,*
*18*  96:*10*
195:*10, 13*
198:*5, 16, 24*
257:*12, 20*
258:*3*  259:*17,*
*18*  264:*11*
265:*10*  292:*21*
300:*4*
**username**
147:*23*  263:*7,*
*12*  267:*7, 9, 10*
**uses**  195:*17,*
*18*  197:*14*
256:*13*  257:*21*
**Usual**  6:*16, 18*
**usually**  184:*2*
185:*7*  222:*19*
275:*23*  299:*6*
**utilities**  47:*16,*
*17*  108:*18*

**< V >**
**vacated**  35:*5*
273:*8*
**vacation**  308:*7*

**vaguely**  216:*5,*
*19*  223:*4*
290:*14*
**valid**  155:*11*
**value**  36:*8, 20*
38:*12*  117:*22*
133:*8*
**VAN**  2:*4*
5:*19, 20*  6:*20*
11:*16, 19, 23*
12:*7, 17, 22*
15:*22*  16:*14*
17:*13, 18*  18:*7,*
*11, 17*  19:*2, 11,*
*15, 24*  20:*14,*
*20*  21:*4, 8, 17*
22:*2, 13, 21*
23:*2, 22*  24:*5*
25:*7, 15*  26:*12*
28:*5*  29:*10*
30:*5*  31:*3, 16,*
*23*  32:*7, 11*
33:*6, 22*  35:*17*
37:*17*  39:*2, 6,*
*11, 14, 22*
40:*17*  41:*5, 18*
67:*20*  68:*22*
69:*5, 14, 17*
71:*7*  76:*9, 13*
81:*1, 22*  82:*1,*
*12, 15*  89:*20*
94:*14*  103:*15*
104:*16*  112:*9,*
*17, 23*  114:*3*
115:*22*  116:*2,*
*10*  117:*4*
118:*22*  130:*7,*
*11, 18*  132:*12,*
*17*  133:*1*
140:*3, 10*
141:*7, 22*
142:*3*  150:*20*
169:*4*  180:*14,*
*20*  181:*2, 6, 16*
186:*12*  189:*9,*
*14, 19*  190:*3*
200:*18*  229:*2,*
*6*  244:*13*
245:*7, 11, 17*
258:*14*  260:*11,*
*15*  261:*2, 15,*
*21*  262:*12, 23*
270:*3*  277:*19*
278:*4, 10*
279:*8, 19*
280:*2, 7*  282:*4*
287:*2, 7, 13, 21*
292:*2*  296:*3,*
*15*  301:*11, 20*

302:*4, 11, 14,*
*18, 22, 23*
303:*7, 11, 14*
304:*8, 17, 21*
306:*5*  312:*2*
**vehicle**  14:*4*
50:*7, 8, 10*
51:*1*
**Venmo**  95:*19,*
*20*
**verbal**  8:*1*
**verdict**  39:*16*
**version**  160:*9*
168:*9, 24*
171:*6*  178:*22*
179:*11, 12, 14*
283:*4*  287:*1*
**versions**  160:*6*
**versus**  108:*11,*
*15*  109:*16*
179:*15*
**victim**  138:*4*
285:*11, 12, 13*
**Victoria**
270:*21*
**video**  5:*4, 5*
**Videographer**
2:*16*  5:*3, 14*
6:*7*  42:*11, 15*
78:*12, 16*
142:*5, 9*  224:*3,*
*7*  280:*14, 19*
281:*12, 16*
282:*6, 11*
300:*17*  301:*1*
311:*6, 10*
312:*4*
**Videotaped**
1:*1*  312:*9*
**vindicated**
305:*5*
**violations**
33:*21*
**visit**  136:*18*
137:*7, 13*
188:*9, 24*
190:*12*  232:*23*
240:*20*
**visited**  188:*7*
190:*16, 18, 22,*
*24*
**visiting**  225:*14*
240:*15*
**visitor**  140:*1, 8*
**visitors**  139:*22*
**visitor's**  240:*1*
**voice**  139:*14*
308:*8*

voluntarily 133:6
VSCP 2:3

< W >
Wafiya 271:6
wait 64:23 96:23 192:5 260:3
waiting 56:4 58:21, 22 250:14
want 7:15 9:2, 11 10:3 16:22 23:13 36:12 46:2 47:5 56:21 58:5, 8, 9 60:21 64:22 66:17, 19 71:5 76:14 83:21 91:11 99:1, 21 100:4, 7 105:10 111:17 117:10 119:19 120:20 121:18 139:11 150:17 155:14 159:7 162:11, 22 169:22 171:19 172:15 175:18 176:7 185:11 187:21 192:17 198:20 200:13 204:2, 15 206:13 207:4 208:2 210:21 215:20 216:14 217:5 222:9 224:13 225:2 227:1, 11 231:1 234:24 235:7, 15 236:11 238:3 241:22 246:11 247:20 248:9, 15 251:8 252:13 255:16 256:3, 10, 16 258:20 263:4 264:2 276:14 277:12 279:22 281:5 284:10 285:5, 15 295:20 304:9
wanted 15:7 43:6 124:10 134:9 137:14, 24 138:20

139:18 155:12, 17 198:10, 13 226:17 236:7 285:9 290:11 304:7 305:2, 3, 5, 20
wanting 35:7 305:1 309:18
wants 33:10 36:14 38:20
way 85:24 88:10 106:13 153:5 175:12 177:7, 21 226:20 230:9 238:6 244:3 275:19, 21 304:7
weak 138:5, 8
website 58:13
week 107:11
weeks 107:5
Well 24:20 30:14 34:4 37:2, 9, 20 40:3 46:6 47:15 50:7 52:1, 5 57:19 58:3 60:19 62:18 63:22, 24 75:11
went 15:13 45:11, 23 46:18 98:18 119:23 136:22 139:9 187:10 188:10 224:11 232:22 239:21 249:4, 7 302:20
We're 5:3, 15 7:20 9:24 32:17 42:11, 15 58:11, 21 78:12, 16 96:17 111:22 119:16, 22 142:5, 9 170:8 224:3, 7 254:7, 12 258:6 271:15 280:12, 14, 19 281:12, 16, 21 293:22 294:21 300:21 301:1 305:23 306:3 307:6 312:7
Wesley 70:16 73:2 74:16 91:17 200:6,

24 192:3, 24 194:4 196:6 198:12 201:21 202:24 207:5 208:10, 21 209:1 210:4, 12 211:14 212:1, 18 214:10 218:19 220:14 221:19 222:18 226:1 229:9 230:9 236:16, 24 237:14, 22 238:7 241:9 247:2, 8, 13, 15, 17 257:6, 20 258:1, 6 259:8, 17, 18 260:2 262:14, 19 265:6, 8, 14 268:7 270:3 275:20 277:19 279:8 285:11, 14 292:13 298:13 300:14 303:8 304:6 307:1, 12
Wells 107:20 109:21
withdraw 256:5
withheld 34:12
withholding 34:17
WITNESS 3:1 6:9 7:12 12:1, 9 17:21 18:20 19:5 26:23 28:7 33:8, 24 37:20 40:19 41:7, 24 63:6 83:4 85:10 112:15, 22 113:6, 12 116:3, 6 117:9 124:16 130:21 140:5, 12 141:9, 13, 19 189:11 190:9 200:20 229:4 232:12, 16 244:16 245:22 249:19 262:14 263:1 287:5, 9 292:7 304:14 306:2
witnesses 83:9, 12 105:7 135:12, 16, 17,

12, 16 201:2 205:24 211:18 212:7 215:13, 17 216:1 248:24
Wesley's 205:3
West 268:19 269:2, 14
We've 141:1 161:1 265:16 277:20
When's 163:5 168:23
whichever 85:3
white 281:23
who've 262:21
wife 122:1 129:16 131:2 219:8 253:6, 7, 8, 11, 13, 21 297:2, 3
Williams 70:19 73:4, 5 75:23 91:19 214:2
willing 134:6 136:11, 13
windy 310:1
wit 249:21
withdraw 256:5

20 136:4, 18 221:9, 11 230:13
wives 129:11 130:5, 6
woman 233:4, 7 234:19
word 75:5 104:24 144:1 178:7 186:23 187:5, 6, 11, 14 220:4
words 8:4 28:14 144:10 172:18 300:4
work 29:13 49:10 51:18 54:12 128:4 246:20 259:16 292:21 310:8
worked 49:14 59:3 87:12
working 22:22 25:24 42:8 53:13 58:14, 18, 20 309:11, 15, 21
Workman 270:22
work-related 311:4
works 257:19
worried 308:19
worry 251:12 256:6
wrapped 137:15 138:1 168:1 170:19 220:20
write 92:17 93:1 136:7 164:21 168:2 193:11, 13 221:12 223:20
writeaninmate.com 294:15 298:3, 5
writing 135:13 170:18 191:11 249:23
written 121:11 144:22 147:16 159:23 163:22, 23 171:13 178:15 191:8 210:5 249:11, 24 281:4 292:14

wrong 36:21 94:9 101:16 162:11 165:17 204:5 287:19 296:5
wrote 90:9 128:6 163:19 164:18 165:12 167:23 173:21 209:18 210:7 223:12 248:17 283:1 286:19 288:15 294:8 295:21, 23, 24 296:10, 12, 24 298:23
Wyatt 207:2, 6 208:6, 24 209:20 210:15 211:5 214:5
Wyatt's 207:20 212:24 213:1 214:4

< Y >
Yashon 70:19 73:4 75:22 91:18
yeah 16:8 47:24 68:5 69:9, 16, 17 76:18 78:7 81:5 91:6 94:21 98:4 118:22 126:24 127:20 130:2 143:4 144:2 145:9 147:14 148:9 159:22 166:4 175:11, 15 181:7 182:11, 16 185:8 187:8 188:21 193:16 194:12 207:20 209:15 216:20 218:12 221:20 223:10 237:18 243:9 247:13 248:5 255:6 256:9 275:20 287:2 300:11, 19 304:19 309:1, 24 310:24 311:23
year 52:17, 23 57:21 59:2 115:4 117:3

Monique Solomon
7/22/2022

120:*1*  152:*19*
**yearlong**  52:*15*
**years**  14:*16*
34:*5*  36:*10*
37:*3, 4*  44:*10*
48:*23*  55:*5*
58:*1*  84:*20*
112:2  115:*5*
140:2, *9*  143:7
147:*3, 10*
155:*2, 3, 5*
204:*13*
**yesterday**
107:*13, 14*
180:*23*  278:5
302:*24*  303:*10,
16*
**Yo**  310:*1*
**younger**  247:*4,
9*
**Yusef**  73:*1*
91:*17*

**< Z >**
**Zieger**  85:*5*
86:*23, 24*
**Zykia**  131:*12,
14*  214:*23*
**Z-y-k-i-a**
131:*16*

# EXHIBIT C

(Donald Outlaw Deposition Transcript)

```
 1            UNITED STATES DISTRICT COURT

 2         EASTERN DISTRICT OF PENNSYLVANIA

 3

 4   Donald Michael Outlaw    :
                  Plaintiff   :
 5                            :
           vs.               : Civil Action
 6                           : No. 21-1290
     City of Philadelphia    :
 7   et al.                  :
                  Defendant   :
 8

 9
                    - - -
10         Tuesday, July 26, 2022
                    - - -
11

12         Videotaped deposition of DONALD

13   OUTLAW, taken pursuant to notice, at the

14   offices of the Philadelphia Law Department,

15   1515 Arch Street, Philadelphia, Pennsylvania,

16   before Michele L. Murphy, a Registered

17   Professional Reporter and Notary Public, on

18   the above date, beginning at approximately

19   10:45 a.m.

20                    - - -

21

22

23

24
```

```
 1   A P P E A R A N C E S:

 2

 3          VSCP LAW
            By:  JOSHUA VAN NAARDEN, ESQUIRE
 4               Two Commerce Square
                 2001 Market Street, Suite 3700
 5               Philadelphia, PA 19103
                 215-960-0000
 6               jvannaarden@vscplaw.com
                 Representing the Plaintiff
 7

 8          CITY OF PHILADELPHIA LAW DEPARTMENT
            By:  DANIELLE B. ROSENTHAL, ESQUIRE
 9               KATELYN MAYS, ESQUIRE
                 1515 Arch Street, 14th Floor
10               Philadelphia, PA 19102
                 215-683-5448
11               danielle.rosenthal@phila.gov
                 katelyn.mays@phila.gov
12               Representing the Defendants

13
     ALSO PRESENT:  Bill Hayes
14                  Video Technician

15
                        - - -
16

17                 (It is hereby stipulated and

18        agreed by and between counsel that

19        sealing, filing and certification are

20        waived; and that all objections, except

21        as to the form of questions, be reserved

22        until the time of trial.)

23                      - - -

24
```

Donald Outlaw - 10:45 a.m.   3 (3 - 6)
7/26/2022

Page 3

                    I N D E X

WITNESS:                            Page

Donald Outlaw
  By Ms. Rosenthal                6, 358
  By Mr. Van Naarden              348


           E X H I B I T S

No.      Description              Page

Outlaw-1    Complaint               20

Outlaw-2    Audio file              23

Outlaw-3    Defendants' First Set of
            Requests for Production 27

Outlaw-4    2021 Income Taxes       42

Outlaw-5    Supplementary Authorized
            Visitors form           98

Outlaw-6    Audio file             131

Outlaw-7    Affidavit of Lamar
            Rodgers                131

Outlaw-8    Affidavit of Katima
            Jackson                134

Outlaw-9    October 16, 2008 letter
            to Outlaw from Smarro  136

Outlaw-10   Affidavit of Chris
            Holder                 139

Outlaw-11   Affidavit of Wesley
            Harmon                 143

Page 4

INDEX (Continued):

           E X H I B I T S

No.      Description              Page

Outlaw-12   Audio file             149

Outlaw-13   Audio file             170

Outlaw-14   Inmate Visitor Log     187

Outlaw-15   Resume of Donald Outlaw 239

Outlaw-16   Audio file             282

Outlaw-17   Audio file             285

Outlaw-18   Audio file             288

Outlaw-19   E-mail chain between
            Foster and Monique Outlaw 296

Outlaw-20   Audio file             309

Outlaw-21   Audio file             313

Outlaw-22   Inmate Money Transfer
            Deposit History        317

Outlaw-23   Complaint - Motor Vehicle
            Accident               324

Outlaw-24   Praecipe to Attach
            Verification           328

Outlaw-25   Handwritten letter to
            Nikki                  342

       (Audio files retained by counsel.)
                    - - -

Page 5

1    VIDEO TECHNICIAN:  We are now
2  on the video record.  This is the video
3  deposition of Donald Outlaw, taken in the
4  matter of Donald Outlaw versus the City
5  of Philadelphia, Civil Action No.
6  21-1290, being held at 1515 Arch Street,
7  14th Floor, Philadelphia, PA on July 26,
8  2022 at 10:45 a.m.
9         I am Bill Hayes, the
10  videographer.  The court reporter is
11  Michele Murphy.  We are from the firm of
12  Strehlow and Associates.
13         Counsel will now introduce
14  themselves.
15         MR. VAN NAARDEN:  Josh Van
16  Naarden on behalf of Donald Outlaw.
17         MS. ROSENTHAL:  Danielle
18  Rosenthal on behalf of Defendant City of
19  Philadelphia, Howard Peterman, and
20  Jeffrey Piree.
21         VIDEO TECHNICIAN:  The court
22  reporter will now swear in the witness.
23         MS. ROSENTHAL:  Sorry.  My
24  co-counsel.

Page 6

1         MS. MAYS:  Katelyn Mays on
2  behalf of the City, Detectives Piree and
3  Peterman as well.
4         VIDEO TECHNICIAN:  The court
5  reporter will now swear in the witness.
6                    - - -
7         ...DONALD OUTLAW, after having
8  been duly sworn, was examined and
9  testified as follows:
10                    - - -
11  BY MS. ROSENTHAL:
12     Q.  So good morning, Mr. Outlaw.  Thank
13  you for bearing with us with the technical
14  difficulties.  I represent the defendants in
15  this case, and I will be taking your
16  deposition today.  So I just wanted to go over
17  some ground rules at the beginning of the
18  deposition to make sure it goes more smoothly
19  and we understand each other and we're on the
20  same page.
21         First of all, do you understand that
22  you're testifying under oath today and you're
23  legally obligated to tell the truth under the
24  penalty of perjury?

Page 7

1    A.   Yes.
2    Q.   So even though you're testifying in
3  an informal conference room, do you understand
4  that the same penalties apply for lying under
5  oath as if you were testifying in a courtroom
6  before a judge?
7    A.   Yes.
8    Q.   You must provide also a verbal
9  response to any questions that I ask.  The
10  stenographer is taking down what you say, so
11  like uh-huh or a verbal gesture won't be
12  easily recorded.  So if you could just
13  remember to provide verbal responses.
14       Does that make sense?
15    A.   Yes.  I will try my best.
16    Q.   If you don't hear a question or you
17  don't understand a question, please say so,
18  and I will repeat or rephrase the question or
19  ask the court reporter to read the question
20  back.
21       If you answer a question that I ask,
22  I will assume that you both heard the question
23  and understood the question.
24       Do you understand this?

Page 8

1    A.   Yes.
2    Q.   And I'm going to be asking you
3  questions today about certain events that may
4  have occurred quite a while ago.  If you have
5  an actual present recollection, no matter
6  whether it's faint or not, please give us that
7  recollection, but I'm not asking you to guess
8  or speculate if you do not remember.  So if
9  you do not remember, please say that you don't
10  remember.
11       Does that make sense?
12    A.   Yes.  I will try to give testimony
13  to the best of my ability.  A lot of stuff
14  from 10, 20 years ago is not fresh on my mind,
15  but whatever, you know, I remember, I will
16  definitely let you know to the best of my
17  ability.
18    Q.   Okay.  And then also if you don't
19  know the answer to a question, then please say
20  "I don't know" rather than to guess at an
21  answer, unless I ask you to make your best
22  guess in answering the question.
23       Does that make sense?
24    A.   Yes.  Whatever you need me to do, I

Page 9

1  will do.
2    Q.   Another thing that will help the
3  deposition go more smoothly is, don't start to
4  answer a question until I finish asking my
5  question, because if we talk over each other,
6  it will be difficult for the court reporter.
7  And I'll try to do the same in letting you
8  finish your answer and asking a question.
9       Does that make sense?
10    A.   Can you repeat that?
11    Q.   Sure.  So because the court reporter
12  is taking down what both of us are saying, it
13  is important that we don't talk over one
14  another.  So I'll do my best to let you finish
15  your answer before I ask another question, and
16  I would ask that you let me finish my
17  question, even if you think you know what is
18  coming, just let me finish my question before
19  you begin your answer.
20       Does that make sense to you?
21    A.   Yes.
22    Q.   If at any point during the
23  deposition if I've asked a question and you
24  need to talk to your attorney, you may do so

Page 10

1  if it relates to a claim of privilege.  Do you
2  understand what I mean by that?
3    A.   No, I do not.
4    Q.   Okay.  If I ask you a question,
5  unless your counsel instructs you not to
6  answer the question, you must answer it.  You
7  can ask, however, to consult with counsel, but
8  only if the reason for consulting with counsel
9  before answering the question is because you
10  have a question about whether there's an
11  attorney/client privilege, if it's amendment
12  privilege, some other privilege that you need
13  to confer with counsel about.
14       Does that make sense?
15    A.   Can you repeat that again?
16    Q.   Sure.  Sure.  Well, what part of it
17  is confusing to you?  Maybe -- so I can say it
18  more clearly rather than just repeat myself.
19    A.   I mean, I'm not a hundred percent
20  sure exactly what you mean by certain
21  privileges when it come to answering the
22  questions.  I just -- I didn't really
23  comprehend it, so can you repeat it, please.
24       MS. ROSENTHAL:  Does it make

Page 11

1  sense, Mr. Van Naarden, for you to say --
2  explain?
3          MR. VAN NAARDEN:  I'm happy to,
4  if you want me to.
5          MS. ROSENTHAL:  Sure.  Well,
6  yeah, sure.  Go ahead.  I'm not sure how
7  to explain it better, so...
8          MR. VAN NAARDEN:  I think what
9  Ms. Rosenthal is saying, under normal
10  circumstances if a question is posed, you
11  have to give an answer before taking a
12  break, but you are absolutely permitted
13  to take a break after you give your
14  answer if you so choose.
15          However, if the question is
16  asked of you and you're concerned that
17  your answer may incriminate you or that
18  answer may divulge discussions that
19  you've had with attorneys that may be
20  privileged, you can ask to take a break
21  even before you give your answer if you
22  want to speak to me under those
23  circumstances.
24          Does that make sense?

Page 12

1          THE WITNESS:  Yes.
2          MR. VAN NAARDEN:  Okay.
3          MS. ROSENTHAL:  Okay.
4  BY MS. ROSENTHAL:
5      Q.   So, yeah, that explained it well.
6  It has to relate to a question about divulging
7  communications or incriminating yourself or
8  some other legally protected reason for not
9  answering, though.  You can't consult with
10  your counsel about just the best way to answer
11  the question, if that makes sense.
12      A.   Yes.
13      Q.   Okay.  And if you want to take a
14  break at any point in time to stretch, to go
15  to the bathroom, to get something to eat, feel
16  free to let me know, and we'll take a break,
17  and we will probably take breaks regularly
18  regardless.
19          Do you understand that?
20      A.   Yes.
21      Q.   Okay.  Do you have any questions for
22  me before the deposition begins about how it
23  will proceed today?
24      A.   No.

Page 13

1      Q.   Okay.  Did you take any prescription
2  medications or any other substances within the
3  past 24 hours that could impair your memory,
4  your ability to answer my questions, or your
5  ability to testify truthfully and fully?
6      A.   No.
7      Q.   Is there any other reason that you
8  may not be able to testify fully and
9  truthfully today?
10      A.   No.
11      Q.   Have you ever been deposed before?
12      A.   Deposed?  What you mean?
13      Q.   Have you ever sat for a deposition
14  similar to the deposition you're sitting for
15  today in a civil case?
16      A.   No.  No.  I never had to sit with
17  this before.
18      Q.   Have you ever testified in court
19  before?
20      A.   I'm not sure.  I've been through a
21  lot of court proceedings.
22          COURT REPORTER:  I'm sorry.
23  Can you keep your voice up.  You're very
24  soft spoken.

Page 14

1          THE WITNESS:  Yeah.  I'm not
2  sure.  I've been through a lot of court
3  proceedings.  To my knowledge, I think so
4  with all the stuff going on with my case.
5  BY MS. ROSENTHAL:
6      Q.   Can you recall a specific instance
7  in which you testified in court before either
8  as a party to a case or as a witness?
9      A.   Not offhand.
10      Q.   Have you ever been a plaintiff or a
11  defendant in a civil case other than this
12  case?
13      A.   Can you repeat the question?
14      Q.   Sure.
15          Have you ever been a party to a
16  civil case, excluding this case?
17      A.   No, not that I know of.
18      Q.   Did you do any sort of preparation
19  in advance of your deposition today?
20      A.   No.  Well, I woke up, ate breakfast,
21  tried my best to just clear my mind.
22      Q.   So without divulging any
23  communications between you and your counsel,
24  did you meet with your counsel to prepare for

Page 15

1  your deposition today?
2      A.   Yes.  I met with my counsel
3  yesterday to -- he told me that the deposition
4  was tomorrow.
5          MR. VAN NAARDEN:  You can't
6      talk about what we talked about.  She's
7      very careful.  She's saying don't talk
8      about what we talked about, but she can
9      ask questions kind of around the fringe,
10      like where we met and how long we spent.
11          THE WITNESS:  Well --
12          MR. VAN NAARDEN:  She has to
13      ask the questions.
14  BY MS. ROSENTHAL:
15      Q.   You met yesterday with your counsel
16  about preparing for the deposition today?
17      A.   I met with my counsel yesterday.  He
18  told me that the deposition --
19      Q.   No.
20      A.   -- was today and to be on time.
21  That was it.
22      Q.   Okay.  So you didn't prepare
23  substantively.
24          Did you meet any other time with

Page 16

1  your counsel where you met in part or in full
2  to prepare for today's deposition?
3      A.   Can you repeat that question?
4      Q.   Sure.
5          Other than the meeting yesterday,
6  which it sounds like you did not substantively
7  discuss preparation for the deposition, did
8  you have any other meeting with your counsel
9  that specifically addressed preparation for
10  the deposition today?
11      A.   No, not that I know of.  No.
12      Q.   How long did you meet with your
13  counsel yesterday?
14      A.   I'm not exactly sure of the time.
15  Like ten minutes.
16      Q.   Did you review any documents in
17  preparation for your deposition today?
18      A.   No.
19      Q.   Did you speak with anyone else other
20  than your counsel about your deposition today?
21      A.   What do you mean by that?  I'm
22  confused.
23      Q.   Did you talk to anyone else,
24  excluding your counsel, who I already asked

Page 17

1  about, about your deposition today?
2      A.   I mean, my wife.  I know that she
3  got deposed, and I told her I was getting
4  deposed today.  But as far as in-depth
5  conversation, no, but just in general about
6  the deposition, my wife.
7      Q.   Did you talk to anyone about what
8  questions might be asked of you or what
9  answers you might give?
10      A.   No.
11      Q.   Have you read any transcripts of
12  prior depositions in this case?
13      A.   Prior depositions?  What you mean?
14      Q.   Other people have been deposed in
15  this case thus far.  Have you read any
16  transcripts of those depositions or viewed any
17  video recordings of those individuals being
18  deposed?
19      A.   No, I have not.
20      Q.   Did you speak with your wife about
21  her deposition, other than the fact that she
22  was deposed?
23      A.   No.  We didn't get into depth, but
24  she told me that she got deposed and a lot of

Page 18

1  the questions was uncomfortable for her.
2      Q.   Okay.  I just want to be clear,
3  because when you say you didn't go into depth,
4  I'm unsure whether you mean that you didn't
5  discuss it at all or you didn't discuss it to
6  the extent you would consider it to go into
7  depth.
8          You said that she said that a lot of
9  the questions were uncomfortable.  Did she say
10  anything else about the deposition?
11      A.   No.  That was it.  When she left the
12  deposition and got home that night, she told
13  me that she got deposed and that she was asked
14  some things that she wasn't comfortable with,
15  and she left it there.  She was like -- you
16  know, she know that I was supposed to get
17  deposed soon, and that was basically it.
18          MS. ROSENTHAL:  Can you hear
19      him?
20          COURT REPORTER:  It's very
21      difficult.
22          If you could just keep your
23      voice up a little bit more, that would be
24      great.

Page 19

```
 1              THE WITNESS:  I apologize.  I'm
 2     sorry.
 3              COURT REPORTER:  Thank you.
 4              THE WITNESS:  I'mma try my
 5     best.
 6              COURT REPORTER:  Thank you.
 7  BY MS. ROSENTHAL:
 8     Q.   Did she specify what questions she
 9  was uncomfortable with?
10     A.   No, she did not.
11     Q.   Did you know she was going to be
12  deposed in advance of Friday's deposition?
13     A.   Yes.
14     Q.   Did you ask her any questions about
15  the deposition?
16     A.   No.
17     Q.   Did you bring any documents with you
18  today?
19     A.   No, I did not.
20     Q.   Okay.  I want to show you a document
21  that I'm going to mark as Exhibit-1 -- or
22  excuse me.  I'm going to mark it as Outlaw
23  Exhibit-1.  It's a copy of the Complaint that
24  was filed in this case.
```

Page 20

```
 1              - - -
 2         (Exhibit Outlaw-1 marked for
 3     identification by counsel.)
 4              - - -
 5  BY MS. ROSENTHAL:
 6     Q.   So just for the record, this is a
 7  copy of the 26-page ECF filing of the
 8  Complaint in this case dated March 17th, 2021.
 9         Are you familiar with this document,
10  Mr. Outlaw?
11     A.   Yes.
12     Q.   Have you read it in full?
13     A.   Yes, but I don't remember exactly.
14  I don't remember every page of the document,
15  but I've seen it.
16     Q.   Okay.  My question was only whether
17  you read it in full.
18         Did you read it prior to the
19  Complaint being filed?
20     A.   No.
21     Q.   You did not see a copy of the
22  Complaint prior to your counsel filing it in
23  court?
24     A.   I don't know exactly when it was
```

Page 21

```
 1  filed, so I can't honestly say that I saw it
 2  before or after.  I don't know.  I just know
 3  that he showed me or gave me a copy of it.
 4  Before or after it was filed, I'm not sure.
 5     Q.   I want to direct your attention to
 6  the first page of the Complaint.  It's the
 7  page that's marked Page 4, if you look at the
 8  numbering at the top.
 9              MS. ROSENTHAL:  I apologize.
10     Sorry.  Can we go off the record for one
11     second.
12              VIDEO TECHNICIAN:  We're now
13     going off record.  The time now is 11:02
14     a.m.
15              - - -
16         (Discussion held off the
17     record.)
18              - - -
19              VIDEO TECHNICIAN:  We're now
20     back on record.  The time is 11:05 a.m.
21  BY MS. ROSENTHAL:
22     Q.   So before we went off the record, I
23  called your attention to the first page of
24  allegations in the Complaint.  Do you see
```

Page 22

```
 1  Paragraph 2?
 2         I think that you may be on the wrong
 3  page.
 4     A.   Page 4?
 5     Q.   It's Page 4 if you look at the
 6  numbering at the top.  If you want to look at
 7  the numbers at the bottom, it's Page 1.
 8     A.   Oh, I'm sorry.
 9     Q.   That's okay.
10         Do you see under No. 2 it reads,
11  "Mr. Outlaw ultimately spent sixteen years
12  wrongfully incarcerated for these crimes,
13  before his conviction was overturned, as a
14  direct result of clear and unequivocal
15  violations of his constitutional civil rights
16  that led to his conviction"?
17         Do you see where I read that?
18     A.   Yes.
19     Q.   Is that a correct statement, that as
20  a result of your belief that you were
21  wrongfully incarcerated, you spent 16 years in
22  prison needlessly for a crime you didn't
23  commit?
24     A.   Can you ask that question again?
```

Page 23

```
 1    Q.   Sure.
 2         Do you believe that that's a correct
 3  allegation as stated in No. 2?
 4    A.   Yes.  Absolutely.
 5    Q.   Well, isn't it true that you spent
 6  ten of those years locked up for a different
 7  case?
 8         MR. VAN NAARDEN:  Objection.
 9         THE WITNESS:  No.
10  BY MS. ROSENTHAL:
11    Q.   So I'm going to mark as Exhibit --
12  Outlaw Exhibit-2, and I understand from the
13  stenographer that the audio clip will be
14  retained by counsel rather than submit it but
15  can be marked as Exhibit-2, a call from
16  Christopher Holder to the number 267-456-8719
17  that was placed on February 17th, 2021 at
18  9:08:26, and the clip covers minute 3:05 to
19  6:20.  I'm going to play it for you.
20         MR. VAN NAARDEN:  Hold on a
21    second.  What is the source of the -- is
22    that from the PA prisons?  So we can
23    track.  What is the source of that call?
24         MS. ROSENTHAL:  I believe it's
```

Page 24

```
 1  from the PA prisons.
 2         MR. VAN NAARDEN:  So
 3  Pennsylvania Department of Corrections?
 4         MS. ROSENTHAL:  Yes, although I
 5  won't -- I believe so, but I will -- I am
 6  happy to confirm that for you.
 7         MR. VAN NAARDEN:  Well, just
 8  for all of these clips, I think just for
 9  the record we need to know obviously, as
10  you've done, the date, the time, and the
11  duration of the clip but also the source.
12         MS. ROSENTHAL:  Sure.  Sure.  I
13  believe this is from the Department of
14  Corrections.
15         MR. VAN NAARDEN:  And, again,
16  is it specific as to which institution it
17  came from?  Because you're talking about
18  Chris Holder.
19         MS. ROSENTHAL:  Sorry.  The
20  Pennsylvania Department of Prisons.
21         MR. VAN NAARDEN:  I understand,
22  but do you have -- do you know what --
23         MS. MAYS:  But like which SCI?
24         MR. VAN NAARDEN:  Correct,
```

Page 25

```
 1  because if it's coming from Chris Holder,
 2  it could be from a different institution.
 3         MS. ROSENTHAL:  No.  The
 4  Pennsylvania -- sorry.
 5         MR. VAN NAARDEN:  That's okay.
 6         MS. ROSENTHAL:  The
 7  Philadelphia Department --
 8         MS. MAYS:  CFCF?
 9         MR. VAN NAARDEN:  CFCF?
10         MS. ROSENTHAL:  No.  I don't
11  know what facility.  I don't think that
12  it's designated in the --
13         MR. VAN NAARDEN:  And this was
14  produced, correct?
15         MS. ROSENTHAL:  Yes.  All the
16  calls were produced.
17  BY MS. ROSENTHAL:
18    Q.   So please let me know if you can't
19  hear this.
20         (Audio being played.)
21         Sorry.  Is that loud enough?
22         MS. MAYS:  I don't think it's
23  coming out at all.
24         MS. ROSENTHAL:  Can we go off
```

Page 26

```
 1  the record.  I'm sorry.
 2         VIDEO TECHNICIAN:  We're now
 3    going off record.  The time now is
 4    11:09 -- 11:10 a.m.
 5                  - - -
 6         (Discussion held off the
 7    record.)
 8                  - - -
 9         VIDEO TECHNICIAN:  We're now
10    back on record.  The time is 11:11 a.m.
11  BY MS. ROSENTHAL:
12    Q.   Okay.  So I am going to play a video
13  clip that I have marked as Outlaw Exhibit-2.
14  It's a call from Christopher Holder at the
15  Philadelphia Department of Prisons to the
16  number 267-456-8719 on February 17th, 2021 at
17  9:08:26, and the clip covers minute 3:05 to
18  minute 6:20.
19         MR. VAN NAARDEN:  Just you said
20    it was a video clip.  That's not true,
21    right?
22         MS. ROSENTHAL:  Audio clip.
23         MR. VAN NAARDEN:  Okay.  Great.
24         (Audio being played.)
```

Page 27

MS. ROSENTHAL:  All right.
Sorry.  We're going to have to go off.  I
don't know what's going on with the
audio.

          VIDEO TECHNICIAN:  We're now
going off record.  The time is 11:14 a.m.

               - - -

          (Discussion held off the
record.)

               - - -

          VIDEO TECHNICIAN:  We're now
back on record.  The time is 11:19 a.m.
BY MS. ROSENTHAL:
     Q.  We're having issues with the audio
being audible, so I'm going to fast forward
and skip that at this point.
          MS. ROSENTHAL:  I'm going to
mark as Exhibit-3 -- I'm going to mark as
Outlaw-3 Defendants' First Set of
Requests for Production Directed Toward
Plaintiff Donald Michael Outlaw.
               - - -
          (Exhibit Outlaw-3 marked for
identification by counsel.)

Page 28

               - - -
BY MS. ROSENTHAL:
     Q.  Have you seen this document before?
     A.  Yes.
     Q.  Do you recognize it as a set of
requests asking you to produce documents?
          MR. VAN NAARDEN:  Hold on a
second.  What you gave me -- oh, I'm
sorry.
BY MS. ROSENTHAL:
     Q.  You said that you have seen this
document before?
     A.  Yes, but I looked at so many
documents, so many different paperwork, I want
to refresh my memory before I intelligently
speak on anything that's in here.
     Q.  Sure.  I will give you time to look
through it if you need to to answer any
questions.
     A.  Right, but you asked me if I saw the
document, and I just want to, you know, look
at it before I commit myself to saying that.
          (Pause.)
          Okay.

Page 29

     Q.  When you received this set of
document requests, did you search for all of
the documents that were requested within the
set of requests?
     A.  Yes.
     Q.  And what sources of information or
files did you search; for example, computer,
hard copy files, e-mails, text messages?  What
sources of information did you search?
     A.  I do not have a computer.  I
searched my telephone.
     Q.  You do not have a computer?
     A.  No, I do not.
          I searched my telephone, my e-mail
record, my text log, my call log, anything
that was in my phone.
     Q.  Do you have a tablet?
     A.  No.
     Q.  Did you search for any hard copy
documents?
     A.  Yes.  To the best of my ability,
yes.
     Q.  Did you have hard copy documents?
     A.  No.

Page 30

     Q.  Okay.  So any hard copy documents
produced by your counsel were obtained from
elsewhere, you didn't have any?
     A.  Unfortunately, I served a lot of
time in jail, and I'm not real savvy with a
lot of stuff.  Like I depend on my wife for a
lot of things.  I'm like, you know,
handicapped with a lot of stuff due to my
long-term incarceration.  I really don't know
how to keep up with a lot of things.  I really
don't -- you know, a lot of stuff I rely on
Monique for.
          I spent most of my life in jail, and
these are not things that -- any type of
documents or things of that nature, like I
don't keep.  I don't -- like anything with
that, I rely on my wife.  Like I give it to
her and, you know, it's her job to, you know,
store it, keep track of it, so forth and so
on.  Due to me being behind, like I really
don't know how to do a lot of things, where I
rely on my wife for a lot.
     Q.  Okay.
     A.  So my main source of trying to find

Page 31

1 these documents and everything that you asked
2 for was me asking Monique.
3    Q.   Okay.  I'd like to strike that
4 answer as non-responsive.
5         My question is whether you
6 provided --
7    A.   I apologize.
8    Q.   -- any hard copy documents to your
9 counsel.  If any hard copy documents were
10 produced, would they have come from a
11 different source other than you?
12   A.   Yes.  More than likely, it would
13 have came from --
14   Q.   That's not -- I've not asked --
15        MR. VAN NAARDEN:  Danielle, you
16   have to let him answer the question.  If
17   you want --
18        MS. ROSENTHAL:  My question --
19        MR. VAN NAARDEN:  If you want
20   to move to strike it after the fact, but
21   you can't just interrupt him in the
22   middle of an answer.  So if you could let
23   him answer, and if you want to move to
24   strike it, so be it.

Page 32

1        MR. ROSENTHAL:  Sure.  If we
2   can --
3        MR. VAN NAARDEN:  But it's
4   not -- just like I don't want to be
5   interrupted when I'm talking.
6        MS. ROSENTHAL:  Sure.  If we
7   spend --
8        MR. VAN NAARDEN:  But -- I'm
9   still talking.
10        If you want to move to strike
11   an answer, that's your prerogative, but
12   you can't -- that's the instruction you
13   gave the witness in the beginning.  He
14   hasn't stepped on your toes.
15        MS. ROSENTHAL:  Sure.  If we do
16   spend a lot of the deposition with
17   non-responsive answers, though, then we
18   may need to extend the time of the
19   deposition because the amount of time
20   that was taken up not answering the
21   questions.
22        MR. VAN NAARDEN:  You can
23   certainly seek whatever legal avenues you
24   believe are appropriate to do that.

Page 33

1   Obviously we're not going to agree to
2   that.  He's here and he's willing to
3   answer all of your questions.
4        MS. ROSENTHAL:  Okay.  I
5   believe --
6        MR. VAN NAARDEN:  That are
7   appropriate.
8 BY MS. ROSENTHAL:
9    Q.   I believe that you've answered my
10 question, that you don't have any hard copy
11 documents and none were provided.
12        Did you find any responsive
13 documents -- well, let me strike that.
14        First of all, does your wife have a
15 computer?
16   A.   No.
17   Q.   Have you ever owned a computer?
18   A.   No.  I was in jail most of my life.
19   Q.   And how many phones do you own?
20   A.   Currently right now, one.
21   Q.   My question is how many phones do
22 you have, whether or not they're currently
23 active, that are in your possession that
24 you're able to search for responsive documents

Page 34

1 or communications on?
2    A.   One.
3    Q.   So all your prior phones are no
4 longer in your possession?
5    A.   Yeah.  Unfortunately, I spent most
6 of my life in jail.  Like I'm not -- like I'm
7 careless with the devices.  Sometimes I've
8 gotten out the car, I dropped my phone.  I
9 lost it.  Several of my phones have been
10 broken and, you know, my number changed a lot
11 because I lose my phones, I break them, and
12 they're no good to me no more.  If they're
13 broken and if I lose it, I don't have it.
14   Q.   When is the most recent phone that
15 you have gotten?
16   A.   The one I have now.
17   Q.   Yes.  When did you obtain it?
18   A.   I just changed my number and got a
19 new phone maybe two weeks ago.
20   Q.   And is your phone one that's
21 registered in your name with the cell phone
22 company or is it a phone that you've purchased
23 that's not registered in your name?  For
24 example, you can purchase phones that have

Page 35

1  minutes on them.
2      A.   I have a prepaid phone, so I'm not
3  sure of what you're asking me, but I hope that
4  answers the question.
5      Q.   So every time you get a new phone,
6  you need to change your number?
7      A.   No.  When I get a new phone, it's
8  because I lost the phone or I broke a phone.
9  So if I lose a phone, I get a new phone.
10     Q.   Okay.  I think we're talking past
11 each other.  My question is -- or I might be
12 wrong, but when you go --
13     A.   I'm sorry.
14     Q.   My understanding is when you go and
15 you buy a phone that's not, you know, an AT&T,
16 registered with a cell phone company, then
17 you -- that there's a new number that's
18 assigned to that phone.  Is that not correct?
19     A.   Yes.  I believe so, yes.  I never
20 kept the same number, because I had different
21 phones.
22     Q.   Okay.  So --
23     A.   But exactly -- I don't work for the
24 cell phone company.  I don't know exactly a

Page 36

1  hundred percent how it works.
2      Q.   What's your current phone number?
3      A.   My current phone number is -- I
4  don't know.  I will have to ask my wife.  I
5  just changed it.  215 something.
6      Q.   What was your last phone number?
7      A.   I don't know.
8      Q.   What's the last phone number that
9  you remember having?
10     A.   I'm not sure.  I'm not good with
11 that.
12     Q.   What happened to your --
13     A.   I've changed my number.  Since I've
14 been released from prison, my number has
15 changed at least 10 or 15 times.
16     Q.   What kind of phone is it that you
17 have now?
18     A.   An iPhone.
19     Q.   And what's the carrier?
20     A.   I believe it's -- it's a prepaid
21 phone.  I think it's Simple Mobile or AT&T.
22 It's one of them prepaid phones.  I'm not
23 exactly sure.
24     Q.   Is that phone in only your name or

Page 37

1  is it also in someone else's name?
2      A.   I'm not sure.  When I purchased the
3  phone, they don't ask for that type of
4  information.  So I don't know exactly who name
5  the phone is in.  They never asked me.  It's
6  not no stipulations to the phone.  I just
7  purchased the phone.
8      Q.   And it's an iPhone.  What model
9  iPhone?
10     A.   I'm not good with technology.  I
11 don't know.  It's an iPhone.  I'm not sure.
12     Q.   How much did it cost?
13     A.   I paid about 300, 400 for it.
14     Q.   And what happened to your last
15 phone?
16     A.   I lost it.
17     Q.   How long did you have that phone
18 for?
19     A.   I'm not sure.
20     Q.   Did you have it for longer than a
21 month?
22     A.   I'm not sure.
23     Q.   Can you remember if you had it for
24 longer than six months?

Page 38

1      A.   No.  I know I didn't.
2      Q.   At the time that you received this
3  request for production, did you search the
4  phone that you currently had?
5      A.   Whatever phone I had at that moment,
6  that's the phone I searched.
7      Q.   And so how many phones would you --
8  just roughly, how many phones would you
9  estimate that you've had since being released
10 from prison?
11     A.   I mean, this is just a guess.  Maybe
12 15, 20.
13     Q.   Fifteen, 20.  And you lost all of
14 those phones or did they break?
15     A.   I lost some, I broke some.  My wife
16 broke a couple.
17     Q.   The ones that were broke, did you
18 save those or you threw them away?
19     A.   No.  I got rid of them.  There was
20 no sense in me keeping a broke phone.
21     Q.   So do you have an e-mail address?
22     A.   Yes.
23     Q.   Do you have more than one?
24     A.   I probably got 15 e-mail addresses.

Page 39

1    Q.   Oh, you have 15 e-mail addresses.
2  What are those?
3    A.   I don't know.  Every time I change
4  the phone -- only how I know how to get into
5  an e-mail is from the phone that I have at the
6  moment.  So when I change my phone, a lot of
7  times I get locked out the e-mail.  I'm not
8  real savvy with the e-mail system, so I would
9  have to set up a new one for the phone.
10   Q.   What's your current e-mail address?
11   A.   I'm not a hundred percent sure,
12 because I rarely use the e-mail.
13   Q.   So you don't know how to retrieve
14 e-mails -- well, let me ask you this:  Do you
15 have any Gmail accounts?
16   A.   What's -- I don't understand.  What
17 do you mean "Gmail"?
18   Q.   Do you know if any of the e-mail
19 addresses ended at @Gmail.com?
20   A.   I believe so.  I mean, when -- I
21 don't know how to set up an e-mail.  Monique
22 will set up the e-mail for me.  So I would
23 really have to ask Monique what it is.
24   Q.   So am I understanding you correctly

Page 40

1  that you did not search e-mail in response to
2  these document requests?
3    A.   No.  That's not true at all.
4    Q.   Okay.  What e-mail did you search?
5    A.   Every e-mail that I have, but my
6  source of searching the e-mail is telling
7  Monique, they want this information, Monique.
8  Can you go and search the e-mails and give
9  them whatever they need.
10   Q.   I'm sorry.  I thought I understood
11 that you had a different e-mail account
12 associated with every different phone?
13   A.   I do.
14   Q.   So how would she be able to search
15 e-mails that are only on phones that are
16 broken and lost?
17   A.   Well, Monique sets it up, so if she
18 knows the passcode or whatever.  And then
19 sometimes she'd say that she could do
20 something to try to get in there.  If she
21 can't get in, she can't get in, but she tried
22 to get into every e-mail that she remembered I
23 had, and I went from there.
24        I relied on Monique to come up with

Page 41

1  this information.  Once I knew that I had to
2  give whatever information that y'all wanted, I
3  tried my best.  I searched as much as I could.
4  When I came to a dead end, I called my wife,
5  told her that they want this information, can
6  you look through all my prior e-mails, can you
7  look through whatever you got to give them
8  everything they need.
9        I want to give them -- you know, I
10 want to be straightforward with y'all and give
11 y'all everything that y'all want, everything
12 y'all need.  I didn't leave no stone unturned.
13 I did everything I could to provide all the
14 information that y'all wanted.
15   Q.   And by everything you could, you
16 mean asked Monique?
17        MR. VAN NAARDEN:  Objection.
18        THE WITNESS:  No.  I looked
19     through the phone that -- the device I
20     had.
21 BY MS. ROSENTHAL:
22   Q.   You looked -- I thought -- do you
23 know how to look at e-mail on the device you
24 have?

Page 42

1    A.   Yeah.  I'm not savvy with it, but I
2  got with Monique.  She went through the phone,
3  me and her went together.
4    Q.   And does Monique know the passwords
5  and user names for your 15 to 20 e-mail
6  accounts?
7    A.   I can't tell you what Monique knows,
8  but Monique is more savvy with the e-mail
9  system than I am.  She sets it up for me, and
10 I rely on her.  As far as which e-mail what
11 she remembers, I can't tell you that.  I'm
12 sorry.  I apologize.
13   Q.   If you don't have a computer --
14 well, let me show you a document that I'm
15 going to mark as Outlaw Exhibit-3.
16        MR. VAN NAARDEN:  3 are these
17     Interrogatories.
18        MS. ROSENTHAL:  Outlaw
19     Exhibit-4.
20             - - -
21        (Exhibit Outlaw-4 marked for
22     identification by counsel.)
23             - - -
24 BY MS. ROSENTHAL:

Page 43

Q.   This is a copy of a 2021 tax return
pertaining to you that was produced to us in
this litigation.

Did you prepare this tax return
yourself?

A.   I mean, unfortunately, I spent most
of my life in jail.  I don't know how to
prepare taxes.  I don't know how to do a lot
of things.  Like I'm naive, and I don't really
know how to do a lot of things and I rely on
Monique.

Q.   I would strike everything in your
response as non-responsive other than you
don't know how to prepare a tax return, which
I take to mean you didn't prepare yourself.

I'd like to turn your attention to
the second page of the -- the second page of
the tax return.

I apologize.  Do you have the 2020
or 2021 tax return?  2021.

I'd like to turn your attention to
the second page.  Do you see at the bottom of
the page where it says "self-prepared"?

A.   Yes, I see that.

Page 44

Q.   Was it your testimony that you did
not prepare this tax return yourself?

A.   Yes.  That's my testimony exactly.
I did not prepare this myself.  I don't know
how to do that.  I'm not a tax expert.  I
spent most of my life in prison.  I do not
know how to do taxes.

Q.   Well, why would you submit a tax
return then that said that it was
self-prepared?

A.   I allow my wife to prepare it for
me.  I didn't know exactly what was on none of
this stuff.  I don't know how to do this.  So
I can't accurately give you an honest question
about why would I do anything on this paper,
because I didn't do it.

Q.   Did you --

A.   My wife did it.

Q.   Did you see the tax return before it
was submitted?

A.   No.

Q.   Did she consult you about it?

A.   She just told me she filed my taxes.

Q.   Did you ever sign the tax return?

Page 45

A.   No.

Q.   So it's your testimony that your
wife prepared the tax return, wrote that it
was self-prepared, and either submitted it
without your signature or with a forged
signature?

A.   It's my testimony that I gave my
wife consent to file my taxes on my behalf.
She's my wife.  She has power of attorney.  So
that's my testimony today, that I gave my wife
consent to file my taxes for me, that I told
her to file my taxes for me.

I've given Monique power of attorney
on my behalf.  If anything happens to me, she
can act as me, so...

Q.   You have a power of attorney
agreement with Monique?

A.   Yes, I do.

Q.   And what does that cover
specifically?

A.   I mean, I'm not a hundred percent
sure, but just from my understanding, that
Monique can make decisions on my behalf.

Q.   About anything, any legal matter she

Page 46

has power of attorney over you?

A.   I can't give you that response.  I
don't know.  I just know she has power of
attorney, and whatever that means, that's what
it means.

Q.   Did you sign a power of attorney
form?

A.   Yes.

Q.   When was that?

A.   I'm not a hundred percent sure.
Sometime throughout my incarceration.

Q.   Did Monique ever consult you about
the tax return when she was preparing this?

A.   She asked me questions about my W-2,
where it was at and things of that nature,
but...

Q.   Did you have a W-2 from 2021?

A.   I don't know.  Whatever got sent to
the house.  I told her to check the mail.

Q.   She asked you about the W-2 and you
told her to check the mail?

A.   Listen, I don't know.  You're asking
me did Monique confer with me about my taxes.
I can't tell you exactly what was the

Page 47

1  conversation me and her had, but when it came
2  time for my W-2 form, I told her, you know, I
3  was waiting on it from the mail, that she had
4  to check for it in the mail, but...
5      Q.   Go to the first page of the tax
6  return.  Do you see that the address listed,
7  91 North York Road, Willow Grove?
8      A.   Yes, I see that.
9      Q.   Is that an address that you've lived
10 at?
11     A.   That's an address that is an
12 apartment that I frequent, but I didn't a
13 hundred percent live there.
14     Q.   What do you mean it's an apartment
15 that you frequent?
16     A.   It's an apartment that I frequent,
17 that I had, and I will go back and forth from
18 my house to there.
19     Q.   During what time period?
20     A.   I had the apartment for about a
21 little over a year.
22     Q.   From when to when?
23     A.   I can't give you that.  I don't
24 know.

Page 48

1      Q.   Well, when did you last have it?
2      A.   I think -- what year is this?
3      Q.   2022.
4      A.   So probably like March of '22,
5  somewhere around there.
6      Q.   Okay.  And --
7      A.   But I wasn't living there.  I live
8  with Monique at 241 Cambridge Road.
9      Q.   And you said it's an apartment that
10 you frequent.  Do you pay rent for the
11 apartment?
12     A.   I no longer have the apartment.
13     Q.   When you had the apartment, did you
14 pay rent or did you own the apartment?
15     A.   I paid rent.
16     Q.   Who did you pay rent to?
17     A.   Whatever company it was.
18     Q.   So you had a lease for the
19 apartment?
20     A.   Yes.
21     Q.   And was there any other individuals
22 who were living with you there or frequenting
23 the apartment with you there?
24     A.   Yes.

Page 49

1      Q.   Who was that?
2      A.   A girl named Zakia.
3      Q.   Last name?
4      A.   I don't know Zakia's last name
5  offhand.
6      Q.   Were you at any point married to
7  Zakia?
8      A.   Legally, no.
9      Q.   What about non-legally?
10          MR. VAN NAARDEN:  Objection.
11          I'll let you answer.
12 BY MS. ROSENTHAL:
13     Q.   Did you consider her to be your
14 wife?
15     A.   I'm not sure if you have any
16 knowledge of the Islamic faith, but legally in
17 Pennsylvania I am married to Monique and only
18 Monique.  Me and Zakia had a relationship, and
19 at one point we had a religious ceremony
20 Islamically, and I guess you would consider it
21 like religiously married.
22     Q.   Did you have a child with her?
23     A.   Yes, I did.
24     Q.   So you religiously married this

Page 50

1  woman, had a child with her, but you don't
2  know her last name; is that your testimony?
3      A.   I mean, offhand like, yeah, that's
4  my testimony, but like I don't just run around
5  just knowing everybody's last name, her last
6  name or something.
7      Q.   Well, it doesn't sound like she's
8  everybody.  It sounds like she's the mother of
9  your child.
10     A.   Yeah, exactly.
11     Q.   Do you know why Monique would put
12 this other address on your tax return?
13     A.   You would have to ask Monique that.
14 You're asking me why Monique made decisions.
15 I can't tell you why Monique did anything.
16     Q.   I want to turn your attention to the
17 last page of the document.  Do you see that --
18          MR. VAN NAARDEN:  What Bate
19     number is it?
20          MS. ROSENTHAL:  PLAINTIFF00611.
21          MR. VAN NAARDEN:  Okay.
22 BY MS. ROSENTHAL:
23     Q.   Do you see how at the top it says,
24 "Complete Part III for each student for whom

Page 51

1  you're claiming either the American
2  opportunity credit or lifetime learning
3  credit," and then there's some information
4  filled out under Student and Educational
5  Institution Information?  Do you see that on
6  the last page?
7      A.   On this page?
8      Q.   Yep.
9      A.   Right here?
10     Q.   Yep.
11     A.   You're talking about line where it
12 says 22?
13     Q.   Do you see that this page appears to
14 contain information for individuals who are
15 claiming a tax credit as a result of being a
16 student at an educational institution?
17     A.   Yes.  I see that on here.
18     Q.   Do you see that Delaware County
19 Community College is listed as the name of the
20 educational institution that Donald Outlaw is
21 attending?
22     A.   Yes, I see that.
23     Q.   Have you attended Delaware County
24 Community College?

Page 52

1      A.   Me and Monique had conversations
2  about me going back to school going to
3  Delaware County.  I actually spoke with
4  somebody about it, but I didn't fully pursue
5  it all the way.
6      Q.   So you never enrolled in Delaware
7  County Community College?
8      A.   No, I did not.
9      Q.   But did you have any knowledge that
10 Monique was claiming a tax credit for you
11 having enrolled in Community College?
12     A.   You would have to ask Monique about
13 anything on this paper.  I just gave Monique
14 permission to file it.  So Monique could have
15 been under the impression I enrolled or
16 whatever the case may be, but --
17     Q.   I would like --
18     A.   -- but you're asking me about a
19 document that I did not prepare, and I can't
20 really give you the information that you're
21 looking for, because I didn't prepare this
22 document.  So I apologize.  I'm trying to
23 answer the questions to the best of my
24 ability, but I didn't prepare the document.

Page 53

1  I'm sorry.
2      Q.   Mr. Outlaw, if you could just listen
3  carefully to my questions, I think it would go
4  smoother.  My question is, did you have any
5  knowledge that Monique was claiming a tax
6  credit for you having attended or that you
7  were attending Delaware County Community
8  College?
9      A.   I'm sorry.  What's your name?
10     Q.   My name?
11     A.   Yes.
12     Q.   Danielle Rosenthal.
13     A.   I'm sorry, Danielle.  I'm answering
14 the questions to the best of my ability.  I'm
15 not sure exactly what you're looking for, but
16 I didn't prepare the document.  I don't know
17 what you want me to say.  I'm sorry.  But I
18 don't know.
19     Q.   My question is, did you have
20 knowledge of her having filled out the form
21 this way and claiming a tax credit for you?
22 My question is not what her intent was or what
23 knowledge she had.
24     A.   I didn't know exactly a hundred

Page 54

1  percent what she put on this form.  All I know
2  is Monique is my wife.  She does a lot of
3  my -- a lot of things for me.  She sends my
4  e-mails.  She washes my clothes.  She prepares
5  my meals.  She -- I rely on Monique for a lot
6  of things, and I relied on Monique to file my
7  taxes, and I didn't second guess, you know,
8  her filing my taxes.
9          I didn't -- no, we didn't go through
10 this and, you know, we didn't go over it with
11 everything she put on there.  So I can't
12 answer the question the way you want me to.
13 I'm sorry.
14     Q.   Before today are you aware that a
15 tax credit was -- an educational tax credit
16 was claimed for you in 2021 on your tax
17 returns?
18     A.   I'm sorry.  I gave the best answer I
19 can give you.  Before today I knew Monique
20 filed my taxes for me.  I knew before this
21 that Monique made some mistakes, got with a
22 tax expert, and we have an expert amending our
23 taxes right now as we speak.
24         MR. VAN NAARDEN:  Danielle, I

Donald Outlaw - 104 bw                    16 (55 - 58)
7/26/2022

Page 55

1   just -- I have to -- it's 11:50.  I have
2   a 12 o'clock hearing.
3          MS. ROSENTHAL:  Okay.  Can
4   we --
5          MR. VAN NAARDEN:  My only
6   concern is that with the WiFi, I just
7   want can get an extra ten minutes to make sure I
8   can get a hotspot.
9          MS. ROSENTHAL:  Of course.
10  What's the -- is the conference room, is
11  it the one downstairs?
12         MR. VAN NAARDEN:  Guys, I
13  can -- go off the record and talk.
14         MS. ROSENTHAL:  Oh, sorry.
15         VIDEO TECHNICIAN:  We're now
16  going off record.  The time is 11:50 a.m.
17            - - -
18         (Discussion held off the
19  record.
20         (Luncheon recess.)
21            - - -
22         VIDEO TECHNICIAN:  We're now
23  back on record.  The time is 1:02 p.m.
24  BY MS. ROSENTHAL:

Page 56

1      Q.   Mr. Outlaw, before you went on the
2   break, you were talking about your 2021
3   federal tax return.  To your knowledge, have
4   any other federal tax returns been filed by
5   you or on your behalf in the course of your
6   lifetime?
7      A.   I don't know.
8      Q.   There weren't any state or local tax
9   returns produced in this litigation.  Have you
10  paid state or local taxes?
11     A.   I don't know.  I get Monique to do
12  my taxes.  So I don't know exactly how the
13  whole tax thing work.  I'm really like -- I
14  really don't have an understanding of it.  I
15  just rely on Monique to file it.  So I don't
16  know.
17     Q.   Well, isn't it the case that after
18  you were released from prison, you obtained a
19  loan from the federal government for
20  Coronavirus stimulus relief for over $20,000?
21     A.   I obtained some type of loan that
22  had to do with the business and -- yeah.  That
23  had some truth to it.  I don't know exactly
24  what you're asking me, but I received some

Page 57

1   type of assistance.
2      Q.   Well, I'm asking, did you receive at
3   least $20,000 in loan money from the federal
4   government?
5      A.   Yes.
6      Q.   And is it your testimony you have no
7   knowledge about what, if any, taxes were paid
8   on that money or reported to the federal
9   government under tax returns?
10     A.   Yeah.  I really don't know, because
11  I didn't actually file the taxes myself.  I'm
12  not a tax expert, and I rely mainly on my wife
13  to file taxes.  So before I could give you
14  like an accurate answer, I would have to speak
15  with Monique about it.
16     Q.   Do you have any recollection of
17  signing any tax return - federal, state, or
18  local - at any point in your lifetime?
19     A.   Can you ask me that question again?
20  I'm sorry.
21     Q.   Do you have any recollection of
22  signing any state, federal, or local tax
23  return at any point in your lifetime?
24     A.   I don't remember.

Page 58

1      Q.   The stimulus relief that you
2   received from the federal government, did you
3   prepare those papers by yourself?
4      A.   No, I didn't.  I don't really know
5   how to do that kind of stuff.
6      Q.   Who did?
7      A.   It was a guy that I know.  He helped
8   me out.
9      Q.   Was the loan in your name?
10     A.   Yes.
11     Q.   Did you sign the papers?
12     A.   Yeah, I'm pretty sure I did.
13     Q.   Do you have the papers?
14     A.   No, I don't.
15     Q.   What?
16     A.   No, I do not.
17     Q.   What happened to them?
18     A.   I'm not sure.  I would have to ask
19  my wife.  All the important stuff my wife has.
20  But it wasn't on paper.  It was like through
21  using the phone where there's like -- you do
22  it like that.  I guess like a DocuSign or
23  something like that.  But it wasn't like -- I
24  never had a hard copy.  The application wasn't

Page 59

1  a hard copy.

2      Q.  So you did it through your phone?

3      A.  Yes.

4      Q.  Well, in answering this request for

5  production of documents, did you ask your wife

6  any of these questions about whether she had

7  these other tax returns or documents related

8  to any loans or income?

9      A.  Yes.  I asked my wife for -- me and

10 her went over the paperwork that was

11 requested.  I told her I needed all the

12 information on there, I need it to be

13 produced.

14     Q.  Did you ask her, do we have any --

15 were any state or local tax returns filed for

16 me?

17     A.  I really don't know the difference

18 to even ask her that.  I just asked her what I

19 know, the tax returns.  I really don't know

20 the difference between state, local, whatever,

21 federal.  I don't know how that work.  So for

22 me to ask her about multiple forms of taxes, I

23 don't think I asked her that, because I'm

24 really not aware of exactly how does it work

Page 60

1  with the filing or the difference.  I thought

2  it was just one thing.

3      Q.  Well, have you taken any steps to

4  educate yourself now that you're earning

5  money?

6      A.  No.  I'm married.  You know, where I

7  fall short, she pick up.  I never felt the

8  need to, you know, looking to be a tax expert,

9  because, you know, I rely on my wife with the

10 taxes.

11     Q.  Well, you filed the tax return as a

12 single person, didn't you?

13         MR. VAN NAARDEN:  Objection.

14         THE WITNESS:  I didn't file

15     anything.  I relied on my wife to do it.

16 BY MS. ROSENTHAL:

17     Q.  You said that you didn't have any

18 hard copy documents related -- responsive to

19 the subpoena in your house?

20     A.  Huh?

21     Q.  Am I correct that you testified

22 earlier that you didn't have any hard copy

23 documents that were responsive, sorry, to the

24 request for production?

Page 61

1      A.  I don't know if I said that.  I'm

2  not sure if I --

3      Q.  Okay.  Did you have any hard copy

4  documents responsive?

5      A.  Did I have any hard -- what?  Of

6  this?

7      Q.  Did you have any documents that were

8  printed out -- that's what I mean by "hard

9  copy" -- that were responsive to those

10 requests for production?

11     A.  So you're saying that what you

12 requested from the paperwork, was anything

13 hard copy that I handed over?

14     Q.  I'm asking -- the request asked for

15 documents regardless of whether they were hard

16 copy or not.  I'm asking whether you had any

17 hard copy documents that were responsive.

18     A.  I'm not exactly sure.  All I know is

19 that I got with my wife and I produced

20 everything that I could produce.  I didn't

21 comb through everything with a fine tooth and

22 nail.

23         Monique is my go-to person for a lot

24 of things and, you know, I trust her with my

Page 62

1  life.  So when I told Monique what was going

2  on and what I needed and so forth and so on, I

3  relied on Monique to hunt down most of the

4  documents.  We went over it and so forth and

5  so on, and I produced it to the best of my

6  ability.  I looked high and low for everything

7  you asked for and I tried to produce it.

8      Q.  Well, what do you mean by you

9  "looked high and low," other than asking

10 Monique?

11     A.  That's high and low for me.  I went

12 through my phone, and everything else I rely

13 on Monique.  So I didn't know of no other

14 means of trying to find the documents that you

15 were looking for.

16     Q.  Are you aware of the fact that since

17 being served with this request for production

18 if additional documents come into your

19 possession; for example, if you have text

20 messages with any of the individuals who are

21 listed, you have an obligation now to turn

22 those over?

23     A.  Yes, I'm aware of that.

24     Q.  Okay.  So since you received the

Page 63

1  request, have you had any communications with
2  Christopher Holder?
3      A.   I may have talked to Chris over the
4  phone on several occasions, but anything that
5  I can produce, no.  I don't text him.  Chris
6  is incarcerated.
7      Q.   Well, the subpoena -- or sorry.  The
8  request for production asks for any
9  communications that you had with him directly
10 or indirectly.  Do you understand what's meant
11 by that?
12     A.   Yeah, but I wouldn't know how to
13 produce a phone conversation.
14     Q.   Okay.  But a text message
15 conversation indirectly with him; for example,
16 if you used an intermediary to speak with him,
17 would you understand that to be responsive to
18 this request for production?
19     A.   Yes, I will understand that.
20     Q.   Is it correct that you had a large
21 number of hard copy documents related to your
22 criminal proceedings while you were
23 incarcerated?
24     A.   Yes.  That's absolutely correct.  I

Page 64

1  had a whole lot of paperwork.
2      Q.   And what happened to that paperwork?
3      A.   When I was released from prison, I
4  was released from Curran-Fromhold Correctional
5  Facility.  All my property was at SCI Dallas.
6  When I was released, I went to court from SCI
7  Dallas and I was transferred to
8  Curran-Fromhold Correctional Facility.  I
9  didn't know I was being released at the time I
10 was being released, so all my property stayed
11 up SCI Dallas.  I went home.  All my property
12 stayed up there.
13     Q.   And is it true that Monique also had
14 a large quantity of documents?
15     A.   Yes.  Monique -- a lot of times I
16 would send whatever home to make sure Monique
17 had copies of it and, you know, she was like
18 my security of it, you know, if I lost anything
19 or anything of that nature, I will give it to
20 Monique.
21     Q.   So what happened --
22     A.   Or I mailed it to Monique.
23     Q.   So what happened to all the
24 documents that Monique had related to the

Page 65

1  case?
2      A.   Well, recently when we was asked to
3  produced the documents pertaining to my case
4  and so forth and so on, I asked Monique where
5  the box was at that had all my stuff in there,
6  and she told me that she no longer had it.
7      Q.   Did she tell you what she did with
8  it?
9      A.   She didn't get into depth.  She just
10 said she didn't have it no more, she got rid
11 of it.  I asked her, you know, why she do
12 that.  She was like, you know, I thought your
13 case was over.  I thought we was done with the
14 case.  She didn't feel the need to keep it,
15 and I didn't argue with her judgment.
16     Q.   When is it exactly that she got rid
17 of it?
18     A.   I can't tell you exactly when
19 Monique got rid of it.  I'm not sure.  I don't
20 know.
21     Q.   Is it correct that you also intended
22 to destroy documents after your release from
23 prison?
24          MR. VAN NAARDEN:  Objection.

Page 66

1  BY MS. ROSENTHAL:
2      Q.   Sorry.  You can answer the question.
3      A.   Can you repeat the question
4  because --
5          MS. ROSENTHAL:  Can the court
6     reporter read it.
7          THE WITNESS:  -- there was an
8     objection where --
9  BY MS. ROSENTHAL:
10     Q.   So there's two types of objections
11 in depositions.  One type is an objection
12 where you can still answer.
13     A.   Yeah.  I understand that.  I'm just
14 saying when he objected, it kind of threw me
15 through a loop.
16     Q.   Sure.
17     A.   So I'm asking can you ask the
18 question again, please.  I'm sorry.
19          MS. ROSENTHAL:  Can you read...
20          - - -
21          (Court Reporter read back the
22     pending question.)
23          - - -
24          THE WITNESS:  I wouldn't say

Page 67

1 that I intended to destroy documents or
2 anything of that nature, but I just
3 wanted -- when I was released, I wanted
4 to be done with the case.  I didn't want
5 to keep thinking about it.
6         It brings me anxiety when, you
7 know, I look at certain paperworks and so
8 forth and so on.  So I didn't intend on
9 having memorabilia of my life sentence.
10 So, no, I didn't intend to keep it
11 forever.  No, I didn't.
12 BY MS. ROSENTHAL:
13    Q.   Well, you had plans to bring a civil
14 lawsuit at that point; did you not?
15    A.   Initially when I was released from
16 prison, my main goal was to be exonerated, and
17 that's what I was focused on.  Once I got
18 exonerated, I felt as though that somebody
19 needed to be held accountable for me being
20 convicted for this crime I didn't commit.
21    Q.   My question is a little different.
22 My question was whether, regardless of what
23 your main goal was, you had plans or were
24 aware of the likelihood of bringing civil

Page 68

1 litigation at the time that you were released
2 from prison; is that correct?
3         MR. VAN NAARDEN:  Objection.
4         THE WITNESS:  Can you repeat
5    the question, please.
6         MS. ROSENTHAL:  Sure.  Can the
7    court reporter...
8              - - -
9         (Court Reporter read back the
10    pending question.)
11              - - -
12         THE WITNESS:  My answer to that
13    question is, I suffered for a long time.
14    Like I went through a lot with serving a
15    life sentence for a crime I didn't
16    commit, and, yes, when I was released
17    from prison, I wanted somebody to be held
18    accountable, and with the judicial
19    system, I don't feel like there's no
20    accountability for anyone when it comes
21    to somebody being wrongfully charged or
22    wrongfully convicted of a crime.
23         So if your question is did I
24    just want to just kick my feet up and be

Page 69

1 happy that I was done wrong by the
2 system, no.  I want these detectives to
3 be held accountable and the City for what
4 they did to me.
5 BY MS. ROSENTHAL:
6    Q.   My question is whether you
7 understood that you had an obligation to
8 retain documents that were relevant to
9 litigation if you intended to bring it at the
10 time.
11         MR. VAN NAARDEN:  Objection.
12         THE WITNESS:  Excuse me?
13    Because that wasn't the last question.
14    What was the last question?  I'm sorry.
15    I'm confused a little bit.
16 BY MS. ROSENTHAL:
17    Q.   That's my current question.
18         MS. ROSENTHAL:  Can you read it
19    back.
20              - - -
21         (Court Reporter read back the
22    pending question.)
23              - - -
24         THE WITNESS:  No.  I recently

Page 70

1    when I seen whatever paperwork it was
2    from my attorney that was requesting a
3    bunch of different -- all these
4    communications, the paperwork and so
5    forth and so on, at that moment that's
6    when I realized I had an obligation to
7    overturn whatever it is that y'all
8    wanted.  But I don't know about civil
9    litigations to have that understanding of
10    what I supposed and not supposed to have.
11 BY MS. ROSENTHAL:
12    Q.   Did you ever have a conversation
13 with anyone when you were in prison about your
14 desire to burn your documents when you left?
15    A.   I'm not sure.  I don't know.
16    Q.   Okay.  I'm going to play a prison
17 call.
18         MR. VAN NAARDEN:  Marking this
19    as an exhibit?
20         MS. ROSENTHAL:  Yes.  Hold on.
21    Hopefully it cooperates.
22         I apologize.  Bear with me.
23         What exhibit number are we up
24    to?

Page 71

1    COURT REPORTER: 5.
2  BY MS. ROSENTHAL:
3    Q.   Sorry.  While I bring that up, did
4  you instruct Monique at any time to retain
5  documents she had related to the case for
6  purposes of civil litigation?
7    A.   Can you repeat the question?  I'm
8  not understanding what you saying.
9    Q.   Did you instruct Monique at any time
10 that the documents she had in her possession
11 that she obtained pursuant to the power of
12 attorney that you gave her should be retained
13 because you intended to bring a lawsuit
14 against the City?
15   A.   I'm not sure exactly what you're
16 saying, but -- so you're saying that did I
17 tell Monique to get certain documents solely
18 for the purpose of suing the City?
19   Q.   No.  Did you tell her to keep the
20 documents because you would be engaging in a
21 lawsuit?
22   A.   I'm not sure.  You know, I told
23 Monique a lot of things over the years, but --
24 I don't know.  I can't, you know, answer that

Page 72

1  question intelligently, but for the most part,
2  my intent was to be released from prison and
3  hold people accountable for what they did for
4  me -- to me, I mean.  I mean, I just wasn't
5  content with serving the time for a crime I
6  didn't commit.
7    Q.   Okay.  Since we continue to have
8  issues with the audio, let's move on to -- I'm
9  going to bring you back to the day of Jamal
10 Kelly's murder in September of 2000.
11        At the time, did you know Jamal
12 Kelly?  Had you ever met him?
13   A.   No.  I never met Jamal personally.
14   Q.   Did you know who he was?
15   A.   I knew who he was from the
16 neighborhood, but I didn't know him
17 personally.
18   Q.   What did you know about him?
19   A.   I just knew he lived on the same
20 block as Jabril or in the vicinity of one of
21 my friends named Jabril.
22   Q.   Did you know Lamar Rodgers?
23   A.   Yes, I know Lamar Rodgers.
24   Q.   Did you know Charles Paladino?

Page 73

1    A.   Yes, I know Charles Paladino.
2    Q.   Did you know Eric Lee?
3    A.   No.  I didn't know Eric Lee
4  personally.  I just knew who he was.  I know
5  he was -- he used to hang with Paladino.  They
6  would fix cars and, from my knowledge, get
7  high together.
8    Q.   What about Katima Jackson?
9    A.   I knew who Katima Jackson was from
10 the neighborhood.  She's a little older than
11 me, but I didn't like know her personally, but
12 I knew who she was.  I knew of her.
13   Q.   Where were you at the time of the
14 murder?
15   A.   At the time of the murder --
16   Q.   I apologize.  Let me rephrase that.
17        Where were you at the time that
18 Jamal Kelly was shot, as he did not die right
19 away?
20   A.   I honestly don't know.  It didn't
21 really have no significance with me for me to
22 remember.  I don't know where I was at.  I
23 just know I wasn't there.
24        I was arrested three years after the

Page 74

1  murder, and nothing stood out before that date
2  for me to remember exact time or, you know,
3  exactly where I was at.
4    Q.   Well, do you remember asserting in
5  legal filings in submitting your affidavit
6  that you were on house arrest at the time?
7    A.   Yes.
8    Q.   And was that accurate?
9    A.   Yes.  It's around or about accurate,
10 but my aunt stated that -- she was telling me
11 like she remembered that it was Labor Day
12 weekend, that I was in the house, and that,
13 you know, she was adamant about it.
14        But my personal recollection of the
15 day, I don't remember too much about that day.
16 Nothing stood out to me, but when I told my
17 aunt about the case and what I was locked up
18 for, so forth and so on, she was like, that
19 was Labor Day weekend, you were on house
20 arrest, you were in the house.  But me
21 personally, nothing stood out about that day
22 where I remember timeframe or where I was at
23 or -- I really don't remember.
24   Q.   Do you -- did you ever have

Page 75

1  electronic monitoring, like an ankle bracelet
2  as a juvenile?
3      A.   Yes.
4      Q.   And do you know if you had it during
5  that time period?
6      A.   I believe I may have been on house
7  arrest, yes.
8      Q.   Did you make any efforts to obtain
9  records to establish that you were on house
10 arrest?
11     A.   Yes.  I made a lot of efforts.
12     Q.   And are you aware that juvenile
13 records that you've produced show that you had
14 weeks earlier absconded and a bench warrant
15 was issued for your arrest and then you
16 surrendered several weeks after the Jamal
17 Kelly murder?
18     A.   Yes.  I looked at the juvenile
19 records, but I'm not -- I don't have it in
20 front of me to tell you exactly dates of how
21 exactly it worked.
22     Q.   But you remember seeing that you
23 were AWOL on the date of the Jamal Kelly
24 murder?

Page 76

1      A.   No, I don't remember seeing that.
2      Q.   Do you remember seeing that you had
3  absconded and you had not surrendered on the
4  date of the Jamal Kelly murder?
5      A.   I mean, it's like kind of vague to
6  me.  It's over 20 years ago, so you asking me
7  to remember some documents from over 20 years
8  ago.  It's hard for me to do that, but I know
9  for sure with certainty that I was not at that
10 place at that time when Jamal was shot or
11 murdered.
12     Q.   Well, it might be hard for you to
13 remember 20 years later, but what about at the
14 time you were charged with the murder; did you
15 then remember where you were at the time?
16     A.   I was charged three years after the
17 murder.  I don't know where I was at in 2020
18 on September 3rd.
19     Q.   Well, did you make any efforts to
20 try to confirm or verify or find out where you
21 were given that you were being charged with
22 murder?
23     A.   Yes.  I told you, I spoke with my
24 aunt and a few of my relatives.  They knew

Page 77

1  what I was locked up for, and my aunt, she was
2  adamant that I was in the house, that we had a
3  cookout, it was Labor Day weekend and so forth
4  and so on.
5           But from my recollection, I don't
6  remember too much about that day.  It's
7  nothing that stood out to me about the day for
8  me to remember where I was at, what time and
9  so forth and so on.  Nothing stood out to me
10 where I was forced to remember that day.
11     Q.   So would it be fair to say then that
12 you don't have an alibi as to where you were
13 at the time of the murder?
14          MR. VAN NAARDEN:  Objection.
15          THE WITNESS:  It would be fair
16      to say that other people could place me
17      somewhere else, but as far as my
18      recollection, no.  My recollection, I
19      can't give an alibi, but other people can
20      place me in the house.  But as far as me,
21      I don't remember.
22 BY MS. ROSENTHAL:
23     Q.   Well, did your aunt place you in the
24 house or did she just say that you are on

Page 78

1  house arrest?
2      A.   My aunt said that we had a cookout
3  and she remembered me being in the house.  I
4  don't remember.
5      Q.   Was the cookout documented anywhere?
6      A.   What do you mean?
7      Q.   In any legal filings?
8      A.   I'm not sure.  I don't know.
9  There's so much legal filings that I can't
10 tell you.  I don't know.
11     Q.   Oh, one question I wanted to ask you
12 at the beginning, are you on probation or
13 parole currently?
14     A.   No.
15     Q.   Okay.  Did you drive a car at the
16 time of the murder around September 2000?
17          MR. VAN NAARDEN:  Objection.
18          THE WITNESS:  I don't know.
19          MR. VAN NAARDEN:  You're asking
20      him if he owned a car or if he was
21      driving a car on September 3rd, 2000?
22          MS. ROSENTHAL:  No.  I'm asking
23      if he --
24 BY MS. ROSENTHAL:

Page 79

1    Q.   I mean, you don't necessarily have
2  to own it.  It could be a family -- is there a
3  car that you regularly used at that time?
4           MR. VAN NAARDEN:  That's fine.
5           THE WITNESS:  No, not that I
6    remember.
7  BY MS. ROSENTHAL:
8    Q.   Did you own a gun at that time?
9    A.   No.  I never owned a gun.
10   Q.   And when you say you never owned a
11 gun, how are you interpreting the word "own"?
12 Do you mean purchased?
13   A.   However it could be interpreted.  I
14 never owned a gun.
15   Q.   Did you ever use anyone else's gun?
16          MR. VAN NAARDEN:  Objection.
17          You can answer.
18          You can answer.
19          THE WITNESS:  I had a case that
20   I was arrested for in 2003 where I had an
21   altercation with somebody.  I end up
22   getting shot.  He end up getting shot.
23   And the person I got into the altercation
24   with, it was his gun.  We got in a

Page 80

1    struggle for it, and it was his gun.
2           So that's the only time that,
3    you know, I can intelligently say that,
4    you know, I used someone else's gun.
5  BY MS. ROSENTHAL:
6    Q.   You've never fired a gun in any
7  other instance other than that time?
8    A.   No, not that I remember.
9    Q.   Have you ever possessed a gun, had a
10 gun on your person at any other time?
11   A.   No, not that I remember.
12   Q.   Did you see Charles Paladino the day
13 of the murder?
14   A.   I don't remember the day of the
15 murder to say if I saw Charles Paladino or
16 not.
17   Q.   Is it possible?
18   A.   I don't remember if I seen Charles
19 Paladino on the day of the murder.  I can't
20 intelligently tell you anything about that day
21 because I don't remember.  Nothing stands out
22 to me.
23   Q.   At what point did you come to learn
24 that you were a suspect in the investigation?

Page 81

1    A.   When I got arrested.
2    Q.   You had no idea that you were
3  under -- you had no idea that you were a
4  potential suspect for the murder or in any way
5  associated with the investigation until you
6  were arrested?
7    A.   Yeah.  I didn't know nothing about
8  Jamal Kelly -- that I was a suspect in Jamal
9  Kelly's murder until my arrest.
10   Q.   When did you learn the name Shelby
11 Green?
12   A.   When I got arrested.
13   Q.   How did you come to learn the name
14 Shelby Green when you got arrested?  Do you
15 mean at the time of your arrest?
16   A.   No.  There was a preliminary
17 hearing.  After the preliminary hearing, I
18 received the discovery.  After I received the
19 discovery or whatever paperwork it was with
20 the case, I learned that Jamal was with a girl
21 named Shelby Green.
22   Q.   Did you or any of your family
23 members ever communicate with Shelby Green?
24   A.   Yes.

Page 82

1    Q.   Who?
2    A.   I actually -- I actually wrote
3  Shelby Green a letter, and she actually
4  responded and wrote me back.
5    Q.   What happened to the letter that you
6  wrote her?
7    A.   I overturned it to -- well, the
8  letter I wrote her?  I don't know what
9  happened to the letter I wrote her.  You would
10 have to ask her, but the letter she wrote me,
11 I gave to my attorney at the time, whatever
12 attorney that was.  I believe it was Mark
13 Greenberg.
14   Q.   Did you give him an original copy of
15 the letter?
16   A.   Yes, I believe I did.
17   Q.   Did you retain a copy of the letter
18 for yourself?
19   A.   Yes.
20   Q.   Was that your normal practice when
21 you gave something to an attorney, to retain a
22 copy yourself?
23   A.   I mean, I didn't really have a
24 normal practice, but I felt like the letter

Page 83

1  was crucial, and for whatever reason, I kept a
2  copy of it.  But I didn't really have a normal
3  practice.  Like, you know, I went off what I
4  felt at the moment, and if I felt like I
5  needed a copy, I will make a copy for myself.
6  If I didn't, I wouldn't.
7      Q.   And when was it that you wrote her?
8  Was it before trial?
9      A.   Yes, it was before trial.
10     Q.   How did you get her contact
11 information?
12     A.   I got her contact information from
13 off of my discovery.
14     Q.   The discovery had the contact
15 information on it?
16     A.   The discovery had her address on
17 there.
18     Q.   And what did you say in the letter?
19     A.   I'm not a hundred percent sure of
20 what I said in the letter, but I explained to
21 her that I was arrested for Jamal Kelly's
22 murder, that I was innocent, I didn't commit
23 the murder and, you know, I respectfully asked
24 if she could come to court and tell the truth

Page 84

1  on whatever happened.
2      Q.   Did you think that there was
3  anything improper about directly contacting a
4  witness in a criminal case?
5      A.   At the time, I didn't really, you
6  know -- I was 19 years old.  I didn't know too
7  much about the law.  All I know that I was --
8  I come from poor people.  Like I didn't have
9  resources.  I didn't really have money and,
10 you know, I reached out to her to see if it
11 could be beneficial to me with me fighting
12 this murder that I didn't commit.
13         At the time, I didn't see nothing
14 wrong with it, because, you know, I wasn't --
15 I didn't have ill intentions.  I wasn't trying
16 to threaten her.  I wasn't trying to cause her
17 no harm.  I just wanted her to, you know, come
18 to court and tell the truth about whatever she
19 saw.  So in my mind, I didn't think I was
20 doing anything wrong.
21     Q.   Did any of your family members
22 contact her?
23     A.   I believe so.  At the time, I had a
24 girlfriend, and the girlfriend, her mom had

Page 85

1  reached out to her.
2      Q.   Who was your girlfriend?
3      A.   It was a girl named Tya.
4      Q.   What's -- is Tya a nickname?
5      A.   Yeah.  Her name is Christya.
6      Q.   Last name?
7      A.   Dixon.
8      Q.   And do you know her mom's name?
9      A.   I just know her mom as Crystal, but
10 I'm not a hundred percent sure if her and her
11 mom shares the same last name.
12     Q.   Did any of your direct immediate
13 family members contact Shelby Green, to your
14 knowledge?
15     A.   No, not that I remember.  No.
16     Q.   And when Shelby Green wrote you
17 back, did you write her back after that?
18     A.   No, I don't think I did, but I'm not
19 a hundred percent sure.  We didn't have like
20 extensive communication.  Once she wrote me
21 back, it went through my attorney after that.
22     Q.   What do you mean?
23     A.   Once she wrote me back, I sent the
24 letter to my attorney, and my attorney say he

Page 86

1  was going to reach out to her, and it went
2  from there.  But me and her didn't maintain a
3  lot of communication after that.
4      Q.   Did she ever write you again?
5      A.   No, not that I remember.  No.
6      Q.   When did you learn that Charles
7  Paladino had spoken to police?
8      A.   When I got arrested.
9      Q.   And when you say when you got
10 arrested, you again mean when you received
11 discovery?
12     A.   At my preliminary hearing.  So I was
13 arrested on, I believe, September 3rd or 4th
14 of 2003 for the murder, and shortly afterwards
15 I had a preliminary hearing and Charles
16 Paladino showed up to the preliminary hearing,
17 and at that moment, that's when I knew about
18 Charles Paladino involvement in the case.
19     Q.   At any point were you held in a cell
20 or in a cell next to Mr. -- sorry.  Strike
21 that.
22         At any point were you held in a cell
23 with or next to Mr. Paladino?
24     A.   I was never in a cell with Paladino,

Page 87

1  but I remember when I was going to trial, I
2  believe it was Paladino and might have been
3  Eric Lee or Derrick Alston, I was in one
4  holding cell and they were directly across
5  from me.
6        But us being in the same holding
7  cell, no, I was never in the same holding
8  cell.  It was a court order that we be
9  separated.  It's been times where I was
10 transferred to another institution because of
11 Charles Paladino arriving at the jail, and the
12 jail was strict about keeping us away from
13 each other.  I never had contact with Charles
14 Paladino.  I haven't seen Charles Paladino
15 since maybe 2000, somewhere in the early
16 2000s.
17     Q.   You were convicted of a witness
18 intimidation charge; is that correct?
19     A.   Yes, that's correct.
20     Q.   And that pertained to Charles
21 Paladino?
22     A.   Yes, that's correct.
23     Q.   Do you have any firsthand
24 information about whether Charles Paladino was

Page 88

1  in fact assaulted in or about September 2001
2  after his release -- sorry.  Yeah, after his
3  release from jail?
4      A.   I don't know nothing about Charles
5  Paladino being released from jail.  I had no
6  involvement in any type of assault that had to
7  do with Charles Paladino.  That whole story
8  Charles Paladino, he stated under oath that he
9  fabricated the whole story.  So I don't know
10 nothing about that alleged assault that him
11 and Detective Peterman fabricated.
12     Q.   Well, do you have any knowledge
13 about whether he was assaulted by anybody?
14     A.   Me and Charles Paladino was from the
15 same neighborhood.  I known Charles Paladino
16 to have problems with a lot of people.
17     Q.   The specific incident that -- I'm
18 talking about the specific incident where he
19 was allegedly assaulted.  Whether or not you
20 participated, do you have knowledge about
21 whether an assault in fact occurred?
22     A.   No.  I have no knowledge about the
23 alleged assault that you are mentioning
24 that -- from my understanding, Charles

Page 89

1  Paladino and Detective Peterman fabricated
2  that whole story.
3      Q.   Well, would it surprise you that he
4  testified during his deposition in this case
5  that he was in fact assaulted?
6      A.   No.  It wouldn't surprise me at all,
7  but it would surprise me if he said I
8  assaulted him.  That would surprise me.
9      Q.   Well, why wouldn't it surprise you
10 if he said that he was assaulted when your
11 understanding is that Paladino and Peterman
12 made up the fact of the assault altogether?
13     A.   It wouldn't surprise me that Charles
14 Paladino was assaulted because Charles
15 Paladino stayed in a bunch of different
16 altercations in the neighborhood.  He was
17 known for stealing cars.  He was known for
18 stealing people radios.  And he always was in
19 some type of form of altercation.  So it
20 doesn't surprise me that he was in an
21 altercation.
22     Q.   Well --
23     A.   But as far as anything concerning me
24 and me assaulting him, that's a whole 'nother

Page 90

1  story.
2        It would surprise me greatly if
3  Charles Paladino stated that I assaulted him
4  and he stated this was true.  Like I know I
5  didn't never assault Charles Paladino ever in
6  my life.
7      Q.   Well, are you --
8      A.   Nor did I have anything to do with
9  an assault nor did I witness an assault.  I
10 have no knowledge of no assault with Charles
11 Paladino that's directly linked with me in any
12 way.
13     Q.   So if he were to say that he was
14 assaulted not by you but you were physically
15 present, would that be untrue?
16     A.   I don't believe anything that
17 Charles Paladino says at all.
18     Q.   Well, isn't the linchpin of this
19 case what Charles Paladino says happened to
20 him by detectives?
21     A.   Yes, it is.  It plays a major role
22 in this case, but Charles Paladino, he told a
23 bunch of lies, and I look at everything he say
24 with a grain of salt.

**Page 91**

```
 1          However, I do believe that he was
 2 assaulted by Detective Peterman, because I
 3 experienced the same assault from Detective
 4 Peterman.  So it brings that some credibility
 5 in my eyes, because Detective Peterman, he did
 6 the same exact thing to me.  So Detective
 7 Peterman has a pattern of doing these things.
 8          So when it comes to what he said
 9 about Detective Peterman, it brings some
10 credibility with me, because Detective
11 Peterman, he assaulted me.  He tried to make
12 me say things that weren't true and he did
13 things to me.
14          So in that aspect, and only that
15 aspect alone, would I say Charles Paladino was
16 telling the truth.  Everything else, he lied
17 so much, I wouldn't know what to believe from
18 him.
19     Q.   Well, isn't it true at times he said
20 that he was assaulted by Peterman?  At other
21 times he said he was bribed by Peterman?
22 Other times he said that he told Peterman what
23 he wanted to hear so he could leave?  And
24 other times he said Peterman wrote up the
```

**Page 92**

```
 1 statement, he just signed it?
 2          MR. VAN NAARDEN:  Objection.
 3 BY MS. ROSENTHAL:
 4     Q.   What is -- yeah.  Is it your
 5 understanding that he's told various versions
 6 of what's happened with respect to Detective
 7 Peterman?
 8     A.   It's from my understanding and from
 9 my personal experience, I witnessed Charles
10 Paladino testify on several occasions.  I seen
11 several statements that Charles Paladino made,
12 and, you know, it's from my understanding that
13 Charles Paladino, you know, he has been
14 inconsistent in the past, and the only thing
15 that I do believe Charles Paladino stated was
16 that Detective Peterman actually assaulted him
17 and fabricated a statement.  And when I saw
18 the proof inside the homicide file of him and
19 Peterman, the letters they was going back and
20 forth, it gave it credibility with me.  Also
21 what Peterman did to me, it gave it
22 credibility.
23          So if it's not something that's
24 showing me credibility that's substantiating
```

**Page 93**

```
 1 something Charles Paladino is saying, then
 2 I'mma have to look at it with a grain of salt
 3 that he's telling a lie.  Unless it's some
 4 form of proof that's supporting it, then I
 5 think he may be lying.
 6     Q.   So you view him as a liar, except
 7 for this one thing?
 8     A.   I view him -- I mean, I don't know
 9 how else to view him.
10     Q.   I want to return to the -- I was
11 going to play a clip that --
12          MS. ROSENTHAL:  What exhibit
13     are we up to?
14          COURT REPORTER:  If you marked
15     the video, that's 5.
16          MS. ROSENTHAL:  It's an audio,
17     but yeah.
18          I'm going to mark it as 5, and
19     this is a call -- I'm not sure why I
20     don't have the most recent version of
21     this, but this is a call that I believe
22     Robert Outlaw placed on June 29, 2019 at
23     20:56:56 to the phone number
24     484-461-4031.
```

**Page 94**

```
 1          MR. VAN NAARDEN:  Where is the
 2     call?  Where's the -- so we have like a
 3     chain of custody and we know like for
 4     custodian purposes, where is the call
 5     from?
 6          MS. ROSENTHAL:  I believe it's
 7     from the Philadelphia Department of --
 8          MS. MAYS:  It will probably say
 9     it at some point on the call.
10          MR. VAN NAARDEN:  Sure, but
11     that's why I have a question, because you
12     represented that it was --
13          MS. ROSENTHAL:  I know.  I may
14     have been wrong.
15          MR. VAN NAARDEN:  Hold on a
16     second.  You represented -- you said that
17     it was a Philly institution, but then
18     they said SCI Somerset, which my
19     understanding is a state institution.
20          MS. ROSENTHAL:  You're right.
21          MR. VAN NAARDEN:  So one of the
22     things -- and, again, I'm more concerned
23     about like trial and to the extent that
24     individuals want to lay a foundation for
```

Page 95

1   these being true and accurate, we need to
2   have records custodians at the ready to
3   potentially come in and testify.  I want
4   to make sure we're all on the same page
5   as to where it's coming from.
6           MS. ROSENTHAL:  Yeah, of
7       course, but I don't think that the dates
8       overlapped, so I do think -- okay.  Yeah.
9           MR. VAN NAARDEN:  So you think
10      this one is Philly?
11          MS. ROSENTHAL:  I do think it's
12      Philly, but I was surprised when I heard
13      the Holder one.  So I'm not totally sure,
14      to be honest, the way these are marked.
15          (Audio being played.)
16          MS. ROSENTHAL:  All right.
17      We'll have to strike that again.  I'm
18      really struggling with the calls.  I'm so
19      sorry.
20  BY MS. ROSENTHAL:
21      Q.   Okay.  I want to ask you about
22  Katima Jackson.  Describe your relationship
23  with her.
24      A.   We have a good relationship.

Page 96

1       Q.   Is it a friendship, acquaintance,
2   romantic relationship?
3       A.   I mean, it started off with, you
4   know, I met Katima Jackson.  She came forth in
5   my case.  She had visited me.  After that,
6   after she visited me and let me know what was
7   going on and that she was a witness in the
8   case, she -- when she left the jail, she got
9   with my family.  She went to put together an
10  affidavit and, you know, things started to
11  develop from there.  She maintained a line of
12  communication with me and, you know, we
13  started to communicate on a regular basis.
14  After that, she came to see me several times
15  and, you know, it went from, you know, us like
16  not knowing each other to becoming friends and
17  to it being a little more than that, where I
18  really developed some love for her.
19      Q.   Before she came forward in 2013, had
20  you ever spoken to her before?
21      A.   Before she came forth in 2013?
22      Q.   Am I correct that in 2013 is when
23  she came to visit you in the prison about the
24  Jamal Kelly murder?

Page 97

1       A.   Yes.
2       Q.   Before then, had you ever spoken to
3   her before?
4       A.   No.
5       Q.   Did you know her name?
6       A.   Yes, I knew her name.
7       Q.   Did you know her address?
8       A.   No.  I didn't know her address
9   offhand.  I got her address -- I called home
10  one day and I received her address from my
11  sister or my wife.
12      Q.   When was that?
13      A.   I ain't a hundred percent sure.
14  Around the time that she gave the affidavit
15  or -- I can't accurately tell you exactly
16  when, but whenever it was, that's how it got
17  pursued.  Whenever I found out the
18  information, I put her on my list.
19      Q.   You put her on the list when you
20  found out the information?
21      A.   Well, I put her on my list.  She
22  told my sister or Monique or somebody that she
23  wanted to speak with me and that she was
24  adamant about talking to me in person about

Page 98

1   whatever it is, and she came to see me from
2   there.
3           MS. ROSENTHAL:  I'm going to
4       mark as Outlaw-5 a one-page document
5       Bates marked PADOC01375.
6           -  -  -
7           (Exhibit Outlaw-5 marked for
8       identification by counsel.)
9           -  -  -
10  BY MS. ROSENTHAL:
11      Q.   Do you recognize this document?
12      A.   No, I don't.
13      Q.   Would you agree with me it appears
14  to be a filled out form that's titled
15  Supplementary Authorized Visitors, just to
16  describe it for the record?
17      A.   Yes, I'll agree with that.
18      Q.   Have you ever seen it?
19          MR. VAN NAARDEN:  Can I just
20      interject?  Because the copy that we have
21      that was produced to us was not in color.
22      This is the first time I'm ever seeing
23      this in color.
24          MS. ROSENTHAL:  This is your

Page 99

1  Bates stamp.
2       MR. VAN NAARDEN:  No, it's not.
3  It's PADOC.  That's not plaintiff.  This
4  was produced by the prison.  That's
5  why -- I'm not saying --
6       MS. ROSENTHAL:  No.  We've been
7  producing things produced by the prison
8  with the City.  You guys have been
9  producing with PADOC.  Julia has.
10      MR. VAN NAARDEN:  And you're
11 saying -- well, we know you've gotten
12 stuff independent from the PADOC as well.
13      MS. ROSENTHAL:  I have never
14 used that Bates mark.
15      MR. VAN NAARDEN:  Okay.
16      MS. ROSENTHAL:  Everything
17 you've received, you've Batesed.
18      MR. VAN NAARDEN:  Oh, okay.
19 For whatever reason, our version isn't in
20 color.  I'm glad you have one that's in
21 color.  Okay.
22      MS. ROSENTHAL:  I would look at
23 your -- I would check with Julia.
24      MR. VAN NAARDEN:  Yeah.  Okay.

Page 100

1  BY MS. ROSENTHAL:
2     Q.   Sorry.  My question is, have you
3  ever seen a form that looked like this?
4     A.   Yes.  I've seen plenty of forms that
5  look like this.
6     Q.   Is this a form that you would fill
7  out at the Department of Corrections if you
8  wanted to add or remove someone from your
9  authorized visitor list?
10    A.   Yeah.  This is one of them, but they
11 have multiple forms.  But this is a form that
12 I recognize from being incarcerated with
13 adding a visitor, yes.
14    Q.   Do you see at the bottom there's a
15 line that says Inmate Signature?
16    A.   Yes.
17    Q.   Is that your signature?
18    A.   It looks like my signature, but --
19 yeah, it looks like my signature, but I'm not
20 a hundred -- I need to see -- is this the
21 original copy of it?  Do you have the
22 original?
23    Q.   It was scanned in, and I don't have
24 a physical of it.

Page 101

1       Do you have any reason to believe
2  it's not your signature?
3     A.   Yeah.  This is not an original.
4     Q.   Sorry.  My question is, looking at
5  it, understanding that you're not conducting a
6  forensic analysis, does it look like your
7  signature?  Do you have any reason to believe
8  that it looks suspiciously not like your
9  signature?
10    A.   No.  I don't have no reason to
11 believe anything, but if it's not an original
12 copy of it, I don't know.  I don't know.
13    Q.   So you would agree that it's
14 important to have original copies of things
15 because it's hard to know if some things are
16 authentic without an original copy?
17    A.   I wouldn't agree with anything, but
18 me personally, like, you know, from my
19 experience, before I adopt anything, I would
20 want to see the original.
21    Q.   Do you see that this form appears to
22 be dated June 21st, 2010?
23    A.   Yeah.  That's what it say at the
24 top.

Page 102

1     Q.   And would you -- do you see where
2  under Removal From the List of Authorized
3  Visitors Christya Dixon is listed?
4     A.   Yes, I see that.
5     Q.   Is that the woman you described as
6  your girlfriend?
7     A.   Yes.  I know her.
8     Q.   And then in addition to the list of
9  authorized visitors, do you see that Katima
10 Jackson is listed?
11    A.   Absolutely.  Yes, I see that.
12    Q.   Are either Katima Jackson or
13 Christya Dixon, those lines, is that your
14 handwriting, as far as you can tell?
15    A.   It looks similar to my handwriting.
16 I can't a hundred percent say it is or it
17 isn't without looking at the original.
18    Q.   But it looks similar to your
19 handwriting?
20    A.   Yes.
21    Q.   Do you know whether Katima Jackson's
22 date of birth is in fact 4/14/79?
23    A.   I don't know Katima Jackson's date
24 of birth a hundred percent offhand, but I

Page 103

1  wouldn't argue with it.
2       Q.   Do you know whether that was her
3  address at the time, 8244 Algon Avenue?
4       A.   I don't know Katima address by
5  heart, but I wouldn't argue with it.  I don't
6  know.
7       Q.   Do you have any idea why this
8  authorized visitor form was placed in your DOC
9  file -- well, strike that.
10       Do you remember adding Katima
11  Jackson to your visitor list in 2010?
12       A.   No, I don't remember this.  But, I
13  mean, I'm not saying -- I just don't remember.
14  And then it's strange that it says that she's
15  my cousin, and the date is -- so it's kind of
16  throwing me through a loop.
17       Q.   Well, isn't it true that -- well,
18  let me -- in your experience, is it sometimes
19  the case that individuals in prison will list
20  people that they add to their visitor list as
21  having some sort of familial relationship with
22  them because they're allowed additional
23  privileges, such as more time to spend with
24  them during visits?

Page 104

1       A.   No, that's not true.
2       Q.   That's uncommon?
3       A.   No.  What you saying is not true.
4  You don't -- you wouldn't receive nothing
5  special from somebody being your cousin.
6       Q.   Okay.  I understand that.
7       A.   The only way you'll get any type of
8  different treatment is if it's immediate
9  family, and with immediate family, if you're
10  in the -- what is it called?  If you're in the
11  restricted housing unit, then your mother or
12  your children or somebody that's immediate
13  family can have contact with you, but a cousin
14  wouldn't be immediate family.
15       Q.   Sitting here today -- well, strike
16  that.
17       Would it be surprising to you if you
18  had added Katima Jackson to your visitors list
19  in 2010 given that you cannot recall
20  specifically whether you did?
21            MR. VAN NAARDEN:  Objection.
22            You can answer.
23            THE WITNESS:  Excuse me?
24  BY MS. ROSENTHAL:

Page 105

1       Q.   I believe -- and please let me know
2  if I misheard you, but I believe you said that
3  you don't have a specific recollection as to
4  whether you did in fact add her?
5       A.   Yeah.  I just don't remember.
6  That's what I'm saying.  So you're asking me
7  if I did this or if I didn't do it.  Like I
8  don't remember this document, and I would like
9  to see the original one before I make an
10  accurate, you know, decision on it.
11       But I put in so many different
12  visiting forms, I had at times 50 people on my
13  visiting list.  So I don't remember each and
14  every one over the years.  Like that's hard
15  for me to remember, so...
16       Q.   But would it be surprising to you if
17  you had found out if you saw the original and
18  you saw it was in fact your handwriting, is
19  that something that would be surprising to
20  you?
21            MR. VAN NAARDEN:  Objection.
22            THE WITNESS:  I don't
23       understand what you mean.
24  BY MS. ROSENTHAL:

Page 106

1       Q.   Let me think about if there's a way
2  that I can --
3       A.   But --
4            MR. VAN NAARDEN:  There's no
5       question.  She has to ask the questions.
6            MS. ROSENTHAL:  Yeah.  Let me
7       think about if there's a way I can
8       rephrase.
9  BY MS. ROSENTHAL:
10       Q.   Given that it was your testimony
11  that you recall adding her to the visitor list
12  around 2013, if you learned that you were
13  mistaken, is that something that you would be
14  very surprised by or is it possible that you
15  added her and you forgot?
16            MR. VAN NAARDEN:  Objection.
17            You can answer.
18            THE WITNESS:  All I know is
19       that when I received the information of
20       Katima name and her address, I added her
21       on my visiting list and I received a
22       visit from her.  As far as surprises or
23       whatever the case may be, I don't really
24       understand what you saying, but I know

Page 107

1   that when I received the information from
2   Katima, I put her on my visiting list.
3   The only thing that's surprising is the
4   relation.  Katima is not my cousin and so
5   forth and so on, but I know I didn't add
6   her in that I remember in 2010.  It
7   doesn't make sense.  And what I do know
8   is I added her in 2013 shortly after she
9   came and visit me.  That's the only time
10   that I got a visit from her.  Prior to
11   that, I never seen Tima before 2013.
12 BY MS. ROSENTHAL:
13   Q.   You've never seen Katima before
14 2013; is that what you just testified to?
15   A.   Yes.  I never seen her on a visit
16 before 2013.  That's exactly what I testified
17 to.
18   Q.   Well, what incentive would the
19 Department of Corrections have to make a false
20 additional visitor request from 2010?
21          MR. VAN NAARDEN:  Objection.
22          THE WITNESS:  I never --
23          MR. VAN NAARDEN:  Objection.
24          You can answer.

Page 108

1          THE WITNESS:  I never said -- I
2   never accused the DOC of doing anything,
3   but I don't know where the error came in,
4   with who behalf it was on, whatever the
5   case may be, but I'm not accusing the DOC
6   of doing anything wrong.
7 BY MS. ROSENTHAL:
8   Q.   Well, if you added her in 2010, why
9 would you add her -- well, strike that.
10          Isn't it the case that you're only
11 allowed to have a limited number of
12 individuals on your visitors list?
13   A.   Yeah.  There's a limitation.
14   Q.   Which is why -- so is it frequently
15 the case that you have to remove someone in
16 order to add someone, because you have to stay
17 within the limit?
18   A.   No.  You don't have to remove nobody
19 to add a person, no.
20   Q.   There's not an upper limit of how
21 many people you can have on your list?
22   A.   Yeah.  It's like 40 people you can
23 have on your list.  So the average person
24 doesn't have 40 people on their visiting list.

Page 109

1 And then children doesn't count as a person on
2 the visiting list, so...
3   Q.   Do you know why you removed Christya
4 Dixon in 2010?
5   A.   I don't know.  I don't know.
6 Christya Dixon was my old girlfriend.  I don't
7 know why I took her off or whatever the case
8 may be, but -- I don't know, but -- I can't
9 give you an accurate -- I don't remember.
10   Q.   Okay.  So you have no explanation
11 for this document?
12   A.   Yeah.  I vaguely remember taking
13 Christya off.  I would like to see the
14 original of this and -- I don't know.  I don't
15 have a valid explanation for you concerning
16 this and I'm not -- you know, that's all I can
17 give you with it.
18   Q.   Why do you think -- given that it's
19 in color, what do you think would be helpful
20 about the original?
21   A.   Excuse me?
22   Q.   Given that it's in color, what would
23 you be hoping to see from the original?
24   A.   I mean, I wouldn't be hoping to see

Page 110

1 anything from the original.  I just would like
2 to see the original before I say anything,
3 because, you know, my experience with the
4 court proceedings and so forth and so on
5 where, you know, I've been -- I have a lack of
6 trust for the system.
7   Q.   Although the Department of
8 Corrections has no connection to the City of
9 Philadelphia?
10   A.   I have a lack of trust for the
11 Department of Corrections as well.
12   Q.   Okay.  Do you have any familial
13 relationship, even extended family, with
14 Katima Jackson?
15   A.   Excuse me?
16   Q.   Do you have any familial
17 relationship with Katima Jackson?  And I'm
18 including extended family, someone's third
19 cousin, for example.
20   A.   Me and Katima Jackson doesn't share
21 any type of relation at all.
22   Q.   Okay.  And you referred to her as
23 Tima I believe at one point?
24   A.   Yeah.

Page 111

1    Q.   Are there any other -- does she have
2  a Muslim name?
3       A.   Not that I know of.  I just know her
4  as Tima.
5       Q.   Okay.  Any other names that you
6  refer to her by?
7       A.   Katima.
8       Q.   Okay.  When is the last time you've
9  contacted Katima?
10      A.   It's been a while.  Maybe over a
11 year.
12      Q.   Since this lawsuit was filed?
13      A.   Since this lawsuit was filed, no.
14 Me and her, the relationship took a turn for
15 the worse and we really not on speaking terms
16 now.
17      Q.   What happened?
18      A.   When I got released from prison, you
19 know, we were good friends, and when I got
20 released from prison, you know, I wasn't able
21 to spend time with her or I wasn't able to
22 communicate with her and, you know, we fell
23 out.  Like when I was incarcerated, we
24 became -- you know, we became good friends,

Page 112

1  and when I was released from prison, you know,
2  things took a turn for the worse and, you
3  know, we end up falling out from a lack of
4  communicating with her.
5       Q.   So you had some communication after
6  you were released from prison and then fell
7  out with her?
8       A.   Yeah.  I talked to her a few times
9  and --
10      Q.   Was that over the phone or in
11 person?
12      A.   Most of the time it was in person,
13 but I've talked to her on the phone as well.
14      Q.   Have you ever e-mailed with her?
15      A.   No.  I rarely use e-mails and -- no.
16      Q.   Did you use the inmate messaging
17 system to communicate with her when you were
18 in prison?
19      A.   Yeah.  It's been times that we went
20 back and forth on Global Tel Link system.
21      Q.   Do you still have access to that
22 system?
23      A.   No, not at all.
24      Q.   You can't sign in anymore?

Page 113

1       A.   It's not set up in a manner where
2  somebody that's not in jail can log into the
3  prisoners.  Like my account from --
4       Q.   Oh --
5       A.   -- when I was an inmate, I can't log
6  into -- I can't log into that.
7       Q.   I understand.
8       A.   I need -- I would need the actual
9  tablet that was sold to me when I was
10 incarcerated and I would have to sync it with
11 they system in order for me to have any type
12 of like -- I really don't know how to put it.
13      Q.   No.  I understand and --
14      A.   I don't know how to articulate --
15      Q.   I don't mean to cut you off, but my
16 question -- was it the case that after you
17 were released from prison, you also had an
18 account to communicate with those who were in
19 prison?
20      A.   Yeah.  At some point, I had set up
21 Global Tel Link, but it didn't really last
22 long.
23      Q.   Have you -- do you have access to it
24 anymore?

Page 114

1       A.   No, because I changed phones so much
2  that when I had it in my phone like -- with
3  the phones, it would be set up that I would
4  save whatever password it is to that phone.
5  So when I go to log into whatever it is, I can
6  tap for the password and it will let me in
7  through that device, but when I don't have the
8  device no more, I won't remember the passcode
9  and so forth and so on to get into that actual
10 app or whatever it is.  But it's been maybe
11 two years, a year and a half before I sent
12 anybody an e-mail on there.
13      Q.   Am I correct that in many of your
14 prison calls -- or I don't know if you'd say
15 many, but a substantial number, you used the
16 term "secure package"?
17      A.   Yeah.
18      Q.   What's a secure package?
19      A.   It's food that you get sent.
20      Q.   It's only food?
21      A.   Yeah.  It's like -- I guess it's
22 like a website where your relatives can order
23 you food and they will send you food.  Instead
24 of you using your commissary -- well, going to

Page 115

1  commissary is like a way of your family
2  members sending you food.
3       Q.   Did you ever disclose to anyone
4  that -- you said that you began a friendship
5  with Katima Jackson, then it turned into
6  something more.  Did you ever disclose that or
7  did someone ever disclose that on your behalf
8  to the District Attorney's Office?
9       A.   I'm not sure.  Not that I know of.
10 I mean, if anybody would ask me, I would have
11 told them, but...
12      Q.   Well, isn't it the case that you
13 didn't volunteer the information because it
14 made her a less credible witness?
15           MR. VAN NAARDEN:  Objection.
16           THE WITNESS:  No.  I didn't
17      even think that far, but if anybody would
18      have asked me me and her relationship, I
19      would have been honest about it.  You
20      asked me about me and her relationship
21      and I told you the truth.
22 BY MS. ROSENTHAL:
23      Q.   Well, you know I have a quite a few
24 documents that show it, but --

Page 116

1       A.   I don't know what you have.
2       Q.   How frequently would she visit you
3  in jail?
4       A.   I'm not sure how frequent it was,
5  but she came to see me a number of times.
6       Q.   And would you talk about your case?
7       A.   No.  I never would mention my case
8  to her.  It was like we became friends and
9  then shit started to get personal.  So as far
10 as my case, like the most she would say is
11 like she felt bad for me.  She sympathized for
12 me with my situation and, you know, she was
13 like, you know, heartbroken to see that I was
14 in jail for some shit I didn't do.  Excuse my
15 language.  I was in jail for something I
16 didn't do, and that was basically that.
17      Q.   Are you aware that when the District
18 Attorney's Office nolle prossed your case, one
19 of the reasons is because they viewed Katima
20 Jackson as an independent witness who wasn't
21 affiliated with you?
22      A.   From my understanding, the judge
23 believes Katima Jackson to be credible and,
24 you know, I feel as though me and her

Page 117

1  relationship was irrelevant to what she saw.
2  I have a relationship with a lot of people
3  involved in the case.  We all from the same
4  neighborhood.  You not from this neighborhood.
5  You not from this neighborhood.  Like the sad
6  reality is, we all from around the same
7  neighborhood.  We all like know the same
8  people.  And I might not directly know you
9  personally, but with people being from around
10 the same neighborhood and something happens,
11 like you tend to know each other.
12      Q.   I'm actually talking about Patricia
13 Cummings.  Do you know who Patricia Cummings
14 is?
15      A.   I believe Patricia Cummings was
16 something to do with the CRU.
17      Q.   Yes.  After your conviction was
18 overturned, then there was a decision to nolle
19 pros it.  And did you understand that they
20 gave credibility to Katima Jackson because she
21 was, unlike some other witnesses involved in
22 the case who had some relationship with you,
23 they were not aware of her having a personal
24 relationship with you?

Page 118

1           MR. VAN NAARDEN:  Objection.
2           THE WITNESS:  I mean, I can't
3      accurately say why Patricia Cummings, you
4      know, thought what she thought or did
5      what she did.  All I know in the case is
6      that I was innocent.  I'm really
7      innocent, and regardless of what me and
8      Katima relationship developed into, it
9      started off with me being innocent and
10     her being a witness to me not committing
11     a crime.  Like she saw somebody else
12     commit the crime.
13 BY MS. ROSENTHAL:
14      Q.   And when did --
15      A.   And from there, you know, I feel as
16 though she felt bad for me.  She had sympathy
17 for me.  And, you know, I'm a human being.  I
18 was somebody that was serving a life sentence.
19 Like, you know, it's times that, you know, I
20 was in there lonely.  I was in there stressed
21 out and, you know, we developed a friendship.
22 I'm not going to stop somebody from writing me
23 a letter or tell somebody, whatever the case
24 may be.

Page 119

1    (Ms. Mays left the conference
2    room.)
3    Q.   How quickly did you develop a
4 friendship with her from when she came to see
5 you?
6    A.   A couple years.  I'm not a hundred
7 percent sure, but it just didn't like she seen
8 me on Monday, and Tuesday we was, you know,
9 swapping letters or whatever the case may be.
10 It took a couple years before, you know, our
11 bond developed.
12    Q.   Well, when is the next time that she
13 came to see you in the prison after she came
14 to see you the first time in 2013?
15    A.   Honestly, like I used to receive a
16 visit almost every week.
17    (Ms. Mays re-entered the
18    conference room.)
19    Q.   Well, why was she visiting you if
20 she had just come to tell you that she was a
21 witness to the murder?  Why did she continue
22 to visit every week?
23    A.   Katima didn't come see me every
24 week.  Monique would come see me every week.

Page 120

1    Q.   We're talking about Katima.
2    A.   Yeah.  But, no, Katima didn't come
3 see me every week.  I'm just telling -- in
4 general you asked me when was the next time
5 Katima came up after that, and the reason for
6 me saying that I used to get visits on a
7 regular basis is to show like I got so many
8 visits that I couldn't keep track of this
9 time, this time, how far afterwards or so
10 forth and so on, but I know she came back up
11 there several times.  But the time span
12 exactly, I'm not a hundred percent sure.  It
13 could have been six months before I seen her
14 again.  She may have came to see me about five
15 times, six.
16    Q.   And who did -- did you disclose your
17 relationship with Katima to anyone?
18    A.   A couple of my friends.
19    Q.   Only a couple?
20    A.   I mean, a couple of my friends.  I
21 mean, I wasn't running around broadcasting
22 that, you know, me and her became more than
23 friends.
24    Q.   And you didn't think, sitting here

Page 121

1 under oath today, you didn't think that it
2 would be damaging at all to your case if it
3 became public knowledge that you and Katima
4 Jackson had a strong friendship or were
5 something more than friends?
6    A.   I mean, we weren't having sex or
7 anything of that nature.  So I didn't really
8 look at it like -- how can I put this?  Like,
9 you know, we was friends and I felt like, you
10 know, she felt bad for me.  She had sympathy
11 for me and, you know, it developed into a
12 friendship that developed into me having love
13 for her.
14    As far as what I thought as far as
15 the damage to my case, the fact of the matter
16 is, I didn't commit the murder, and that's
17 that.  Nothing changes that.  I don't think
18 that, you know, because I knew Katima Jackson,
19 that it would change the fact that I didn't
20 commit the murder.
21    At the end of the day, I didn't
22 commit the murder, and nothing changes that I
23 didn't commit the murder, that I was innocent.
24    Q.   Okay.  I move to strike that answer

Page 122

1 as non-responsive, and also I would just let
2 you know that to the extent you provide
3 prolonged responses that are not responsive to
4 the question, you do run the risk of having to
5 be re-called for another deposition.  That's
6 something the judge would have to decide, but
7 it's important that you answer the question so
8 we can get everything done.
9    A.   Oh, I'm sorry.  I thought I answered
10 the question.
11    MR. VAN NAARDEN:  She's telling
12    you something.
13    I would just say just so the
14    record is clear, you asked him a very
15    compound question, open-ended about what
16    damage he thought that Katima's
17    relationship with him would have.  That's
18    not a yes or no response, and he gave you
19    a response that was absolutely responsive
20    to your question.  But, again, you
21    reserve the right to --
22    MS. ROSENTHAL:  I disagree.
23    MR. VAN NAARDEN:  You reserve
24    the right to do whatever you want.

Page 123

BY MS. ROSENTHAL:

Q.    My question is whether you thought
it would be harmful to your ability to obtain
post-conviction release if it was known that
you had the relationship that you had with
Katima Jackson.

A.    I didn't think that if me and Katima
became friends, that it changed the fact that
I was innocent.

Q.    But would it potentially change the
fact about whether you would be granted relief
that would let you out of jail?

MR. VAN NAARDEN:  Objection.

THE WITNESS:  I have no way
of -- I'm not one who determines
credibility, so I don't know the standard
of credibility.  What I am saying is,
what I thought in my mind -- you asked me
what I thought.  I didn't think that if
me and her was friends, that it would
change the fact that I'm innocent, and I
hope that that answers the question as
however you want me to answer or respond.
Like I'm not trying to be difficult or

Page 124

anything.  I'm trying to answer the
questions to the best of my ability, and
I apologize if --

BY MS. ROSENTHAL:

Q.    You don't need to apologize, but you
thought you were innocent all along; isn't
that correct?

A.    I didn't think.  I know --

Q.    You knew?

A.    -- with certainty I was innocent all
along.

Q.    But your belief that you were
innocent didn't lead to you being able to get
out of jail.  It was important for you to have
witnesses, and their credibility was
important; is that correct?

MR. VAN NAARDEN:  Objection.

MS. ROSENTHAL:  You know what?
I will withdraw that question and we can
move on.

MR. VAN NAARDEN:  When it's
good for you, if you want to take a
five-minute.  We've been going at it for
over an hour, but I don't want to --

Page 125

MS. ROSENTHAL:  Yeah.  That's
good.

Let's go off the record.

MR. VAN NAARDEN:  Just like
five minutes.  I'm not even saying...

VIDEO TECHNICIAN:  We're now
going off record.  The time now is 2:18
p.m.

- - -

(Short recess.)

- - -

VIDEO TECHNICIAN:  We're now
back on record.  The time is 2:31 p.m.

BY MS. ROSENTHAL:

Q.    Okay.  I want to play you an audio
clip that I had attempted to play you before
and was unable.  It's a call that you placed
on, I believe, June 29, 2019 at 20:55:58 to
353 -- no.  That might not be the number.  To
484-461-4031.  And before I -- and the clip is
from 8:15 to 8:52.  It looks like the speakers
may be working all the sudden.

(Audio being played.)

All right.  You're going to have to

Page 126

hold this to your ear.  That's the only way
you're going to be able to hear it.

MR. VAN NAARDEN:  I need to
hear it too.

MS. ROSENTHAL:  You can each
take one.

MR. VAN NAARDEN:  Whatever was
playing just now I could hear.

MS. ROSENTHAL:  Oh, you could?

MR. VAN NAARDEN:  Barely, but
yeah.

MS. ROSENTHAL:  All right.  I'm
going to replay it, but I think it would
be helpful if you...

(Audio being played.)

BY MS. ROSENTHAL:

Q.    Do you recognize your voice in that
audio clip?

A.    Yes.

Q.    And were you talking to your wife,
Monique?

A.    Yes.

Q.    And am I correct that in the audio
clip, Monique asked you, what are you going to

Page 127

1  do with your law work when you go home?  Shred
2  it?
3            And you said that you wanted to take
4  it -- take away the box of law shit and set it
5  on fire; is that correct?
6     A.   No.  That's not how that
7  conversation went.
8     Q.   How did the conversation go?
9     A.   You heard the conversation.  You
10 know, it's traumatic to me.  It's something
11 that, you know, I struggle with.  It's
12 something that is -- when I think of it, it's
13 something that's real traumatic to me.  It's
14 me reliving a moment in my life of me
15 suffering, of me literally fighting for my
16 life for a crime I didn't commit.  It's
17 something that I don't want to entertain every
18 day.  It's something that I don't want to
19 constantly relive.
20    Q.   Well, my question is not why you
21 would want to set it on fire.  It is whether
22 you stated in the call -- is it correct to say
23 that you stated in the call that you want to
24 take your box of law shit and set it on fire?

Page 128

1     A.   Can you replay the call for me?
2     Q.   Sure.
3            (Audio being played.)
4            So is it correct that you stated in
5  the clip that when you get home, you're going
6  to take the box of law shit and you're going
7  to set the shit on fire?
8     A.   Yes.  I can't deny that.  Yes.  Yes,
9  I said that, but this comes from me not having
10 no good memories of it, and that's that.  But
11 to answer your question, yes, I said that.
12    Q.   Well, is it not the case that by
13 choosing to bring this civil suit, you also
14 are having to face memories of what happened
15 to you?
16    A.   Yes.  Yes, absolutely, and it
17 bothers me.  Just mentioning it, it gives me
18 anxiety.  It gives me stress.  Like right now,
19 like I'm anxious.  Like it's me reliving the
20 most traumatic event of my life.  Like it's
21 fucking with me now.
22            MR. VAN NAARDEN:  Do you need
23       to take a minute?
24            THE WITNESS:  Yeah.

Page 129

1            VIDEO TECHNICIAN:  We are now
2       going off record.  The time now is 2:37
3       p.m.
4                   -  -  -
5            (Short recess.)
6                   -  -  -
7            VIDEO TECHNICIAN:  We're now
8       back on record.  The time is 2:41 p.m.
9  BY MS. ROSENTHAL:
10    Q.   At the time that you made that
11 statement in 2019, you were contemplating
12 bringing litigation in the event that your
13 conviction was nolle prossed; is that correct?
14            MR. VAN NAARDEN:  Objection.
15            THE WITNESS:  I mean, I always
16       felt as though that -- I mean, how can I
17       put this?  You know, as somebody serving
18       a life sentence, you know, worried about
19       a litigation is like putting the buggy
20       before the horse.  It's impossible.  My
21       main priority was like being released
22       from prison, but in the event that I got
23       out of prison, I felt as though that,
24       yes, I wanted somebody to be held

Page 130

1       accountable for what happened to me.  I
2       felt as though I was wronged by the
3       system, and I just wasn't going to sit
4       back and be happy that I got wronged.
5  BY MS. ROSENTHAL:
6     Q.   But you understand the importance of
7  discovery, right?  That was one of the large
8  foundations of your case, that documents
9  should have been turned over and exchanged?
10    A.   Yeah.  I always understood the
11 importance of discovery.  I was never confused
12 about that.  But when I was speaking about --
13 I was speaking about my file that I never had.
14 My file was at SCI Dallas.  I didn't have
15 possession of my file.  Then a lot of --
16 everything that was original I sent to my
17 attorney, Edward Foster.  Monique made a copy
18 of everything she had and gave to my attorney.
19 So it was no need, I felt as though for me, to
20 hold onto anything, because Monique gave Ed
21 everything and she took the copies, and it was
22 no need for me to hold on and to me, you know,
23 taunt myself with this paperwork.
24    Q.   Well, maybe you can help us then

Page 131

1  identify where some of the originals are
2  located, because we're not able to locate them
3  either from Ed Foster or someone else.
4         MS. ROSENTHAL:  Sorry.  Did I
5     mark that call as an exhibit?
6         COURT REPORTER:  No.
7         MS. ROSENTHAL:  What number are
8     we at?
9         COURT REPORTER:  6.
10         MS. ROSENTHAL:  Okay.  So I'd
11     like to mark that as an exhibit.
12  BY MS. ROSENTHAL:
13     Q.   I'm going to show you a document
14  that I'm going to mark as Outlaw-7.
15                  - - -
16         (Exhibit Outlaw-7 marked for
17  identification by counsel.)
18                  - - -
19  BY MS. ROSENTHAL:
20     Q.   It's a one-page document that's
21  Bates stamped OUTLAWDAO2022002530.
22         Do you recognize this document?
23     A.   No.  Let me read it.
24         (Pause.)

Page 132

1         I don't know.  I vaguely remember
2  it.
3     Q.   It's an affidavit that Lamar Rodgers
4  signed dated January -- Lamar Rodgers
5  purportedly signed dated January 8, 2015?
6     A.   Yes.  I see it.
7     Q.   Do you know where the original of
8  this document is located?
9     A.   It has to either be in Ed's file or
10  it could be in my file that I have up SCI
11  Dallas that I never retrieved.
12     Q.   Did you make attempts to retrieve
13  it?
14     A.   Yes.  I actually called SCI Dallas
15  and tried to get my property.  They said it
16  was destroyed after six months.
17     Q.   When did you call?
18     A.   I probably called -- I got off of
19  house arrest in -- I got off house arrest
20  around or about August 1st of 2020.  Somewhere
21  around that time I called SCI Dallas trying to
22  retrieve my property, and they told me that
23  they only held onto it for a certain time.
24  And I was willing to drive up there and get my

Page 133

1  property, just things that I didn't want to
2  get left behind, and it wasn't -- it didn't
3  really have nothing to do with the law work.
4  It was pictures of my wife that I had that I
5  wouldn't want nobody else to see.  It was
6  pictures of my family and, you know, things of
7  that nature that meant something to me that I
8  didn't want to just be languoring around the
9  jail or wanted the jail to destroy.  So I
10  called to get all my property, and they
11  informed me that they didn't have it no more.
12     Q.   Why didn't you call them before six
13  months was over?  You waited six months until
14  after you left?  Or longer than that.  Was it
15  years?
16     A.   Yeah.  At the time, it probably was
17  like nine months to a year.
18     Q.   Do you know whether Monique had this
19  original or do you have a distinct
20  recollection that you were the one who had the
21  original?
22         MR. VAN NAARDEN:  Objection.
23         THE WITNESS:  I mean, it's hard
24     for me to keep track of thousands of

Page 134

1     papers to say exactly where the original
2     landed.  I really don't know.
3         But to answer your other
4     question, I was on house arrest and I
5     didn't have a means of getting up to SCI
6     Dallas to retrieve my property.  I
7     couldn't leave the house.  The only thing
8     I could do was go to court.
9         MS. ROSENTHAL:  I'm going to
10     mark a document that I'm going to -- I'm
11     going to mark another document as Exhibit
12     Outlaw Exhibit-8.
13                  - - -
14         (Exhibit Outlaw-8 marked for
15     identification by counsel.)
16                  - - -
17  BY MS. ROSENTHAL:
18     Q.   It's a two-page document Bates
19  marked DAO02499 to DAO02500.
20         Do you recognize this document as an
21  affidavit purportedly signed by Katima Jackson
22  on September 7, 2013?
23     A.   I mean, I never -- I'm not familiar
24  with this actual piece of paper.  It look like

Page 135

1  a copy to me, but I'm familiar with the
2  affidavit Katima signed, yes.
3      Q.   Who had that original?
4      A.   Katima.
5      Q.   Katima kept the original?
6      A.   I'm not a hundred percent sure.  I
7  know whenever I got a hold to it, it was
8  always a copy.  I never had the original to
9  say who --
10     Q.   Did -- sorry.  Go ahead.
11     A.   I'm not qualified to answer that
12 question.
13     Q.   Because you never had the original;
14 you were sent a copy to begin with?
15          COURT REPORTER:  I'm sorry.
16     Was that a -- what answer was that?
17          THE WITNESS:  I'm not qualified
18     to answer that question because I never
19     had the original to say where exactly
20     it's at.
21 BY MS. ROSENTHAL:
22     Q.   Were you sent the copy by Katima
23 Jackson or were you sent the copy by Monique?
24     A.   I was sent to it by Monique.

Page 136

1      Q.   Do you have any idea where the
2  original is?  Sorry.  Strike that.  I think
3  you already answered the question.
4          MS. ROSENTHAL:  I want to mark
5      as Exhibit -- Outlaw Exhibit-8 --
6          MR. VAN NAARDEN:  9.
7          COURT REPORTER:  9.
8          MS. ROSENTHAL:  -- 9 a one-page
9      document Bates marked PLAINTIFF06888.
10              - - -
11         (Exhibit Outlaw-9 marked for
12     identification by counsel.)
13              - - -
14 BY MS. ROSENTHAL:
15     Q.   Do you recognize this document as a
16 letter that appears to be written by Janis
17 Smarro to you?
18     A.   I mean, I don't remember this
19 letter, but now that you putting it in front
20 of me, I still don't remember it, but I could
21 believe she sent it to me, yes.
22     Q.   She was a former attorney of yours?
23     A.   Yes.
24     Q.   And the letter reads, "Dear

Page 137

1  Mr. Outlaw, I have located Lemuel Bar and I
2  have written the attached letter to him.  I
3  will be in touch with you as soon as I receive
4  a response."
5          I'll represent to you that nowhere
6  in the production of any third party or
7  yourself is the letter that's being referred
8  to in this letter to you.  Do you know where
9  it is?
10     A.   No.  I have no idea, but I could
11 reach out to Janis Smarro and see if she has
12 it.  I don't know.  But I don't know where the
13 original at.
14          I explained to you that I gave you
15 everything that I had.  My original file, I
16 gave everything to Ed.  So Ed could have it.
17 Besides that, it could have got lost at SCI
18 Dallas.  I can't give you an accurate answer
19 to that, because I really don't know.  All the
20 law work I had and everything I had
21 personally, it got left at SCI Dallas due to
22 me transitioning from jail.
23     Q.   But you said that you frequently or
24 usually sent Monique a copy of everything too?

Page 138

1      A.   Yeah.  I sent Monique a lot of
2  things.  I can't say what, but, yeah, whatever
3  Monique had before she got rid of or whatever
4  she did, she gave Ed a copy of it.  So
5  whatever I had, y'all got.
6      Q.   How do you know she gave Ed a copy
7  of everything she had?
8      A.   She did.  That's how Ed got my file.
9      Q.   My question is, how do you know that
10 Monique gave Ed a copy of everything that she
11 had?
12     A.   She told me that everything she had,
13 Ed has a copy of.
14     Q.   Do you remember what was in the
15 attached letter?
16     A.   This was in 2008.  It's impossible
17 for me to remember what was in that letter.  I
18 do not remember.  I apologize.  I don't
19 remember.  I'm sorry.
20     Q.   Do you remember whether she received
21 response to the letter?
22     A.   Again, it was in 2008.  I don't
23 remember.  I'm sorry.  I don't remember.
24     Q.   And am I correct that Lemuel Bar is

Page 139

1 a witness that you disclosed as someone who
2 may attest to your innocence in this case?
3     A.    From my understanding, Lemuel Bar
4 was questioned by the police.  He gave
5 favorable testimony that never surfaced, and
6 that was that.
7     Q.    Do you have any belief or
8 understanding that he may be called as a
9 witness on your behalf in this litigation?
10    A.    Not that I know of.  I don't know.
11    Q.    But you would agree that he is an
12 individual who could be relevant to the
13 litigation because of his statement that you
14 just said he gave to police?
15    A.    Yeah.  From my understanding, he
16 gave some form of statement to the police that
17 nobody never saw.
18    Q.    I want to show you a document that
19 I'm going to mark as Outlaw-10.  It's a
20 two-page document Bates marked PLAINTIFF17813
21 to PLAINTIFF17814.
22              - - -
23        (Exhibit Outlaw-10 marked for
24     identification by counsel.)

Page 140

1              - - -
2 BY MS. ROSENTHAL:
3     Q.    Do you recognize this document?
4     A.    It's an affidavit from Chris.
5     Q.    It looks like it's an affidavit --
6     A.    Yeah.  It looks like it's an
7 affidavit from Chris, but the actual document,
8 it's hard for me to remember everything on my
9 case, every nook and cranny.
10    Q.    To describe it for the record, does
11 it look like an affidavit that appears to be
12 written by Chris Holder dated September 30,
13 2014?
14    A.    Yes.
15    Q.    Am I correct that this affidavit was
16 sent to you by Monique in prison?
17    A.    More than likely.  I can't a hundred
18 percent say if it was sent by Monique or not,
19 but more than likely.  Monique is like my
20 go-to person like, so...
21    Q.    Do you remember ever seeing an
22 original of this affidavit?
23    A.    No.  I never had the original.
24    Q.    You never had the original of this

Page 141

1 affidavit?
2     A.    Yeah.  I had the copy.
3     Q.    Do you know who had the original?
4     A.    I believe Chris, because it came
5 from him.
6     Q.    Do you have any reason to believe
7 Chris made a copy of the affidavit for himself
8 and then -- or retained the original and then
9 gave a copy to Monique as opposed to giving
10 her the original of the affidavit?
11    A.    I don't know what Chris did.  I'm
12 sorry.
13    Q.    Okay.  So you would think that
14 either Chris has an original of the affidavit
15 or Monique would have an original of the
16 affidavit?
17    A.    I don't know who has the original.
18 I really don't know.
19    Q.    And you would agree that based on
20 what you said about the Katima Jackson
21 authorized visitor sheet, it's important to
22 look at originals in order to determine their
23 authenticity; is that correct?
24    A.    Excuse me.  Can you repeat the

Page 142

1 question?
2     Q.    Well, when you were looking at the
3 Katima Jackson sign-in sheet, which we
4 previously marked as an exhibit during this
5 deposition, you very much wanted to see the
6 original in order to say whether it was
7 something that you had written?
8     A.    Yeah.  Whether it was something that
9 I written, yes.
10    Q.    Would the same principle potentially
11 apply here?
12    A.    No.  Why would it?  This is not
13 something that belongs to me.  I don't have no
14 reason to second guess it.  It's something
15 that was beneficial to me proving my
16 innocence.  I didn't second guess it at all.
17    Q.    Well, do you think the defendants in
18 this case would have an interest in -- if
19 it's -- sorry.  Strike that.
20        If it's beneficial to proving your
21 innocence, would it be something that the
22 defendants would be interested in
23 understanding whether it was authentic or not?
24        MR. VAN NAARDEN:  Objection;

Page 143

```
 1    speculation.
 2              THE WITNESS:  I don't
 3    understand what the question is.
 4 BY MS. ROSENTHAL:
 5    Q.   All right.  I'll withdraw the
 6 question.
 7         I want to show you a document that
 8 I'm going to mark as Outlaw Exhibit-11.  It's
 9 a one-page document Bates marked
10 PLAINTIFF17811.
11                  - - -
12         (Exhibit Outlaw-11 marked for
13    identification by counsel.)
14                  - - -
15 BY MS. ROSENTHAL:
16    Q.   Just for the record, would you agree
17 with me that it appears to be an affidavit
18 signed by Wesley Harmon dated January 21st,
19 2015?
20    A.   That's correct.
21    Q.   Do you recognize this document?
22    A.   Vaguely, but no.  I mean, I know
23 Wesley Harmon gave a statement in the case --
24 I mean, an affidavit.  This particular paper,
```

Page 144

```
 1 I don't know, but yeah.
 2    Q.   Did you ever have an original of
 3 this affidavit?
 4    A.   I'm not sure.
 5    Q.   Do you know whether --
 6    A.   But I don't think so.
 7    Q.   Do you know who would have an
 8 original?
 9    A.   More than likely, Wesley.
10    Q.   Why do you say "more than likely,
11 Wesley"?
12    A.   Because it came from him.
13    Q.   Well, isn't it the case that when a
14 number of witnesses signed affidavits on your
15 behalf in 2018 and gave them to Ed Foster,
16 they gave the originals to Ed Foster, not
17 copies?  Are you aware of that?
18              MR. VAN NAARDEN:  Objection.
19              THE WITNESS:  I wasn't there.
20    I don't know.  I mean, this wasn't
21    nothing that I was adamant about, to be
22    honest with you, but if they would have
23    gave it to me personally, then I would
24    have wanted the original if it was put in
```

Page 145

```
 1    my hand first, but because it came from
 2    my attorney, I had no reason to second
 3    guess it.
 4 BY MS. ROSENTHAL:
 5    Q.   This came from your attorney?
 6    A.   This right here?  No, this didn't
 7 come from my attorney.  This came like third
 8 party from somebody either from -- I ain't
 9 sure exactly, but Wesley Harmon is a friend of
10 mine.  Like I know Wesley Harmon for a long
11 time, and throughout my years of
12 incarceration, initially when I had got
13 arrested or whatever, he reached out to
14 somebody in my family and signed an affidavit
15 stating what he saw.
16    Q.   Was it -- sorry.  Strike that.
17         Did Monique send you this affidavit?
18    A.   I don't think so, but I'm not a
19 hundred percent sure.
20    Q.   If she sent it to you, you believe
21 she would have a copy?
22    A.   I don't understand what you saying.
23 If Monique sent --
24    Q.   If she sent it to you, you don't
```

Page 146

```
 1 have any memory of it being an original that
 2 she sent; is that correct?
 3    A.   I don't know.  I got sent this
 4 document so long ago when I was incarcerated,
 5 like it's like vague to say where the original
 6 is and where it isn't.  I don't know.
 7    Q.   Other than asking Monique, Wesley
 8 Harmon, or Ed Foster, do you have any other
 9 idea of where the original might reside if
10 those individuals do not have it?
11    A.   I mean, it's a simple solution to
12 this.  Wesley Harmon is still alive.  He gave
13 the affidavit.  He's around.  He could be
14 questioned about his affidavit.
15         I have trouble answering questions
16 about something that he signed and that he
17 notarized or whatever the case may be.  When I
18 received it --
19    Q.   My question --
20    A.   -- I didn't -- I'm not sure if I
21 received the original.  I think I had a copy.
22    Q.   My question is just a little
23 different.  It's whether -- in thinking about
24 whether there could be some other party -
```

Page 147

1  attorney, investigator - that might have a
2  copy of this that we could reach out to, is
3  there anyone else other than those individuals
4  that you can think of who could have a copy?
5       A.   If I -- if anything I have, Ed has
6  it.  I gave everything -- everything I had I
7  disclosed to Ed.  I gave him all my paperwork.
8       Q.   You said you had a copy of it.  I
9  can tell you Ed Foster does not have an
10 original of this.
11      A.   I mean, I don't know what he did
12 with his file, but I'm just telling you I gave
13 Ed everything that I had.
14      Q.   But you said you didn't have an
15 original?
16      A.   Yeah.  I don't know if I had the
17 original or not, but more than likely, I'm
18 believing I had a copy.  But whatever I had on
19 this, I sent to Ed, whatever it was.
20      Q.   Okay.  I want to play --
21      A.   But it's too long ago for me to
22 remember like originals and copies and so
23 forth and so on.  Like this was years ago.
24      Q.   If you had had an original, would

Page 148

1  you have saved it throughout the life of your
2  criminal case until the nolle pros?
3       A.   I'm not sure what I would have did,
4  but more than likely, I would have kept it.
5       Q.   How come?
6       A.   Because I was fighting for my life.
7       Q.   And you would think it would be
8  important to have the original; is that
9  correct?
10      A.   Yeah.  My goal was to get out of
11 jail.  Like I was keeping everything I needed
12 to keep, a track record of everything until I
13 conquered my goal.  My goal was being released
14 from prison.
15      Q.   So it matters whether it's the
16 original or a copy?
17      A.   No.  It didn't matter, but my goal,
18 like I said, was being released from prison
19 for a crime I didn't commit.  That was my
20 focal point.  I couldn't think past nothing
21 else.
22           MS. ROSENTHAL:  I'm going to
23      play another tape that I'm going to mark
24      as Exhibit-11.

Page 149

1           MR. VAN NAARDEN:  12.
2           MS. ROSENTHAL:  12.  I'm
3      horrible at this.
4           It's a call that was placed
5      from Donald Outlaw on March 7, 2019 at
6      9:48:31 to 215-669-9861, and the clip
7      covers 8:15 to 8 -- no.  Sorry.  The clip
8      covers 0 minutes to 3:38.
9           MR. VAN NAARDEN:  Hold on.
10     Before you play it, just so we have a
11     foundation, where was this call placed
12     from?  Where do these records come from?
13     Is this Philly?  Is this DOC?  Something
14     else?
15          MS. ROSENTHAL:  I again believe
16     that this -- I'm fairly confident that
17     this one is from the Philadelphia
18     Department of Prisons.
19 BY MS. ROSENTHAL:
20     Q.   You were in the Philadelphia
21 Department of Prisons in March 2019?
22     A.   I'm not a hundred percent sure.
23     Q.   Okay.
24          MS. ROSENTHAL:  I think it is.

Page 150

1      Sorry.  I don't have Bates numbers.  I
2      have it marked as Disk No. 4, Call No.
3      81.  So it's Call No. 81 on one of the
4      CDs.  Okay.
5           (Audio being played.)
6  BY MS. ROSENTHAL:
7      Q.   So do you recognize your voice on --
8      A.   Yes.
9      Q.   -- that?
10          Sorry.  Just for the court reporter,
11 just make sure I ask the question fully.
12          Do you recognize your voice on that
13 tape?
14     A.   Yes.  That was me talking to my
15 sister.
16     Q.   And your sister was Shanita Starr?
17     A.   Yes.
18     Q.   Okay.  And then I'm just going to
19 ask you to confirm that certain statements
20 were made, not the context behind them, but
21 just the fact whether or not they were said
22 and I'm accurately characterizing the tape.
23          Did you make the statement that your
24 legal mail and your legal shit, you were going

Page 151

1 to burn that?

2    A.   Yeah, I made that statement.

3    Q.   Did you also say that you think it's
4 important to keep the stuff that's beneficial
5 to you?

6    A.   No.  I said that me holding onto
7 this paper for so long end up being beneficial
8 for me, because it was a cover page of my
9 discovery and they were saying that they
10 disclosed something to me that they didn't,
11 but because I still had my law work, I had the
12 cover page, I could prove that they didn't
13 disclose whatever they was alleging they
14 disclosed to me, and it helped me prove that
15 they was withholding evidence in my case.

16    Q.   Right.  You were talking about those
17 discovery cover sheets.  You said that you had
18 held onto them for 16 years and they helped
19 and with your Brady claim?

20    A.   Yes.

21    Q.   But isn't it correct that you were
22 also saying that it's important going forward
23 to keep stuff that's beneficial to you?

24    A.   Yeah.  I was talking about my

Page 152

1 degrees and my accomplishments that, you know,
2 I made in jail.  But as far as my law work, I
3 didn't see how it was beneficial to me.

4    Q.   You didn't see how any of the
5 underlying paperwork in your criminal case
6 could be beneficial at all in the civil case?

7    A.   All my paperwork that was
8 beneficial, I handed over.  Everything that I
9 had, I gave up.  I didn't hold back nothing
10 or, you know, maliciously withheld anything.
11 So anything that I thought was of any
12 importance, I gave up.  Ed got everything that
13 I felt like was important.  My stuff that I
14 had and I was, you know, telling my sister if
15 they mail my stuff, I don't care about that
16 law work and, in my words, you can set this
17 shit on fire.  It's a trigger for me.

18    Q.   And when you're saying that you
19 would give him anything that was important or
20 beneficial, are you referring to important or
21 beneficial to your case or are you including
22 anything that would be relevant as evidence in
23 this matter?

24    A.   When I was -- I believe when I was

Page 153

1 speaking about what's important and
2 beneficial, I was telling her I took courses
3 at Stratford Career Institution, and I told
4 her that just in case I got to go through the
5 modules and I get a job in that field, I can
6 go through the modules and look back at
7 certain stuff and it could be beneficial to
8 me.

9    And I was saying like my grand-mom,
10 her name was Betty, she was a hoarder.  She
11 will hoard a lot of stuff, and I don't like to
12 have that characteristic of having a bunch of
13 stuff hoarded in my house.  So like me
14 personally, when I feel like anything is
15 piling up, I get rid of it.

16    Q.   So if you had law work that wasn't
17 necessarily beneficial to support your case,
18 there's really no reason to keep it?

19    A.   No.  That's not true at all.  If I
20 had law work that wasn't beneficial to me, I
21 still understand that whether it's beneficial
22 or not, I got to disclose it.

23    Anything that was beneficial to me
24 or wasn't beneficial or whatever, anything I

Page 154

1 ran across, I disclosed.  And I'm stating this
2 on the record.  Anything that came my way that
3 was beneficial to me or whatever the case may
4 be, I disclosed everything.  I disclosed
5 everything I had in the case.  I never
6 maliciously withheld anything.  I never tried
7 to get rid of anything, to elude anything or
8 anybody.  My personal box of the stuff, I
9 never received from Dallas.  That was it.

10    Q.   But you're talking about when you're
11 saying that you never withheld anything or --
12 you're talking about for your criminal
13 proceedings, which would you understand that
14 there's different rules of discovery and the
15 issues are slightly different in the civil and
16 the criminal?

17    A.   I'm saying in every aspect of civil,
18 criminal, or any time I was ever asked to
19 disclose anything, I complied to the best of
20 my ability.  I did everything I could to
21 comply.  If I didn't disclose it, it was
22 because I couldn't, I was unable to.

23    Q.   So when this call was made in June
24 of 2019, this lawsuit had not been filed, so

Page 155

1 there was no request made of you to disclose
2 anything.  My question is whether your
3 statement was that you would keep stuff that
4 was beneficial to you, like, for example, the
5 Brady stuff ended up being beneficial to you
6 in the underlying criminal case?
7            MR. VAN NAARDEN:  Objection.
8      There's like five statements in there.
9      Objection to the form.
10            THE WITNESS:  To answer your
11      question, if you go back through the
12      recording, what I was saying was
13      beneficial was my modules to the courses
14      I took, and I stated why it was
15      beneficial.  If I ever get a job in that
16      field, I could go back through the
17      module, comb through it, and it would be
18      able to help me out.
19 BY MS. ROSENTHAL:
20      Q.   That was one example, right?
21      A.   That's exactly what I was talking
22 about.  It wasn't -- that's what I was talking
23 about why holding onto it.
24      Q.   Didn't you also give the example of

Page 156

1 the Brady evidence?
2      A.   Yeah.  Me giving an example of the
3 Brady evidence was an example how me holding
4 onto it benefited me.  And my other thing was
5 with my modules, if I hold onto it, it could
6 benefit me with me having a job in that field.
7      Q.   Did you end up losing your modules
8 or do you still have them?
9      A.   No, I don't have them.
10      Q.   Were they also left at the prison
11 and not found?
12      A.   Yeah.  It was at my prison -- I
13 mean, it was in my property.  The footlocker I
14 was speaking of, I never retrieved.  The TV,
15 the sneakers, the tablet, all that stuff is up
16 at SCI Dallas.
17      Q.   Did you hear that at the end of the
18 call, did you hear you say that, well, it
19 depends on the back end how this is going to
20 play out?
21      A.   Right.
22      Q.   Were you referring to litigation?
23      A.   I was referring to I was still in
24 the process of knowing whether or not my case

Page 157

1 was going to get dropped.
2      Q.   Were you referring to the fact that
3 certain documents could be relevant depending
4 on what happens on the back end, meaning if
5 your case was going to be dropped, there would
6 be potential litigation?
7      A.   No.  The back end is more so with me
8 being released from jail.  Like I can't throw
9 nothing away now until I get out.  I was
10 incarcerated at the time.
11      Q.   I want to -- I just want to play
12 that last little bit again, because I'm a
13 little confused by what you're saying.  Hold
14 on.
15            (Audio being played.)
16            So did you say that -- is it that
17 Shanita said, well, you might -- it might be a
18 good idea to keep those papers, referring to
19 legal papers, and then did you say, well,
20 yeah, it depends on what's going to happen on
21 the back end how it's going to play out?
22      A.   That was --
23            MR. VAN NAARDEN:  Objection.
24            THE WITNESS:  -- exactly what I

Page 158

1 said.
2 BY MS. ROSENTHAL:
3      Q.   And that was referring, wasn't it,
4 to the fact that if it played out in your
5 favor, then on the back end there might be use
6 for the papers in other litigation?
7      A.   No.  That's not what I meant.
8      Q.   What did you mean?
9      A.   I was saying I was holding onto the
10 papers until I be released from prison.
11      Q.   Did you end up mailing any documents
12 to Shanita?
13      A.   No.  I didn't send Shanita anything.
14 I was trying to set it up where Shanita get
15 all my stuff from SCI Dallas, but she wasn't
16 able to do it.
17      Q.   Why not?
18      A.   For whatever reason, I had to
19 request it myself and Shanita wasn't able to
20 retrieve it.
21      Q.   Okay.  But you waited six or nine
22 months to do that?
23      A.   Yeah.  I didn't care too much
24 about -- I mean, I had a life sentence.  The

Page 159

1  TV, the tablet, and the other stuff, like it's
2  all memories of incarceration.  This is not
3  no -- what use do I have?  I'm out in the
4  world like.
5       Q.   I'm not talking about your tablet
6  and TVs.  I'm talking about documents that
7  would be relevant to this case.
8       A.   Yeah.  I mean, I understand what
9  you're saying, but, you know, at that moment,
10 them documents didn't mean as much as my
11 freedom to me.  I didn't have no way to
12 foresee me needing them documents.  Only thing
13 I was thinking about was my freedom.
14      Q.   Did you take any steps when you left
15 to notify the DOC that there was legal
16 documentation and it was important that it was
17 not destroyed?
18      A.   I reached out to the DOC to try to
19 retrieve my property.  They said they
20 destroyed it.  I didn't know what to do from
21 there.
22      Q.   Did you tell them when you left that
23 it contained legal documents?
24      A.   Yeah.  They knew exactly what it

Page 160

1  contained, but I was falsely under the
2  impression that I was returning back to SCI
3  Dallas.  I didn't know that I was being
4  released from CFCF.  I had no way of knowing
5  that I was going to be released from CFCF.  I
6  had no way of knowing that my petition was
7  going to be granted.  I had no way of knowing
8  how things was going to play out.
9       Q.   And so when you didn't get -- when
10 you tried to reach out to get the documents
11 and you found they were destroyed, did you
12 have -- did it occur to you to have any
13 conversation with Monique to say, hey, you
14 should -- it's a good thing you have a copy of
15 the documents, you should retain them because
16 mine are gone?
17      A.   No.  When I had a conversation to
18 Monique about my property, she told me that Ed
19 had a copy of everything.  So I wasn't worried
20 about the documents she had, because Ed has a
21 copy of everything or Ed has the originals or
22 whatever it may be.  Like Ed has my main file.
23 Ed has everything.  Like Ed went to the
24 District Attorney Office, combed through their

Page 161

1  whole file and had a copy of everything.  Ed
2  had a copy of my file.  Ed had the main source
3  of everything with him.
4       Q.   Well, isn't it the case that you or
5  Monique would have certain texts, e-mail,
6  letter, communications with these individuals
7  and those weren't necessarily part of your
8  file and turned over?
9       A.   Excuse me?
10      Q.   Would you write Chris Holder?  Would
11 Chris Holder write you?
12      A.   No.  I wasn't writing Chris Holder.
13      Q.   You've never sent a letter to Chris
14 Holder in prison?
15      A.   I'm not a hundred percent sure.
16 Since Chris Holder been arrested this time?
17      Q.   Period.  Has he sent -- did he send
18 you a letter in prison?  Did you send him a
19 letter in prison?
20      A.   Yeah.  Chris Holder has sent me
21 letters in prison, and it's up there in SCI
22 Dallas.
23      Q.   Was that any letter that he --
24      A.   When I was incarcerated --

Page 162

1  Christopher Holder is a friend of mine.  It's
2  been times we corresponded through letters.
3       Q.   And if you corresponded with him
4  through letters, would Ed Foster necessarily
5  have a copy of those if you weren't going to
6  introduce them as evidence in your case?
7       A.   I mean, I would never have felt the
8  need to give Ed letters that was before Chris
9  Holder even came forward.  Like it wouldn't
10 make sense to like give him letters -- like
11 Chris Holder maybe wrote me a handful of
12 times, and I never seen no significance in
13 overturning some letters that was talking
14 about his mom dog, the cat and so forth and so
15 on.
16           But in a nutshell, around the time
17 Chris Holder sent me this affidavit or I got
18 the affidavit, I didn't receive a letter from
19 him ever again.  He went to jail and I was
20 released.  I don't remember having no letters
21 from Chris and -- our communication, I went to
22 visit Chris before.  I sent Chris money.  But
23 as far as us communicating through the mail, I
24 don't write letters.  I don't like to do it.

Page 163

```
 1      Q.   Well, would it surprise you that
 2  Monique testified that she had correspondence
 3  with Charles Paladino and she would routinely
 4  throw it away?
 5      A.   Excuse me?  Can you repeat that?
 6      Q.   Would it surprise you if I told you
 7  that Monique testified during her deposition
 8  that she would routinely have during certain
 9  years written communications with Charles
10  Paladino and she would throw the letters that
11  she received away?
12           MR. VAN NAARDEN:  Objection.
13           THE WITNESS:  I'm not
14      understanding that question.  What are
15      you asking me?
16  BY MS. ROSENTHAL:
17      Q.   I'm asking you if that would
18  surprise you, or you would expect all
19  communications with witnesses in the case to
20  be turned over to Ed Foster?
21           MR. VAN NAARDEN:  Objection.
22           THE WITNESS:  So you're asking
23      me if Monique received a letter from
24      anybody in the case, am I expecting her
```

Page 164

```
 1      to turn it over or whatever the case may
 2      be?
 3  BY MS. ROSENTHAL:
 4      Q.   Yes.
 5      A.   If Monique received any -- I didn't
 6  know nothing about Monique receiving letters
 7  from Charles Paladino.  So I can't accurately,
 8  you know, give you an answer to that, but it
 9  is -- I don't know nothing about that.
10      Q.   But if you received a communication
11  with any of the witnesses that wasn't
12  necessarily about your underlying case, that
13  wouldn't be something that you would
14  necessarily turn over to Ed Foster; is that
15  correct?
16           MR. VAN NAARDEN:  Objection.
17           THE WITNESS:  In a nutshell,
18      everything that they ever asked me to
19      turn over that I had, I turned over.  So
20      that's that.  Everything I ever had that
21      was in my possession that was asked for,
22      I turned over.
23  BY MS. ROSENTHAL:
24      Q.   Okay.
```

Page 165

```
 1      A.   I mean, I don't know what else to
 2  tell you.
 3      Q.   So when he has a copy of --
 4      A.   Everything I had, I turned over.
 5      Q.   He has a copy -- well, you're saying
 6  two things.  You're saying, number one,
 7  everything that was asked for, you turned
 8  over.
 9      A.   Everything that I had, was in my
10  possession, I turned over.  And if I couldn't
11  turn over it, it's because I didn't have it,
12  but I looked for it diligently.
13      Q.   Well, what about things that weren't
14  asked for?
15      A.   Anything that I had that was
16  pertaining to the case, I handed over.
17      Q.   Well, that's why I'm asking you
18  whether you would consider certain
19  communication --
20      A.   It don't matter if --
21      Q.   Wait.  Let me just finish --
22      A.   -- it was asked for or not.
23      Q.   Let me just finish my question.
24      A.   If I had it, I turned it over.
```

Page 166

```
 1      Q.   My question is whether you would
 2  consider communications with certain witnesses
 3  as pertinent to the case?
 4           MR. VAN NAARDEN:  Objection.
 5           THE WITNESS:  Repeat the
 6      question.
 7  BY MS. ROSENTHAL:
 8      Q.   Well, you said that some of these
 9  witnesses are individuals who you grew up with
10  who, you know, were your friends.  If you were
11  corresponding with them, would you consider
12  that pertinent to the case and thus would you
13  turn it over?
14      A.   As far as my criminal case, no.  As
15  my civil case, yes, I would hand over anything
16  I had.  My criminal case, if Chris wrote me,
17  said, my dog bit James yesterday, happy
18  birthday Don, have a good day, no, I wouldn't
19  disclose it in my criminal case, but in my
20  civil case, if Chris wrote me, said, my dog
21  bit James, so forth and so on, I would
22  disclose it from me talking to my attorney and
23  seeing the importance of everything has to be
24  disclosed.  So, yeah, I would give you every
```

Page 167

1  and anything I had.
2      Q.   But the problem is that at the time,
3  you made decisions potentially or others made
4  decisions who were acting on your behalf, like
5  Monique, to dispose of things under the
6  criminal case rules?
7          MR. VAN NAARDEN:  Objection.
8          THE WITNESS:  I can't speak on
9      anything Monique did.  So I'm telling you
10     that whatever was asked of me and
11     Monique, it was disclosed.
12 BY MS. ROSENTHAL:
13     Q.   Okay.  That makes sense.
14          Have you had any text message
15 communications with Jabril Jones recently?
16     A.   Yes.
17     Q.   And have you preserved those
18 communications?
19          MR. VAN NAARDEN:  They were
20     turned over to you.
21          THE WITNESS:  I gave it to my
22     attorney.
23 BY MS. ROSENTHAL:
24     Q.   Okay.

Page 168

1          MR. VAN NAARDEN:  Just -- so
2      you sent us Interrogatory that wasn't yet
3      due, but as a courtesy, we sent them to
4      you, I think, two days ago.
5          MS. ROSENTHAL:  Yeah.  I
6      couldn't tell what those --
7          MR. VAN NAARDEN:  That's fine.
8      I'm just saying.
9  BY MS. ROSENTHAL:
10     Q.   But -- okay.  I also want to
11 return -- hopefully the audio will work -- to
12 the question I asked you about what we marked
13 as Exhibit-1.  It was the Complaint.  Do you
14 have that document still?
15     A.   Is it Exhibit No. 3?  Is that what
16 you're speaking of?
17     Q.   No.  Exhibit-1.
18     A.   Oh, I'm sorry.
19     Q.   The Complaint.  And I ask you to
20 turn to the first page of allegations, which
21 is No. 4 on the top.
22          Sorry.  You're looking at the second
23 page, I think.
24     A.   Oh, I'm sorry.

Page 169

1      Q.   So do you see under No. 2 on the
2  first page of the Complaint, it says,
3  "Mr. Outlaw ultimately spent sixteen years
4  wrongfully incarcerated for these crimes,
5  before his conviction was overturned, as a
6  direct result of clear and unequivocal
7  violations of his constitutional civil rights
8  that led to his conviction"?
9          Do you see that?
10     A.   Yes.
11     Q.   Do you see on the next page,
12 Paragraph 4, do you see the last clause refers
13 to you having spent more than sixteen years
14 wrongfully incarcerated for a murder that you
15 did not --
16     A.   Yes, I see that.
17     Q.   -- commit?
18     A.   Yes.
19     Q.   And then look at the next page,
20 Paragraph 10.  Do you see there's reference to
21 the fact that you were wrongfully convicted of
22 the murder of Jamal Kelly and, as a result,
23 served over sixteen years in jail and prison
24 until previously withheld exculpatory evidence

Page 170

1  provided a basis for his exoneration?
2      A.   Yes.  I see that as well.
3      Q.   So do each of these statements refer
4  to the fact that as a result of what you
5  allege to be wrongful conduct in this case,
6  you spent 16 years in prison that you would
7  not have otherwise; is that correct?
8      A.   Yes.  That's absolutely correct.
9      Q.   And I had asked you earlier, I
10 believe, whether it's true that ten of those
11 years you would have been in prison anyways
12 because of other convictions that you had
13 obtained, and I believe your answer was no,
14 that was not true.  Did I hear you correctly?
15     A.   Yeah, you heard me correctly.
16     Q.   Okay.  I want to play a tape that
17 I'm going to mark as Exhibit --
18          COURT REPORTER:  13.
19 BY MS. ROSENTHAL:
20     Q.   -- 13.
21          MS. ROSENTHAL:  I have this
22     marked, Josh, as -- my notes say Disk No.
23     4, Call No. 135, but, again, I'm confused
24     what "disk" means.

Page 171

1      MR. VAN NAARDEN:  Do we know
2  the source?
3      MS. ROSENTHAL:  Well, I would
4  assume it -- I'm sorry.  I don't know the
5  source.  I don't know the source, and why
6  don't we -- at a break, I will check on
7  that.
8          It is a call that was made from
9  Chris Holder's account.  He had called
10 the number 267-456-8719 on February 17,
11 2021 at 9:08:26, and the clip covers 3:05
12 to 6:20.
13         (Audio being played.)
14         MS. ROSENTHAL:  Sorry.  I'm
15 going to pause it.
16         (Audio being played.)
17         MS. ROSENTHAL:  It's really
18 hard to hear.
19 BY MS. ROSENTHAL:
20     Q.   Were you able to hear that at all?
21     A.   I mean, I vaguely heard it.
22     Q.   Was that Christopher Holder who you
23 were talking to?
24     A.   Yes.

Page 172

1      Q.   And did you recognize your voice as
2  well?
3      A.   In some parts I did, some parts I
4  didn't.  It was like too low for me to like
5  really...
6      Q.   Why don't I play it one more time
7  and put the speaker next to you.  I don't know
8  what other option.
9          MR. VAN NAARDEN:  Just note my
10     objection, because I think we're going to
11     have a problem with transcribing this
12     unless --
13         MS. ROSENTHAL:  They're not
14     transcribing them, I was told.
15         MR. VAN NAARDEN:  Okay.
16         THE WITNESS:  I mean, I don't
17     have a problem hearing.  I heard it
18     clearly, but I couldn't make out a lot of
19     the stuff.
20 BY MS. ROSENTHAL:
21     Q.   Let's just try one more time.
22         MR. VAN NAARDEN:  I couldn't
23     hear it.
24         (Audio being played.)

Page 173

1      THE WITNESS:  I'm sorry.  My
2  back is bad.  Let me get up for a minute.
3          (Audio being played.)
4  BY MS. ROSENTHAL:
5      Q.   I understand that it may not be
6  totally clear, but I'm just going to ask you
7  questions to the extent that you were able to
8  hear it.
9          MS. ROSENTHAL:  You object,
10     Josh?
11         MR. VAN NAARDEN:  Yeah, I do
12     object, and I even have concerns about
13     him answering.  I cannot just -- I cannot
14     hear any aspect other than the one
15     person.  I don't know if that's Chris
16     Holder or not, but there's one person
17     whose voice I can clearly hear.  To the
18     extent that Don Outlaw is on that tape, I
19     could not hear it, and I feel
20     uncomfortable having my client answer
21     questions regarding that recording.
22         If you want to make certain
23     representations to him, then that's fine,
24     but I do have concerns about, you know,

Page 174

1      trying to confirm what's on that tape,
2      because I certainly couldn't.
3  BY MS. ROSENTHAL:
4      Q.   Well, I'm only going to ask you what
5  you're able -- if you're not able to hear
6  something, then please let me know.
7          First of all, do you remember --
8          MR. VAN NAARDEN:  Just real
9      quick.  My concern is a little different.
10     As his attorney, I need to be able to
11     know what's on there too.  It's not just
12     about him.  So I can properly defend the
13     deposition.  That's my concern.
14         MS. ROSENTHAL:  I understand
15     that, and maybe we'll -- I'm going to
16     proceed with questions, see how it goes,
17     and maybe we'll find some other discovery
18     device to ask about it.
19 BY MS. ROSENTHAL:
20     Q.   Do you remember this conversation?
21     A.   No.
22     Q.   So did you -- well, do you remember
23 talking to Chris Holder about the fact that
24 you believe that a law is being passed that

Page 175

1  would give compensation to anyone who is
2  wrongly accused of a crime where they're
3  supposed to get 50,000 per year of
4  incarceration for -- a year for incarceration?
5      A.   I had a lot of conversations with
6  Chris.  I don't really remember that, no.
7      Q.   Were you not able to hear that part
8  of the call?
9      A.   No.  I couldn't really hear it.  The
10 whole call is like muffled and it's hard for
11 me to make out a lot of stuff on there.  So
12 no.
13     Q.   Okay.  Did you hear you say that
14 your case is attached to another one of your
15 other cases?
16              MR. VAN NAARDEN:  Objection.
17              THE WITNESS:  I can't hear much
18     on there.
19              MS. ROSENTHAL:  I don't see
20     what's objectionable.  I asked if he
21     heard it.  He said he didn't.
22              MR. VAN NAARDEN:  I can't hear
23     it, so it's very hard for me to let my
24     client answer something when I can't hear

Page 176

1  it.
2  BY MS. ROSENTHAL:
3      Q.   Would that be a true statement if it
4  was said, that your case is attached to one of
5  your other cases?
6      A.   The truth of the matter is that in
7  2004, I got convicted of first-degree murder,
8  and when I got convicted of first-degree
9  murder, I got sentenced to life.  After I got
10 sentenced to life, I took a deal for another
11 case.
12     Q.   Right.
13     A.   That ran consecutive to my life.  So
14 I had to serve the life, and after I was done
15 serving life, I would serve whatever time, but
16 coincidentally I didn't end up serving a whole
17 life sentence, so I didn't have to die and get
18 cuffed for ten years.  I end up prevailing on
19 the life sentence.
20     Q.   But is it your understanding that
21 you did serve the sentence -- first of all,
22 was the sentence five to ten years for the
23 other case that you were referring to?
24     A.   Yes.  From my understanding, if I

Page 177

1  would have had just that case, I would have
2  served five years and been home, like all the
3  inmates with a five to ten.
4      Q.   Why is your understanding that it
5  would have been five years?
6      A.   Because I spent 16 years in jail,
7  and everybody I seen with a five to ten went
8  home in five or six years.  But back in 2006,
9  '07, they was doing pre-release and they was
10 making it home before that.
11     Q.   Okay.  So your understanding is
12 based on what you saw other people?
13     A.   Yes; my experience in jail.
14     Q.   You didn't -- did you ever tell
15 Chris Holder on this call or any other call
16 that you remember that ten years of your time
17 is credited towards another case?
18     A.   First and foremost, I can't make out
19 that call, and I don't remember the
20 conversation.
21     Q.   My question --
22     A.   I can't make out the call.
23     Q.   My question is just whether you
24 remember telling him that.

Page 178

1      A.   I don't know.  I don't remember.  I
2  don't know.  But I can't really fully make out
3  the call.
4      Q.   My question is, put aside this call.
5  Did you ever tell Chris Holder on a call that
6  you remember that ten years of your time is
7  credited towards another case?
8      A.   I don't remember, but what I can say
9  is that when I was -- when my life sentence
10 was overturned, I never went back up SCI
11 Dallas, and from my understanding of me not
12 going back up SCI Dallas was that I was just
13 released and that whatever time I was done, I
14 served whatever time I served.
15     Q.   Why is it your understanding that
16 the life sentence would have been served first
17 before the five to ten years?
18     A.   Because I'm not -- from my
19 experience of being incarcerated, being
20 arrested, when you get sentenced, the first
21 sentence you get sentenced to is the first
22 sentence you serve.  On my docket sheet I
23 had -- my number was GB2883 and my minimum
24 said life and my maximum said life, and that

Page 179

1  was the sentence that I was serving.
2      Q.   So you have no idea whether you were
3  released for that other case based on time
4  served, that you had served your sentence?
5      A.   I believe that from the time I was
6  in jail, I was serving my life sentence.  I
7  knew I had another case.  When my life
8  sentence got vacated, I was released
9  immediately, and I believe they weighted out
10 the time however they weighted it out.  I
11 believe I had a five to ten, but if I never
12 got the life sentence, I believe I would have
13 been home in four to five years.
14     Q.   Okay.  So it's your testimony that
15 they should have kept you another five to ten
16 years or that they credited the time you were
17 in jail for the life sentence towards the
18 five- to ten-year sentence?
19          MR. VAN NAARDEN:  Objection.
20          THE WITNESS:  I'm not
21     understanding.  You saying it's my
22     understanding they should have kept me
23     for five to ten more years?
24 BY MS. ROSENTHAL:

Page 180

1      Q.   Yeah.  I'm saying didn't they
2  release you because you had stayed there for
3  16 years and your sentence was five to ten, so
4  you had served it once the life sentence
5  had --
6      A.   I mean, you would have to ask them
7  exactly how they weighted the time out, but I
8  don't know exactly how it went, to be all the
9  way honest with you.
10     Q.   And then you --
11     A.   But I know for sure that I was
12 serving my minimum and my max date on my
13 docket sheet, on my sheet.  It both said life.
14     Q.   And once the life was erased, what
15 did your maximum state?  Did it say 2015?
16     A.   I never seen anything because I
17 never went back upstate.  I was released from
18 the county jail.
19     Q.   But if you saw that docket sheet, it
20 would clear it up, right?
21     A.   I mean, yeah.  If I saw the docket
22 sheet, it will clear it up.  You can show it
23 to me and clear it up.
24     Q.   Did you hear yourself say on that

Page 181

1  tape that you're going to play stupid until
2  they mother fucking weed it out?
3      A.   I didn't hear nothing.
4      Q.   Was that your -- was your intent to
5  play stupid about the fact that --
6      A.   I didn't hear it.
7      Q.   Sorry.  Let me finish the question.
8          It sounds like there's some dispute
9  as to whether you would have had to serve five
10 years or ten years of that sentence, but were
11 you planning on playing stupid about the fact
12 that you weren't really incarcerated for a
13 full 16 years wrongfully on this conviction
14 because you would have served at least five
15 for your other case?
16          MR. VAN NAARDEN:  Objection.
17          THE WITNESS:  I don't even
18     understand.  The question is so complex
19     that you have to dumb it down for me.
20 BY MS. ROSENTHAL:
21     Q.   Okay.  Would you agree that you
22 would have had to serve at least five years
23 once you were sent to prison in 2004 because
24 of your other guilty plea?

Page 182

1          MR. VAN NAARDEN:  Objection.
2          THE WITNESS:  I can't
3     intelligently answer that question.  I
4     don't know, but --
5          MR. VAN NAARDEN:  Just the
6     premise of the question I just
7     fundamentally object to because the dates
8     aren't correct.
9          THE WITNESS:  But I mean --
10         MS. ROSENTHAL:  The 16 years?
11         MR. VAN NAARDEN:  No.  You're
12    saying that he pled to another case in
13    2004.  He didn't.
14         MS. ROSENTHAL:  I think he said
15    that.
16         MR. VAN NAARDEN:  You
17    represented that to him.  He didn't plead
18    guilty until 2005.
19 BY MS. ROSENTHAL:
20     Q.   I think you said 2004.  Sorry.  I
21 think you said it and then I repeated it.  I'm
22 not sure.  Maybe 2005.
23         Did you hear Holder say on the
24 call -- I believe this was clear -- that the

Page 183

1  worst-case scenario is you only get 350,000,
2  that's better than nothing?
3       A.    I can't make out too much on the
4  call.  I'm sorry.
5       Q.    You couldn't make out that part?
6       A.    I couldn't make out too much on the
7  call what I was saying.
8       Q.    My question is whether you can make
9  out the words that Holder says you only get
10  300 -- if you only get 350,000, that's better
11  than nothing?  Do you want me to replay it?
12       A.    You can replay it all you want.
13       Q.    Sure.
14            (Audio being played.)
15            Did you hear that 350,000 is better
16  than no thousand?
17       A.    Yes.  I heard him say that, but I'm
18  not confirming that he was talking to me.  I
19  can't really hear what you saying is me in the
20  audio.
21       Q.    Did you hear that the number that
22  was dialed -- or if I represent to you that
23  the number that was dialed was 267-254-8803,
24  is that your number?

Page 184

1       A.    No, that's not my number.
2       Q.    That was never your number at any
3  time?
4       A.    Not that I know of.  I told you, I
5  did have 10 different phones, maybe 15.
6       Q.    So is it your testimony that you're
7  not able to tell whether your voice is at all
8  on this audio recording and you don't recall
9  having this conversation with him?
10            MR. VAN NAARDEN:  Objection.
11            THE WITNESS:  I mean, you know,
12       everybody in the room can hear the audio.
13       It's something going on with it where
14       it's not really clear.  So I can't say
15       that it was me.  But, you know, I can
16       hear the end where it sounds like Chris,
17       and I heard the same thing you heard with
18       the number that he threw out there, but I
19       can't say that that was me, no.  I'm
20       sorry.
21  BY MS. ROSENTHAL:
22       Q.    Do you recall whether you had a
23  conversation with him about this?
24       A.    I told you I didn't, no.

Page 185

1       Q.    Okay.  Are you sure -- when you say
2  you don't recall, is it because you're sure
3  you didn't or you could have, you just don't
4  remember?
5       A.    I'm telling you I don't remember.
6  So anything extra to it, I wouldn't want to
7  add to it.  I don't remember.
8       Q.    Okay.  That's fair.
9            I want to shift gears and ask
10  about -- I want to mark as Exhibit --
11            COURT REPORTER:  14.
12  BY MS. ROSENTHAL:
13       Q.    15 --
14            COURT REPORTER:  14.
15            MS. ROSENTHAL:  14 -- did you
16       want to take a break?
17            MR. VAN NAARDEN:  It's like ten
18       of 4:00.  Do you want to do it like ten
19       minutes?
20            THE WITNESS:  Yeah.
21            MR. VAN NAARDEN:  If you need a
22       break, take a break.
23            THE WITNESS:  Yeah.
24            VIDEO TECHNICIAN:  We're now

Page 186

1  going off record.  The time now is 3:52
2  p.m.
3                  - - -
4            (Short recess.)
5                  - - -
6            VIDEO TECHNICIAN:  We're now
7       back on record.  The time is 4:06 p.m.
8  BY MS. ROSENTHAL:
9       Q.    I want to show you a document that
10  I'm going to mark as --
11            COURT REPORTER:  14.  Yeah.
12       You didn't mark it yet.
13  BY MS. ROSENTHAL:
14       Q.    I'll mark as Outlaw-14.
15            MS. ROSENTHAL:  I would just
16       note this has a confidential stamp
17       because it's his visitor history that was
18       produced with other individuals' visitor
19       histories.  I'm happy to have him sign
20       the protective order and go through that,
21       but -- okay.
22            MR. VAN NAARDEN:  I don't care.
23            MS. ROSENTHAL:  It really
24       should have not been produced as

Page 187

```
 1    confidential.
 2            It's a document that is Bates
 3    marked CITY017397 to CITY017412.
 4                 - - -
 5            (Exhibit Outlaw-14 marked for
 6    identification by counsel.)
 7                 - - -
 8    BY MS. ROSENTHAL:
 9        Q.   I will represent to you that this is
10    a printout of your visitor history that was
11    pulled from the Philadelphia Department of
12    Prison system Lock and Track Inmate Management
13    System from December 9, 2002 to the date it
14    was produced, which is recently.
15            Do you recognize this document?
16        A.   I never seen this document before,
17    but I recognize the names on here.
18        Q.   Have you seen like inmate visitor
19    logs before?
20        A.   No.
21        Q.   So I want you just to leaf through
22    it quickly and let me know if it -- I
23    understand that you likely don't remember
24    every date that any person visited you, but if
```

Page 188

```
 1    anything stands out to you as inaccurate or
 2    whether you have any reason to dispute that
 3    this accurately reflects your visitor history
 4    while incarcerated at the Philadelphia
 5    Department of Prisons.
 6            MS. ROSENTHAL:  Are you missing
 7        a page, Josh?
 8            MR. VAN NAARDEN:  Mine goes
 9        from like 2018 to 2005.
10            MS. ROSENTHAL:  Sometimes we
11        get them out of -- oh, that's because he
12        was at the --
13            MR. VAN NAARDEN:  State.
14        That's fine.  Okay.
15    BY MS. ROSENTHAL:
16        Q.   So just so you know when you're
17    reviewing it, my primary purpose in showing
18    you this is to ask you about some of the names
19    on the list rather than to confirm
20    particular --
21        A.   Okay.
22        Q.   -- visits dates.
23            But do you have any reason to
24    dispute the accuracy of these dates?  Does
```

Page 189

```
 1    anything stand out to you as obviously wrong?
 2        A.   I mean, I don't -- I don't remember.
 3    I mean, I recognize a lot of these names.
 4        Q.   Okay.
 5        A.   But as far as dates, it goes back to
 6    2002, 2003.
 7        Q.   But there's nothing looking it over
 8    where you're like, no, that's impossible, I
 9    never would have met with that person?
10        A.   I mean, not that I see thus far, no.
11        Q.   Okay.  Let me know when you're
12    ready.  Like I said, I wanted to ask you about
13    some of the individuals on the list.
14            (Pause.)
15        A.   All right.  I looked at it.
16        Q.   So if you can turn to the second
17    page that's Bates marked -- well, first of
18    all, actually looking at the first page,
19    CITY017397, do you see it says Dependents, 0?
20        A.   Mm-hmm.
21        Q.   Is that correct?  Do you have any
22    children?  You mentioned you had one child at
23    least?
24        A.   Yeah.
```

Page 190

```
 1        Q.   How many children do you have?
 2        A.   Two.  Deandre, and I just had a
 3    child recently.
 4        Q.   And what's the name of your second
 5    child?
 6        A.   Donald, Jr.
 7        Q.   Last name?
 8        A.   Outlaw.
 9        Q.   Okay.  And those are your only two
10    children?
11        A.   Yes.
12        Q.   Okay.  So turn to the second page,
13    CITY017398.  The first person who's listed is
14    someone named Maria Dowbusz, and there's an O
15    listed next to her name, which I think -- I'm
16    not entirely sure, but I think that may mean
17    it's an official visit.  Is she an attorney?
18        A.   It had to be, because I don't
19    remember that person.
20        Q.   Okay.  You don't recall whether
21    she's someone who worked on this matter,
22    another matter?
23        A.   Yeah.  The name doesn't stand out to
24    me at all.  So it has to be -- they don't
```

Page 191

1 break down these codes that's next to the
2 name?
3     Q.    They don't break down?  Sorry.
4     A.    I mean, I see a T, O, and S that's
5 next to the names.
6     Q.    I'm not actually sure what those
7 mean.  I think O may mean official, like an
8 attorney or a professional, but I'm not
9 entirely sure.
10        Okay.  So then moving down, do you
11 see Herbert, Taneisha?
12    A.    Yes.
13    Q.    Who is that?
14    A.    Taneisha Herbert is some girl I used
15 to deal with 20 years ago.
16    Q.    "Deal with," you mean date?
17    A.    I mean, however you want to call it.
18 We used to hook up.
19    Q.    So that's before your conviction?
20    A.    Yes.
21    Q.    But you remained in touch?
22    A.    Vaguely, once in a blue moon.
23    Q.    Well, it looks like she's visiting
24 you in 2019 here.

Page 192

1     A.    Yeah.  That's possible, but we don't
2 communicate on a regular basis.  I don't talk
3 to or see her on a regular basis.
4     Q.    Okay.  Does she have any relation to
5 you other than someone you hooked up with,
6 like relate to any family members, anything
7 like that?
8     A.    No, not at all.
9     Q.    And does she have any nicknames that
10 you call her by?
11    A.    TT.
12    Q.    Is there anyone else you call TT or
13 just her?
14    A.    There's about five TTs.
15    Q.    Yeah.  So part of why I'm trying to
16 figure this out is the calls are, yes, there's
17 about five of everybody.
18        So who else is TT?
19    A.    I know a couple girls named TT, but
20 I can't pinpoint.
21    Q.    Okay.  And then does she have --
22 Monique was testifying during her deposition
23 about how individuals have a Muslim name.
24 Does she have a Muslim name?

Page 193

1     A.    Not that I know of.  TT.
2     Q.    And of the TTs that you know, is she
3 the one that you communicate with most, or who
4 would you say you're closest to of those?
5     A.    I know another girl named TT, but I
6 don't really know TT's full name.  I just know
7 her as Tiara.
8     Q.    Okay.
9     A.    I know another girl named TT, but --
10 what is TT real name?
11    Q.    Okay.
12    A.    I don't know.  I just know her as
13 TT, but --
14    Q.    Does she have any involvement or did
15 she have any involvement in any of your --
16 when I refer to your criminal proceedings, I'm
17 talking about like the whole 16 years of
18 appellate and post-conviction.  Has she had
19 any role in any of that?
20    A.    Who?
21    Q.    Ms. Herbert we're talking about
22 here.
23    A.    No.
24    Q.    Does she have any family members who

Page 194

1 you're friendly with?
2     A.    No.
3     Q.    I think I may have seen the name
4 Octavia Herbert somewhere.  Do you know who
5 that is?
6     A.    No.  I don't know.
7     Q.    Okay.  Moving down, second to last,
8 see Christopher Jones?
9     A.    Yes.
10    Q.    Who is Christopher Jones?
11    A.    Christopher Jones is -- I have a
12 cousin named Lamont.  That's Lamont's brother.
13    Q.    So you have a cousin named Lamont.
14 Is that through your mother or your father?
15    A.    My mother mom.  My mom has several
16 sisters.  Lamont is my Aunt Jackie's son, and
17 him and Chris Jones, they have the same
18 father.
19    Q.    Okay.  You're going to have to do
20 that a little more slowly.
21        So your mom, that's Nita Starr?
22    A.    Yes.  My mom name is Nita Starr.
23 She has a sister named Jacqueline Starr.
24    Q.    Okay.  And --

Page 195

1    A.    Jacqueline Starr has several kids.
2 One of her children is Lamont.  And Lamont has
3 a brother on his father's side, and that's
4 Chris Jones.
5    Q.    Okay.  And who is his father?
6    A.    I don't know they dad name.  They
7 dad passed away.  I don't know.
8    Q.    Okay.  And is Chris Jones someone
9 that you're close with?
10    A.    He's a friend of mine.
11    Q.    And has he been a friend since
12 childhood?
13    A.    No.  He's a lot older than me, but
14 I've known him for a long time.
15    Q.    Since before your conviction?
16    A.    No.  Actually like -- the thing is,
17 he's my cousin's -- he's my cousin's brother.
18    Q.    He's your cousin's brother, right.
19 Stepbrother?
20    A.    Right.
21    Q.    Yeah.
22    A.    So he did a long time in jail, so we
23 wasn't like -- we wasn't like -- how can I put
24 this?  We didn't really -- from his

Page 196

1 incarceration, when he came home, I was in
2 jail, and that's that.  So we don't got
3 like -- we didn't never hang together or
4 anything like that, but, you know, when he
5 found out about, you know, I was locked up,
6 you know, he sent me a little money and
7 visited me a couple times, sent me pictures
8 and, you know, told me to hold my head, fight
9 for my life.
10    Q.    Does he run in the same social
11 circles as you?  Is he friends with Wesley
12 Harmon or other individuals who you're
13 friendly with?
14    A.    I mean, we all from around the same
15 neighborhood.  I mean, I can't say exactly who
16 he know and all that, but, I mean, we all know
17 each other.
18    Q.    Is he married or with a significant
19 other?
20    A.    I'm not a hundred percent sure about
21 his personal life.
22    Q.    Okay.  And does he have any
23 nicknames that he goes by?
24    A.    Chris.

Page 197

1    Q.    Okay.  And is he Muslim as well?
2    A.    Yeah.
3    Q.    Does he have a Muslim name?
4    A.    I believe so, but I'm not sure what
5 it is.
6    Q.    Okay.  Is he someone that you're
7 friendly with to this day?
8    A.    Yeah.  I mean, I randomly see him,
9 but I know him as Chris.
10    Q.    And did he have any involvement at
11 all in the proceedings in this case or any
12 relevance?
13    A.    No.
14    Q.    On the next page there's Alexis
15 Williams?
16    A.    Okay.
17    Q.    Do you see that?
18    A.    Yes.
19    Q.    Is that a female?
20    A.    Yes.
21    Q.    Who is Alexis Williams?
22    A.    One of my friends that I grew up
23 with, a girl I know.
24    Q.    There's a lot of -- it seems that

Page 198

1 there's a lot of Williams that pop up in
2 papers.  Is she related to other -- no?
3    A.    No relation at all.
4    Q.    No relation at all, okay.
5         And does she have any -- well, does
6 she have any nicknames or Muslim names?
7    A.    I know her as Lex.
8    Q.    Lex, okay.
9         Does she have any involvement in
10 this case?
11    A.    No.
12    Q.    What about Chris Ammon or Ammon?
13 How do you pronounce that?
14    A.    I don't know.
15    Q.    Oh, he has an O next to him.  Is he
16 a lawyer?
17    A.    Yeah.  I don't know who that is.
18    Q.    It looks like he may have visited --
19 okay.  You don't know who he is.  That name
20 doesn't ring a bell?
21    A.    No.
22    Q.    What about Kasimah Sweets?
23    A.    She is a friend of mine.  Like we
24 grew up together.

Page 199

1    Q.   Any relation to family members?
2    A.   Yeah.  She is -- she shares a child
3  with one of my cousin's.
4    Q.   Which cousin?
5    A.   My cousin Anthony.
6    Q.   Anthony Starr?
7    A.   Yes.
8    Q.   Are they still together?
9    A.   No, not that I know of.
10   Q.   What's their child's name?
11   A.   Raheem.
12   Q.   Raheem Starr?
13   A.   I'm guessing.
14   Q.   You're guessing, okay.
15   A.   I don't know.
16   Q.   And what nickname or other names do
17 you have for Kasimah?
18   A.   Simah.
19   Q.   Simah?  Is there anyone else named
20 Simah that you know?
21   A.   No.  Her name is Kasimah.  We call
22 her Simah.
23   Q.   Okay.  Do you know any other Simahs,
24 like you know other TTs?

Page 200

1    A.   No, I don't know no more Simahs.
2    Q.   And then Wesley Harmon underneath,
3  am I correct that he has a child with your
4  sister Shanita Starr?
5    A.   Yes.
6    Q.   Okay.  And when did they begin -- am
7  I correct that it's an on-and-off-again
8  relationship with them or no?
9    A.   No.  They share a daughter, but my
10 sister's daughter is a grown lady.  She's like
11 25.
12   Q.   What's her name?
13   A.   Shirah.
14   Q.   Shirah Starr?
15   A.   Yeah.
16   Q.   Okay.  But Shanita and Wesley, when
17 were they a couple?
18   A.   About 90 -- in the mid '90s.
19   Q.   Okay.  Are they still friendly?
20   A.   No.  She can't stand him.
21   Q.   But you're friends with Wesley?
22   A.   Yeah.
23   Q.   And they haven't since that time,
24 they haven't gotten back together?

Page 201

1    A.   No.
2    Q.   Were they ever legally or
3  religiously married?
4    A.   No.
5    Q.   Okay.  Who is Paul McAllister?
6    A.   He's one of my friends.  I wouldn't
7  know how to describe, but he's just one of my
8  friends.
9    Q.   Okay.  I guess I have the same kind
10 of questions, whether he has any relation,
11 familial relationship to you?
12   A.   No.  We don't have no type of link
13 or relation.  He don't have kids by anybody I
14 know or anything of that nature.
15   Q.   Any nicknames?
16   A.   Pauly.
17   Q.   Okay.  Is there anyone else -- when
18 you refer to Pauly in calls and things like
19 that, is that usually Paul McAllister or is
20 there other Paulys?
21   A.   I know a few Paulys, so...
22   Q.   Who would you communicate most often
23 with when you were in prison?
24   A.   I don't know.

Page 202

1    Q.   All the Paulys?
2    A.   Monique.
3    Q.   No; of the Paulys.  I'm saying --
4  well, who else do you know that has a nickname
5  Pauly?
6    A.   I know about three guys named Pauly.
7  Paul or Pauly.
8    Q.   Who are those?
9    A.   There's a guy that used to live on
10 my old block, his name Paul.  Sometimes we
11 call him Pauly.
12   Q.   His full name is what I'm looking
13 for.
14   A.   I don't know his full name.  I just
15 know him as Pauly.
16   Q.   Yeah.  Okay.
17   A.   And another guy I was locked up with
18 that sometimes, you know, I would communicate
19 with him, his name Pauly too or Paul.
20   Q.   What's his full name; do you know?
21   A.   Paul.  I don't know.  But I might
22 call him P-Mack or Paul.
23   Q.   Does this Paul McAllister have
24 mutual friends with you in common?

Page 203

1    A.    I'm not sure.  Yeah, we got a mutual
2  friend, Dom.
3    Q.    Dom, is that Dominic Carter?
4    A.    Yeah.
5    Q.    Okay.  And does he go by Donald
6  Carter also?
7    A.    I think that might be the name he
8  locked up under.  I'm not sure.
9    Q.    Oh, okay.  You have a mutual friend
10 Dominic Carter.  How does Dominic Carter know
11 Paul?
12   A.    You would have to ask him that.  I
13 mean, it's all from, you know, being in the
14 same area.
15   Q.    But no familial relationship?  No?
16   A.    I don't know.
17   Q.    Oh, you don't know if they are
18 related in some way?
19   A.    I doubt it, but, I mean --
20   Q.    You doubt it?
21   A.    -- I don't know.
22   Q.    Okay.  What about, moving onto the
23 next page, CITY017400, Rasuli Reid?  Who is
24 he?

Page 204

1    A.    One of my friends.
2    Q.    Can you provide a -- since they're
3  all one of your friends, can you provide a
4  little more elaboration?
5    A.    What do you want to know?
6    Q.    When did you first meet him?
7    A.    I knew Rasul for -- since I was
8  eight years old.  He was my next-door neighbor
9  on the block I grew up on.
10   Q.    So he was a close friend?
11   A.    Yeah.  Me and him are cool.
12   Q.    Was he involved in any criminal
13 activities that you were involved in or any
14 cases that you were charged with?  No?
15   A.    No, not that I know of.
16   Q.    Okay.  Do you have any familial
17 relationship with him?
18   A.    No.
19   Q.    Does he have a nickname?  You said
20 Rasul?
21   A.    Sule.
22   Q.    Sule, okay.  And do you know other
23 Sules?
24   A.    Yeah.  I know 30 Sules.

Page 205

1    Q.    Okay.  How do you keep them all
2  apart?  Okay.
3          And do you have mutual friends in
4  common?
5    A.    Yeah.  We have a lot of mutual
6  friends in common.  There's too many to name.
7    Q.    Okay.  So that's helpful to know
8  when you're distinguishing between people.
9          Okay.  What about Taeyanna -- well,
10 first of all, is Rasuli Reid, is he married or
11 does he have a partner?
12   A.    I think he might be married, but I'm
13 not sure if he's still currently married.  I
14 know his wife is Keisha, but --
15   Q.    Keisha?
16   A.    -- I don't know Keisha's last name.
17   Q.    Okay.  And do you know his kids'
18 names?
19   A.    No.
20   Q.    What about two lines down, Taeyanna
21 Smith?
22   A.    Taeyanna Smith?
23   Q.    I may be mispronouncing that.
24   A.    I don't even know who that is.

Page 206

1    Q.    Okay.
2    A.    This could be like some type of
3  mistake or something, because I don't even
4  know like -- there's no start or ending date
5  to, I guess, that visit.  I don't even know
6  who that is.
7    Q.    Oh, I think -- I'm not sure, but I
8  think when there's no start date, it might
9  mean they came with the person above, but...
10         Okay.  On the next page, Kareem
11 Greenwood.  How do you know Kareem?
12   A.    Kareem is a friend of mine.
13   Q.    How do you know him, though?  How
14 did you first meet him?
15   A.    I don't know exactly how I met
16 Kareem, but he's a friend of mine that I end
17 up working for at some point.  He became my
18 boss.
19   Q.    Is he someone that you've been
20 friends with since you were a juvenile?
21   A.    I wouldn't say a juvenile, but I've
22 known him for a while, but, you know, with my
23 incarceration, you know -- how can I put this?
24 I would go long periods without communicating

Page 207

1  with him, talking to him, but...
2       Q.   Did you know him before your
3  incarceration?
4       A.   Yeah.  I know Kareem for a long
5  time.
6       Q.   Is he someone that you would hang
7  out with a lot?
8       A.   No.  We wouldn't hang out a lot, but
9  I considered him to be a friend.
10      Q.   Okay.  Does he have any familial
11 relationship to you?
12      A.   No.
13      Q.   What about -- I could be
14 misremembering, but I thought I may have
15 listened to a call where there was a reference
16 to Kareem being -- Katima and Kareem being
17 cousins, nephew.  I don't know.  You don't
18 know what I'm talking about?
19      A.   No, I don't know you talking about.
20      Q.   Okay.  Is Kareem someone that you
21 have a lot of mutual friends in common with?
22      A.   Yeah.  Kareem is like 47 years old.
23      Q.   Okay.  And when you said that you
24 ended up working for him, was that at S.O.S.?

Page 208

1       A.   Yeah, at S.O.S. Restoration.
2       Q.   What time period was that?
3       A.   I can't give you an exact timeframe.
4  It's like a blur to me.
5       Q.   Isn't it true that they had offered
6  you a job, but then you weren't approved to be
7  able to work there?
8       A.   Yeah.
9       Q.   By the District Attorney?
10      A.   Yes.
11      Q.   Did you work there anyways?
12      A.   I worked there after I was off of
13 house arrest.
14      Q.   Oh, okay.  What was the time period
15 of that?
16      A.   I'm not a hundred percent sure.
17      Q.   Oh, you said you weren't sure.  Do
18 you still work there?
19      A.   No.  I don't work there no more.
20      Q.   How come?
21      A.   Some stuff happened that prevented
22 me from being able to work there.
23      Q.   What stuff?
24      A.   I'd rather not talk about it, but I

Page 209

1  can't work there no more.
2            MR. VAN NAARDEN:  You have
3       to -- I mean, that's a legitimate
4       question.
5            THE WITNESS:  I had got into an
6       accident.  I hurt my back.  The job is
7       like manual labor.  It's a restoration
8       company.  It's heavy lifting and it's
9       using sledge hammers and things of that
10      nature, and once I got into an accident,
11      my back was messed up, I couldn't work
12      there no more.
13 BY MS. ROSENTHAL:
14      Q.   Okay.  What time period was that?
15      A.   I'm not sure, but --
16      Q.   You don't know when the accident
17 was?
18      A.   I'm not a hundred percent sure the
19 timeframes of the accident or whatever, but
20 it's within the last -- since I've been home
21 off house arrest.
22      Q.   How long had you worked there
23 approximately before the accident?
24      A.   A couple months.

Page 210

1       Q.   And how much were you paid?  Were
2  you paid per hour?
3       A.   Yeah, I was paid per hour, but...
4       Q.   How much were you paid?
5       A.   I'm not really a hundred percent
6  sure.  I would have to go back and look at my
7  stubs or whatever, but...
8       Q.   Do you have additional pay stubs?
9  Because very few pay stubs were produced in
10 this litigation, and no S.O.S. ones.
11           MR. VAN NAARDEN:  Objection.
12           THE WITNESS:  S.O.S.
13      Restoration --
14           MS. ROSENTHAL:  There were six
15      pages, I think.
16           MR. VAN NAARDEN:  We gave you
17      all the PAAN pay stubs.  There were pages
18      and pages and pages.
19           MS. ROSENTHAL:  No.  Well,
20      maybe we can talk about this at break.
21      We have literally six pages, I think.
22           MR. VAN NAARDEN:  I think there
23      were a lot more than that, but okay.
24           THE WITNESS:  With S.O.S.

Page 211

```
 1   Restoration, it was like they -- it's
 2   like they was hiring me as like a private
 3   contractor or whatever, and they was
 4   1099'ing me.
 5  BY MS. ROSENTHAL:
 6   Q.   10.99 an hour?
 7   A.   No.  I mean, like you pay your own
 8  taxes on the money type.
 9           MS. MAYS:  They were 1099'ing.
10           MS. ROSENTHAL:  Oh, okay.
11           THE WITNESS:  But I didn't work
12   there that long.  I only worked there
13   like a month or two at the most.
14  BY MS. ROSENTHAL:
15   Q.   Okay.  And you stopped immediately
16  upon your accident?
17   A.   Yeah.
18   Q.   Are Kareem Greenwood and Wesley
19  Harmon friends?
20   A.   I don't know the nature of their
21  friendship.  I mean, I would like to think
22  they know each other, because we all from
23  around the same neighborhood.  We all within
24  about a five-block radius.  But for me to say,
```

Page 212

```
 1  you know, their relationship, you would have
 2  to ask them.
 3   Q.   Okay.  Turn to CITY17403.  What
 4  about Nakita King; who is that?
 5   A.   Nakita King is my old girlfriend.
 6   Q.   From what time period?
 7   A.   When I was a kid.
 8   Q.   Can you give me a little --
 9   A.   '99.
10   Q.   Like around the time of the Jamal
11  Kelly shooting?
12   A.   Yeah, somewhere around there.
13   Q.   Okay.  But you've kept in touch
14  since then?
15   A.   Yeah.
16   Q.   Including during your incarceration?
17   A.   Sporadically throughout the years
18  like we stayed in touch, but, you know, at
19  times we lost contact as well.
20   Q.   I must say you're quite good at
21  staying in touch with people.  The same names
22  who appear in 2004 and 2005 seem to appear at
23  the end.
24   A.   They sympathize for me.
```

Page 213

```
 1   Q.   Did she go by another name or names?
 2  Did she have a Muslim name?
 3   A.   Sometimes they would call her Kiki.
 4   Q.   Kiki?
 5   A.   Yeah.
 6   Q.   But does she have a Muslim name?
 7   A.   I'm not sure what it is.
 8   Q.   Does she have any siblings?
 9   A.   Yeah.  She got a couple siblings.
10  I'm not sure of every last one of them, but...
11   Q.   Any other family members that you
12  know or friends with?
13   A.   What you mean?
14   Q.   Are you friendly with or know any
15  other family members by name?
16   A.   She got a brother named Mel.  She
17  got another named Pooh.  And that's all I
18  know.  I know her mom named Sandy.
19   Q.   Is she in the same social -- do you
20  have a lot of friends in common or no?
21   A.   No.  The only friend we have in
22  common is my sister Shanita, but that's about
23  it.  Nobody has kids by nobody or anything of
24  that nature that links me and her together in
```

Page 214

```
 1  no type of way, shape, form, or fashion.
 2   Q.   Kenyata Boone, am I correct that --
 3  wait.  Let me get -- actually I'm going to
 4  mess it up.  I'll ask you.
 5           What's your relationship with
 6  Kenyata Boone?
 7   A.   She's a friend.
 8   Q.   Okay.  Did you -- at one time were
 9  you in a relationship with a Salina -- Saleem
10  Boone or Salina Boone?
11   A.   Oh, yeah.  That's her sister, Salima
12  Boone.
13   Q.   Did you ever get into an altercation
14  with Kenyata Boone, like a physical
15  altercation?
16   A.   No.
17   Q.   Okay.  Do you still keep in touch
18  with Salina?
19   A.   No.
20   Q.   And then Kenyata Boone also has a
21  relationship to Wesley Harmon?
22   A.   Yeah.
23   Q.   Yes.  Is the mother of one of his
24  children?
```

Page 215

```
1    A.  No.
2    Q.  Oh, okay.  See, I said I would get
3 it wrong.
4        What's the relationship with Wesley
5 Harmon?
6    A.  It was his girlfriend at one point.
7    Q.  Oh, really?  Okay.
8        Is there someone else that she had a
9 child with that I'm --
10   A.  Not that I know of.
11   Q.  Does she have any relationship or
12 involvement in any way, shape, or form with
13 the underlying criminal case or proceedings or
14 attempts to get affidavits, anything like
15 that?  No?
16   A.  No.
17   Q.  Okay.  Any other mutual friends you
18 have in common besides Wesley Harmon?
19   A.  Wesley Harmon, her sister Salima.
20 That's it.
21   Q.  Does she have a nickname?
22   A.  Yata.
23   Q.  Yata.  Do you know other Yatas?
24   A.  Not that I could think of offhand.
```

Page 216

```
1    Q.  We talked about Dominic Carter.  How
2 would you describe your relationship with him
3 now?  Is he a -- would you describe him as a
4 close friend?
5    A.  I mean, he's a good friend of mine.
6    Q.  He's a good friend of yours.
7        And he was incarcerated during much
8 of the same time period as you were?
9    A.  Yeah.
10   Q.  Okay.  And does he have a wife named
11 Pear Carter?
12   A.  I don't know his wife personally,
13 but I know he does have a wife, but I'm not
14 exactly sure what her name is.  I know his
15 wife by like an Islamic name.
16   Q.  What's that?
17   A.  Like Wadeeha or Waleeha or
18 Wah-something.
19   Q.  While we're on that topic, do you
20 have an Islamic name?
21   A.  Yeah.
22   Q.  What's that?
23   A.  Abdul.  Abdul Latief.
24   Q.  Abdul Latief.  And is Monique, your
```

Page 217

```
1 wife, hers is Munreeha?
2    A.  Munirah.
3    Q.  Munirah, okay.
4        Who is Munreeha Scott?  Am I saying
5 that person's name right?  No?  Muneerha
6 Scott?
7    A.  I don't know.
8    Q.  Okay.  Let's see who else.  Keandra
9 Davis, who is that?
10   A.  That's an old girlfriend on mine
11 named Kiki.
12   Q.  Oh, did we already go over her?
13   A.  No.
14   Q.  Oh, a different Kiki?
15   A.  Yeah.
16   Q.  Was she somebody you kept in touch
17 with when you were incarcerated?
18   A.  Yeah.  We stayed in touch.
19   Q.  Oh, sorry.  Going back to Carter,
20 Dominic Carter.  Is there other family members
21 of the Carters that you're friendly with?
22   A.  No.  I don't know no other Carters.
23   Q.  Okay.  What about Davises?
24   A.  No.  I don't know no other Davises
```

Page 218

```
1 either.
2    Q.  Okay.  Any familial relationship for
3 either of those two people?
4    A.  What, Carter or Davis?
5    Q.  Yeah.
6    A.  No.  Kiki, we are from two different
7 parts of town.  I knew her from school and I
8 just know her.  I don't know a lot of people
9 that's connected to her.
10   Q.  Okay.  Who is Jamir Martin?  I don't
11 know why there's two asterisks next to...
12   A.  I don't know.
13   Q.  That's okay if you don't know.
14   A.  I don't know.
15   Q.  What about Tracy Pettiford?
16   A.  Tracy Pettiford, it's some girl from
17 the neighborhood that I know.
18   Q.  Did you have any kind of like
19 romantic relationship with her?
20   A.  No, not really.  No.
21   Q.  No?  What was your relationship with
22 her at the time of the Jamal Kelly murder?
23   A.  She was my friend.
24   Q.  Was she friends with Charles
```

Page 219

1 Paladino?
2     A.    I don't know.
3     Q.    Do you have any other mutual friends
4 in common with Tracy Pettiford?
5     A.    Tracy has a sister named Kia.  I
6 know Kia.  She have a brother named Kevin.  I
7 know Kevin, but that's about it.
8     Q.    Kia who?  Kia?  Last name?
9     A.    I don't know.
10    Q.    You don't know her last name?
11    A.    I mean, you know, and I don't know
12 how it works where you're from, but in, you
13 know, my neighborhood, it's like we don't meet
14 and greet with first and last name basis.
15 Some people I know as TT and I just know them
16 as TT.  Some people I know as Man-Man and I
17 know him as Man-Man.  I don't --
18    Q.    That's totally fine.  I'm just
19 trying to get as much identifying information
20 as possible.
21          On the next page, Saniyyah Williams?
22    A.    Yeah.  Saniyyah is one of my old
23 girlfriends.
24    Q.    Okay.  There was another Williams

Page 220

1 that I asked about, Alexis Williams.  Does she
2 have any relationship to Alexis?
3     A.    No, not at all.
4     Q.    Okay.  And does she have a nickname,
5 Saniyyah Williams?
6     A.    No.  I just know Saniyyah as
7 Saniyyah.
8     Q.    As what?
9     A.    Saniyyah or --
10    Q.    Okay.  When you said she was an old
11 girlfriend, is that before you were
12 incarcerated, during your incarceration?
13    A.    No; before I was incarcerated.
14    Q.    Okay.  And has she had any
15 relationship with any of your other friends?
16    A.    She knows Sy, Wesley Harmon.  She
17 knows Dominic Carter.  She know a few of my
18 friends.
19    Q.    She lived in the same neighborhood?
20    A.    No.
21    Q.    No?
22    A.    No.
23    Q.    Oh, okay.  So how is it that they
24 know each other then?

Page 221

1     A.    Because she was my girlfriend.
2     Q.    Oh, Sy knows through -- they know
3 her through you?
4     A.    Yeah.
5     Q.    Okay.  When is the last time you've
6 had any contact with Saniyyah Williams?
7     A.    Maybe like a year and a half ago,
8 two years, something like that.
9     Q.    Did you ask her ever to do anything
10 in relation to your case for you?
11    A.    No.
12    Q.    Okay.  What about Willie Cooley; who
13 is that -- Coley?
14    A.    That's some guy I know from the
15 neighborhood.
16    Q.    Okay.  Is he someone -- this is
17 2004.  Is he someone you've stayed in touch
18 with?
19    A.    No.
20    Q.    Okay.  The next page, Caron Jones.
21 Did I say that right?
22    A.    Yeah.  I don't know who that is.
23    Q.    You don't know who that person is?
24 Okay.

Page 222

1          What about Ebonie Jones?
2     A.    Ebonie Jones, I don't remember
3 Ebonie Jones either.
4     Q.    Okay.  What about Shannon Glover?
5     A.    Shannon is a guy that I know from
6 the neighborhood.
7     Q.    Were you close with him?
8     A.    No.  I just know him from the
9 neighborhood.
10    Q.    Is he currently incarcerated?
11    A.    I'm not sure.
12    Q.    Okay.  Did he have any -- are you
13 related to him by family in any way?
14    A.    No, not at all.
15    Q.    Is he related to Usef Brown in any
16 way?
17    A.    I don't know.
18    Q.    Usef Brown is related to Glovers?
19 No?  You don't know?
20    A.    I don't know.
21    Q.    Okay.  What about Darrell Johnson;
22 who is that?
23    A.    I'm not sure who that is.
24    Q.    The name doesn't ring a bell at all?

Page 223

1    A.   I mean, it could be somebody that
2   came to see me and I know him by a nickname.
3   When you in the county jail, like I don't see
4   your ID.
5        Q.   You don't have to put them on your
6   visitor list?
7        A.   No.  There's no visitor list in the
8   county jail.  So I don't -- I can't dictate
9   who is coming to visit me.  You can just pop
10  up, and I have no way of knowing, you know,
11  your name.
12         But it's nothing that stands out
13  that I remember about that particular name,
14  but it could be somebody I know by another
15  name.  But then again, it was 2004 and I don't
16  really remember that.
17       Q.   Or him, Darrell.
18         If you could skip a few pages to
19  CITY17410.  Are you there?
20       A.   To where?
21       Q.   CITY017410.
22         Do you see Brandon Staratton?
23       A.   Yes.
24       Q.   Who is that?

Page 224

1    A.   One of my friends.
2        Q.   How do you -- how did you meet him?
3        A.   We went to school together.
4        Q.   Is he someone you would describe as
5   a close friend?  How would you describe your
6   relationship?
7        A.   We was good friends.  We were all
8   right.
9        Q.   Are you still good friends?
10       A.   No.  He passed away.
11       Q.   Oh, okay.
12         Was he known by any other name?
13       A.   Brandon, Bran.
14       Q.   Okay.
15       A.   Bus.  Some people called him Bus.
16       Q.   Oh, okay.
17         Is there anyone else you know that
18  goes by the name Bus?
19       A.   Not offhand, no.
20       Q.   What about C-Bus?
21       A.   No, not offhand.  C-Bus?  Yeah, I
22  know a guy named C-Bus, yeah.
23       Q.   Who is that?
24       A.   I know him as C-Bus.

Page 225

1        Q.   You don't know his last name?
2        A.   No.
3        Q.   Some people you mentioned earlier,
4   Lamar Rodgers, do you have a nickname for him
5   or does he have a nickname or an Islamic name?
6        A.   Yeah.  I know Lamar Rodgers as Mar.
7        Q.   Do you know him as Morf?
8        A.   No, not really.  I know him as Mar.
9        Q.   You've never -- have you heard the
10  name Morf used to refer to him?
11       A.   I know a couple people named Morf,
12  but I never knew they called him Morf.
13       Q.   Who do you know named Morf?
14       A.   Another guy from around there.
15       Q.   Do you know any other information
16  about him?
17       A.   I know him as Morf.  I mean, you got
18  to be mindful, I did 16 years in jail like.
19       Q.   Okay.  And what about Eric Lee; you
20  knew him by E?
21       A.   I know him as Eric Lee.
22       Q.   You never used the nickname E?
23       A.   I mean, people call him E.  They
24  call him Freak and they call him something

Page 226

1   else.
2        Q.   Is there anyone else that you know
3   who you refer to routinely as E?
4        A.   Yeah.  Everybody I know as Eric, we
5   call them E.  You know, a couple -- a lot of
6   people that I know as Eric, we drive it short
7   and call him E.
8        Q.   Okay.
9        A.   One of my friends, he got killed not
10  too long ago, his name was Eric Lawson.  We
11  used to call him E.  Another guy that I know
12  from the neighborhood named Eric, we used to
13  call him E.  My sister baby father is named
14  Eric.  We call him E.
15       Q.   Who is your sister's baby father?
16       A.   I have another sister.  Her name is
17  Annette and she has kids with this guy, his
18  name is Eric.
19       Q.   Eric what?
20       A.   His name is Eric Mundy.
21       Q.   Oh, Eric Mundy, okay.
22         At the time of the Jamal Kelly
23  murder, were you involved in dealing drugs at
24  all?

Page 227

```
1              MR. VAN NAARDEN:  Objection.
2              THE WITNESS:  I mean, at the
3    time of Jamal Kelly's murder --
4              MR. VAN NAARDEN:  You're asking
5      him at the time that Jamal Kelly was
6      shot?
7              MS. ROSENTHAL:  I'm asking
8      about during that time period.
9  BY MS. ROSENTHAL:
10     Q.   Do you understand that question or
11  do you need more specification?
12     A.   I mean, I understand the question
13  vaguely and I'm going to answer it to the best
14  of my ability.
15     Q.   Okay.  How about let's say from,
16  yeah, the three-year period leading up to it,
17  were you engaged in drug activity?
18              MR. VAN NAARDEN:  Objection.
19              THE WITNESS:  No.  But my mom
20      was a drug addict.  My dad was a drug
21      addict.  I grew up around drugs.  You
22      know, it was always around me and, you
23      know, it's been times where, you know, I
24      had some type of association with drugs,
```

Page 228

```
1      but, you know, I wasn't an active drug
2      dealer.
3              Like you got to be mindful, I
4      was a child.  Like in the year 2000, I
5      was 16 years old.  I was going to Simon
6      Gratz High School.  I've been around
7      drugs.  I smoked weed and, you know.
8  BY MS. ROSENTHAL:
9      Q.   So you were always a drug user, not
10  a drug dealer?
11              MR. VAN NAARDEN:  Objection.
12  BY MS. ROSENTHAL:
13     Q.   Is that what you're saying?
14     A.   What I'm saying is that in the
15  neighborhood that I grew up in, that drugs are
16  prevalent like and, you know, they always been
17  around.  So it's been times where I've been
18  associated with drugs, but I never was like a
19  full-time drug dealer and this was my
20  occupation.
21     Q.   Okay.  But when you say "associated"
22  with drugs, I guess I had thought maybe you
23  meant that you were just using them.  But when
24  you have at times dealt them, just not as a
```

Page 229

```
1  full-time occupation?
2      A.   I mean --
3              MR. VAN NAARDEN:  Objection.
4              THE WITNESS:  -- I'm not going
5      to say that either.  I'm just saying
6      that, you know, I always been around
7      drugs.  My mom was a drug addict.  She
8      was hooked on drugs.
9  BY MS. ROSENTHAL:
10     Q.   What do you mean by "associated"
11  with drugs?
12     A.   I mean, it's been times where I've
13  been around drug dealers and, you know, I did
14  had a part in it, but I wasn't the actual drug
15  dealer.
16     Q.   You've never sold drugs to anyone
17  else?
18              MR. VAN NAARDEN:  Objection.
19              THE WITNESS:  I mean, I have
20      some type of dealings with drugs where I
21      like conspire, but I actually wasn't a
22      drug dealer, no.  If you're asking me was
23      I a drug dealer, no.
24  BY MS. ROSENTHAL:
```

Page 230

```
1      Q.   Okay.  So are you defining drug
2  dealer as a person who hands over --
3      A.   I'm just defining drug dealer as
4  somebody that buys and sell drugs for a living
5  that has an occupation of -- that my
6  definition of a drug dealer is a person whose
7  main occupation is selling drugs.
8      Q.   Right.
9      A.   They sell drugs for a lifestyle or
10  living.
11     Q.   Yeah.
12     A.   They profit off of drugs.
13              I mean, I was a kid.  I was 16 years
14  old at the time, and I wasn't a drug dealer.
15     Q.   So that's not how I was using the
16  term.  When you said -- well, first of all,
17  when you say you conspire, what were you
18  referring to?
19     A.   I mean, but like, for example, you
20  know, if my girlfriend gives me a bag of weed
21  for $5, I wouldn't say she was a drug dealer.
22  Like she gave me a bag of weed.
23     Q.   I'm asking what you meant when you
24  used the term "conspire"?
```

Page 231

1    A.   I mean, that I was around people
2  that sold drugs and, you know, I knew it was
3  wrong.
4    Q.   You were around people who sold --
5  do you understand the difference between --
6    A.   Yeah.  I'm around people that sell
7  drugs.  I ain't call the cops on them.  I
8  didn't tell on them, and I knew what was going
9  on.  I didn't tell on them.
10   Q.   But did you participate in the
11 activity, furthering it?
12        MR. VAN NAARDEN:  Objection.
13 BY MS. ROSENTHAL:
14   Q.   Go ahead.
15   A.   It's been times where I've been
16 around the drugs and I ain't object to it.
17 It's been times I got locked up for drug
18 cases.  But, no, I don't categorize myself as
19 a drug dealer or I can't say before Jamal got
20 murdered that my occupation was selling drugs.
21 I'm sorry.
22   Q.   Okay.  So I'm not referring to it as
23 an occupation selling drugs.  I'm referring to
24 it as whether you were engaged in not a

Page 232

1  one-off, giving a bag of weed to your
2  girlfriend, but in selling drugs for money
3  regardless of how full time it was?
4        MR. VAN NAARDEN:  Objection.
5        THE WITNESS:  I'm telling you
6    that I've been around drugs my entire
7    life.  My mom was a drug user and, you
8    know, I had some involvement in drugs,
9    but, no, I don't consider myself a drug
10   dealer.
11 BY MS. ROSENTHAL:
12   Q.   I'm asking what -- I'm asking what
13 was your involvement in drugs besides being
14 around people with drugs?
15   A.   I mean, you know, I knew people was
16 selling drugs and, you know, I sent people --
17 I might had told him, he got the drugs or you
18 bought it.  But, you know, directly like, no.
19   Q.   Have you ever been arrested for a
20 drug-related crime?
21   A.   Yes.
22        MR. VAN NAARDEN:  Objection.
23 BY MS. ROSENTHAL:
24   Q.   What?

Page 233

1    A.   I was arrested for drugs, possession
2  of drugs.
3    Q.   Possession of drugs.  Were you ever
4  arrested for anything about manufacturing or
5  intent to distribute?
6        MR. VAN NAARDEN:  Objection.
7        THE WITNESS:  I never had -- I
8    never manufactured drugs ever in my life.
9    There was a time where I got arrested, I
10   believe it was on Woodlawn and Blakemore.
11   I was out there with somebody that was
12   selling drugs.  They arrested a couple
13   people that had the drugs, and because I
14   was out there, I had conspiracy.  I went
15   to jail too.  But I wasn't --
16 BY MS. ROSENTHAL:
17   Q.   Because you were in their presence?
18   A.   Yeah.  Because I was out there, I
19 went to jail for conspiracy.  I didn't have
20 any drugs on me.  They didn't find no drugs on
21 me.  They found drugs on the users, but I was
22 out there and I was around it and I got
23 charged too.  And, you know, I knew I was
24 wrong for being around it, and I took a deal.

Page 234

1    Q.   I still need an answer to my
2  question about whether you dealt drugs
3  according to -- not according to your
4  definition where you do it as a full-time
5  occupation but according to my definition,
6  which is that you gave --
7    A.   According to your definition --
8        MR. VAN NAARDEN:  Objection.
9        THE WITNESS:  -- no.
10 BY MS. ROSENTHAL:
11   Q.   No?  So you have not sold drugs?
12        MR. VAN NAARDEN:  Objection.
13        THE WITNESS:  According to your
14   definition, no.
15 BY MS. ROSENTHAL:
16   Q.   Okay.  In the three-year period
17 leading up to --
18        MS. ROSENTHAL:  Josh, this is
19   directly relevant to --
20        MR. VAN NAARDEN:  To what?
21        MS. ROSENTHAL:  To his
22   relationship or association with Jamal
23   Kelly.
24        MR. VAN NAARDEN:  If you want

Page 235

```
1    to ask him whether or not he had any
2    association with Jamal Kelly, you've
3    already asked him that.  I'm not going to
4    let you just carte blanche ask him
5    questions about arrests that he's had,
6    which is never going to be admissible in
7    this case.
8              MS. ROSENTHAL:  You know that
9    depositions are not limited to --
10             MR. VAN NAARDEN:  No, but I'm
11   not going to let him -- by the way, I've
12   objected and I've actually let him answer
13   those questions.
14             MS. ROSENTHAL:  Okay.
15             MR. VAN NAARDEN:  But I'm going
16   to keep objecting.
17             MS. ROSENTHAL:  Okay.  You can
18   keep objecting.
19   BY MS. ROSENTHAL:
20        Q.   Have you -- I'm asking if -- in the
21   three-year period leading up to Jamal Kelly's
22   murder, did you ever sell drugs for money?
23             MR. VAN NAARDEN:  Objection;
24   asked and answered.
```

Page 236

```
1              THE WITNESS:  Say what?
2              MR. VAN NAARDEN:  Go ahead.
3              THE WITNESS:  No.
4    BY MS. ROSENTHAL:
5         Q.   Okay.
6         A.   I was around people that sold drugs,
7    but the three years leading up to Jamal's
8    murder, did I sell drugs?  No.
9         Q.   So if Charles Paladino testified
10   that he had bought drugs from you on multiple
11   occasions, that would be a lie?
12             MR. VAN NAARDEN:  Objection.
13             MS. ROSENTHAL:  On what ground?
14             MR. VAN NAARDEN:  I don't have
15   the page and line, so I'm not looking at
16   what his testimony is.  I'm not so
17   certain that's exactly what he said.
18             MS. ROSENTHAL:  Okay.
19             THE WITNESS:  Like I stated
20   earlier, the only thing I believe from
21   Charles Paladino is what he said
22   Detective Peterman did to him.
23   BY MS. ROSENTHAL:
24        Q.   So is your answer yes, that would be
```

Page 237

```
1    a lie?
2         A.   Yes.  You can take it as that.
3              Can I get a break real fast?  I have
4    to use the bathroom.
5         Q.   Yes.  Of course.  Of course.
6              VIDEO TECHNICIAN:  We're now
7    going off record.  The time now is
8    5:00 p.m.
9                    - - -
10             (Short recess.)
11                   - - -
12             VIDEO TECHNICIAN:  We're now
13   back on record.  The time is 5:06 p.m.
14             MS. ROSENTHAL:  When we were
15   just off the record, Mr. Outlaw had just
16   remarked that he has obligations and he
17   works.
18   BY MS. ROSENTHAL:
19        Q.   Are you currently employed,
20   Mr. Outlaw?
21        A.   Yes.
22        Q.   Were are you currently employed?
23        A.   I work for -- oh, I'm sorry.
24             I work for PAAN, the Philadelphia
```

Page 238

```
1    Anti-Drug/Anti-Violence Network.
2         Q.   Oh, okay.  And how many hours a week
3    do you work there?
4         A.   I work 40 hours a week.
5         Q.   Do you get a yearly salary or just
6    per hour?
7         A.   I believe it's a yearly salary, but
8    I really don't know what it is, because I let
9    my wife keep the check.
10        Q.   Your testimony today is you have no
11   idea how much you make per year?
12        A.   That's exactly my testimony.  I give
13   my check to my wife, my paycheck.
14        Q.   You have no even ballpark
15   understanding?
16        A.   It's 30-something thousand,
17   somewhere around there.
18        Q.   Do you get medical benefits?
19        A.   Yes.
20        Q.   What's your position?
21        A.   It's crisis intervention, so I'm
22   like a CCIP worker.
23        Q.   Okay.  This is a good segue into the
24   next document, which I'm going to mark as
```

Page 239

```
1   Exhibit --
2           MS. ROSENTHAL:  What number?
3           COURT REPORTER:  15.
4   BY MS. ROSENTHAL:
5       Q.  -- Outlaw-15.  It's a one-page --
6   two-page document Bates labeled PLAINTIFF00628
7   to PLAINTIFF00629.
8                   - - -
9           (Exhibit Outlaw-15 marked for
10      identification by counsel.)
11                  - - -
12  BY MS. ROSENTHAL:
13      Q.  Do you recognize this document,
14  Mr. Outlaw?
15      A.  No, I don't recognize it.
16      Q.  You've never seen this document
17  before in your life?
18      A.  I'm not saying that.  I'm just
19  saying I don't recognize it.
20      Q.  Would you agree it appears to be --
21  we'll just describe it for the record.  Would
22  you agree it appears to be a resume --
23      A.  Yes.
24      Q.  -- of yours?
```

Page 240

```
1       A.  Yes.
2       Q.  But you have no recollection of ever
3   seeing this?
4       A.  No, not really, and I can explain
5   why.
6       Q.  Well, before you explain why, I just
7   want to ask, as you can see by the Bates
8   numbering, this was a document that was
9   produced by you in this litigation.  Is this
10  not a document that you provided to your
11  attorneys?
12      A.  No.  It's absolutely a document I
13  provided to my attorneys.
14      Q.  But -- okay.  So explain how it is
15  that you provided it, but you didn't see it.
16          MR. VAN NAARDEN:  Objection.
17          THE WITNESS:  I'm not saying I
18      didn't see it.  I don't know how to put
19      together a resume.
20  BY MS. ROSENTHAL:
21      Q.  I never asked you whether you put
22  together.  I asked if you've seen this
23  document before.
24      A.  Right, but me looking at this
```

Page 241

```
1   document, it looks like a resume to me, and
2   any time I got to put a resume together, my
3   wife does it for me, so...
4       Q.  Have you -- my question before, and
5   I just want to give you a chance to clarify if
6   your answer was incorrect, but I took it to
7   mean that you do not recognize having seen
8   this resume to your recollection; is that
9   correct?
10      A.  I'm not going to say that.  I'm just
11  saying that, you know, this not the first
12  thing on my mind.  I'm not saying it's
13  possible I never saw it or anything of that
14  nature, but, you know, I know I didn't put it
15  together.  I know somebody put it together for
16  me.
17      Q.  In searching -- is this a document
18  that you found in searching for documents in
19  the case?
20      A.  Yes.  I told you that when I had to
21  retrieve all the documents or whatever, I got
22  with Monique.  Monique helped me find
23  everything, and I submitted everything I need
24  to submit.
```

Page 242

```
1       Q.  Okay.
2       A.  And I explained to you that I rely
3   on Monique for a whole lot of things.
4       Q.  Okay.  I have not asked about
5   Monique and I haven't asked who typed up this
6   document.
7       A.  I'm sorry.
8       Q.  Do you see there's a phone number at
9   the top, 215-713-8907?  Is that your phone
10  number?
11      A.  No, that's not my phone number.
12      Q.  Is that a phone number that you've
13  ever had in the past?
14      A.  I'm not sure.  I had so many
15  numbers.
16      Q.  Do you know what the date range of
17  this resume or do you know when this
18  document -- well, let me strike that.
19          Is it your understanding that
20  Monique typed up this document?
21      A.  Yes.  Monique had to do it.
22      Q.  Are you assuming that or you know?
23      A.  I'm not a hundred percent sure, but
24  any time I got a resume done, it was through
```

Page 243

1  Monique.
2      Q.   Have you gotten resumes done on
3  occasion; do you remember?
4      A.   Yeah.  I had another girl put a
5  resume together for me.
6      Q.   When was that?
7      A.   When I first was released from
8  prison.
9      Q.   When you say "another girl," who are
10 you referring to?
11     A.   One of my friends.
12     Q.   Who is that?
13     A.   I believe it was Alexis.
14     Q.   And do you have a copy of that
15 resume?
16     A.   Not offhand, no.
17     Q.   What do you mean by "offhand"?
18     A.   I don't have a copy in my hand, no.
19     Q.   Okay.  Do you have a copy in your
20 possession at home or any ability to obtain a
21 copy?
22     A.   No.  She like e-mailed it to me.
23     Q.   So would it be in your e-mail?
24     A.   Yeah.  It would be in one of the

Page 244

1  e-mails that I can't get in.
2      Q.   That you can't get in?
3      A.   Yeah.  I told you, once I lose my
4  device, then I can no longer log into the
5  e-mail, because the e-mail be attached to the
6  phone.  And then sometimes when you try to go
7  into the e-mail, it sends like a security
8  something and, you know, I was confused about
9  it, tried to get Monique to help me, and
10 sometimes I can't get in it.  It like send
11 some type of security where you log in there
12 from a different device.  It does something
13 and it locks and then you're unable to get in.
14     Q.   Okay.
15     A.   You don't know what I'm talking
16 about?
17          MS. ROSENTHAL:  Mr. Outlaw
18     seems to have a Gmail account that's used
19     quite frequently.  I would ask that you
20     make efforts to attempt to reset the
21     password for him.
22          MR. VAN NAARDEN:  We've already
23     made attempts to and we've fully responded
24     to your discovery.

Page 245

1          MS. ROSENTHAL:  Well --
2          MR. VAN NAARDEN:  We're not
3     going to go back and forth on what you
4     want --
5          MS. ROSENTHAL:  Okay.  I'm just
6     putting on the record that I'm making a
7     request that the e-mail be searched and
8     to the extent that there haven't been
9     attempts to be able to go into the
10    e-mail, then that --
11         THE WITNESS:  That was --
12         MR. VAN NAARDEN:  That's okay.
13         MS. ROSENTHAL:  It's just for
14    the record.  It's not --
15         MR. VAN NAARDEN:  But you can't
16    just make discovery demands on the record
17    and expect them to be honored.  You got
18    to send us an actual formal discovery
19    request, and we will respond to it in
20    kind.  Just like putting stuff on the
21    record is not going to obligate me or my
22    client to give you anything.
23         MS. ROSENTHAL:  Okay.  I think
24    that the law is what it is on that, so

Page 246

1  I'm not going to waste time arguing about
2     it now.
3  BY MS. ROSENTHAL:
4      Q.   When is the last time you were able
5  to log into your Gmail account?
6      A.   I honestly don't know.
7      Q.   Has Monique ever put together a
8  resume for you before?
9      A.   Yes.  I believe she put together
10 this one.
11     Q.   Has she put together any other
12 resumes?
13     A.   I'm not sure, but any time I have a
14 resume to do, she did it.
15     Q.   Okay.  But I'm asking when you say
16 any time you had a resume to do, are you
17 recalling specific instances?
18     A.   Whenever I apply for a job -- you
19 know, I'm not literate with a lot of stuff
20 like applying for jobs and say, right, if I
21 want to work at Sam's Club, I ask Monique for
22 her help with filling out an application, and
23 I would rely on her to do it.  So if they
24 asking for a resume, I'm relying on Monique to

Page 247

1  send them the resume.
2       Q.   So does Monique fill out the job
3  applications for you and then send them
4  without you reviewing them in advance?
5       A.   I scan through it and that's that.
6       Q.   Okay.  So you've seen resumes
7  attached to other job applications?
8       A.   I'm pretty sure I did.
9       Q.   And have there been other versions
10 of resumes other than this one?
11      A.   I'm not sure.  I can't really think
12 back off of my memory and say -- pick out
13 inconsistencies in resumes that's not before
14 me.
15      Q.   Sorry.  I feel like I asked this
16 question, but I can't remember your answer.
17 Did you say that you're assuming she put
18 together this one or you specifically had a
19 conversation with her about it?
20      A.   I'm telling you that this resume
21 right here, Monique had to put it together.
22      Q.   And you say "had to" because why?
23      A.   Because Monique does my resumes for
24 me.

Page 248

1       Q.   Well, you said another girl did in
2  another instance?
3       A.   A year -- two years ago when I first
4  came home from jail.
5       Q.   And who is the name of that person?
6       A.   A girl named Alexis.  But I didn't
7  even use the resume she put together for me,
8  because my wife had an issue with somebody
9  else doing a resume for me.
10      Q.   Was that also sent to Monique via
11 e-mail?
12      A.   No.  Monique would have had a heart
13 attack.
14      Q.   Okay.  And was that Alexis -- was
15 that the same Alexis we had talked about
16 before, Alexis Williams?
17      A.   Yeah.
18      Q.   Okay.  Do you know when Monique put
19 together this resume?
20      A.   No, I don't.  Unless it's a date on
21 there, I wouldn't be able to tell you when.
22      Q.   And then when you were going
23 through -- did you say that when you were
24 collecting documents responsive to the

Page 249

1  subpoena, you went through the documents
2  together?
3       A.   I mean, I scanned through some of
4  the stuff, but I can't say that.
5       Q.   Do you know where she found this?
6       A.   No, I don't.
7       Q.   And the e-mails at the top, the
8  doutlaw1983@iCloud.com, is that an e-mail
9  address you currently use?
10      A.   That was my last e-mail.
11      Q.   From what time period?
12      A.   From probably like a month ago.
13      Q.   For how long did you have it?
14      A.   I might have had it for like two,
15 three months.
16      Q.   And you're unable to get into that
17 e-mail account?
18      A.   Yeah.  I can't get in it no more.
19      Q.   Okay.  I'm just -- I'm not asking to
20 be difficult.  I just legitimately have not
21 had the experience of not being able to look
22 at e-mails when you change phones.  So that's
23 why I'm asking.
24           Have you tried to change the

Page 250

1  password?
2       A.   Yes.  I don't know how to do it.
3  Like I rely on my wife, and she will try to
4  show me exactly what's going on, but I don't
5  really comprehend that stuff like that, so I
6  get my wife to do it.
7       Q.   You asked your wife to try to change
8  the password?
9       A.   I told my wife to get me into the
10 e-mail, and it locked me out for whatever
11 reason.
12      Q.   Have you had a conversation with
13 your wife about trying to reset the password?
14      A.   Yes.
15      Q.   And did she try?
16      A.   Yeah.  Whatever reason, because I'm
17 not logging in in the same device, it won't
18 let me in.
19      Q.   That's for the iCloud account?
20      A.   For both of the accounts.  For
21 whatever reason, from my experience with my --
22 when I lose my phone, I don't have that device
23 no more, they won't let me in to them e-mails.
24 I don't know if it's specifically with me or

Page 251

1  what, but --
2      Q.   Have you tried using -- I know you
3  don't have a computer, but have you tried
4  using a computer at the library or somewhere
5  else to log in to these accounts?
6      A.   I tried logging into the accounts.
7  I couldn't get in.
8      Q.   On your phone?
9      A.   I called my wife, got my wife to try
10 to do it.  She couldn't do it.  Monique is my
11 go-to.
12     Q.   I'm going to strike that.  I move to
13 strike that answer as non-responsive.
14          Have you tried using a computer to
15 reset the e-mail accounts?
16     A.   I don't have a computer, so I can't
17 say I did, no.
18     Q.   Okay.
19     A.   But --
20     Q.   When did you last have access to
21 outlawdon484@gmail.com?  Was that your e-mail
22 address at one time?  Sorry.  Strike that.
23          Did you ever have an e-mail address
24 outlawdon484@gmail.com?

Page 252

1      A.   Yes.
2      Q.   When did you have that?
3      A.   I don't know.  I know I had it at
4  one point, but I'm not sure.  I changed my
5  phone so much.
6      Q.   Can you give me a rough time period?
7      A.   I can't.
8      Q.   Was it a long time period that you
9  had that one?
10     A.   I can't.  It's between from when I
11 got off of house arrest until now.
12     Q.   Do you have any record or any way of
13 being able to tell all the different e-mail
14 accounts that you've had over the time period?
15     A.   No.
16     Q.   Do you know whether this is the
17 e-mail account that you had just before the
18 iCloud account?
19     A.   Excuse me?
20     Q.   You said you had the iCloud account
21 about a month ago for two to three months
22 before that.  Is the outlawdon account the
23 account you had immediately before the
24 doutlaw1983?

Page 253

1      A.   I can't answer that question.  I
2  really don't know like.  I changed my phone a
3  lot, and I don't know --
4      Q.   Okay.
5      A.   I don't know how to answer the
6  question.  I don't know.  I don't know.
7      Q.   Does --
8      A.   I'm sorry, but I just don't know.
9      Q.   Okay.  Do you have an e-mail account
10 currently?
11     A.   I'm pretty sure I do, but I think
12 I'm operating off of -- Monique set up my
13 phone, so I'm operating off of Monique e-mail.
14 She got her e-mail attached to my phone.
15 We're sharing the iCloud.
16     Q.   Oh, so do you have access to her
17 e-mail account?
18     A.   Yeah.  I got access to it probably
19 from my phone, but...
20     Q.   The monique@aol.com account?
21     A.   Yeah.
22     Q.   But you understand she may have set
23 up another e-mail address for you when you got
24 your new iPhone a couple weeks ago?

Page 254

1      A.   I don't know.  All I know is she set
2  up -- she set her e-mail up to my phone.
3      Q.   Okay.  You said that -- I believe
4  that you said that Monique doesn't have a
5  computer.  Do you know how this was typed up?
6      A.   You would have to ask Monique that.
7      Q.   When you were reviewing documents to
8  provide to counsel and going over them
9  together, you saw a hard copy of this that was
10 printed out; you didn't see it on any kind of
11 a device?
12     A.   I don't remember.
13     Q.   Do you know what purpose Monique
14 typed up this resume for?
15     A.   I don't remember.
16     Q.   Looking at this resume, is your work
17 history accurate since leaving -- since being
18 released from incarceration, from the time you
19 were granted bail?
20     A.   For the most part.  There's some
21 things I don't really agree with.
22     Q.   What don't you agree with?
23     A.   But, yeah, I guess most of it is
24 accurate.  This is what my job does, but the

Page 255

1  last, maintain accurate paper and computer
2  files, no, that's not accurate.
3      Q.   Okay.  What about the names of the
4  organization and the date ranges and
5  locations?
6      A.   I can't -- I don't know.  I can't
7  say that, because I'm really --
8      Q.   Don't worry about the back page.
9  That's not work history.
10         You can't say whether it's accurate
11  that you worked at these two organizations
12  during those date ranges?
13      A.   I believe I did start PAAN in
14  December of 2020.  As far as S.O.S.
15  Restoration, I can't really remember, because
16  I didn't work there that long.  PAAN, I'm
17  still working there, so I know when I started.
18  S.O.S., I was there for a short period of
19  time, so it's like faint to me.
20      Q.   Can you just remember just to speak
21  up so she can hear you a little better.
22      A.   Oh, I'm sorry.  With PAAN it's a
23  little -- I'm still working there.
24      Q.   Okay.  So it's accurate you worked

Page 256

1  there from December 2020 to the present as a
2  CCIP advocate?
3      A.   No.
4      Q.   Okay.  What's not accurate?
5      A.   That I took a break in between.  I
6  started in December.  I worked probably up
7  until September.  I was off for like two
8  months and then started back in probably
9  December of '21.  So I had like a three-month
10  gap of being off.
11      Q.   Okay.  So you would say the date
12  range was December 2020 to September 2021 and
13  then December 2021 to the present?
14      A.   Yeah, around there about.  I can't a
15  hundred percent say.  I just know like I had a
16  gap.
17      Q.   A couple months?
18      A.   That I had stopped working there
19  for.
20      Q.   What was the reason for that?
21      A.   My mom had passed away.  I was under
22  a lot of stress.  I couldn't adequately do my
23  job.
24      Q.   Okay.

Page 257

1      A.   So I asked for a leave.
2      Q.   And you were a CCIP advocate the
3  entire time, that was your title?
4          You have to use words.
5      A.   Yes.  I'm sorry.
6      Q.   And that's a -- that was a full-time
7  job for the entire time period you were
8  employed there?
9      A.   Yes, 40 hours a week.
10      Q.   And including benefits?
11      A.   Yes, medical and dental.
12      Q.   Medical and dental.
13          Do you get your health insurance
14  through your employer or through Monique's?
15      A.   Through my employer.
16      Q.   Okay.  And then does she get it
17  through her own?
18      A.   I'm not sure.
19      Q.   You're not sure, okay.
20          And then you said S.O.S. Restoration
21  and Rebuilders, LLC, you don't believe you
22  started September 2019.
23      A.   I didn't say that.  I'm just not
24  sure exactly.

Page 258

1      Q.   Oh, I believe earlier you had given
2  a date.
3      A.   No.  I never gave a date.
4      Q.   Oh, you didn't?  Okay.
5          Well, didn't we discuss the fact
6  that you weren't approved to work there while
7  you were on house arrest?
8      A.   Yes.
9      Q.   And you were on house arrest in
10  September 2019?
11      A.   Was I on house arrest?  Yeah, I was
12  on house arrest September 2019.
13      Q.   Okay.  When was your house arrest
14  lifted?
15      A.   I was released from prison, I think,
16  in maybe August 1st or July 31st of 2020.
17      Q.   Okay.  And so when it says to
18  present, that's not correct, but you don't
19  know the date that this was drafted, so it
20  could have been to present at the time?
21      A.   No.  That couldn't have been.  That
22  date got to be off.  It got to be some typo,
23  because when I was on house arrest, they
24  wouldn't allow me to work there.

Page 259

1    Q.   Right.  Oh, I mean as far as to
2  present.
3    A.   It might be 2020 until whenever this
4  was for.
5    Q.   Okay.  And how many hours a week did
6  you say you worked at S.O.S. Restoration?
7    A.   At S.O.S. Restoration I was doing
8  about 48 hours sometimes.
9    Q.   So you worked 48 hours a week there
10 while simultaneously doing 40 hours a week at
11 Urban Affairs Coalition?  You had two jobs?
12   A.   Yeah.
13   Q.   And did you receive benefit -- you
14 received an annual salary through S.O.S. and
15 also benefits?
16   A.   No.  No.  S.O.S. didn't work like
17 that.
18   Q.   Oh, that was the one you said was
19 per hour?
20   A.   Excuse me?
21   Q.   It was per hour?
22   A.   Yeah.  You get paid by the hour and
23 then it's --
24   Q.   Do you have any other work history

Page 260

1  since being released from incarceration?
2    A.   Not that I can think of offhand.
3  I'm not sure.
4    Q.   Well, I mean, we're only talking
5  about two different employers.  Would it be
6  that difficult -- I would think that -- one
7  would think that you would remember if you had
8  worked for another employer in the last couple
9  of years.
10   A.   I mean, I don't remember.  I don't
11 know.
12   Q.   Okay.  But it's possible you could
13 have worked for another employer and
14 forgotten?
15   A.   Yeah.  If I did, it wasn't that
16 long.
17   Q.   I'm sorry?
18   A.   I mean, if I did, it wasn't for that
19 long.  I just don't --
20   Q.   Have you ever been terminated from a
21 job?
22   A.   No, not that I know of.
23   Q.   After incarceration -- by
24 "terminated," I mean fired.  Have you ever

Page 261

1  been fired from a job?
2    A.   No, I don't think so.
3         I'm sorry.  I'm getting a little
4  tired.
5    Q.   You're good to continue?
6    A.   Yes.  I'm great.  We're going to go
7  as long as we need to go.
8    Q.   Okay.  And then on the back, you see
9  Education and Certifications.  It says high
10 school diploma?
11   A.   Yeah.
12   Q.   That's not accurate, right?
13   A.   No.  I got a GED, but same thing.
14   Q.   Are you a certified healthcare aide?
15   A.   Yeah.  I got -- I had went to this
16 Stratford Career Institution when I was
17 incarcerated and I got -- that's what I was
18 telling my sister about over the phone.  I got
19 like the module where I passed the course.
20   Q.   Yeah.
21   A.   And also for the drug and alcohol
22 treatment thing, I went to Stratford Career
23 Institution and got a certification in that as
24 well.

Page 262

1    Q.   The PPP loan that you had testified
2  you had gotten from the federal government
3  during COVID that was over $20,000, what
4  business was that for?
5    A.   I believe it was for Outlaw
6  Demolition and Restoration.
7    Q.   What was the loan -- what was the
8  purpose of the loan?
9    A.   The purpose of the loan was to put
10 into the business.
11   Q.   It wasn't for employee payroll
12 protection?
13   A.   From my understanding, it was for --
14 a percentage was for payroll, a percentage was
15 for supplies or whatever.
16   Q.   Are you an owner of Outlaw
17 Demolition and Restoration?
18   A.   I guess, yeah.
19   Q.   What type of entity?  Is it an LLC?
20   A.   Yes.
21   Q.   And are there other members?  You're
22 a member?
23   A.   Yes.
24   Q.   Are there other members?

Page 263

1    A.   Yes.
2    Q.   Who?
3    A.   Monique and our son, Deandre.
4    Q.   Did Deandre get his own PPP loan as
5    well?
6    A.   I'm not sure.
7    Q.   You're not sure if he got one also
8    for Demolition at the same address as you?
9    A.   I don't know.
10   Q.   And how many employees does Outlaw
11   Demolition and Restoration have?
12   A.   Currently right now we're like
13   stagnated.  The business is not really doing
14   too good right now.
15   Q.   Since when?
16   A.   For a couple months now.
17   Q.   I need more accurate than a couple
18   months.
19   A.   I mean, I would have to go look at
20   my books and, you know, to give you anything
21   accurate.
22   Q.   Well, what changed?  When you say
23   it's "stagnated," you had employees and you no
24   longer have employees?

Page 264

1    A.   Yes.
2    Q.   How many employees did you have?
3    A.   I had a few employees.  Probably
4    between six to ten, somewhere around there.
5    Q.   You had six to ten employees at
6    Outlaw Demolition and Restoration?
7         Were you performing the demolition
8    and restoration work yourself or acting as a
9    manager?
10   A.   I was mainly acting as a manager.
11   Q.   And what role does Monique have in
12   that business?
13   A.   She don't really play a role in it.
14   Q.   For how long did Outlaw Demolition
15   and Restoration keep the ten employees?
16   A.   It didn't last long.  I mean, I
17   wasn't laying really jobs like that.  With me
18   marketing the business, it depends on me
19   landing a job.  I would only have a few jobs,
20   and the workers, you know, got tired of me not
21   being consistent and --
22   Q.   So was it like you didn't hire
23   workers full time, it would -- you contracted
24   with them?

Page 265

1    A.   Yeah.  I contracted with them
2    depending on the job.  If I land a job, I will
3    hire the guys.
4    Q.   Did you fill out the paperwork for
5    the PPP loan or did Monique?
6         MR. VAN NAARDEN:  Objection.
7         THE WITNESS:  Neither one of
8    us.
9    BY MS. ROSENTHAL:
10   Q.   Who filled it out?
11   A.   A guy I know.
12   Q.   Who?
13   A.   A guy named Wes.
14   Q.   Wes who?
15   A.   I'm not sure of Wes's last name.
16   Q.   Wesley Harmon?
17   A.   No.  It's not Wesley Harmon.  Wesley
18   Harmon name is Sy.
19   Q.   Sy?
20   A.   Yeah, Sy, like S-Y.
21   Q.   Why did Wes do it?  Did he have any
22   special expertise?
23   A.   He came to me and, you know, say he
24   could help me out with my business, and he

Page 266

1    filled it out for me and that was that.
2    Q.   How many hours per week have you
3    devoted on average over the last year to
4    Outlaw Demolition and Restoration?
5    A.   I can't say for sure.  I don't know.
6    Q.   Less than five hours per week?
7    A.   I mean, I don't know.  At one point
8    I was devoting a lot of time, a lot of effort
9    into it, but when it wasn't working out for me
10   the way I wanted it to, I started mainly
11   focusing on my job.
12   Q.   At its height how many hours were
13   you working?
14   A.   I don't know.  I would have to go
15   look at the books to give you --
16   Q.   Who keeps the books?
17   A.   Deandre, our son.  He really in
18   control of that one.
19   Q.   How much income have you made over
20   the last year from the business?
21   A.   I haven't made that much money.
22   Q.   Okay.  But I'm asking approximately
23   how much.
24   A.   I'm saying approximately I don't

Page 267

1  know.  It wasn't that much.
2      Q.  Well, I don't know what not that
3  much means to you, so --
4      A.  A few thousand.
5      Q.  A few thousand.  What about the year
6  before?
7      A.  I can't say.
8      Q.  A few thousand as well?
9      A.  The year before Deandre was mainly,
10 you know, in control of it, so I don't know.
11     Q.  But you're a member of the LLC,
12 aren't you?
13     A.  Yes, I am.  But it's my family.  I
14 trust him.
15     Q.  Well, it was your name on the PPP
16 loan, right?
17     A.  Yeah.  I never said it wasn't.
18     Q.  So you asked for $20,000 for a
19 business that was making a couple thousand a
20 year?
21     A.  The business was generating money,
22 but as far as exactly what I asked for, how I
23 asked for it, I didn't fill out the
24 application to tell you exactly what I put,

Page 268

1  how I put it on there.  I had help with
2  filling out the application.  So I don't know
3  exactly what they put on the application.
4      Q.  And I assume that you don't know
5  whether the income that you received from
6  Outlaw Demolition and Restoration was
7  reflected on your tax returns since you didn't
8  fill them out and didn't see them before they
9  were filed?
10     A.  No, but me and Monique had a
11 conversation and she end up amending the taxes
12 because she saw some type of flaw or whatever.
13 She's trying to make it right, whatever was
14 wrong.
15     Q.  Have they already been resubmitted?
16     A.  Yeah.  As soon as we get it out,
17 we'll send it over to you.
18     Q.  Have they been submitted to the
19 federal --
20     A.  I mean, I don't -- I'm not --
21     Q.  Are you amending your state taxes as
22 well?
23     A.  I don't know too much about that.  I
24 rely on my wife to do that.  So whenever that

Page 269

1  happens, I will be sure to send it to Josh.
2      Q.  Are the two tax returns we showed
3  you, are those the only two tax returns you
4  filed in your life?
5      A.  I don't know.
6      Q.  You didn't file any in prison,
7  right?
8      A.  No.  I was in jail.  How can I file
9  it in prison?
10     Q.  Well, I won't give you legal advice
11 on that, but there is an obligation if you
12 make certain amounts of money to file tax
13 returns.  I don't know how much you made,
14 but...
15         What about the other LLC?  Do you
16 have a connection to Outlaw Tender Touch?
17     A.  Monique runs that.  I don't have --
18 I can't give you anything on that.  I don't
19 know.
20     Q.  Do you have any -- I'm just checking
21 the time.
22         Do you have any affiliation at all
23 with them?
24     A.  I do a little word of mouth

Page 270

1  marketing, but besides that, not really.
2      Q.  Well, do you have any either as a
3  member or manager or employee, anything other
4  than just it -- you know, providing some help
5  as a family member?
6      A.  No.  I don't do nothing.  I let
7  Monique run it.
8      Q.  Do you know why documents related to
9  Outlaw Tender Touch were produced in response
10 to a request for production about your income?
11     A.  Because me and Monique are married
12 and we have a joint income.  I told you, my
13 whole paycheck goes to Monique.  We consider
14 our income as one.
15     Q.  Okay.  We didn't receive any
16 documents related to her paralegal employment,
17 though.
18     A.  I'm sorry to hear that, but
19 whatever --
20     Q.  You consider that your income?
21     A.  No.  I don't get none of Monique's
22 money.  Monique takes my money.  What's mine
23 is hers.  What's hers is hers.
24     Q.  Do you have an understanding when

Page 271

1 you're filing the revised tax return whether
2 they're going to be filed as jointly?
3      A.   I'm not sure how it's going to go,
4 but whenever it's done, I will give it to Josh
5 and he will hand over everything he needs to
6 hand over to you for --
7      Q.   Do you have an idea of how long it
8 will be?
9      A.   A couple weeks.
10      Q.   Did you file a tax return in 2020?
11 No.  Sorry.  Strike that.
12           MS. ROSENTHAL:  I think we have
13      to break now, because I have to go, and
14      then I guess we'll come back at -- I will
15      rush her home and bring -- unless you
16      want a puppy barking, and then come by --
17      I will take -- I hope I'll be back by
18      6:10.  I'll do my very, very best.
19           MR. VAN NAARDEN:  Okay.
20           VIDEO TECHNICIAN:  We're now
21      going off record.  The time now is 5:40
22      p.m.
23                 - - -
24           (Recess.)

Page 272

1           (Ms. Mays left the conference
2      room.)
3                 - - -
4           VIDEO TECHNICIAN:  We're now
5      back on record.  The time is 6:49 p.m.
6 BY MS. ROSENTHAL:
7      Q.   We're back on the record.
8           How would you describe your
9 relationship with Christopher Holder right now
10 in more detail than he's a friend, if he is
11 one?
12      A.   Christopher Holder, he's currently
13 incarcerated.  If I could do anything, like
14 there's been times where I got my wife to send
15 him money on his books, like if he's doing
16 Ramadan or anything like that due to, you
17 know, me being incarcerated and so forth and
18 so on and, you know, me considering him to be
19 a friend, I have sent him money.
20           I don't really -- I rarely talk to
21 him, but I consider him still to be a friend,
22 but he's serving time.
23      Q.   And what would you say is about the
24 total amount of money that you've sent him?

Page 273

1      A.   I can't give an accurate amount.
2 Maybe a few hundred bucks, a couple hundred.
3 Three, four hundred.
4      Q.   Is that a lot of money for you and
5 your household given your income?
6      A.   It depends.  Sometimes it is;
7 sometimes it's not.
8      Q.   And is it your practice to give that
9 amount of money to any of your friends who are
10 incarcerated?
11      A.   Yes.  Any of my friends that have
12 reached out to me that's in need, if I can
13 help them out, I try my best to help them out.
14           It's -- you know, I got the
15 mentality of I understand exactly what it's
16 like to be in jail.  I understand that
17 sometimes a person might need to call Imam,
18 and it's not free to make a phone call.
19 Sometimes a person might not like the meal
20 that they serving and they might want to get
21 something to eat, so -- and there's other
22 things in jail where you need money for.  You
23 need money to put music on your tablet.
24           You know, throughout my

Page 274

1 incarceration, like, you know, certain songs,
2 you know, helped me get through the night.
3           So I got a mentality of that if I
4 could do anything to help him out, if I got
5 it, like I will send my money if I can,
6 because I can directly relate to what they
7 going through, especially the guys that I feel
8 as though are actually innocent.  But, you
9 know, whether they innocent or not is
10 irrelevant.  I think I know exactly what they
11 going through.  I got empathy for them, and if
12 I consider them a friend, I know how much it
13 means to them to send $50 or $100.
14      Q.   I'm going to -- I've given you the
15 chance to elaborate, but I'm going to cut you
16 off at this point, because my question was
17 much more limited about describing your
18 relationship.
19           MR. VAN NAARDEN:  Note my
20      objection.  You said -- you asked him
21      specifically if he's more than a friend,
22      to elaborate.  That was your initial
23      question.
24           MS. ROSENTHAL:  Yes, but now --

Page 275

```
1                MR. VAN NAARDEN:  And he did.
2                MS. ROSENTHAL:  -- he's
3       repeating himself.
4                THE WITNESS:  But the question
5       was about the money that I sent to jail.
6                MR. VAN NAARDEN:  Right.
7       That's also true.
8  BY MS. ROSENTHAL:
9       Q.   Can you name the names of any other
10 inmates who you've sent similar amounts of
11 money to?
12      A.   A guy named Dominic Carter.
13      Q.   You've actually sent much more than
14 that to Dominic Carter, haven't you?
15               MR. VAN NAARDEN:  Objection.
16               THE WITNESS:  I don't know
17      exactly how much I sent to Dominic
18      Carter, but any chance I get, I send Dom
19      money.  So, yeah, I've sent Dom money on
20      several occasions.  Anything I could do
21      to help Dom out, I try my best to help
22      him out.
23 BY MS. ROSENTHAL:
24      Q.   You've spoken to Holder about the
```

Page 276

```
1  fact he may be a witness in this civil case;
2  is that correct?
3       A.   I may have said something about, you
4  know, somebody reaching out to him.  I never
5  got into depth.  I never tried to coerce him
6  or anything of that nature, but I may have
7  told him that, you know, they might call you
8  as a witness.
9       Q.   Have you ever had discussions with
10 Christopher Holder about sending very large
11 sums of money to him, in the, you know
12 $15,000, $16,000 range, as a result of any
13 type of check that you have gotten from the
14 government?
15      A.   No, not -- I'm not sure if I told
16 him I was going to send him 15,000, 16,000 or
17 anything of that nature, but Chris Holder is
18 one of my friends that he visited me when I
19 was in jail.  If I got 15,000, 20,000, 30,000
20 to send, I would send it to him.  He's one of
21 my friends that when I was incarcerated, he
22 sent me money.  He came to see me.  He did
23 things for me, so...
24      Q.   You don't have any idea of what I'm
```

Page 277

```
1  talking about when I'm -- if I would reference
2  conversations where there's discussions about
3  large checks being sent to him in relation to
4  unemployment benefits that you had received?
5       A.   No.  I'm not sure exactly what
6  you're talking about, but you can get into
7  depth if you want to.
8       Q.   Nope.  That's all I wanted to ask
9  you about.
10               Besides the PPP loan that we've
11 talked about, you've also applied for
12 unemployment?
13      A.   Yes.
14      Q.   Have you received it?
15      A.   Yes.
16      Q.   And you haven't produced any
17 documents related to that even though it's
18 responsive to the request for production; is
19 that correct?
20      A.   I'm not a hundred percent sure,
21 but -- yeah.  I don't know if I produced
22 anything with the PUA assistance that I
23 received.
24      Q.   What records would you have of that?
```

Page 278

```
1       A.   I would have my log-in information
2  that I would have to get from my wife and see
3  if I can log in and --
4       Q.   What about your unemployment
5  application?
6       A.   What do you mean?
7       Q.   Don't you have to fill out some type
8  of form or application to obtain unemployment
9  benefits?
10      A.   Yes.
11      Q.   Do you have that?
12      A.   When you log into the portal or
13 whatever, I'm a hundred percent sure that
14 everything that you put down on there would be
15 on there.  Actually, Margaret from the
16 Innocence Project, she would go on interviews
17 with me, and I didn't know anything about the
18 PUA assistance when I came home, and Margaret
19 assisted me with the PUA assistance and she
20 filled out -- she basically walked me through
21 the application and helped me apply for the
22 unemployment assistance.
23               Before that, Margaret would go on
24 interviews with me when I kept getting denied
```

Page 279

1  and things of that nature.  She had came up
2  with me applying for unemployment, because I
3  was supposed to start a job somewhere and
4  didn't get it.
5      Q.   So which exhibit did we mark as the
6  request for production of documents?  Do you
7  have the -- which exhibit was it?
8      A.   I'm not sure which one you want.
9      Q.   Yeah.  It's Exhibit-3.  If you could
10 take a look at that and turn to Page 10.
11     A.   Okay.
12     Q.   Do you see Request for Production
13 No. 34 asks for "all documents that relate to
14 or discuss any claims for workers'
15 compensation, disability, and/or unemployment
16 benefits filed by you or any person on your
17 behalf.  The time period for this request is
18 from the date of your eighteenth birthday to
19 the present"?  And then also Request for
20 Production No. 35, "all documents that reflect
21 or discuss any income received by you during
22 the time period of September 4, 2000 to the
23 present."
24     Did you understand documents relate

Page 280

1  to unemployment benefits to be encompassed
2  within those requests?
3      A.   Yeah, I understood that.
4      Q.   What searches did you -- what
5  efforts did you undertake to obtain documents
6  and produce them?
7      A.   I tried to log into the portal, but
8  I don't have the log-in information.  The
9  log-in information I don't have no more.  I
10 don't know what I did with it.
11     Q.   You still receive the unemployment
12 benefits?
13     A.   To this day?  No.  I stopped
14 receiving unemployment in about maybe --
15 probably like September of 2020.
16     Q.   Would your bank statements reflect
17 the unemployment benefits that you received?
18 Is it deposited directly into your bank?
19     A.   No.  It was like a ReliaCard that
20 the money was going on.  They had their own
21 like type of bank that was set up with that.
22     Q.   Did you take any steps to contact
23 the website operator to see if anything could
24 be done about obtaining those documents?

Page 281

1      A.   Me -- I got with Monique, and she
2  had -- she tried to log into the portal.  It's
3  a way that you can bypass the password and the
4  user name or whatever, and she tried to do it,
5  but the question, the security question, is
6  that she said they was asking, she kept
7  getting them wrong, and for whatever reason,
8  she wasn't able to get into the portal.  So I
9  gave up there.  I tried.
10     Q.   But you didn't contact anyone on the
11 website, there was no contact information for
12 anyone to call if you were having issues?
13     A.   I told you before that I relied
14 mainly on my wife.  She really know what she
15 doing, so if Monique can't do it, it can't be
16 done.
17     Q.   Well, you understand the request for
18 production served on you and not on your wife;
19 is that correct?
20     A.   Yeah, but you asked me what means
21 did I take to find these things.
22 Unfortunately -- I don't mean to keep saying
23 this, but I spent most of my life in jail.
24 I'm really not savvy with a lot of that stuff,

Page 282

1  and when I go to look for things, my wife
2  assists me and, you know, if she can't do it,
3  then I'm like at a dead end.
4      Q.   I want to play a telephone call to
5  you that I'm going to mark as --
6         MS. ROSENTHAL:  What exhibit
7      are we at?
8         COURT REPORTER:  16.
9  BY MS. ROSENTHAL:
10     Q.   -- as Exhibit-16.  It's a telephone
11 call that Mr. Holder made using Department of
12 Corrections cell phone system on December 9,
13 2021 to the number 267-456-8719 at 14:08:45,
14 and it covers the time period -- the minute
15 14:49 to 15:47.
16     (Audio being played.)
17     Something is wrong with the Holder
18 calls.  I don't know why we're not able to
19 play them.
20     Do you remember having a call with
21 Mr. Holder where Mr. Holder asked for money
22 and you say that you would have Rakiya text
23 him and will get the cash to Rakiya?  Do you
24 recall that?

Page 283

1    A.   I don't recall that, but I could
2 have said that, but -- yeah.  I may have said
3 that I was going to send some cash to Rakiya.
4 Rakiya is like his girlfriend, and a lot of
5 times he want me to send the money to Rakiya.
6    Q.   And that call was on 12/9/21.
7 Assuming that was the conversation that day, I
8 don't believe we received any text messages in
9 response to our request for production about
10 payments made to or from Christopher Holder
11 directly or indirectly.  Was that a text
12 message that you retained?
13         MR. VAN NAARDEN:  Objection.
14         THE WITNESS:  Excuse me?
15 BY MS. ROSENTHAL:
16    Q.   Do you have -- would you have a text
17 message that -- if you had texted -- if Rakiya
18 texted you or you texted Rakiya about this,
19 about giving cash to Christopher Holder after
20 the lawsuit -- this lawsuit was filed, is that
21 a text message that you would have preserved?
22    A.   I spoke with you before about my
23 situation with my phones.  So if I had it in
24 the phone, whatever phone I had at that time,

Page 284

1 it would have been in there.  But a lot of
2 times, to be honest with you, he has called
3 me, asked me for money and I bullshitted and
4 didn't send him money.  So I don't know if
5 it's one of them times that, you know, I
6 bullshitted him and didn't send him money.
7    Q.   My question was about text messages
8 asking about sending cash.
9    A.   If I had any text messages from
10 Rakiya pertaining to Mr. Holder, I would have
11 gave it to you, but that -- like you said,
12 that was, what, December of -- what was the
13 date on there?
14    Q.   2021.
15    A.   December 2021.  What's today?
16    Q.   It's July 2022.
17    A.   It's July 2022.  Unfortunately, I've
18 had five phones in between that time, and I
19 don't think I'll be able to produce anything
20 from a phone five phones ago that I don't
21 have.  And a lot of my phones is prepaid.  I
22 lose them, break them.  But any -- I searched
23 high and low to try to get --
24    Q.   Do you have any of the broken phones

Page 285

1 in your possession?
2    A.   You asked me earlier.  I'm sorry.  I
3 only have one phone in my possession, the
4 phone that I have currently.  Any other phone
5 that was broken or lost, I don't have.  I
6 didn't see the use of keeping a broke phone.
7    Q.   Okay.  Has Monique ever met with
8 Mr. Paladino in prison?
9    A.   Not that I know of.
10    Q.   You have no knowledge of her having
11 visited Mr. Paladino on December 31st, 2017
12 with your son?
13    A.   Fuck, no.
14         MR. VAN NAARDEN:  Hey, watch
15    it.
16         THE WITNESS:  Excuse me.  I'm
17    sorry.
18 BY MS. ROSENTHAL:
19    Q.   Okay.  I want to play -- mark as
20 Exhibit -- we're up to --
21         MS. ROSENTHAL:  Which exhibit
22    are we up to?
23         COURT REPORTER:  17.
24         MS. ROSENTHAL:  17.  I'm going

Page 286

1    to keep -- I'm going to keep a list to
2    try to be better.
3         It's a call from Robert Outlaw
4    to 215-669-9861 on December 30, 2017 at
5    18:34:24.  He would have been
6    incarcerated in the Pennsylvania
7    Department of Corrections.  Then the clip
8    is from minute 1:57 to 3:11.
9         (Audio being played.)
10 BY MS. ROSENTHAL:
11    Q.   I don't know what's going on with
12 the audio when it's the other person talking,
13 but I don't think that that -- I'm not going
14 to ask you questions about that part.
15         Do you recognize your voice on the
16 call?
17    A.   Yeah, I recognize my voice on the
18 call.
19    Q.   You were the one who was primarily
20 doing the speaking in the louder voice?
21    A.   Yes.
22    Q.   Do you know who you were talking to?
23    A.   Yes.  I was talking to my sister.
24    Q.   Do you remember that conversation?

Page 287

```
 1      A.   Not really, but vaguely.
 2      Q.   Okay.  And I'm just going to ask you
 3 first just to confirm just statements, not to
 4 actually explain but just to confirm
 5 statements you made on the call.
 6          Do you say that Nikki is a fucking
 7 weirdo?
 8      A.   No.  I don't believe I said Nikki.
 9 Can you play that back for me?
10          (Audio being played.)
11      Q.   I stand corrected, having listened
12 to the call.  You say she is fucking weirdo.
13 Do you understand -- or is that what you said?
14      A.   Yeah.
15      Q.   Do you understand you were referring
16 to your wife, Monique?
17      A.   No.  I don't believe I was, no.
18      Q.   You don't believe you were.  Who do
19 you believe you were referring to?
20      A.   I don't know.  I would have to hear
21 the whole conversation.  Can you play the
22 whole conversation?
23      Q.   Yes.  We'll have to go off the
24 record for me to find it.  It will take --
```

Page 288

```
 1      A.   Never mind.
 2      Q.   But if you're not able to confirm
 3 that it's Monique, we may have no choice.
 4      A.   There's another girl that I know.
 5 Her name is Nicosia.  I call her Nikki too.
 6      Q.   Did Nicosia visit on a weekly basis
 7 and sit for three hours?
 8      A.   Yeah.  Look at my visiting list.
 9      Q.   That's for a different jail, but can
10 you --
11      A.   You got my visiting list?
12      Q.   No.  Can you just hold on.  I may be
13 able to get you the clip quicker.  That
14 visiting list is for when you were at the
15 Philadelphia Department of Corrections.
16      A.   Right.
17          MS. ROSENTHAL:  All right.
18      I'll mark this as, I guess -- I guess
19      I'll have to mark it as a separate
20      exhibit, 18, the entire call from
21      12/30/2017 from Mr. Outlaw to
22      215-669-9861.
23          (Audio being played.)
24 BY MS. ROSENTHAL:
```

Page 289

```
 1      Q.   Okay.  I've now played the full
 2 call.  Did you hear -- first of all, was that
 3 a conversation of you talking to your sister
 4 Shanita?
 5      A.   Yes.  That was a conversation of me
 6 talking to Shanita.
 7      Q.   And you called Nikki a fucking
 8 weirdo?
 9      A.   Yeah.  I may have, yeah.
10      Q.   And listening to the whole
11 conversation, are you able to confirm that
12 you're referring to Monique Solomon rather
13 than Nicosia Capers?
14      A.   I may have been referring to
15 Monique, yeah.
16      Q.   You may have been referring to
17 Monique or you were referring to Monique?
18      A.   I mean, I vaguely remember the call,
19 but from the nature of the conversation, I
20 feel like I might have been referring to
21 Monique.
22      Q.   Okay.  Well, how sure are you?  Do
23 you need me to play another call to confirm
24 that or are you sure?
```

Page 290

```
 1      A.   No.  I mean, I probably was talking
 2 about Monique.
 3      Q.   Okay.  And Shanita asked, did she do
 4 what she was supposed to do today, and you say
 5 no; is that correct?
 6      A.   Yeah.  That's what it said.
 7      Q.   And you were referring to her
 8 visiting Paladino?
 9      A.   No.  I was referring to -- I don't
10 know, but Monique is my secretary.  Monique
11 went to the DA Office for me before.  Monique,
12 she's done a lot.  Like I had Monique giving
13 out flyers, going to the District Attorney
14 Office, going to copy files, going to see my
15 lawyer, and if she ain't doing what I need her
16 to do, I will get agitated.
17      Q.   Okay.  Just to get everyone out here
18 as soon as possible, if I just ask a short,
19 direct question about whether you were
20 referring to her visiting Paladino, if the
21 answer is no, you can say no, but I don't need
22 a more -- a greater elaboration.
23          It's just a -- do you specifically
24 recall what it was that she was supposed to
```

Page 291

1  do?
2      A.    No, but I just know it was something
3  concerning my case probably, because I was
4  upset.  But specifically what I wanted her to
5  do, I didn't get into depth exactly what I
6  wanted her to do.  It's probably a hundred
7  more conversations like that.
8      Q.    And --
9      A.    So I always had a gripe with Monique
10  about, you know, certain things concerning me
11  helping prove my innocence.
12      Q.    And you say that she's supposed to
13  do it tomorrow, not that day?
14      A.    That's what it sound like, yeah.
15      Q.    And I'll represent to you that the
16  Paladino's visiting log from the Department of
17  Corrections shows that there is a visit from
18  Ms. Solomon-Outlaw and your son, and she also
19  confirmed that during her deposition Friday.
20          Do you have any reason to dispute
21  that she visited Paladino on December 31st
22  other than the fact that you testified you
23  weren't aware of it?
24      A.    Yeah.  I don't know nothing about

Page 292

1  the visit.  I don't know nothing about my son
2  going up there.  I can't confirm that.  But
3  Monique, she was supposed to do a lot of
4  things for me and specifically concerning my
5  case.  She could have detoured and went there.
6  I don't know.
7      Q.    So it's just a coincidence that
8  you're saying that she's supposed to do
9  something for you that next day and she goes
10  to visit Paladino the next day?
11      A.    Yeah.  Monique always did stuff
12  concerning my case.  I told you, all the
13  affidavits went through Monique.
14      Q.    Yeah.  And so on the call you say,
15  listen, listen, this is everything, she wants
16  to ride up here every week, two hours here,
17  two hours back on a weekly basis and sit here
18  for three hours, but if I'm asking you to do
19  something to help me get out of here and you
20  don't want to do it, that sounds weird to me,
21  especially if it's something that's going to
22  get me the fuck out of here.
23          I'm not sure that's a verbatim
24  transcript, but does that generally paraphrase

Page 293

1  what you were saying?
2          MR. VAN NAARDEN:  Objection.
3          THE WITNESS:  I don't remember
4      exactly what I'm saying.  The only
5      recollection of it is when you play it
6      for me.  So I only confirm it when I hear
7      it, but --
8  BY MS. ROSENTHAL:
9      Q.    Yeah.  The problem is --
10      A.    -- you reading it to me, I can't
11  confirm it in that manner.  It sound like some
12  things may been missing out of there.
13      Q.    Okay.  The problem is that --
14      A.    But --
15      Q.    -- it won't be in the transcript, so
16  I'm just trying to get a description.
17      A.    But if I was sending Monique and my
18  son somewhere, I would have said Monique and
19  my son in the phone call.
20      Q.    Okay.  Let me just phrase it in more
21  general terms, and let me know if I'm
22  paraphrasing it correctly.
23          You're expressing frustration that
24  she rides on a weekly basis, it takes her

Page 294

1  multiple hours to get there, she spends
2  multiple hours there, but you were asking her
3  to do something to help you get out of jail
4  and she doesn't want to do it, and you were
5  upset because it was something that was going
6  to get you out of jail?
7          MR. VAN NAARDEN:  Objection.
8          THE WITNESS:  No.  I don't know
9      exactly what it was.  Any mission I had
10      Monique on was to fight for my freedom.
11      So when I sent her to the DA Office, it
12      was to see if she could get the file that
13      possibly I could find something in there
14      that can help me be released from prison.
15  BY MS. ROSENTHAL:
16      Q.    Okay.
17      A.    When I told her to hand out flyers,
18  it was for my fight for my freedom to possibly
19  help me get out of jail.  When I told her to
20  do anything, go to my lawyer office, go take
21  Ed the file or do anything, it was all about
22  me being released from prison.
23      Q.    And you --
24      A.    So I can't pinpoint exactly what I

Page 295

1  was talking about on that phone conversation.
2      Q.   Okay.
3      A.   But I didn't say specifically go see
4  anybody and take my son, you and my son go see
5  somebody.
6      Q.   Okay.  And you say don't come --
7  that Monique shouldn't come to see you until
8  she does what you need her to do; is that
9  right?
10     A.   You have to play it back for me
11 again.
12          (Audio being played.)
13     Q.   I'm going to move towards the end of
14 the call since that's what you wanted to ask.
15          (Audio being played.)
16          So does that refresh your
17 recollection that you said, bitch, don't come
18 see me until you do what you're supposed to
19 do?
20     A.   I was speaking to my sister in
21 frustration about my wife.  I didn't tell, you
22 know -- I was just speaking with my sister
23 about what I was going through and, you know,
24 I was frustrated about, you know, my struggle

Page 296

1  to get out of jail.  But as far as exactly
2  what I wanted Monique to do, I ain't tell her
3  to go see nobody in that phone call.
4      Q.   Okay.  That wasn't my question.
5           I want to show you a document that
6  I'm going to mark as Exhibit-18.
7           COURT REPORTER:  19.
8           MS. ROSENTHAL:  19.
9                  - - -
10          (Exhibit Outlaw-19 marked for
11     identification by counsel.)
12                 - - -
13 BY MS. ROSENTHAL:
14     Q.   It's a four-page document Bates
15 marked CITY020310 to CITY020313.
16          Would you agree with me that this is
17 an e-mail string between Edward Foster and
18 Monique concerning your case?
19     A.   I have to read it first before I
20 agree with anything.
21     Q.   Sure.  Go ahead.
22     A.   Give me a minute.
23          (Pause.)
24     Q.   So I'll give you a chance to look at

Page 297

1  it again, and you should certainly feel free
2  to read it over, but my only question right
3  now is whether this is an e-mail string
4  between Ed Foster and Monique in January 2018
5  about your case for purposes of describing the
6  document for the record?
7      A.   What you saying right here?  I mean,
8  I never seen this e-mail before, but from the
9  looks of it, at the top of it it say from
10 Edward Foster to Monique, and that's Monique's
11 e-mail.
12     Q.   Okay.
13     A.   But I never seen this before.
14     Q.   Okay.  I want to direct your
15 attention to the page that's Bates marked
16 CITY020311 at the bottom.  It's the page where
17 it looks like a letter is written with your
18 letterhead at the top.
19          Do you see what I'm talking about?
20 It looks like it's a letter that's typed up
21 from you inserted into the e-mail on
22 January 9, 2018?
23     A.   I told you before I never seen this.
24     Q.   Okay.  I'm just asking if you see

Page 298

1  the part of the page that I'm talking about.
2      A.   Yeah.  I see exactly what you're
3  talking about.
4      Q.   Okay.  And so are you -- based on
5  what you just said, is it your testimony that
6  this appears to be a letter from you, but you
7  don't believe that you were the one who
8  authored the letter?
9      A.   No.  My testimony is that I never
10 seen this before, and this -- I didn't e-mail
11 this to Ed.
12     Q.   Okay.  Disregarding the remainder of
13 the e-mail, the follow-up, do you see the part
14 of the e-mail that begins on Page CITY020311
15 and it looks like it's an e-mail that Monique
16 wrote that includes a letter and it ends
17 "sincerely, Robert Outlaw" on CITY020312?
18 Have you seen the substance of that letter
19 before and did you author it?
20     A.   Monique wrote this.  I cannot
21 confirm or deny anything that Monique wrote.
22 You would have to ask Monique about her
23 correspondence with Ed.
24     Q.   I'm not -- my question is whether

Page 299

1  you wrote this to give to Monique to pass
2  along to Ed?
3      A.   I don't remember seeing this before.
4      Q.   Okay.
5      A.   I don't remember.
6      Q.   Does it read like your writing?
7      A.   I don't know.  I didn't send this to
8  Ed.  Monique sent this, so you would have to
9  ask her.  But like I told you before, I sent
10 Monique a lot of stuff pertaining to my case,
11 so -- but you're asking me to confirm if this
12 is me.  I didn't send this to nobody to
13 confirm if this is me or not.  I don't
14 remember this.
15     Q.   Well, you didn't --
16     A.   I didn't send it to Ed, so --
17     Q.   You didn't --
18     A.   -- I can't confirm it.
19     Q.   You didn't have access to secure
20 e-mail in prison, right?
21     A.   No.
22     Q.   So you couldn't have sent this
23 directly?
24     A.   Right.

Page 300

1      Q.   Okay.  So it may be the case that
2  you wrote or drafted the substance of it and
3  asked Monique to send it over e-mail?  That's
4  what I'm trying to understand.  Is this her
5  writing or yours?
6      A.   I'm telling you that --
7      Q.   You don't know?
8      A.   -- I'm not familiar with this.
9      Q.   Okay.
10     A.   And you would have to ask Monique in
11 depth about this document that she sent to Ed.
12     Q.   Okay.
13     A.   I can't answer that question for
14 you.
15     Q.   Do you see -- I understand that you
16 don't recall this letter, but do you see that
17 that letter that we're talking about, the
18 first paragraph, the last sentence, it says,
19 "From my understanding, Paladino can confirm
20 her presence and I would like to subpoena him
21 for my upcoming evidentiary hearing."
22          Do you see that line?
23     A.   I see everything that you're talking
24 about, but like I told you before --

Page 301

1      Q.   I'm just asking if you see that
2  line.  I'm just directing your attention so I
3  can ask follow-up questions --
4      A.   I apologize.
5      Q.   -- about it.
6      A.   Yes, I see it.
7      Q.   Okay.
8      A.   I'm sorry.
9      Q.   And do you understand "her presence"
10 to being Katima Jackson?
11     A.   I'm not sure.
12     Q.   The letter -- and the reason -- just
13 so you know, the reason I'm asking these
14 introductory questions is because the
15 transcript, it will be easier to follow if
16 they understand what we're talking about.
17          The first paragraph, do you agree it
18 reads, "I would like for you to contact
19 Paladino and see if you can verify Ms.
20 Jackson's presence.  Paladino was the
21 Commonwealth star witness and if he can
22 support Ms. Jackson's testimony I believe that
23 he would be very beneficial.  From my
24 understanding Paladino can confirm her

Page 302

1  presence and I would like to subpoena him for
2  my upcoming hearing.  Or you could write him
3  and verify my theory first"?
4          Does it make sense that "her
5  presence" would refer to Ms. Jackson?
6      A.   I didn't write this, so I can't tell
7  you what was meant by anything in here, so --
8      Q.   Okay.
9      A.   Because this is not from me, I can't
10 tell you what the mindset of it was when it
11 was sent to Ed.
12     Q.   Did you understand as of January 9,
13 2018 that Paladino could confirm Katima
14 Jackson's presence at the scene of the Jamal
15 Kelly shooting?
16     A.   I don't know.
17     Q.   You can't remember or --
18     A.   I don't know.
19     Q.   Sorry.  I don't understand that
20 response.
21     A.   I'm saying I spent a lot of time in
22 jail.  You're asking me did I know that
23 Paladino can confirm Katima Jackson on this
24 date, and I'm telling you I don't know.

Page 303

```
1    Q.    You can't recall?
2    A.    Yeah.  I don't know.
3    Q.    And this was just a little over a
4  week after the phone call that we listened to
5  earlier and your wife and her son went to go
6  visit Mr. Paladino.  You have no knowledge of
7  that visit or of whether they discussed
8  whether Paladino could confirm Katima
9  Jackson's presence at that visit?
10   A.    I was not on the visit with
11 Paladino, my wife and you saying my son to
12 tell you anything about that visit.
13   Q.    Do you see in the second paragraph
14 it says, "Commonwealth witness Lamar Rodgers
15 and Jabril Jones signed affidavits confirming
16 her presence"?
17   A.    Like I said, I didn't write this,
18 so --
19   Q.    I'm asking --
20   A.    -- I see what you saying, but...
21   Q.    Okay.  Are you aware of any
22 affidavit that Jabril Jones signed at any
23 point in time confirming Katima Jackson's
24 presence?
```

Page 304

```
1    A.    I'm aware that Jabril signed an
2  affidavit at some point.  The exact nature of
3  what he signed, I don't remember.  I just
4  remember it was beneficial to me, but exactly
5  what he said, I would have to see it to tell
6  you.
7    Q.    I will tell you that I don't believe
8  that any affidavit from Jabril Jones has been
9  produced to us.  Do you know when, around what
10 time it was that he signed the affidavit?
11   A.    I'm not sure.  I would have to
12 check.
13   Q.    Check what?
14   A.    I would have to check with Monique.
15   Q.    Why would Monique know?
16   A.    Because Monique was my legs when I
17 was in jail and --
18   Q.    Well, didn't Shanita Starr, for
19 example, talk to some witnesses as well?
20   A.    No, not necessarily Shanita, but my
21 sister Annette.
22   Q.    What about Kareem Jackson -- or
23 Kareem Greenwood?
24   A.    What do you mean?
```

Page 305

```
1    Q.    Did he go talk to any witnesses?
2    A.    Not that I know of, no.
3    Q.    Okay.  But you don't know who has
4  possession of that affidavit, if anyone has
5  possession of that affidavit at this time?
6    A.    I'm not sure.  I'm not sure, and
7  like honestly like -- I don't know.  I'm not
8  even sure.  You're making me second guess the
9  whole thing now, but...
10   Q.    You're sure that he wrote an
11 affidavit or you're not sure?
12   A.    Yeah, I'm not sure once you said
13 that, because everything I had, I disclosed to
14 you.  So if I got an affidavit from him, you
15 got it.
16   Q.    Sorry.  It's my understanding you
17 didn't have anything, so there was nothing for
18 you to disclose.
19   A.    Yeah.  I'm saying you asked me about
20 affidavit from Jabril Jones, and I said I
21 think he might have signed one somewhere along
22 the line, and you said do I remember the
23 nature of it.  I said I don't know.  I think
24 it may have been beneficial to me.  But then
```

Page 306

```
1  we went back and forth, but I'm telling you
2  that if I had an affidavit from Jabril, I
3  disclosed everything.  Everything that I had,
4  my lawyer had, and my lawyer disclosed
5  everything that he had.
6          Now, I will check with my wife,
7  confer with her to see if Jabril gave an
8  affidavit, where it's at and so forth and so
9  on, and if it's around, then I'll give it to
10 you.
11   Q.    So you're saying that every piece of
12 paper that you received that in any way was
13 related to your case was given to Ed Foster?
14   A.    Yes.
15   Q.    Do you know if that was Monique's
16 practice?
17   A.    I don't know what Monique practice
18 were -- was exactly, but --
19   Q.    Okay.
20   A.    -- Monique is -- she's --
21   Q.    But you recall there being an
22 affidavit from him?
23   A.    Vaguely.  I know a lot of people --
24 I had so many affidavits, so many papers on my
```

Page 307

1 case that I think Jabril did sign an
2 affidavit, if I'm not mistaken.
3    Q.   So it's impossible to even really
4 confirm who signed affidavits?
5    A.   No.  I remember Christopher Holder,
6 he signed an affidavit.  Wesley Harmon signed
7 an affidavit.  Lamar Rodgers, I believe he
8 signed an affidavit.  Derrick Alston may have.
9    Q.   I mean, the full universe of people
10 who signed affidavits.
11    A.   Yeah.
12    Q.   You don't have a list?
13    A.   That's who I remember firsthand.
14    Q.   Okay.  I want to ask you about Eric
15 Lee.  When is the last time you spoke to Eric
16 Lee?
17    A.   I don't have a line of communication
18 with Eric Lee.
19    Q.   My question is, when is the last
20 time you've spoken to him?
21    A.   I don't know.  I really don't know.
22    Q.   Give me your best guess.
23    A.   I'm not sure.
24    Q.   Before COVID?

Page 308

1    A.   I'm not sure.  Since I've been home,
2 I ran into Eric Lee a couple times.
3    Q.   Where?
4    A.   In the streets of Philly.  Eric Lee
5 lives in the Germantown area.
6    Q.   Did you discuss anything related to
7 your conviction or this case?
8    A.   No.  We didn't have a conversation.
9 I seen him.  He spoke to me, and I got far
10 away from Eric Lee as I could.
11    Q.   During your post-conviction
12 proceedings, you wanted an affidavit from Eric
13 Lee as well to confirm that he saw Katima
14 Jackson; is that correct?
15    A.   During my legal proceedings, I
16 wanted an affidavit from anybody involved in
17 the case that could help prove my innocence.
18 I wanted an affidavit from every witness to
19 tell the truth.
20    Q.   And you thought that that was so
21 important because it was your belief that the
22 reason the PCRA petition with respect to
23 Katima Jackson was denied the first time was
24 because there weren't other witnesses who

Page 309

1 would confirm her presence; is that correct?
2         MR. VAN NAARDEN:  Objection.
3         THE WITNESS:  No, that's not
4    correct.
5 BY MS. ROSENTHAL:
6    Q.   You don't remember discussing that
7 on any phone calls?
8    A.   I don't know.  I might have said
9 that, but I don't know.
10    Q.   So sitting here today, you don't
11 believe that the reason the first petition was
12 denied was because -- by the "first petition,"
13 I mean the petition where you first raised
14 Katima Jackson -- you don't believe was denied
15 because there was no other witnesses who were
16 confirming her presence?
17    A.   I believe that played a role and I
18 also believe that Judge Rogers wasn't the best
19 judge.
20         MS. ROSENTHAL:  I want to mark
21    as Exhibit-18 --
22         COURT REPORTER:  20.
23         MS. ROSENTHAL:  -- 20 a call
24    that Robert -- or I keep saying Robert

Page 310

1    Outlaw, because that's how you're
2    identified on the prison calls -- that
3    Donald Outlaw makes to 215-669-9861 at --
4    one second.  I'm sorry.
5         THE WITNESS:  Is there any
6    question that's being imposed right now?
7         MS. ROSENTHAL:  No.  I'm
8    just looking --
9         THE WITNESS:  Can I take a
10    slight break real quick?
11         MS. ROSENTHAL:  Yeah.
12         Can we go off the record.
13         VIDEO TECHNICIAN:  We're now
14    going off record.  The time now is 7:39
15    p.m.
16              - - -
17         (Short recess.)
18              - - -
19         VIDEO TECHNICIAN:  We're now
20    back on record.  The time is 7:44 p.m.
21         MS. ROSENTHAL:  Right before we
22    went off the record, I was about to play
23    an audio clip that I was marking as
24    Exhibit-20, Outlaw Exhibit-20.  It's a

Page 311

```
 1   telephone call from Donald Outlaw on
 2   March 11, 2018 at 18:45:50 to the
 3   telephone number 215-669-9861.  The clip
 4   starts at 6:51 and ends at 7:12.
 5              (Audio being played.)
 6              MS. ROSENTHAL:  Sorry.  Things
 7   are playing -- sorry.  Something weird is
 8   going on.
 9              (Audio being played.)
10   BY MS. ROSENTHAL:
11        Q.   Hold on one second.
12             Again, the audio is not great, but
13   do you know whose number you were calling,
14   215-669-9861?  Is that Shanita's number?
15        A.   That's my sister phone number.
16        Q.   And was it your voice on the phone?
17        A.   I couldn't tell.  It was messing up.
18        Q.   You couldn't tell if it was your
19   voice, the loud talking?
20             I'll play it again for you.  I
21   understand that the other voice was quieter,
22   but I have no idea what's going on with this
23   audio.
24             (Audio being played.)
```

Page 312

```
 1             Do you recognize your voice?
 2        A.   Yes, I recognize my voice.
 3        Q.   Okay.  And am I correct that you say
 4   to Shanita, holla at E for me so I can finish
 5   the lineup with this situation?
 6        A.   Yeah.  That's what was said.
 7        Q.   Sorry?
 8        A.   Yeah.  That's what was said.
 9        Q.   Is that what you said?
10        A.   Yeah, I said that.
11        Q.   Do you recall this conversation?
12        A.   No, I don't recall the conversation.
13        Q.   Do you know if you're referring to
14   Eric Lee when you said holla at E for me?
15        A.   No.  I think I might have been
16   referring to Eric Mundy.  Eric Mundy paid for
17   my attorney.  He paid for Edward Foster.
18        Q.   So what did you mean then by, I can
19   finish -- so we can finish the lineup with the
20   situation?
21        A.   Probably paying for the rest of my
22   attorney.
23        Q.   The rest of your attorney would be a
24   lineup?
```

Page 313

```
 1        A.   I mean, yeah, depending on how much
 2   I owed him.
 3        Q.   Well, isn't it the case in spring of
 4   2018 you were in the process of obtaining an
 5   affidavit from and did obtain an affidavit
 6   from virtually every witness verifying Katima
 7   Jackson's presence at the scene?
 8        A.   I searched high and low to verify
 9   Katima Jackson's presence.  I did everything I
10   could.
11        Q.   So you weren't referring to
12   finishing the lineup, meaning Eric Lee, you
13   needed to finish the lineup of the witnesses?
14        A.   No.  My sister baby father name is
15   Eric Mundy, and we call him E.
16        Q.   Is it possible that you could have
17   been referring to Eric Lee finishing the
18   lineup?
19        A.   I seriously doubt it.
20        Q.   I'm going to play -- I'm going to
21   mark as Exhibit-21 the full telephone -- well,
22   actually it's -- it's too long.  I'm going to
23   play another clip from that same call starting
24   at minute 13:17 until the end.  Just bear with
```

Page 314

```
 1   me while I tee it up.
 2              MR. VAN NAARDEN:  Just note my
 3        objection to like cherry-picking aspects
 4        of these calls and then asking him to put
 5        it in context.
 6              MS. ROSENTHAL:  Okay.  I note
 7        your objection.
 8              I'll try one more time before
 9        moving on.
10              Here, I'll just move on from
11        that one.
12   BY MS. ROSENTHAL:
13        Q.   And is it true that when -- that you
14   did eventually get an affidavit from Eric Lee?
15        A.   I got an affidavit from a bunch of
16   different people.  I'm not exactly sure
17   exactly.  Like they all signed affidavits at
18   some point, so...
19        Q.   My question is whether you know
20   whether you ultimately got an affidavit from
21   Eric Lee?
22        A.   I'm saying they all signed
23   affidavits.  So all the witnesses in the case
24   had signed affidavits before and after the
```

Page 315

1  case.
2     Q.    What do you mean all witnesses
3  signed affidavits before the case?
4     A.    Before I went to trial, I believe
5  they all recanted, and after I got found
6  guilty, they all recanted.
7     Q.    They all signed affidavits before
8  you went to trial?
9     A.    I believe they did.
10    Q.    Those are affidavits they gave to
11 your attorney?
12    A.    Either they went to my attorney or
13 in some way, shape, form, or fashion they
14 recanted before and after trial.
15    Q.    Okay.  I'm asking if they recanted
16 in writing before trial?
17    A.    I'm not sure what my lawyers
18 recorded of the recantation, but before I went
19 to trial, Lamar Rodgers went to Mark
20 Greenberg's office and he disavowed his
21 statement.
22    Q.    Okay.
23    A.    And he testified.  Before that,
24 Derrick Alston, he went to my lawyer office,

Page 316

1  recanted --
2     Q.    I was asking about your statement
3  that they all signed affidavits.  Did you
4  understand the affidavit is a written
5  statement?
6     A.    Yeah.  I'm just saying in some form
7  of recantation, they did it before and after
8  trial.  It wasn't nothing new to me.
9     Q.    And do you know that -- or isn't it
10 true that Wesley Harmon brought Eric Lee into
11 Ed Foster's office to have the statement
12 signed?
13    A.    I'm not sure.  You would have to ask
14 Eric Lee how he got there.
15    Q.    Would that be surprising to you if
16 it was true?
17    A.    No, it wouldn't be surprising.
18    Q.    Why wouldn't it be surprising?
19    A.    Because they know each other.
20    Q.    Was Wesley Harmon helping you with
21 talking to witnesses and getting affidavits?
22    A.    Wesley Harmon was in jail for a long
23 time, so --
24    Q.    My question is whether he was

Page 317

1  helping you with getting affidavits, talking
2  to witnesses?
3     A.    I don't remember nothing like that,
4  but...
5     Q.    Okay.  I'm going to mark as
6  Exhibit-22 a document Bates stamped CITY018726
7  to CITY018732, and I'm only going to be asking
8  very specific questions, not about the entire
9  document.
10                  -  -  -
11             (Exhibit Outlaw-22 marked for
12         identification by counsel.)
13                  -  -  -
14 BY MS. ROSENTHAL:
15    Q.    This is labeled as an Inmate Money
16 Transfer Deposit History that pertains to you
17 that the Department of Corrections produced to
18 us covering the date range January 1st, 2008
19 to June 15th, 2022.
20          I want to ask you at the bottom of
21 the -- well, I want to ask you about a couple
22 of entries.  Do you see an entry on the first
23 page Bates marked CITY018726 from Floyd Odom?
24 It's April 5th, 2011 -- or sorry; April 6th,

Page 318

1  2011.  Do you see that?
2     A.    You said April 6th?
3     Q.    Do you see the second column has the
4  date?
5     A.    This is like in real small.
6     Q.    Yes.  I apologize.
7          It says April 6, 2011, Floyd Odom,
8  255 Rosemar Street?
9     A.    Yeah.  This is real small.  Yeah, I
10 see it.
11    Q.    My question is, who is Floyd Odom?
12    A.    I don't know.
13    Q.    You have no idea who Floyd Odom is?
14    A.    No.
15    Q.    No idea why he was putting money in
16 your books?
17    A.    No, but I see that this is my
18 sister's address.
19    Q.    Oh, she --
20    A.    So it could have been a friend of
21 hers that sent it.
22    Q.    Which sister?
23    A.    Shanita.
24    Q.    Was living at 225 Rosemar Street at

Page 319

```
 1  the time?
 2      A.  Yeah.
 3      Q.  Okay.  Then four lines from the
 4  bottom, do you see there's an entry --
 5      A.  Was it $16 that was sent?
 6      Q.  Yes.  I believe that was $16.
 7          Do you see four lines from the
 8  bottom there's an entry on June 18, 2011 from
 9  Dorian Clark at 947 East Chelten Avenue for
10  $300?
11      A.  Yeah, I see that.
12      Q.  Who is Dorian Clark?
13      A.  I don't know who that is either.
14      Q.  Do you recognize the address 947
15  East Chelten Avenue?
16      A.  I'm not sure of that address, no.
17      Q.  Is that an address that -- do you
18  know if that's an address that Monique or any
19  of her family members have lived in at any
20  time?
21      A.  I'm not sure.  Since I met Monique,
22  she stayed at 3708 Schuylkill Falls Lane and
23  241 Cambridge Road.
24      Q.  What about her mother?
```

Page 320

```
 1      A.  I don't know her mother's address.
 2      Q.  And you don't know anyone by the
 3  name of Dorian Clark?
 4      A.  Not offhand, no.
 5      Q.  There's also a number of entries
 6  throughout this from someone named Muneerah
 7  Outlaw.  Do you know who that is?  Would that
 8  be Monique or someone else?
 9      A.  Muneerah Outlaw?
10      Q.  If you look at the second page, for
11  example, CITY018727.
12      A.  I'm not a hundred percent sure.
13      Q.  Is that how you spell Monique's
14  Islamic name?
15      A.  No.  Her Islamic name is
16  M-U-N-I-R-A-H.
17      Q.  So the same pronunciation but
18  different spelling?
19      A.  Yeah, pretty much.
20          MR. VAN NAARDEN:  Could we get
21      a time check?  I have over seven hours.
22          VIDEO TECHNICIAN:  Almost.
23          MS. ROSENTHAL:  How many
24      minutes?
```

Page 321

```
 1          VIDEO TECHNICIAN:  You got
 2      another 30.
 3          MS. ROSENTHAL:  So 8:30 we'll
 4      be done.
 5  BY MS. ROSENTHAL:
 6      Q.  You have no -- were you aware of
 7  someone who was placing money -- would you
 8  agree with me that Muneerah Outlaw's name
 9  appears many times in this document?
10      A.  Yeah, I agree with that.
11      Q.  Do you remember being aware that
12  someone named Muneerah Outlaw was placing
13  frequent deposits on your books?
14      A.  It was ten years ago.  I don't
15  remember, but I got a lot of relatives with
16  the last name Outlaw.
17      Q.  Okay.  So you don't remember
18  anything one way or another?
19      A.  I mean, you asking me about some
20  money that was sent ten years ago and sent to
21  me by one of my relatives.  Like I'm not sure.
22      Q.  Okay.  If you look at Page
23  CITY018732, the last page.
24      A.  See, the issue with this was like,
```

Page 322

```
 1  to be all the way honest with you, when people
 2  used to send money orders to me, a lot of
 3  times they would just put any name on the
 4  money order and I wouldn't know exactly who
 5  was who --
 6      Q.  Right.
 7      A.  -- sometimes when the money was
 8  getting sent.  So if you asking me who this
 9  person was, who this person was, my sister
10  Annette, sometimes she would put Muneerah on
11  there.
12      Q.  Right.  I understand that with the
13  name, with the address.  There's also some
14  credit card information on here, but not that
15  that would necessarily --
16      A.  Yeah, but, you know, I have a sister
17  named Annette Outlaw that would send me money.
18  I have another sister named Michelle Outlaw
19  that would send me money, another sister named
20  Jennifer and so forth and so on, and they will
21  all send me money, and sometimes -- like, for
22  example, on the first page, it say Floyd
23  Mayweather.  Floyd Mayweather ain't never sent
24  me no money, but during the time of --
```

Page 323

1    Q.   Do you know who that is?
2    A.   I don't know who that is.  It say
3  Floyd Mayweather.
4             MR. VAN NAARDEN:  He's a boxer.
5             THE WITNESS:  It's the boxer,
6    but --
7  BY MS. ROSENTHAL:
8    Q.   Okay.
9    A.   But if you asking me to identify
10 this person, I can't.  I don't know who it is.
11 When they would send money orders, they
12 would -- nobody would always put they real
13 name on there, so...
14   Q.   Right.
15   A.   I can't tell you who sent it.
16   Q.   Have you sent money since leaving
17 prison to other inmates using the same system,
18 so you're familiar with it?
19   A.   No.  See, the thing now is the
20 system has evolved.  You can't send an inmate
21 a money order no more.  So you have to send
22 money through the JPay system.
23   Q.   Well, these say mobile online.
24   A.   Say what?

Page 324

1    Q.   I'm not sure these are -- what makes
2  you think these are money orders?  Oh, one
3  says a money order, but --
4    A.   Because it say -- a lot of these say
5  money orders over here.
6    Q.   Oh, but some don't say money orders?
7    A.   Yeah.  And it has changed since
8  then.  Since back then, anybody could send you
9  a money order with any name, so --
10   Q.   Okay.
11   A.   -- I don't know.
12   Q.   That was my question about that.
13        I want to show you another document
14 that I'm going to mark as --
15            MS. ROSENTHAL:  Sorry.  I'm
16   hopeful.  It's what exhibit?
17            COURT REPORTER:  23.
18 BY MS. ROSENTHAL:
19   Q.   -- Exhibit Outlaw-23.
20            -   -   -
21        (Exhibit Outlaw-23 marked for
22   identification by counsel.)
23            -   -   -
24 BY MS. ROSENTHAL:

Page 325

1    Q.   If you could put that aside.  We're
2  done with that document.
3         It's a document Bates marked
4  CITY014376 to CITY014381.  For the record,
5  this is a Court of Common Pleas Complaint in
6  the Court of Common Pleas of Delaware County
7  that's captioned Donald Outlaw v -- I'm not
8  sure how to pronounce the last name.  The
9  first name is R-A-C-H-E-A-L, last name
10 E-M-U-Z-E.
11        Are you familiar with this document,
12 Mr. Outlaw?
13   A.   No, I'm not familiar with this
14 document.
15   Q.   Would you agree that this appears to
16 be a Complaint of a lawsuit that's brought on
17 your behalf?
18   A.   Yes, I will agree with that.
19   Q.   Are you aware of such a lawsuit
20 having been brought on your behalf?
21   A.   I would have to look at it and read
22 it and tell you.
23   Q.   You wouldn't be --
24   A.   You show me a document and you just

Page 326

1  say this is a lawsuit on my behalf, am I aware
2  of this, and I didn't read it and I'm telling
3  you I didn't see it before.  So if you want me
4  to agree with this without reading it, I
5  can't.
6    Q.   Are you aware that you have a
7  personal injury lawsuit pending about a motor
8  vehicle accident that you sustained?
9    A.   Yes.
10   Q.   Do you have any other civil lawsuits
11 besides that lawsuit and this lawsuit that's
12 pending?
13   A.   Not that I know of, no.
14   Q.   Okay.  So feel free to take a look
15 at this document, but you're saying that --
16 well, have you read the Complaint in the
17 personal injury lawsuit?
18   A.   Not legally.  I let Monique handle
19 this type of stuff.
20   Q.   Are you aware that you signed a
21 verification attesting to the truth of
22 everything in the Complaint that was filed in
23 the docket with your signature?
24   A.   Yeah.  I mean, I looked at it, I

Page 327

1 signed it, but, you know --
2          MR. VAN NAARDEN:  Do you
3    have -- this one is signed by the
4    attorney.
5          MS. ROSENTHAL:  I don't have
6    the verification as an exhibit.  My
7    question is whether he's aware he signed
8    a verification.
9          MR. VAN NAARDEN:  You made it
10   sound like that he did.  You represented
11   to him that he did.
12         MS. ROSENTHAL:  He did.
13         MR. VAN NAARDEN:  You don't
14   have it?
15         MS. ROSENTHAL:  I don't have
16   it.
17         THE WITNESS:  I may have
18   signed --
19         MS. ROSENTHAL:  It's been
20   produced.
21         THE WITNESS:  I may have signed
22   something, but, you know, I rely on my
23   wife with a whole lot of things, so...
24 BY MS. ROSENTHAL:

Page 328

1    Q.   Would it be your practice if -- hold
2 on.  I may have it.  I may not.
3         Oh, yeah.  Why don't we mark this as
4 24.  It's a two-page document that is Bates
5 labeled CITY014382 to CITY014383.
6                   - - -
7              (Exhibit Outlaw-24 marked for
8    identification by counsel.)
9                   - - -
10 BY MS. ROSENTHAL:
11   Q.   It's another filing in the same
12 lawsuit that is titled Praecipe to Attach
13 Verification and then a verification that's
14 attached that states, "I, Donald Outlaw, am a
15 Plaintiff in the within action and state that
16 the facts set forth in the foregoing Pleadings
17 are true and correct to the best of my
18 knowledge, information and belief, and that
19 this statement is made subject to the
20 penalties of 18 PA C.S.A. 4904 relating to
21 unsworn falsification to authorities."
22        Is that your signature on that page?
23   A.   Yeah.  This is definitely my
24 signature.

Page 329

1    Q.   And was it your testimony that --
2 well, what is your -- I'm not sure what you
3 were saying when you were saying you rely on
4 Monique.
5    A.   I filed a lawsuit.  I got into a
6 motor vehicle accident.  I collided with
7 another car.  I went to the hospital.
8    Q.   I'm not asking about the details of
9 that.  I'm just asking about whether you --
10 given that you said you're not familiar with
11 the document, whether you were aware that you
12 signed a verification attesting to the truth
13 of the facts within it, and I believe you said
14 that you rely on Monique, and I was asking for
15 clarification.
16   A.   This is Monique's job.  Monique
17 works for the Law Office of Robert Katz.
18   Q.   So are you trying to say that when
19 you signed this, you're relying on her to say
20 that everything is true; you don't
21 independently read it and make a
22 determination?
23   A.   I didn't independently read the
24 whole exact thing, but Monique told me -- she

Page 330

1 came to me, was like, here go the stuff, sign
2 it real quick so I can get it back.  I signed
3 it and gave it back to her.
4    Q.   Well, I have a question.  You've
5 signed a verification for Interrogatory
6 responses in this case attesting to the truth
7 of the statements in the Interrogatory
8 responses under the penalty of perjury.  Did
9 you read those yourself or did you rely on
10 someone else in the same way?
11   A.   I read that myself.
12   Q.   Why would you read those yourself,
13 but you'd rely on Monique for this?
14   A.   I always rely on Monique.  This is
15 her job.  This is her profession.  This what
16 she do.  I don't have more knowledge about
17 this than Monique.
18   Q.   Well, she's not the one who was
19 involved in the car accident, was she?
20   A.   No, but Monique is my wife and where
21 I signed up at, she works there.  She has my
22 best interest at heart.
23   Q.   Well, you testified that Monique
24 knows a lot about the underlying criminal case

Page 331

1  in this matter and she's the one who maintains
2  all the documents, so --
3      A.   Yeah, she do.
4      Q.   You didn't take the same approach
5  where you relied on her to agree that
6  everything was accurate in the Interrogatory
7  responses?
8      A.   Because I didn't want to put too
9  much on Monique.  I was already getting her to
10 hunt down all the paperwork, so I figured the
11 least I could do is read it and sign it.
12     Q.   Okay.  But you didn't read this one,
13 you just signed it?
14     A.   Let me see.
15     Q.   I think you have the two exhibits.
16     A.   What, this right here?
17     Q.   You have the verification and then
18 you have the Complaint.
19     A.   Yeah.  I glanced over it.  I barely
20 read it, and I signed it.
21     Q.   Is that your normal practice when
22 you sign verifications like this?
23     A.   I don't really have a normal
24 practice, but if this is my wife's job where

Page 332

1  my wife work and I trust Monique the way I
2  trust Monique, of course if Monique say sign
3  something, I'm going to sign it.  I trust
4  Monique with my life.
5      Q.   Don't you understand that what you
6  were attesting to is the truth of the
7  underlying facts of the motor vehicle accident
8  and the damages you sustained and those are in
9  your exclusive knowledge?
10     A.   No, I didn't --
11          MR. VAN NAARDEN:  Objection.
12          THE WITNESS:  -- understand
13     that.  I signed it because I trusted
14     that, you know, this is my wife's job,
15     that what was in here was correct.
16 BY MS. ROSENTHAL:
17     Q.   You submitted a number of
18 declarations in your underlying criminal and
19 post-conviction case related to the Jamal
20 Kelly murder.  Were any of those declarations
21 drafted by Monique?
22     A.   I'm not understanding what you
23 saying.
24     Q.   Were any -- you attached a number of

Page 333

1  court filings, declarations in your Post
2  Conviction Relief Act petition and appellate
3  proceedings for the Jamal Kelly conviction.
4  Were any of those verifications drafted by
5  Monique?
6      A.   No, not that I know of.  Monique --
7  I was in jail.  Monique was on the streets.  A
8  lot of stuff I filed from jail I either did
9  myself or had the inmates at the law library
10 help me out, people that was familiar with the
11 law and things of that nature, but -- so
12 everything I signed from jail I read myself.
13     Q.   Okay.  I want to ask you --
14     A.   I signed it.
15     Q.   -- about the Complaint that we just
16 marked as an exhibit.  Do you see in Paragraph
17 3 it says -- do you see in Paragraph 3 and 4,
18 to paraphrase, there is allegations that you
19 were involved in a motor vehicle accident
20 November 18, 2020?
21     A.   Oh, yeah.  That do make sense,
22 because I was working at S.O.S. Restoration in
23 2020 of September, and on the paper it said
24 2019 of September and I told you I had stopped

Page 334

1  because of the car accident.  So I told you I
2  was only working there for a little bit of
3  time, and I think that this was a misprint of
4  the 2020 -- I mean, the 2019.
5      Q.   Okay.  My question is just whether
6  it is accurate that you were involved in a
7  motor vehicle accident that day.
8      A.   Oh, I'm sorry.  I apologize.  Yes,
9  this is -- I believe this is accurate.  On
10 November 18th I was in an accident, yes.
11     Q.   Can you turn to Page 4 of the
12 Complaint?  It's Bates marked CITY014380.
13     A.   Yes.
14     Q.   Am I correct that that paragraph
15 reads, "As a result of the negligence and
16 carelessness of the defendant as aforesaid,
17 the Plaintiff, Donald Outlaw, was caused to
18 sustain serious and permanent personal
19 injuries in, on and about her person
20 including, but not limited to:  C5-6
21 herniation with tear, C3-C5 protrusions with
22 tear, L4-L5 herniation, L3-L4 bulge with
23 indentation, cervical sprain and strain,
24 thoracic sprain and strain, lumbar sprain and

Page 335

1  strain, and possible injuries to the nerves,
2  muscles, ligaments, discs, bones, cartilage
3  and blood vessels thereof, possible
4  aggravation, activation, precipitation,
5  instigation, and aggravation of any
6  pre-existing asymptomatic conditions and other
7  severe injuries in, on and about her body, all
8  of which have caused her great pain, suffering
9  and inconvenience and have prevented her from
10 attending to her usual and customary
11 duties" --
12     A.   Hold up.  Who is "her"?
13     Q.   Let me finish reading.
14          -- "avocations and occupations, all
15 of which have caused him to sustain great
16 financial damage and a loss of earning and
17 earnings power, all of which may continue for
18 an indefinite time into the future and may be
19 permanent in nature and character."
20          Did I read that correctly?
21     A.   Yeah, you read it correctly, and
22 there's clearly some typos in here, because
23 it's referring to two different genders with
24 the pronoun.  It's one pronoun that's a her.

Page 336

1  It's three pronouns that's her.
2     Q.   I would agree.
3     A.   And there's another pronoun that's a
4  male gender of him.
5     Q.   It appears that --
6     A.   So it's clearly some type of mistake
7  in here.  Then on the next paragraph, it's
8  another pronoun that's her and she.
9     Q.   Maybe you should have read it
10 yourself before you signed that verification?
11          MR. VAN NAARDEN:  Objection.
12     Don't answer that.
13 BY MS. ROSENTHAL:
14     Q.   Okay.  I agree with you, the
15 pronouns seem to be a typographical error.
16 Otherwise, is the allegation, correct?
17     A.   I don't know.  I really have to read
18 this after, you know, they made a lot of
19 mistakes in here.
20     Q.   Okay.  Why don't I turn to -- thanks
21 for that answer.  I would turn to the last
22 page, CITY014381, Paragraph 14, "As a further
23 result of the negligence of the defendants
24 aforesaid, plaintiff was and may in the future

Page 337

1  be prevented from attending to her usual daily
2  duties and occupations, thereby causing her
3  great inconvenience and a loss of" --
4     A.   Causing her?
5     Q.   Yes.
6          -- "her great inconvenience and a
7  loss of earnings and earning capacity all to
8  his great loss and detriment."
9          There again appears to be an issue
10 with the pronouns, but would you agree with
11 the allegation?
12     A.   I don't agree with it because it's
13 making a lot of mistakes.  It was a lady that
14 I was in an accident with.  I don't know if
15 it's referring to her or me.  It keeps saying
16 her.  So the pronouns is clearly off.  So I
17 can't confirm that is right, because it's a
18 lot of typos, a lot of errors in here, so --
19     Q.   Okay.
20     A.   -- I can't confirm that this is
21 right.
22     Q.   Let me ask it this way:  As a result
23 of the car accident, is it correct that you
24 have sustained a loss of earnings and earning

Page 338

1  capacity to your great loss and detriment?
2     A.   From the accident, I have back
3  injuries.
4     Q.   And have you incurred wage losses
5  and a loss of earning power as a result?
6     A.   Excuse me?
7     Q.   Have you incurred wage losses and a
8  loss of earning power as a result?
9     A.   I don't understand what you mean by
10 that.
11     Q.   Well, I'm looking at --
12          VIDEO TECHNICIAN:  20 minutes.
13          MS. ROSENTHAL:  Yeah.  It was
14     8:30.
15          MR. VAN NAARDEN:  It's 8:17.
16     It's much less than that.  You're not
17     doing the time right.  I'm sorry to be
18     like a little bit critical, but like I'm
19     doing the time.  We started at --
20          MS. ROSENTHAL:  All right.
21     I'll wrap up within five minutes.
22          MR. VAN NAARDEN:  No.  You
23     should use all the time that you have,
24     and I have you having another 12 minutes.

Page 339

1      MS. ROSENTHAL:  I thought that
2  we decided at 8:30 it would be over.
3      MR. VAN NAARDEN:  Right.
4      MS. ROSENTHAL:  Oh, okay.
5      MR. VAN NAARDEN:  That's what
6  I'm saying.
7      MS. ROSENTHAL:  Oh, that's what
8  he said --
9      MR. VAN NAARDEN:  No.  He's
10  saying you have 20 minutes left.
11      VIDEO TECHNICIAN:  I said 20.
12      MS. ROSENTHAL:  Anyways, it
13  doesn't matter.  Let's not use it up.
14 BY MS. ROSENTHAL:
15      Q.  I'm referring to Paragraph 13.  Do
16 you see it says, "Plaintiff may have incurred
17 wage losses and loss of earning power"?
18         Have you sustained that as a result
19 of the car accident?
20      A.  Yeah, somewhat.  I lost my job
21 because of the accident.
22      Q.  Does it still -- do the injuries
23 cause you pain today?
24      A.  Yeah.  I mean, I had to get up a few

Page 340

1 times and stretch.  I told my attorney that,
2 you know, I have problems with my back, but
3 overall, yeah.
4      Q.  Do you still have -- does it still
5 interfere with your ability to work performing
6 certain jobs?
7      A.  No.  I'm starting to -- I work.  I
8 got a job now, so...
9      Q.  Where do you work?
10      A.  I believe I told you I work for
11 PAAN, the Philadelphia Anti-Drug/Anti-Violence
12 Network.
13      Q.  Wasn't that the case when this
14 lawsuit was filed?
15      A.  I'm not sure -- yeah.  I was working
16 at both jobs, but my back, I'm all right.
17      Q.  Okay.  So the allegations in this
18 Complaint you're saying need to be amended
19 because they're no longer correct?
20      A.  Well, what I'm saying is, I hurt my
21 back because of this accident.  I was out of
22 work for a long stretch of time.  I've been
23 through therapy.  I've been through
24 rehabilitation, and my back is getting better.

Page 341

1 That's what I'm telling you.
2      Q.  Okay.
3      A.  So --
4      Q.  Do you see that in Paragraph 11 it
5 says that detriment and loss and loss of
6 life's pleasures will continue for an
7 indefinite time in the future and may be
8 permanent in nature and character?
9         Is that no longer accurate?
10      A.  I mean, I don't know.  It depend on
11 what the future may hold.  I'm telling you now
12 my back is feeling better, but, you know, I
13 don't know.  I'm not a doctor.  I can't
14 diagnose how things will be in the future.
15 Again, I didn't put this together.
16      Q.  Well, do you believe you're entitled
17 to compensation for injuries you're presently
18 sustaining in relation to this lawsuit?
19      A.  I believe I'm entitled to have my
20 car paid for that was destroyed, and basically
21 that's that.
22      Q.  You don't believe you're entitled to
23 the compensation for the loss of wages and
24 earnings capacity that you're suing for?

Page 342

1      A.  As for what I'm entitled to, I left
2 that up to my attorney.  I don't know nothing
3 about the legal aspect of this lawsuit, and I
4 can't competently speak on you, know, anything
5 concerning this lawsuit, because I didn't file
6 it.  My attorney filed it.  And as you can
7 see, I didn't write this stuff in this paper.
8 They wrote it in there.  So for me to make an
9 intelligent decision on --
10      Q.  Okay.
11      A.  I can't do that.  I'm sorry.
12      Q.  I'm going to show you one -- we only
13 have ten minutes left.  I'm going to show you
14 one final document and then we will be done,
15 if I can find it myself.  Got a little
16 discombobulated.
17      MS. ROSENTHAL:  I'm marking
18   this as what exhibit number?
19      COURT REPORTER:  25.
20          - - -
21      (Exhibit Outlaw-25 marked for
22   identification by counsel.)
23          - - -
24 BY MS. ROSENTHAL:

Page 343

```
 1      Q.    Outlaw-25.  It's a document Bates
 2 labeled PLAINTIFF15317 to 15322.
 3          Do you recognize this document?
 4 There's a redaction on it for material that
 5 your attorneys are claiming is privileged, but
 6 other than that, do you recognize this
 7 document?
 8      A.    No.
 9      Q.    You don't recognize the letter
10 that's attached to the cover letter?
11      A.    I recognize this handwriting.  This
12 look like Paladino handwriting.  I studied his
13 handwriting for a long time, but as for a
14 letter on January 2nd, no.
15      Q.    You studied his handwriting for a
16 long time?  Why is that?
17      A.    This was my life.  I was serving a
18 life sentence for a crime I didn't commit.  I
19 had letters that he had wrote, and I used to
20 read his letters looking for inconsistencies.
21      Q.    In the handwriting?
22      A.    No.  I'm just saying in general.  I
23 read the letters that he wrote to -- he had
24 wrote me a letter before.  I read the letter
```

Page 344

```
 1 over 2,000 times.  I would be up at night
 2 reading --
 3      Q.    What did you do with the originals
 4 of those letters?
 5      A.    I never had the original of the
 6 letter.
 7      Q.    The letter that he sent you?
 8      A.    Whatever letter that I got -- he
 9 didn't send it to me directly.  He sent it to
10 my sister, and my sister sent it to me.
11      Q.    A photocopy?
12      A.    Whatever I got, I overturned to my
13 lawyer, whatever I had.
14      Q.    Okay.
15      A.    Whether it was original, copy.  I
16 can't remember exactly what it was, but
17 whatever I had, as soon as I got it, I sent it
18 to my lawyer.
19      Q.    That's not my question.  Do you
20 recall this letter --
21      A.    But, I mean --
22      Q.    We have a very short amount of time
23 left, so can I just ask the question?
24      A.    I was incarcerated.  I wasn't the
```

Page 345

```
 1 main source of the letter.  It was always a
 2 third party.
 3      Q.    Okay.
 4      A.    So when he sent the letter to
 5 somebody, and somebody sent it to me.
 6      Q.    Well --
 7      A.    Now --
 8      Q.    -- could Nikki have sent you an
 9 original?
10      A.    Couldn't Nikki have sent me an
11 original?  What do you mean?
12      Q.    Yeah.  Could she have sent you in
13 the mail the original letter that she received
14 from Paladino?  Did she ever do that?
15      A.    I don't even know what you talking
16 about.  I never said Nikki sent me Paladino's
17 letter.
18      Q.    Well, this is a letter that's
19 addressed to Nikki.
20      A.    Okay.
21      Q.    How did you receive it?
22      A.    I didn't tell you I received this.
23      Q.    Okay.  But --
24      A.    I'm telling you that over the years,
```

Page 346

```
 1 Paladino wrote me several letters, and I'm
 2 familiar with his handwriting.  I never seen
 3 this letter.  I don't remember this letter to
 4 say that I saw this.  I'm saying I'm familiar
 5 with his handwriting because I studied my
 6 case.  I used to read the different letters
 7 that he wrote me over and over again.
 8      Q.    Do you recall the first page where
 9 you're attaching the letter indicating you
10 received it?  It was produced as a single
11 document, so I assume that it was attached.
12      A.    No.  I don't remember this,
13 because --
14      Q.    You don't remember the cover letter
15 and you don't remember the -- you don't
16 remember ever seeing this --
17      A.    No.
18      Q.    -- letter?
19      A.    What I can say is, this is typed,
20 but -- I don't know.  This look like my
21 handwriting on this page right here.  It look
22 like I signed it.
23      Q.    But you have no recollection of
24 receiving the attached letter?
```

Page 347

1    A.    Excuse me?
2    Q.    You have no recollection of
3 receiving or seeing before this letter that
4 reads "Dear Nikki" that starts PLAINTIFF15319?
5    A.    I'm not sure.  I would have to read
6 the letter.  He wrote so many letters over the
7 years.  I've looked at letters that he sent to
8 detectives.  I looked at letters that he wrote
9 me.
10   Q.    Okay.  I would move to strike, other
11 than that you don't remember, and then I think
12 we'll end the deposition, because we're out of
13 time.
14   A.    But I don't remember.  I'm sorry.
15        MS. ROSENTHAL:  Okay.  So we
16   can --
17        VIDEO TECHNICIAN:  We're now
18   going off --
19        MR. VAN NAARDEN:  No, no, no.
20   Hold on a second.  I get a chance to ask
21   questions.
22        MS. ROSENTHAL:  That's true.
23        MR. VAN NAARDEN:  I just have a
24   few just to follow up.

Page 348

1 BY MR. VAN NAARDEN:
2    Q.    You earlier in response to questions
3 by counsel for the City talked about -- a
4 little bit about Detective Peterman.  Do you
5 remember him?
6    A.    Yes.
7    Q.    Was he involved when you got
8 arrested for the murder of Jamal Kelly?
9    A.    Yes.
10   Q.    Do you remember when you first
11 interacted with him?
12        MS. ROSENTHAL:  Objection.
13   Outside the scope of my direct
14   examination.
15 BY MR. VAN NAARDEN:
16   Q.    Answer my question.  Go ahead.
17   A.    Yes, I remember when I first came in
18 contact with Detective Peterman.
19   Q.    Tell us about that first interaction
20 with Detective Peterman.
21        MS. ROSENTHAL:  Objection.
22   Outside the scope.  This is clearly
23   improper.
24        THE WITNESS:  When I first came

Page 349

1 in contact with Detective Peterman, it
2 was September 3rd, 4th of 2003.  I got
3 rearrested for the homicide.  Detective
4 Peterman and another detective came and
5 got me from CFCF.
6        (Lights went off.)
7        MS. ROSENTHAL:  Well, this is
8   all outside the scope.
9        MR. VAN NAARDEN:  No.  We're
10   going to stay here.  You're going to turn
11   off the lights on us in the middle of my
12   questioning?
13        MS. ROSENTHAL:  I didn't turn
14   off the lights.
15        MR. VAN NAARDEN:  Jesus.
16        VIDEO TECHNICIAN:  Do you want
17   to go off record?
18        MR. VAN NAARDEN:  No.  Stay on
19   the record.  I want to figure out why it
20   is that when I have a chance to ask
21   questions, everything shuts down.
22        MS. ROSENTHAL:  I have a secret
23   button?  I don't think so.
24        MR. VAN NAARDEN:  I don't know,

Page 350

1 Danielle.  All I know is you didn't have
2 any problems with your questions.
3        Do you know why the lights are
4   all off?
5        UNIDENTIFIED SPEAKER:  They go
6   off at a certain hour.
7        MR. VAN NAARDEN:  Well, then
8   we're going to do it -- there we go.  Do
9   you have a flash you can put on the
10   camera --
11        VIDEO TECHNICIAN:  No.
12        MR. VAN NAARDEN:  -- so at
13   least we get the witness?
14        VIDEO TECHNICIAN:  No.
15        MR. VAN NAARDEN:  All right.
16   We'll do it by flashlight then.
17        UNIDENTIFIED SPEAKER:
18   Deposition?
19        MR. VAN NAARDEN:  Yeah.
20        Unbelievable.
21        UNIDENTIFIED SPEAKER:  Who is
22   the City attorney here?
23        MR. VAN NAARDEN:  Danielle
24   Rosenthal.

Page 351

```
1        MS. ROSENTHAL: But, Josh, this
2  is your client. This is --
3        MR. VAN NAARDEN: Are you
4  suggesting that you can ask my client
5  questions for seven hours and I'm not
6  allowed to clarify anything with my
7  witness?
8        MS. ROSENTHAL: Yes, you're
9  allowed to clarify.
10       MR. VAN NAARDEN: That's what
11 I'm doing. If you have an objection that
12 you believe it's outside of the scope,
13 put it on the record, but I'm not going
14 to let you ask my client questions for
15 seven hours and not have the ability to
16 ask him my own questions. It's just not
17 going to happen.
18       MS. ROSENTHAL: I'm just
19 putting it on record again that --
20       MR. VAN NAARDEN: Again, put it
21 on the record and let's move on.
22       MS. ROSENTHAL: -- Josh Van
23 Naarden is raising his voice at me in
24 a --
```

Page 352

```
1        MR. VAN NAARDEN: Well, you
2  turned the lights off on us in the middle
3  of a deposition.
4        MS. ROSENTHAL: I turned the
5  lights off on you?
6        MR. VAN NAARDEN: This is not
7  my office, Danielle. We're in the City's
8  office conducting an official deposition,
9  and all of the sudden when it's my turn
10 to ask questions, everything goes dark.
11 You want to talk about care, custody, and
12 control? We're in a room that is your
13 care, custody, and control. You wanted
14 to do it here. All of the other
15 depositions were agreed upon by the
16 parties to be conducted in my office. As
17 a courtesy to your office, I agreed to do
18 it here. Never in my wildest dreams did
19 I think we'd be treated this way. But
20 we're going to keep going.
21       MS. ROSENTHAL: I'm sorry.
22 I've never been in the office at this
23 hour where the lights have gone off.
24 BY MR. VAN NAARDEN:
```

Page 353

```
1  Q.   Now we have to do this by
2  flashlight.
3        Can you hold this up?
4        My question, could you continue with
5  your testimony about your interactions with
6  Detective Peterman when he arrested you?
7  A.   He came and got me from
8  Curran-Fromhold Correctional Facility. It was
9  him and another detective. They took me down
10 to 8th and Race. When I got down to 8th and
11 Race, they handcuffed me to a chair. They set
12 me in there for hours and hours and hours and
13 before Detective Peterman came in.
14       When he came in, he started asking
15 me several questions about the murder of Jamal
16 Kelly. When I didn't respond the way he
17 wanted me to and I told him that I didn't
18 commit the murder, he grabbed -- he took my
19 handcuffs off me and -- it was two handcuffs
20 cuffing me to both arms of the chair. He took
21 one off and he started hitting me, like not
22 very, very hard, but he started like tapping
23 me on my forehead and he was telling me that,
24 you going to tell me something. You going to
```

Page 354

```
1  tell me something, or he was going to fuck me
2  up in there. And, you know, at the time, you
3  know, I'm young. I'm 19 years old. I didn't
4  know nothing about the law, you know. I was
5  petrified. I was scared to death like, you
6  know.
7        At that moment, I knew that it
8  wasn't going to end well for me. I knew that
9  this was very bad. And from there, another
10 detective had left out and Detective Peterman
11 came back in and he was saying stuff to me
12 like, you had a gun. Jamal had a gun on him
13 that night. If you didn't kill him, he was
14 going to kill you. Just tell us what
15 happened. Let us know and, you know, we'll
16 let you go. And when that didn't work, he got
17 upset with me and, you know, he started to
18 punch on me. Like not hard, but he would just
19 kick my shin, push me, rough me up, and he was
20 like playing mental games with me, like it was
21 like he had an alter ego. And, you know, at
22 one point he was acting nice to me. Another
23 point he was acting mean. He was trying to
24 get me to confess to the murder. And, you
```

Page 355

1  know, I was scared.  I was scared, you know,
2  literally for my life.  I knew at that moment,
3  I felt it, that this wasn't going to end good
4  for me.
5       Q.   When you got arrested for this case,
6  were you already incarcerated?
7       A.   Yes.
8       Q.   Well, tell me, if you were already
9  incarcerated, what damage did you suffer from
10  the time that you were arrested on this murder
11  if you were already in custody?
12            MS. ROSENTHAL:  Objection.
13       Outside the scope of my questioning.
14  BY MR. VAN NAARDEN:
15       Q.   Go ahead.
16       A.   Initially when I was arrested, it
17  was for like a robbery charge, but when I got
18  rearrested when Detective Peterman and the
19  other detective came and got me, it was
20  completely different.  The stakes was
21  completely higher.  It's like going up for
22  surgery and to get your finger -- a prick out
23  your finger and end up getting open heart
24  surgery with the comparison from my initial

Page 356

1  arrest to getting charged for the murder, to
2  me realizing that it's a possibility that I'm
3  going to get the death penalty.
4       They charged me with first-degree
5  murder, and it was a capital homicide, and
6  initially they was saying that I could get the
7  death penalty.
8       Everything changed from that moment.
9  Everything went downhill.  They made me pack
10  my stuff up and go to a higher custody jail.
11  And, you know, the distress that I went under
12  at that moment was unexplainable.  I can't
13  articulate what it's like to have the mindset
14  that, you know, I might die in jail for a
15  crime that I didn't commit, where I was
16  initially locked up for a robbery, where I
17  knew I was going home.
18       It was completely different.  It was
19  completely stressful.  It was one of the worst
20  feelings that I ever dealt with in my life.
21  Like I can't even articulate like how it made
22  me feel.  It really like -- to this day, it
23  has a toll on me any time I think about it or
24  when I think back to that moment.

Page 357

1       Q.   You eventually pled, I think, to
2  aggravated assault related to that other
3  matter?
4       A.   Yes.  I mean, I got found guilty of
5  murder.  I got sentenced to life, plus 10 to
6  20 years.  Once I got sentenced to life, plus
7  10 to 20 years, I felt as though like I had to
8  focus my time and my energy on fighting this
9  life sentence with 10 to 20 years behind it.
10  I didn't feel like this other case was a
11  priority, so I took a deal on that case
12  because I got found guilty of life, and that's
13  the only reason I took a deal on that case,
14  because I had life.
15       Q.   Last question.  You were asked
16  questions about a call on -- it was
17  December 30th of 2017 and you were asked --
18  there was some language that you used
19  referring to Monique about doing something.
20  Do you remember those questions?
21       A.   Yes.
22       Q.   Let me ask you this:  Throughout the
23  course of your Post Conviction Relief Act, if
24  you learned that there may be an individual

Page 358

1  that may have information that may be helpful,
2  would you do everything in your power to get
3  that information?
4       A.   Absolutely.
5            MR. VAN NAARDEN:  Thanks.
6            MS. ROSENTHAL:  Before we
7       close, I just want to say that -- well,
8       actually I had -- well, I have -- given
9       Mr. Van Naarden's questioning, I just
10       want to ask a couple of follow-ups.
11  BY MS. ROSENTHAL:
12       Q.   As far as the physical abuse that
13  you just testified to, was that before you
14  were booked or after you were booked for this
15  murder?
16       A.   Can you repeat the question?  I'm
17  sorry.
18       Q.   Yeah.  Can you put your microphone
19  on?
20       A.   Yes.
21       Q.   Mr. Van Naarden asked you about
22  physical abuse that you suffered by
23  Mr. Paladino?
24            MR. VAN NAARDEN:  No.

Page 359

```
 1              MS. ROSENTHAL:  Sorry.
 2              MR. VAN NAARDEN:  Detective
 3    Peterman.
 4              MS. ROSENTHAL:  Detective
 5    Peterman.
 6  BY MS. ROSENTHAL:
 7      Q.    Sorry.  Let me ask that in a better
 8  way.
 9          Do you remember testifying in
10  response to Mr. Van Naarden's questions that
11  you suffered physical abuse by Detective
12  Peterman after being arrested for the Jamal
13  Kelly murder?
14      A.    Yes.
15      Q.    Was that before or after you were
16  booked?
17      A.    I don't understand what you saying.
18      Q.    Was that before or after your
19  mugshot was taken and you were fingerprinted?
20      A.    I'm not understanding what you
21  saying.  I was arrested for attempted -- a
22  robbery case.
23      Q.    Yes.
24      A.    While I was arrested for that
```

Page 360

```
 1  robbery case, a month later I got rearrested
 2  for --
 3      Q.    Right.
 4      A.    -- the murder.  So you're saying
 5  when they rearrested me for the murder, before
 6  he fingerprinted me and mugshotted me for the
 7  murder?
 8      Q.    Didn't they take you to be -- when
 9  you were arrested, even though you were
10  already in custody, didn't they take you to be
11  booked for the second murder?  I thought you
12  had testified that's when this abuse had
13  occurred.
14      A.    Yeah.  When they took me to be
15  recharged down at 8th and Race for the murder
16  case, that's when the incident between me and
17  Peterman occurred, when he transported me from
18  the Curran-Fromhold Correctional Facility to
19  8th and Race.  When I got down there, they
20  stuck me in a room, didn't read me Miranda
21  rights --
22      Q.    Okay.  My question was just
23  whether --
24      A.    Abused me.
```

Page 361

```
 1      Q.    -- it was before or after you were
 2  fingerprinted and your mugshot was taken.
 3      A.    I can't even remember that.  I don't
 4  know.  Like that's not something that stands
 5  out to me.  I don't remember that part of
 6  before or after.
 7      Q.    Okay.  That's fine.
 8      A.    At what point he abused me like.
 9      Q.    Did you have physical injuries?
10      A.    Yes.
11      Q.    On your face?
12      A.    I had like little bruises.
13      Q.    And you said there's another
14  detective there?
15      A.    Another detective -- yeah.  Another
16  detective rolled in the car with us to 8th and
17  Race.
18      Q.    Oh, it happened in the car?
19      A.    No.  The actual abuse, it was me and
20  Peterman in the room, me and him.
21      Q.    Was there another detective in the
22  room?
23      A.    No.  He's not stupid.  He's not
24  going to do nothing like that.  It was just me
```

Page 362

```
 1  and him when he did what he did to me.
 2      Q.    He was the arresting officer?
 3      A.    I'm not sure, but I know that he
 4  came and got me from 8th and Race.
 5      Q.    Okay.
 6      A.    What I do know is that I feel as
 7  though like, you know, my whole case went sour
 8  with Peterman.
 9      Q.    No.  My question --
10      A.    Everything went downhill with
11  Detective Peterman.  Everybody he questioned
12  said I did something.  Prior to that, nobody
13  said I did anything.
14      Q.    My question was just whether any
15  detective was present during that.  I think
16  you've answered it.
17          How long did that last, that
18  interaction with him in the room?
19      A.    It felt like a long time, but I
20  can't time it.  I don't know.  I didn't have a
21  stop watch to say how long he was harassing
22  me.
23      Q.    Was it more than 24 hours?
24      A.    No, it wasn't more than 24 hours.
```

Page 363

1 The assault probably lasted -- I'm not sure.
2 Maybe half an hour or whatever, but I was down
3 8th and Race for at least a day.
4      Q.    And then was any kind of a medical
5 checklist completed upon you being rebooked
6 into the jail?
7      A.    They don't do that kind of stuff.
8      Q.    Okay.  I don't know, so I'm sorry.
9      A.    You ever been arrested before?
10      Q.    No.  Well, it's not my -- I believe
11 that -- well, anyway, there was no medical
12 checklist that was completed?
13      A.    No.  They never do that.  They going
14 to cover up what they did.  They not going to
15 do that.
16      Q.    And did you report any of this to
17 anyone at the time?
18      A.    Yes.  When I got back to the jail, I
19 informed my attorney.
20      Q.    Mark Greenwood?
21      A.    At the time -- whatever attorney I
22 had at the time.  I can't really remember.
23      Q.    Did you seek any medical treatment
24 at the jail?

Page 364

1      A.    No.  I can't a hundred percent
2 remember, but he didn't like beat me to a
3 bloody pulp.  He didn't break no bones on me
4 or nothing like that.
5      Q.    Did you file a grievance?
6      A.    No, but I filed a complaint with
7 Internal Affairs against Peterman.
8      Q.    You did?  When was that?
9      A.    Sometime in 2004, I believe.
10      Q.    You filed a complaint with Internal
11 Affairs against Peterman.  Anyone else?
12      A.    No.  It was against Detective
13 Peterman.
14      Q.    In respect to this incident?
15      A.    Yes.
16      Q.    And what investigation came as a
17 result of that; do you know?  Was anyone
18 interviewed?
19      A.    They didn't do any type of
20 investigation.  It's --
21      Q.    Do you know what the results of it
22 was?
23      A.    Yeah.  They brushed it under the
24 rug.

Page 365

1      Q.    So you filed a citizens complaint?
2      A.    I sent -- I wrote a letter to
3 Internal Affairs letting them know what
4 Peterman did to me.
5      Q.    And did you receive a response?
6      A.    No, not at all.
7           MS. ROSENTHAL:  Okay.  Just
8 finally, I just wanted to say that
9 there's been documents that haven't been
10 produced that are responsive.  In
11 particular, the unemployment documents
12 we've been asking for for months and
13 other documents reflecting income.  And
14 so we reserve the right to re-call the
15 witness with respect to unproduced
16 documents that have been pending for
17 quite a long period of time, and that is
18 it.  We can close.
19           MR. VAN NAARDEN:  All right.
20 Let's go.
21           MS. ROSENTHAL:  They need to
22 put it on the record.
23           VIDEO TECHNICIAN:  This
24 concludes the video deposition of Donald

Page 366

1 Outlaw.  We are now going off record at
2 8:40 p.m.
3           COURT REPORTER:  Do you want a
4 copy of the transcript, Mr. Van Naarden?
5           MR. VAN NAARDEN:  I do,
6 expedited, if you could.  I don't know
7 what that means.  It's already late in
8 the day, but as quick as you can.  Okay?
9           COURT REPORTER:  All right.
10               -  -  -
11           (Witness excused.)
12           (Videotaped deposition
13 concluded at 8:40 p.m.)
14               -  -  -
15
16
17
18
19
20
21
22
23
24

```
                                        Page 367
1              CERTIFICATE
2          I HEREBY CERTIFY that the
3  proceedings, evidence and objections are
4  contained fully and accurately in the
5  stenographic notes taken by me upon the
6  foregoing matter, and that this is a true and
7  correct transcript of same.
8
9
10
11
12 --------------------
13 MICHELE L. MURPHY
14 RPR-Notary Public
15
16
17
18
19          (The foregoing certification of this
20 transcript does not apply to any reproduction
21 of the same by any means, unless under the
22 direct control and/or supervision of the
23 certifying reporter.)
24
```

# EXHIBIT D

(Excerpt of Call from Donald Outlaw on 09/03/2017 at 20:02:42 – start to minute 4:30)

# EXHIBIT E

(Excerpt of Call from Donald Outlaw on 06/21/18 at 13:58:05 – minute 3:30 to 5:45)

# EXHIBIT F

(Excerpt of Call from Donald Outlaw on 06/28/18 at 09:00:40
– minute 4:00 to 5:45)

# EXHIBIT G

(Excerpt of Call from Donald Outlaw on 7/9/18 at 09:00:47
– minute 4:00 to 5:15)

# EXHIBIT H

(Excerpt of Call from Donald Outlaw on 9/6/18 at 10:14:29
– minute 3:00 to 4:50)

# EXHIBIT I

(Excerpt of Call from Donald Outlaw on 6/29/19 at 20:56:56
– minute 8:16 to 8:52)

# EXHIBIT J

(Excerpt of Call from Donald Outlaw on 3/7/19 at 09:48:31
– start to minute 3:38)