## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DONALD MICHAEL OUTLAW** | : | |
| | : | |
| **v.** | : | **NO. 21-1290** |
| | : | |
| **CITY OF PHILADELPHIA, JEFFREY** | : | |
| **PIREE and HOWARD PETERMAN** | : | |

## <u>PROPOSED ORDER</u>

AND NOW, this_____ day of _____, 2022, upon consideration of Defendants' Motion for Sanctions Against Plaintiff Donald Michael Outlaw, (ECF Doc. 123) and Plaintiff's Response in Opposition thereto, it is hereby **ORDERED** that the Defendants' Motion is **DENIED WITH PREJUDCIE**.

BY THE COURT:

_____

CHAD F. KENNEY, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DONALD MICHAEL OUTLAW** | : | |
| | : | |
| v. | : | NO. 21-1290 |
| | : | |
| **CITY OF PHILADELPHIA, JEFFREY** | : | |
| **PIREE and HOWARD PETERMAN** | : | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SANCTIONS

Plaintiff, Donald Michael Outlaw, by and through his attorneys, VSCP LAW, hereby respectfully submits this Response in Opposition to Defendants' Motion for Sanctions (ECF No. 123) for two reasons: first, to address Defendants' unfounded accusations that Plaintiff is engaged in witness intimidation or alteration and falsification of evidence; and second, to correct the inaccurate picture painted by Defendants' selective use of isolated quotes and phrases to suggest that Mr. Outlaw, in a scheme to become a "millionaire" plotted to "burn" "boxes" of evidence to prevent Defendants from obtaining highly critical and incriminating information that they have not obtained through other sources. Defendants' failure to cite to the record other than to cherry-pick Mr. Outlaw's quotes out of context evidences the lack of support for their claims and conclusions. Plaintiff submits this Response to again clarify certain inaccurate representations made by Defendants and the conclusions therefrom that Defendants improperly ask this Court to make.

## I. INTRODUCTION

On August 15, 2022, Defendants filed a Motion for Sanctions claiming that Defendants have "significant concerns as to the alteration and falsification" of witness affidavits, and that "witness intimidation, witness credibility, and potential falsification of documents are at issue."

See ECF No. 123 p. 10, 18.  Plaintiff concedes that witness credibility is at issue in this case, as in every case. However, Plaintiff was unaware until reading Defendants' Motion that they believe that Plaintiff may be engaged in the "alteration and falsification" of witness affidavits nor has there been any evidence cited by Defendants to substantiate such a serious accusation.[1]

Defendants have presented to this Court that a matter of dispute in this case is *Plaintiff's* engagement in witness intimidation or potential falsification of documents, without offering a single reason for their seemingly manufactured concern.[2] This conclusion is not only unsupported by the record in this case, but Defendants are aware that the evidentiary and factual record expressly contradicts their statements. The only evidence of witness intimidation that Plaintiff is aware of, is the fabricated charge brought against Mr. Outlaw by Detective Peterman which has been expressly testified to by the "victim," Charles Paladino[3], and has been overturned by a court[4] and not re-filed against him after an investigation by the District Attorney's Office which included re-interviewing witnesses[5]. Defendants' claims and motion should be stricken on its face for the failure to substantiate such significant accusations.

---

[1] During a status conference on June 6, 2022, Defendants' use of the word "purportedly" in a motion without any support was addressed by the Court. See Transcript of Motions Hearing dated June 6, 2022, at p. 12- 14.

[2] The inherent problem with such bald accusations without explanation, is that the responding party is left to guess, and then make and rebut hypothetical arguments for Defendants where they have failed to do so themselves.

[3] See Testimony of Charles Paladino at Plaintiff's PCRA hearing stating that Detective Peterman asked, during an interrogation why Mr. Paladino had a black and blue eye, Mr. Paladino said "So I explained the entire situation to him about how I stole a guy's car and they came and kicked the door in and jumped me. Several minutes into our conversation, he explained to me, well, I want you to say that Don-Don and his friends are – well, I'm sorry, Robert Outlaw was the one who did this to you." Mr. Paladino goes on to say that when he objected to this false statement, Detective Peterman told him, "arrangements can be made for your testimony" and then gave Mr. Paladino a $50 bill. November 16, 2018, p. 10:24-25 - 3050-3063. See also confirmation of this during Mr. Paladino's deposition in this case at p 108:1 – 24, 109:1-18. See also Certification dated April 5, 2018 "I was coerced by detectives to testify that […] Don-Don and his family attempted to intimidate me." CITY2098. See also notes of attorney interview with Mr. Paladino, confirming same, CITY 2096; see also notes of CIU interview with Mr. Paladino, confirming same RO (CIU) 000204.

[4] See Order granting PCRA Relief on all counts on January 29, 2019. PLAINTIFF16524 – 16526.

[5] See Memorandum in Support of Motion for *Nolle Prosequie* Pursuant to Pa.R.Crim.P. 585(a).  "Significantly, when the CIU and the Homicide Unit recently interviewed a witness in an effort to determine whether Mr. Paladino's original claims of intimidation and retaliation were true, that witness provided information that corroborated his original claims were in fact not credible. It was at this point that the DAO made its final decision to file a motion for *nolle prose* of all of the charges against Mr. Outlaw." See PLAINTIFF16457 – 16467 p. 6

Further, Defendants' rush to prematurely file a Motion for Sanctions in the form of securing an adverse inference jury charge before fact discovery has even concluded is procedurally improper as discovery is ongoing[6]. In fact, Defendants filed their motion in the literal eleventh hour on the eve of their deposition of yet another witness who provided two affidavits in Mr. Outlaw's appellate process. Had Defendants waited even another day to file their motion, they would have had yet another reason not to, as the deposition of Katima Jackson conducted the following day on August 16, 2022, confirmed the affidavit she provided in support of Mr. Outlaw's innocence were expressly not the product of coercion, just as every other witness has in this case. (A transcript of this deposition testimony is not yet available.)

Defendants stated "concern" about Plaintiff's possible alteration of evidence and witness intimidation, without *any proof* to support these accusations is highly inappropriate. This Motion will establish that Plaintiff has not destroyed a single document, he did not have control of any documents Defendants claim to be "destroyed" and that he has not acted in bad faith in the handling of evidence in this case.

## II.   PROCEDURAL POSTURE

The discovery deadline in this case is August 29, 2022. See Amended Scheduling Order, dated June 6, 2022, ECF No. 91.  Motions *in limine* are due on January 17, 2023, and proposed Points for Charge are due on January 20, 2023. Id.  Fact discovery is ongoing. In the three days between Defendants' Motion and Plaintiff's Response, two additional depositions have been conducted (Katima Jackson, an eyewitness to the murder, who confirmed, again, that Mr. Outlaw

---

[6] At the appropriate time for ruling on evidentiary issues, Plaintiff will address Defendants' own destruction of records in this case such as at least one other key letter between Charles Paladino and Detective Peterman regarding his arrangement for testifying against Mr. Outlaw, and the formal complaint Mr. Outlaw filed with internal affairs regarding Detective Peterman's coercive conduct.

did not shoot Jamal Kelly; "Shank" did, and former Detective Charles Boyle.) At least three additional depositions are scheduled to occur before August 29, 2022 (former Lt. Mark Deegan, witness Charles Paladino, witness Wesley Harmon, and, possibly witness Christopher Holder, pending guidance from the Court regarding Fifth Amendment issues).

### III.   <u>FACTUAL BACKGROUND</u>

The Court has now received many filings explaining that this is a civil rights case brought by Plaintiff, Donald Outlaw, who spent sixteen (16) years wrongfully incarcerated for a murder that he did not commit. Therefore, in the interest of efficiency, Plaintiff will not re-state his claims and the bases for them, but only presents the factual background specifically relevant for the Court to consider in deciding whether to grant or deny Defendants' Motion for Sanctions. Further, many of Plaintiff's citations to the record are not specifically attached in the interest of efficiency. However, should the Court seek to inspect such exhibits itself, Plaintiff will promptly make those records available to the Court.

Defendants' Motion states that, due to spoilation, they are deprived of access to the following material: "all of the underlying papers and filings in Mr. Outlaw's criminal case and original copies of affidavits and letters, including those on which Mr. Outlaw relied in obtaining the reversal and/or *nolle prose* of his conviction; an unknown quantity of communications with key witnesses" and   "copies of correspondence between Ms. Solomon Outlaw and Mr. Paladino that pre-date 2018, original copies of correspondence and affidavits"  and <u>See</u> ECF Doc. 123 at p.15 and 10, respectfully.

Plaintiff agrees that additional letters from Mr. Paladino to Ms. Solomon Outlaw may have been received and thrown away by her (though Plaintiff did not have control over this material as

described in the *Legal Argument Section* ) However, Defendants have failed to justify their belief that any of the other described material is missing.

Plaintiff has been deposed in this case, as has his wife. In both depositions, Defendants used every last minute of their allotted seven hours to question Donald Outlaw and Monique Solomon Outlaw.  During these depositions, Defendants expressly asked about spoilation of evidence. The only evidence obtained was that documents had been lost and discarded, but no evidence was obtained (and Defendants can cite to none) to support claims that any lost or discarded documents contained original, unseen material or that any material has been intentionally suppressed from disclosure to Defendants by Plaintiff or Monique Solomon Outlaw.

Plaintiff submits the following chart identifying statements in Defendants' Motion (ECF No. 123) which are inconsistent with the factual record:

| | |
|---|---|
| 1.      "As early as 2017, Mr. Outlaw planned to file a lawsuit" p. 4. | None of the calls presented by Defendants' occur until at least halfway through 2018. |
| 2.      "At the close of the fact discovery period in this case…" p. 7. | Fact discovery remains ongoing until August 29, 2022, per Court Order, ECF No. 91,  and no less than five depositions were scheduled to occur after the date of Defendants' filing, including two key witness that have occurred in the days between Defendants' Motion and this instant Response. <u>See</u> Notices of Deposition for: Katima Jackson, Det. Charles Boyle, Chris Holder, Charles Paladino, and Lt. Mark Deegan. |
| 3.      "…after having engaged in motions practice and countless meet-and-confers and served a significant number of third-party subpoenas to track down documents." P. 7. | The connection between discovery disputes in this case and this instant motion for sanctions is unclear. Plaintiff provided and/or facilitated discovery of thousands of records, many of which are the very documents that Defendants now herein claim to be either destroyed or altered. |
| 4.      "Mr. Outlaw and his wife are responsible for destroying and/or failing to preserve a multitude of significant documents that speak directly to the claims and defenses in this case." P. 7. | Taking each phrase separately:<br>- *"Mr. Outlaw […] is responsible for…"* Mr. Outlaw did not personally destroy or instruct anyone to destroy or discard any material in this case as supported by the record. |

See Deposition Transcript of Monique Solomon Outlaw at p. 101:1 – 4. Exhibit B.

- *"a multitude of [...] documents…"*

To the extent Defendants are referring to material collected in "boxes" by Ms. Solomon Outlaw, see entry no. 6, below.

To the extent Defendants are referring to his personal affects in prison, this is irrelevant because there can be no question that Defendant is not responsible for the prison's destruction of his personal documents upon his release.

Q. Is it correct that you had a large number of hard copy documents related to your criminal proceedings while you were incarcerated?

A. Yes. That's absolutely correct. I had a whole lot of paperwork.

Q. And what happened to that paperwork?

A. When I was released from prison, I was released from Curran-Fromhold Correctional Facility. All my property was at SCI Dallas. When I was released, I went to court from SCI Dallas and I was transferred to Curran-Fromhold Correctional Facility. I didn't know I was being released at the time I was being released, so all my property stayed up SCI Dallas. I went home. All my property stayed up there.

See Plaintiff's Deposition Transcript at p. 63:20-24, 64:1-12. See also at p. 132-134 (Plaintiff could not go retrieve his material while he was on house arrest, and when he called SCI Dallas to obtain these personal

| | |
|---|---|
| | documents and items, he was told they were destroyed.<br><br>See corroborating PA DOC Moves Report confirming that on January 9, 2019, he was transferred to Philadelphia via writ, and that he never returned to SCI Dallas (the entry on January 29, 2019 shows an entry at 12:00 for "Actively Serving" which is immediately changed to "vacated conviction" by 12:01. CITY16923-16924. See also, docket report showing that Mr. Outlaw was housed at local detention centers, after January 29, 2019.<br><br>- *"…significant documents that speak directly to the claims and defenses in this case."*<br><br>Defendants have failed to identify the "significant" documents destroyed or how they "speak directly to the claims and defenses in this case." |
| 5.     "The most significant categories of these documents include …. An unqualifiable numbers of letters, emails and text messages to/from Mr. and Mrs. Outlaw and key witnesses in this case, including those reflecting and/or discussing payments of money." | - *"emails and text messages"*<br><br>There is no indication that Plaintiff has discarded or destroyed "emails" or "text messages."<br><br>- *"letters"*<br>Plaintiff does not dispute his wife's testimony about her practice of discarding letters/mail after receiving them and reading them, rather than saving them, with the exception of specific letters from Mr. Paladino pertaining to Plaintiff's criminal appeal. However, there is no indication that letters between *Plaintiff* and anyone else are unaccounted for, *except for* the written complaint that Plaintiff submitted to the PPD regarding Detective Peterman's improper conduct, which Defendants have failed to account for or produce. |

| | |
|---|---|
| | - *"including those [correspondence] reflecting and/or discussing payments of money* <br><br> There is no indication that any missing material contains discussions of payments of money between "Mr. and Mrs. Outlaw and key witnesses." |
| 6.    "Ms. Solomon-Outlaw set boxes of documents pertaining to Mr. Outlaw's criminal case on fire" | Monique did not set multiple "boxes" of documents on fire. Monique describes the number of hard copies she had collected over the years saying "I can't <br> give you a page number, but it was <br> definitely a lot of documents," though in comparison to the size of a banker's box, "Maybe it was enough to fit in a box like that, but not really completely fill the box up." <u>See</u> Deposition Transcript dated July 22, 2022, at p. 99. |
| 7.    "large quantities of originals and copies of documents remain unaccounted for" p. 15 | See Plaintiff's detailed citation and summary of affidavits and documents that account for original affidavits. <br><br> <u>See</u> also Deposition transcript of Monique Solomon Outlaw: <br><br>  Q. So everything that you had, you turned over to an attorney? <br><br>  A. Yes. <br><br> […] <br><br> Q. I'm asking if there were originals of any of the documents that were burned? <br><br> A. Originals to what? <br><br> Q. For example, if a letter was handwritten, an affidavit was handsigned? <br><br>  A. No. <br><br> Q. Who was in possession of all the copies? <br><br> A. His attorneys, I would think. |

| | |
|---|---|
| | Q. Why would you think that? Did you give it to them?<br><br>A. Well, because the originals would be for the attorneys to have. I wouldn't have an original.<br><br><u>See</u> Deposition Transcript of Monique Solomon Outlaw, at 101-102. Attached as Exhibit B.<br><br><u>See</u> also her testimony, reiterating such at p. 235 – 237. Exhibit B.<br><br>As to "copies," Defendants cannot be prejudiced for failing to receive "copies" of documents that they already have. |
| 8.     Mr. Outlaw again stated that he is "going to burn . . . all [his] legal shit," this time noting that "keeping certain stuff" has been "beneficial to [him]." p. 17, citing Exhibit J. | As pasted together, and to the extent that this sentence suggests that Mr. Outlaw was going to destroy legal documents because keeping them would *not* be "beneficial to him," a full listen to this audio clip reveals that he is not planning to "burn" material that is not beneficial to him, and keeping material that is "beneficial to him" in an effort to destroy unfavorable evidence.<br>Rather, the "beneficial material" he talks about consists of certificates from the courses he's completed and he mentions his intent to get a job upon release stating that he would like to keep module material from the drug and alcohol treatment certification he received in case it could be helpful to him when he gets a job in that field.<br><br>When Mr. Outlaw's sister encourages him to keep all of the documents including his legal documents at least for a year, Mr. Outlaw responds emotionally with a series of explanations of how those documents make him feel, including his desire to "burn" them, because "I don't want to look at that again in my life." He goes on to describe his desire to put the wrongful conviction "in the rearview mirror," because "no good memories come from that shit," and "that shit like watching a |

| | |
|---|---|
| | tape of you getting knocked out over and over again […] That shit is not no good feeling, it's not no good memory […] that shit takes me back to a bad place […] the worst thing I've ever been through…" <u>See</u> full audio call, attached only in part as Defendants' Exhibit "J." |
| 9.     "Mr. Outlaw's bad faith and personal responsibility is further underscored by his recorded telephone conversations in which he indicated his intent to destroy documents *by fire*, which is precisely the means by which they were disposed" P. 18 | The phone calls referenced in support of this statement (Defendants' Exhibits I and J) reveal that Mr. Outlaw is talking about the legal material he obtained and collected in his prison cell at SCI Dallas, in the context of describing to his sister and wife all of the personal affects he intends to bring home should he be released. Nothing in these calls constitutes a direction, instruction or request that his wife actually carry out the act of burning documents.<br><br><u>See</u> also, Deposition testimony of Monique Solomon Outlaw describing how the burning of the documents came about as a "celebration" for her where a burden had been "lifted." <u>See</u> Deposition Transcript, p. 100. Exhibit B. |
| 10.     "The destruction of correspondence with witness and original affidavits and letters is particularly detrimental…" p. 18 | -    *"The destruction of […] original affidavits"*<br>All original witness affidavits that were ever in the possession of Plaintiff or Ms. Solomon Outlaw have been turned over to Mr. Outlaw's attorney at the time.<br><br>Several of the sworn witness statements and notarized affidavits are for the purpose of documenting the receipt and transition of other witness statements/affidavits: <u>see</u> Affidavit of Donald Outlaw dated 1/22/15 ("On January 13, 2015, Monique Solomon received the affidavit of Lamar Rodgers and forwarded it to me, in which I received on January 21, 2015.") CITY2899; <u>see</u> Affidavit of Monique Solomon dated October 6, 2014 ("On October 2, 2014, Chris Holder gave me a signed Affidavit stating what he told me in our conversation of |

September 20, 2014 and asked me to get this to don as son as possible") CITY 2040; <u>see</u> Affidavit of Donald Outlaw dated September 23, 2014, stating that he received a letter from Monique Solomon that contained two affidavits, one from her and one from Chris Holder. <u>See</u> CITY 2042. <u>See</u> Affidavit of Mr. Outlaw dated September 12, 2013, confirming that on August 18, 2013, he received a visit from Katima Jackson, and she told him that she witnessed the murder and saw "Shank" shoot Jamal Kelly. Mr. Outlaw says "I told her to put her statement in writing and contact my Lawyer Asap." <u>See</u> CITY 2093. <u>See</u> Affidavit of Robert Outlaw, dated February 6, 2015, states that that "[o]n February 3, 2015, Monique Solomon received the affidavit of Charles Paladino and forwarded it to me, in which I received in February 6, 2015." CITY 2951. <u>See</u> Notarized Affidavit of Monique Solomon dated February 6, 2015, states that she received a signed affidavit from Charles Paladino on February 3, 2015 and forwarded it to Mr. Outlaw in a letter dated February 4, 2015. <u>See</u> CITY2953. <u>See</u> Notarized Affidavit of Monique Solomon dated February 14, 2015, stating that on January 27, 2015, she received a signed affidavit from Wesley Harmon which she forwarded to Mr. Outlaw in a letter dated January 29, 2015. CITY2915; <u>See</u> Affidavit of Mr. Outlaw dated February 28, 2015 states that on February 2, 2015, he received the letter from Monique containing the affidavit of Wesley Harmon. <u>See</u> CITY 2913.

Others sworn statements, such as the affidavit of Sydney Starr is attached to a cover letter addressed to attorney Samuel Stretton, former counsel from Mr. Outlaw, and intended recipient of the original sworn affidavit. <u>See</u> CITY2743 - -2744.

Further, it is likely that originals were used as exhibits in evidentiary PCRA hearings and retained by the Court. <u>See</u> DAO7247 exhibit submission form indicating that the affidavit of

| | |
|---|---|
| | Katima Jackson was submitted as an exhibit by attorney Norris Gelman during a PCRA hearing. |
| 11. "…where, as here, particularly where witness intimidation, witness credibility, and potential falsification of documents are at issue." P. 18 | - *".. witness intimidation […] [is] at issue"*<br><br>The intimidation of witnesses from testifying in this instant action has never been an issue in this case.<br><br>To the extent this is in reference to the underlying intimidation conviction against Mr. Outlaw that has been overturned, see footnote 3, *supra*. See PCRA testimony of Charles Paladino dated November 16, 2018, p. 10:24-25 - 3050-3063. See also Deposition testimony of Charles Paladino dated March 31, 2021 p 108:1 – 24, 109:1-18. See also Certification dated April 5, 2018 CITY2098. See also notes of attorney interview with Mr. Paladino, CITY 2096; see also notes of CIU interview with Mr. Paladino, RO (CIU) 000204.<br><br>- *…potential falsification of documents are at issue."*<br><br>The integrity of the documented affidavits and witness statements or summaries in this case have never been facially challenged. The only challenge to falsification of evidence are the witness interviews conducted by members of the PPD, which are not the subject of this motion.<br><br>Defendants have exercised their opportunity to specifically question Ms. Solomon Outlaw about whether she ever altered any of Mr. Paladino's letters. Ms. Solomon Outlaw unequivocally stated "absolutely not." See Dep. Transcript at p. 172: 3 – 14; 178:20-24. Further when presented with a copy of what appears to be a creased letter and asked if she altered it, Ms. Solomon Outlaw confirms she did not. A copy of the document with an apparent crease, and a clean copy of the same |

| | document are attached to Ms. Solomon Outlaw's Deposition, attached here as Exhibit B. |

With this more complete context, Plaintiff presents the following legal arguments and authorities and requests that this Court dismiss Defendants premature and unsupported request for an adverse inference jury charge.

## IV.   LEGAL ARGUMENTS AND AUTHORITIES

There is no evidence to suggest that Mr. Outlaw himself has destroyed evidence. Defendants rest their argument that Plaintiff spoiled evidence on an agency theory that that they cannot establish. Nor can Defendants establish that Mr. Outlaw is responsible for destroying material that Defendants do not already have in their possession. Most importantly, there is no evidence to suggest that Mr. Outlaw has falsified or altered evidence or coerced witnesses. Defendants have completely failed to prove that Mr. Outlaw engaged in sanctionable conduct, and this unsupported and procedurally premature motion should be denied.

### A.   <u>Plaintiff has not suppressed or "spoiled" any relevant documents within his control.</u>

Defendants cites to <u>Bull v. United Parcel Serv., Inc</u>., for the standard for determining whether spoliation of evidence has occurred: "Spoliation occurs where: the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and, the duty to preserve the evidence was reasonably foreseeable to the party." ECF Doc. 123, *citing* <u>Bull v. United Parcel Serv., Inc.</u>, 665 F.3d 68, 73 (3d Cir. 2012). In that labor and employment case, the Third Circuit determined that the district court abused its discretion in concluding that spoliation had occurred in the failure to disclose to opposing counsel that the plaintiff had possession of an original document until the plaintiff was

on the witness stand during day three of trial. Id.  The issue in Bull, which turned on the authenticity of two doctor's notes related to the plaintiff's work-related injury, plaintiff's counsel had represented in response to an objection to foundation for these exhibits that only copies of the documents existed. Id., at 70-71.  Much to everyone's apparent surprise, including Plaintiff's own counsel, the plaintiff stated from the witness stand that the original document was at her home. See Id.  at 71-72; (transcript excerpt provided in opinion). The District Court dismissed plaintiff's case with prejudice as a sanction for plaintiff's failure to produce originals of these medical notes, concluding that the actions constituted spoliation. Id. The Third Circuit overturned this dismissal, in part, because "though [plaintiff] failed to produce the originals, she did provide [defendant] with facsimiles and photocopies of the documents." The dismissal for spoilation in Bull was also overturned due to the District Court's reliance on "misrepresentations" in defendant's foundational premise. ("The central problem is that the District Court accepted, without any critical examination, misrepresentations of the record promulgated by [defendant]." Id at 74.) Those "misrepresentations" included the defendants' embellishment and misrepresentation of the extent of efforts taken to uncover the original documents. Id. Because the defendants ultimately did obtain the original copy they sought, the appropriateness for sanctions turned on whether plaintiffs' statements that she did not have the documents and the fact that she did have the document, was "intentional," and the Third Circuit found that the district court failed to obtain sufficient factual evidence to make such a determination.  Id at 77

**1) Duty to preserve relevant evidence**

Plaintiff does not dispute the existence of a duty to preserve relevant evidence upon the filing of a lawsuit, and that such a duty may be triggered even earlier "depending on the particular circumstances," as Defendants cite. See ECF Doc. 123 p. 12, Bistrian v. Levi, 448 F. Supp. 3d

454, 468 (E.D. P.A. 2020).  However, Defendants' claim that Plaintiff's duty to protect all evidence began "at least by 2018" before he was even exonerated is without merit and contradicts their own cited Ninth Circuit case on this point. See ECF 123 p. 12. See also, Milke v. City of Phoenix, 497 F. Supp. 3d 442, 464 (D. Ariz. 2020), aff'd, No. 20-17210, 2022 WL 259937 (9th Cir. Jan. 27, 2022) (the duty to preserve material arose when writ of habeas corpus was granted.)

The only case Defendants cite in support of their conclusion that the timing of Mr. Outlaw's obligation to preserve evidence "undisputedly" pre-dates the filing of this instant action, is a Ninth Circuit opinion which contains conduct so egregious and dissimilar that Plaintiff has attached a courtesy copy as Exhibit C.  Id. In Milke, the Ninth Circuit found that litigation was "reasonably foreseeable" when relief from the underlying conviction was granted. Even though the Milke court found "[t]here is no question the evidence shows Milke planned litigation beginning almost immediately after her arrest" based upon "explicitly and repeatedly stating that she planned on suing governmental officials based on her prosecution," the court did not impose a duty to preserve material upon Milke until litigation was actually reasonably foreseeable. Id., at 464.

By the same analysis, it does not matter when Mr. Outlaw may have first begin musing about suing those who wrongfully incarcerated him.[7] Defendants have no legal basis for suggesting that Mr. Outlaw's duty to preserve evidence for a future civil case began any time before relief would have been granted to him when the underlying conviction was granted.  Further, the "relief" granted in Milke was that of *habeus corpus*, not an order resulting from a  PCRA relief under Pennsylvania law. In the Commonwealth of Pennsylvania, *habeus* relief and PCRA are not the same, and Mr. Outlaws' *habeus* claims had already been exhausted and denied. Even when Mr. Outlaw's PCRA petition was granted his criminal conviction overturned on January 29, 2019, a

---

[7] Further, the citations to Mr. Outlaw's musings that he could become a "millionaire" open a dangerous evidentiary door for Defendants which Plaintiff welcomes should this evidence be presented in front of a jury.

new trial was also ordered on those same claims. See CITY22197-22199. For this reason, Mr. Outlaw was not released with the entry Judge Anhalt's Order in January 2019. It was not until the Philadelphia District Attorney's office filed a motion for *nolle pros*, and that motion was granted on December, 18, 2020, that Mr. Outlaw's criminal case had finally come to a close. This instant lawsuit was then filed on March 17, 20021. See ECF Doc. 1. (DAO7247-7249); CITY22224.

Defendants have failed to establish that Mr. Outlaw should have known that items like his paperwork and filings from his criminal case would be relevant in a lawsuit arising out of the wrongful conduct of the City. Lawyers obviously understand the legal connection and the affirmative defenses (i.e. the re-litigation over the plaintiff's innocence) that relate evidence from the two cases but this knowledge cannot be imposed on a civilian, particularly where there is no showing that they had this knowledge. See Dep. Transcript Donald Outlaw a p. 69-70 when asked whether he "understood that [he] had an obligation to retain documents that were relevant to litigation" he responded "…I don't know about civil litigation to have that understanding of what I was supposed and not supposed to have."

Perhaps most importantly, the record shows that Plaintiff *did* make attempts to obtain his personal file from SCI Dallas:

> Q. It's an affidavit that Lamar Rodgers signed dated January -- Lamar Rodgers purportedly signed dated January 8, 2015?
>
> A. Yes. I see it.
>
> Q. Do you know where the original of this document is located?
>
> A. It has to either be in Ed's file or it could be in my file that I have up SCI Dallas that I never retrieved.
>
> Q. Did you make attempts to retrieve it?
>
> A. Yes. I actually called SCI Dallas and tried to get my property. They said it was destroyed after six months.

Q. When did you call?

A. I probably called -- I got off of house arrest in -- I got off house arrest around or about August 1st of 2020. Somewhere around that time I called SCI Dallas trying to retrieve my property, and they told me that they only held onto it for a certain time. And I was willing to drive up there and get my property, just things that I didn't want to get left behind, and it wasn't -- it didn't really have nothing to do with the law work. It was pictures of my wife that I had that I wouldn't want nobody else to see. It was pictures of my family and, you know, things of that nature that meant something to me that I didn't want to just be languoring around the jail or wanted the jail to destroy. So I called to get all my property, and they informed me that they didn't have it no more.

Q. Why didn't you call them before six  months was over? You waited six months until after you left? Or longer than that. Was it years?

A. Yeah. At the time, it probably was  like nine months to a year.

Q. Do you know whether Monique had this original or do you have a distinct recollection that you were the one who had the original?

[Objection.]

THE WITNESS: I mean, it's hard for me to keep track of thousands of papers to say exactly where the original landed. I really don't know. But to answer your other question, I was on house arrest and I didn't have a means of getting up to SCI Dallas to retrieve my property. I couldn't leave the house. The only thing I could do was go to court.

See Deposition Transcript at p. 132-132. Exhibit A.

**2) Plaintiff did not have direct control over any documents which have been discarded by non-parties.**

Mr. Outlaw did not personally destroy any of the documents in this case and did not maintain actual possession of any discarded documents at the time they were discarded. Yet for an adverse inference to apply, "it is essential that the evidence in question be within the party's control" Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 334 (3d Cir. 1995), *citing* Gumbs v.

International Harvester, Inc., 718 F.2d 88, 96 (3d Cir.1983).  Defendants vaguely assert: "prior to their destruction, **all of the spoliated evidence** was not only in the control – but actual possession – of Mr. Outlaw and his wife, who were cohabitating at the time of the document destruction." See ECF Doc. 123 p. 13, (emphasis added).  Further the case cited by Defendants to argue that spouses can be considered agents of the litigant-spouse involved a case where one spouse destroyed a hardrive of critical material *during the course of active litigation*.  See World Courier v. Barone, No. C 06-3072 TEH, 2007 WL 1119196, at *1 (N.D. Cal. Apr. 16, 2007). Mr. Outlaw cannot be held to have an affirmative duty to control the actions of others who may have access to copies of relevant material before he has even decided to and formally filed a lawsuit.

Defendants have failed to prove that Mr. Outlaw had control over any spoliated evidence. Rather for the factual record described *supra*, supports the opposite for the following reasons: 1) Mr. Outlaw never personally destroyed any documents. Therefore, none of the documents destroyed were in his actual possession. 2) Mr. Outlaw never directed anyone to destroy evidence on his behalf. 3) Any of his personal documents accumulated at the prison were never returned to him and believed to be destroyed by the prison. 4) Any of the letters "thrown away" by his wife occurred before Mr. Outlaw was even released from prison, and Mr. Outlaw had no knowledge that his wife was even receiving these letters from Mr. Paladino at the time. 5) Even if the box of material burned by Ms. Solomon Outlaw was kept in their shared residence, and even if Mr. Outlaw was released from custody and living in the residence at the time that they were burned, Mr. Outlaw did not even know where the box was kept, nor did he have any knowledge that they had been burned until he went to look for them in response to discovery requests in this litigation. Further, of those records contained in the box that was burned, their contents have not been withheld from Defendants as Ms. Solomon Outlaw testified that Mr. Outlaw's attorneys had copies

of any documents contained in that box and the material from most of Mr. Outlaw's attorneys have been subpoenaed and received by Defendants in this case.

Plaintiff cannot be said to have had any control over the destruction of any documents in this case.

### 3) Evidence has not been suppressed from Defendants by Plaintiff

Actual suppression or withholding of the evidence must have occurred. "No unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for." Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 334 (3d Cir. 1995), citing generally 31A C.J.S. Evidence § 156(2); 29 Am.Jur.2d Evidence § 177 ("Such a presumption or inference arises, however, only when the spoilation or destruction [of evidence] was intentional, and indicates fraud and a desire to suppress the truth, and it does not arise where the destruction was a matter of routine with no fraudulent intent.").

Even assuming, *arguendo*, that this Court finds Plaintiff had control over the box of documents burned by his wife, both parties have been forthcoming about the circumstances of these records in their deposition including Ms. Solomon Outlaw's reason for doing so and her stated belief that she was not doing anything wrong or trying to hide or destroy original evidence for her husband's civil rights case which had not even been filed at the time.  The failure to produce these documents is properly accounted for where Ms. Solomon Outlaw has testified that she did not destroy originals and that Mr. Outlaw's attorneys had copies of these same materials. Defendants have been given the prior attorneys files that they requested, and none of these requested documents have been suppressed from them by Plaintiff in the course of this discovery.

### 4) Plaintiff is not responsible for the destruction of any relevant evidence

"When the contents of a document are relevant to an issue in a case, the trier of fact generally may receive the fact of the document's nonproduction or destruction as evidence that the party that has prevented production did so out of the well-founded fear that the contents would harm him." Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 334 (3d Cir. 1995), *citing Gumbs v. International Harvester, Inc.,* 718 F.2d 88, 96 (3d Cir.1983); *United States v. Cherkasky Meat Co.,* 259 F.2d 89 (3d Cir.1958). Because Defendants fail on the first three prongs of this analysis, the fourth requires no consideration. Defendants have failed to show that any material has been destroyed by Plaintiff and further that any such material is anything other than copies of material that Plaintiff or other third parties have already produced.

### B. __Sanctions against Plaintiff are not warranted.__

Sanctions against Plaintiff are not appropriate. Defendants bring their request for sanctions under Fed. R. Civ. P. 37(e) Failure to Preserve Electronically Stored Information. Fed. R. Civ. P. 37(e). However, although Defendants' Motion mentions "emails and texts" as material destroyed in this case, there is absolutely no further explanation for this statement and the Motion appears to focus on "hard copy" documents in Plaintiff's possession in prison and in his wife's possession at home. For hard copy documents, sanctions under Rue 37(e) are improper. However, Plaintiff recognizes the Court's inherent poser to issue sanctions where appropriate. "There is no rule of law mandating a particular sanction upon a finding of improper destruction or loss of evidence; rather, such a decision is left to the discretion of the Court." Paramount Pictures Corp. v. Davis, 234 F.R.D. 102, 111 (E.D. Pa. 2005) citing Erie Ins. Exchange v. Applica Consumer Prods., Inc., No. 02–1040, 2005 WL 1165562, at *3 (May 17, 2005) *citing* Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79 (3d Cir.1994).

Within this framework, the Third Circuit has "laid out three factors district courts must consider when contemplating Rule 37 sanctions." GN Netcom, Inc. v. Plantronics, Inc., 930 F.3d 76, 82 (3d Cir. 2019). Those factors consist of:

> (1) the degree of fault of the party who altered or destroyed the evidence;
>
> (2) the degree of prejudice suffered by the opposing party; and
>
> (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.

Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79 (3d Cir. 1994). A dispositive sanction is warranted only where "the non-responsible party's case is severely impaired because it lacked the information that was not produced." GN Netcom, Inc. v. Plantronics, Inc., 930 F.3d 76, 82 (3d Cir. 2019), quoting Bull v. United Parcel Serv., Inc., 665 F.3d 68, 83 (3d Cir. 2012).

Frist, Plaintiff is not at fault for the destruction of any evidence in this case and Defendants' attempts to miscolor Plaintiff's conduct with unrelated and unsupported claims of witness intimidation and alteration of documents in an attempt to tangentially suggest that Mr. Outlaw spoiled evidence beyond his control, is simply inconsistent with the factual record. Second, Defendants failed to establish any prejudice suffered by the alleged spoilation of evidence. Third, because the first two elements have not been satisfied, the Court need not consider the third prong which is not only factually unsupported but procedurally premature.

### 1) Plaintiff has not acted in bad faith

Defendant bears the burden of proving that Plaintiff acted in bad faith. Bull v. United Parcel Serv., Inc., 665 F.3d 68, 77 (3d Cir. 2012). The Third Circuit recognizes "there are strong reasons favoring a presumption of inadvertence." Id. Here, although "burning" is an affirmative act, Ms.

Solomon-Outlaw's "inadvertence" can be seen in the fact that she thought she was doing nothing more than ceremoniously and therapeutically getting rid of copies of material that she did not believe to consist of original, relevant evidence that might be used for or against Mr. Outlaw in a future civil rights case. There is no evidence to connect the off-handed comments Mr. Outlaw made in jail phone calls about wishing he could "burn" the legal documents he collected in prison (which were destroyed by the prison and not returned to Mr. Outlaw when he was released) and Ms. Solomon Outlaw's act of burning the documents that she had collected. This was not an instruction by Plaintiff, and there is no evidence to suggest otherwise.

Rather in his deposition he expressly states that he understands the "importance of discovery" but believed that he had complied with his obligation to keep track of material by giving all evidence to his attorneys such that he did not believe he needed to preserve his own copies – which SCI Dallas destroyed:

> Q. But you understand the importance of discovery, right? That was one of the large foundations of your case, that documents should have been turned over and exchanged?
>
> A. Yeah. I always understood the importance of discovery. I never confused about that. But when I was speaking about -- I was speaking about my file that I never had. My file was at SCI Dallas. I didn't have possession of my file. Then a lot of -- everything that was original I sent to my attorney, Edward Foster. Monique made a copy of everything she had and gave to my attorney. So it was no need, I felt as though for me, to hold onto anything, because Monique gave Ed everything and she took the copies, and it was no need for me to hold on and to me, you know, taunt myself with this paperwork.

See Plaintiff's Deposition Transcript at p. 130:6 – 23.

In GN Netcom, Inc. v. Plantronics, Inc., the spoiled material was also unquestionable unfavorable to the spoiling party as admitted by agents of the spoiling party who conceded that there may have been "damning statements" in the emails which were destroyed in that case. GN

<u>Netcom, Inc. v. Plantronics, Inc.</u>, 930 F.3d 76, 83 (3d Cir. 2019). No such evidence exists in this case.

Defendants have already directly questioned Mr. Outlaw on nearly every element of a spoilation and sanction analysis (the line of questioning in Mr. Outlaw's deposition suggests that this Motion for Sanctions was planned prior to Mr. Outlaw's deposition, however after obtaining clear explanations from Mr. Outlaw that dispel any suggestion of bad faith, Defendants proceeded with a motion for sanctions, anyways.) Defendants have already asked Mr. Outlaw whether he "intended to destroy documents after [his] release from prison" and whether he "understood that he had an obligation to retain documents that were relevant to litigation if [he] intended to bring it at the time." Unlike the spoiling parties in the cases cited by Defendants, Mr. Outlaw's response confirms that he was not aware of a duty, and that he did not intend to destroy evidence to prevent Defendants in this case from obtaining it.

Rather, Mr. Outlaw responded by explaining that he was not aware of an obligation to retain documents prior to bringing a lawsuit. <u>See</u> Deposition Transcript at p. 69: 6 – 24 – 70:1 – 10. Exhibit A. He also explained that once he was released, he did not want to keep the "memorabilia of [his] life sentence" because it brought him anxiety. For that reason, Mr. Outlaw said that he "didn't intend to keep it forever, No, I didn't."  <u>See</u> Deposition Transcript at p. 67:6-11, Exhibit A. Despite obtaining this answer from Mr. Outlaw, Defendants claim to this Court that Mr. Outlaw acted in bad faith.

Defendants have failed to meet the burden of proving that Plaintiff acted in bad faith.  **2)**

## 2)  Defendants fail to show that they have suffered any prejudice

Even assuming *arguendo*, that Defendants could substantiate the claims in their motion with facts, sanctions would still be improper because Defendants have failed to establish any

prejudice. At the outset, "when a party moving for spoliation sanctions cannot offer "plausible, concrete suggestions as to what [the lost] evidence might have been," there should be no finding of prejudice." GN Netcom, Inc. v. Plantronics, Inc., 930 F.3d 76, 83 (3d Cir. 2019), *citing* Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 80 (3d Cir. 1994). Defendants in this case have failed to offer plausible, concrete suggestions as to the nature of the lost evidence, and their Motion for Sanctions should be denied without further analysis. In fact, without identifying what evidence Defendants believe to have been lost, Plaintiff cannot possibly provide a Response to Defendant's broad-sweeping and factually unsupported assertions.

To the extent that Defendants claim that the lost evidence only constitutes 1) original letters between Mr. Paladino and Monique Solomon Outlaw, and 2) original affidavits and witness statements, Plaintiff has already explained that this evidence has not been spoiled by him. Further, even if spoliation did occur, Defendants have experienced no prejudice because they have copies of these documents of affidavits and witness statements and the letters that were thrown away did not contain information related to Mr. Outlaw's case. To the extent that the letters included information that speaks to the nature of the relationship between Ms. Solomon Outlaw and Mr. Paladino, both witnesses have been (and are scheduled to continue to be) deposed in this case such that counsel can fully explore any factual information on that point, under oath.

### 3) Sanctions are inappropriate and seeking an adverse inference jury charge is premature while discovery is ongoing.

Finally, in addition to this premature request for sanctions on an evidentiary ruling before even the close of discovery, which Plaintiff will not re-iterate again here, Defendants have failed to show that their case is "severely impaired because it lacked the information that was not produced" as required before the imposition of sanctions are appropriate. GN Netcom, Inc. v. Plantronics, Inc., 930 F.3d 76, 82 (3d Cir. 2019), quoting Bull v. United Parcel Serv., Inc., 665

F.3d 68, 83 (3d Cir. 2012). For the reasons exhausted above, Defendants either have copies of the material destroyed, or have exercised the ability to question both party and non-party witnesses about any of the material believed to be destroyed. Information has not be withheld from Defendants such that their ability to defend their case is "severely impaired." The request for an adverse inference where copies of the material has been produced and where witnesses may be called to testify as to the substance of any communications, affidavits, or statements, an adverse inference is not appropriate. Therefore, Defendants' request for sanctions should be denied.

## IV.    <u>CONCLUSION</u>

For the reasons stated above, Plaintiff respectfully requests that this Court deny Defendants' Motion for Sanctions, and respectfully seeks entry of the order proposed and submitted with this Response.

**VSCP** LAW   VAN NAARDEN · SPIZER
                CHASE · PINTO

*Julia Ronnebaum*

JOSHUA VAN NAARDEN, ESQUIRE
JULIA RONNEBAUM, ESQUIRE
Two Commerce Square
2001 Market Street, Suite 3700
Philadelphia, PA 19103
TEL:  215-960-0000
FAX:  215-960-0384
jvannaarden@vscplaw.com
jronnebaum@vscplaw.com

*Attorneys for Plaintiff*

Date: August 19, 2022

## <u>CERTIFICATE OF SERVICE</u>

I, Valerie A. Wilus, Paralegal to Julia Ronnebaum, Esquire, hereby certify that I caused a true and correct copy of Plaintiff's Response in Opposition to Defendants' Motion for Sanctions (ECF No. 123) to be served upon the following persons listed below via ECF filing:

Danielle B. Rosenthal, Esquire
Katelyn L. Mays, Esquire
City of Philadelphia – Solicitor Office
1515 Arch Street, 14th Floor
Philadelphia, PA  19102
danielle.rosenthal@phila.gov
Katelyn.Mays@phila.gov
*Attorneys for Defendants*

_Valerie A. Wilus_
VALERIE A. WILUS

Dated:  August 19, 2020