# EXHIBIT A

MICHAEL MOSINIAK
PO BOX 49
JAMISON, PA 18929

September 12, 2022

Joshua Van Naarden
Julia Ronnebaum
VSCP LAW
2001 Market Street, Suite 3700
Philadelphia PA 19103

      Re:    Donald Outlaw v. City of Philadelphia et al.

Dear Mr. Van Naarden and Mrs. Ronnebaum:

This letter is my report setting forth my conclusions after review of the materials provided to me which are identified in a separate appendix. I have effectuated a confidentiality agreement and therefore will not specifically identify documents that have been deemed confidential by the parties. To the extent additional information becomes available I reserve the right to supplement this report.

My 37-year career in law enforcement began as a Law Enforcement Specialist in the United States Air Force. I was Honorably Discharged from the military in 1989. I became a Police Officer with the Warminster Township Police Department in 1990 and was promoted to the rank of Sergeant in 1995, serving as the Detective Sergeant and supervising all criminal investigations from 1995 to 1998. In 1998, I was hired as a County Detective by the Bucks County District Attorney's Office. In 2011, I was promoted to Deputy Chief of the Bucks County Detectives and served in that position, conducting investigations and supervising them until retiring in June 2022. I hold an active MPOETC number as a certified police officer.

During my tenure in the military police and as a sworn police officer, Detective, and Deputy Chief in Bucks County, I was involved in many arrests and conducted and supervised complex investigations, including death investigations, homicides, cold case homicides, and other felonies. I have conducted hundreds of interviews of witnesses, suspects, offenders, and crime victims. I have also made numerous undercover drug purchases, conducted surveillance, and participated in the execution and preparation of numerous search and seizure warrants. I have interviewed many drug violators, from buyers who have purchased for personal use to drug distributors with direct links to source countries. I have written and reviewed hundreds of Affidavits of Probable Cause for arrest for numerous different types of violations of the PA Crimes Code during the course of my career.

In addition, I have served as an instructor on numerous occasions, training other police officers in interview and interrogation at various schools and trainings within Pennsylvania. I have trained officers and detectives to properly draft Affidavits of Probable Cause for arrest.

I have received instruction relating to death investigations, including training provided by the Delaware County Police Academy, Bucks County Police Training Center, the Bucks County District Attorney's Office, the Advanced Homicide Investigation course offered by the New Jersey State Police, the Federal Bureau of Investigation (FBI), the Practical Homicide Investigation course instructed by Ret. LT Vernon Gerbreth, former commander of the NYPD Bronx Homicide Task Force, the Pennsylvania Homicide Investigator's Association, and the International Homicide Investigator's Association.

Additional credentialling information is contained in my attached curriculum vitae as are my fees for services.

I have been tasked with reviewing materials and render any conclusions to be drawn from that review regarding the Philadelphia Police Department's operational, supervisory, managerial conduct as well as their customs, policies, practices and directives, as well as the conduct of Homicide Detectives in investigating the shooting and murder of Jamal Kelly.

In conducting my examination of the materials and conduct in this case I have used generally accepted methodologies commonly used in investigating crimes as well as investigating police misconduct related to investigations as I have spent my entire career employing these generally accepted methods. I have applied my training and skills to review the content of the materials and depositions in assessing compliance with and deviations from accepted operational, managerial practices as well as compliance and deviations from accepted police practices and investigatory conduct. My conclusions are based on best practices of police and law enforcement as well as criminal and internal investigations, supervision, training and management and operations as applied to the materials provided.

## SEPTEMBER 4, 2000, SHOOTING OF JAMAL KELLY

The crime that is the subject matter of the present litigation involves the September 4, 2000, shooting of Jamal Kelly at 19th and Champlost located in Philadelphia. The first police responder to the scene was Officer Lee Datts who prepared a 75-48 incident report the night of the shooting [OutlawDAO2022001164]. The document reflects that he prepared the report at 12:18am on September 4, 2000, and that when he arrives he is able to obtain information reflecting that "unk b/male offender or offenders shot above compt 3 times in the back while talking to below [Shelby Green]" the document further reflects that the "offender left in auto going North on 19th Street." Officer Datts indicates that "offender stated to police it was shank while dying". Officer Datts later clarified in an interview with Homicide Detective Boyle that this was the statement of Jamal Kelly [Outlawdao2022000418]. Shelby Green was interviewed by Detective Willis at 3:41am the morning of the shooting and confirmed that an individual named Shank was with her and Jamal approximately 5-7 minutes before the shooting and that after the shooting Jamal stated "Shank, Shank set me up" [CITY 572-574].

Ms. Green was brought back to the scene and identified Derrick Alston as "Shank," who she had seen talking with Jamal earlier that evening [OutlawDAO2022000419]. Mr. Alston was then transported for an interview that was conducted by Detective Geliebter. Shank indicated in his initial statement to police that he did not see who shot Jamal Kelly [in the statement it says "Did you see anyone shoot at shank" which is obviously a mistake]. Shank admits to being at the scene when the shooting happened and to talking to Jamal shortly before the shooting. Mr. Alston denies shooting Jamal and indicates he was with a white boy name Poppie. Shank also admits to having an argument with Jamal over the summer that was over drugs.

On September 16, 2000, Jamal Kelly died of his gunshot wounds and the matter was classified as a Homicide. While Homicide was notified on the night of the shooting [CITY 00104] they were officially assigned the case on September 18, 2000 [OutlawDAO2022000229]. The assigned Detective was initially Detective Boyle under the supervision of Sgt. Muci and Lt. Deegan. Lt. Deegan would remain as the highest ranking supervisor on the case until the case was cleared upon the arrest of Mr. Outlaw in 2003. The activity sheets document various actions taken by assigned Detectives Boyle and Piree which included attempts to locate Mr. Alston [Shank] as well as re-interviewing police and medical personnel at the scene as well as attempting to get information regarding drug activity in the area of the shooting. [OutlawDAO2022000229]. The homicide notes indicate that early in the investigation Detective Boyle spoke to Cynthia Kelly [mother of Jamal] and was informed that "girl w/him stated male came up behind him and shot him "SHANK" – did it –" [OutlawDAO2022000054]. On September 23, 2000, Detective Boyle re-interviewed first responder Lee Datts who again confirmed Mr. Kelly's dying declaration that "Shank did it" as well as Ms. Green's statement that she heard Mr. Kelly say "Shank set me up" [OutlawDAO2022000419]. Officer Datts provided information that Poppy [white male] was also interviewed at the scene by Detectives and indicated that a gold Honda/Hyundi took off from the location after the shooting and that he did not see the shooter[s]. Poppy also confirmed that he was with Shank at the time of the shooting [OutlawDAO2022000419].

On October 30, 2000, Derrick Alston was arrested after being found hiding on a 3rd floor fire tower going through a females pocketbook [Dovetta Simpkins]. [OutlawDAO2022000612]. Ms. Simpkins alleged that Alston kicked down the bathroom door, punched her and took her pocketbook. Mr. Alston was arrested on criminal charges for this incident, but also mirandized and questioned by Detective Boyle about the Jamal Kelly murder. The interview started at 12:20pm and concluded at 1:37pm [OutlawDAO202000156-160]. Mr. Alston was mirandized because he was a suspect in the Jamal Kelly murder, according to Detective Boyle [Boyle pg. 149]. Mr. Alston confirmed that he was with Poppie at the time of the shooting across the street and also confirmed that he had a problem/feud with Jamal who was a drug dealer. Mr. Alston also identified "Pumpkin" as being at the scene shortly before the shooting. Ultimately Mr. Alston did not admit to the shooting and denied knowing who the shooter was. There is a Statement Adoption Attestation sheet signed by Mr. Alston and Detective Boyle attached to the statement [OutlawDAO202200165] as well as a diagram adopted by Mr. Alston demonstrating the path of travel he took after talking to Jamal. [OutlawDAO2022000134]. This statement was faxed to DACU the same day [OutlawDAO2022000143].

The Homicide notes prepared by Detective Boyle indicate that on October 8, 2000, Detectives went to the New Night Winds Lounge and talked to manager Kim Moody [OutlawDAO2022000694]. The next day a "While you were out" note was provided to Detective Boyle that indicated "your killer is a b/m name "Blunt" – he's been bragging in the Dew Drop In …" [OutlawDAO2022000696]. Detective Boyle also contacted Detective Jeff Arbiz who according to Detective Boyle worked Narcotics Intelligence and got information about Blount. [Boyle pg. 84/85] as he was a suspect in the shooting. The homicide notes also confirm that "Blount – b/m supplies to "mal" as well as information about a gold Honda accord at 16th and Nedro [OutlawDAO2022002971]. There is also confirmation in the file that detectives identified Blunt/Blount as Jerome/Eric Grant [DAO 01126]. There are also homicide notes indicating that Lemuel Barr "Pumpkin" provided information about the shooter but no statement is in the file [CITY 608]

On November 27, 2000, Anthony Brisbon was interviewed by Detective Boyle who documents the start time but not the end time [OutlawDAO2022000665]. The interview date is November 27, 2000, but he was brought in by the 35th district on November 6th. Mr. Brisbon indicated that he talked to detectives at the scene but there is no corresponding interview. Mr. Brisbon confirmed that Jamal was a drug dealer and that Shank was his supplier and that Pumpkin was also someone Jamal sold drugs for. Mr. Brisbon did not see the shooting but was able to provide information about the problem between Shank and Jamal as it was over money owed for drugs.

On May 15, 2001, Charles Paladino "Pops/Poppie" was transported to "assigned Detective Peterman" [CITY 534]. The statement is taken by Detective Jeffrey Piree which starts at 8:40pm and has no documented end time [OutlawDAO2022000055-60]. In this statement Mr. Paladino indicates that he did see the shooting but that he could not identify the shooter[s] as they were in a gold/tan Hyundi. He also indicates that was with Shank and Eric Lee at the time of the shooting and that they never indicated they recognized the shooter. He claims Lamar Rodgers told him that Don-Don admitted to the shooting about a month after the shooting.

On June 23, 2001, at 10:38 am, Mr. Paladino was arrested at 1500 W Belfield for being in possession of a stolen car [CITY 9575]. There is an indication he was transported to the PAB for "medical reasons" per police memorandum. The PAB is the location of the Philadelphia Homicide unit. On June 24, 2001, at 5:50pm, Ruth Mills [mother of Mr. Paladino] leaves a message to Detective Boyle indicating that "her son Charles Paladino is locked up" [OutlawDAO2022000054].

On June 26, 2001, at 11:00am, Mr. Paladino's interview was memorialized by Detectives Peterman and McNamee [OutlawDAO2022000062-67]. The end of the interview is not documented. In the statement Detective Peterman confirms that Mr. Paladino's interview was actually started on June 25th and that he provided information at that time as well as picked Mr. Outlaw out of "all the pictures on the machine". None of this was documented or recorded by Detectives. In this interview Mr. Paladino for the first time indicates that he saw Don-Don [identified as Donald Outlaw] shoot Jamal Kelly and that the shooter was not in a car but rather came up the side of the steps and shot Mr. Kelly at close range. He also provided information for the first time that he had seen Mr. Outlaw twice on the night of the shooting – the first time at approximately 5 pm at the Night Winds bar, where Mr. Paladino's interview indicates that Mr. Outlaw had a gun and told Jamal that he was going to shoot him and that he wanted his money; the second time at approximately 9:30 pm on the corner of 19th and Champlost, where Mr. Outlaw asked about Jamal's whereabouts and said that he was going to "bang" him. [CITY 8-13]. No further corroborating or dispelling evidence was developed or documented by Detectives. Mr. Paladino also indicated in his statement that Mr. Outlaw was wearing blue long khakis and a white t-shirt and was carrying a ".9 or a 380" firearm.

45 minutes later, that same day, June 26, 2001, the same detectives [Peterman and McNamee] also questioned Mr. Paladino as a witness in an unrelated murder and obtained a witness statement from Mr. Paladino in which he positively identifies the shooter after he is shown video surveillance.

On October 23, 2001, a sign in sheet indicates that Mr. Paladino along with this mother were signed into Homicide under Detective Peterman's badge number at 10:42 [CITY 7403]. At 11:00, Detective McNamee took an interview of Ruth Mills who indicated her son told her he was beat up after release from prison by Mr. Outlaw as well as indications that he was in her yard shooting 3 nights earlier [CITY 495]. Mr. Paladino did not provide a statement that day. On October 24, 2001, Mr. Paladino was arrested at 8:58am at 1900 North Champlost. At 10:53am Detective Peterman documents the start of another Mr. Paladino statement. [OutlawDAO202200068]. This statement is also not timed as to when it ended. Detective Peterman indicates that Mr. Paladino called him and set up an appointment. There is no mention of Mr. Paladino being present with his mother the day before. In this statement Detective Peterman indicates that Mr. Paladino claims he was assaulted by Mr. Outlaw.

There are various bring down requests initiated by Detective Peterman for Derrick Alston on November 8, 2001 [CITY 259] December 5, 2001 [CITY 271] as well as for Yashon Williams on March 19, 2002 [CITY 488] but no corresponding interviews are documented. There is also reference in the homicide notes that on March 19, 2002, someone was interviewed which

corresponds with the Williams "bring down" [CITY486]. There is also reference to information provided by Lemuel Barr [Pumpkin] but no corresponding interview [CITY 486].

On March 29, 2002, Lamar Rodgers was interviewed by Detectives Peterman and Harkins. CITY 490-493]. There is no end time identified on the statement. Mr. Rodgers claims he did not see the shooting but that Shank and Pop were there when the shooting happened. The statement documents that after the shooting he ran into Mr. Outlaw who he overheard talking to Lemuel Barr or "SAA" [Wesley Harmon[1]] and that he admitted to the shooting. Mr. Rodgers is reported to have stated that Mr. Outlaw was in a blue Honda. Mr. Rodgers is also reported as stating that there was another conversation about a month later where Mr. Outlaw again drove by and admitted to the shooting.[2]

On July 9, 2003, there is another bring down request submitted by Detective Peterman for Anthony Brisbon but no corresponding interview is documented [CITY 28]. This is further confirmed in the activity sheets [OutlawDAO2022000236].

On July 9, 2003, Derrick Alston was picked up and transferred to Homicide by 35th district officers [OutlawDAO2022000638]. The same day at 8:28pm he was re-interviewed by Detective Peterman. In this third interview, Mr. Alston claims he witnessed Mr. Outlaw shoot Jamal. Mr. Alston is reported as stating Mr. Outlaw was wearing a white shirt [OutlawDAO2022000110]. The interview appears to conclude on page 3 but then additional questioning about the kind of gun used in the shooting appears on page 4. For the first time, Mr. Alston's sister is mentioned as someone that works for the Fraternal Order of Police.

On August 19, 2003, Eric Lee signs into Homicide unit at 2:20am. His statement is obtained by Detectives Peterman and Harkins [OutlawDAO2022001090]. In this statement Mr. Lee is reported as identifying Mr. Outlaw as the shooter and also confirms that Paladino and Alston were present when the shooting occurred. There is a Statement Adoption Attestation attached to the document [OutlawDAO2022001097].

Throughout the entire police investigative file there is no evidence that Mr. Outlaw was aware that he was a suspect in the murder of Jamal Kelly until his arrest. Mr. Outlaw is first identified in a witness statement by Mr. Paladino on May 15, 2001, but no attempts to interview Mr. Outlaw are ever documented.

Detective Peterman, as the assigned, is the affiant on the arrest warrant for Mr. Outlaw. The only documentation of information provided to the DA's office related to this investigation is that the October 30, 2000, statement of Mr. Alston and the August 19, 2003, statement of Eric Lee were provided to the DA via fax [OutlawDAO20222163]. On August 26, 2003, edits were made by ADA McCann that crossed out mention of Alston's July 9, 2003, statement as well as the statement of Ruth Mills [OutlawDAO2022002160-2162]. There is also mention that on August 28, 2003, ADA McCann and Sgt. Barlow conferred. [OutlawDAO2022000219]. The warrant prepared by Detective Peterman contained only the statements of Paladino taken June

---

[1] Mr. Harmon has testified that this information is not true.
[2] There are house arrest records which indicate that when this conversation occurred Mr. Outlaw was on house arrest [PH HAMU00001-32].

26, 2001, October 24, 2001, Lamar Rodgers taken March 29, 2002, and Eric Lee taken August 19, 2003. There was no information about the previous inconsistent statements provided by Paladino at the night of the shooting as well on May 15, 2001, nor was any reference made to the fact that Jamal Kelly's dying declaration was that "Shank did it" nor that Shank was identified at the scene and admitted that he was present for the shooting and that he had a feud/argument with Mr. Kelly just prior to the shooting. The evidence submitted to substantiate probable cause against Mr. Outlaw was entirely based upon purported eyewitness testimony.

The details of the shooting provided by Mr. Paladino, Lee and Alston [in their statements inculpating Mr. Outlaw] are as follows:

Paladino: Don-Don comes up behind the wall and starts shooting him, straight at him. But he was ducking his face behind the wall. He fired about 5 times. I ducked down so he wouldn't see me. Then Don-Don ran back where he came from and the car turned the corner and Don-Don dove into the car and it drove off and it headed towards church ln.[3] [OutlawDAO2022000066]

Alston: I looked across the street where the shots was coming from and I saw smoke. Gunsmoke on the corner next to the wall. Then Don-Don standing on the corner next to the wall. Don-Don looked over at me. I seen Mal down on the street, he and the girl was on the pavement. Then I looked up and saw Don-Don and he looked at us and he raised his gun up and racked it when he was looking at us, like for us that we better be quiet …I didn't see a car pull up. No but I seen a car go fast around the corner up 19th st toward church ln.[4] [OutlawDAO2022000111].

Lee: I seen young boy behind the wall and I could see flames coming from his gun. He was reaching over the wall and you could see the shots . . . A car came fast around the corner up 19th street. I don't know if he got in. The car didn't slow down much, if at all [OutlawDAO20220001091]

In addition to being inconsistent with prior statements provided to the Police [Paladino and Alston] these statements are internally inconsistent. Without further credible evidence these statements are simply not enough to create probable cause to a reasonable officer. This is especially true considering the *crimen falsi* information available on these witnesses. It is also important to any investigator, when weighing credibility, to know if any of the witnesses have cooperated in homicide investigations in the past or if the witnesses are also potentially suspects in the murder – which was clearly the case with Paladino and Alston. In light of these known facts a reasonable police officer would have recorded these statements. The statements were not recorded and do not indicate when they were concluded, which are both not acceptable police practices in place in 2000 to ensure the integrity of witness and suspect statements.

The warrant was approved on September 3, 2003, [OutlawDAO2022000091] based upon the information provided by Detective Peterman who also prepared the bills of information

---

[3] Paladino in this statement describes that car as a 4 door Hyundai hatchback, brown green 85-86. He also states that another person got shot at the scene. The gun that he describes Mr. Outlaw having earlier in the day is a brown handle, automatic, either a .9 or .380

[4] Mr. Alston in the continuation of the statement that is not timed states that the gun was a .380 or .9

indicating the murder and the purported incident of purported intimidation all occurred on
September 4, 2000, which is clearly not accurate as the intimidation happened sometime in 2001.
Mr. Outlaw was brought down from CFCF and charged with the murder of Jamal Kelly on
September 3, 2003 [OutlawDAO2022000219]. Mr. Outlaw testified that Detective Peterman
questioned him about the murder without mirandizing him and used force by hitting Mr.
Outlaw's head with a set of handcuffs.

On January 29, 2002, Mr. Paladino pled guilty to misdemeanor charges related to car theft and
had the felony charges dropped [CITY 9654]. On October 29, 2003, Mr. Paladino testified at a
preliminary hearing for the Jamal Kelly murder. At this hearing Mr. Paladino testified about
seeing Mr. Outlaw shoot Jamal and that the assault occurred after his release from custody on
November 24, 2001 [pg. 25]. This date is obviously after the statement he provided to Detective
Paladino on October 24, 2001. Mr. Paladino also testified that he was a very frequent crack
cocaine user at the time of the shooting. [pg. 42]. Mr. Paladino was the only civilian to testify at
the preliminary hearing.

On May 18, 2004, Mr. Paladino was transported to Police Headquarters for an interview [CITY
653]. On May 19, 2004, Mr. Paladino was brought down by Homicide detectives [CITY 665].
There is no further documentation of these interactions between Mr. Paladino and Homicide
detectives. On August 11, 2004, Mr. Paladino wrote a letter to DA Jude Conroy related to his
involvement in the Outlaw case [RO[CIU]000037]. On September 20, 2004, Mr. Paladino
writes a letter to Mr. Outlaw as well as Detective Peterman. In the letter to Mr. Outlaw, Mr.
Paladino indicates that he was "forced to do something I never wanted to do" [RO[CIU]00041].
The letter to Detective Peterman indicates that "I've put together a speech for the up coming trial
and I'm sure you'll be happy with it as well as I am. I have learned a lot about being a witness,
so please help, me help you." [CITY 599]. The letter to Detective Peterman was never disclosed
to Mr. Outlaw or his trial counsel.

The criminal trial against Donald Outlaw started in December of 2004. The entire case was
premised upon eyewitness testimony. No ballistic evidence links Mr. Outlaw to the scene of the
crime. No other forensic evidence was presented or developed linking Mr. Outlaw to the scene of
the crime.

Trial Testimony December 16, 2004:
Lamar Rodgers:
     -Testified he never saw Mr. Outlaw the night of the shooting [pg. 73; 86]
     -Detectives came to his house and told him he had to come with them [pg. 77]
     -He wrote down what happened and gave to detective and they then said they would type
     it up, but he never reviewed it before signing [pg. 88]
     -Denies telling Detectives he heard Mr. Outlaw admit to the shooting [pg. 95]
     -He doesn't know who killed Jamal [pg. 95]
     -He met with Peterman and a dark-skinned detective [pg. 128]

Eric Lee:
     -Testified that he never told detectives he saw Mr. Outlaw shot Jamal [pg. 176-177]

-Never read his statement obtained by Det. Peterman, just signed it so he could leave [pg. 170]

-Detective Peterman came to his house and took him to Homicide [pg. 163]

December 17, 2004:
Derrick Alston:
    -Testified his nickname is shank [pg. 54]
    -Did not see Mr. Outlaw the night of the shooting [pg. 70/71]
    -He denies making the July 9, 2003, statement to Detectives and signed without reading it [pg. 95]
    -He claims he was "hassled and locked up" before providing that statement against Mr. Outlaw [pg. 96-98]
    -The statements inculpating Mr. Outlaw are false [pg. 103]

December 20, 2004
Charles Paladino:
    -Homicide Detectives forced their way into his house and pulled him out [pg. 30]
    -He talked to Detectives at Homicide after they arrested him for auto theft [pg. 32/33]
    -Mr. Outlaw did not beat him up [pg. 74]
    -June 26th interview was under interrogation and is not true [pg. 85]
    -Detective Peterman and him fabricated the statement [pg. 86]
    -He was caused to forcefully implicate Mr. Outlaw by Detective Peterman [pg. 86]
    -He knew he was lying at the preliminary hearing [pg. 140]

The remainder of the testimony at the trial from civilians and non-Homicide police personnel was consistent with prior statements provided. Detectives Boyle, Harkin, Piree and Peterman were all required to testify in order to admit the prior statements of Mr. Paladino, Lee, Rodgers and Alston. Every witness statement that Detective Peterman participated in obtaining, was either denied or recanted by that witness at trial.

Mr. Outlaw was found guilty and subsequently sentenced to life in prison for the murder of Jamal Kelly and intimidating witness charges as well. After his conviction Mr. Outlaw participated in a lengthy appellate process that eventually culminated in several post conviction relief act hearings. Throughout the appellate process various witness testified at hearings including Mr. Paladino, Lamar Rodgers and Eric Lee who all maintained that their statements inculpating Mr. Outlaw were wither coerced or fabricated or both. Katima Jackson and several other individuals [Wesley Harmon, Lloyd Odum] as well as Paladino, Rodgers and Lee all provided affidavits indicating that either Mr. Outlaw didn't commit this murder or that they heard/saw Derrick Alston [Shank] shoot Jamal. There is also a letter from Attorney Mark Greenberg that he spoke with Lemuel Barr and that he indicated he was interviewed by Detectives and that he informed them Mr. Outlaw was not the shooter [CITY 2120]. No documentation of this interview exists, nor was this information provided to Mr. Outlaw.

On January 29, 2019, the Honorable Judge Diana L. Anhalt vacated Mr. Outlaw's conviction and ordered a new trial. This ruling was based upon newly discovered evidence in the form of Katima Jackson that was determined to be credible by the Court and a violation of Mr. Outlaw's

due process rights for failure to disclose the letter that Mr. Paladino wrote to Detective Peterman on September 20, 2004, as well as information about an eyewitness having seen a gold Hyundai. [CITY 22197]. On July 31, 2019, Mr. Outlaw was released on house arrest pending decision by the DA regarding re-arrest [CITY 22219]. On December 18, 2020, the District Attorney's Office filed a motion for Nolle Prosequi which was authored by the Chief of their Conviction Integrity Unit [CIU] Patricia Cummings [CITY 22112]. In the District Attorney's office brief, they represented that the Commonwealth reinvestigated the case against Mr. Outlaw which included Jamal's dying declaration regarding "Shank" and his involvement in the shooting. The CIU stated that Shank was deceased but that there was no evidence linking Mr. Outlaw to Shank. The CIU uncovered additional evidence suggesting that Shank committed the crime during another extensive interview with Charles Paladino who confirmed that he was a witness in at least 3 other homicides [this was confirmed in a letter authored by ADA Jude Conroy from May of 2004 indicating he was a witness for the Commonwealth in several homicides [RO[CIU]000003]]. The motion was granted on December 29, 2020.

Since the commencement of this 1983 Civil Rights case, several of these witnesses have been deposed including Shelby Green, Charles Paladino, Derrick Alston, Katima Jackson, Wesley Harmon, Jabrail Jones, Chris Holder as well as Detectives, Harkins, Piree, McNamee, Peterman, Boyle and Lt. Deegan. Patricia Cummings also provided testimony. I will address pertinent parts of their testimony as I discuss the criminal investigation.

## EVALUATION OF THE CRIMINAL INVESTIGATION

I will not address witness credibility as that is not my role, however I will comment on apparent departures from normal and prudent investigation practices as well as inconsistencies, claims raised by witnesses and other aspect of the investigation that are contrary to common sense and experience of a police officer, deductive reasoning, and the other facts in the case. I will also provide my professional opinions and offer alternative versions of disputed facts so that the jury can properly determine credibility issues. On August 30, 2022, I was provided the opportunity to review what is left of the original homicide file.

When the investigation into the Jamal Kelly shooting was determined to be a Homicide and Detective Boyle took over the investigation, there was clear evidence that the prime suspect was Derrick "Shank" Alston as he had a motive and opportunity. This was acknowledged by Detective Boyle [pg. 55; 129]. There was credible evidence that Jamal believed that Shank either shot him or set him up as well as evidence that Shank had a motive and opportunity to shoot Mr. Kelly from more than one witness as well as a connection between Jamal and Alston due to their involvement in the drug trade [Green, Brisbon, Alston]. From the time of the shooting until the file was transferred to Detective Peterman in the SIU there were more than one potential suspects [Shank, Blount] [Boyle pg. 55, 84]. According to Detective Boyle, at some point in the investigation Detective Peterman apparently was able to get new information about the potential shooter – although none of the detectives can recall what that information was. This information is not documented anywhere. Detective Boyle indicated that he did not believe that Alston committed the murder but that belief was premised upon information provided by Paladino. Paladino was Shank's alibi and vice versa – however they both admit to being present at the time of the murder. It is not standard and acceptable police practice to rule out a potential murder suspect based upon the statement of another potential murder suspect. Detective Boyle testified that in his opinion, the only way an arrest would be effectuated was if a Detective could find somebody to identify the murderer [pg. 240]. Based on the materials provided that is exactly what happened from the moment that Detective Peterman was assigned to the case. There is no documentation as to when Detective Peterman was first involved in this case, but it appears to be well before May of 2001. Several witnesses have identified Detective Peterman as being involved much earlier [Green/Paladino]. We also know from Lt. Deegan that it was not unusual for a Detective to "pre-interview" a witness but not take the actual statement [Lt. Deegan pg. 84].

The first time Mr. Outlaw's name is implicated is when Mr. Paladino is brought to Homicide for questioning in May of 2001. While the statement was documented by Detective Piree, Detective Peterman was the assigned and involved. During this statement Mr. Paladino claims that he knows Mr. Outlaw shot Jamal based upon information provided to him by Lamar Rodgers. Mr. Paladino then provided 2 additional statements in June and October that are both after he is arrested and taken into custody on his own criminal charges, and none of the interviews are timed as to when they concluded. Mr. Paladino claims that these statements are the product of coercion, being detained for long periods of time, and physical force used by Detective Peterman in the presence of Detective Boyle as well as being offered cash and incentives for testimony.

There are several data points that are important in determining the credibility of Mr. Paladino's assertions:

1.  The first time he specifically claimed that Mr. Outlaw shot Jamal is the June 26, 2001 statement taken by Detective Peterman [after Paladino's mother called Detective Boyle letting him know her son is in custody]. This statement clearly indicates he was detained at least the night before and he was arrested 3 days earlier. He also provided another statement on another murder that same day;
2.  The second time he is interviewed by Detective Peterman on October 24, 2001, the statement claims that it was Paladino who set up the appointment but contrary to that statement by Peterman, Mr. Paladino signed into the building the day before and was actually arrested earlier that day of the statement;
3.  The content of the September 20, 2004 letter sent to Detective Peterman from Mr. Paladino prior to trial.
4.  Shelby Green identified Detective Peterman, as well as another detective, as taking her out of school as a 14 year old at girls high and verbally abusing her and trying to get her to state things that were not true [Green pg. 191]

Mr. Paladino was also cooperating in several other homicide cases. In several letters authored by Mr. Paladino it appears that he has cooperated and then recanted his statements in other matters as well. This coupled with Mr. Paladino's extensive *crimen falsi* criminal history made any statement he made inherently suspect requiring corroboration. Mr. Paladino has since provided several letters, affidavits and testimony regarding the coercion, fabrication and force used to obtain his statements. Mr. Paladino has been unequivocal regarding Mr. Outlaw's lack of any involvement in the shooting of Jamal.

Additionally, the statement of July 9, 2003, taken from Derrick Alston by Detective Peterman appears to end and then additional questioning is initiated. Activity sheets indicate that Mr. Alston was wanted for questioning in this murder. He is then picked up on a bench warrant and brought to homicide. This action is more indicative of how a suspect is referred to and not a witness. It is also significantly different from other versions of the events that Mr. Alston provided. Consequently, Mr. Alston [who is alive] testified recently and again stated that he never implicated Mr. Outlaw. The differing versions in Mr. Alston's various statements also should have created significant doubt as to the veracity of his statements. Within this context, no reasonable Detective should have believed him or relied on his statements inculpating Mr. Outlaw.

The two key prosecution witnesses are both individuals that should have been suspects in the murder: Mr. Paladino and Mr. Alston. It is contrary to standard investigatory practices to rely on two witnesses who give materially inconsistent statements.

Eric Lee is the only other individual that Detective Peterman/Harkins claims stated that he saw Mr. Outlaw shoot Jamal. He also has provided testimony on multiple occasions claiming that the statement was fabricated. As indicated above, Detective Peterman was involved in each of these statements that were then recanted.

Lamar Rodgers also provided a statement that placed Mr. Outlaw as driving in the area and admitting to the shooting at a time that Mr. Outlaw was on house arrest. This does not appear to be investigated by Detective Peterman or any other Detective. Mr. Rodgers also says that his statement is fabricated by Detective Peterman.

As testified to by Detectives Boyle and Lt. Deegan – it is unheard of for every single witness questioned by a particular Detective to recant their testimony. Additionally, there is significant evidence that Detective Peterman failed to investigate other suspects and instead relied on a statement from Charles Paladino to build their case. This is not in accordance with accepted and standard investigatory police practice. As indicated below, this led to DA Cummings statement that she was disturbed by the lack of investigation into Mr. Alston.[5]

If Detective Peterman or any other detectives actively abused witnesses or fabricated/coerced statements it would be a violation of the constitution, contrary to accepted police practices and constitute a violation of accepted police and municipal practices and a deliberate disregard of the legal practices of suspect and citizens. This would also apply to any detective who was present or aware of such actions.

The investigatory practices utilized in this case are contrary to accepted police practices. According to witnesses in the case, each critical witness was interviewed without letting them know they were free to leave which constitutes a custodial interrogation requiring providing Miranda warnings. This significantly undermines the integrity of each of these statements.

Detective Peterman, as the assigned, is responsible for the integrity of the homicide file and to ensure all materials are turned over to the DA. The critical letter from Paladino as well as several notes reflecting other suspects and information corroborating the presence of a gold car at the scene were not properly turned over in violation of the constitution and in reckless disregard for the rights of Mr. Outlaw. This resulted in his conviction being vacated.

There are constitutional violations and violations of accepted police practices by Detective Peterman in the drafting and finalization of the arrest warrant. Detective Peterman recklessly omitted from the affidavit the following known facts that were required to be presented to the neutral arbiter:

1. Shelby Green's September 4, 2000, statement confirming that Shank asked Jamal how long he would be at the corner and that after being shot Jamal Kelly stated "Shank, set me up!";
2. Officer Lee Datt's statements on the night of the shooting and then later when interviewed by Detective Boyle that he heard Jamal Kelly state "Shank did it" while dying;
3. Derrick Alston's [Shank] September 4, 2000 statement confirming he was at the scene when the shooting occurred as well as having a motive for shooting Mr. Kelly. Mr. Alston also confirmed he was with Paladino;

---

[5] Mr. Alston's last statement reveals his sister works for the Fraternal Order of Police. This is an uncommon piece of information to include in a statement according to Lt. Deegan [Deegan pg. 110]

4. Charles Paladino's September 4, 2000 statement to Police indicating he could not identify the shooter and that a gold car left the scene. Mr. Paladino also confirmed he was with Alston;

5. Derrick Alston's October 30, 2000, statement again confirming that he could not identify the shooter and again confirmed he was with Paladino;

6. Anthony Brisbon November 27, 2000, statement indicating that Alston supplied drugs to Jamal and they had an argument over drugs and money;

7. Charles Paladino's May 15, 2001, statement where he again confirms he could not identify the shooter but claims Lamar Rodgers told him Mr. Outlaw admitted to the shooting;

8. Charles Paladino was arrested 3 days before his June 26, 2001 interview, this was started at least the day before but not documented in any report;

9. Charles Paladino was a cooperating witness in several other homicides and provided a statement on June 26, 2001 on another murder as well;

10. Charles Paladino was present in Homicide unit 10/23 but did not provide a statement then was arrested October 24th and brought to Homicide and provided a statement.

11. Charles Paladino had a significant criminal record including crimes of dishonesty.

12. Derrick Alston's July 9, 2003, statement where he identified Mr. Outlaw contrary to his previous 2 statements. Mr. Alston also has a criminal record that includes crimes of dishonesty;

13. Homicide received a tip in 2000 that an individual named blunt was bragging about the shooting and that it was confirmed that individual was Jerome/Eric Grant and that he supplied drugs to Jamal. [CITY 614]

This information is absolutely required to be in the affidavit of probable cause as it is exculpatory and contains differing versions of the events from the same witnesses that are being used to establish probable cause. A reasonable police officer should know that the neutral magistrate / bail commissioner would need to know this information in order to determine whether probable cause existed, and that it was required to be added pursuant to the 4th amendment. This was well known and standard police practice in 2000 and 2003. These omissions are material and any supervisor [Lt. Deegan/Sgt. Barlow] is also responsible for permitting this affidavit to proceed without this critical information. When looking at all the information that was required [but omitted] from the affidavit – no reasonable police officer or supervisor should have ever even submitted it for approval as it does not satisfy the requisite burden for probable cause.

## Philadelphia Police Practices

Captain Francis Healy testified in this case that police officers were inappropriately taking witnesses against their will to be interviewed. The testimony elicited in this case that directly touch on the PPD's customs and practices are:

| | |
|---|---|
| Detective Piree: | He was not taught to include exculpatory information in arrest warrants [pg. 261] |
| | He was not taught you can't put statements in an arrest warrant that he knows are untrue [pg. 33] |
| Detective Peterman: | He was not taught he had to include exculpatory[6] information in arrest warrants [pg. 301] |
| | He was not taught that he had to include summaries of all statements of witness when warrant is based on eyewitness testimony [pg. 454; 457] |
| Detective Harkin: | He was not taught to include exculpatory[7] information in arrest warrants [pg. 56] |
| Detective Boyle: | He was not taught to include exculpatory information in arrest warrants [pg. 41/42] |
| | He did not tell witnesses they were free to leave [pg. 116] |
| | He was not taught that he had to include summaries of all statements of witness when warrant is based on eyewitness testimony [pg. 454; 218] |
| Lt. Deegan: | Detectives should put start/end time on all statements and failure to do so impugns the integrity of the investigation [pg. 31/32; 66] |
| | Detective Peterman's statement of Paladino where the interview the day before was not documented is not acceptable without a valid explanation [pg. 92] |
| | Exculpatory information does not need to be in arrest warrant [pg. 116] |
| | If he had read the letter Paladino sent to Peterman he would have forwarded to the DA and probably talked to his Captain [pg. 139] |
| | After reading the directive on arrest warrants [CITY 1156] says that summarizing all the witnesses statements was not what they did in practice [pg. 144]. |

---

[6] Detective Peterman's definition of exculpatory evidence is flawed as he did not consider many of the clearly exculpatory pieces of evidence in this case to be considered exculpatory.

[7] Detective Harkins admitted, as did others, that the dying declaration statement of Jamal Kelly as well as the inconsistent statement of al the witnesses are exculpatory and failure to put in arrest warrant violated the 4th amendment [pg. 256]

The above referenced testimony is in stark contrast to the PPD policies and testimony from their "corporate designee" Francis Healy:

1. PPD Directive mandates that if probable cause based on eyewitness that all statement must be summarized. Detective not given discretion and it would be violation of 4th amendment if they fail to conform [pg. 67-71; 123]
2. Police are provided no training [until day before the deposition] regarding the summarizing of eyewitness statements [pg. 127]
3. The PPD directive as to arrest warrants was updated due to civil litigations surrounding this issue and was the driving force to update the directive [pg. 79]
4. He was aware in 2003 that exculpatory[8] information needed to be in arrest warrants but they provided no training or directive on that issue until 2020 [pg. 102];
5. Police and specifically homicide detectives were not letting witnesses know they were free to leave during interviews [pg. 180]
6. Prior to 2014 Police were provided no guidance on issues of coercion or abuse [pg. 162]

PPD DIRECTIVE 139 [8/17/94]
Arrest Warrants:
Defines Probable Cause:  The existence of facts and circumstances that would justify a person of reasonable caution to believe:

That an offense has been or is being committed;
That the particular person or item to be seized is reasonably connected to the crime AND
That the person can be found at a particular place or the item can be found in the possession of a particular person or at a particular place [CITY 1157]

This is not the definition of probable cause as "reasonably connected" is a much lower standard than the true definition requires – reasonable belief that the person committed the crime.  This is also contrary to the definitions provided by MPOETC [CITY 4914-4915].  Detective Peterman testified he used this flawed definition when submitting the arrest warrant in this case.

---

[8] Exculpatory was not defined until 2022 in a recent bulletin that came out the day before the depositions [pg. 121]. He also stated that the revision in the policy was primarily a result of an individual being exonerated and a civil suit being filed against the City.  As the Police were aware this was the law at least back in 2000, it is unacceptable and against standard Police practices to wait until an individual has served significant prison time and exonerated to properly train their police force.  [Healy pg. 197; 201]

This same directive indicates that police MUST:

> When probable cause is based on an eyewitness account, indicate name and address of each eyewitness and their summary statement[s] [CITY 1159]

Philadelphia police were not properly trained or supervised on this very important constitutional requirement. The same policy was again updated in 2013 but not in any substantive way and the deficient definition of probable cause was not changed. In 2020 this policy was changed [although it still has the deficient definition of probable cause] to include a section on Misstatements, Omission and Exculpatory Information that specifically stated:

> Under the Fourth Amendment, when applying for a warrant, a police officer may not intentionally include misstatements or false statements; or recklessly omit any material facts from the accompanying affidavit of probable cause. Because the Fourth Amendment prohibits this conduct, the Department also prohibits it. Misstatements in or materials omissions from a warrant application will damage the criminal case and could subject the investigator and the City to a 1983 federal civil rights case.

> Regarding omissions, investigators shall include in all warrant applications highly relevant facts within his or her knowledge that any reasonable officer knows that a magistrate would need to make an independent determination of probable cause. This included all culpable information as well as exculpable information. Exculpable information includes, but is not limited to:

>> Any misidentification, inconsistency or failure to identify a suspect by a witness/victim difference in height, clothing or other specifics of the offender from originally reported flash information discrepancies in license tag or vehicle description information initially described by a victim/witness Information regarding any past actions/relationships between the suspect and the victim that could affect a probably cause determination [CITY 20703]

The above referenced language has been a requirement for arrest warrants well before the 2003 affidavit in this case. As indicated above this information was material, highly relevant and any reasonable officer should have known to include it. Had this information been included the affidavit should have never been approved. It is incumbent on the police officer to include this information. Even if an ADA approves of a defective warrant, a police officer, as the affiant, is still required to refuse signing an affidavit that violated the constitution. This is why this directive was eventually created [it is not a DA directive].

No policy/directive or guidance was provided to Police prior to the 2014 directive 151. According to Mr. Healy this was created as a result of the ACLU threatening another lawsuit over the misconduct of homicide detectives. For the first time it discusses use of force in the context of police interviews and interrogations [CITY 21390]. Shelby Green, Charles Paladino, Eric Lee, Lamar Rodgers, Derrick Alston all claim that Detective Peterman [also Detective Boyle was aware] used force/coercion to obtain statements or fabricated statements. Detective Peterman indicates that he never would use force. Without determining the credibility of these very different

versions, what is clear is that if the civilian witnesses are believed then the PPD had a pattern and practice of homicide detectives and police personnel using force and fabricating evidence. If Detective Peterman and/or any others used force and/or fabricated evidence [or were aware that same was happening] this is not just a constitutional violation on their part but also on the part of the PPD for failing to properly train supervise and discipline their personnel. This is separate and distinct from the custom and practice and failure to properly train and supervise related to the issues associated with the arrest warrants as detailed above.

**SUMMARY CONCLUSIONS:**

All opinions and conclusions contained in this report are stated to a reasonable degree of professional certainty and probability.   The conclusions related to use of force and coercion/fabrication are contingent on the veracity of the witnesses that allege this conduct and should not be viewed as an opinion regarding their credibility.

1.  Detectives Peterman, Piree, Boyle, Harkin and McNamee acted under color of state law when they deprived Donald Outlaw of his federal constitutional rights, by:

    a.  Failing to instruct witnesses they were free to leave during questioning;
    b.  Failing to include exculpatory evidence in arrest warrants;
    c.  Failing to include summaries of all witness statements in arrest warrants;
    d.  Using physical force, coercive tactics and fabrication of evidence to obtain false witness statements;
    e.  Failing to disclose exculpatory evidence

2.  The PPD/City as well as Lt. Deegan acted with deliberate indifference to the consequences by establishing and maintaining a policy, practice or custom which directly caused a violation of Mr. Outlaw's constitutional rights by:

    a.  Failing to instruct witnesses they were free to leave during questioning;
    b.  Failing to include exculpatory evidence in arrest warrants;
    c.  Failing to include summaries of all witness statements in arrest warrants;
    d.  Using physical force, coercive tactics and fabrication of evidence to obtain false witness statements;
    e.  Failing to disclose exculpatory evidence

3.  Detectives Peterman, Piree, Boyle, Harkin and McNamee had a duty to intervene to prevent the use of excessive force or coercive tactics/fabricated evidence in the prosecution of Mr. Outlaw's case.  Each Detective had a reasonable opportunity to intervene and failed to do so.

4.  The PPD/City failed to adopt/follow practices that created an unreasonable risk of violating the 4th and 14th amendment that directly led to Mr. Outlaw's rights being violated. PPD/City was aware that failure to adopt/ follow these policies created an unreasonable risk and was deliberately indifferent to that risk and that Detective Peterman/Piree/Harkin/McNamee/Boyle's conduct resulted from their failure to adopt/follow appropriate practices:

    a.  To instruct witnesses they were free to leave during questioning;
    b.  To include exculpatory evidence in arrest warrants;
    c.  To include summaries of all witness statements in arrest warrants;
    d.  Prohibition on using physical force, coercive tactics and fabrication of evidence
    e.  Requirement to disclose all exculpatory evidence even after the case is cleared

5. The PPD/City custom or policy resulted in the deprivation of Mr. Outlaw's constitutional rights.

    a. Failure to adequately train or supervise and failure to adopt needed policies related to:
   - i. To instruct witnesses they were free to leave during questioning;
   - ii. To include exculpatory evidence in arrest warrants;
   - iii. To include summaries of all witness statements in arrest warrants;
   - iv. Prohibition on using physical force, coercive tactics and fabrication of evidence
   - v. Requirement to disclose all exculpatory evidence even after the case is cleared

    b. PPD/City was deliberately indifferent to the fact that violations of the 4th and 14th amendments are a highly predictable consequence of their failure to adequately train/supervise and adopt the polices identified in 5a.

6. The PPD/City had inappropriate practices of:

    a. Failing to instruct witnesses they were free to leave during questioning;
    b. Failing to include exculpatory evidence in arrest warrants;
    c. Failing to include summaries of all witness statements in arrest warrants;
    d. Using physical force, coercive tactics and fabrication of evidence

These practices were so widespread and well-settled that the policy makers either knew of these practices or should have known.

7. The PPD/City had inadequate training/supervision as their training programs was inadequate to train their employees to carry out their duties and their failure to adequately train/supervise amounted to deliberate indifference to the fact that inaction would obviously result in the violation of the constitution as follows:

    a. Witnesses would be questioned and interrogated and not free to leave
    b. Exculpatory evidence would be intentionally excluded from arrest warrants
    c. Inconsistent witness statements would be excluded from arrest warrants
    d. Police would use physical force and coercive tactic and fabricate evidence during investigations;
    e. Exculpatory evidence obtained even after the case is cleared would not be disclosed

The failures identified in 7a-e were the cause of the violation of Mr. Outlaw's constitutional rights. The PPD/City knew that police would be confronted with situations as identified in 7a-e and that there was a history of officer mishandling these situations and that finally the wrong choice would frequently cause a constitutional violation as it did in Mr. Outlaw's case.

8. Detective Peterman lacked probable cause to initiate the prosecution against Mr. Outlaw:

    a. To the extent the statements of Paladino, Lee, Rodgers and Alston were coerced/fabricated then there is no evidence to suggest that Mr. Outlaw was at all involved in this case.

    b. To the extent the statements of Paladino, Lee, Rodgers and Alston were not coerced or fabricated there were so many inconsistencies throughout the investigation and multiple other suspects that significantly negate any reasonable police officer from believing probable cause existed.

    c. He recklessly omitted exculpatory information in the arrest warrant that any reasonable police officer would know the neutral needed and would negate probable cause and acted with deliberate indifference to Mr. Outlaw.

9. Detective Peterman also violated Mr. Outlaw's constitutional rights in failing to disclose the September 20, 2004, letter that Paladino wrote to him indicating that he had prepared a speech for trial that Detective Peterman would be happy with. This letter was authored after the homicide file was turned over to the DA. It is clear from the inventory of materials the DA sent to Mr. Outlaw's defense lawyer that this letter was not contained in those materials. The Detective likewise failed to turn over notes reflecting other suspects. According to Mr. Paladino there was another letter that was sent to Detective Peterman as well that is not contained in the homicide file.

10. Detective Peterman, Boyle, Piree, Harkins and McNamee all conspired either actively or by failing to address the inconsistencies, coercion and fabrication of witness statements.

Respectfully submitted,

MICHAEL MOSINIAK

DONALD MICHAEL OUTLAW      :
      :
v.      :    NO. 21-1290
      :
CITY OF PHILADELPHIA, JEFFREY      :
PIREE and HOWARD PETERMAN      :

## APPENDIX

1) CITY004186-4188 - PPD Statement of Ethical Principles (January 1988)
2) CITY004253-4267 - PPD Directive 61 Investigation Report (2/26/87)
3) CITY004243-4252 - PPD Directive 61 Investigation Report (7/28/97)
4) CITY001030-1039 - PPD-Directive 12.12 Investigation Report (2/1/01)
5) CITY001040-1045 - PPD Directive 33 Police and Suspect Photographs (8/18/99)
6) CITY004290-4306 - PPD Directive 50 Investigation & Charging Procedure (1/21/87)
7) CITY004307-4333 - PPD Directive 50 Investigation & Charging Procedure (5/6/96)
8) CITY001046-1063 - PPD Directive 50 Investigation & Charging Procedure (6/13/00)
9) CITY004334-4339 - PPD Directive 79 Disciplinary Procedure (4/14/80 - version 1)
10) CITY001082-1101 - PPD Directive 79 Disciplinary Procedure (4/14/80 - version 2)
11) PLAINTIFF17873-17887 – PPD Directive 8.6 – Disciplinary Procedure (5/1/10)
12) CITY001102-1131 - PPD Directive 82 Criminal Identification Processing, Transportation and Temporary Detention of Adult Prisoners (3/8/82)
13) CITY004268-4271 - PPD Directive 106 Criminal Records (5/15/81)
14) CITY001132-1133 - PPD Directive 106 Criminal Records (10/23/02)
15) CITY004272 - PPD Directive 114 Right, Duty and Opportunity to Present Complaints or Information (1/8/82)
16) CITY004273-4274 - PPD Directive 114 Right, Duty and Opportunity to Present Complaints or Information (3/21/97)
17) CITY001137-1139 - PPD Directive 114 Employee's Responsibility to Report Corruption, Misconduct and Other Improper Acts Negatively Affecting the Department (10/8/99)
18) CITY001134-1136 - PPD Directive 114 Employee's Responsibility to Report Corruption, Misconduct and Other Improper Acts Negatively Affecting the Department (3/6/03)
19) CITY004275-4283 - PPD Directive 127 Complaints against Police (9/28/94)
20) CITY001140-1147 - PPD Directive 127 Complaints against the Philadelphia Police Department (11-13-00)
21) CITY004284-4289 - PPD Directive 135 Rules of Discovery (4/13/81)
22) CITY004148-1155 - PPD Directive 135 Rules of Discovery (5/12/00)
23) CITY001156-1165 - PPD Directive 139 Arrest Warrants (10/21/96)
24) CITY021379-21388 - PPD Directive 139 - Arrest Warrants (3/25/13)
25) PLAINTIFF02206-02215 – PPD Directive 5.22 – Arrest Warrants (9/1/20)
26) CITY020702-20711 - PPD Directives 5.22 – Arrest Warrants (updated 9/1/20)
27) CITY001166-1177 - PPD Disciplinary Code
28) CITY004190-4242 - PPD Instruction booklet

29) CITY004344-4345 - PPD Memorandum Formal Statements (July 24, 1998)
30) PLAINTIFF02181-02205 – PPD Directive 5.23 – Interviews and Interrogations (5/29/20)
31) CITY021389-21402 - PPD Directive 151 - Interviews and Interrogations (1/1/14)
32) PLAINTIFF22144-22152 – PPD Directive 7.16 – Department Directives Program (7/9/15)
33) PLAINTIFF02181-02205 – PPD Directive 5.23
34) PLAINTIFF02206-02215 – PPD Directive 5.22
35) PLAINTIFF17873-17887 – PPD Directive 8.6
36) PLAINTIFF22092-22096 – PPD Directive 7.11 – Records Retention
37) PLAINTIFF22097-22119 – PPD Directive 10.2 – Use of Force
38) CITY004346 – Retention Policy
39) PLAINTIFF22012-22091 – *US Department of Justice – Standards and Guidelines for Internal Affairs – Recommendations from a Community of Practice*
40) CITY004421-4522 - Course #99-315 Officer Safety Awareness IX (10/21/98)
41) CITY004786-4904 - Section IV Laws and Procedures – Search and Seizure (6/1/00)
42) CITY004905-4968 - Section IV Laws and Procedures – Criminal Procedures and Laws of Arrest (6/1/00)
43) CITY004969-5021 - Section IV Laws and Procedures – Criminal Procedures and Laws of Arrest 2 (6/1/00)
44) CITY004706-4722 - Section IX Principles of Criminal Investigation - Crimes Against People (6/1/00)
45) CITY004723-4785 - Section IX Principles of Criminal Investigation – Interviewing and Interrogation Techniques and Skills (6/1/00)
46) CITY004523-4529 - Section XVIII Handling Arrested Persons – Booking and Lockup (6/1/00)
47) CITY004530-4554 - Section XVIII Handling Arrested Persons – Transporting Prisoners (6/1/00)
48) CITY004347-4420 - Legal Update Course #04-201 (12/1/03)
49) CITY004555-4705 - Section XI Crisis Management – Recognizing Special Needs (7/13/05)
50) CITY005022-5083 - Basic Training Curriculum for Pennsylvania Police Patrol Officers – Pre-Patrol and Routine Patrol Procedures
51) CITY005084-5209 - Basic Training Curriculum for Pennsylvania Police Patrol Officers – Patrol Activities and Incidents
52) CITY005210-5225 - Basic Training Curriculum for Pennsylvania Police Patrol Officers – Surveillance
53) CITY005226-5239 - Basic Training Curriculum for Pennsylvania Police Patrol Officers – Area Searches
54) CITY005240-5259 - Basic Training Curriculum for Pennsylvania Police Patrol Officers – In-depth Investigations
55) CITY005260-5276 - Basic Training Curriculum for Pennsylvania Police Patrol Officers – Processing Evidence
56) CITY005277-5302 - Basic Training Curriculum for Pennsylvania Police Patrol Officers – Interviewing and Interrogation
57) CITY005303-5333 - Basic Training Curriculum for Pennsylvania Police Patrol Officers – Preliminary Investigations

58) CITY005334-5352 - Basic Training Curriculum for Pennsylvania Police Patrol Officers – Investigations
59) CITY005353-5400 - Basic Training Curriculum for Pennsylvania Police Patrol Officers – Evidence
60) CITY005401-5521 - Basic Training Curriculum for Pennsylvania Police Patrol Officers – Criminal Procedure
61) CITY005522-5580 - Basic Training Curriculum for Pennsylvania Police Patrol Officers – Criminal Procedure 2
62) CITY005581-5602 - Basic Training Curriculum for Pennsylvania Police Patrol Officers – Authority and Jurisdiction
63) CITY005603-5636 - Basic Training Curriculum for Pennsylvania Police Patrol Officers – Civil Law
64) CITY005637-5646 - Basic Training Curriculum for Pennsylvania Police Patrol Officers – Civil Law 2
65) CITY005747-5760 - Basic Training Curriculum – Constitutional Law – Section 4B
66) CITY005892-5905 - Basic Training Curriculum – Constitutional Law – Section 4B
67) CITY005761-5821 - Basic Training Curriculum – Criminal Procedure– Section 4D
68) CITY006045-6105 - Basic Training Curriculum – Criminal Procedure– Section 4D
69) CITY005822-5874 - Basic Training Curriculum – Search and Seizure – Section 4E
70) CITY005906-5958 - Basic Training Curriculum – Search and Seizure – Section 4E
71) CITY005647-5697 - Basic Training Curriculum – Interviewing and Interrogation Techniques and Skills - Section 9C
72) CITY005959-6009 - Basic Training Curriculum – Interviewing and Interrogation Techniques and Skills - Section 9C
73) CITY006150-6200 - Basic Training Curriculum – Interviewing and Interrogation Techniques and Skills - Section 9C
74) CITY005698-5732 - Basic Training Curriculum – Identifying, Collecting and Processing Evidence – Section 9D
75) CITY006010-6044 - Basic Training Curriculum – Identifying, Collecting and Processing Evidence – Section 9D
76) CITY005733-5746 - Basic Training Curriculum – Crimes Against People – Section 9F
77) CITY006106-6119 - Basic Training Curriculum – Crimes Against People – Section 9F
78) CITY005875-5891 - Basic Training Curriculum – Case Preparation – Section 9N
79) CITY006133-6149 - Basic Training Curriculum – Case Preparation – Section 9N
80) CITY006120-6132 - Instructor Cues and Performance Objectives – Civil and Criminal Liability
81) CITY000001-669
   a. Activity Sheets (CITY000053; 109-112; 104; 88; 83; 474; 476-77; 480-85; 7; 105; 117-18)
   b. Affidavit of Probable Cause (CITY000340-346)
   c. Affidavit of Probable Cause (DAO 00291-93)
   d. Affidavit of Probable Cause (CITY000359-366)
   e. Affidavit of Probable Cause (DAO 00282-84)
   f. Affidavit of Probable Cause (DAO 00944-46)

      g.  Warrant of Arrest/Arrest Report (9/3/03) (CITY000348; 371; 373; 349-51)
      h.  Arrest Report (DAO 00699-700)
      i.  Police Notes (CITY000099; 332-33; 486; 512; 602-23; 50)

82)    PH HAMU00001-32 - House Arrest Records

83)    PLAINTIFF16285-16373 – Pennsylvania Innocence Project - Investigative Report

84)    CITY001006-1029 - Preliminary Hearing (10/29/2003)

85)    CITY000670-917 - Trial
      a.  December 15, 2004 (CITY000670-694)
      b.  December 16, 2004 (CITY000695-757)
      c.  December 17, 2004 (CITY000758-787)
      d.  December 20, 2004 (CITY000788-865)
      e.  December 21, 2004 (CITY000866-917)

86)    CITY003484-3486 - Sentencing (3/24/05)

87)    CITY000918-935 - Hearing (11/24/14)

88)    CITY003002-3005 - Hearing (5/12/15)

89)    CITY003006-3071 - PCRA Hearing
      a.  November 15, 2018 (CITY003006-3049)
      b.  November 16, 2018 (CITY003050-3071)

90)    CITY002988-3001 - PCRA Hearing (1/25/19)

91)    PLAINTIFF22153-22157 – Hearing Transcript on Motion for Nolle Pros (12/20/20)

92)    CITY003195-3210 – Opinion (10/19/05)

93)    CITY001938-1942 – Memorandum (5/17/06)

94)    CITY002656-2671 – Memorandum (2/20/07)

95)    CITY002642-2655 – Opinion (1/20/10)

96)    CITY001943-1952 – Memorandum (12/2/10)

97)    CITY001419-1444 – Report and Recommendation (4/10/13)

98)    CITY001717-1724 – Report and Recommendation (11/25/14)

99)    CITY002673-2675 – Opinion (12/31/15)

100)   CITY002708-2716 – Memorandum (5/2/17)

101)   CITY001953-2655 – Second Amended Petition for PCRA (7/6/18)

102)   CITY002581-2591 – Memorandum in Support of Motion for *Nolle Prosequi* (12/18/20)

103)   Orders
      a.  September 16, 2019 (CITY002691)
      b.  November 8, 2019 (CITY002693)
      c.  November 27, 2019 (CITY002694)
      d.  February 12, 2020 (CITY002682)
      e.  February 2, 2021 (CITY1799)
      f.  CITY002704 – Order granting Motion for *Nolle Prosequi* (12/29/20)

104)   Motion to Compel -- Defendant Certification (2/9/22)

105)   Motion to Compel – Court Order (1/31/22)

106)   CITY000313, 305-306 - Statement - Police Officer Lee Datts (9/23/00)

107)   CITY000572-574 - PPD Investigation Interview - Shelby Green (9/4/00)

108)   CITY000525-526 - PPD Investigation Report - Derrick Alston (9/4/00)

109)   CITY000299-300 - PPD Investigation Report - Ritter (handwritten) (10/5/00)

110) CITY000301-302 - PPD Investigation Interview Record (handwritten) (10/5/00)
111) CITY000540-545; 538; 586; 571; 565-567; 258; 271 - PPD Statement - Derrick Alston (10/30/00)
112) CITY000023-26; 28; 30-36 - PPD Investigation Interview Record - Anthony Brisbon (11/27/00)
113) CITY000001-6; 534 - PPD Investigation Interview Record (handwritten) - Charles Paladino (5/15/01)
114) CITY000008-13; 527-531; 533 - PPD Investigation Interview Record (handwritten) - Charles Paladino (6/26/01)
115) CITY000495-496; 499 - PPD Investigation Interview Record - Ruth Mills (10/23/01)
116) CITY000014-16; 665; 653-654 - PPD Investigation Interview Record – Charles Paladino (10/24/01)
117) CITY000490-494; 497 - PPD Investigation Interview Record - Lamar Rodgers (3/29/02)
118) CITY000272; 513-518; 273 - PPD Investigation Interview Record - Derrick Alston (7/9/03)
119) CITY000521-524; 319; 142; 162-165 - PPD Investigation Interview Record - Eric Lee (8/19/03)
120) CITY002120 - Affidavit - Mark Greenberg to Outlaw (2/14/04)
121) RO (CIU) 000003 - ADA Conroy - letter to Elsa Legesse (5/21/04)
122) RO (CIU) 000037; 39 - Palladino letter to Conroy (8/11/04)
123) RO (CIU) 000041; 44; 42-43 - Palladino to Outlaw (9/20/04)
124) CITY000601; 599-600 - Palladino to Detective Peterman (9/20/04)
125) RO (CIU) 000004 - ADA Conroy-letter to Deputy Commissioner (11/24/04)
126) CITY002743; 2744 - Statement - Sydney Starr (1/3/06)
127) CITY002838 - Affidavit - Annette Outlaw (9/12/07)
128) CITY002121-2122 - Affidavit - Wesley Harmon (11/24/07)
129) CITY002091-2092 - Affidavit - Katima Jackson (9/7/13)
130) CITY002093 - Affidavit - Robert Outlaw (9/12/13)
131) DAO 02629 - Affidavit - Robert Outlaw (9/26/13)
132) RO (CIU) 000045-48 - Palladino letter to "Nikki" (1/2/14)
133) CITY002042 - Affidavit - Robert Outlaw (10/9/14)
134) CITY002037-2038 - Affidavit - Chris Holder (10/2/14)
135) CITY002040 - Affidavit - Monique Solomon (10/6/14)
136) CITY002954-2958 - Letter - Charles Paladino (1/5/15)
137) CITY002916 - Letter - Monique Solomon (1/7/15)
138) CITY002897 - Affidavit - Lamar Rodgers (1/8/15)
139) CITY002899 - Affidavit - Robert Outlaw (1/22/15)
140) PLAINTIFF00079-80 - Affidavit – Charles Paladino (1/27/15)
141) CITY002911; 2917 - Affidavit - Wesley Harmon (1/21/15) - Given by Monique Solomon (1/29/15)
142) CITY002951 - Affidavit - Robert Outlaw (2/6/15)
143) CITY002953 - Affidavit - Monique Solomon (2/6/15)
144) CITY002915 - Affidavit - Monique Solomon (2/14/15)
145) CITY002913 - Affidavit - Robert Outlaw (2/28/15)
146) DAO 02972 - Certification - Katima Jackson (3/19/18)

147) CITY002098 - Certification - Charles Paladino (4/5/18)
148) DAO 03145 - Certification - Eric Lee (4/6/18)
149) CITY002096 - Memo to Foster from Leah Berney - Phone Conference with Pop (4/27/18)
150) RO (CIU) 000202-205 - Notes - Paladino (6/5/19)
151) PLAINTIFF17809-17810 - Christopher Holder Interview – PA Innocence Project
152) CITY003727-3729 – Piree Concise Officer History
153) PLAINTIFF22929-22938 – *Chester Hollman, Spent 28 Years in Prison After Wrongful Conviction, to Get $9.8M from Philly*
154) PLAINTIFF22939 – DAO Misconduct Disclosures
155) PLAINTIFF22940 - *Hollman* – Order granting Habeas Corpus (6/25/19)
156) PLAINTIFF22941-22958 - *Hollman* – Commonwealth's Answer to Counseled PCRA Petition (6/24/19)
157) PLAINTIFF22959-22973 - *Hollman* – Joint Stipulations of Fact of Petitioner and Respondent (6/24/19)
158) PLAINTIFF22974 - *Miller* – Order granting Habeas Corpus (7/31/19)
159) PLAINTIFF22975-23006 - *Miller* – Motion for *Nolle Pros* (7/29/19)
160) PLAINTIFF23007 – DAO Misconduct Disclosures
161) PLAINTIFF23008 - *Hollman* – Order granting Habeas Corpus (6/25/19)
162) PLAINTIFF23009-23026 - *Hollman* – Commonwealth's Answer to Counseled PCRA Petition (6/24/19)
163) PLAINTIFF23027-23041 - *Hollman* – Joint Stipulations of Fact of Petitioner and Respondent (6/24/19)
164) PLAINTIFF23042 - *Miller* – Order granting Habeas Corpus (7/31/19)
165) PLAINTIFF23043-23074 - *Miller* – Motion for *Nolle Pros* (7/29/19)
166) PLAINTIFF23075-23110 - *Miller* –Complaint – 20-3054 - (6/24/20)
167) PLAINTIFF23111-23156 - *Miller* – Report and Recommendation – 12-742 (6/12/19)
168) PLAINTIFF23157-23176 - *Miller* – Defendants Partial Motion to Dismiss – 20-3054 (10/22/20)
169) PLAINTIFF23177-23273 – *Commonwealth v Thomas* – Motion to Supplement the Record
170) PLAINTIFF23274-23293 – *Thomas v. Varner* – Opinion (11/4/05)
171) CITY003723-3726 - Peterman Concise Officer History
172) CITY003730-4185 – Peterman Personnel File
173) CITY011142-13284 – Peterman IAD Files
174) PLAINTIFF22721-22785 - *Thorpe* PCRA Hearing Transcript (6/19/17)
175) PLAINTIFF22786-22852 - *Thorpe* PCRA Hearing Transcript (6/20/17)
176) PLAINTIFF22853-22860 - *Thorpe* PCRA Hearing Transcript (6/21/17)
177) PLAINTIFF22861-22922 - *Thorpe* PCRA Hearing Transcript (6/22/17)
178) PLAINTIFF22923-22928 – *Tolbert* Memorandum of Internal Affairs Division -Complaint against Peterman
179) PLAINTIFF12479-12509 – *Thomas v. City of Philadelphia* – McCauley Report (1/14/19)
180) PLAINTIFF12510-12511 – *Thomas v. City of Philadelphia* – McCauley Report (3/1/19)
181) PLAINTIFF12097-12168 – *Thomas v. City of Philadelphia* – Devlin Transcript
182) PLAINTIFF12409-12478 – *Thomas v. City of Philadelphia* – Worrell Transcript
183) PLAINTIFF12224-12256 – *Thomas v. City of Philadelphia* – Nodiff Transcript

184)  PLAINTIFF22158-22207 – *Thomas v. City of Philadelphia* - Memorandum and Opinion on Motion for Summary Judgment

185)  PLAINTIFF01360-1367 - *NAACP v. City of Philadelphia* – Docket Report

186)  PLAINTIFF01368-1413 - *NAACP v. City of Philadelphia* – Settlement and Monitoring Agreement and Stipulations of the Parties

187)  PLAINTIFF01414-1420 - *NAACP v. City of Philadelphia* – Complaint (1996)

188)  PLAINTIFF01421-1422 - *NAACP v. City of Philadelphia* – Order (1996)

189)  PLAINTIFF01423-1516 - *NAACP v. City of Philadelphia* – Plaintiffs' First Monitoring Report – Complaints Against Police

190)  PLAINTIFF01517-1559 - Integrity and Accountability Office – Philadelphia Police Department – First Report (November 1997)

191)  PLAINTIFF01560-1604 - Integrity and Accountability Office – Philadelphia Police Department – Second Report (September 1998)

192)  PLAINTIFF01605-1748 - Integrity and Accountability Office – Philadelphia Police Department – Third Report (July 1999)

193)  PLAINTIFF01749-1821 - Integrity and Accountability Office – Philadelphia Police Department – Fourth Report - Enforcement of Narcotics Laws (July 2002)

194)  PLAINTIFF01822-1896 - Integrity and Accountability Office – Philadelphia Police Department – Fifth Report - Disciplinary System (March 2001)

195)  PLAINTIFF01897-1967 - Integrity and Accountability Office – Philadelphia Police Department – Sixth Report - Disciplinary System (December 2003)

196)  PLAINTIFF01968-2052 - Integrity and Accountability Office – Philadelphia Police Department – Seventh Report

197)  PLAINTIFF02053-2175 - Police Integrity and Accountability in Philadelphia: Predicting and Assessing Police Misconduct (December 2004)

198)  PLAINTIFF12580-12773 – *Wright v. City of Philadelphia* – Nodiff Transcript

199)  PLAINTIFF22208-22213 – *Wright v. City of Philadelphia* – Memorandum and Opinion on Motion to Compel

200)  PLAINTIFF12512-12538 - *Gilyard v. City of Philadelphia* – Dusak Transcript

201)  PLAINTIFF17839-17872 - *Gilyard v. City of Philadelphia* – Healy Transcript

202)  PLAINTIFF22214-22225 - *Gilyard v. City of Philadelphia* – Memorandum and Opinion on Motion for Judgment on the Pleadings

203)  PLAINTIFF22226-22272 - *Gilyard v. City of Philadelphia* – Memorandum and Opinion on Motion for Summary Judgment

204)  PLAINTIFF12774-12808 – Nordo Grand Jury Presentment

205)  PLAINTIFF22120-22124 – The Philadelphia Inquirer – *A Former Philly Homicide Informant Said he was Forced to have Sex with a Detective at a Hotel* (Nordo)

206)  PLAINTIFF22125-22128 – The Philadelphia Inquirer – *A Former Prison Guard Said an Ex-Philly Homicide Detective Tried to Sexually Assault Him in a Car* (Nordo)

207)  PLAINTIFF22129-22132 – The Philadelphia Inquirer – *A Homicide Informant Said a Former Philly Detective Assaulted Him in a Police Headquarters Elevator* (Nordo)

208) PLAINTIFF22133-22143 – *The Philadelphia Inquirer – Former Philly Homicide Detective Philip Nordo was Found Guilty of Sexually Assaulting Witnesses While on the Job*
209) PLAINTIFF20097-20298 – *Commonwealth v. Thorpe* – PCRA Transcript (6/19/21)
210) PLAINTIFF01300-01302 - *District Attorney Krasner, ADA Cummings Statements on 17ᵗʰ Exoneration Since 2018*
211) PLAINTIFF01303-01310 - District Attorney's Office Website Printout
212) PLAINTIFF01311-01357 - *Overturning Convictions – and an Era* – Conviction Integrity Unit Report (January 2018-June 2021)
213) PLAINTIFF22277-22281 – *Donald Outlaw, Cleared of Murder, is Philadelphia's 17ᵗʰ Exoneree in 3 Years*
214) PLAINTIFF22282-22286 – The National Registry of Exonerations – Donald Outlaw
215) PLAINTIFF22287-22290 – Pennsylvania Innocence Project – Robert "Donald" Outlaw
216) PLAINTIFF22291-22294 – The National Registry of Exonerations – Pennsylvania List
217) PLAINTIFF22295-22296 – *Department of Justice Releases Report on Philadelphia Police Department's Use of Deadly Force*
218) PLAINTIFF22297-22484 – Collaborative Reform Initiative – *An Assessment of Deadly Force in the Philadelphia Police Department*
219) PLAINTIFF22485-22491 – Philadelphia Police Department – Website Printout – *Accountability*
220) PLAINTIFF22492-22497 – *A Man Who Served 37 Years May be Freed After Informant Said Cops Provided Sex for False Testimony* (Stokes)
221) PLAINTIFF22498-22506 – *Philly Man Has Served 38 Years for Robbery of $1,200 – Witnesses Say He Wasn't Even There* (McKeithan)
222) PLAINTIFF22507-22529 – *Once-Secret Records Show How the Police Arbitration System Overturned the Firings or Discipline of More than 100 Questionable Philadelphia Cops*
223) PLAINTIFF22530-22536 – *Ex-Philly Detective James Pitts is Charged with Perjury, Alleging he Lied About a Coerced Confession*
224) PLAINTIFF22537-22539 – *Philadelphia Narcotics Cops Charged with Stealing Drugs, Money*
225) PLAINTIFF22540-22543 – *For Many in North Philadelphia, Police Corruption is No Surprise*
226) PLAINTIFF22544-22570 – *An Inquirer Investigation Has Found Numerous Cops Who Have Claimed to be Too Injured to Work, But at the Same Time Launched New Businesses, Toiled at Physically Strenuous Jobs and More*
227) PLAINTIFF22571-22573 – *Philadelphia Homicide Detective Indicted by Grand Jury in Murder Case Involving Lover* (Dove)
228) PLAINTIFF22574-22576 – *Philadelphia Ordered to Pay 2 Ex-Officers $1 Million in Lawsuit that Forced Former Police Commissioner Richard Ross' Resignation*
229) PLAINTIFF22577-22579 – *Philly Declaration – Philadelphia Police Complaint Archive*
230) PLAINTIFF22580-22584 – *Acting Philly Police Commissioner Promotes Officers Accused of Misconduct*
231) PLAINTIFF22585-22604 – *Philadelphia Police: A History of Corruption*
232) PLAINTIFF22605-22609 – *Jury Orders Philadelphia to Pay $1 Million to Former Police Officers in Case that Brough Down Former Commissioner Richard Ross*
233) PLAINTIFF22610-22617 – *Search The Inquirer's Database of 170 Philadelphia Police Misconduct Files*

234)  PLAINTIFF22618-22630 – *Police Misconduct in Philadelphia: Unsealed Records Name the City's Most Cited Cops*
235)  PLAINTIFF22631-22634 – *Wikipedia – 39th District Corruption Scandal*
236)  PLAINTIFF22635-22642 – *Philly Police to Adopt Sweeping Interrogation Reforms come Jan. 1*
237)  PLAINTIFF22643-22645 – *Police Think They can Get Away with Anything – That's Because They Usually Do*
238)  PLAINTIFF22646-22650 – *False Confessions, Explained*
239)  PLAINTIFF22651-22655 – *Judge, DA Apologize to Man Who Was Exonerated After 28 Years in Prison: "We Failed"* (Hollman)
240)  PLAINTIFF22656-22659 – *Court Affirms PPD Obligation to Provide Police Misconduct Disclosures to DAO in FOP Lawsuit*
241)  PLAINTIFF22660-22679 – *Testilying - Swearing to Tell a Lie*
242)  PLAINTIFF22680-22683 – *Philadelphia Homicides Surge Hit 30-Year High in 2020*
243)  PLAINTIFF22684-22694 – *$5 Million for Wrongfully Convicted Exoneree, Willie Veasy, from City of Philadelphia*
244)  PLAINTIFF23294-26890 - Complaints Against Pitts and News Articles
   a.  PLAINTIFF25888-25929 – *Commonwealth v. Thorpe* – Sarmina Opinion (6/7/18)

## DEPOSITION TRANSCRIPTS

1)  Patricia Cummings (1/27/22)
2)  Detective John Harkins (3/3/22)
3)  (Retired Det.) Jeffrey Piree (3/14/22)
4)  Charles Paladino (3/31/22)
5)  Charles Paladino (4/5/22)
6)  Detective John McNamee (4/19/22)
7)  Detective Lee Datts (4/21/22)
8)  Howard Peterman (5/12/22)
9)  Shelby Green (5/18/22)
10)  Derrick Alston (6/21/22)
11)  Monique Solomon Outlaw (7/22/22)
12)  Donald Outlaw (7/26/22)
13)  Francis Healy (8/9/22)
14)  Charles Boyle (8/17/22)
15)  Mark Deegan (8/23/22)
16)  Charles Paladino (9/7/22)
17)  Charles Paladino (9/8/22)
18)  Charles Paladino (9/9/22)

## PPD WEBSITE

1)  Website – About the Department
2)  Website – Complaint spreadsheet

# MICHAEL V. MOSINIAK

DELVALINVESTIGATOR@GMAIL.COM
(C) 215-768-6814

## EDUCATION

**NEUMANN UNIVERSITY, Aston, PA:** B.S 2022, Major: Public Safety Administration

## PROFESSIONAL EXPERIENCE

**BUCKS COUNTY DETECTIVES, BUCKS COUNTY, PA: 1998 to 2022 (ret.)**
Promoted to Deputy Chief of Detectives in 2011

Deputy Chief, Bucks County Detectives Drug Strike Force, 2017-2022
- Investigated and supervised high-level narcotics and illegal firearm cases from inception through prosecution
- Conducted interviews of informants and investigative targets
- Conducted mobile and stationary surveillances
- Solved and collaborated with other detectives and prosecutors on multiple cold-case homicide investigations

Deputy Chief, Bucks County Detectives, Detective Division, 2011-2017
- Investigated and supervised major crimes, including Homicide, Theft, Fraud, Corruption, etc. from case inception through prosecution
- Developed investigative strategies and made investigative recommendations
- Investigated major cases including Homicides and acted as Lead Investigator/Affiant
- Conducted interviews of suspects and witnesses

Detective, Bucks County Detectives, 1998-2011
- Conducted timely investigations of major crimes including Homicide, Theft, Fraud, Corruption, etc. from case inception through prosecution.
- Conducted extensive interviews of victims, witnesses, and suspects and relevant fieldwork
- Conducted background investigations and surveillance of subjects of investigation
- Prepared and submitted detailed investigative reports and worked collaboratively with prosecuting attorneys

**WARMINSTER TOWNSHIP POLICE DEPARTMENT, Warminster, PA: 1990 to 1998**
Promoted to Sergeant in 1995 and assigned as Detective Sergeant

Detective Sergeant, 1995-1998
- Conducted and coordinated unbiased confidential investigations
- Conducted interviews of suspects, victims, and witnesses
- Shared intelligence with other law enforcement agencies
- Investigated major crimes including Homicide, Robbery, Theft, Fraud, etc. from case inception through prosecution

Patrol Officer, 1990-1995
- Served the public and citizens of Warminster Township by responding to calls for service including emergencies
- Routinely spoke and interacted with members of the public, business owners, victims, witnesses, and informants

**UNITED STATES AIR FORCE, SECURITY POLICE LAW ENFORCEMENT SPECIALIST: 1985-1989**
Honorably Discharged from active duty in 1989

- Trained in law enforcement and combat arms to protect and serve on military installations with similar responsibilities as civilian police officers

- Assigned to 1776th SPS in 1988-1989 at Andrews AFB provided on base security for Air Force One, the President, and various dignitaries in addition to normal patrol duties

## ADDITIONAL EDUCATION, EXPERIENCE & PROFESSIONAL DEVELOPMENT

Certified as an Expert in the field of Drug Investigation in the District Courts of Bucks and Montgomery Counties, Bucks and Montgomery County Court of Common Pleas, Pennsylvania State Grand Jury, and Federal Court (EDPA)
PA Act 120 Certified Police Officer – 1998 to present
ACFE Certified Fraud Examiner, 2021 to present
Recipient of FBI LEEDA Trilogy Award for their Supervisor, Command, and Executive Leadership Trainings, 2020
2017 Graduate of Northwestern University School of Police Staff and Command
Interviewed on ID Discovery Channel documentary – Homicide City – "Russian Tragedy" Season 1, Episode 6, March 2018
Interviewed on ID Discovery Channel documentary – On the Case with Paula Zahn - "A Different Time" Season 17, Episode #3, July 2018
Interviewed on ID Discovery Channel documentary – True Convictions – "The Wound Never Heals" Season 3 Episode 10, March 2021

## MEMBERSHIPS AND TRAINING HIGHLIGHTS

- International Homicide Investigators Association - member
- Delaware Valley Association of Professional Police Officials - member
- Pennsylvania Narcotics Officers Association (P.N.O.A.) Member – 2002 to Present
- Police Chief's Association of Bucks County - member
- Senior Faculty Member – Squad Leader - Top Gun Pennsylvania – Undercover Drug Investigator Course – 2006 to 2022
- Instructor – Interview/Interrogation Techniques – Top Gun Pennsylvania – 2014 to 2021
- Faculty Member – Top Gun #1 Massachusetts – Undercover Drug Investigator course – 2018
- Faculty Member – Pennsylvania State Police Undercover School – 2019
- Coordinator/Instructor - Bucks County DA's Office Drug Investigator Training School – 2006 to 2022, Presented Interview class and other subjects
- Pennsylvania State Wiretap and Electronic Surveillance A Certification – 2000-present
- International Homicide Investigators Association Cold Case/No-Body Homicide Investigation & Prosecution Training
- Practical Homicide Investigation Training
- Police Supervisor in Training (POSIT) – Penn State University
- Managing Criminal Investigations
- FBI Intercounty Detective Training School
- Advanced Crime Scene Investigation
- Presented case studies on a Cold Case Homicide to the Pennsylvania District Attorney's Association (PDAA) 2022 and to MACCHIA (Mid-Atlantic Cold Case Homicide Investigators Association) annual conference 2021

## AWARDS, COMMENDATIONS, & ADDITIONAL TRAINING (available upon request)

# DELAWARE VALLEY INVESTIGATIVE
# SOLUTIONS LLC WWW.DELVAL369.COM

**TO:** Joshua Van Naarden, Esquire

**FROM:** Delaware Valley Investigative Solutions LLC

**DATE:** July 18, 2022

**RE:** Outlaw Case Expert Testimony Proposal

Delaware Valley Investigative Solutions LLC offers Expert Testimony services billed at $125.00 per hour. Any testimony in depositions or court appearances would be billed at $1,000 per day. Business phone calls and email services are not billed. Testimony preparation by phone is billed at the hourly rate. An initial, non-refundable retainer of $5,000.00 is requested to cover services. If/once the initial retainer is exhausted, I will request an additional retainer based on progress made to date and anticipated further work/investigation. Based on our initial conversation, I would take the following steps:

1. Review all pertinent investigative files/reports and note findings that I would include in any expert opinion that I may be asked to provide;

2. Discuss content of my opinion;

3. Prepare potential deposition and/or courtroom testimony strategy;

4. Prepare a report of my official opinion in writing.

An email response to this proposal will bind the agreement with confidentiality.

Delaware Valley Investigative Solutions LLC
Mike Mosiniak
P.O. Box 49
Jamison, PA 18929
(215) 768-6814
delvalinvestigator@gmail.com

Valid through 09/18/22