# **EXHIBIT B**

UNITED STATES DISTRICT COURT
EASTERN DIVISION OF PENNSYLVANIA

DONALD MICHAEL OUTLAW,          )
                                )
        Plaintiff,              )
                                )
    v.                          )        No. 21-1290
                                )
CITY OF PHILADELPHIA, JEFFREY   )
PIREE and HOWARD PETERMAN,      )
                                )
                                )
                                )
        Defendants.             )

EXPERT SUMMARY AND DISCLOSURE OF
DR. DARRIN K. PORCHER

Dated: September 12, 2022

1

**Table of Contents**

1.  Summary of Findings…………………………………………………..……...PG. 3

2.  Background and Methodology……………………………………….…...PG. 14

3.  Scope of Retention…………………………………………………….PG. 16

4.  Investigation……..………………………………………………….....PG. 17

5.  Affidavit for Probable Cause for Arrest Warrant……………………….…...PG. 27

6.  Philadelphia Police Department Practices ……………………..……………. PG. 31

7.  Trial………………………………………………………………….PG. 32

8.  Post Conviction…………………………………………………….…...PG. 35

9.  Information Supportive of Detective Peterman's Coercion and Fabrication of Investigative Statements………………………………………………………...……...PG.36

10. Philadelphia   Police   Department   Conduct:      Failure   To   Supervise/Train …………………………………………………………………...PG.37

11. Opinions………………………………………………………..…...PG.46

12. Conclusions…………………………………………………..……...PG.48

**Exhibit**

Exhibit 1:      Curriculum Vitae of Darrin K. Porcher

## 1.      SUMMARY OF FINDINGS

I offer the following opinions based on the materials I have reviewed: 1)  the Philadelphia Police Department and detectives Boyle, Peterman, Harkin, McNamee and Lt. Deegan and Jeffrey Piree acted with deliberate indifference and were recklessly deficient in their homicide investigation; 2) the deficiencies of these individuals [primarily Detective Howard Peterman but also by implication Detectives Boyle, Piree, Harkin and McNamee] violated Plaintiff Donald Outlaw's constitutional rights; 3) Detective Peterman submitted an affidavit of probable cause that violated the 4th amendment of the constitution as it failed to include critical exculpatory information; 4) The Philadelphia Police Department failed to properly train and supervise their officers how to determine probable cause – and in fact provided the wrong definition of probable cause in their training material; 5) the Philadelphia Police Department failed to properly train and supervise officers to include exculpatory information in an affidavit of probable cause; 6) The Philadelphia Police Department failed to eliminate the use of coercive techniques in witness interrogations and failed to instruct witnesses that they were free to leave causing each witness to be subject to a custodial interrogation without providing Miranda warnings and right to counsel; 7) The Philadelphia Police Department had a custom or policy of not disclosing exculpatory evidence in arrest warrants/coercing and fabricating statements/not permitting witnesses to leave interviews. The Philadelphia Police Department were deliberately indifferent to the fact that violations of the 4th and 14th amendments would be a highly predictable consequence of their failure to adequately train and supervise and adopt policies that addressed these deficiencies.  All of these violations resulted in the arrest and wrongful conviction of Donald Outlaw.

I, Dr. Darrin Porcher, have reviewed the following exhibits in the 1983 civil rights claim titled **DONALD OUTLAW v. CITY OF PHILADELPHIA, JEFFREY PIREE and HOWARD PETERMAN:**

## PHILADELPHIA POLICE DEPARTMENT – DIRECTIVES

1.      CITY004186-4188 - PPD Statement of Ethical Principles (January 1988)
2.      CITY004253-4267 - PPD Directive 61 Investigation Report (2/26/87)
3.      CITY004243-4252 - PPD Directive 61 Investigation Report (7/28/97)
4.      CITY001030-1039 - PPD-Directive 12.12 Investigation Report (2/1/01)
5.      CITY001040-1045 - PPD Directive 33 Police and Suspect Photographs (8/18/99)
6.      CITY004290-4306 - PPD Directive 50 Investigation & Charging Procedure (1/21/87)
7.      CITY004307-4333 - PPD Directive 50 Investigation & Charging Procedure (5/6/96)
8.      CITY001046-1063 - PPD Directive 50 Investigation & Charging Procedure (6/13/00)
9.      CITY004334-4339 - PPD Directive 79 Disciplinary Procedure (4/14/80 - version 1)
10.    CITY001082-1101 - PPD Directive 79 Disciplinary Procedure (4/14/80 - version 2)
11.    PLAINTIFF17873-17887 - PPD Directive 8.6 Disciplinary Procedure (5/1/10)
12.    CITY001102-1131 - PPD Directive 82 Criminal Identification Processing, Transportation and Temporary Detention of Adult Prisoners (3/8/82)

3

13. CITY004268-4271 - PPD Directive 106 Criminal Records (5/15/81)
14. CITY001132-1133 - PPD Directive 106 Criminal Records (10/23/02)
15. CITY004272 - PPD Directive 114 Right, Duty and Opportunity to Present Complaints or Information (1/8/82)
16. CITY004273-4274 - PPD Directive 114 Right, Duty and Opportunity to Present Complaints or Information (3/21/97)
17. CITY001137-1139 - PPD Directive 114 Employee's Responsibility to Report Corruption, Misconduct and Other Improper Acts Negatively Affecting the Department (10/8/99)
18. CITY001134-1136 - PPD Directive 114 Employee's Responsibility to Report Corruption, Misconduct and Other Improper Acts Negatively Affecting the Department (3/6/03)
19. CITY004275-4283 - PPD Directive 127 Complaints against Police (9/28/94)
20. CITY001140-1147 - PPD Directive 127 Complaints against the Philadelphia Police Department (11-13-00)
21. CITY004284-4289 - PPD Directive 135 Rules of Discovery (4/13/81)
22. CITY001148-1155 - PPD Directive 135 Rules of Discovery (5/12/00)
23. CITY001156-1165 - PPD Directive 139 Arrest Warrants (8/17/94)
24. CITY021379-21388 - PPD Directive 139 - Arrest Warrants (3/25/13)
25. PLAINTIFF02206-02215 – PPD Directive 5.22 – Arrest Warrants (9/1/20)
26. CITY020702-20711 - PPD Directives 5.22 – Arrest Warrants (updated 9/1/20)
27. CITY001166-1177 - PPD Disciplinary Code
28. CITY004190-4242 - PPD Instruction booklet
29. CITY004344-4345 - PPD Memorandum Formal Statements (July 24, 1998)
30. PLAINTIFF02181-02205 – PPD Directive 5.23 – Interviews and Interrogations (5/29/20)
31. CITY021389-21402 - PPD Directive 151 - Interviews and Interrogations (1/1/14)
32. PLAINTIFF22144-22152 – PPD Directive 7.16 – Department Directives Program (7/9/15)
33. PLAINTIFF02181-02205 – PPD Directive 5.23
34. PLAINTIFF02206-02215 – PPD Directive 5.22
35. PLAINTIFF17873-17887 – PPD Directive 8.6
36. PLAINTIFF22092-22096 – PPD Directive 7.11 – Records Retention
37. PLAINTIFF22097-22119 – PPD Directive 10.2 – Use of Force
38. CITY004346 – Retention Policy
39. PLAINTIFF22012-22091 – *US Department of Justice – Standards and Guidelines for Internal Affairs – Recommendations from a Community of Practice*

## PHILADELPHIA POLICE DEPARTMENT – TRAINING

1. CITY004421-4522 - Course #99-315 Officer Safety Awareness IX (10/21/98)
2. CITY004786-4904 - Section IV Laws and Procedures – Search and Seizure (6/1/00)
3. CITY004905-4968 - Section IV Laws and Procedures – Criminal Procedures and Laws of Arrest (6/1/00)
4. CITY004969-5021 - Section IV Laws and Procedures – Criminal Procedures and Laws of Arrest 2 (6/1/00)
5. CITY004706-4722 - Section IX Principles of Criminal Investigation - Crimes Against People (6/1/00)
6. CITY004723-4785 - Section IX Principles of Criminal Investigation – Interviewing and Interrogation Techniques and Skills (6/1/00)

7. CITY004523-4529 - Section XVIII Handling Arrested Persons -- Booking and Lockup (6/1/00)
8. CITY004530-4554 - Section XVIII Handling Arrested Persons -- Transporting Prisoners (6/1/00)
9. CITY004347-4420 - Legal Update Course #04-201 (12/1/03)
10. CITY004555-4705 - Section XI Crisis Management -- Recognizing Special Needs (7/13/05)
11. CITY005022-5083 - Basic Training Curriculum for Pennsylvania Police Patrol Officers -- Pre-Patrol and Routine Patrol Procedures
12. CITY005084-5209 - Basic Training Curriculum for Pennsylvania Police Patrol Officers -- Patrol Activities and Incidents
13. CITY005210-5225 - Basic Training Curriculum for Pennsylvania Police Patrol Officers -- Surveillance
14. CITY005226-5239 - Basic Training Curriculum for Pennsylvania Police Patrol Officers -- Area Searches
15. CITY005240-5259 - Basic Training Curriculum for Pennsylvania Police Patrol Officers -- In-depth Investigations
16. CITY005260-5276 - Basic Training Curriculum for Pennsylvania Police Patrol Officers -- Processing Evidence
17. CITY005277-5302 - Basic Training Curriculum for Pennsylvania Police Patrol Officers -- Interviewing and Interrogation
18. CITY005303-5333 - Basic Training Curriculum for Pennsylvania Police Patrol Officers -- Preliminary Investigations
19. CITY005334-5352 - Basic Training Curriculum for Pennsylvania Police Patrol Officers -- Investigations
20. CITY005353-5400 - Basic Training Curriculum for Pennsylvania Police Patrol Officers -- Evidence
21. CITY005401-5521 - Basic Training Curriculum for Pennsylvania Police Patrol Officers -- Criminal Procedure
22. CITY005522-5580 - Basic Training Curriculum for Pennsylvania Police Patrol Officers -- Criminal Procedure 2
23. CITY005581-5602 - Basic Training Curriculum for Pennsylvania Police Patrol Officers -- Authority and Jurisdiction
24. CITY005603-5636 - Basic Training Curriculum for Pennsylvania Police Patrol Officers -- Civil Law
25. CITY005637-5646 - Basic Training Curriculum for Pennsylvania Police Patrol Officers -- Civil Law 2
26. CITY005747-5760 - Basic Training Curriculum -- Constitutional Law -- Section 4B
27. CITY005892-5905 - Basic Training Curriculum -- Constitutional Law -- Section 4B
28. CITY005761-5821 - Basic Training Curriculum -- Criminal Procedure-- Section 4D
29. CITY006045-6105 - Basic Training Curriculum -- Criminal Procedure-- Section 4D
30. CITY005822-5874 - Basic Training Curriculum -- Search and Seizure -- Section 4E
31. CITY005906-5958 - Basic Training Curriculum -- Search and Seizure -- Section 4E
32. CITY005647-5697 - Basic Training Curriculum -- Interviewing and Interrogation Techniques and Skills - Section 9C

5

33. CITY005959-6009 - Basic Training Curriculum – Interviewing and Interrogation Techniques and Skills - Section 9C
34. CITY006150-6200 - Basic Training Curriculum – Interviewing and Interrogation Techniques and Skills - Section 9C
35. CITY005698-5732 - Basic Training Curriculum – Identifying, Collecting and Processing Evidence – Section 9D
36. CITY006010-6044 - Basic Training Curriculum – Identifying, Collecting and Processing Evidence – Section 9D
37. CITY005733-5746 - Basic Training Curriculum – Crimes Against People – Section 9F
38. CITY006106-6119 - Basic Training Curriculum – Crimes Against People – Section 9F
39. CITY005875-5891 - Basic Training Curriculum – Case Preparation – Section 9N
40. CITY006133-6149 - Basic Training Curriculum – Case Preparation – Section 9N
41. CITY006120-6132 - Instructor Cues and Performance Objectives – Civil and Criminal Liability

## OUTLAW – HOMICIDE FILE

1. CITY000001-669
   a. Activity Sheets (CITY000053; 109-112; 104; 88; 83; 474; 476-77; 480-85; 7; 105; 117-18)
   b. Affidavit of Probable Cause (CITY000340-346)
   c. Affidavit of Probable Cause (DAO 00291-93)
   d. Affidavit of Probable Cause (CITY000359-366)
   e. Affidavit of Probable Cause (DAO 00282-84)
   f. Affidavit of Probable Cause (DAO 00944-46)
   g. Warrant of Arrest/Arrest Report (9/3/03) (CITY000348; 371; 373; 349-51)
   h. Arrest Report (DAO 00699-700)
   i. Police Notes (CITY000099; 332-33; 486; 512; 602-23; 50)
2. PH HAMU00001-32 - House Arrest Records
3. PLAINTIFF16285-16373 – Pennsylvania Innocence Project - Investigative Report

## OUTLAW – COURT TRANSCRIPTS

1. CITY001006-1029 - Preliminary Hearing (10/29/2003)
2. CITY000670-917 - Trial
   a. December 15, 2004 (CITY000670-694)
   b. December 16, 2004 (CITY000695-757)
   c. December 17, 2004 (CITY000758-787)
   d. December 20, 2004 (CITY000788-865)
   e. December 21, 2004 (CITY000866-917)
3. CITY003484-3486 - Sentencing (3/24/05)
4. CITY000918-935 - Hearing (11/24/14)
5. CITY003002-3005 - Hearing (5/12/15)
6. CITY003006-3071 - PCRA Hearing
   a. November 15, 2018 (CITY003006-3049)
   b. November 16, 2018 (CITY003050-3071)

6

7.     CITY002988-3001 - PCRA Hearing (1/25/19)
8.     PLAINTIFF22153-22157 – Hearing Transcript on Motion for Nolle Pros (12/20/20)

**OUTLAW – COURT FILINGS**

1.     CITY003195-3210 – Opinion (10/19/05)
2.     CITY001938-1942 – Memorandum (5/17/06)
3.     CITY002656-2671 – Memorandum (2/20/07)
4.     CITY002642-2655 – Opinion (1/20/10)
5.     CITY001943-1952 – Memorandum (12/2/10)
6.     CITY001419-1444 – Report and Recommendation (4/10/13)
7.     CITY001717-1724 – Report and Recommendation (11/25/14)
8.     CITY002673-2675 – Opinion (12/31/15)
9.     CITY002708-2716 – Memorandum (5/2/17)
10.    CITY001953-2655 – Second Amended Petition for PCRA (7/6/18)
11.    CITY002581-2591 – Memorandum in Support of Motion for *Nolle Prosequi* (12/18/20)
12.    Orders
       a.     September 16, 2019 (CITY002691)
       b.     November 8, 2019 (CITY002693)
       c.     November 27, 2019 (CITY002694)
       d.     February 12, 2020 (CITY002682)
       e.     February 2, 2021 (CITY1799)
       f.     CITY002704 – Order granting Motion for *Nolle Prosequi* (12/29/20)
13.    Motion to Compel – Defendant Certification (2/9/22)
14.    Motion to Compel – Court Order (1/31/22)

**AFFIDAVITS/LETTERS/REPORTS**

1.     CITY000313, 305-306 - Statement - Police Officer Lee Datts (9/23/00)
2.     CITY000572-574 - PPD Investigation Interview - Shelby Green (9/4/00)
3.     CITY000525-526 - PPD Investigation Report - Derrick Alston (9/4/00)
4.     CITY000299-300 - PPD Investigation Report - Ritter (handwritten) (10/5/00)
5.     CITY000301-302 - PPD Investigation Interview Record (handwritten) (10/5/00)
6.     CITY000540-545; 538; 586; 571; 565-567; 258; 271 - PPD Statement - Derrick Alston
       (10/30/00)
7.     CITY000023-26; 28; 30-36 - PPD Investigation Interview Record - Anthony Brisbon
       (11/27/00)
8.     CITY000001-6; 534 - PPD Investigation Interview Record (handwritten) - Charles
       Paladino (5/15/01)
9.     CITY000008-13; 527-531; 533 - PPD Investigation Interview Record (handwritten) -
       Charles Paladino (6/26/01)
10.    CITY000495-496; 499 - PPD Investigation Interview Record - Ruth Mills (10/23/01)
11.    CITY000014-16; 665; 653-654 - PPD Investigation Interview Record – Charles Paladino
       (10/24/01)
12.    CITY000490-494; 497 - PPD Investigation Interview Record - Lamar Rodgers (3/29/02)

7

13.    CITY000272; 513-518; 273 - PPD Investigation Interview Record - Derrick Alston (7/9/03)
14.    CITY000521-524; 319; 142; 162-165 - PPD Investigation Interview Record - Eric Lee (8/19/03)
15.    CITY002120 - Affidavit - Mark Greenberg to Outlaw (2/14/04)
16.    RO (CIU) 000003 - ADA Conroy - letter to Elsa Legesse (5/21/04)
17.    RO (CIU) 000037; 39 - Palladino letter to Conroy (8/11/04)
18.    RO (CIU) 000041; 44; 42-43 - Palladino to Outlaw (9/20/04)
19.    CITY000601; 599-600 - Palladino to Detective Peterman (9/20/04)
20.    RO (CIU) 000004 - ADA Conroy-letter to Deputy Commissioner (11/24/04)
21.    CITY002743; 2744 - Statement - Sydney Starr (1/3/06)
22.    CITY002838 - Affidavit - Annette Outlaw (9/12/07)
23.    CITY002121-2122 - Affidavit - Wesley Harmon (11/24/07)
24.    CITY002091-2092 - Affidavit - Katima Jackson (9/7/13)
25.    CITY002093 - Affidavit - Robert Outlaw (9/12/13)
26.    DAO 02629 - Affidavit - Robert Outlaw (9/26/13)
27.    RO (CIU) 000045-48 - Palladino letter to "Nikki" (1/2/14)
28.    CITY002042 - Affidavit - Robert Outlaw (10/9/14)
29.    CITY002037-2038 - Affidavit - Chris Holder (10/2/14)
30.    CITY002040 - Affidavit - Monique Solomon (10/6/14)
31.    CITY002954-2958 - Letter - Charles Paladino (1/5/15)
32.    CITY002916 - Letter - Monique Solomon (1/7/15)
33.    CITY002897 - Affidavit - Lamar Rodgers (1/8/15)
34.    CITY002899 - Affidavit - Robert Outlaw (1/22/15)
35.    PLAINTIFF00079-80 - Affidavit – Charles Paladino (1/27/15)
36.    CITY002911; 2917 - Affidavit - Wesley Harmon (1/21/15) - Given by Monique Solomon (1/29/15)
37.    CITY002951 - Affidavit - Robert Outlaw (2/6/15)
38.    CITY002953 - Affidavit - Monique Solomon (2/6/15)
39.    CITY002915 - Affidavit - Monique Solomon (2/14/15)
40.    CITY002913 - Affidavit - Robert Outlaw (2/28/15)
41.    DAO 02972 - Certification - Katima Jackson (3/19/18)
42.    CITY002098 - Certification - Charles Paladino (4/5/18)
43.    DAO 03145 - Certification - Eric Lee (4/6/18)
44.    CITY002096 - Memo to Foster from Leah Berney - Phone Conference with Pop (4/27/18)
45.    RO (CIU) 000202-205 - Notes - Paladino (6/5/19)
46.    PLAINTIFF17809-17810 - Christopher Holder Interview – PA Innocence Project
47.    OUTLAWDAO2022000418-419 - Statement - Police Officer Lee Datts (9/23/00)
48.    CITY009670-9672 - Arrest PARS report (10/24/01)
49.    CITY009654-9657 - Guilty Plea Colloquy (1/29/02)
50.    PSP/SPU000001-408 – Pennsylvania State Police – Response to Subpoena (MPOETC)

8

**DETECTIVES**

1. Piree
   a. CITY003727-3729 – Piree Concise Officer History
   b. PLAINTIFF22929-22938 – *Chester Hollman, Spent 28 Years in Prison After Wrongful Conviction, to Get $9.8M from Philly*
   c. PLAINTIFF22939 – DAO Misconduct Disclosures
   d. PLAINTIFF22940 - *Hollman* – Order granting Habeas Corpus (6/25/19)
   e. PLAINTIFF22941-22958 - *Hollman* – Commonwealth's Answer to Counseled PCRA Petition (6/24/19)
   f. PLAINTIFF22959-22973 - *Hollman* – Joint Stipulations of Fact of Petitioner and Respondent (6/24/19)
   g. PLAINTIFF22974 - *Miller* – Order granting Habeas Corpus (7/31/19)
   h. PLAINTIFF22975-23006 - *Miller* – Motion for *Nolle Pros* (7/29/19)
   i. PLAINTIFF23007 – DAO Misconduct Disclosures
   j. PLAINTIFF23008 - *Hollman* – Order granting Habeas Corpus (6/25/19)
   k. PLAINTIFF23009-23026 - *Hollman* – Commonwealth's Answer to Counseled PCRA Petition (6/24/19)
   l. PLAINTIFF23027-23041 - *Hollman* – Joint Stipulations of Fact of Petitioner and Respondent (6/24/19)
   m. PLAINTIFF23042 - *Miller* – Order granting Habeas Corpus (7/31/19)
   n. PLAINTIFF23043-23074 - *Miller* – Motion for *Nolle Pros* (7/29/19)
   o. PLAINTIFF23075-23110 - *Miller* –Complaint – 20-3054 - (6/24/20)
   p. PLAINTIFF23111-23156 - *Miller* – Report and Recommendation – 12-742 (6/12/19)
   q. PLAINTIFF23157-23176 - *Miller* – Defendants Partial Motion to Dismiss – 20-3054 (10/22/20)
   r. PLAINTIFF23177-23273 – *Commonwealth v Thomas* – Motion to Supplement the Record
   s. PLAINTIFF23274-23293 – *Thomas v. Varner* – Opinion (11/4/05)

2. Peterman
   a. CITY003723-3726 - Concise Officer History
   b. CITY003730-4185 - Personnel File
   c. CITY011142-13284 - IAD Files
   d. PLAINTIFF22721-22785 - *Thorpe* PCRA Hearing Transcript (6/19/17)
   e. PLAINTIFF22786-22852 - *Thorpe* PCRA Hearing Transcript (6/20/17)
   f. PLAINTIFF22853-22860 - *Thorpe* PCRA Hearing Transcript (6/21/17)
   g. PLAINTIFF22861-22922 - *Thorpe* PCRA Hearing Transcript (6/22/17)
   h. PLAINTIFF22923-22928 – *Tolbert* Memorandum of Internal Affairs Division - Complaint against Peterman

**OUTLAW FEDERAL – DEPOSITION TRANSCRIPTS**

1. Patricia Cummings (1/27/22)
2. Detective John Harkins (3/3/22)

3.   (Retired Det.) Jeffrey Piree (3/14/22)
4.   Charles Paladino (3/31/22)
5.   Charles Paladino (4/5/22)
6.   Detective John McNamee (4/19/22)
7.   Detective Lee Datts (4/21/22)
8.   Howard Peterman (5/12/22)
9.   Shelby Green (5/18/22)
10.  Derrick Alston (6/21/22)
11.  Monique Solomon Outlaw (7/22/22)
12.  Donald Outlaw (7/26/22)
13.  Francis Healy (8/9/22)
14.  Charles Boyle (8/17/22)
15.  Mark Deegan (8/23/22)
16.  Charles Paladino (9/7/22)
17.  Charles Paladino (9/8/22)
18.  Charles Paladino (9/9/22)

## OTHER CASES

1.   SHAURN THOMAS
   a.   PLAINTIFF12479-12509 – *Thomas v. City of Philadelphia* – McCauley Report (1/14/19)
   b.   PLAINTIFF12510-12511 – *Thomas v. City of Philadelphia* – McCauley Report (3/1/19)
   c.   PLAINTIFF12097-12168 – *Thomas v. City of Philadelphia* – Devlin Transcript
   d.   PLAINTIFF12409-12478 – *Thomas v. City of Philadelphia* – Worrell Transcript
   e.   PLAINTIFF12224-12256 – *Thomas v. City of Philadelphia* – Nodiff Transcript
   f.   PLAINTIFF22158-22207 – *Thomas v. City of Philadelphia* - Memorandum and Opinion on Motion for Summary Judgment

2.   NAACP
   a.   PLAINTIFF01360-1367 - *NAACP v. City of Philadelphia* – Docket Report
   b.   PLAINTIFF01368-1413 - *NAACP v. City of Philadelphia* – Settlement and Monitoring Agreement and Stipulations of the Parties
   c.   PLAINTIFF01414-1420 - *NAACP v. City of Philadelphia* – Complaint (1996)
   d.   PLAINTIFF01421-1422 - *NAACP v. City of Philadelphia* – Order (1996)
   e.   PLAINTIFF01423-1516 - *NAACP v. City of Philadelphia* – Plaintiffs' First Monitoring Report – Complaints Against Police

      f.     PLAINTIFF01517-1559 - Integrity and Accountability Office – Philadelphia Police Department – First Report (November 1997)

      g.    PLAINTIFF01560-1604 - Integrity and Accountability Office – Philadelphia Police Department – Second Report (September 1998)

      h.    PLAINTIFF01605-1748 - Integrity and Accountability Office – Philadelphia Police Department – Third Report (July 1999)

      i.     PLAINTIFF01749-1821 - Integrity and Accountability Office – Philadelphia Police Department – Fourth Report - Enforcement of Narcotics Laws (July 2002)

      j.     PLAINTIFF01822-1896 - Integrity and Accountability Office – Philadelphia Police Department – Fifth Report - Disciplinary System (March 2001)

      k.    PLAINTIFF01897-1967 - Integrity and Accountability Office – Philadelphia Police Department – Sixth Report - Disciplinary System (December 2003)

      l.     PLAINTIFF01968-2052 - Integrity and Accountability Office – Philadelphia Police Department – Seventh Report

      m.   PLAINTIFF02053-2175 - Police Integrity and Accountability in Philadelphia: Predicting and Assessing Police Misconduct (December 2004)

3.    WRIGHT

      a.    PLAINTIFF12580-12773 – *Wright v. City of Philadelphia* -- Nodiff Transcript

      b.    PLAINTIFF22208-22213 – *Wright v. City of Philadelphia* – Memorandum and Opinion on Motion to Compel

4.    GILYARD

      a.    PLAINTIFF12512-12538 – *Gilyard v. City of Philadelphia* – Dusak Transcript

      b.    PLAINTIFF17839-17872 – *Gilyard v. City of Philadelphia* – Healy Transcript

      c.    PLAINTIFF22214-22225 – *Gilyard v. City of Philadelphia* – Memorandum and Opinion on Motion for Judgment on the Pleadings

      d.    PLAINTIFF22226-22272 – *Gilyard v. City of Philadelphia* – Memorandum and Opinion on Motion for Summary Judgment

5.    NORDO

      a.    PLAINTIFF12774-12808 – Nordo Grand Jury Presentment

      b.    PLAINTIFF22120-22124 – The Philadelphia Inquirer – *A Former Philly Homicide Informant Said he was Forced to have Sex with a Detective at a Hotel* (Nordo)

      c.    PLAINTIFF22125-22128 – The Philadelphia Inquirer – *A Former Prison Guard Said an Ex-Philly Homicide Detective Tried to Sexually Assault Him in a Car* (Nordo)

      d.    PLAINTIFF22129-22132 – The Philadelphia Inquirer – *A Homicide Informant Said a Former Philly Detective Assaulted Him in a Police Headquarters Elevator* (Nordo)

11

e. PLAINTIFF22133-22143 – The Philadelphia Inquirer – *Former Philly Homicide Detective Philip Nordo was Found Guilty of Sexually Assaulting Witnesses While on the Job*

6. **THORPE**
   a. PLAINTIFF20097-20298 – *Commonwealth v. Thorpe* – PCRA Transcript (6/19/21)

## OTHER WEBSITES/NEWS ARTICLES

1. PLAINTIFF01300-01302 - *District Attorney Krasner, ADA Cummings Statements on 17th Exoneration Since 2018*
2. PLAINTIFF01303-01310 - District Attorney's Office Website Printout
3. PLAINTIFF01311-01357 - *Overturning Convictions – and an Era* – Conviction Integrity Unit Report (January 2018-June 2021)
4. PLAINTIFF22277-22281 – *Donald Outlaw, Cleared of Murder, is Philadelphia's 17th Exoneree in 3 Years*
5. PLAINTIFF22282-22286 – The National Registry of Exonerations – Donald Outlaw
6. PLAINTIFF22287-22290 – Pennsylvania Innocence Project – Robert "Donald" Outlaw
7. PLAINTIFF22291-22294 – The National Registry of Exonerations – Pennsylvania List
8. PLAINTIFF22295-22296 – *Department of Justice Releases Report on Philadelphia Police Department's Use of Deadly Force*
9. PLAINTIFF22297-22484 – Collaborative Reform Initiative – *An Assessment of Deadly Force in the Philadelphia Police Department*
10. PLAINTIFF22485-22491 – Philadelphia Police Department – Website Printout – *Accountability*
11. PLAINTIFF22492-22497 – *A Man Who Served 37 Years May be Freed After Informant Said Cops Provided Sex for False Testimony* (Stokes)
12. PLAINTIFF22498-22506 – *Philly Man Has Served 38 Years for Robbery of $1,200 – Witnesses Say He Wasn't Even There* (McKeithan)
13. PLAINTIFF22507-22529 – *Once-Secret Records Show How the Police Arbitration System Overturned the Firings or Discipline of More than 100 Questionable Philadelphia Cops*
14. PLAINTIFF22530-22536 – *Ex-Philly Detective James Pitts is Charged with Perjury, Alleging he Lied About a Coerced Confession*
15. PLAINTIFF22537-22539 – *Philadelphia Narcotics Cops Charged with Stealing Drugs, Money*
16. PLAINTIFF22540-22543 – *For Many in North Philadelphia, Police Corruption is No Surprise*
17. PLAINTIFF22544-22570 – *An Inquirer Investigation Has Found Numerous Cops Who Have Claimed to be Too Injured to Work, But at the Same Time Launched New Businesses, Toiled at Physically Strenuous Jobs and More*

18. PLAINTIFF22571-22573 – *Philadelphia Homicide Detective Indicted by Grand Jury in Murder Case Involving Lover* (Dove)
19. PLAINTIFF22574-22576 – *Philadelphia Ordered to Pay 2 Ex-Officers $1 Million in Lawsuit that Forced Former Police Commissioner Richard Ross' Resignation*
20. PLAINTIFF22577-22579 – Philly Declaration – *Philadelphia Police Complaint Archive*
21. PLAINTIFF22580-22584 – *Acting Philly Police Commissioner Promotes Officers Accused of Misconduct*
22. PLAINTIFF22585-22604 – *Philadelphia Police: A History of Corruption*
23. PLAINTIFF22605-22609 – *Jury Orders Philadelphia to Pay $1 Million to Former Police Officers in Case that Brough Down Former Commissioner Richard Ross*
24. PLAINTIFF22610-22617 – *Search The Inquirer's Database of 170 Philadelphia Police Misconduct Files*
25. PLAINTIFF22618-22630 – *Police Misconduct in Philadelphia: Unsealed Records Name the City's Most Cited Cops*
26. PLAINTIFF22631-22634 – Wikipedia – *39th District Corruption Scandal*
27. PLAINTIFF22635-22642 – *Philly Police to Adopt Sweeping Interrogation Reforms come Jan. 1*
28. PLAINTIFF22643-22645 – *Police Think They can Get Away with Anything – That's Because They Usually Do*
29. PLAINTIFF22646-22650 – *False Confessions, Explained*
30. PLAINTIFF22651-22655 – *Judge, DA Apologize to Man Who Was Exonerated After 28 Years in Prison: "We Failed"* (Hollman)
31. PLAINTIFF22656-22659 – *Court Affirms PPD Obligation to Provide Police Misconduct Disclosures to DAO in FOP Lawsuit*
32. PLAINTIFF22660-22679 – *Testilying - Swearing to Tell a Lie*
33. PLAINTIFF22680-22683 – *Philadelphia Homicides Surge Hit 30-Year High in 2020*
34. PLAINTIFF22684-22694 – *$5 Million for Wrongfully Convicted Exoneree, Willie Veasy, from City of Philadelphia*
35. PLAINTIFF23294-26890 - Complaints Against Pitts and News Articles
    a. PLAINTIFF25888-25929 – *Commonwealth v. Thorpe* – Sarmina Opinion (6/7/18)

## JURY INSTRUCTIONS

1. Third Circuit EDPA Jury Instructions for 1983 Claims

## 2.    **BACKGROUND AND METHODOLOGY**

My experience and qualifications are set forth at length in my CV which is attached here. I began my career as a New York City Police Officer in 1991. I was a commissioned Officer in the United States Army. I have been a member of the New York City Police Department Civilian Complaint Review Division, and a member of the Internal Affairs Bureau. I have also served the NYPD as a detective in an investigational capacity. I have also served as an instructor in the Police Academy training officers on the preservation of crime scenes and tenants necessary to establish probable cause to arrest suspects. My background in investigations is extensive encompassing over 10 years of my 20-year tenure as a sworn police officer in the NYPD. I have served in the capacity of a Detective supervisor as a Lieutenant where I managed a multitude of homicide and investigations where on many occasions I was controlled and directed the trajectory of the investigation.

I have been trained in eyewitness identification procedures and the necessary elements to establish probable cause to arrest suspects. I have trained countless police officers in the NYPD police academy as an instructor on processing crime scenes and extracting information from both witnesses and victims for the future prosecution of suspects.

In my time in internal affairs, I conducted investigations into numerous cases where officers arrested suspects without sufficient evidence, and failed to comply with the guidelines, policies and procedures set forth by the New York City Police Department, which are virtually identical to those set forth in this case by the Philadelphia Police Department.

This is because these guidelines are often developed in conjunction with – and directly from materials provided by the United States Constitutions Fourth Amendment. In connection with those investigations, I have reviewed all of the available evidence and rendered opinions and conclusions concerning the standard of proof necessary to effect a lawful arrest that was consistent with Department policy, general policing practices, and the law. Where appropriate I have made and recommended punitive and/or corrective action against police officers, whose failure to establish the criteria necessary to establish probable cause to arrest suspects, violated the policies and the law. In addition to these investigations as a part of the New York City Police Department, I have conducted similar investigations on behalf of litigants across the Country, on behalf of both Plaintiffs and Defendants. I have been qualified as an expert witness in police procedure in establishing probable cause to arrest suspects in Courts across the Country, and I have never been barred as an expert witness nor disqualified for any reason.

In any case such as this – and in any investigation in general – the methodology is the same. An investigation starts with a review of all of the facts. An investigator determining whether the standard of proof to arrest suspects is appropriate in a particular situation must look at the evidence presented which would lead a reasonable police officer to conclude that there is probable cause to believe that person in question committed the offense.

The investigator then compares all of this evidence to the standards which are applicable in each case, and the rules which apply to the police officers. These rules come from several places, including the United States Constitution and the Fourth Amendment. These rules also

14

come from the police departments themselves. These rules are set forth in writing in most occasions, as in this case, with the Philadelphia Police Department.

A comparison to the facts and the evidence must then be made to determine whether the officers' actions were in compliance with the guidelines and criteria necessary to establish probable cause to arrest in a given situation.

There is a general concept in policing and the criteria necessary to exercise appropriate judgment to arrest suspects which is worth noting: The criteria established by an officer to fulfill the obligation of probable cause must adhere to the Fourth Amendment.

This is the methodology I have used in my practice investigating cases in a litigation context, and countless other police experts have used in investigating cases such as this. I have applied this same methodology in this report.

3.  **SCOPE OF RETENTION**

I have been retained to provide expert opinions and testimony in this matter based on my education, professional knowledge and experience.  More specifically, I have been asked to evaluate and explain the probable cause protocols practiced by the Philadelphia Police Department resulting in the arrest of Donald Outlaw.

In this report, I have described my opinions and the bases for those opinions.  In reaching the opinions expressed in this report, I have relied upon my education, my 20 plus years of professional knowledge and experience on the subjects of police establishment of probable cause to effect a lawful arrest.  I have also relied upon my review of case documents and discovery commonly relied upon by experts in my field.  The documents and discovery relied upon include those cited in this report and other records. I considered the pleadings, discovery responses and the documents exchanged by the parties in discovery.  Further, I have relied upon my experience as a former NYPD Lieutenant where I conducted investigations for over 10 years which is commonly accepted and held reliable by experts in my field.

I was retained by VSCP Law to review the case materials and render a professional opinion regarding the Philadelphia Police Department's arrest, investigation and probable cause affidavit protocols and retired detectives Jeffrey Pierre and Howard Peterman's investigation leading to the arrest of Donald Outlaw.

My hourly billing rate for work on this case is $300.00 for field work, research and preparation time; $3,000.00 per day for depositions; and $3,000.00 per day for trial testimony.  The amount of my fee is not contingent upon the opinions expressed herein or on the outcome of this matter.

If additional relevant information becomes available, I reserve the right to revise my opinions.  I may also provide supplemental and/or rebuttal opinions regarding this case, if requested.  References cited in this report are not to be exhaustive but rather exemplary.  The opinions described in this report are made to a reasonable degree of certainty in my field and were arrived at using the same methodology and principles I employ in my non-litigation projects.

4.    **INVESTIGATION**

In the early summer of 2000, Jamal Kelly provided Derrick Alston with $80 of crack cocaine to sell; however, Mr. Alston smoked the product and failed to pay Mr. Kelly. Jamal's brother "Sleep" choked Mr. Alston in relation to the matter (CITY 780).

On September 3, 2000, at approximately 11:55 PM, Derrick Alston who's also known as Shank approached Jamal Kelly and Shelby Green as they were sitting on the front steps of 1863 W. Champlost Ave. Derrick Alston (Shank) had an argument with Mr. Kelly and told Jamal there was a lot of money in his backyard and walked westbound on Champlost on (CITY 573).

Within a very short timeframe, on September 4, 2000, Jamal Kelly was shot in the back while sitting on the front steps of 1863 W Champlost Ave. Jamal Kelly repeatedly told Shelby Green that "Shank (Derrick Alston) set me up." Philadelphia Police Department officer Lee Datts was first on the scene and Shelby Green informed him that the assailant came from behind and shot Mr. Kelly and departed. Ms. Green further stated that she never observed them enter nor exit an auto (CITY 837). Jamal Kelly, as he was dying" informed Officer Datts that Shank did it (CITY 305). Paramedics Anna Ritter and Joseph Gilmore arrived on scene and at 12:24 AM, transported Jamal Kelly to Temple University Medical Center (CITY 109).

Officer Datts responded to Temple University Medical Center while accompanied by Ms. Green where they met with Mr. Kelly's mother. At 12:40 PM, detective John Geliebter arrived at 1863 Champlost Ave. Officer Datts responded back to 1863 Champlost Ave where he was directed by detectives to detain Mr. Alston who Ms. Green positively identified as the man who had spoken to her and Jamal Kelly earlier.

Charles Paladino's 1st Interview

September 4, 2000, Officer Datts, along with detectives Geliebter, and Davis questioned Charles Paladino at his home where he informed them that he saw a **gold or tan colored** Honda or Hyundai drive west on Champlost and then shots were fired at Mr. Kelly from the passenger window. Detective Geliebter did not take notes in connection with his interview of Charles Paladino (CITY 829). **Mr. Paladino stated that he didn't see the shooter** (CITY 858).

Officer Datts transported Derrick Alston (Shank) in his patrol vehicle to the Philadelphia Police Department's 35th District. At 1:55 AM, Officers Whitehouse, Trenwith, and Wilson arrived at 1863 Champlost Ave. and began to process the crime scene and catalogued the location of the four bullet casings on the corner of 19th and Champlost, as well as the blood splatter outside of 1853 and 1863 Champlost.

Derrick Alston's 1st Statement

At 3:30 AM, on September 4, 2000, detective Geliebter questioned Derrick Alston (Shank) in the 35th district where he stated that shortly before midnight, Jamal called him over while walking down Champlost. They had a short conversation and then Derrick went to hang out with Mr. Paladino in his backyard. While hanging with Mr. Paladino in his backyard, he heard four to five shots and ran to his girlfriend's home at Spencer and Lambert and **didn't see the shooter and failed to implicate Donald Outlaw** (CITY 110).

Mr. Alston mentioned that he returned to the crime scene. Mr. Alston also stated that earlier in the summer, Jamal gave him $80 of crack to sell but he smoked it. Mr. Alston also mentioned that Jamal's brother "Sleep" choked him after the incident involving the $80 and said "Next time I see you, you better have my money." Mr. Alston further stated that a week later Jamal told him not to worry about it. Mr. Alston was not able to identify the shooter nor did he implicate Donald Outlaw (CITY 829). Both Mr. Paladino and Mr. Alston provided each other as an alibi for the murder.

At 3:41 AM, Philadelphia Police Department detective Keary Willis interviewed Ms. Green over the phone who stated that the shooter came from behind so she didn't see him but after Mr. Kelly was shot he told her "Shank, Shank set me up" (CITY 572).

On September 16, 2000, at 3:19 PM, Jamal Kelly was pronounced dead by Dr. Harris which was twelve days after the incident. Dr. Francisco Diaz later performed an autopsy which described two gunshot wounds to the back as the cause of death. Dr. Francisco further described in his autopsy report that there is no gross evidence of close-range firing (CITY 483). The case was transferred from detective Geliebter to detective Boyle under the supervision of Lt. Deegan in Homicide. Ms. Green was interviewed by detective Boyle of the Homicide Unit after the 18th of September 2000, and described the shooter as coming from behind Mr. Kelly (CITY 837). Ms. Green later testified she was 14 years old at the time of the shooting and a few months after the events she was taken out of high school by detective Peterman who verbally abused her and that he tried to get her to say things that were not true. (pg. 191). She was not told she was free to leave nor were her parents notified. There is also no documentation of this interrogation. This testimony is consistent with Mr. Paladino's testimony that detective Peterman was involved in the case shortly after the shooting.

Derrick Alston's 2nd Statement

On October 30, 2000, Derrick Alston (Shank), who was already in custody for robbery and theft, was interviewed by detective Charles Boyle (CITY 834). Derrick Alston was mentioned by Jamal Kelly and Shelby Green as the shooter. Mr. Alston was at the scene of the shooting and had a motive to kill Jamal Kelly based on being beat up by his brother "Sleep" in connection with the $80 loss incurred in relation to Mr. Alston being given crack to sell; however, he smoked it as opposed to selling it. The three above factors caused detective Boyle to consider Derrick Alston as a suspect in the homicide of Jamal Kelly (CITY 838).

Mr. Alston allegedly waived his Miranda rights as per detective Boyle and discussed the events of September 4, 2000. Mr. Alston stated that he was with pumpkin (later identified as Mr. Barr) when Mr. Kelly called him over and had a brief conversation just prior to the

18

shooting and left to hang with Charles Paladino referred to as Poppie. After hearing the shots, he went back to the scene with Mr. Paladino where he observed Mr. Kelly on the ground crawling. **Derrick Alston denied being the shooter and stated that he doesn't know who the shooter was** (City 779).

On November 27, 2000, Anthony Brisbon was interviewed in connection with this investigation. The dates associated with this interview are inconsistent (11/27 v. 11/6). Mr. Brisbon did not witness the shooting but confirmed that Jamal Kelly and Derrick Alston were both drug dealers. He also provided contextual information about the feud between Alston and Kelly that was contrary to the version that Alston provided in his initial statement. (OUTLAWDAO2022000665).

At some point the case was re-assigned to detective Peterman in the Special Investigations Unit as he had "new" information about the case. It is noted that both Ms. Green and Mr. Paladino indicate that Detective Peterman was involved in the case much earlier than what is documented. None of the involved detectives are able to articulate what new information was uncovered by detective Peterman. Thus far in the investigation Mr. Outlaw's name was not mentioned.

Charles Paladino's 2nd Interview

Charles Paladino's 2nd Interview
On May 15, 2001, Charles Paladino was interviewed by detective Jeff Piree of the Homicide Division (CITY 797). Detective Piree transcribed a 6 page hand written statement from Mr. Paladino as opposed to recording the interview (CITY 839). Detective Peterman was the assigned Detective at this point as confirmed by the transport records (CITY 534). Mr. Paladino was picked up by police at the instruction of detective Peterman and taken to the Homicide Unit. This statement was custodial and therefore required Miranda warnings that were not provided. It is also not documented as to when the interrogation ended. This is contrary to established police practices and violation of constitution. This significantly impairs the credibility of Mr. Paladino's statement. While detective Piree is documented as taking this statement, there is evidence that detective Peterman was also involved (i.e., transport records, Mr. Paladino's testimony as well as Ms. Green's testimony that detective Peterman was also involved in her statement).

This was a custodial interrogation and therefore was required to be recorded. Recording the statements of a witness allows an investigator to review what was said to ensure authenticity and also displays the temperament of the interviewee. The practice of not recording witness interviews removes a significant fail-safe mechanism in investigations which allows detectives to review recordings against handwritten notes to ensure all information is captured. Detective Peterman/Piree's failure to record witness interviews doesn't allow them to present recorded information to refute allegations of manufactured statements. Under these circumstances it was contrary to accepted police practices to not record this statement.

Charles Paladino stated that **someone in a gold or tan Hyundai who Charles Paladino was unable to identify** shot Mr. Kelly from the front passenger seat (CITY 3). **Mr. Paladino stated that Shank and Eric Lee were present, but they didn't recognize the**

19

shooter (CITY 4). In this statement Mr. Paladino states that Lamar Rodgers told him that Mr. Outlaw (referred to as Don-Don) was driving in the area and admitted to the shooting about 1 month after the shooting. It appears that Mr. Outlaw was on electronic monitoring/house arrest at the time these statements were purportedly made (PH HAMU00001-32). Based on Donald Outlaw being on house arrest, he was only able to travel to and from school. Once Mr. Outlaw's name was identified it was incumbent on detective Peterman, as the assigned, to make sure any suspects were not in custody or under supervision at the time of the crime and to corroborate/disprove allegations that Mr. Outlaw admitted to the crime a month later. The failure of detective Peterman to further corroborate this is contrary to accepted police practices.

On June 23, 2001, while stripping a car in front of his house (CITY 806), Mr. Paladino was arrested and charged with theft and unauthorized use of a vehicle and receiving stolen property while operating an automobile "Chop Shop" out of his backyard and eventually pled guilty MC-51-CR-0629991-2001. On June 24, 2001, Mr. Paladino's mother contacted the Homicide unit to inform them that her son was in custody (OUTLAWDAO2022000054). On June 25, 2001, detective Peterman contacted CFCF for records (DAO00766).

Charles Paladino's 3rd Interview

On June 26, 2001, Paladino was interviewed by detective Peterman and McNamee, and stated he did not tell the entire story in earlier interviews because he was afraid of what Mr. Outlaw would do to him and his family (CITY 8). This was clearly another custodial interrogation that required Miranda warning was well as preserving the integrity of the interview by recording it. Charles Paladino was held by detectives McNamee and Peterman overnight and detectives initiated their investigation, without documenting anything relating to the investigation, until the next day (despite showing him photos on a computer and having him view a video in an unrelated case). Detective Peterman elected to transcribe Charles Paladino's interview as opposed to recording it. Standard practice in policing dictate that detectives should immediately begin documentation and recording of detainment and interviews of a potential witness/suspects. The conclusion of the interview is also not timed which is another deviation from acceptable police practices and corroborates Mr. Paladino's later testimony that he was held in custody for long periods of time by detectives on this case.

In this statement, Charles Paladino stated that while exiting the Night Winds Bar at Church La, and Ogontz Ave on September 3, 2000, at approximately 5:00 PM, a couple of doors down on Church Ln he saw Donald Outlaw telling Jamal Kelly that he wanted his money later that day or he was going shoot him (CITY 10). Donald Outlaw pulled out a gun and held it down by his side and Mr. Paladino left. At around 9:30 PM, that same night, Donald Outlaw asked Charles if he saw Jamal Kelly and he responded no and Mr. Outlaw informed Mr. Paladino that he's going to bang him and walked off. Around midnight, Mr. Paladino stated that Jamal Kelly was sitting on the steps of the corner house at 19th and Champlost St. accompanied by a woman when Derrick Alston walked over and engaged him in a brief conversation and walked off and joined Mr. Paladino. Mr. Paladino stated that shortly after, he saw Mr. Outlaw get out of a double parked **brown or green Hyundai** hatchback and come from behind a wall and shoot Mr. Kelly and hopped into a vehicle fleeing the scene (CITY 12). This directly contradicts Mr. Paladino's previous statements (ON MAY 15, 2021, CHARLES PALADINO SAID **HE DIDN'T SEE THE SHOOTER WHO FIRED FROM THE CAR** WHICH WAS A TAN OR GOLD HYUNDI

WHICH CONFLICTS WITH HIS STATEMENT ON JUNE 26, 2001, WHERE HE STATED THE HYUNDI WAS BROWN OR GREEN WHICH BOTH CONFLCIT WITH THE STATEMENT HE PROVIDED AFTER THE SHOOTING)

On June 26, 2001, Mr. Paladino became a cooperating witness on another homicide investigation with detective Peterman where there was a videotaped statement for another homicide which involved the conviction of Yusef Brown. Detective Peterman videotaped Mr. Brown's interrogation in relation to that case.; however, he never videotaped nor recorded any of the interviews involving the murder of Jamal Kelly. This is significant as clearly he was videotaping murder suspects. A reasonable police officer would have treated Mr. Paladino and Mr. Alston as murder suspects as well and recorded their statements as that was standard police practice in 2000.

The available evidence suggests that Mr. Paladino's information to detectives Peterman and McNamee of another murder in addition to Mr. Kelly's was with the intention of receiving leniency for his open cases. This is corroborated by the fact that his mother informed detectives of his incarceration (looking for help for her son) as well as Mr. Paladino's 2004 letter indicating he was expecting some benefit from his "speech" as well as the fact that upon completion of Mr. Paladino's statement, he requested a transfer from Philadelphia Industrial Correctional Center to North Hampton which occurred as per detective Peterman's request. Mr. Paladino also wrote ADA Jude Conroy a letter that speaks to his perceived importance as a witness. This all is strongly suggestive of a witness that was expecting something in return for testimony that he thinks they will like (i.e., favorable for the prosecution). Upon his incarceration, Charles Paladino wrote detective Peterman a letter requesting a level of reciprocity for his statements against Donald Outlaw which again corroborates his claims that they had an agreement for a benefit concerning these statements (CITY 601). This is also corroborated by the deviations from acceptable police practices in the manner that these statements were obtained as they do not properly document when they end as well as the fact that the interview started at least the day before it is documented. This is addition to the fact that this was a custodial interrogation and not recorded.

Police should never offer incentives to incarcerated witnesses to provide information against others with the expectation that their statements will impact on their criminal cases. By offering incentives to incarcerated witnesses to provide statements against others they are more likely to embellish or fabricate their prospective to benefit themselves which would result in a positive outcome in their criminal cases. As detailed more below, based upon review of the circumstances surrounding the statements obtained in this case, if true, establish a custom and practice of coercion and fabrication on the part of the PPD as well as a custom and practice of failing to record interviews. Seven out of Eight civilian witnesses testified that the homicide detectives and specifically detective Peterman coerced, abused, harassed and/or fabricated statements. This alone establishes a pattern and practice that the PPD was permitting this conduct and failed to properly supervise/train their officers.

On August 31, 2001, Charles Paladino plead guilty to theft for receiving stolen property for a 1999 arrest MC-51-CR-0929821-1999 (CITY 790). Mr. Paladino also plead guilty to theft for receiving stolen property and conspiracy for a 2000 arrest MC-51-CR-1036031-2000. Mr. Paladino plead guilty to theft by receiving stolen property for his June 23, 2001 arrest.

Charles Paladino's 4th Interview

On October 23, 2001, Charles Paladino along with his mother were signed into the Homicide unit by detective Peterman, badge 9114 (CITY 7403) Ms. Mills provides a statement, but Mr. Paladino does not. The next day, Mr. Paladino was arrested in the lot behind his house (CITY 9670). Detective Peterman interviewed him hours later at the homicide unit. This statement to detective Peterman is about allegedly being jumped by Mr. Outlaw at his home and Mr. Outlaw's threatening behavior. Charles Paladino refused medical aid and never reported this incident to police when it occurred (despite clearly having a direct line to the homicide unit). At the same time, Mr. Paladino was arrested and charged with criminal mischief and possession of instruments of a crime and plead guilty. There is no documentation as to when this statement ended. This was also a custodial interrogation. The objective evidence is contrary to detective Peterman's assertion that Mr. Paladino called him to set up an appointment. There is no explanation for why Mr. Paladino was in the homicide unit on the 23rd and then left without providing a statement, then arrested and decided to provide another statement inculpating Mr. Outlaw. Objectively looking at the circumstances surrounding this statement it is certainly very unusual and against police protocol and standards as indicated above. Additionally, detective Peterman, at this point in the investigation, knew that Mr. Paladino had provided very inconsistent statements that would have to be somehow reconciled at trial. As stated by Lt. Deegan, one of the most often excuses for inconsistent identifications is intimidation. It would certainly help detective Peterman to explain why Mr. Paladino provided inconsistent statements if Mr. Paladino alleged intimidation. Mr. Paladino claims detective Peterman fabricated and coerced this statement.

Throughout the remained of 2001 the homicide notes and bring down forms indicate that detective Peterman transported Derrick Alston, as well for Yashon Williams, but no corresponding interviews are documented. There are also reference to other interviews that are not documented (i.e., Lemuel Barr [CITY 486]). On January 16, 2002, Mr. Paladino was arrested and charged with theft by unlawfully taking or disposition, theft by receiving stolen property, possession of an instrument of crime, unauthorized use of an automobile and criminal conspiracy MC-51-CR-011411-2002.

Lamar Rodgers 1st and Only Interview

On March 29, 2002, detective Peterman and detective Harkins questioned Lamar Rodgers after he was mentioned in earlier statements made by both Mr. Paladino and Mr. Alston (CITY 729). Mr. Rogers told detectives that he was in the parking lot in front of Charles Paladino's house on Opal Street when he heard the gunshots. **Lamar stated he did not see the shooting**; rather he heard the shots being fired. After the shooting on the same night, while still at Mr. Paladino's house, Lamar observed Mr. Outlaw pull up in a blue Honda rental car which Lamar referred to as a smoker's car. Either Lemuel or SAA said to Mr. Outlaw that was some fucked up shit in relation to him shooting Mr. Kelly on the night of the murder. Lamar Rodgers said he overheard Mr. Outlaw admit to the shooting and state "people get what they deserve. That boy is going to be alright. I didn't kill him." Either Lemuel Barr or SAA got in the car with Mr. Outlaw and they drove off (CITY 492).

The discovery file failed to contain documentation that supports that either detective Peterman or detective Harkins conducted a search via rental car agencies in the immediate area to determine if a blue Honda was rented to Donald Outlaw. When deposed, detective Harkins stated

that he doesn't recall reviewing other eyewitness statements to corroborate if a blue Honda was identified (Harkins Deposition pg. 145).

Lamar Rodgers also stated that six weeks after the shooting, he again overheard Mr. Outlaw make incriminating statements when he was questioned by Derrick Alston and Lemuel Barr, about Mr. Kelly's murder. Mr. Outlaw allegedly responded, "Nobody was meant to get killed, that shit just happens" (CITY 493). On City 491, two grammatical corrections were made which detective Harkins alleged were handwritten by Lamar Rodgers (CITY 491). This interview also does not document when it ends. Mr. Rodgers claims that he was told that the statement was documenting what the detectives told him Paladino said and he was correcting a version of the events presented to him by detectives as represented to be Paladino's version.

Records indicate that on September 18, 2000, Donald Outlaw was on house arrest until December of 2000 and wearing an ankle monitor when Lamar Rodgers alleges, he confessed to the murder of Jamal Kelly six weeks after Jamal Kelly's murder (PH HAMU00023). Based on Donald Outlaw being under the supervision of the Department of Probation while on house arrest, if he violated his terms of confinement he would have been incarcerated or sanctioned by the authority. If detective Peterman investigated Lamar Rodgers allegations he would have been able to determine that based on Mr. Outlaw being on house arrest and wearing an ankle monitor he wasn't present to make this statement.

On March 30, 2002, the day after talking to homicide detectives, Mr. Rodgers pled guilty to charges stemming from a November 30, 2001 arrest. Mr. Rodgers was initially charged with possession with intent to deliver a controlled substance (a felony) and possession of a controlled substance (a misdemeanor). Mr. Rodgers ended up pleading guilty to the misdemeanor, and the felony charge was dropped (CITY 729).

On May 17, 2002, Charles Paladino pled guilty to criminal mischief and possession of instruments of crime for his October 24, 2000 arrest. Mr. Paladino also pled guilty to theft by receiving stolen property for his January 16, 2002 arrest. On October 24, 2002, Charles Paladino was arrested for theft by receiving stolen property, criminal mischief, and possessing instruments of a crime MC-51-CR-103742-2001.

On July 2, 2003, Mr. Lee was arrested for possession with intent to distribute and plead guilty.

On July 9, 2003, another bring down request is submitted by Detective Peterman for Anthony Brisbon but no interview is documented (CITY28/OUTLAWDAO2022000236).

Derrick Alston's 3rd Interview
On July 9, 2003, Mr. Alston was interviewed by detective Peterman after being picked up by police (CITY 272). Derrick stated that he didn't tell the truth during his October 30, 2000, interview because he didn't want to give somebody up. Mr. Alston stated that on the night of the shooting, he was in Mr. Paladino's backyard talking to Charles with his back towards 1863 W Champlost when he heard shots being fired. Mr. Aston reported that he and Mr. Paladino both ducked after hearing the shots and then looked up and saw **Mr. Outlaw standing on the corner**

of 19th and Champlost **holding a smoking gun.** Derrick Alston stated that he didn't actually see the shooting. This interview appears to end and then restart but no documentation exists as to when it finally concludes. The additional statement as documented by Detective Peterman has to do with the type of gun used (.380 or .9). This is consistent with Mr. Paladino's statement in June of 2001. It is highly suspect that this information was obtained after the statement ended and happens to be consistent with this known fact in Paladino's recent statement. At this point it was almost 3 years since the shooting. This was also a custodial interrogation and not recorded.

Eric Lee's Interview

On August 19, 2003, Mr. Lee was interviewed by detective Peterman. This statement indicates that he told detective Peterman and Harkins that he saw Donald Outlaw standing behind a wall as he shot Mr. Kelly from behind on the stoop (CITY 342). Eric Lee stated that he recognized Donald Outlaw as the shooter because he and Charles Paladino worked on Mr. Outlaw's car in the past. *IN CHARLES PALADINO'S 5/15/2001 INTERVIEW WITH DETECTIVE PIREE HE SAID ERIC LEE DIDN'T SEE THE SHOOTER WHICH IS CLEARLY INCONSISTENT INFORMATION.*

Mr. Lee indicated at trial that the entire statement was fabricated, and he did not read it before signing. There are no edits or corrections made on this statement which is unusual as standard police practice is to insert intentional errors to ensure that the reader will correct the error to minimize allegations of coercion/fabrication. In fact, with the exception of Mr. Rodger's statement, there are no edits made on any of the statements [Alston, Paladino, Rodgers].

Eric Lee's Arrests

July 2, 2003, Eric Lee arrested on drug possession charges MC-51-CR-0642951-2003 and pled guilty on December 7, 2005, to the above charges (CITY 743).

Shortly after Mr. Lee's statement is obtained, detective Peterman prepared the affidavit for probable cause for the arrest of Mr. Outlaw. The first version was faxed to on August 26, 2003 (CITY 340). Prior to this time the only documentation that any information was shared with the DA was the 10/2000 statement of Mr. Alston (OUTLAWDAO2022000143). The only other documentation of investigation materials being sent to the DA is on 8/20/2003 attaching Mr. Lee's statement (OUTLAWDAO2022003380).

**Charles Paladino Presented Three Different Versions of the Incident as Follows:**

Version 1

On September 4, 2001, Officer Datts, along with detectives Geliebter, and Davis questioned Mr. Paladino at his home where he informed them that he saw a gold or tan colored Honda or Hyundai drive west on Champlost and then shots were fired at Mr. Kelly from the passenger window. Mr. Paladino **failed to implicate Donald Outlaw** in the murder of Jamal Kelly and stated that he **didn't see the shooter.**

Version 2

On May 15, 2001, Philadelphia Police Department Homicide detective Jeff Piree questioned Mr. Paladino about the shooting of Mr. Kelly. Detective Peterman was the assigned detective. Charles Paladino allegedly stated that he while in the company of Shank (Derrick Alston) and Eric Lee **observed someone shoot Jamal Kelly while in the passenger side of a gold or tan in color car** (CITY 3). **Mr. Paladino stated that Shank and Eric Lee didn't recognize the shooter** (CITY 4). Mr. Paladino also stated that Lamar Rodgers told him that he heard Mr. Outlaw confess to shooting Jamal Kelly while he was at Mr. Paladino's residence. Mr. Paladino further stated that Lamar also mentioned to him that six weeks later Mr. Rodgers heard Mr. Outlaw again confess to shooting Mr. Kelly (CITY 5).

Version 3

On June 26, 2001, while incarcerated, Mr. Paladino was interviewed by detective Peterman and McNamee and said that he did not tell the entire story in earlier interviews because he was afraid of what Mr. Outlaw would do to him and his family (CITY 8). Mr. Paladino stated that hours before the shooting, he heard Mr. Outlaw threaten to shoot Mr. Kelly over a monetary dispute. Mr. Paladino stated that later that night after the dispute, he **saw Mr. Outlaw come from behind the wall of the house on the corner of 19th and Champlost St. and start shooting Jamal Kelly**. Mr. Paladino further stated **after shooting Jamal Kelly, Donald Outlaw ran back to a brown or green Hyundai hatchback** and Donald got into the auto departed (CITY 341).

Charles Paladino clearly presented conflicting versions of the shooting. In version 1, he stated that he didn't see the shooting nor know who the shooter was. In version 2, Charles Paladino stated the shooter fired from the vehicle which was gold or tan Hyundai and was told by Lamar Rodgers that he heard from a third party that Donald Outlaw confessed. In version 3, Charles Paladino stated that he saw Donald Outlaw shoot Jamal Kelly and depart in a brown or green Hyundai.

No reasonable police offer would believe Mr. Paladino and rely on his statements to establish probable cause. This is especially true as Mr. Paladino should have been a suspect in the murder and his extensive criminal history for crimes of dishonesty.

**Derrick Alston Presented Three Different Versions of the Incident As Follows:**

Version 1

At 3:30 AM, on September 4, 2000, detective Geliebter questioned Derrick Alston (Shank) in the 35th district where he stated that shortly before midnight, Jamal called him over while walking down Champlost. They had a short conversation and then Derrick went to hang out with Mr. Paladino in his backyard. While hanging with Mr. Paladino in his backyard, he heard four to five shots and ran to his girlfriend's home at Spencer and Lambert and **didn't see the shooter and failed to implicate Donald Outlaw** (CITY 110).

Version 2

On October 30, 2000, Derrick Alston (Shank) was interviewed by detective Charles Boyle (CITY 834). Detective Boyle identified Mr. Alston as a suspect based on being identified by Jamal Kelley, and Shelby Green and being present at the scene of the crime (CITY

838).   While with Charles Paladino he heard shots and went back to the scene with Mr. Paladino where he observed Mr. Kelly on the ground crawling. **Derrick Alston denied being the shooter and stated that he doesn't know who the shooter was** (City 779).

Version 3

On July 9, 2003, Mr. Alston was interviewed by detective Peterman and stated that he didn't tell the truth during his October 30, 2000. Mr. Alston stated that on the night of the shooting, he was in Mr. Paladino's backyard talking to Charles with his back towards 1863 W Champlost when he heard shots being fired. Mr. Aston reported that he and Mr. Paladino both ducked after hearing the shots and then looked up and saw **Mr. Outlaw standing on the corner of 19th and Champlost holding a smoking gun.** Derrick Alston stated that he didn't actually see the shooting.

Derrick Alston presented three versions of the shooting with conflicting information. In version's 1 and 2, Mr. Alston stated that he failed to see the shooting and was unable to identify the shooter. In version 3, Mr. Alston stated that he heard the shots and turned towards the incident and observed Donald Outlaw standing near Jamal Kelly with a smoking gun.

No reasonable police offer would believe Mr. Alston and rely on his statements to establish probable cause. This is especially true as Mr. Alston should have been a suspect in the murder and his extensive criminal history for crimes of dishonesty.

The shooting incident occurred on September 4, 2000, and the first incriminating statements identifying Donald Outlaw were retrieved on May 15, 2001, by detective Peterman/Piree from Charles Paladino (in a "I was told he admitted it" statement).  On June 26, 2001, less than a month later and under suspect circumstances, Charles Paladino informed detective Peterman while incarcerated that he observed Donald Outlaw shoot Jamal Kelly. On March 29, 2002, Lamar Rodgers informed detective's Peterman and Harkins that he overheard Donald Outlaw confess to the crime both on the day of the shooting and six weeks later (while he was under electronic monitoring).  On July 9, 2003, Derrick Alston informed detective Peterman that after hearing shots he observed Donald Outlaw standing by Jamal Kelly with a smoking gun.  On August 19, 2003, Eric Lee informed detective Peterman that he observed Donald Outlaw shoot Jamal Kelly (Contrary to Mr. Paladino stating Lee didn't know who the shooter was).  All of these statements were recanted at time of trial and consistently thereafter. Even assuming the statements are true and accurate accounts of the declarant version of the events it is simply not enough to create probable cause to any reasonable police officer.

5.    **AFFIDAVIT FOR PROBABLE CAUSE TO ARREST WARRANT**

On September 3, 2003, detective Peterman drafted an Affidavit of Probable Cause for Arrest Warrant DC# 35-93414 Warrant # 277491 which was approved by ADA McCann and signed on September 3, 2003 (CITY 944).  Detective Peterman's warrant was issued for Mr. Outlaw's arrest based on the statements from Charles Paladino, Lamar Rodgers and Eric Lee (Mr. Alston's statements were excluded from the document) as follows:

On June 26, 2001, Charles Paladino stated that while exiting the Night Winds Bar at Church La, and Ogontz Ave on September 4, 2000, at approximately 5:00 PM, a couple of doors down on Church La he saw Donald Outlaw telling Jamal Kelly that he wanted his money later that day or he was going shoot him.  Donald Outlaw pulled out a gun and held it down by his side and Mr. Paladino left.  At around 9:30 PM, that same night, Donald Outlaw asked Charles if he saw Jamal Kelly and he responded no and Mr. Outlaw informed Mr. Paladino that he's going to bang him and walked off.

Around midnight, Mr. Paladino stated that Jamal Kelly was sitting on the steps of the corner house at 19th and Champlost St. accompanied by a woman when Derrick Alston walked over and engaged him in a brief conversation and walked off and joined Mr. Paladino.  Mr. Paladino then heard a car door slam and observed Donald Outlaw walk behind Jamal Kelly and shot him multiple times and ran back to the auto and departed (DAO 945).  Detective Peterman included statements by Charles Paladino alleging that he was approached by Donald Outlaw and two other individuals on October 24, 2001, and assaulted; however, he never received medical attention nor reported it to police (DOA 945).  Detective Peterman also included statements which alleged that on March 29, 2002, Lamar Rodgers heard statements from Donald Outlaw confessing to the shooting of Jamal Kelly both on the date of the incident and a month and a half later (DOA 946).  Detective Peterman further transcribed in the Affidavit of Probable Cause for Arrest Warrant against Donald Outlaw statements made by Eric Lee on August 19, 2003, where he stated that while accompanied by Charles Paladino he observed Donald Outlaw shoot Mr. Kelly on the night of the incident (DAO 946).  Detective Peterman omitted several versions of witness statements in a case that was based upon eyewitness testimony alone.  He also omitted exculpatory information that was required to be in the document.

In 1994, the Philadelphia Police Department implemented PHILADELPHIA POLICE DEPARTMENT DIRECTIVE 139 ARREST WARRANTS (CITY 1156).  This directive contains a definition of probable cause that is not consistent with the legal definition.  It merely requires that the person be "reasonably connected" to the crime.  The accurate definition is significantly and materially different and requires reasonable belief that the person committed the crime (CITY 4914).  This policy does not address the constitutional requirement to include exculpatory evidence in an arrest warrant but does mandate that inconsistent witness statements must be summarized and in the affidavit (when arrest is premised on eyewitness testimony).

In 2020, the Philadelphia Police Department implemented PHILADELPHIA POLICE DEPARTMENT DIRECTIVE 5.22 ARREST WARRANTS [Plaintiff02181].  This directive substantially changed the language of the previous directive [but still articulates a faulty probable cause definition]

1. Under the Fourth Amendment, when applying for a warrant, police officers may not intentionally include misstatements or false statements; or recklessly omit any material facts from the accompanying, affidavit of probable cause. Because the Fourth Amendment prohibits this conduct, the Department also prohibits it. Misstatements in or material omissions from a warrants application will damage the criminal case and could subject the investigator and the City to a 1983 Federal civil rights claim.

2. Regarding omissions, investigators shall include in all warrant applications highly relevant facts within his or her knowledge that any reasonable officer knows that a magistrate would need to make an independent determination of probable cause. This included all culpable information as well as exculpable information. Exculpable information includes, but is not limited to:

> a. any misidentification, inconsistency or failure to identify a suspect by a witness/victim ...

Detective Peterman omitted exculpable information that consisted of highly relevant and material facts within his knowledge that were included in the Jamal Kelly Homicide file. The exculpable information that was excluded by detective Peterman would have greatly assisted the magistrate in making an independent determination of probable cause against Donald Outlaw and was required to be included. A reasonably prudent officer would know this information would be something the magistrate would need to know. While detective Peterman's affidavit is deficient and violates the basic tenets of Mr. Outlaw's 4th amendment rights, it should never have been submitted or approved by his supervisor (Sgt. Barlow/Lt. Deegan). No reasonable officer would believe that probable cause existed to arrest Mr. Outlaw for the murder of Jamal Kelly. There are so many significant inconsistencies and credibility problems with each of the eyewitnesses that detective Peterman used to substantiate probable cause. Even accepting as true their statements, detective Peterman initiated this case without probable cause.

Detective Peterman **failed to list material and significant exculpable information** in the Affidavit of Probable Cause for Arrest Warrant contained in the homicide file as follows:

-Jamal Kelly's dying declaration where he informed officer Lee Datts that "Shank Did It"

-Shelby Green's statements to detective's Willis, Geliebter and officer Datts where she informed them that Jamal Kelly informed her "Shank Set Me Up"

-Charles Paladino's initial interview on the night of Jamal Kelly's murder when he informed Detective Geliebter the lead detective that he saw a **gold or tan colored** Honda or Hyundai drive west on Champlost and then shots were fired at Mr. Kelly from the passenger window and **didn't see the shooter.**

-Detective Geliebter's interrogation of Derrick Alston (Shank) on the day of the shooting was on the scene of the shooting on the day of the incident, never implicated Donald Outlaw and also had a motive for the shooting.

-Detective Boyle's interview of Derrick Alston on October 30, 2000, when he identified Mr. Alston as a suspect. Derrick Alston informed detective Boyle he didn't know who the shooter was.

-Charles Paladino's May 15, 2001 interview with detective Piree where he stated that while accompanied by Derick Alston, Eric Lee and Lamar Rodgers, an unidentified person shot Jamal Kelly from the passenger seat of a **gold or tan** Hyundai. This was in contrast to June 26, 2001, when Charles Paladino informed detective Peterman that Donald Outlaw walked up to Jamal Kelly and shot him and departed in a green or brown Hyundai.    Detective Peterman failed to introduce Charles Paladino's clearly inconsistent accounts.

-Detective Peterman failed to include the color of the vehicle in his Affidavit of Probable Cause for Arrest Warrant against Donald Outlaw.

-On August 19, 2003, Eric Lee told detective's Peterman and Harkins that he saw Donald Outlaw standing behind a wall as he shot Mr. Kelly from behind on the stoop (CITY 342).    In Charles Paladino's May 15, 2021 interview with detective Peterman/Piree he stated that Eric Lee didn't see the shooter which is clearly inconsistent information.

-On June 26 Mr. Paladino informed detectives Peterman and McNamee of another murder in addition to Mr. Kelly's with the intention of receiving leniency for his June 23, 2001 arrest.    Upon completion of Mr. Paladino's statement, he requested a transfer from Philadelphia Industrial Correctional Center to North Hampton which occurred as per detective Peterman's request.

-Mr. Outlaw was on house arrest when Lamar Rodgers indicated that he was driving around and admitting to the murder.

Detective Peterman constructed an Affidavit of Probable Cause for Arrest Warrant excluding the above exculpable and inconsistent information which violates the Fourth amendment. There is no evidence of any materials being provided to the DA with the exception of the 2000 statement of Mr. Alston (which was omitted from the document) and Mr. Lee's 2003, statement.

On September 3, 2003, at 2 PM, detective Peterman arrested Donald Outlaw.  Mr. Paladino pled to misdemeanor charged in January of 2002 and then testified at the preliminary hearing on this matter on October 29, 2003.  The case was held for trial based upon the testimony of Mr. Paladino. At this hearing Mr. Paladino's testimony regarding the intimidation charges do not make sense as he indicates he was in custody at the time the assault occurred. Prior to trial Mr. Paladino was transported to Police headquarters on various occasions (5/18/20004, 5/19/2004).  Then in September Mr. Paladino wrote a letter to detective Peterman indicating that he put a speech together that he believes detective Peterman will like (CITY

29

599). The letter was addressed directly to detective Peterman and was never disclosed until many years later when the homicide file was reviewed by Mr. Outlaw's appellate lawyers.

6. **PHILADELPHIA POLICE DEPARTMENT PRACTICES**

The Philadelphia Police Department (PPD) failed to have an interrogation policy or provide any adequate training on this subject prior to 2014. All of the detectives involved in obtaining statements in this case failed to record any of the witness interviews transcribed during the investigation. Each of the civilian witnesses questions were never free to leave and therefore under custodial interrogation. Detective Peterman worked in homicide for 6 years and never recorded a witness interview. This was clearly a custom and practice on the part of the PPD. Recording the statements of a witness allows an investigator to review what was said to ensure authenticity and also displays the temperament of the interviewee. The practice of not recording witness interviews removes a significant fail safe mechanism in investigations which allows detectives to review recordings against handwritten notes to ensure all information is captured. Detective Peterman's failure to record witness interviews didn't allow him to present recorded information to refute allegations of manufactured statements.

In 2014, the Philadelphia Police Department established a policy to govern interviews and interrogations as follows:

PHILADELPHIA POLICE DEPARTMENT DIRECTIVE 151 INTERVIEWS AND INTERROGATIONS-RIGHTS OF INDIVIDUALS AND DUTIES OF LAW ENFORCEMENT

2. POLICY [CITY021389]

A. It is imperative that the Philadelphia Police Department safeguards the constitutional rights of all persons encountered in the course of their official duties. It is the policy of the Philadelphia Police Department that all sworn personnel understand and follow this directive during the course of any interview and/or custodial interrogation to protect the constitutional rights of the persons being questioned, to avoid the appearance of any improprieties, and to guard against any charges of police coercion or intimidation during the questioning process.

For the first time the Philadelphia Police Department instructed their officers that use of force of any kind was not permitted.

NOTE: It shall be the responsibility of the supervisor on duty to make the proper notification upon change of shift to ensure the oncoming supervisors are made aware of any victims or witnesses being interviewed or waiting to be interviewed. This is done so that the oncoming supervisor can continue to check on the well-being of these individuals. Philadelphia Police Department supervisors failed to ensure that the wellbeing of Lamar Rodgers, Derrick Alston, Charles Paladino and Mr. Lee was intact. Based on the statements by the above witnesses during the trial they mentioned that their testimony was coerced and fabricated.

31

7. **TRIAL**

On December 15, 2004, Mr. Outlaw's trial began in the Court of Common Pleas in Philadelphia County.

**Lamar Rodgers**

At trial, Lamar Rodgers denied having made the two statements, on March 29, 2002, to detectives Peterman and detective Harkins alleging he heard Mr. Outlaw admitting to the shooting of Mr. Kelly and said that he signed the statement without reading it in its entirety after the 8-9 hour interview (CITY 729). Lamar Rodgers stated that he was harassed by detective Peterman during his interview and directed to say that he heard pop (Charles Paladino) tell him something (CITY 729). Lamar Rodgers had one pre-trial conversation with ADA Ruiz where he told her he didn't say what was in the March 29, 2002 signed statement given to detectives Peterman and Harkins (CITY 725).

**Derrick Alston**

At trial, Mr. Alston was incarcerated on a bench warrant on an October 2001 drug case. Mr. Alston denied making the statements to detective Peterman on July 9, 2003, where he allegedly stated on the night of the shooting, he was talking to Mr. Paladino with his back towards 1863 W Champlost when he heard shots. Mr. Alston further denied he stated, on July 9, 2003, that he and Mr. Paladino both ducked after hearing the shots and then looked up to see Mr. Outlaw standing on the corner of 19th and Champlost holding a smoking gun. Derrick Alston further stated during the trial that he didn't see Donald Outlaw at the scene of the crime holding a smoking gun (CITY 782). Derrick Alston stated that he knows Mr. Rodgers; however, didn't see him anywhere the night of the shooting.

Derrick Alston stated that he did not tell detective Peterman the story concerning Outlaw being a participant in the death of Jamal Kelly. When asked by Assistant District Attorney Ruiz why he signed a statement saying he saw the above on July 9, 2003, with detective Peterman he said he was being harassed and didn't read it just to get out of there (CITY 782/783). Derrick Alston claimed during the trial that on October 30, 2000, he wanted an attorney but didn't see one (CITY 778). Derrick also claimed during the trial that his signature on the October 30, 2000 interview was false.

Mr. Alston further stated during the trial on July 9, 2003, the police handcuffed him and placed him in an unmarked police vehicle and transported him to the police station. Mr. Alston further alleges that he was held in a homicide unit room overnight and they released him in the morning and he denied giving a statement on this date. Derrick was allowed to go home after his first two statements with police; however, was held overnight after the third interview which was taken in the morning which he allegedly signed (CITY 782). The statement allegedly obtained from Mr. Alston on July 9, 2003 was the only statement he made which implicated Donald Outlaw.

**Eric Lee**

At trial, Eric Lee denied he informed detective Peterman on August 19, 2003, that he saw Mr. Outlaw shoot Mr. Kelly from behind (CITY 740). Mr. Lee further stated that he did not read the four signed copies of his statements transcribed by police on August 19, 2003, before signing because he is not able to read well and was a drug user at the time of the interview (CITY 740). Eric Lee further stated he didn't see Donald Outlaw shoot anybody and vehemently expressed his anger with his August 19, 2003 statement being misrepresented. Eric further stated that he along with Charles Paladino were high on crack cocaine, PCP and marijuana on the night of the shooting which was corroborated by Charles Paladino (CITY 744). During the trial, detective Peterman acknowledged that he interviewed Eric Lee for 2 hours.

**Charles Paladino**

At trial, on December 20, 2004, Mr. Paladino was in custody for a narcotics case with intent to sell from March 9, 2004, resulting in his conviction of 11½ to 23 (CITY 790). Mr. Paladino stated while in his yard accompanied by Shank and Eric Lee on September 4, 2000, they were smoking marijuana and crack. Mr. Paladino observed a car pull up and four to five shots were fired from the passenger side by an unknown person of the vehicle striking Jamal Kelly (CITY 795/796).

Mr. Paladino denied receiving information from Mr. Rodgers which stated Lamar overheard Mr. Outlaw confess to shooting Mr. Kelly which detective Jeff Piree included in a statement taken from Charles on May 15, 2001. Lamar Rodgers further confirmed that he neither heard Donald Outlaw confess to shooting Mr. Kelly nor did he provide this information to Charles Paladino.

Mr. Paladino was incarcerated during his June 26, 2001 statement and testified that he was high on marijuana when he gave this statement to detective Peterman and McNamee. During the trial, Charles Paladino stated he smoked crack 10 times a day and was also high on PCP and marijuana prior to and on the day of the shooting incident of September 4, 2000, which was corroborated by Eric Lee (CITY 793).

Charles Paladino was held by detectives McNamee and Peterman overnight and the detectives initiated their investigation without documenting anything relating to the investigation until the next day. Standard practices in policing dictate that detectives should immediately begin documentation of detainment and interviews of a potential witness.

During the trial, Mr. Paladino stated that detective Peterman forced him to implicate Donald Outlaw in the statement he made on June 26, 2001 (CITY 810). Mr. Paladino stated that he and detective Peterman fabricated his June 26, 2001 statement where he alleged that hours before the shooting, he heard Mr. Outlaw threaten to shoot Mr. Kelly over a monetary dispute. Charles Paladino also claimed he was forced to implicate Donald Outlaw by way of physical interrogation. Mr. Paladino stated at trial he told detectives Peterman and McNamee what they wanted to hear with the hopes that they would let him go. Charles Paladino stated at trial he falsely implicated Donald Outlaw in the shooting death of Jamal Kelly and admitted lying under oath during the preliminary hearing (CITY 812).

Mr. Paladino also denied that he informed police that he observed Mr. Outlaw outside near the corner of 19th and Champlost Ave looking for Mr. Kelly because he is going to "fuckin bang him."

At the time of Mr. Outlaw's trial, Mr. Paladino was serving an 11.5-23 prison sentence for possession of narcotics with intent to distribute. Mr. Paladino wrote to Mr. Outlaw asking for money for an attorney. The letters were sent in September of 2004 while both men were incarcerated. In this letter, Mr. Paladino told Mr. Outlaw that he was coerced into implicating him in the crime, and says he needs money for an attorney so he can help show that his statements implicating Mr. Outlaw were coerced (CITY 810).

In October of 2003, Mr. Paladino, while incarcerated called Anne Alexander the mother of his child and said he did not see Mr. Outlaw shoot Mr. Kelly (CITY 853).

Fabricated testimony violates the 4th amendment and 14th Amendment; therefore, it can't be introduced at trial. Detectives Boyle, Peterman, Piree, McNamee and Harkin all provided testimony indicating that the statements were true and accurate. Clearly both the detectives and these witnesses cannot be telling the truth.

Sergeant Barlow was the SIU supervisor responsible for detectives Peterman and Harkins and Lieutenant Mark Deegan was the overall supervisor (Harkins Deposition pg. 167). Numerous allegations of coercion and intimidation arose from Charles Paladino, Derrick Alston, Lamar Rodgers and Eric Lee during the trial. No references in discovery reveal Sergeant Barlow/Lt. Deegan effectively supervising the interview process, if at all.

**Donald Outlaw's Conviction**
On December 21, 2004, Donald Outlaw was convicted of the 1st degree murder of Jamal Kelly and the aggravated assault of Charles Paladino. Mr. Outlaw's conviction was based entirely on statements that were gathered several months/years after the incident from known drug addicts, all of whom were either under police supervision or had pending cases at the time of trial, and all of whom eventually recanted their statements implicating Mr. Outlaw. As noted above, none of them testified consistently with their earlier statements at trial; their statements were therefore read into the record [as was Mr. Alston]. No other evidence was presented against Mr. Outlaw.

There was no evidence implicating Outlaw in Mr. Kelly's murder until May 15, 2001, which was eight months after the shooting. The only evidence connecting Mr. Outlaw who was 16 at the time of the incident were statements made to police months, and even years, after the crime by Charles Paladino, Lamar Rodgers, Derrick Alston, and Eric Lee. All four men recanted their statements implicating Outlaw at trial and claimed police coercion and fabrication. Two of these men should have themselves been investigated for this murder (Paladino/Alston).

34

## 8.    POST CONVICTION

After making their statements, and since the trial, a number of witnesses in addition to Mr. Paladino have come forward to say that Mr. Outlaw was not the shooter.

On November 24, 2007, Wesley Harmon signed an affidavit declaring that he was an eyewitness to the crime and that Mr. Outlaw was not the shooter. Mr. Harmon described the shooter as a 511, black, bearded male in his 40s. Mr. Harmon also stated that the shooter was accompanied by a white male whom he knew to be a mechanic in the neighborhood who fixes cars and hangs out with crack heads. The descriptions in Mr. Harmon's affidavit match the descriptions of Mr. Alston who is black and was 44 at the time of the shooting and Mr. Paladino who is a white street mechanic. Mr. Harmon stated that he did not come forward until 2007 because, for several years, he was unaware that Mr. Kelly died as a result of the shooting (CITY 2121).

On September 17, 2013, Katima Jackson signed an affidavit stating that she was an eyewitness to Mr. Kelly's murder. In the affidavit, Mr. Jackson reports that she saw Mr. Alston come up behind Mr. Kelly and shoot him 3-4 times in the back. Ms. Jackson reported that after Mr. Alston fired the weapon, he ran up North 19th St. Ms. Jackson approached Mr. Outlaw and his family to tell them what she witnessed after seeing a flyer stating that Mr. Outlaw had been convicted for Mr. Kelly's murder (CITY 2091). Ms. Jackson met with Mr. Outlaw on August 18, 2013 (Cummings Deposition pg. 68). Katima Jackson testified in a PCRA hearing that she saw Shank commit the murder of Jamal Kelly (Cummings Deposition pg. 68).

In July 2014, Christopher Holder reported that Mr. Alston told him that he had gotten away with Mr. Kelly's murder. On September 20, 2014, Mr. Holder relayed this conversation to Monique Solomon, a friend of Mr. Outlaw's and told her he would be willing to sign an affidavit detailing his conversations with Mr. Alston (CITY 2037). On September 23, 2014, Mr. Outlaw received a letter from Monique Solomon detailing the conversation she had with Christopher Holder (CITY 2040).

On January 2, 2015, Mr. Paladino wrote a letter detailing the police coercion that led to his statements implicating Mr. Outlaw and stated he is willing to testify on Mr. Outlaw's behalf. Mr. Paladino stated that he was on crack at the time of Mr. Kelly's shooting, and was repeatedly harassed and interrogated by the police, and made the statements that they wanted. Mr. Paladino further stated that Mr. Outlaw was not involved and indicated his willingness to testify for Mr. Outlaw but that he is ill and may not have long to live (CITY 810).

Donald Outlaw was incarcerated for 16 years. Patricia Cummings stated that Mr. Outlaw did not receive a fair trial and was wrongfully incarcerated for the homicide of Jamal Kelly (Cummings Deposition pg. 156). Patricia Cummings requested that the charges against Donald Outlaw be Nolle Prossed on December 18, 2020 (Cummings Deposition pg. 20). Ms. Cummings stated that upon conducting interviews in 2019 she was confident that Donald Outlaw did not intimidate or retaliate against Charles Paladino as alleged year's earlier (Cummings Deposition pg. 65).

9.    **INFORMATION SUPPORTIVE OF DETECTIVE PETERMAN'S COERCION AND FABRICATION OF INVESTIGATIVE STATEMENTS**

As indicated above, each of the statements of the civilian witnesses was a custodial interrogation but not treated as such. Moreover, there are so many departures from standard police procedures in each of these statements, as indicated above, that call into question the validity of the content of the statements. In October of 2003, Mr. Paladino, while incarcerated called Anne Alexander the mother of his child and said he did not see Mr. Outlaw shoot Mr. Kelly and he didn't do it (CITY 853). Prior to the trial Mr. Paladino wrote a letter to detective Peterman about creating a speech for trial would make the detective happy. While on the stand during Mr. Outlaw's trial, Charles Paladino stated that he never informed detective Peterman on June 26, 2001, that he observed Mr. Outlaw shoot Mr. Kelly as documented. This further supports Mr. Paladino's trial testimony that detective Peterman fabricated his statements obtained during the investigation.

Mr. Paladino has written various letters that are consistent on this point. In September 2004, while incarcerated, Mr. Paladino wrote a letter to Mr. Outlaw telling him that he was coerced into implicating Mr. Outlaw in his signed statements and requested money for attorney fees (CITY 810). Mr. Paladino remained consistent in his accounts in relation to be coerced during the investigation which he wrote to Mr. Outlaw about as well as during Mr. Outlaw's trial.

On January 2, 2015, Mr. Paladino wrote a letter detailing the police coercion that led to his statements implicating Mr. Outlaw and stated he is willing to testify on Mr. Outlaw's behalf. Mr. Paladino stated that he was on crack at the time of Mr. Kelly's shooting, and was repeatedly harassed and interrogated by the police, and made the statements that they wanted. Mr. Paladino further stated that Mr. Outlaw was not involved and indicated his willingness to testify for Mr. Outlaw but that he is ill and may not have long to live (CITY 810). On January 8, 2015, Lamar Rodgers signed and affidavit affirming his statements during the trial (CITY 2897).

On June 5, 2019, Charles Paladino was interviewed by Ms. Cummings and Mr. Murphy of the District Attorney's Office and stated that detectives arrested him and threatened him with stolen stuff unless he testified it was Don-Don (Donald Outlaw) and he got physically abused by police and lied and told them what they wanted to hear and not get prosecuted for other things (Cummings Deposition pg. 121).

## 10.   PHILADELPHIA POLICE DEPARTMENT CONDUCT:   FAILURE TO SUPERVISE/TRAIN

I am very familiar with the organization and management of the Philadelphia Police Department. I am also very familiar with the tortured history of the Philadelphia Police Department that chronicles credible well documented reports and allegations of practices, customs and policies that deviated from generally acceptable police procedures as well as violating citizen's constitutional rights.

In 1978 the Philadelphia Inquirer investigated and reported on the Philadelphia police force which won a Pulitzer Prize. The first article for which the Pulitzer was awarded dealt with the use of the "third degree" in the interrogation of homicide suspects. A series of four articles on this subject ran in The Inquirer from April 24 to April 27, 1977. The charges of police brutality made by The Inquirer resulted in the investigation by the U.S. Attorney's office of some 52 cases. The types of misconduct that were reported are the same as those alleged in the prosecution of Donald Outlaw (fabrication of evidence, coerced statements, concealment of evidence).

In the 1980s the PPD was enjoined from violating citizen's constitutional rights in several Federal Court Cases:

| | |
|---|---|
| Cliett v. City of Phila: | Enjoining illegal search and seizures |
| Spring Garden United Neighbors v. City of Phila: | Enjoining Police sweep of Latinos |
| Arrintgon v. City of Phila: | Enjoining Stop and search of African Americans |

In the 1980-1990s, police investigations led to multiple incarcerated individuals being exonerated based upon fabricated evidence, false police testimony and concealment of evidence: [National Registry of Exonerations (Plaintiff 22291-22294)]

Don Ray Adams
Edward Baker
Hassan Bennett
Yeidja Bostick
Raymond Carter
Troy Coulston
Curtis Corsland
Albert Daidone
James Frazier
Termaine Hicks
Chester Hollman
Orlando Maisonet
Antonio Marinez
Raymond Martorano
John Miller
William Neives
Walter Osgrod
Willie Stokes

37

Carol Stonehouse
Andrew Swainson
Shaurn Thomas
Clayton Thomas Jr.
Christopher Williams
Terrence Williams
Harold Wilson
Theophalis Wilson
Anthony Wright

This pattern and practice, which is almost exclusively limited to Philadelphia Homicide Detectives, continued throughout the early 2000s and has resulted in 21 exonerations since 2018 with the vast majority of the exonerations premised on police misconduct. These exonerees have spent collectively more than 400 years in prison. (DAO CIU Report, Plaintiff01311). The author of the report, Patricia Cummings was disturbed by the lack of follow up into whether Derrick Alston was the murderer in this case (Cummings pg. 51). She also confirmed that Mr. Outlaw's conviction lacked integrity and was not just (pg. 157). Ms. Cummings, whose analysis let to the decision not to further prosecute Mr. Outlaw, came to the conclusion that Mr. Outlaw was innocent. (Cummings pg. 84; 335). The District Attorney of Philadelphia, Larry Krasner has indicated that:

> The Philadelphia Police Department have historically violated their sworn oaths to uphold the Constitution, seek justice, and protect and serve Philadelphians. Too often they engaged in and tolerated horrendous abuses of power. Numerous police officers coerced confessions through physical abuse, verbal threats, and violations of constitutional rights. Sometimes they simply fabricated confessions. (Outlaw 179).

Ms. Cummings also said that was her experience as well. (pg. 98). Again, these are the same allegations and those presented in this case against Detective Peterman by Mr. Paladino, Rodgers, Alston and Lee.

In 1996 the NAACP filed a complaint seeking to enjoin the PPD from engaging in unlawful and unconstitutional police practices (Plaintiff01416). This led to a settlement agreement that required the PPD and the City to implement reforms and training to ensure that police adhered to restrictions imposed by the constitution. As part of the agreement the PPD established an Integrity and Accountability Officer (IAO) to monitor and access the progress of the PPD in reforming the manner in which they train, supervise and discipline their officers related to complaints of misconduct. From 1997-2003, 3 reports were generated from Ellen Green-Ceisler (IAO). Attached to these reports are appendixes A – H which each contain at least 10-15 internal affair files that document allegations of police misconduct that are similar to the allegations in this case (i.e. police coercion, fabrication of evidence, physical abuse). The conclusion of the IAO in 2003 was that the disciplinary system in the PPD remained fundamentally flawed ineffective, inadequate and unpredictable (Plaintiff01901).

The systematic deficiencies in the disciplinary system of the PPD, in addition to being the subject of the NAACP litigation, persisted and in August of 2013 the US department of Justice

(DOJ) was asked to investigate the effectiveness of the internal disciplinary mechanism and in 2015 the DOJ issued a report that was highly critical of the PD practices and policies and the DOJ recommended numerous changes to their disciplinary mechanism. Clearly the PPD's disciplinary mechanism was even more problematic in 2000.

In addition to the litany of allegations of police misconduct that formed the foundations for the above referenced civil actions, reforms and exonerations, in 2021 the Philadelphia Inquirer made available data in light of their belief that:

> 21 people convicted of murder have been exonerated since 2018. But those account for a fraction of cases in which witnesses and defendants made allegation that detectives fabricated statements." (Plaintiff031491).

This data chronicles police misconduct spanning from the 1980s to 2020 and are similar to the allegations in this case (Fabrication/verbal abuse/physical abuse/threats). These are all cases involving homicide detectives.

In 2018, Judge Sarmina in the Dwayne Thorpe case examined testimony from 11 witnesses that claimed that they were verbally and physically abused by detective Pitts and concluded that when he operated under the apparent belief that an interrogation suspect was lying, he habitually made unreasonable threats, employs physical abuse and prolongs detentions of interrogation subject and does not permit witnesses or suspects to review or correct statements before signing them. (Plaintiff25910). These are exactly the same allegations in this case as to detective Peterman who admittedly worked on many cases with detective Pitts and claims this habitual conduct never happened. It is also worth noting that one of these witnesses, Keith Tolbert, also identified Detective Peterman as being present while detective Pitts utilized physical force and detective Peterman threatened to break his jaw. (Plaintiff25092) An ensuing Internal affairs investigation cleared both Pitts and Peterman as they each corroborated each other's story. Relying on fellow police testimony to clear an allegation of misconduct has been a known deficiency in the disciplinary investigations into police misconduct since 1996. This is a prime example of how the PPD's deficient discipline system enabled Police officers to continue patterns of abuse. Detective Pitts was later indicted for perjury related to false statement he made under oath during an investigation. Philip Nordo is another prolific offender of police misconduct who worked in homicide and recently was convicted of sexually abuse and fabricating evidence.

In the Eugene Gilyard exoneration case, involving a 1995 murder and 1998 affidavit, the police were questioned about their understanding of what needed to be contained in an arrest warrant. The officers all testified that it is not the police officers' job to include exculpatory evidence and that custom and practice in Philadelphia was not to summarize all witness statements (testimony from Dusak/Centeno/Baldini). This is a recurring issue as it was also the subject of the Shaurn Thomas case (testimony from Devlin/Worrell/Nodiff) involving a 1990 murder and a 1993 arrest warrant. Captain Francis Healy also testified in that case that police officers were inappropriately taking witnesses against their will to be interviewed. The testimony in the Gilyard/Thomas cases are strikingly similar to the facts of the Outlaw case and the testimony elicited in this case:

39

Detectives Piree/Peterman/Harkin/Boyle and Lt. Deegan all confirmed:

a.  They were not taught and did not include exculpatory information in arrest warrants;

b.  They were not taught to include summaries of all statements of eyewitness when warrant is based on that testimony;

This is not consistent with their obligations under the constitution and also contrary to the testimony of the City's 30b6 witness Mr. Healy who confirmed that:

1.  PPD officers were provided no training on issue of coercion or abuse before 2014;

2.  Homicide detectives were known to not be permitting witness to leave questioning and not informing them they were free to leave;

3.  PPD was aware that law required exculpatory information and inconsistent witness statements to be in arrest warrants before 2003 but did not address it until 2020 (which was a reaction to an exoneration case).

Lt. Deegan went so far as to admit that while the directive mandates that inconsistent statements be contained in the arrest warrant that was not the practice or custom.

PPD DIRECTIVE 139 (8/17/94) reference above does not provide the definition of probable cause.  This gives police guidance that violates the constitution and on its face is deliberately indifference to the constitutional rights of Philadelphians.  Detective Peterman (as well as almost every other officer in this case) testified he used this definition when finalizing arrest warrants in this case which is an explanation for why it was submitted with a lack of credible evidence and without probable cause.

This same directive indicates that police MUST:

When probable cause is based on an eyewitness account, indicate name and address of each eyewitness and their summary statement(s) (CITY 1159)

Philadelphia police were not properly trained or supervised on this very important constitutional requirement.  The PPD was deliberately indifferent to the known risk that failing to properly train and supervise their officers presented – that it was highly probable that officers would violate citizens constitutional rights when preparing affidavits.

The language contained in the newer version of this policy has been a requirement for arrest warrants well before the 2003 affidavit in this case.  The PPD and City were deliberately indifferent to the constitutional rights of its citizens as well as Mr. Outlaw as none of this information was contained in the affidavit that detective Peterman created.  These directives also contradict the arguments made by several of the detectives that these arrest warrants are approved by the DA and therefore police have no culpability.  The affiant must never sign an affidavit that violates the constitution even if the DA approves it.  In this case there is no evidence that the DA was even aware of all of the inconsistent and exculpatory evidence at the time the affidavit was submitted. It does demonstrate that it was certainly feasible to create this directive or provide adequate

training well before 2003. This is a blatant violation of standard police practices on the part of the PPD and City and demonstrates their deliberate indifference as well as a custom, pattern and practice of officers violating the requirement to include this critical information in arrest warrants.

There was a very well documented and well know deficiency in the disciplinary system within the Police department that permitted police to continue to use inappropriate force and fabricate evidence without any repercussions. The PPD failed to supervise and train and discipline their officers that it was unacceptable to use force or fabricate evidence and that such conduct would be subject to severe consequences. Police misconduct was not properly or effectively monitored internally in the early 2000s despite the fact that (particularly in the Homicide unit) supervisors were aware. It was also standard police practice to utilize audio/video recording in 2000. This was not the custom and practice of the PPD. The failure of the PPD to implement and train officers to utilize these critical investigatory methods are violations of accepted police practices and should have been used to supervise detectives and would certainly prevent coercion and fabrication. Mr. Outlaw testified that he submitted complaints about detective Peterman's conduct during his arrest and interrogation. He alleges physical abuse by detective Peterman. If true, this is another example of failures on the part of the PPD disciplinary system that occurred prior to Mr. Outlaw's trial.

Mr. Outlaw's case is certainly not an isolated incident or even a product of a few rogue officers. It is indicative of a systemic problem within the PPD that has existed for many decades. Seventeen of the last eighteen wrongful conviction case exonerations in Philadelphia involved African Americans. Even just limiting the analysis to this case, if Green, Paladino, Rodgers, Lee and Rodgers are believed, then there was clearly a pattern, practice and custom of using coercive tactics and fabricating evidence in violation of the constitution.

## EXAMINATION OF RELATED INVESTIGATIONS

I have examined the other homicide cases and, in each case, investigatory misconduct was identified and documented. The materials reviewed in these cases include facts drawn from court submissions and/or judicial findings, as well as evidentiary support such as notes of testimony, witness statements, and forensic reports. Each case presented evidence of investigative misconduct that was similar to the misconduct alleged to have been committed against Mr. Outlaw, including coerced confessions, coerced or improperly induced witnesses, and suppression of exculpable evidence. The underlying facts of each case can be summarized as follows:

SUMMARY: COMMONWEALTH v. ANTHONY WRIGHT, CP-51-CR-1131582-1991: Mr. Wright was convicted of the 1991 rape and murder of a 78-year-old woman. A squad of Philadelphia homicide unit detectives, coerced confessions, and failed to consider all relevant material facts, including exculpatory evidence, before arresting and initiating the prosecution of Mr. Wright. After spending 25 years in prison, the Supreme Court of Pennsylvania reversed his conviction, and he was later acquitted at a retrial based on the misconduct of the Philadelphia Homicide detectives. Mr. Wright filed suit in U.S. District Court. The case settled for nearly 10 million dollars.

SUMMARY: COMMONWEALTH v. JAMES DENNIS, CP-51-CR-0104841-1992: On October 22, 1991, a young woman was murdered in the course of a robbery. James Dennis was arrested and prosecuted for that murder. In 1992, he was convicted and sentenced to death. In August 2016, the Third Circuit granted habeas relief, vacated the conviction, and remanded the case back to state court. *Dennis v. Sec'y Pennsylvania Department of Corrections*, 834 F.3d 263, 269 (3d.Cir. 2016).

The allegations of police misconduct in the Dennis case included coerced statements, failure to consider exculpatory evidence, and the failure to maintain an effective police disciplinary mechanism. The Third Circuit's Opinion — which makes numerous findings that are directly relevant to the Monell claims in the Donald Outlaw case —include the following:

1. The failure to consider and investigate evidence that suspects such Derrick Alston other than Mr. Outlaw had committed the crime.
2. The improper suppression of evidence that contained exculpatory evidence such as Shelby Green and Jamal Kelly's statements omitted from the Affidavit of Probable Cause for Arrest Warrant that Donald Outlaw committed the crime.
3. Coerced confessions of Charles Paladino

SUMMARY: COMMONWEALTH v. PERCY ST. GEORGE, CP-51-CR-1012571-1993: Japelle McCray was shot and killed on May 14, 1993. On August 14, 1993, Percy St. George was arrested. There is evidence that Philadelphia homicide detectives coerced false statements implicating Mr. St. George in the murder. On October 7,1994, faced with allegations that Percy St. George had been subjected to misconduct by the police, three Philadelphia Police Department homicide detectives alerted the Court that they would be asserting their Fifth Amendment rights should they be called to testify. The capital murder case against Percy St. George was dismissed.

SUMMARY: COMMONWEALTH v. WALTER OGROD, CP-51-CR-0532781-1992:  Barbara Jean Horn was killed on July 12, 1988. The initial investigation did not yield any criminal charges. A grand jury indictment was unsuccessfully sought against two other suspects. Thereafter, the investigation was transferred to the cold case unit (Detective Peterman's Unit). There is evidence that Homicide detectives coerced false statements, and subjected witnesses to prolonged detention, threats, and improper influences, and other practices that violated accepted police procedures which similarly reflect accounts from Charles Paladino and Derrick Alston.

SUMMARY: COMMONWEALTH V. JACK COMBS, CP-51-CR-0435971-1990:  On April 9, 1990, Philadelphia Police responded to a report of a shooting inside Jacko's Variety Store located at 3212 Ridge Avenue. Police found two men, Roy Sheppard and Christian Bradley, dead on the floor of that store. Each man had been shot in the head. Police transported to the Homicide Division several witnesses who had been inside the store at the time of the shooting.

All of the witnesses initially reported that the shooting was a murder-suicide. Some of the witnesses later changed their stories to claim that Jack Combs shot Sheppard. The witnesses who changed their stories stated:

1) they were either physically or mentally coerced to make the second statements or

42

2)    they never said Combs shot Sheppard and police wrote the statements. Philadelphia Homicide detectives drafted an affidavit of probable cause for the arrest of Jack Combs and failed to disclose that every witness claimed the shooting was a murder-suicide until they were pressured to change their statements. In similar circumstances, Derrick Alston who allegedly informed detective Peterman that he observed Donald with a smoking gun standing by Jamal Kelly as he laid on the ground after being shot's statement was excluded from the Affidavit for Probable Cause to Arrest Warrant.

SUMMARY: EUGENE GILYARD V. CITY OF PHILADELPHIA, ET AL.: The Philadelphia Police Department had no official policies/directives defining or prohibiting the use of low-level force in the interrogation and interviewing of witnesses and suspects prior to Directive 5.23 INTERVIEWS AND INTEROGATIONS—RIGHTS OF INDIVIDUALS AND DUTIES OF LAW ENFORCEMENT, effective date 01-01-14 (Updated 09-04-14).

In *Gilyard v Dusak* no policy existed governing interrogations within the Philadelphia Police Department during 2000-2003 which constitutes the period when the investigation of Donald Outlaw occurred resulting in his wrongful conviction.

i.     The Integrity and Accounting Office (IAO) found in its 1999 report that the majority of force incidents involve low level force resulting in minor or no injury and these incidents need to be tracked, investigated, and analyzed.

ii.    The Philadelphia Police Department had no official policies/directives prohibiting the use of low-level force in the interrogation and interviewing of witnesses and suspects prior to 1999.

-      The use of district level first-line supervisors/sergeants was ineffective in the investigation of use of force investigations. Sergeant Barlow was the SIU supervisor responsible for detectives Peterman and Harkins and Lieutenant Mark Deegan was the overall supervisor during the Jamal Kelly investigation; however, no oversight of the investigational process occurred.

iii.   First-line supervisors/sergeants were ineffective in the control, discovery, and investigation low-level use of force by subordinates in their units. Sergeant Barlow was the SIU supervisor responsible for detectives Peterman and Harkins and Lieutenant Mark Deegan was the overall supervisor during the Jamal Kelly investigation. Based on detective Peterman's Affidavit of Probable Cause for Arrest Warrant which lacked exculpable information its apparent that a lack of oversight existed.

iv.    Videotaping of interrogations, interviews, and confessions was discretionary until 2013.

v.     The plaintiffs' convictions in the instant matter were based on the identification of one or two eyewitnesses each, who now claim the police coerced him or them

43

similar to Charles Paladino's claim, and the other tainted by an improper photo array and a rushed lineup procedure.

No IAD investigation was initiated when the instant lawsuit was filed, contrary to the City Solicitor's 1997 general request that such investigations be initiated. Combs was convicted of murder and sentenced to mandatory life in prison without the possibility of parole.

OPINION: Had the Philadelphia Police Department conducted a comprehensive internal investigation of the above cases, which demonstrate a clear pattern of the Philadelphia Police Departments Homicide Unit's investigatory/operational and management misconduct, the Philadelphia Police Department would have found and could have corrected a pattern of lack of supervision and discipline of officers and the management of the cases which would have included Mr. Outlaw's case.

Based on the evidence reviewed in this case, during the period leading to and including Mr. Outlaw's arrest, there was a widespread practice in the Philadelphia Police Department Homicide Unit and Special Investigation Unit, of improper coercion, and inducements of suspects and witnesses. The Philadelphia Police Department failed to take meaningful remedial or disciplinary measures and failed to implement accepted police practices designed to eliminate the improper conduct of interrogations in the Homicide Unit and Special Investigation Unit. The misconduct persisted. Cases investigated by the Homicide Unit in the early 1990s reflect a pattern of lack of training, discipline, and supervision on this critical issue.

The matter of Eugene Gilyard is a 1995 cold case reopened in 1997 with a 1999 conviction and exoneration in 2014 (non-DNA). Detective Dusak (who was a defendant officer in the Wright case) testified he received two weeks of detective training that did not include specific training in homicide investigations. He was not trained about the use of coercion, intimidation, or low-level force and his sergeant always rated him "satisfactory."

SUMMARY: SHAURN THOMAS V. CITY OF PHILADELPHIA, ET AL: In the Shaurn Thomas case there were similar allegations. There is evidence that the detectives provided false narratives to John and William Stallworth and, further, failed to carefully evaluate all information provided by the Stallworths in light of inconsistencies in their various statements as well as their obvious bias. Further, the detectives failed to take steps to verify their claims, including the failure to confirm Mr. Thomas' alibi, and to consider known forensic evidence such as the lack of blue paint fragments on the Martinez vehicle. Since no internal investigation or review was conducted in this case, or in the cases referenced above, these fundamental investigation issues were not addressed by the detectives' supervisors, internal affairs, or Philadelphia Police Department officials.

It is the responsibility of the Philadelphia Police Department to make efforts to detect and correct such police misconduct. A recognized police administrative mechanism to accomplish that objective is the creation of an effective internal disciplinary system. In addition, it is critical to have an independent body to review police policies and practices and to recommend remedial measures. Ultimately, Philadelphia established the Police Advisory Commission in the immediate wake of the homicide prosecutions and other instances of police misconduct discussed above.

44

The regular evaluation and monitoring of police officer performance is fundamental to organizational and officer integrity. The Philadelphia Police Department did not take reasonable corrective measures or impose meaningful disciplinary or remedial measures. As a result, the Philadelphia Police Department has a long history of officers not being adequately directed, trained, supervised, and disciplined when it comes to matters such as coerced confessions, and similar types of misconduct.

The Philadelphia Police Department's actions and/or inactions reflect a deliberate disregard of the wellbeing of citizens' legal protections. Based on my review of this matter, policies, training, supervision, discipline, organizational feedback, and accountability are root issues and deficiencies in the Philadelphia Police Department. One of the critical violations of accepted police practices in this case is the failure of the detectives to carefully consider and assess the available facts, and in particular witnesses and documents that showed individuals other than Mr. Outlaw were involved in the murder of Jamal Kelly.

Police are required to consider all available evidence, including exculpatory evidence, in determining whether there is probable cause to arrest. The existence or non-existence of probable cause is determined by the "totality of the circumstances." The totality of the circumstances test asks whether the facts and circumstances which are within the knowledge of the officer at the time of the arrest, and of which he has reasonably trustworthy information, are sufficient, such that a reasonable officer would believe the suspect has committed a crime. It violates accepted police practices to ignore or conceal evidence that negates the existence of probable cause. In this case, there is evidence that detectives knew and had access to evidence that exculpated Mr. Outlaw and pointed to other more likely suspects such as Derrick Alston. The detectives failed to conduct a reasonably thorough investigation of the Jamal Kelly murder and disregarded credible evidence that did not support their theory of the case. It is not standard police practice to accept an incentivized witness' claims simply because the police like what the witness says such as the interviews with Charles Paladino. Corroboration by witnesses or physical evidence and further investigation is essential to confirm the incentivized witness' version.

## 11.   **OPINIONS**

My opinions in this case are based upon current information and all opinions are stated to a reasonable degree of certainty/probability as are all statements contained in my report.

**Opinions**

There are 2 categories of constitutional violations that are apparent after review of all the materials in this case. Some conclusions are obviously premised upon the veracity of certain statements. In the above report I provided corroborating evidence to permit the fact finder to make informed decisions regarding the credibility of witnesses.

To the extent that Green, Paladino, Alston, Lee and Rodgers are telling the truth:

1.   Detective Peterman (as well as Boyle, Harkin, McNamee and Piree for conspiring/failing to intervene) acted with deliberate indifference when they deprived Mr. Outlaw of his constitutionally mandated rights of due process in coercing and fabricating the statements of Paladino, Lee, Rodgers and Alston and then lying under oath at the trial. Additionally Detective Peterman and Lt. Deegan acted with deliberate indifference in preparation and submission of the arrest warrant for Donald Outlaw.

2.   PPD and Lt. Deegan acted with deliberate indifference to the highly predictable consequence of violation of citizen's constitution rights by establishing and maintaining a policy/practice/custom which led to Mr. Outlaw's wrongful conviction.   This included training and supervision that permitted material exculpatory evidence to be excluded from arrest warrants as well as failing to properly train/discipline officer to prevent coercion and fabrication of evidence and permitting officers to conduct witness interviews but not let witness know they are free to leave and failing to record such interviews/interrogations.

3.   PPD maintained a custom or practice of coercing witnesses and fabricating evidence as evidence by prior cases but more significantly the allegations of the witnesses in this case (almost every single witness makes these claims).

Even if the statements of Paladino, Alston, Lee and Rodgers are not coerced or fabricated, no reasonable officer would have believed that probable cause existed and certainly all exculpatory information needed to be in the arrest warrant which would not have established probable cause:

1.   Detective Peterman (as well as Boyle, Harkin, McNamee and Piree for conspiring/failing to intervene) lacked probable cause to initiate prosecution against Mr. Outlaw. These detectives recklessly omitted material exculpatory evidence from the arrest warrant, failed to properly investigate other viable suspects, conducted custodial interrogations without informing witnesses of their rights, failed to record statements, failed to reasonably understand that the

46

statements provided lacked credibility and failed to disclose the substance of the September 20, 2004 letter that Paladino wrote to detective Peterman.

2.  PPD and Lt. Deegan acted with deliberate indifference to the highly predictable consequence of violation of citizen's constitution rights by establishing and maintaining a policy/practice/custom which led to Mr. Outlaw's wrongful conviction. This included training and supervision that permitted exculpatory evidence to be excluded from arrest warrants as well as permitting officers to conduct witness interviews but not let witness know they are free to leave and not record interviews/interrogations.

## 12.   **CONCLUSIONS**

1) The Philadelphia Police Department and Detectives Boyle, Peterman, Harkin, McNamee and Lt. Deegan and Jeffrey Piree acted with deliberate indifference and were recklessly deficient in their homicide investigation; 2) The deficiencies of these individuals (primarily detective Howard Peterman but also by implication detectives Boyle, Piree, Harkin and McNamee violated Plaintiff Donald Outlaw's constitutional rights; 3) Detective Peterman submitted an affidavit of probable cause that violated the Fourth amendment of the constitution as it failed to include critical exculpatory information; 4) The Philadelphia Police Department failed to properly train and supervise their officers how to determine probable cause – and in fact provided the wrong definition of probable cause in their training material; 5) The Philadelphia Police Department failed to properly train and supervise officers to include exculpatory information in an affidavit of probable cause; 6) The Philadelphia Police Department failed to eliminate the use of coercive techniques in witness interrogations and failed to instruct witnesses that they were free to leave causing each witness to be subject to a custodial interrogation without providing Miranda warnings and right to counsel; 7) The Philadelphia Police Department had a custom or policy of not disclosing exculpatory evidence in arrest warrants/coercing, failing to record statements and fabricating statements/not permitting witnesses to leave interviews. The Philadelphia Police Department were deliberately indifferent to the fact that violations of the Fourth and Fourteenth amendments would be a highly predictable consequence of their failure to adequately train and supervise and adopt policies that addressed these deficiencies. All of these violations resulted in the arrest and wrongful conviction of Donald Outlaw.

All of the above opinions contained herein are held to a reasonable degree of professional certainty as a police officer and investigator familiar with investigations into the appropriate use force and standard of proof to make an arrest. I certify and verify under penalty of perjury that the foregoing is true and correct. 28 U.S. Code, Sec. 1746.

Executed on September 12, 2022

Dr. Darrin Porcher

# EXHIBIT
# 1

**Dr. Darrin K. Porcher Ed.D.**
3222 Cambridge Ave #2
Bronx NY, 10463
(347)678-2916 (Preferred Contact)
doctorpnyc@gmail.com

## EDUCATION

| | |
|---|---|
| September 2011 | **Doctorate Degree In Education, Fordham University**<br>*Dissertation:* "Reducing school misdemeanor assaults in urban settings through school leader and police collaboration: A comparative case study."<br>***Dissertation Committee:*** Bruce S Cooper Ph.D. (chair), Sheldon Marcus Ed.D, and Edgar Tyson Ph.D. |
| May 2003 | **MPA, Marist College, Poughkeepsie, New York** |
| May 2000 | **BS, Organizational Management, St. Joseph's College, Brooklyn, New York** |

## PROFESSIONAL POSITIONS

| | |
|---|---|
| 1/15/22-Present | **Commissioner** New York City Districting Commission |
| 9/2013-Present | **Adjunct Professor**, Pace University, School of Criminal Justice |
| 9/2012-12/2013 | **Adjunct Professor**, Fairleigh Dickinson University, School of Criminal Justice |
| 9/2004 -- Present | **Adjunct Professor,** Monroe College, School of Criminal Justice |
| 4/1991-4/2011 | **Police Officer, Detective, Sergeant, Lieutenant,** New York City Police Department |
| 3/1986 – 3/1990 | **Enlisted Airman/Non Commissioned Officer,** United States Air force |
| 3/1990-3/2003 | **Non Commissioned Officer**, United States Air Force Reserve |
| 3/2003-10/2007 | **Commissioned Officer**, Executive Officer 1st FST United States Army Reserve |

## POLICE CAREER

| | |
|---|---|
| 2007-2011 | New York City Police Department: Lieutenant Assigned to the Community Affairs Bureau as a Supervisor of Police and Community Relations and Integrity Control Officer |

50

| 2004-2007 | New York City Police Department: Lieutenant Assigned to the Internal Affairs Bureau as an Investigative Supervisor |
| 2003-2004 | New York City Police Department: Lieutenant assigned to the NYC Department of Personnel for the purposes of constructing a Promotional Examination for the rank of Lieutenant (open to NYPD Sergeants) |
| 2002-2003 | New York City Police Department: Lieutenant assigned to Transit District 3 (Harlem) as the Platoon Commander and Counterterrorism Coordinator |
| 1998-2002 | New York City Police Department: Sergeant Assigned to the Police Academy as an Instructor |
| 1995-1998 | New York City Police Department: Detective Assigned to the Internal Affairs Bureau |
| 1994-1995 | New York City Police Department: Police Officer Assigned to the Civilian Complaint Review Board |
| 1991-1994 | New York City Police Department: Uniformed Police Officer assigned to Police Service Area 7 (South Bronx) |

## ACADEMIC CAREER

| 9/2012 | Adjunct Professor, Fairleigh Dickinson University, Teaneck New Jersey: Teaching experience includes onsite instruction for graduate and undergraduate students |
| 9/2004 -Present | Adjunct Professor, Monroe College, Bronx New York: Teaching experience (includes online and onsite forum) |
| 6/2006-12/2008 | SW BOCES: Homeland Security, Police & Emergency Management Curriculum author and editor |

## COLLEGE TEACHING EXPERIENCE

**Fall 2021** *(Pace University)*
CJ-250 Community Relations in Criminal Justice Systems

**Spring 2021** *(Pace University)*
CJ-242 Crime and Public Policy
CJ-414 Integrity Issues in the Criminal Justice System

**Fall 2020** *(Pace University)*
CJ-242 Crime and Public Policy
CJ-250 Community Relations in Criminal Justice Systems

**Spring 2020** *(Pace University)*
CJ-242 Crime and Public Policy
CJ-414 Integrity Issues in the Criminal Justice System

**Fall 2019** *(Pace University)*
CJ-242 Crime and Public Policy

**Spring 2019** *(Pace University)*
CJ-242 Crime and Public Policy
CJ-414 Integrity Issues in the Criminal Justice System
CJ-404 Emergency Management

**Fall 2018** *(Pace University)*
CJ-242 Crime and Public Policy

**Spring 2018** *(Pace University)*
CJ-242 Crime and Public Policy
CJ-414 Integrity Issues in the Criminal Justice System

**Fall 2017** *(Monroe College)*
CJ-212 Ethical Issues in Criminal Justice

**Fall 2017** *(Pace University)*
CJ-242 Crime and Public Policy

**Summer 2017 (***Monroe College***)**
CJ-210 Criminal Investigations
CJ- 212 Ethical Issues in Criminal Justice

**Winter 2017 (***Pace University***)**
CJ-414 Integrity Issues in the Criminal Justice System
CJ-242 Crime and Public Policy

**Winter 2017 (***Monroe College***)**
CJ-212 Ethical Issues in Criminal Justice
CJ-210 Criminal Investigations

**Fall 2016 (***Monroe College***)**
CJ-210 Criminal Investigation

**Fall 2016 (***Pace University***)**
CJ-242 Crime and Public Police

**Summer 2016 (*Monroe College*)**
CJ-212 Ethical Issues in Criminal Justice

**Winter 2016 *(Pace University)***
CJ-242 Crime and Public Policy
CJ-414 Integrity Issues in The Criminal Justice System

**Winter 2016 *(Monroe College)***
CJ-212 Ethical Issues in Criminal Justice
CJ-210 Criminal Investigations

**Fall 2015 *(Monroe College)***
CJ-212 Ethical Issues in Criminal Justice
CJ 210 Criminal Investigations

**Fall 2015 *(Pace University)***
CJ-242 Crime and Public Policy
CJ-242 Crime and Public Policy

**Summer 2015 (*Monroe College*)**
CJ-212 Ethical Issues in Criminal Justice
CJ-212 Ethical Issues in Criminal Justice

**Winter 2015 (*Pace University*)**
CJ-242 Crime and Public Policy
CJ-414 Integrity Issues in The Criminal Justice System

**Winter 2015 (*Monroe College*)**
CJ-210 Criminal Investigations
CJ-212 Ethical Issues in Criminal Justice

**Fall 2014 (*Pace University*)**
CJ-242 Crime and Public Policy
CJ-242 Crime and Public Policy

**Fall 2014 (*Monroe College*)**
CJ-212 Ethical Issues in Criminal Justice
CJ-210 Criminal Investigations

**Spring 2014 (*Pace University*)**
CJ-242 Crime and Public Policy
CJ-305 Criminal Law
CJ-414 Integrity Issues In The Criminal Justice System

**Fall 2013 *(Fairleigh Dickinson University)***
CRIM-7070 Contemporary Issues in Crime and Justice *(Graduate Course)*

53

**Fall 2013** *(Pace University)*
CJ-242 Crime and Public Policy

**Fall 2013 (Monroe College)**
CJ-212 Ethical Issues in Criminal Justice
CJ-210 Criminal Investigations
CJ-103 Intro to Political Science

**Spring 2013 (*Fairleigh Dickinson University*)**
CRIM-7020 Ethics, Politics & Justice (**Graduate Course**)

**Spring 2013**
LA-240 Criminology
LA-103 Political Science

**Fall 2012** *(Fairleigh Dickinson University)*
CRIM-3313 Analysis of Serial Killers
CRIM-7090 Professional Development Seminar (**Graduate Course**)

**Fall 2012**
*LA-240* Criminology
*CJ-202* Prisons: Punishment and Rehabilitation In America
*CJ-211* Police and Community

**Summer 2012**
*CJ-211* Police and Community
*LA-103* Political Science

**Spring 2012**
CJ-212 Ethical Issues in Criminal Justice
CJ-211 Police and Community
CJ-301 Homeland Security

**Fall 2011**
CJ-212 Ethical Issues in Criminal Justice
CJ-211 Police and Community
LA-103 Introduction to Political Science
CJ-301 Homeland Security Online

**Summer 2011**
CJ-211 Police and Community
CJ-210 Criminal Investigations Online
CJ-211 Police and Community Online
CJ-301 Homeland Security Online

**Spring 2011**
CJ-211 Police and Community
CJ-210 Criminal Investigations Online
CJ-211 Police and Community Online
CJ 301 Homeland Security Online

**Fall 2010**
CJ-211 Police and Community
CJ-210 Criminal Investigations Online
CJ-2111 Police and Community Online

**Summer 2010**
CJ-211 Police and Community Online
CJ-210 Criminal Investigations Online

**Spring 2010**
CJ-211 Police and Community Online
CJ-210 Criminal Investigations Online

**Fall 2009**
CJ-211 Police and Community Online
CJ-210 Criminal Investigations Online

**Summer 2009**
CJ-211 Police and Community Online
CJ-210 Criminal Investigations Online

**Spring 2009**
CJ-210 Criminal Investigations Online
CJ-301 Homeland Security Online

**Fall 2008**
CJ-210 Criminal Investigations Online
CJ-301 Homeland Security Online

**Spring 2008**
CJ-210 Criminal Investigations Online
CJ-301 Homeland Security Online

**Fall 2007**
LA-241 Juvenile Delinquency
CJ-311 Organized Crime and Gangs
LA-240 Criminology

**Spring 2007**
LA-241 Juvenile Delinquency

55

CJ-305 Drugs in America
CJ-326 Sex Crimes

**Fall 2006**
CJ-205 Criminal Procedure and Process
CJ-200 Criminal Law
CJ-305 Drugs in America

**Summer 2006**
CJ-205 Criminal Procedure and Process
CJ-200 Criminal Law
CJ-320 Diversity in the Criminal Justice System

**Spring 2006**
LA-241 Juvenile Delinquency
CJ-311 Organized Crime and Gangs

**Fall 2005**
CJ-240 Correctional Administration & the Law
CJ-205 Criminal Procedure and Process

**Summer 2005**
CJ-240 Correctional Administration & the Law
CJ-101 Introduction to Criminal Justice

**Spring 2005**
CJ-311 Organized Crime and Gangs
CJ-305 Drugs in America

**Fall 2004**
CJ-205 Criminal Procedure and Process

## POLICE TEACHING EXPERIENCE

12/1998-1/2002 - New York City Police Academy – Homeland Security, NYS Penal law and Police Science

## LEADERSHIP EXPERIENCE

12/1998- Sergeant, New York City Police Department- As a sergeant in the New York City Police Department I performed a multitude of supervisory tasks. Upon my initial promotion to the rank of sergeant, I was responsible for the supervision of 10 police officers who were required to perform uniformed patrol functions. I applied to and was accepted as an instructor for the New York City Police Academy. In my position as a sergeant within the Police Academy, I provided instruction in the discipline of the New York State Penal Law for over 2000 recruits during a three year period.

56

During the terrorist attacks on Manhattan in 2001, I was responsible for the supervision and rescue and recovery of victims in the World Trade Center complex.

In January of 2003, I was promoted to the rank of police Lieutenant and reassigned to Harlem. While in Harlem, I was responsible for 70 subordinates who were under my supervision. I was designated as the counterterrorism expert based on my military background and training.

In 2004, I was assigned to the Internal Affairs Bureau, while in the Internal Affairs Bureau; I constructed various corruption prevention strategies and conducted integrity testing for Police Officers. In addition, I supervised police investigations involving police corruption.

In 2007, I was assigned to the Community Affairs Bureau. In Community Affairs, I was responsible for the integrity and control of all Police Officers assigned to the Community Affairs Bureau within the City of New York. Attended Community Council meetings and interactive meetings with a variety of NYC communities designed to strengthen police and community relations.

**BUISNESS EXPERIENCE**

Founding Partner Innovative Public Safety & Media LLC

Innovative Public Safety & Media LLC (IPSM) exists to assist agency heads and other policymakers in organizational, structural, and human capital decision-making based on extent research and decades of experience in public safety practice. IPSM is a benchmark organization focused on the complex challenges facing today's public safety practitioners. IPSM is committed to sober, objective research and to an approach to problem-solving that is informed by academic rigor and analysis. Our work is interdisciplinary and **broad** in scope. Our project teams are deliberately diverse to ensure multiple perspectives are applied to problem-solving. Our work product is free of commercial, partisan, and ideological bias. Innovative Public Safety & Media is committed to the public good. Personal Protection for the following celebrities:
Mariah Carey
Nas (Nasir Jones)
DMX (Earl Simmons)
Interscope Records (CEO)

**EXPERT WITNESS**

As a Sergeant in the NYPD Police Academy I trained thousands of Police Officers on procedural guidelines, use of force, court testimony, and law. As a Lieutenant in the NYPD Internal Affairs Bureau, I disciplined numerous Police Officers, Sergeants, Detectives on procedural infractions coupled with testimony in the NYPD trial room on behalf of the New York City Police Department. Numerous appearances as an expert in high profile trials and depositions.

<u>Trial</u>

1.   ROBERT THOMAS and CHRISTINE TENNANT v CITY OF MCKEESPORT POLICE DEPARTMENT and CITY OF MCKEESPORT, et al., Case #GD-18-002896; Represented Plaintiff - Police pursuit case

2.   NEW YORK v HARRIS, Bronx County Supreme Court, Case #1672/2018; Represented Defendant - Gun possession case

<u>Deposition</u>

1.   PERSON v OKLAHOMA, United States District Court for the Western District of Oklahoma, Case #2015-574-W; Represented Plaintiff - Police Pursuit, Police Use of Force

2.   ZACARIAS v TOWN OF CICERO POLICE DEPARTMENT, Circuit Court of Cook County, Illinois, Case #2015L013076; Represented Plaintiff - Police Emergency Response and Accident

3.   ESTATE OF CODY HEALEY, deceased v DAVID MORGAN, in his official capacity as SHERIFF, ESCAMBIA COUNTY, FLORIDA, Case #16-CA-002013; Represented the Plaintiff - Police use of deadly force, Death in Custody

4.   ALLEN v CITY OF JOLIET, Case #18-cv-04047; Represented Plaintiff - EEOC Case

5.   VALERIE JADDO, as the Administrator of the Estate of STEVEN BARRIER Jr., deceased, on behalf of the Estate and next of kin, and the CONNECTICUT LEGAL RIGHTS PROJECT., INC., on behalf of the population it services v SERGEANT MICHAEL CONNELLY, OFFICER RHETT CONNELLY, OFFICER TROY C. JUDGE, LIEUTENANT DOUGLAS R. DIESO, STAMFORD POLICE DEPARTMENT, and THE TOWN AND CITY OF STAMFORD, CONNECTICUT, Case NO. 3:21 CV 00350 (MPS); Represented Plaintiff

6.   COOKS v LAKELAND POLICE DEPARTMENT, Case #9-19-cv-3051-T-TPB-SPF; Represented Plaintiff - Excessive Force, Police Firearms Discharge

**CURRICULUM EXPERIENCE**

1999-2002 Police Academy - Produced curriculum for probationary police officers on homeland security and taught police procedural guidelines to newly hired recruits

From 2006-2008, I was hired by BOCES Southern Westchester to develop a curriculum in Homeland Security and emergency management for high school students. This consisted of collecting literature and practical items and compiling them for instruction to students in a police, EMS and fire safety. The data collection alone took 18 months and the creation of the written

58

curriculum took 6 months.   Subsequently, the course was completed and certified by the State of New York.

## MILITARY EXPERIENCE

United States Army Commissioned Officer, I managed budget and acquired logistics and provided leadership to enlisted soldiers in the capacity of the Executive Officer. From 2003-2007, I was the executive officer of the 1st FST Army unit assigned to Fort Totten Queens, NY.   In my capacity as the executive officer, I was the second in command answering directly to the commanding officer.  I was responsible for monitoring the promotion board, physical training assessment, weight management and Officer Performance Reports. As a commissioned officer in the Army during a time of war I was tasked with ensuring that the unit was prepared in various aspects of counterterrorism.  I constructed a series of homeland security professional development seminars for enlisted soldiers and my fellow officers to ensure unit compliance.  I was also responsible for maintaining discipline within the unit and ensuring that all supply levels were adequate for wartime deployment.

## EXAMINATION DEVELOPMENT

In May of 2002, I was assigned to the New York City Department of Personnel as the author of the 2003 New York City Police Department promotional exam for the rank of Lieutenant. In my role as the author of the Lieutenants exam, I conducted a critical assessment of the job description of a police sergeant.   This assessment was transferred into a knowledge based examination which required 5,560 sergeants to utilize critical thinking and literature linked to the job description of a New York City Police Lieutenant.

## STRENGTHS

Expert in implementing counterterrorism strategies and conducting homeland security needs assessment evaluations based on prior military training

Capable of creating and implementing public policy and managing a municipal budget based on MPA and current Doctoral Studies program

Expert in identifying violence in public high schools based on dissertation research

Able to manage community and police relations based on years of experience within the Community Affairs Bureau of the New York City Police Department

Public Speaking ability based on experience within the Community Affairs Bureau and as an Adjunct Professor, Monroe College.

NYPD Internal Investigator and Supervisor based on experience within the Internal Affairs Bureau

59

Expert in 21st Century Policing and deployment of police personnel. Able to assist communities and law enforcement agencies to strengthen trust while maintaining a semiotic relationship and simultaneously reducing crime

Police Procedural and use of force expert with national trial experience and numerous court deposition appearances as a subject matter expert

## AWARDS

| 2008-2011 | **NYPD Perfect Attendance Award,** New York City Police Department |
| 2006 | **Iraq Enduring Freedom Award,** United States Army |
| 2000 | **Unit Citation Award,** New York City Police Department |
| 1994 | **Excellent Police Duty**, New York City Police Department |
| 1993 | **Excellent Police Duty,** New York City Police Department |
| 1992 | **Excellent Police Duty**, New York City Police Department |
| 1991 | **Iraq Desert Shield Desert Storm Award,** United States Army |
| 1990 | **Meritorious Service Award,** United States Army |

## PANELS

2015 Presenter- New York State Bar Association Annual Forum on Race Justice and Police Reform

2016 HOT 97FM Push For Peace Panel to Reduce Gun Violence in New York City

## MEDIA COMMENTATOR

I continuously participate as a media commentator for a multitude of television and radio entities within the New York City metropolitan area on terminal issues of Criminal Justice. I currently and regularly make appearances with the following entities as a Criminal Justice and police tactics and procedural expert:

> New York 1 Television News (Inside City Hall)
> Fox 5 News
> Pix 11 Morning News
> Hot 97 FM Radio
> BBC Television
> United Nations Associated Press (Russia, Turkey)
> Al Jazeera America

Riverdale Press Newspaper
HLN
CNN, Anderson Cooper 360,
CNN, Erin Burnett Out Front
CNN, Cuomo Primetime
NBC Nightly News with Lester Holt
Newsmax
PBS
ABC News
Bronx Net
FOX and Friends
FOX News
FOX Business
MSNBC
Wendy Williams Show

## PUBLISHING

*Journal Article: Race and Social Problems*, February 15, 2012
Racial Group Comparisons of Conceptualizations of Rap Music Constructs: A Cross-Racial Validity Study of the Rap Music Attitude and Perception Scale

**DISSERTATION ABSTRACT**

REDUCING SCHOOL MISDEMEANOR ASSAULTS IN URBAN SETTINGS THROUGH

SCHOOL COLLABORATION BETWEEN SCHOOL

LEADERS AND POLICE: A COMPARATIVE

CASE STUDY

Darrin K. Porcher, EdD

Fordham University, New York, 2011

The purpose of this study was to identify how urban high schools can improve safety and reduce the number of misdemeanor assaults among students. The focus of the study was to determine if the leadership within three urban public high schools reduced misdemeanor assaults in their respective facilities through a collaboration with police. A review of school records revealed that all three large, urban high schools in the study initially had a high number of misdemeanor assaults, followed by a substantial reduction in assaults within a 3-year period. All three high schools had newly appointed principals at the beginning of the reduction period.

The principal in Public High School 1 employed a management strategy focused on collaboration with the police. The principal held regular strategy meetings with his staff, producing staff behaviors consisting of a closer administrative presence during arrivals, dismissals, and changes in periods. The strategies employed in Public High School 1 resulted in an 84% reduction in misdemeanor assaults over a 3-year period.

The principal in Public High School 2 also used a management strategy focused on collaboration with the police, and the principal relied on the knowledge base of his newly assigned dean of discipline, who had an extensive background in safety. Staff members became highly visible in the school hallways and corridors during student arrivals, dismissals, and changes in periods, resulting in greater supervision and contributing to a reduction of 42% in misdemeanor assaults over a 3-year period.

The principal of Public High School 3 and a safety advisor appointed by the school board focused on a strategy of mediation and faculty oversight coupled with collaboration with police. The strategy resulted in a 46% reduction in misdemeanor assaults over a 3-year period.